UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| - v. - | : | VERIFIED COMPLAINT FOR FORFEITURE |
| THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, | : | 23 Civ. ____ |
| Defendant-*In-Rem*. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorneys, Damian Williams, United States Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the Counterintelligence and Export Control Section, for its verified civil Complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

1. This action is brought pursuant to Title 18, United States Code, Sections 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the following Defendant-*in-rem*:

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.     The Defendant In Rem is currently located in San Diego, California, after it was previously seized in Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. <u>NATURE OF THE ACTION</u>

5.     This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.     On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, monetary transactions involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if such transactions are conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges. Economic sanctions are an essential means for the United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions,

entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.     In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent hundreds of thousands of dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. Such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

### A.  Statutory Basis for Forfeiture

8.     The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

9.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

10.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

11.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

**B.  Relevant Persons and Entities**

12.     At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

13.     At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as between $300 million and $500 million.

14.     At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation,

4

OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

15.     At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

### III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or

abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O. 13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O. 13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian

Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (79 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[1] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in

---

[1] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include "money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements, services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

a.      To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b.      To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

c.      To be an official of the Government of the Russian Federation;

d.      To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

e.      To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660;

or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. OFAC's licensing authority is located in Washington, D.C.

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. FACTUAL ALLEGATIONS

### A.  Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

**B. KERIMOV's Ownership of the *Amadea***

Overview of KERIMOV's Ownership of the *Amadea*

27.     As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. Between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

<u>The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's
Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV</u>

28.     In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"),[2] traveled to the United Arab Emirates in or about June 2020 in order for KERIMOV to view the *Amadea*.

29.     Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

30.     In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea* for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

31.     On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

32.     In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier,

---

[2] Dinar's status as KERIMOV's representative is evidenced by numerous emails and text messages from Dinar to third-parties, or between third-parties discussing Dinar, in which Dinar held himself out as KERIMOV's representative, or third-parties referred to him as such.

committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, on information and belief, KOCHMAN did not have the means to purchase a luxury superyacht at that price and was instead putting himself forward as a straw owner on behalf of KERIMOV.

33.     Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. Unlike traditional sales agreements, and unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those granted to a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA, although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

34.     The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

35.     Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ 33.

36.     Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. On information and belief, by structuring the transaction in this manner, KERIMOV was able to acquire ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have necessarily notified Cayman Islands government officials[3] and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

37.     In connection with the *Amadea*'s October 2021 voyage, a guest manifest was prepared. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's representative, *see infra* ¶¶ 38, 39.e., 39.g. The third individual listed on the guest manifest was KOCHMAN.

38.     Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on

---

[3] In March 2022, the *Amadea* was registered in the Cayman Islands.

the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent communications.

39.     Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

        a.     In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

        b.     According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened for the purpose of a "New Owner Lunch with Captain[4] & ETO,[5]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

        c.     In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new

---

[4] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.
[5] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

      d.    In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ 37-38, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." On information and belief, this trip— which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

      e.    In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

      f.    In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow." On information and belief, crew uniform changes are matters that would typically be requested by a new owner of a vessel.

      g.    Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a

satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

       h.     In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." On information and belief, the reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

       40.     KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. On information and belief, the structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

       a.     In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[6] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

---

[6] On information and belief, "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

b.      In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.      In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ 37-38, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

d.      In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." Subsequent notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

41.      Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial

owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

      a.     The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

      b.     The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets; (4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin;

(7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

      c.    As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht</u>

    42.    Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with the requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

      a.    On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano." In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message

between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

        b.      In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?" On information and belief, the Captain would not have authorized structural changes to the *Amadea* unless they were requested by the owner's authorized representative or family member.

        c.      In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[7] that had taken place earlier that day, regarding setting the *Amadea*'s travel

---

[7] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications: KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications

agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[8] always wanted music)," referencing the addition of another requested structural change to the *Amadea*.

        d.      In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

        e.      In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[9]/Captain Meeting," in

---

with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[8] Given the foregoing, *see supra* n.7, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

[9] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.7.

which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel at the time, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023. On information and belief, the Captain of a vessel would not have scheduled multi-year itineraries for a temporary guest, but would have done so for the family member of the vessel's beneficial owner.

43.     Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

44.     During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining the *Amadea*.

45.     After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV, would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 33. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and

registration fees. Such costs are essential to maintain a superyacht as a functional vessel. By that measure, on information and belief, the USD payments for fuel, fees, provisions, and maintenance preserved or enhanced the *Amadea*'s overall value.

46.     From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*, which were essential to maintaining and/or increasing the value of the vessel. For example:

a.     Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea*. On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

b.     On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 in fuel costs for the benefit of the *Amadea*. On information and belief, superyachts like the *Amadea* require fuel to maintain the operation of essential equipment aboard the vessel both while the *Amadea* is at anchor and while it is sailing. The lapse in such operations

may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

c.      Between on or about December 26, 2021 and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. On information and belief, such services are fundamental to maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, wire payments totaling approximately $30,301.65 were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

d.      Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. On information and belief, such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

e.      Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 were sent from the IY Jersey account to Company-5, a

fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. *See supra* ¶ 46.b. The wire instructions associated with the payments all refer to the *Amadea*.

f.     In or about March 2022, Millemarin received an invoice billing approximately $55,720 in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

g.     On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

h.     Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 in equipment and freight charges for the benefit of the *Amadea*. The invoices also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

i.     In or about February 2022, an *Amadea* crew member paid approximately $518.99 to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

j.     On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 in fuel costs for the benefit of the *Amadea*.

k.    Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. On information and belief, these four wires sent to Company-11 reflect payment of the invoiced amount, and funds in excess of the $54,500.07 billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

l.    Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

47.    KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since in or about September 2021. Upon information and belief, KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, and that U.S. law prohibited transacting with, on behalf of, or for the benefit of, KERIMOV, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; (2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

48.     IMPERIAL YACHTS employees were also aware that persons controlling, operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to IMPERIAL YACHTS for payment, came from U.S.-based companies, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

49.     Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

## FIRST CLAIM FOR FORFEITURE

50.     The United States incorporates by reference ¶¶ 1 through 49 above as if fully set forth herein.

51.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

52.     As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

53.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

54.     The United States incorporates by reference ¶¶ 1 through 49 above as if fully set

forth herein.

55.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in

a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable

to such property," is subject to forfeiture to the United States.

56.     Section 1956(a)(2) imposes criminal penalties on any person who:

Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a
monetary instrument or funds from a place in the United States to or through a place
outside the United States or to a place in the United States from or through a place
outside the United States—

. . .

    (A) with the intent to promote the carrying on of specified unlawful activity;

57.     For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C.

§ 1956(c)(7) to include violations of IEEPA sanctions.

58.     As set forth above, the Defendant In Rem was involved in, or is traceable to, the

transportation, transmission, or transfer of funds to a place in the United States from or through a

place outside the United States, with the intent to promote the carrying on of specified unlawful

activity.

59.     Therefore, the Defendant In Rem is subject to forfeiture to the United States

pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C.

§ 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

60.     The United States incorporates by reference ¶¶ 1 through 49 above as if fully set

forth herein.

61.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

62.     Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

63.     For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

64.     As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions. More specifically, funds used to purchase or maintain the *Amadea* became criminally-derived property as soon as they transited inbound to a U.S. correspondent bank account in violation of IEEPA sanctions. Thus, when such funds then transited outbound from a U.S. correspondent bank account to their final destination, the outbound monetary transaction was in violation of § 1957.

65.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957.

## FOURTH CLAIM FOR FORFEITURE

66.     The United States incorporates by reference ¶¶ 1 through 49 above as if fully set forth herein.

67. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

68. Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

69. As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

70. Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff, the United States of America prays:

(1) That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2) That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
         October 23, 2023


FOR THE U.S. DEPARTMENT OF JUSTICE:


MARGARET A. MOESER                      DAMIAN WILLIAMS
Acting Chief                            United States Attorney for the
Money Laundering and Asset Recovery     Southern District of New York
Section, Criminal Division              U.S. Department of Justice
U.S. Department of Justice


By:   /s/ *Joshua L. Sohn*              By:   /s/ *Sarah Mortazavi*
    JOSHUA L. SOHN                          SARAH MORTAZAVI
    Trial Attorney                          Assistant United States Attorney
    Money Laundering and Asset             Southern District of New York
    Recovery Section


JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


By:   /s/ *Andrew D. Beaty*
    ANDREW D. BEATY
    Trial Attorney
    Counterintelligence and Export
    Control Section (CES)

## **VERIFICATION**

STATE OF NEW YORK                           )
COUNTY OF NEW YORK                       :
SOUTHERN DISTRICT OF NEW YORK   )

           TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.                                          .

                                                       Timothy J. Bergen
                                                       Special Agent
                                                       Federal Bureau of Investigation

Executed on this 21st day of October, 2023

# EXHIBIT A





