# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-09304 |
| THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, | The Honorable Dale E. Ho **ORAL ARGUMENT REQUESTED** |
| Defendant-*In-Rem*, | |
| and | |
| EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD., | |
| Claimants. | |

## CLAIMANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

PRELIMINARY STATEMENT .......................................................................................... 1

STATUTORY AND FACTUAL BACKGROUND ............................................................. 5

ARGUMENT ......................................................................................................................... 8

I.  The government fails to allege sufficient facts that a sanctioned individual owns the *Amadea,* or that payments were made on his behalf. ............................................................ 8

    A.  The Complaint's allegations that Kerimov bought the *Amadea* is a bald conclusion that is impermissibly made upon "Information and Belief." ........................................ 9

    B.  The Complaint is devoid of facts linking any payment to Kerimov or his agents. ................. 10

II.  The first claim fails because the *Amadea* neither "constitutes" nor is derived from "proceeds traceable to" IEEPA violations, and the Complaint fails to allege that anyone acted "willfully." ............................................................................................... 10

    A.  The *Amadea* cannot be forfeited because it does not constitute "proceeds" of an IEEPA violation. ............................................................................................... 11

    B.  The *Amadea* is not "derived from proceeds traceable to" an IEEPA violation. ........................ 13

    C.  The government fails to allege that anyone acted "willfully," a predicate allegation for forfeiture premised on an IEEPA violation. ............................................................. 15

III.  The Second Claim fails because the government has not alleged facts to state a claim for money laundering under 18 U.S.C. § 1956(a)(2)(A), the *Amadea* was neither "involved in" nor "traceable to" any such alleged violation and fails to allege facts that anyone acted willfully and with the requisite intent for this claim. ............ 19

    A.  Under the government's theory, the *Amadea* is not property "involved in" money laundering, nor is it "traceable to" any such property. ............................................. 19

    B.  The Complaint fails to allege that anyone acted with the specific intent to promote the carrying on of IEEPA violations, which is Required under 18 U.S.C. § 1956(a)(2)(A). .......... 22

IV.  The third claim fails because the government has not alleged facts to state a claim for money laundering under 18 U.S.C. § 1957, the *Amadea* was neither "involved in" nor "traceable to" money laundering, and the allegations are insufficient to show that anyone acted willfully or knowingly. .......................................................... 25

A.   The government fails to allege that the funds used to make vendor payments constitute "criminally derived property.".................................................................................25

B.   The government fails to allege that anyone "knowingly" engaged in a transaction in "criminally derived property.".................................................................................27

C.   The complaint fails to allege the *Amadea* was "involved in" or "traceable to" money laundering. ..................................................................................................................29

V.   The Fourth Claim predicated on alleged conspiracy to commit money laundering under 18 U.S.C. §§ 1956 & 1957 fails to state a claim upon which relief can be granted, and fails to allege the requisite *mens rea*. .............................................................29

CONCLUSION...............................................................................................................30

CERTIFICATE OF SERVICE .......................................................................................32

# TABLE OF AUTHORITIES

**Cases:**

*Aronov v. Mersini*,
   No. 14-CV-7998, 2015 WL 1780164 (S.D.N.Y. Apr. 20, 2015) ...............................................9

*Automated Transaction LLC v. New York Cmty. Bank*,
   No. 12-CV-3070, 2013 WL 992423 (E.D.N.Y. Mar. 13, 2013) ...............................................17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................................8

*Citizens United v. Schneiderman*,
   882 F.3d 374 (2d Cir. 2018) ...................................................................................................9

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
   690 F. Supp. 256 (S.D.N.Y. 1988) ......................................................................................17

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
   869 F.2d 175 (2d Cir. 1989) ................................................................................................17

*In re 650 Fifth Ave. & Related Properties*,
   777 F. Supp. 2d 529 (S.D.N.Y. 2011) .......................................................................... 11-14, 19

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ...................................................................................................17

*Plusgrade L.P. v. Endava Inc.*,
   No. 1:21-CV-1530 (MKV), 2023 WL 2402879 (S.D.N.Y. Mar. 8, 2023) ...............................17

*Rolon v. Henneman*,
   517 F.3d 140 (2d Cir. 2008) .............................................................................................8, 23

*S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*,
   296 F.R.D. 241 (S.D.N.Y. 2013) ...........................................................................................9

*Segal v. Gordon*,
   467 F.2d 602 (2d Cir. 1972) ...................................................................................................9

*U.S. v. $1,399,313.74 in U.S. Currency*,
   591 F. Supp. 2d 365 (S.D.N.Y. 2008) ................................................................ 8-10, 26, 29

*U.S. v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Express Bank*,
   832 F. Supp. 542 (E.D.N.Y. 1993) .......................................................................................14

*U.S. v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy and Others,*
  No. 03–CV–8004, 2008 WL 4129814 (S.D.N.Y. Sept. 5, 2008) .............................................19

*U.S. v. Bornfield,*
  145 F.3d 1123 (10th Cir. 1998) ........................................................................................20

*U.S. v. Contents of Acct. Numbers 208-06070 & 208-06068-1-2,*
  847 F. Supp. 329 (S.D.N.Y. 1994) ...................................................................................20

*U.S. v. Daccarett,*
  6 F.3d 37 (2d Cir. 1993)....................................................................................................8

*U.S. v. Evergreen Int'l,*
  206 F. App'x 71 (2d Cir. 2006) ........................................................................................30

*U.S. v. Herndon,*
  122 F. Supp. 3d 487 (S.D. W. Va. 2015)...........................................................................27

*U.S. v. Howard,*
  245 F. Supp. 2d 24 (D.D.C. 2003) ...................................................................................26

*U.S. v. Johnson,*
  971 F.2d 562 (10th Cir. 1992) ........................................................................................26

*U.S. v. Kalish,*
  No. 06 Cr. 656, 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009)...................................................12

*U.S. v. Mahaffy,*
  693 F.3d 113 (2d Cir. 2012)..............................................................................................12

*U.S. v. Ness,*
  565 F.3d 73 (2d Cir. 2009)...............................................................................................27

*U.S. v. Nicolo,*
  597 F. Supp. 2d 342 (W.D.N.Y. 2009) .........................................................................20, 21

*U.S. v. One White Crystal Covered Bad Tour Glove & Other Michael Jackson Memorabilia,*
  No. CV 11-3582, 2012 WL 8455336 (C.D. Cal. Apr. 12, 2012)................................................18

*U.S. v. Pierce,*
  224 F.3d 158 (2d Cir. 2000)..............................................................................................23

*U.S. v. Piervinanzi,*
  23 F.3d 670 (2d Cir. 1994)...............................................................................................26

*U.S. v. Santos*,
   553 U.S. 507 (2008) .................................................................................................24

*U.S. v. Thorn*,
   317 F.3d 107 (2d Cir. 2003) ..................................................................................23

*United States v. Huber*,
   404 F.3d 1047 (8th Cir. 2005) ..............................................................................20

*United States v. One Gulfstream G-V Jet Aircraft*,
   941 F. Supp. 2d 1 (D.D.C. 2013) .........................................................................10

*United States v. Schlesinger*,
   261 F. App'x 355 (2d Cir. 2008) ..........................................................................20

*United States v. Schlesinger*,
   396 F. Supp. 2d 267 (E.D.N.Y. 2005) .................................................................20

**Statutes and Rules:**

18 U.S.C. §1956(a)(2)(A) .................................................................................4, 19, 22, 24

18 U.S.C. § 1956(c)(7) .................................................................................................4

18 U.S.C. § 1956(c)(9) ...............................................................................................25

18 U.S.C. § 1957 ........................................................................................................25

18 U.S.C. § 1957(f)(2) ...............................................................................................25

18 U.S.C. § 981(a)(1)(A) ......................................................................................19, 29

18 U.S.C. § 981(a)(1)(C) ..................................................................................4, 10, 12

18 U.S.C. § 981(a)(2)(A)-(B) ....................................................................................11

18 U.S.C. § 983(c)(3) ................................................................................................21

50 U.S.C. § 1705(a) .....................................................................................................5

50 U.S.C. § 1705(c) ................................................................................................5, 15

**Other Authorities:**

146 Cong. Rec. S1753–02 (daily ed. March 27, 2000)...................................................................8

12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3242 (3d ed. 2023) .....................................................................................................................8

S. Rep. 99-433.............................................................................................................................24

*Treasury Designates Russian Oligarchs, Offs., & Entities in Response to Worldwide Malign Activity*, Treas. SM-0338 (Apr. 6, 2018) ....................................................................................28

Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd. (collectively, "Claimants") respectfully submit this memorandum of law in support of their motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions E and G.

## PRELIMINARY STATEMENT

The government's attempt to forfeit the *Amadea* stretches the bounds of forfeiture, sanctions, and money laundering laws far beyond their reach, based on flawed legal theories that are divorced from the underlying statutory text and unsupported by binding caselaw. Since it is demonstrably Mr. Khudainatov's vessel, Claimants vigorously deny the overarching allegations that Suleiman Kerimov is the ultimate beneficial owner of the *Amadea*. But even if he were, the Complaint must still be dismissed because the *Amadea* is not "proceeds" or "derived from proceeds" of sanctions evasion or money laundering under any cognizable legal theory.

The government's basis to forfeit the *Amadea*, a 348-foot luxury superyacht whose value has been reported as between $300 million and $500 million, hangs on the singular theory that $1.2 million in funds used to pay lawful third-party vendors over the course of a few months by unnamed and unknown employees of a yacht management company renders the entirety of the vessel criminal proceeds, or otherwise "involved in" or "traceable to" criminal conduct. This is simply not the law. Among the key deficiencies—one that is irreparable—is that the government does not allege any underlying criminal activity that generated the funds to make the vendor payments. Because illegal proceeds were not used to make the vendor payments, the IEEPA claim fails. But even if these allegations were made—which they are not—the entirety of the *Amadea* is still not forfeitable. At most, the government would be entitled to $1.2 million or the actual assets purchased with those payments.  As articulated in the standard jury instructions in this district, and used in the government's own seminal case *650 Fifth Avenue* explained: "[i]f property constitutes

(or was derived) only in part from the proceeds of an IEEPA violation, that property would be subject for forfeiture, *but only in part*. For example, if a car were bought with $100 that is proceeds of an IEEPA violation and $100 in lawfully derived funds, one half of the car would be subject to forfeiture." Of course here, the government does not allege any of the Amadea was purchased with proceeds of an IEEPA violation, only that post-purchase payments were made to vendors during the vessel's operation.  Because the government can trace the ultimate and current destination of these funds which were used to purchase crew clothing and food, fuel, garbage disposal, fees for inspections and telecommunications services, barge fees, dock fees, port fees, and watersports equipment, for reasons that are well-established in the law, these vendor payments alone do not support a cognizable forfeiture claim for the *Amadea*.

The government also asserts that this is a money laundering case, despite the fact that it fails to allege any efforts by anyone to launder criminal proceeds or any intent to "promote the carrying on of" any crime, let alone sanctions evasion. Rather than identifying an underlying crime that generated criminal proceeds that were laundered, the Complaint conflates money laundering with the underlying alleged sanctions violations. In other words, the money laundering and the underlying crime are one and the same, making the charges impermissibly circular. Indeed, the Complaint does not allege that Kerimov or anyone else was involved in an underlying criminal enterprise that generated purportedly illegal proceeds that were used to make the vendor payments. To the contrary, under the government's theory, the vendor payments were initiated with "clean money" that was sent to innocent suppliers. What is more, no specific individual or entity is alleged to have intended to violate the sanctions under 1956(a)(2)(A) and 1957(a) nor ever obtained or retained the proceeds of illegal conduct that was then laundered. This dooms the money laundering counts.

The following facts are undisputed:

- There are no allegations that Kerimov purchased the vessel with illegal proceeds;

- There is no allegation that the alleged sale of the yacht to Kerimov was a crime under U.S. law;

- There is no allegation that any specific individual sent funds to the United States with the intention of violating IEEPA;

- There is no allegation that the funds transmitted to pay vendors involved criminal proceeds, were designed to launder criminal proceeds, or were otherwise tainted at the time the transactions were allegedly initiated;

- There are no allegations that a specific individual or entity possessed the requisite intent to commit any violation of U.S. law.

The government's seizure of the *Amadea* in April 2022 was based on President Biden's foreign-policy mandate that the government seize luxury assets of wealthy Russians in response to Russia's special operations in Ukraine. Despite the government having been presented with evidence that Mr. Khudainatov owns and has always owned the *Amadea*, the government ignored it and seized the *Amadea,* alleging that Mr. Khudainatov was a straw owner for Kerimov.

This theory never made any sense, and the government abandoned it, notwithstanding the fact that it was the theory that provided the legal basis to seize the *Amadea*. Now, the Complaint does not even mention Mr. Khudainatov. Instead, it alleges that a different individual is the straw owner for Kerimov, and that he became so at a different time after Mr. Khudainatov sold the vessel to this other individual. These new allegations, besides being factually wrong (but accepted as true solely for this motion) however, fall short of the heightened pleading standard required for the drastic remedy of forfeiture. The government fails to allege that Kerimov, any of his family members, or anyone employed by him was a party to any of the alleged sale transactions. The government also fails to allege facts linking Kerimov to any of the vendor payments that form the basis of the government's case. The government fails to sufficiently allege that anyone willfully,

knowingly, or intentionally violated U.S. sanctions or money laundering laws when paying vendor expenses for *Amadea's* crew, as well as barge and docking fees.

Apart from these overarching fatal failures, there are still more deficiencies that also require dismissal. In its First Claim, the government alleges that the *Amadea* "constitutes or is derived from proceeds traceable to" violations of the International Emergency Economic Powers Act ("IEEPA"), "because post-purchase maintenance payments in violation of IEEPA sanctions allowed the [*Amadea*] to continue to exist as an operational vessel." Compl. ¶¶ 51, 52, 53; 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7).  Everything about this allegation is wrong as a matter of law. But, under the facts alleged, the *Amadea* neither constitutes nor is derived from "proceeds" traceable to sanctions violations because no illegal funds were used for the vendor payments, thus rendering neither the *Amadea* nor the items purchased proceeds or derived from proceeds traceable to IEEPA violations. Nor did the purchase of crew uniforms and watersports equipment allow the *Amadea* to continue to exist as an operational vessel. And even if they did, the government would still only be permitted to forfeit the value of the payments made that actually enhanced or maintained its value, not the entire vessel.

The Second Claim alleges that the *Amadea* is property involved in or traceable to a violation of money laundering, in that funds were allegedly transferred to the United States from or through outside the United States with the intent to promote the carrying on of IEEPA violations. Compl. ¶¶ 55-59; 18 U.S.C. §§ 981(a)(1)(A), 1956(a)(2)(A). The Third Claim alleges that the *Amadea* was involved in or traceable to monetary transactions "involving criminally derived property" of a value greater than $10,000, the funds of which transactions were derived from IEEPA violations. Compl. ¶¶ 61–65; 18 U.S.C. §§ 981(a)(1)(A), 1957. Both of these claims fail to provide a basis to forfeit the *Amadea* because under the facts alleged, the *Amadea* was neither

"involved in" nor "traceable to" money laundering.  The government does not allege illegal proceeds were obtained or retained and thereafter laundered. The government's allegations that the same wire sent—"clean funds" when initiated and used to pay innocent third-party vendors— is simultaneously a sanctions violation and money laundering fails as a matter of statutory construction, and Second Circuit caselaw.  Moreover, the government fails to allege a specific person who acted knowingly and intended to violate IEEPA or any US law by sending money into the United States.

The Fourth Claim alleges conspiracy, based on the Second and Third substantive money laundering claims, in which the government alleges that the *Amadea* constitutes property involved in a conspiracy to conduct money laundering transactions in violation of 18 U.S.C. §§ 1956 or 1957. Compl. ¶¶ 67, 68, 69, 70. This claim fails because the underlying substantive claims fail and also because the government does not allege facts that anyone conspired together to do anything, much less to violate the law. In light of these glaring legal defects, the Complaint should be dismissed in its entirety.

## STATUTORY AND FACTUAL BACKGROUND

All four claims are predicated on an allegation of "specified unlawful activity" ("SUA"), as defined in 18 U.S.C. § 1956(c)(7)(D), to wit a violation of IEEPA sanctions. Specifically, § 1956(c)(7)(D) defines SUA to include "an offense under . . . section 206 (relating to penalties) of" IEEPA. Section 206(c) of IEEPA prescribes criminal punishment for "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a)." 50 U.S.C. § 1705(c). And subsection (a) provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any . . . order . . . issued under this chapter." *Id.* § 1705(a).

The government asserts that Kerimov who was sanctioned in 2018 purchased the *Amadea* via a series of transactions between July 2021 and March 2022. But no alleged transfer document mentions Kerimov or any agent of his. *See* Compl. ¶¶ 27, 32. The Complaint alleges "on information and belief" that these transactions represent a sale to Kerimov, using a straw owner. *See* Compl. ¶¶ 33, 34 and 36 (asserting that "*[o]n information and belief,*" the structure of the final alleged sales transaction permitted Kerimov "to acquire ownership of the *Amadea* without a documented title transfer of the vessel itself . . . ") (emphasis added). The Complaint does not allege this sale violated any United States law and does not form the basis of a forfeiture claim.

The government then alleges that Kerimov or others acting on his behalf engaged in U.S. dollar transactions that transited U.S. financial institutions relating to the *Amadea*. Compl. ¶¶ 44, 45. The government alleges that the unnamed "*Amadea* crew, by way of Millemarin or [the yacht management company], were billed more than $1.3 million for such expenses, and that "those same individuals and/or entities caused at least $1.2 million in wire transfers through U.S. correspondent accounts and/or to U.S-based demand deposit accounts . . . ." Compl. ¶ 46. The government lists several wire transactions over a seven-month period, but mostly during the three-month period before April 2022. *Id.* These payments were allegedly made for crew clothing, unspecified equipment, provisions, fuel, garbage disposal, hull inspection, barge fees, dock fees, port fees, safety inspection, telecommunications, unspecified yacht services, and watersports equipment. *Id*. Five of these alleged transactions were made from a foreign account or location to another foreign account, with the only U.S. connection being that they transited through a U.S. correspondent bank. *Id.* (b), (c), (e), (k), (l). Only two of these alleged transactions actually ended up in a U.S. bank account. *Id.* (a), (d). According to the government, "on information and belief," these U.S. dollar payments "preserved or enhanced the *Amadea's* overall value." Compl. ¶ 45.

6

The government's *mens rea* allegations are that the alleged straw owner and his unnamed "colleagues at [the yacht management company]" knew that Kerimov had owned the *Amadea* "since in or about September 2021" and, "[u]pon information and belief," were aware that Kerimov "had been sanctioned by the United States, and that U.S. law prohibited transacting with" or for Kerimov. Compl. ¶ 47.

The government then claims that unnamed employees of the yacht management company "were also aware that [unnamed] persons controlling, operating, and/or maintaining the *Amadea* were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*." Compl. ¶ 48. The government alleges that "when [the yacht management company] sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations." Compl. ¶ 49. However, there is no explanation who "they" are, much less how "they" came to understand that legitimate payments to vendors that passed through the U.S. banking system could constitute sanctions violations. Even sophisticated U.S. lawyers might not be aware of such legal nuances. Yet, the government blithely ascribes such knowledge and understanding to unidentified non-U.S. crew members employed by a European yacht management company.

Throughout the Complaint, the government relies on "information and belief" fifteen times to underpin the critical allegations necessary to establish a legal basis for its four claims (Compl. ¶¶ 32, 36, 39(d), 39(f), 39(h), 40, 40(a), 42(b), 42(e), 45, 46(b), 46(c), 46(d), 46(k), 47). Based solely on these speculative and conclusory allegations and on legitimate vendor payments that the government totals to be worth roughly a million dollars and which were for legitimate services, the government seeks to forfeit a vessel valued at over $300 million.

**ARGUMENT**

I.   **The government fails to allege sufficient facts that a sanctioned individual owns the *Amadea,* or that payments were made on his behalf.**

Given their dramatic consequences, *in rem* forfeiture actions are subject to a heightened pleading standard is under Supplemental Rule G that is "more stringent than the general pleading requirements . . . [,] an implicit accommodation to the drastic nature of the civil forfeiture remedy." *U.S. v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993). This heightened pleading standard "fortifies the procedural-due-process protections against improper use of these remedies" by the government. 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3242 (3d ed. 2023).[1]

The government "may not seize and . . . hold property upon conclusory allegations that [such] property is forfeitable." *U.S. v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 369 (S.D.N.Y. 2008) (citations omitted). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations omitted). Indeed, a court must disregard "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

For this reason, allegations used to support required elements based on "information and belief," are not permitted under heightened pleading standards absent specific corroborating facts.

---

[1] In direct response to criticism of the broad scope of the government's civil forfeiture authority, Congress passed the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. 106–185, 114 Stat. 202 (codified principally at 18 U.S.C. § 983), which dramatically overhauled the procedures for civil judicial forfeiture proceedings including requiring this heightened pleading standard. These measures were designed to temper the "prosecutorial zeal" that "skirts the boundaries of due process, leading to the taking of private property regardless of whether the owner is innocent of, or even cognizant of, the property's use in an illegal act, *or whether the seizure is entirely out of proportion to the criminal conduct alleged.*" *See* 146 Cong. Rec. S1753–02 (daily ed. March 27, 2000) (statement of Sen. Leahy) (emphasis added).

The Second Circuit has warned that "[a] litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) (citations omitted). This goes back decades. *See, e.g., Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972) ("[a]llegations [on information and belief] must then be accompanied by a statement of the facts upon which the belief is founded."). For this reason, "[a] complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand." *$1,399,313.74 in United States Currency*, 591 F.Supp.2d at 373–76, *see also S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 248 (S.D.N.Y. 2013) (allegations "upon information and belief" amounted to threadbare allegations requiring dismissal); *see also Aronov v. Mersini*, No. 14-CV-7998, 2015 WL 1780164, at *4 (S.D.N.Y. Apr. 20, 2015) ("[P]laintiffs fail to submit a statement of facts upon which their belief is based. Without such a statement, plaintiffs' allegations fail to satisfy the Rule 9(b) pleading requirements.").

### A. The Complaint's allegations that Kerimov bought the *Amadea* is a bald conclusion that is impermissibly made upon "Information and Belief."

The government's repeated use of "on information and belief," as highlighted above, without any reference to specific facts or evidence, falls far short of the requisite specificity that is required for forfeiture complaints. Indeed, its main conclusion—that the alleged sale transactions represented a sale to Kerimov with another individual serving as his straw owner and that some individuals at the yacht management company knew Kerimov owned the boat and others knew they were transaction in US dollars—is made "on information and belief." Such "threadbare allegations require dismissal." *Unknown Traders in Sec. of Onyx Pharms., Inc.*, at 248

**B.     The Complaint is devoid of facts linking any payment to Kerimov or his agents.**

Based on these uncorroborated allegations of ownership by Kerimov, the government leaps to its next factually and legally deficient allegation: that routine vendor payments that were appurtenant to the *Amadea* were caused by, or made on behalf and for the benefit of, Kerimov. Yet, there is not one single fact alleged linking any of the delineated payments to Kerimov. There are no allegations that the funds came from any account he controlled, no allegations that the payments otherwise originated from him, and no allegations that any of the payments were subsequently reimbursed by or billed to him. These pleading failures doom the Complaint. *See $1,399,313.74 in United States Currency*, 591 F.Supp.2d at 376 (dismissing forfeiture action because government was asking the court to make impermissible "logical leaps in the absence of facts and [to] credit conclusory assertions"); *see also United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14–16 (D.D.C. 2013) (same). Under these circumstances, this Court should dismiss the Complaint. But even assuming the Court permits this case to go forward on such conclusory and speculative allegations of Kerimov's ownership and connection to the vendor payments "on information and belief," the government's four claims fail to allege facts that could ever permit this Court to order the forfeiture of the *Amadea*.

**II.     The first claim fails because the *Amadea* neither "constitutes" nor is derived from "proceeds traceable to" IEEPA violations, and the Complaint fails to allege that anyone acted "willfully."**

The government has failed to allege facts that (1) the vendor payments constitute willful IEEPA violations or (2) the *Amadea* itself constitutes or is derived from *proceeds* traceable to such alleged IEEPA violations, as required by 18 U.S.C. § 981(a)(1)(C). Because no illicit funds were used to make the vendor payments, the *Amadea* does not meet the statutory definition of "proceeds," nor can it be said to have been "derived from proceeds." Given this, and the absence

10

of a factual predicate for the conclusory allegation that anyone willfully violated IEEPA, the First

Claim fails.

### A. The *Amadea* cannot be forfeited because it does not constitute "proceeds" of an IEEPA violation.

The government fails to allege facts that support an inference that the *Amadea* meets either

of the statutory definitions of "proceeds." Relevant here, "proceeds" is defined as:

> (A) In cases involving *illegal goods, illegal services, unlawful activities* … the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means *the amount of money acquired through the illegal transactions* resulting in the forfeiture, less the direct costs incurred in providing the goods or services.

18 U.S.C. § 981(a)(2)(A)–(B) (emphases added).

The definition under part (A) is plainly inapplicable to this case. The government does not

allege here that anyone was involved in any underlying criminal enterprise or any dealings with

illegal goods. Managing a yacht by paying vendors is not an inherently illegal activity. Boating

provisions and services such as crew clothing, fuel, garbage disposal, inspections, barge, dock, and

port fees, telecommunications, and watersports equipment (Compl. ¶¶ 46 (a)–(d), (i), (j), (k), (l))

are not inherently illegal goods or services. *See In re 650 Fifth Ave. & Related Properties*, 777 F.

Supp. 2d 529, 551–552 (S.D.N.Y. 2011) ("normally legal activities" that only were "alleged to be

illegal . . .  because they were performed for the Iranian government" did not fall under the

definition in part (A) above).

Nor does the *Amadea* constitute "proceeds" under part (B). The term "proceeds" in that

subsection refers to the amount of *money* acquired through the illegal transactions resulting in the

forfeiture. 18 U.S.C. § 981(a)(2)(B). Again, the government does not allege any underlying criminal activity that generated money. The *Amadea* itself is not "money" as required by a plain reading of the statute. Indeed, cases in this district have analyzed whether money, and not property, meets the definition of proceeds under 18 U.S.C. § 981(a)(2)(B). *See 650 Fifth Ave.*, 777 F. Supp. at 552 (finding that criminally derived money constitutes proceeds under §981(a)(2)(B) but an entire building did not); *see also U.S. v. Mahaffy*, 693 F.3d 113, 137–138 (2d Cir. 2012); *U.S. v. Kalish*, No. 06 Cr. 656, 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009).

More importantly, however, the definition uses the term "acquired" and not "retained." Thus, the *Amadea* itself does not constitute proceeds based on the government's theory that the vendor payments for crew clothing and dock fees allowed the *Amadea* to be retained. This is the same theory the court in *650 Fifth Ave.* squarely rejected. Similar to the facts in this case, there the government alleged that a foundation, which was established by the Iranian government, owned a building at 650 Fifth Avenue in Manhattan and that the foundation effectively acted as a commercial real estate manager on behalf of the Iranian government, and that those services were in violation of the IEEPA sanctions placed on Iran. *650 Fifth Ave.*, 777 F. Supp. at 550, 552. Also similar to its approach in this case, the government sought to forfeit the entire building under § 981(a)(1)(C). However, the court found that the building itself did not constitute "proceeds" under this statute. *Id.* at 556–57. Further, noting that the statutory definition only used the word "obtained," and not "retained," the court stated that it was "not aware of any court that ha[d] permitted an action to proceed under 18 U.S.C. § 981(a)(1)(C) on the basis that property was *retained* as the result of a criminal offense." *Id.* at 556 (emphasis added). This Court should not be the first. As in *650 Fifth Avenue*, this Court should reject the government's attempt to use innocent

vendor payments to seize an asset whose value is wildly disproportionate to the value of the payments.

**B.      The *Amadea* is not "derived from proceeds traceable to" an IEEPA violation.**

Not only does the *Amadea* not constitute proceeds under Section 981, it also is not "derived from proceeds traceable to" an IEEPA violation for two independent reasons. First, the government does not allege that the funds used to make the vendor payments came from an illegal source or criminal conduct. The government does not dispute that the money used to make these vendor payments was clean. But even if the government adequately alleged that the money used for vendor payments derived from criminal conduct—which it does not—the government ignores governing law in this Circuit, holding that even where illegal funds are used to enhance real property only the exact portion of the illegal proceeds used to enhance the value of that property (and not the entire property) can be considered "traceable." In other words, even if the government is correct in its analysis—which it is not—it would be entitled to forfeit only $1.2 million, not a $300 million vessel.

The government attempts to force a forfeiture claim by alleging that several vendor payments—all but two which went from a foreign bank account to another foreign bank account, but allegedly touched a U.S.-based correspondent account—violated IEEPA, and therefore simultaneously became illegal proceeds. While this theory in and of itself is legally flawed, the government then asks this Court to find that as a result of these $1.2 million payments to innocent vendors, the entirety of the vessel is now proceeds traceable to an IEEPA violation. For the reasons explained above, this allegation is nonsensical and unsupported by governing law.

Again, this Court should compare the allegations here with the facts of *650 Fifth Ave.* There, the government argued that an entire building constituted "proceeds" under the statute, and

sought forfeiture of the entire building under § 981(a)(1)(C) arguing that "crime proceeds"—i.e., rental receipts earned by a management company knowingly acting as a front for the Iranian government that was managing a building in New York City—were used to pay for "maintenance, renovations, and the Building's other expenses and served to enhance the market value of the Building." *Id.* at 552 (quotations omitted). But courts are unanimous that "the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from the fraud were like a drop of ink falling into a glass of water." *See, e.g., U.S. v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Express Bank*, 832 F. Supp. 542, 561–62 (E.D.N.Y. 1993) (quotations and citations omitted). As such, even in the case where a criminal was putting illegal proceeds obtained from a willful violation of sanctions law committed on U.S. soil directly into a building in New York City over a period of years, the *650 Fifth Ave.* court found that only the exact portion of "the Building would be forfeitable to the extent that it is property 'derived from proceeds,' *i.e.*, rent[,]. " Consistent with governing law, the court instructed the jury that: "[i]f property constitutes (or was derived) only in part from the proceeds of an IEEPA violation, that property would be subject for forfeiture, *but only in part*. For example, if a car were bought with $100 that is proceeds of an IEEPA violation and $100 in lawfully derived funds, one half of the car would be subject to forfeiture." ORDER, at 744, *In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529 (S.D.N.Y. 2011), ECF No. 1902.  If this Court were to ever present jury instructions to a jury, the jury here would be given the same instructions. Meaning, that even if the government were right, it would be entitled to forfeit $1.2 million dollars. Not a $300 million dollar vessel.  But the government is not even entitled to that amount as explained herein.

14

This case is even more compelling than *650 Fifth Avenue*. The funds used to make the vendor payments, unlike the rent in *650 Fifth Ave.*, are not alleged to have been crime proceeds. The money sent to the vendors who provided lawful goods and services was not earned by the alleged co-conspirators and never used to enhance the value of the *Amadea* but rather went to crew uniforms and provisions and watersports equipment placed on the Amadea, along with barge and port fees. Obviously, the government does not make any serious factual allegations that the crew uniforms or provisions for the crew "enhanced" the value of the *Amadea*.  Under the Complaint's allegations then, it follows that neither the *Amadea* nor even a portion thereof, therefore, is derived from crime proceeds. This claim fails as a matter of law.

### C.   The government fails to allege that anyone acted "willfully," a predicate allegation for forfeiture premised on an IEEPA violation.

The Complaint fails to plead the necessary *mens rea* elements for each of its claims, which are not premised on the sale, but rather, only on subsequent vendor payments. To forfeit the *Amadea*, the government must prove that these vendor payments constituted crimes, specifically violations of IEEPA sanctions, which is the predicate SUA for each of the government's claims.[2] A criminal violation of IEEPA sanctions requires that a person act "willfully" when doing so. *see* Compl. ¶¶ 16, 24 (citing § 1705(c)).

Here, the Complaint fails to allege which person acted at all, and therefore it fails to specify which "person" purportedly "willfully" violated IEEPA. Rather, the Complaint generally alleges that "KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ('USD') payments" that allegedly constitute sanctions violations. *See* Compl. ¶ 45. But in the next paragraph, the Complaint references "the *Amadea* crew, by way of Millemarin or [the yacht

---

[2] No one has been charged for any of the conduct alleged in the Complaint.

management company],” alleging that those “same individuals and/or entities” caused the payments to occur without any mention of their state of mind. *Id.* ¶ 46. Indeed, all but two of the vendor payments were made from and to foreign bank accounts outside of the United States. Nor does the Complaint allege that any of these individuals had any connection to Kerimov, let alone act as his agent, nor otherwise suggest any reason why they would risk committing a crime so that Kerimov’s daughter could sail in the Caribbean for a few weeks rather than the thousands of other places they could have sailed outside the reach of United States sanctions law. Paragraph 46, which purports to catalog specific transactions constituting sanctions violations, makes no mention of any natural person. Without a specified person, there can be no intent.

Paragraphs 47–49 further highlight this deficiency. Rather than identify who actually acted with the required *mens rea,* these paragraphs simply state that the alleged straw owner and his unnamed “colleagues” at the yacht management company knew that Kerimov had owned the *Amadea* since September 2021, and allege upon “information and belief” that they knew that Kerimov had been sanctioned by the United States, and that he was prohibited from transacting with the United States. Compl. ¶ 47. As discussed *supra* Part I, allegations based on information and belief, especially to establish the requisite *mens rea* for IEEPA violations, are insufficient for a forfeiture complaint.

While the government also alleges that unnamed yacht management “employees” were aware that other “persons controlling, operating, or maintaining the *Amadea* (including [the yacht management company] itself)” were transacting with the United States because vendor invoices indicated transactions with the United States, (Compl. ¶ 48), the government notably fails to identify whether these yacht management company employees are the same colleagues referred to in paragraph 47. The Complaint also fails to allege whether the “other persons” who were

16

transacting with the United States were aware of: (i) who owned the vessel; (ii) whether the owner was sanctioned in the United States; and (iii) the legal prohibitions that resulted from being sanctioned by the United States, particularly for a vessel that the government does not allege was ever in the United States.

The government's conclusory allegation that when the yacht management company "sent money in satisfaction of invoices to U.S. companies through the U.S. banking system to support and maintain the *Amadea*, it was doing so with the intent to promote the carrying on of U.S. sanctions violations" (Compl. ¶ 49) again highlights the pleading failure. Simply put, the Complaint provides no notice of whose alleged culpable state of mind the government relies on to plead a willful violation, as required by Section 206(c) of IEEPA.

Instead, the Complaint engages in what courts consistently characterize as impermissible "group pleading." For example, in *Plusgrade L.P. v. Endava Inc.*, No. 1:21-CV-1530 (MKV), 2023 WL 2402879, at *4 (S.D.N.Y. Mar. 8, 2023), the court dismissed the complaint for improper "group pleading" where "most of the allegations ambiguously state that the alleged misconduct was carried out by 'defendants,' or by numerous defendants placed into makeshift groups". The court in *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) held that: "[a] corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual." *aff'd*, 869 F.2d 175 (2d Cir. 1989); *see also Automated Transaction LLC v. New York Cmty. Bank*, No. 12-CV-3070, 2013 WL 992423, at *4 (E.D.N.Y. Mar. 13, 2013) ("Defendants argue this 'group pleading'—i.e., referring to both Defendants collectively as 'Community' rather than distinguishing between them—is impermissible and insufficient under . . . Rule 8. The Court agrees."). The Second Circuit characterized this in a recent decision as "collective intent – or lack thereof." *Jackson v. Abernathy*, 960 F.3d 94, 96, 99 (2d Cir.

2020) (per curiam) (affirming dismissal of securities-fraud complaint because plaintiff had "not identified any individual whose scienter may be imputed to the Corporate Defendants").

Indeed, in many ways the government's approach here mirrors the approach of the court in *U.S. v. One White Crystal Covered Bad Tour Glove & Other Michael Jackson Memorabilia*, No. CV 11-3582, 2012 WL 8455336, at *1 (C.D. Cal. Apr. 12, 2012). There, rather than specifying which individual or entity had committed the unlawful act (extortion) giving rise to the government's civil-forfeiture allegations, the complaint alleged "that the extortion…was perpetrated by members of the 'Inner Circle.'"*Id.* at *3 (citations omitted). The court held that the government's complaint "thus clearly fails to meet the heightened pleading requirements of Fed. R. Civ. P. Supp. R. G(2)(f) as to the allegations of extortion, since the extortion described therein is not claimed to have been perpetrated by [claimant], but is instead ascribed to the amorphously defined 'Inner Circle' to which he allegedly belonged." *Id.*

The government attempts the same impermissible pleading here and seeks to rely on an "amorphously defined" collection of individuals and entities to demonstrate willfulness. The Complaint refers to "KERIMOV, or those acting on his behalf," and alleges that this ill-defined group "caused entities and persons," another ill-defined group, to undertake the alleged sanctions violations. *See* Compl. ¶ 45. At the same time, the Complaint alleges that the "crew" of the vessel (none of whom is specifically identified) engaged in the purported violations. *See id.* ¶ 46. As in *Bad Tour Glove*, and the above-cited cases, these allegations "clearly fail[] to meet the heightened pleading requirements of Fed. R. Civ. P. Supp. R. G(2)(f)." *See* 2012 WL 8455336, at *3.

**III.**   **The Second Claim fails because the government has not alleged facts to state a claim for money laundering under 18 U.S.C. § 1956(a)(2)(A), the *Amadea* was neither "involved in" nor "traceable to" any such alleged violation and fails to allege facts that anyone acted willfully and with the requisite intent for this claim.**

The government brings its Second Claim (as well as its Third and Fourth Claims) under a money laundering theory without alleging a single fact to support that money laundering ever took place, particularly since no specific individual is alleged to have acted with intent when sending a wire that touched upon the United States. The Second Claim alleges that, pursuant to 18 U.S.C. § 981(a)(1)(A), the vendor payments constituted money laundering, in that funds were transferred to the United States from or through outside the United States with the intent to promote the carrying on of SUA, to wit: IEEPA violations, pursuant to 18 U.S.C. § 1956(a)(2)(A). Compl. ¶¶ 55–59. This claim fails because the Complaint does not allege any specific intent to violate the law. But even if it did, significantly, it fails to allege the *Amadea* is property "involved in" or "traceable to" a money laundering violation under § 1956(a)(2). This claim fails on a plain reading of the statutory text and caselaw. These points are addressed in reverse order.

**A.**   **Under the government's theory, the *Amadea* is not property "involved in" money laundering, nor is it "traceable to" any such property.**

In the money laundering context, the term "involved in" is generally defined as "property that is itself being laundered, as well as property used to facilitate a money laundering offense." *U.S. v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy and Others*, No. 03–CV–8004, 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008); *see also 650 Fifth Ave.*, 777 F. Supp. at 563. The government does not allege that the *Amadea* itself was being laundered.

Nor has the government alleged facts that support an inference that the *Amadea* was used to "facilitate" any money laundering offense. Facilitation "occurs when the property makes the

prohibited conduct less difficult or more or less free from obstruction or hinderance." *See United States v. Huber*, 404 F.3d 1047, 1060 (8th Cir. 2005). Under this definition, the government's theory would be that the *Amadea* somehow makes the sanctions violations "less difficult or more or less free from obstruction or hindrance." But the government does not set forth allegations of "facilitation" as that term has been interpreted. Facilitation cases involve facts where the property at issue was actually "involved in" money laundering transactions because they facilitated the money laundering or served as a conduit for illegal proceeds. *See United States v. Schlesinger*, 396 F. Supp. 2d 267, 269, 272–73 (E.D.N.Y. 2005), *aff'd*, 261 F. App'x 355, 361 (2d Cir. 2008) (finding a factory was "involved in" money laundering under a facilitation theory because it was used to commit insurance and creditor fraud based on fires that occurred there and by having shell companies foreclose on collateral inside the factory, and the proceeds of the frauds were used to pay expenses for the factory making it a conduit to clean illegal proceeds); *U.S. v. Contents of Acct. Numbers 208-06070 & 208-06068-1-2*, 847 F. Supp. 329, 335 (S.D.N.Y. 1994) (finding that the accounts were used to "facilitate" money laundering because legitimate and illegitimate funds were commingled in these accounts, "for the purpose of disguising the nature and source of the proceeds of [the illegal] scheme"). In contrast to cases where facts support a finding that property was "involved in" a money laundering offense by facilitating such offense. In this case there are no allegations that the *Amadea* facilitated any money laundering activity.

For the same reasons that the *Amadea* was and is not involved in money laundering activity, it is also not "traceable to" any such property. Property "traceable to" means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources. *U.S. v. Nicolo*, 597 F. Supp. 2d 342, 348 (W.D.N.Y. 2009). The Tenth Circuit in *U.S. v. Bornfield* provided a helpful example of the definitions of "involved in" and "traceable

to." The court explained that, "if a defendant receives $500,000 in cash in a money laundering scheme and hides the cash in his house, the government may seize that money [but not the house] as property 'involved in' the money laundering offense [under a facilitation theory]. If, on the other hand, the defendant purchases a $500,000 item with that money, the government may seek the item purchased as property 'traceable to' property involved in the money laundering offense [under an acquired theory]." 145 F.3d 1123, 1135 (10th Cir. 1998). The *Amadea*, however, is not alleged to have been acquired with funds attributable to a money laundering scheme or even with funds traceable to any illegal activity.

Lastly, the government's Complaint falls fatally short of Supplemental Rule G(2)(f)'s requirement that an *in rem* forfeiture complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Under the general rules governing civil forfeiture proceedings, 18 U.S.C. § 983(c)(3) provides that "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." The government must provide evidence showing that the nexus between the property and the money laundering offense is strong and more than incidental. *See Nicolo*, 597 F. Supp. 2d at 356 (finding that the house where the defendant sent invoices and received payments in the course of his fraud scheme was too tangentially related to the money laundering offense to satisfy the substantial connection test).

The government's allegations here demonstrate that the *Amadea* is even more tangential to the alleged money laundering than the house in *Nicolo*. There is no alleged fact that suggests a "substantial connection" between the *Amadea* and money laundering, as would be required in a

forfeiture proceeding. The government's baseless allegations that the *Amadea* was "involved in" money laundering because funds used to "maintain" the vessel were illegally transported or transferred to U.S. banks from or through foreign bank accounts in violation of IEEPA fails as a matter of law. Even assuming there was a money laundering scheme—which there was not—the *Amadea* would not be traceable thereto because the alleged scheme acquired identified provisions.

At most, the government would be permitted to forfeit crew uniforms, a tank of gas, food from the pantry, and two jet skis—not the entire vessel. But again, even these items are not "traceable to" any illegal conduct, as no illicit funds were laundered by purchasing them. Accordingly, the Second, Third, and Fourth Claims should be dismissed.

### B. The Complaint fails to allege that anyone acted with the specific intent to promote the carrying on of IEEPA violations, which is Required under 18 U.S.C. § 1956(a)(2)(A).

Similar to the government's failure to plead "willfulness" to establish an underlying IEEPA violation and thus a predicate SUA, the government also fails to allege with the required particularity the *additional* specific intent necessary to plead a money-laundering violation under 18 U.S.C. § 1956.[3] This defect separately requires dismissal of the Second Claim.

More specifically, § 1956(a)(2)(A) pertains to international transactions and—along with its domestic counterpart in (a)(1)(A)—courts have dubbed the covered conduct "promotion money laundering," given the statutory requirement that the offense must be committed "with the *intent* to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A) (emphasis added). For specific intent to commit promotion money laundering, the Second Circuit "demand[s] evidence that the receipt and deposit of laundered funds was made with the intent to promote the

---

[3] As with the First Claim, the government's failure to plead a *willful* IEEPA violation separately dooms the Second Claim. *See supra* Part II.C.

specified underlying unlawful activity, be it, for example, by promoting continued illegal activity." *U.S. v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003). In *U.S. v. Pierce*, the Second Circuit reversed criminal convictions for conspiracy to commit violations of § 1956(a)(1) & (a)(2) where the alleged SUA comprised a wire-fraud scheme, observing that "proof beyond a reasonable doubt that [defendants] had intended to promote wire fraud in the course of their operations was required for conviction on the money laundering charge." 224 F.3d 158, 162 (2d Cir. 2000) (citation omitted). The court of appeals reiterated: "Under § 1956(a)(2)(A), the government had to establish that the Pierces moved funds internationally with 'the intent to promote the carrying on of' the wire fraud scheme." *Id.* at 165.

Here, the Complaint includes minimal factual allegations beyond what is alleged in support of the purported IEEPA violations that suggest any specific "intent to promote the carrying on of" such violations. The Complaint fails to detail how any individual or entity committed IEEPA violations with the intent to promote continued IEEPA violations. Instead, the government simply recites alleged transactions that it claims constitute IEEPA violations, *see* Compl. ¶ 46, and then asserts in conclusory fashion that anonymous individuals (1) knew Kerimov beneficially owned the *Amadea*; (2) upon information and belief, knew Kerimov was sanctioned by the United States; and (3) unnamed employees (without indicating whether they were the same individuals who knew of the vessel's ownership, the sanctions, and the implications of those sanctions) intended that routine *de minimis* expenses appurtenant to a vessel that passed through the United States would "promote the carrying on of U.S. sanctions violations," *Id.* ¶¶ 47–49. This type of conclusory pleading "masquerading as factual conclusions" should not be countenanced. *Henneman*, 517 F.3d

at 149. These allegations do not satisfy the government's pleading requirement and mandate dismissal.[4]

As final point, the government's theory—that the wire transaction that constitutes the IEEPA violation is the same transaction that constitutes the money laundering—raises the "merger problem" identified by the Supreme Court in connection with the money-laundering statutes. *U.S. v. Santos*, 553 U.S. 507, 515 (2008) (plurality). Because the government's allegations for the underlying IEEPA violations and those used to satisfy its claim of money laundering are identical these two crimes merge. Under the government's theory, "nearly every violation of [IEEPA in this manner] would also be a violation of the money-laundering statute"—an impermissible result under the logic embraced by five Justices in *Santos*. While courts in the Second Circuit have found there to be no merger problem with respect to 1956(a)(2)(A) in some cases, those cases involve allegations where money transfers were designed to "promote" the underlying crime, i.e. where co-conspirators understood use of foreign bank accounts to be integral to the success of the underlying criminal scheme. The Complaint here fails to make any such allegations. As such, the government's Second Claim fails to state a claim for money laundering under 1956(a)(2)(A), as is required to sustain a forfeiture claim under 981(a)(1)(A).

---

[4] According to the Senate Judiciary Committee, § 1956(a)(2)(A) was enacted "to authorize the forfeiture of profits earned by launderers." S. Rep. 99-433 at 1. The purpose of this legislation was to disrupt the ability of those involved in profitable criminal enterprises "to disguise the illegal nature and true source of their income." *Id.* at 2. This case does not involve allegations of anyone profiting from the alleged laundered funds and is inconsistent both the statutory text and the stated purpose as reflected in the legislative history.

IV.    **The third claim fails because the government has not alleged facts to state a claim for money laundering under 18 U.S.C. § 1957, the *Amadea* was neither "involved in" nor "traceable to" money laundering, and the allegations are insufficient to show that anyone acted willfully or knowingly.**

A.    **The government fails to allege that the funds used to make vendor payments constitute "criminally derived property."**

For similar reasons, the Third Claim also fails. Section 1957 criminally penalizes any person "who knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000" that is derived from an SUA, here, violations of IEEPA sanctions. Compl. ¶¶ 62–63.

Under the statute, "criminally derived property" is defined as "any property constituting, or derived from, proceeds *obtained* from a criminal offense." 18 U.S.C. § 1957(f)(2) (emphasis added). The term "proceeds" for purposes of this statute is defined as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). These definitions make clear that the proceeds must be obtained or retained from some form of unlawful activity. The Complaint never alleges that anyone obtained or retained criminally derived property that was then used to commit sanctions violations.

Rather, the government's strained theory is that clean funds transited inbound to a U.S. correspondent bank on behalf of a sanctioned individual without a license, at which point they became criminally derived property. Then, according to the government, when the funds transited outbound from the U.S. correspondent bank to their destination, the outbound transaction constituted money laundering in violation of § 1957. Compl. ¶ 64. But the Second Circuit has held that funds used in an alleged money laundering transaction must have been "criminally derived

property" from the outset. In other words, the money laundering must be separate and distinct from the underlying criminal conduct.

In *U.S. v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994), the Second Circuit reversed a conviction under Section 1957 by holding that this statute "only encompasses transactions in which a defendant first obtains 'criminally derived property' and then engages in a monetary transaction with that property." In analyzing this statute, the Second Circuit noted that the "ordinary meaning of the word 'obtained'" used in both definitions above "entails possession of a thing." The Second Circuit further noted that "the word 'property' implies ownership." *Id.* Drawing on these definitions, the Second Circuit then concluded that "[t]he use of such language demonstrates a congressional intent that the proceeds of a crime be in the defendant's possession before he can attempt to transfer those proceeds in violation of § 1957." *Id.* at 676–77; *see also $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 371–72 (holding that for purposes of a § 1957 claim, the proceeds must be "obtained from a prior, separate criminal act since money laundering 'must be a crime distinct from the crime by which the money is obtained.'" (citations omitted)); *U.S. v. Johnson*, 971 F.2d 562, 568 (10th Cir. 1992) (determining that "Congress viewed a violation of § 1957 as occurring only after the individual involved in the specified criminal activity gained possession or disposal of the proceeds generated by the criminal activity"); *U.S. v. Howard*, 245 F. Supp. 2d 24, 29 (D.D.C. 2003) (vacating § 1957 conviction because the jury "did not identify specific unlawful activities from which the laundered funds were acquired that were separate and distinct from the conduct charged as mail and wire fraud").

The government makes no allegation that anyone obtained criminally derived property and then used it to violate sanctions. There is no "separate and distinct" crime. Simply put, the

Complaint fails to allege that the funds used to pay the vendor invoices were "criminally derived property" under the statue, and this claim must be dismissed on this basis as well.

## B.   The government fails to allege that anyone "knowingly" engaged in a transaction in "criminally derived property."

"To prove a violation of § 1957(a), the government must present evidence that the defendant *knowingly* engaged or attempted to engage in a monetary transaction *in unlawful funds*." *U.S. v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (emphases added) (reversing conviction where government failed to prove requisite "monetary transaction"). That is, § 1957(a) requires the government to prove "the defendant knows that the monetary transaction involves criminally derived property." *U.S. v. Herndon*, 122 F. Supp. 3d 487, 491 (S.D. W. Va. 2015) (collecting cases and rejecting plea agreement that failed to satisfy *mens rea* requirement of § 1957).[5]

As explained directly above, the Complaint fails to plead any underlying criminal activity or that the funds used to pay the vendors were "criminally derived property." Nor does the Complaint allege that any specific individual was aware that the funds were criminally derived and still acted knowingly.  Indeed, they could not have as a matter of law.  The government's theory—that as soon as these payments touched U.S. correspondent bank accounts and prior to the closely related (and perhaps automated) transactions necessary to consummate the alleged IEEPA violations—does not cure this defect because the transactions did not involve criminally derived property when initiated (or ever). *See* Compl. ¶ 64. Moreover, the alleged IEEPA violations were not completed once funds were sent to the United States, because Executive Order 13661 only prohibits "transfer[s]" and similar *transactions* in property belonging to sanctioned individuals if the property was "in the United States" at the time of the Executive Order, or later "come[s] within

---

[5] As with the First Claim and Second Claims, the government's failure to plead a *willful* IEEPA violation separately dooms the Third Claim. *See supra* Part II.C.

the United States" or "within the possession or control of any United States person." It does not prohibit a mere transfer of money into a U.S. bank account.[6]

As such, the wire "in" could not have violate any law.  If there can be no "criminally derived property" until the offense is completed, then no one could have "knowingly" laundered such property through the same transaction that renders the property "criminally derived" in the first place. For similar reasons as mentioned in Part III, the government's theory for its Third Claim runs headlong into the "merger problem" identified by five Justices in *Santos*.  The Complaint's twisted logic that the simultaneous transfers into and subsequent transfers out of the United States alleged here are simultaneously IEEPA violations and money laundering simply fails to state a claim.

Similarly, there is no allegation that any individual or entity became aware that the funds transformed into "criminally derived property" as soon as they touched the United States and then such an individual or entity "knowingly" engaged in a separate transaction to launder such funds by paying for goods and services. Indeed, no individual or entity accused of wrongdoing ever obtained or retained criminally derived property. As Southern District Courts have already held in analogous circumstances: "There are . . . no allegations supporting a reasonable belief that these funds involved criminally derived property and that Claimants were aware of such illegal

---

[6] By the same token, it is not a sanctions violation for a sanctioned individual's property simply to be present in the United States; otherwise, any unsanctioned individual who holds a bank account in the United States and is subsequently sanctioned will have by default also committed a sanctions violation, even if she engages in no transactions involving the bank account after being sanctioned. It is the *transacting* in "blocked" or "frozen" property once it is in the United States that gives rise to a violation. *See Treasury Designates Russian Oligarchs, Offs., & Entities in Response to Worldwide Malign Activity*, Treas. SM-0338 (Apr. 6, 2018) ("All assets subject to U.S. jurisdiction of the designated individuals and entities, and of any other entities blocked by operation of law as a result of their ownership by a sanctioned party, are frozen, and U.S. persons are generally prohibited from dealings with them.").

origin. . . . A complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand." *U.S. v.$1,399,313.74 in U.S. Currency*, 591 F. Supp. at 374. This lack of intent provides an additional reason to dismiss the Third Claim.

      **C.**    **The complaint fails to allege the *Amadea* was "involved in" or "traceable to" money laundering.**

Like the Second Claim, the Third Claim is also brought under 18 U.S.C. § 981(a)(1)(A), which provides that any property that is "involved in" a money laundering transaction or any property "traceable to" such property is subject to forfeiture. However, for the reasons set forth above, the government has not set forth any facts of any money laundering activity here. As a result, the Third Claim fails for this reason as well.

**V.**    **The Fourth Claim predicated on alleged conspiracy to commit money laundering under 18 U.S.C. §§ 1956 & 1957 fails to state a claim upon which relief can be granted, and fails to allege the requisite *mens rea*.**

Section 1956(h) imposes criminal liability on "[a]ny person who conspires to commit any offense [under § 1956 or § 1957]." For many of the same reasons explained herein, the Complaint fails to allege that any natural person or entity "conspire[d]," i.e., agreed with another, to engage either in (1) "promotion" under § 1956(a)(2) (Second Claim); or (2) a transaction in "criminally derived property" under § 1957(a) (Third Claim).[7]

At most, the Complaint alleges that some ill-defined collection of individuals or entities— or an amalgamation of both—caused certain payments to be made but the payments were not criminal proceeds when the wires were sent and no one could have known they were and

---

[7] The Fourth Claim includes no additional facts apart from what is alleged in support of the First, Second, and Third Claims, and only the Second and Third Claims allege money laundering. Similar to the First, Second, and Third Claims, the Fourth Claim includes no allegation that anyone conspired to commit a *willful* IEEPA violation, a separate deficiency warranting dismissal. *See supra* Part II.C.

knowingly engaged in wrongdoing. There is no suggestion that in doing so anyone entered into a knowing violation of law, let alone conspired to violate U.S. law and promote IEEPA violations, or sought to launder money that could not even be considered "criminally derived property" before the alleged set of transactions constituting the IEEPA violations were initiated. Thus, the Complaint fails to plead conspiracy to commit money laundering, and the Fourth Claim should be dismissed. *Cf. U.S. v. Evergreen Int'l*, 206 F. App'x 71, 75 (2d Cir. 2006) (summary order) ("[E]ven assuming *arguendo* that [defendants] played a role in the transfers to Forex, there was insufficient evidence that in doing so they intended to promote the mail fraud . . . , and their convictions [for conspiracy to commit money laundering] must therefore be reversed.").

## CONCLUSION

The government's Complaint is fatally flawed. Indeed, the government has already notified Claimants that it will amend its Complaint after this motion to dismiss is filed, knowing the current one fails to set forth a cognizable claim for forfeiture, but wishing to have a look at Claimants' arguments so that the its next version might salvage its baseless claims. The government has even threatened that if Claimant Mr. Khudainatov continues to assert his ownership over his vessel, its next complaint will include the knowingly false allegations that he is a "straw owner" for Igor Sechin and Vladimir Putin.[8]

---

[8] In an email on October 23, 2023, an attorney for the government advised that should Claimants file a claim in this matter, "thereby putting Mr. Khudainatov's ownership at issue, we plan to file an amended Complaint including further details about Mr. Khudainatov, including our position that he is actually the straw owner of numerous yachts, including the *Amadea*, *Crescent*, and *Scheherazade*." As such, the government is on record that the theory on which it filed the present forfeiture Complaint, in which Mr. Khudainatov is not alleged to be the straw owner for Kerimov but a different individual is alleged to be, might be superseded in a new filing with yet another theory.

For all the foregoing reasons, the government's Complaint fails to state a claim upon which relief can be granted and should be dismissed.

Dated: January 26, 2024

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: *Adam Ford*
_____

     Adam C. Ford
     Renée L. Jarusinsky
     Anjula S. Prasad
     Stephen R. Halpin III
     Bryan W. McCracken
     275 Madison Avenue, 24th Floor
     New York, NY 10016
     Tel.: (212) 858-0040 (main)
     Fax: (212) 256-1047
     aford@fordobrien.com
     rjarusinsky@fordobrien.com
     aprasad@fordobrien.com
     shalpin@fordobrien.com
     bmccracken@fordobrien.com

     *Attorneys for Claimants Eduard Yurievich*
     *Khudainatov and Millemarin Investments*
     *Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Motion to Dismiss was served on all counsel of record via the Court's CM/ECF system.

Dated: January 26, 2024

*Adam Ford*
_____
Adam C. Ford