UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

Plaintiff,

v. 23 Civ. 9304 (DEH)

THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO,

Defendant-in-Rem.

Eduard Yurievich Khudainatov,
Millemarin Investments Ltd.,

Claimants. Conference

------------------------------x

New York, N.Y.
January 17, 2024
11:00 a.m.

Before:

HON. DALE E. HO,

District Judge

APPEARANCES

U.S. ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
Attorneys for Plaintiff
BY: TARA M. LA MORTE, ESQ.
Assistant United States Attorney

U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION, CRIMINAL DIVISION
Attorneys for Plaintiff
BY: JOSHUA L. SOHN, ESQ.
Trial Attorney

FORD O'BRIEN LANDY LLP
Attorneys for Claimants
BY: ADAM C. FORD, ESQ.
RENEE L. JARUSINSKY, ESQ.

(Case called)

THE DEPUTY CLERK: Counsel, can you please state your name for the record, starting with the plaintiffs.

MS. LA MORTE: Good morning, your Honor. I am Tara La Morte. I'm an assistant United States Attorney in the Southern District. And I will let my colleague introduce himself.

MR. SOHN: And I am Joshua Sohn, a trial attorney in the money laundering and asset recovery section of the DOJ, also for the plaintiff.

THE COURT: Good morning.

MR. FORD: Good morning, your Honor. Adam Ford on behalf of the claimant Eduard Khudainatov and Millemarin, and along with me is my colleague/partner Renee Jarusinsky.

THE COURT: Good morning.

MS. JARUSINSKY: Good morning, your Honor.

THE COURT: Please, everyone, have a seat.

So we're here for an initial pretrial conference in this matter. I think I just want to thank everyone for showing up in person for this, especially Mr. Sohn. I know it was not unburdensome to come from Washington for this.

I just want to go over some scheduling matters and a few questions I have about some of the issues raised in the parties' joint submission, but before we jump into that, I think it might be helpful to just hear from the government, and

we'll also hear from the claimants, and just a brief overview of the matter and what you see as kind of the major sticking points.

MR. SOHN: Yes, your Honor.

So this is a civil forfeiture case over the M/Y *Amadea*, a 106-meter superyacht. The government contends that the *Amadea* is beneficially owned by Suleiman Kerimov, a Russian oligarch who is under sanctions under IEEPA and associated executive orders, and we contend that the *Amadea* is forfeitable under 18 U.S.C. 981(a)(1)(A) and (a)(1)(C) as property traceable to IEEPA sanctions violations and as property involved in money-laundering transactions, with IEEPA serving predominantly as the authority supporting those money-laundering transactions.

So obviously claimants disagree on who the ultimate beneficial owner is. They allege that the ultimate beneficial owner is not Mr. Kerimov but rather a different Russian businessman, Eduard Khudainatov. So I think the parties are in agreement, so to speak, that a very major factual dispute to be resolved in this case is who is the ultimate beneficial owner of the boat. I will let claimants respond if they have other major factual issues that they see as being raised.

So I don't know if your Honor would like more discussion about pending motions that seem to be rearing their head.

THE COURT: We can jump into those. Why don't I just hear from Mr. Ford for the claimants, and then we can talk about some of those possible motions that might be coming.

Mr. Ford, is there anything you'd like to add?

MR. FORD: Your Honor, should I stand when I speak?

THE COURT: It's fine either way.

MR. FORD: Okay. I'll remain seated then.

Thank you, your Honor. I think Mr. Sohn sort of identified certainly the core of the matter. We represent Eduard Khudainatov. He's the individual who commissioned and had the *Amadea* built, starting 2012. He's always been the ultimate beneficial owner. There may have been some changes with respect to corporate structure, but it always led back to him, still leads back to him. It's his vessel. And we'll be prepared to prove that factually.

In terms of some other issues, however, you know, we think that the forfeiture complaint on its face has legal defects, meaning even if the boat were owned by Mr. Kerimov, which it is not, the allegations currently set forth don't amount to the boat being property that's traceable to a violation or involved in money laundering. At best, at best, what the government has alleged is that there is $1.3 million in vendor payments——that is, payments that were made, frankly, by a yacht management company to vendors that were either in the United States or had correspondent bank accounts——and that

that $1.3 million is what's at issue. So to be clear, the government does not allege——of course it could not——that the alleged sale——they claim that it was sold to Mr. Kerimov in the summer of 2021. They do not allege any issue with that sale. It's only the $1.3 million in vendor payments.

And also, as we'll set forth in our forthcoming motion, even assuming Mr. Kerimov is the owner of the boat——he is not——what is at issue in this case is $1.3 million. One of the things that we will be arguing and that we'll be proposing to the Court is that because the only amount in controversy is this 1.3 million, we propose that the boat should be released back to our client and in exchange, our client will put in the court's escrow account the exact amount of money that is actually at issue such that if the government were to eventually prove its case, they would have the full amount available to it in the court's escrow account. We'll set forth more of this in our moving papers, which we'll be filing shortly.

THE COURT: Okay. I'll have a few questions about that. That's the substitution motion that was referenced in the——

MR. FORD: That's right, your Honor.

THE COURT: I do have a few questions about that. But before that, I just want to get into the schedule and the proposed case management plan, which seems fine, so I will

enter it later today.

I did see that you all referenced the possibility of a referral to the magistrate judge for mediation at the close of fact discovery, so what I think I'll ask you to do——and I know there's going to be some motions practice before that, but I'll just add a line in the case management plan requesting that you submit a status letter to me at the close of fact discovery as to whether or not you still want that referral to the magistrate judge, and if so, I'll sign one right away.

Before getting to the motions, just one question about discovery. It seems there's some dispute between the parties as to special interrogatories that the government wishes to serve. Could I just maybe ask the government your position and then I'll turn to the claimants.

MR. SOHN: Sure. So the supplemental rules plainly allow the government to serve standing interrogatories. Claimants' position, as best we can tell, is that they provided so much detail in their claim that that somehow obviates the need for standing interrogatories. We disagree. We don't think there's any authority that simply because the claimant chooses to be relatively verbose in their claim that that somehow strips the government of its right to serve standing interrogatories. Obviously with respect to claimant Khudainatov, we do not believe he likely has standing because we do not believe he is the true owner of the boat. Even as to

the corporate claimant Millemarin, as we plead in our complaint, we allege that there was a transaction by which another company called Errigal purchased the stock in Millemarin and thus became really the true owner of the boat. So there's at least a fact issue of whether Millemarin is a mere nominee for this other company, Errigal.

So there are multiple disputed issues on standing, and we have the right, under the supplemental rules, to serve interrogatories to get at the standing issue, and we intend to exercise that right.

THE COURT: Thank you.

Mr. Ford, I'll let you respond, and then I may have a question for you.

MR. FORD: Yeah, sure. Thank you, your Honor.

Yeah, as we understand it, the purpose of the standing interrogatories are to sort of weed out frivolous claims, right? So the government brings a forfeiture action, and if someone shows up and says, hey, you know, that's my quarter-billion-dollar boat, the government should have a right to very quickly and promptly suss out whether this is sort of a real claim or someone just, you know, sort of trying to pull one over. When we filed our claim——and look, I mean, the government——we've been in talks with the government, at least in public, for well over a year plus, year and a half. The government knows who we are; they know we represent

Mr. Khudainatov; they understand——and we've proven our claim through all of the documents, which is, as we've said, we have the purchase and sale agreement, we have all of the documents related to the *Amadea*, and they all lead back to Mr. Khudainatov. And we're not just saying it. We actually filed it in our claim. Given that, the——so what we've——so we've in fact already answered what the government would be asking in a standing interrogatory. So when we filed our claim, your Honor, we didn't have to do what we did. We could have literally——and we've seen this——we could have filed one piece of paper that says, you know, Eduard Khudainatov, Millemarin assert a claim, and we could have handed that in, and that would have started——that would have brought us to this table. In that case, the government could have then served standing interrogatories and said, well, how could you possibly say this? What's your evidence? Come forward with it. We skipped that step. We provided that evidence. There is absolutely no doubt that Mr. Khudainatov has standing to make this claim; and Millemarin, the entity, as well. And so for that reason, we feel as though the government I guess can serve them, but we've already provided that information.

THE COURT: But you don't dispute the government's authority under the supplemental rules to serve the interrogatories, or think that I have any sort of authority to quash that, do you?

MR. FORD: Well, I guess to the——I guess if they want to serve the interrogatories and we provide the same documents, I guess we could go through that exercise, yeah. I'm not certain——well, I don't know the answer, sitting here today, whether your Honor would have the authority to quash those or not. I think I'll reserve on that. But sitting here today, I'm not aware of it.

THE COURT: Nor am I, sitting here today. So there's no pending request before me, but the parties flagged it in your status letter to me, so it seemed like something that we should discuss. If there's any dispute, any kind of discovery dispute that you want to bring to me, then obviously you can and I'll rule on it at that time. I'm not going to rule on something that's not before me. But I'll tell you that I don't see any basis to deny the government its ability to serve those interrogatories, which seem permitted under the rules.

What I'd like to turn to next are the motions that you all have referred to and that might be coming down, and my understanding from reading the status letter is that what's triggered the possibility of the substitution motion is the government's possible interlocutory——maybe I'm wrong; maybe these are two independent issues, but they seemed related from the way they were presented in the letter——the government's potential interlocutory sale of the boat.

So why don't I turn to the government first and, if

you could, just so I'm aware of the current status of things, is it still in San Diego?

MR. SOHN: Yes, it is, your Honor.

THE COURT: And is the government currently paying maintenance on it?

MR. SOHN: Yes.

THE COURT: How much does that amount to?

MR. SOHN: It's hundreds of thousands of dollars per month. We were still talking with the Marshals about the precise figure. And certainly if this matter proceeded to interlocutory sale, we would in detail itemize the precise figures and the breakdowns, but sitting here today, I can say it's hundreds of thousands of dollars per month.

THE COURT: Okay. And is the government's intention still to pursue an interlocutory sale or still thinking about it?

MR. SOHN: So the government's motion is to try and stop these large maintenance payments. That's a real drain on the public fisc, and interlocutory sale seemed to us to be the most efficacious way of doing that. We are in correspondence with claimant both by email and even in the hallway just outside, where the parties are talking about whether there can be other arrangements that would stop this bleed of funds, so to speak, which might include an agreed arrangement by which claimant shoulders the maintenance costs with various

stipulations such as that, you know, that cannot be used as evidence of ownership, and so on. And so we would ask that the Court give the parties a little bit of time to see whether an agreed resolution can be worked out. If an agreed resolution cannot be worked out, we do expect that we would come before the Court promptly with a motion for interlocutory sale.

THE COURT: Roughly how much time do you think you might need for that?

MR. SOHN: I don't think we would need any more than a couple weeks at most to see whether the parties can reach agreement or whether no agreement can be reached.

THE COURT: Okay. Why don't I turn to Mr. Ford and give you an opportunity to respond.

MR. FORD: Yes, your Honor.

So certainly we would oppose vigorously any attempt at an interlocutory sale. But my client Mr. Khudainatov has also made clear from the very beginning that he was willing to pay all of the maintenance costs for his vessel. He does not believe it's fair that the American taxpayers have been shouldering this burden. He has been offering to make these payments for quite awhile, from the start, in fact, and he's still willing to make those, and it's just a matter of if we can come to an agreement with the government as to that. So for that reason, we hope that we can come to an agreement, Mr. Khudainatov will pay for the maintenance for his vessel,

and we won't need an interlocutory sale.

THE COURT: Do you think what Mr. Sohn suggested about two weeks is enough time to try to hammer something out? I could say two weeks from this Friday, February 2nd?

MR. SOHN: Certainly seems like plenty of time for us, yes.

THE COURT: Perhaps I'll ask you then to file a status letter two weeks from Friday, February 2nd, on the status of those conversations and whether or not that resolves the possibility of interlocutory sale or whether or not I should expect motions practice on that. If you are able to resolve it, then does that resolve the anticipated substitution motion, Mr. Ford, that you were thinking about filing, or are these really independent issues?

MR. FORD: Yeah, no, your Honor. Respectfully, we see them as, frankly, completely different issues, and so we intend to make our motion for, you know——we'll call it the substitution, although I think it's not a precise word because of substitute, you know, as a term of art. But we still intend——as I said earlier, we believe that the amount of money that the government could ultimately recover on this case, even if it were successful, is less than 1 percent of the value of the vessel, and therefore, we'd prefer to put the cash in the court's CRIS account and remove the vessel and then continue with the litigation at that point.

THE COURT: Have the parties conferred on what a briefing schedule for that might look like?

MR. SOHN: Yes, your Honor. We conferred just in the hallway before the conference, and I think the parties are in agreement that the normal default briefing schedule of Local Rule 6.1 would be appropriate, where there's 14 days for opposition, seven for a reply.

THE COURT: Okay. Do you have a sense, Mr. Ford, for when you anticipate filing that motion?

MR. FORD: Your Honor, we should be prepared——right now I believe our motion to dismiss is due on January 26th, and so I think we will either file it along with that motion or, if we could have an additional week for that in the event that we don't have that ready for the January 26 deadline?

THE COURT: Okay. Well, I take your point that it's independent of the interlocutory sale issue, but I want to give you an opportunity to resolve that, and it maybe does change the facts a little bit, and that might be relevant on the substitution motion or at least just helpful to know when considering it, so I think a week after the motion to dismiss deadline is fine. Does the government have any issues with that?

MR. SOHN: No issues, your Honor.

THE COURT: Okay. I think that is everything that I wanted to address today. I will put a control date in the case

management plan for a status conference after the close of all discovery. Obviously if the case is resolved before then, we won't need to have that conference. And I know the parties disagree on the necessity of a jury trial, but I think we can hold on that until at least that post-discovery conference.

Is there anything else that we should talk about today? I'll start with the government.

MR. SOHN: I don't think so, your Honor.

THE COURT: Okay. Mr. Ford? Oh.

MS. JARUSINSKY: Ms. Jarusinsky. Hi, your Honor.

THE COURT: Yes.

MS. JARUSINSKY: One of the things we noted in our letter on the second page with respect to discovery that has already taken place and/or necessary to facilitate settlement discussions, at the very end of that paragraph, we noted that——I think the government stated in the letter that they don't think any discovery would particularly advance settlement discussions at this time. However, we would——we contend that the production of the government's case file actually may help in that regard, so at this time we are requesting that the government produce their case file. We'd be willing to provide a hard drive or whatever is necessary to facilitate that.

THE COURT: Mr. Sohn?

MR. SOHN: If claimants wish to ask for the case file, I think the parties are in agreement that normal civil

discovery should be opening. They can make a document request for that; we can then interpose any objections either on privilege grounds or otherwise and produce nonprivileged, responsive documents in accordance with normal rules of fact discovery. In other words, I don't see any sort of special carveout needed.

THE COURT: Right. And I don't have a dispute in front of me, so I'll just tell the claimants what I told the government, which is essentially, serve your discovery requests, and if there's a dispute about them and you can't resolve it, bring it to my attention, and I'll do my best to resolve it as quickly as I can.

MS. JARUSINSKY: Thank you, your Honor.

THE COURT: Anything else from claimants?

MS. JARUSINSKY: No. Thank you, your Honor.

MR. FORD: Nothing.

THE COURT: Okay. Well, thank you all so much for your time, and again, Mr. Sohn, for making the trip all the way up here. And I think we're adjourned.

THE DEPUTY CLERK: All rise.

THE COURT: Thank you.

ALL COUNSEL: Thank you.

o0o