# EXHIBIT A

AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Seizure of )
*(Briefly describe the property to be seized)* )
)   Case No.   22-sz-9
THE MOTOR YACHT AMADEA, )
WITH INTERNATIONAL MARITIME )
ORGANIZATION NUMBER 1012531 )

## APPLICATION FOR A WARRANT TO SEIZE
## PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of

_____Columbia_____ is subject to forfeiture to the United States of America under _____ U.S.C. §

_____ *(describe the property)*:

50 U.S.C. § 1705(a); 18 U.S.C. § 1956(a)(2) & (h); 18 U.S.C. § 981(a)(1)(A) & (C), and 28 U.S.C. § 2461

(describe the property): THE MOTOR YACHT AMADEA, WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 1012531.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

☐ Continued on the attached sheet.

_____
*Applicant's signature*

Timothy J. Bergen, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____04/13/2022_____

_____
*Judge's signature*

City and state:   District of Columbia

G. Michael Harvey, United States Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>THE MOTOR YACHT AMADEA,<br>WITH INTERNATIONAL MARITIME<br>ORGANIZATION NUMBER 1012531 | )<br>)<br>)<br>)<br>) | Case No.   22-sz-9 |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the     jurisdiction of the          District of          Columbia          be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

THE MOTOR YACHT AMADEA, WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 1012531, pursuant to 50 U.S.C. § 1705(a); 18 U.S.C. § 1956(a)(2) & (h); 18 U.S.C. § 981(a)(1)(A) & (C), and 28 U.S.C. § 2461

AS FURTHER DESCRIBED IN THE AFFIDAVIT

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before     04/27/2022
                                                                          *(not to exceed 14 days)*

☐ in the daytime – 6:00 a.m. to 10:00 p.m.          ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge          G. Michael Harvey                                          .
                                                                          *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     04/13/2022                    *G. Michael Harvey*
                                                          *Judge's signature*

City and state:     District of Columbia                    G. Michael Harvey, United States Magistrate Judge
                                                          *Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-sz-9 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF THE MOTOR YACHT AMADEA, WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 1012531** | **CASE NO. 22-sz-9** <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEIZURE WARRANT

I, Timothy J. Bergen, a Special Agent with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") working in the New York field office. I have been a Special Agent with the FBI for approximately four years, and I have been personally involved in the investigation of this matter.  As a Special Agent of the FBI, I am authorized to investigate violations of the laws of the United States, and to execute search and seizure warrants issued under the authority of the United States. I am currently assigned to the Eurasian Organized Crime Task Force, a squad that investigates, among other things, racketeering and organized crime. During my time with the FBI, I have participated in investigations of racketeering enterprises, illegal gambling operations, extortion, unlawful drug trafficking, and violent crimes, including robbery and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of cooperating witnesses and informants, reviews of taped conversations, and analysis of electronic records. As a result of my training and experience, I am familiar with the techniques and methods used by individuals involved in criminal activity to conceal their activity from law enforcement.

2.     I have been one of the case agents in this investigation.  During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and other related cases with agents, law enforcement officers, and partners at other U.S. Government agencies who

have been involved in these investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a variety of other sources, including law enforcement officers and agents, witness interviews, public records, bank records, and documents discussed herein.

## I.    **<u>INTRODUCTION</u>**

3.      This affidavit is made in support of a seizure warrant for the vessel known as the AMADEA (International Maritime Organization ("IMO") No. 1012531) (the "AMADEA"), a motor yacht built in 2017 and owned by Suleiman Kerimov, a Russian national, which is currently located in the port of Lautoka, Fiji. References herein to the AMADEA refer to the vessel itself, to include all chattels on board, in inventory, or in transit to the vessel.

4.      As further described herein, the AMADEA is an asset of Kerimov. On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Kerimov as a Specially Designated National, as further described herein. As detailed herein, there is probable cause to believe that:

      a.   Kerimov and those acting on his behalf and for his benefit caused U.S. dollar transactions for the AMADEA to be sent through U.S. financial institutions, after a time which Kerimov was designated by the Treasury Department. Further, there is probable cause to believe that Kerimov had an interest in the AMADEA and the financial transactions for its benefit, and thus a license was required for U.S. dollar transactions, but not obtained; and

      b.   Kerimov and his coconspirators conspired to and did cause funds to be transferred to, from, or through the United States with the intent to promote the carrying on of violations of the International Emergency Economic Powers Act ("IEEPA").

5.      There is probable cause to believe that the AMADEA is subject to seizure and forfeiture based on violations of 50 U.S.C. § 1705(a) (IEEPA), and 18 U.S.C. § 1956(a)(2) & (h) (money laundering & conspiracy). Specifically, 18 U.S.C. § 981(a)(1)(A) & (C), respectively, provide for forfeiture of property that is (i) "involved in" a transaction in violation of 18 U.S.C. § 1956 or (ii) "constitutes" "proceeds traceable" to a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D); here, violations of IEEPA).

6.      This Court has venue over the forfeiture action because "acts or omissions giving rise to the forfeiture occurred" in the District and the property subject to forfeiture "is located in a foreign country." *See* 28 U.S.C. § 1355(b)(1)(A) and (b)(2); *see also United States v. Montgomery,* 441 F. Supp.2d 58, 61 (D.D.C. 2006).  To the extent that the AMADEA is seized in a foreign jurisdiction or upon the high seas, this Court additionally has jurisdiction.  28 U.S.C. § 1355(b)(2); *see also United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-CV-1791, 2020 WL 3771953 (D.D.C. July 2, 2020) ("[T]his Court has venue and jurisdiction over the Defendant Properties: (i) as they are located in a foreign country or have been detained by a foreign authority, pursuant to 28 U.S.C. § 1355(b)(2); and/or (ii) as they are on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b).").

## II.    STATUTES

### A.    IEEPA

7.      This action relates to violations of regulations and executive orders issued pursuant to the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*).  Enacted in 1977, IEEPA gives the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to

violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."  50 U.S.C. § 1705(a).

8.    Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued Executive Order ("E.O.") 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and polices of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660.

    a.   Pursuant to his authority under IEEPA and the NEA, on March 16, 2014, the President issued E.O. 13661 to expand the scope of the national emergency declared in E.O. 13660 of March 6, 2014.

    b.   Pursuant to his authority under IEEPA and the NEA, on March 20, 2014, the President issued E.O. 13662 to further expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, and expanded E.O. 13661 of March 16, 2014.

    c.   Pursuant to his authority under IEEPA and the NEA, on December 19, 2014, the President issued E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine. E.O. 13685 prohibits the exportation or importation of any goods, services, or technology to or from the Crimea region

of Ukraine, and prohibits new investment in the Crimea region of Ukraine by a U.S. person, wherever located.

9.     Together, these orders (hereinafter "the Russia/Crimea sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against persons operating in the arms or related materiel sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

10.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). *See* 31 C.F.R. part 589, Ukraine-Related Sanctions Regulations (the "Regulations") for details.

11.     The Russia/Crimea sanctions also block the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

    a.   To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following:

       i.   Actions or policies that undermine democratic processes or institutions in Ukraine;

      ii.   Actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or

     iii.   Misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b.  To have asserted governmental authority over any part or region of Ukraine without the authorization of the Government of Ukraine;

c.  To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

d.  To be an official of the Government of the Russian Federation;

e.  To operate in the arms or related materiel sector in the Russian Federation;

f.  To operate in such sectors of the Russian Federation economy as may be determined by the Secretary of Treasury, in consultation with the Secretary of State;

g.  To operate in the Crimea region of Ukraine;

h.  To be a leader of an entity operating in the Crimea region of Ukraine;

i.  To be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

j.  To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

12.  Blocking sanctions against individuals and entities designated pursuant to the Russia/Crimea sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless

otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List because of the Russia/Crimea sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. chapter V are also blocked, regardless of whether the entity itself is listed.

    a. As defined, "an interest in property" means "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 589.304.

    b. As defined, "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.308.

13. In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

14. An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. OFAC's licensing authority is located in Washington, D.C.

15.     Transacting with an SDN without first obtaining a license from OFAC is a violation of IEEPA, 50 U.S.C. § 1705(a).

**B.      Correspondent Banking**

16.     Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

17.     According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

**C.      Forfeiture Statutes**

18.     This application seeks a seizure warrant under both civil and criminal authorities because the AMADEA could easily be placed beyond process if not seized by a warrant.

19.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture

action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture.  Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 [other than subsection (d)] for all stages of a criminal forfeiture proceeding. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Seizure warrants may be obtained outside of the district where the property to be seized is located. 21 U.S.C. § 853(*l*).

20.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property, real or personal constituting, derived from, or traceable to any proceeds of a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D); here, violations of IEEPA) is subject to forfeiture.

21.     Under 18 U.S.C. § 981(a)(2)(A), the term "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."

22.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to criminal forfeiture. These money laundering forfeiture authorities apply to a larger class of property than traditional forfeiture authorities.  Money-laundering based forfeitures are not limited to the proceeds of the crime.  Money laundering forfeiture encompasses all property "involved in" the crime, which can include so-called "clean" or "legitimate" money that is comingled with "tainted" money derived from the specified unlawful activity.  When the government proceeds on the basis that property was "involved in" a money laundering offense, it

9

need only show "a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

### III.    PROBABLE CAUSE

#### A.    Background on Suleiman Kerimov

23.    Suleiman Kerimov is a Russian national and member of the Russian Federation Council. Kerimov was first designated by the Treasury Department on April 6, 2018.

24.    From my review of publicly reported information regarding Kerimov, I have learned, among other things, that: In November 2017, Kerimov was detained in France and alleged to have brought hundreds of millions of euros into France – transporting as much as €20 million at a time in suitcases, in addition to conducting more conventional funds transfers – without reporting the money to French tax authorities. Kerimov allegedly laundered the funds through the purchase of villas. Kerimov was also accused of failing to pay €400 million in taxes related to villas. Those charges were dropped in June 2018, after reported pressure from the Russian government, although an additional investigation into tax fraud was opened by French authorities in March 2019.

#### B.    Relevant Sanctions

25.    Pursuant to the Russia/Crimea sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated Kerimov as a specially designated national. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and

malicious cyber activities.  Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018, designation listed Kerimov among the "Russian Oligarchs" being designated and stated that Kerimov was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC stated that Kerimov was among those who benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

**C.     The AMADEA**

**i.   Kerimov's Ownership of the AMADEA**

27.     As described herein, there is probable cause to believe that Kerimov is the true beneficial owner of the AMADEA.

28.     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

29.     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



30.

31.

32.    That the AMADEA was, in fact, sold in or about August 2021 is corroborated by Cayman Islands records: The AMADEA is flagged in the Cayman Islands. The Cayman Islands government maintains a Shipping Registry as a division of Maritime Authority of the Cayman Islands. According to its publicly-available website, the Shipping Registry provides "maritime administration and related services" for Cayman Islands-flagged vessels.

    a.    Business records of the Caymans Islands Shipping Registry show that the AMADEA was initially registered in the Cayman Islands in 2017, but that on August 16, 2021, a new certificate of British registry was issued on transfer of ownership in the name of Millemarin Investment Ltd.

    b.    On September 5, 2021, a fee for "Registration of Transfer or Transmission" was paid for by a Cayman Islands-based law firm.

33. 

34.

35.

36. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

37. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

38. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

39. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

40.   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

41.   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███

42.   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

43.   According to open-source reporting, the AMADEA turned off its automated

information system (AIS) [2] on February 24, 2022, almost immediately after the start of the Russian

---

[2]   According to MarineTraffic, which provides a commercial AIS service, the International Maritime Organization requires an AIS to be fitted on every ship, with exceptions for warships, leisure craft, and fishing boats. The system was introduced primarily for safety reasons by helping government authorities to identify vessels, assist in search and rescue operations as well as provide supplementary information from other navigational systems such as radar.  AIS automatically transmits the ship's position and a timestamp.  The ship's operator may also manually update the

invasion of Ukraine, and did so intermittently thereafter.  The automated information system is generally a safety precaution because it allows the location of a vessel to be transmitted for other ocean-going vessels for navigational purposes.

44.     Thus, there is probable cause to believe that Kerimov has owned the AMADEA since 2021, that he purchased it and maintained it while he was designated by the Treasury Department, that Kerimov would have an "interest in" U.S. dollar transactions for the benefit of the AMADEA within the meaning of 31 C.F.R. §§ 589.304, 589.308, and that such transactions would constitute the "contribution or provision of funds, goods, or services by, to, or for the benefit" of Kerimov in violation of E.O. 13661, 31 C.F.R. § 589.201, and IEEPA (50 U.S.C. § 1705).

### ii.   Unlicensed U.S. Dollar Payments for the AMADEA

45.     Following the April 6, 2018, designation, Kerimov caused entities and persons to make U.S. dollar payments which transited U.S. financial institutions on his behalf and for his benefit related to the AMADEA.

46.     According to open-source reports, the AMADEA has an annual running cost of between $25 and $30 million.

47.



---

navigational status, ship's draft, hazardous cargo information, destination and ETA, and waypoints. *See* https://www.marinetraffic.com/blog/information-transmitted-via-ais-signal.



48.     On or about April 13, 2022, authorities from Fiji conducted a search of the AMADEA. In the course of the search, authorities found numerous documents detailing transactions engaged in on behalf of the AMADEA. Within just the past four months, those financial transactions included:

49.

50.

51.

52. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████

53.     According to OFAC, Kerimov and those acting on his behalf failed to obtain licenses for all of the above-described U.S. dollar transactions.

54.     Thus, there is probable cause to believe that Kerimov and those acting on his behalf and for his benefit caused U.S. dollar transactions for the operation and maintenance of the AMADEA to be sent through U.S. financial institutions, after a time which Kerimov was designated by the Treasury Department. Further, there is probable cause to believe that Kerimov had an interest in the AMADEA and the financial transactions for its benefit, and thus a license was required for U.S. dollar transactions, but not obtained.

55.     There is therefore probable cause to believe that under 18 U.S.C. § 981(a)(2)(A), the AMADEA is "proceeds" of these unlicensed U.S. dollar transactions, in that it is "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." Specifically, there is probable cause to believe that through the execution of the aforementioned conspiracy, scheme, and criminal violations, Kerimov was permitted the use and enjoyment of the AMADEA, and was able to maintain it in good repair, and thus, that the AMADEA is itself "traceable" to the aforementioned violations.

56.     Further, there is probable cause to believe that Kerimov and his coconspirators conspired to and did cause funds to be transferred internationally with the intent to promote the carrying on of his IEEPA violations, in violation of 18 U.S.C. § 1956(a)(2)(A).

57.     Consequently, there is probable cause to believe that, under 18 U.S.C. § 981(a)(1)(A), the AMADEA is property "involved in" money laundering transactions in

violation of 18 U.S.C. § 1956(a)(2)(A) insofar as there is a direct and substantial connection between the AMADEA U.S. dollar payments made for the purpose of provisioning the ship, providing it with onboard cash, securing its passage through the Panama Canal, and maintaining its registration and good standing with the Cayman Islands Shipping Registry.

**D.    Exigency**

58.    The U.S. government has received notification from authorities in Fiji that the AMADEA had arrived in Fiji on or about April 12, 2022, but was making plans to leave on or about April 14, 2022.

59.    According to paperwork filed by the AMADEA, their next destination is the Philippines. However, there is reason to believe that its intended destination is, in fact, Vladivostok or other waters in Russian territory. ███████████████████████████████ ███████████████████████████████ Furthermore, following the March 2022 designations by the Treasury Department of several Russian oligarchs, many such designated individuals made efforts to move their yachts to Russia or otherwise into jurisdictions that do not have mutual legal assistance treaties with the United States. Given the route the AMADEA has taken (from the Caribbean, through the Panama Canal, to Mexico, then to Fiji), your affiant believes that Kerimov may likewise be making plans for the AMADEA to travel to Russia in an effort to avoid U.S. efforts to seize the vessel.

**IV.    <u>CONCLUSION</u>**

60.    Based on the information contained herein and my training and experience, I submit that the AMADEA is subject to seizure and forfeiture, pursuant to the above referenced statutes. Based on the forgoing, I request that the Court issue the proposed seizure warrant.  Because of the

exigent circumstances described above, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

61.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Seizure Warrant. I submit that Trial Attorney Andrew D. Beaty, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

Respectfully submitted,

Timothy J. Bergen, Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 13, 2022.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA

21