**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     Plaintiff,

        v.

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531,
INCLUDING ALL FIXTURES, FITTINGS,
MANUALS, STOCKS, STORES,
INVENTORIES, AND EACH LIFEBOAT,
TENDER, AND OTHER
APPURTENANCE THERETO,

     Defendant-*In-Rem*,

      and

EDUARD YURIEVICH KHUDAINATOV,
MILLEMARIN INVESTMENTS LTD.,

     Claimants.

Case No. 1:23-cv-09304

The Honorable Dale E. Ho

**ORAL ARGUMENT REQUESTED**

---

## CLAIMANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR INTERLOCUTORY SALE

FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047

*Attorneys for Claimants Eduard Yurievich*
*Khudainatov and Millemarin Investments*
*Ltd.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ........................................................................................................................4

ARGUMENT .............................................................................................................................6

I.   The Government's Motion Fails on the Merits Because the Maintenance Costs are Not
     Excessive under Rule G, and the Government has Failed to Establish Other Good Cause
     Shown. ..............................................................................................................................6

     A.   Plaintiff Failed to Present the Required Facts to Determine Whether the Costs for
          Maintaining the Amadea are Excessive; but Nevertheless, the Costs are Demonstrably
          Not Excessive.............................................................................................................7

          1.   Determining What is Excessive Requires a Comparison to What is Usual, Proper,
               Necessary, or Normal or a Comparison to the Property's Value.............................7

          2.   The Government's Motion Must be Denied Because the Government Has Failed to
               Provide Facts Required to Evaluate Whether the Costs are Excessive. ..................12

          3.   The Costs Incurred by the Government are Not Excessive for a Vessel Like the
               Amadea and When Compared to its Alleged Value. .................................................13

     B.   The Government's Repackaging of its Flawed "Excessive" Argument Fails to Show
          "Good Cause" for a Sale. ..............................................................................................15

II.  The Motion for Interlocutory Sale is Premature. ....................................................................16

CONCLUSION.........................................................................................................................18

# TABLE OF AUTHORITIES

**Cases:**

*Adams Offshore, Ltd. v. Con-Dive, LLC*,
No. CIV.A. 09-0378-WS-B, 2010 WL 433676 (S.D. Ala. Feb. 1, 2010) ...........................9, 13

*E.N. Visso & Son, Inc. v. One Twenty-two Foot Survey Boat*,
1996 WL 715505 (E.D. La. Dec. 11, 1996).............................................................................12

*Glander Int'l Bunkering Inc. v. M/V Teresa, et al.*,
586 F. Supp. 3d 189 (E.D.N.Y. 2022) ...................................................................................11

*Jama v. Immigration & Customs Enforcement*,
543 U.S. 335 (2005).............................................................................................................7, 8

*John W. Stone Oil Distrib., L.L.C. v. M/V LUCY*,
No. CIV.A. 09-4440, 2009 WL 4166605 (E.D. La. Nov. 20, 2009) .........................................9

*Merchants Nat'l Bank of Mobile v. Dredge General G.L. Gillespie*,
663 F.2d 1338 (5th Cir. 1981) ...............................................................................................12

*Schoninger v. M/V THREE OLIVES*,
No. CIV. 10-69-P-H, 2010 WL 1935855 (D. Me. May 10, 2010) .......................................9, 13

*Seacor Marine LLC v. FPC Sea Striker*,
No. 8:14-cv-114-T-27TBM, 2014 WL 5018888 (M. D. Fla. Oct. 7, 2014) .........................8, 12

*Triton Container Int'l Ltd. v. Baltic Shipping Co.*,
1995 WL 217483 (E.D. La. Apr. 12, 1995)............................................................................12

*U.S. v. Approximately 81,454 Cans of Baby Formula*,
560 F.3d 638 (7th Cir. 2009) ..................................................................................................6

*United States v. Bass*,
404 U.S. 336 (1971)................................................................................................................8

*United States v. Cabasso*,
No. 19-CR-582 (DRH) (E.D.N.Y. Apr. 6, 2021)............................................................3, 9, 12

*United States v. Esposito*,
970 F.2d 1156 (2d Cir. 1992)................................................................................................16

*United States v. Guzman*,
No. 3:08-CR-00023-2, 2013 WL 12228400 (M.D. Tenn. Oct. 7, 2013)....................................9

*United States v. Kumar*,
   No. 4:17-CR-5-FL-1, 2018 WL 3025946 (E.D.N.C. June 1, 2018) .............................................9

*United States v. Lockhart*,
   749 F.3d 148 (2d Cir. 2014) *aff'd*, 577 U.S. 347 (2016)............................................................7

*United States v. M/Y Galactica Star*,
   No. 4:17-cv-02166 (S.D. Tex. Mar. 20, 2019) .........................................................................10

*United States v. Maye*,
   No. 08-cr-00194-WMS-JJM, 2011 WL 2533020 (W.D.N.Y. June 24, 2011) .........................16

*United States v. Woodland Dream*,
   No. 5:13-CV-279-JMH, 2013 WL 5775298 (E.D. Ky. Oct. 24, 2013) ..............................10, 11

*Vineyard Bank v. M/Y Elizabeth I*,
   No. 08-CV-2044, 2009 WL 799304 (S.D. Cal. Mar. 23, 2009) .................................................11

*Waterfront Newport Beach LLC v. P/V Royal Princess*,
   No. 8:20-CV-01420, 2021 WL 5862167 (C.D. Cal. Aug. 18, 2021) .........................................12

## Statutes and Rules:

Rule E(9)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
Actions ...........................................................................................................................................8

Rule G(7)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset
Forfeiture Actions ........................................................................................................... *passim*

Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd. (collectively, "Claimants") respectfully submit this memorandum of law in opposition to Plaintiff United States of America's motion for interlocutory sale pursuant to Rule G(7)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("the Supplemental Rules").[1]

## PRELIMINARY STATEMENT

An interlocutory sale is irreversible, and should only take place when the government makes a sufficient showing warranting such a drastic action, and when the Court has ruled that the government has set forth a legally cognizable claim for forfeiture. Neither has happened here. Claimants have not identified a contested forfeiture case in this country where a court ruled on an opposed motion for interlocutory sale prior to an answer being filed. And that makes sense. Claimants argued in their original motion to dismiss—and intend to do so in their motion to dismiss the amended complaint—that the government has failed to set forth a legally cognizable claim for forfeiture of the Amadea. Claimants further argued—and intend to argue again—that at best, accepting the allegations as true, the government has only set forth a claim for forfeiture of the alleged vendor payments, i.e., $1.2 million, and not the Amadea itself valued at $300 million. Importantly, Mr. Khudainatov is willing to put an amount sufficient to cover those payments in the Court's escrow account, obviating the need for a sale for what would surely be an outsized amount. These issues must be decided before determining whether an interlocutory sale is appropriate. Indeed, if the Court were to grant the motion for interlocutory sale and then subsequently dismiss the forfeiture complaint, Claimant would be severely prejudiced as he would lose his asset, despite prevailing in the case.

---

[1] The government's memorandum of law in support of its motion for interlocutory sale will be cited to herein as "U.S. Mem."

Claimants have consistently offered to reimburse the government for the costs it has incurred for maintaining the Amadea in exchange for its return. That offer stands. Maintaining the Amadea is certainly expensive, and Claimants never intended for U.S. taxpayers to shoulder that burden. But the wrongful decision to seize it was made by the government, knowing what the costs to American taxpayers would entail.

Even though the government's motion is premature, the Court can deny it at this time on the merits, as the government has failed to make a showing sufficient to justify such a dramatic action. This motion is governed by Rule G(7)(b)(i) of the Supplemental Rules and—importantly—it provides:

> On motion by a party or a person having custody of the property, the court may order all or part of the property sold if:
>
> (A)  the property is perishable or at risk of deterioration, decay, or injury by being detained in custody pending the action;
>
> (B)  the expense of keeping the property is excessive or is disproportionate to its fair market value;
>
> (C)  the property is subject to a mortgage or to taxes on which the owner is in default; or
>
> (D)  the court finds other good cause.

But the government only argues that a sale is warranted because the costs are excessive in a vacuum, only a portion of subsection (B), and repackages that same argument by saying the "excessive" costs provide "good cause" to warrant a sale under subsection (D). This is a paltry showing for such a dramatic request.

In addition, the government improperly parses subsection (B). The government here has incorrectly stated that this factor has "an excessive" prong, which the government claims is separate from the words at the end of that factor: "disproportionate to its fair market value." Thus,

the government claims that this Court may rule that the maintenance costs are "excessive" without considering the value of the Amadea, or the normal and ordinary costs of maintaining a similar vessel. But the government is incorrect, as Claimants are not aware of any case where a court analyzed whether maintenance costs were "excessive" in a vacuum. On the contrary, courts have considered the expenses in comparison to the ultimate value of the asset and/or what normal and customary expenses are under similar circumstances. Just last year, the court in *United States v. Cabasso*, No. 19-CR-582 (DRH) (E.D.N.Y. Apr. 6, 2021)[2] denied an interlocutory sale based on excessive costs because the government failed to provide an assessment of a vessel's fair market value. The two cases the government relies on for the proposition that "excessive" can be determined without comparing it to the ultimate value of the asset do not support that proposition— nor anything remotely close. In one of those cases, the court's decision was a minute entry on an unopposed motion without any analysis whatsoever, and in the other the court did compare the expenses versus the value and normal and customary expenses under similar circumstances. The payments at issue here are not "excessive or disproportionate" when compared to the value of the asset and what typical costs are for a vessel of this nature, as confirmed by an industry expert.

Moreover, the government fails to satisfy the "good cause shown" prong. It argues that the Court should "spare the Government and the public from bearing these costs." This is not only a simple restatement of its flawed primary argument, but it also fails to take into account that the government affirmatively pursued the Amadea as part of the Administration's policy to seize superyachts of wealthy Russians, knowing full well of the costs that were required to maintain such vessels during the pendency of the forfeiture action. The government had every opportunity

---

[2] A copy of this unpublished opinion is attached as Exhibit A to the Declaration of Adam C. Ford. The Declaration of Adam C. Ford will be cited to herein as "Ford Decl."

to file a forfeiture action between June 2022 and October 23, 2023, which would have obviated the need for the government to have spent $20 million in taxpayer dollars during that time. But it made the decision not to—not on account of anything Claimants did or said. Instead, the government waited nearly two years to complain about the costs it chose to spend.

Claimants contend that the Court should deny Plaintiff's motion for interlocutory sale on the merits. However, if the Court is not inclined to do so, Claimants respectfully request that the Court reserve decision on the government's motion because it is premature, and any decision should wait until after an answer is filed in this matter.

## BACKGROUND

On March 2, 2022, President Biden instructed the Department of Justice ("DOJ") to seize the assets of wealthy Russians as part of his administration's response to the Russian operations in Ukraine. The DOJ quickly formed the Task Force KleptoCapture (the "Task Force") to accomplish this agenda. Within weeks, the Task Force targeted the Amadea and ultimately received a court-authorized seizure warrant on April 13, 2022. In the application for that warrant, the government asserted that the Amadea had "an annual running cost of between $25 million and $30 million."[3] During the contested litigation in Fiji, two affidavits were filed by counsel for Millemarin Investments Ltd., one by one of the then captains of the Amadea, in which he detailed the Amadea's technical aspects and described the Amadea as "a technically very complex mega yacht." Ford Decl. Exh. C ¶ 3. That captain also detailed the vessel's annual budget ($12.76 million, which is $1,150,000 monthly), and its monthly fixed and variable costs (totaling nearly $800,000 if the

---

[3] Ford Decl. Exh. B ¶ 46 (Affidavit in Support of an Application for a Seizure Warrant signed by Timothy J. Bergen *In the Matter of the Seizure of THE MOTOR YACHT AMADEA, WITH INTERATIONAL MARITIME ORGANIZATION NUMBER 1012531*, Case No. 22-sz-9 ("Bergen Affidavit")).

vessel is at anchor all month and more than $1 million per month if the vessel is underway for a certain number of days in that month). (*Id.* ¶ 5). The other affidavit was by one of the then-Chief Engineers of the Amadea, in which he detailed the maintenance requirements for the Amadea. Ford Decl. Exh. D.

On May 5, 2022, the government issued a press release touting its seizure of a "$300 million yacht" referring to the Amadea.[4] In the government's Verified Complaint for Forfeiture ("Compl.") filed in this matter on October 23, 2023, the government alleged that the Amadea's value had "been reported as between $300 and $500 million." Compl. ¶ 13. In its First Amended Complaint ("Am. Compl.") filed in this matter on February 16, 2024, the government alleged the Amadea to be "$300 million or more." Am. Compl. ¶ 12.

Mr. Khudainatov commissioned the building of the Amadea in or about 2012. Mr. Khudainatov paid €212,824,677 (today approximately $230 million) for the Amadea in multiple installments between 2012 and 2017. During the Amadea's construction, which took five years, Mr. Khudainatov was heavily involved in the design process, and hand-selected many design elements to reflect his personal vision and style, with an eye towards possibly selling the vessel. Indeed, he personally commissioned the hull designer to make the albatross figurehead that adorns the bow, unique to this vessel. The Amadea, a state-of-the-art one-of-a-kind superyacht, was completed and delivered in 2017. Mr. Khudainatov built the Amadea not only to use it himself, but also because of the prospect of making large profits from selling the vessel. As yachts of this nature take several years to build, there was at the time a strong resale market for buyers who did

---

[4] *$300 Million Yacht of Sanctioned Russian Oligarch Suleiman Kerimov Seized by Fiji at Request of United States*, U.S. DEP'T JUST. OFF. PUB. AFFS. (May 5, 2022), https://www.justice.gov/opa/pr/300-million-yacht-sanctioned-russian-oligarch-suleiman-kerimov-seized-fiji-request-united.

not want to wait that long to own a new yacht. Mr. Khudainatov put the Amadea on the market in 2018, but due to its unique style and the Covid pandemic, it never sold. In addition, Mr. Khudainatov received and rejected offers to buy the Amadea at prices he considered too low.

**ARGUMENT**

In a civil *in rem* forfeiture action, the moving party—here, the government—has the burden of proof to show why the court should order the property sold. *U.S. v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638, 641 (7th Cir. 2009). This motion is governed by Rule G(7)(b)(i) of the Supplemental Rules and provides four factors, set forth above that the Court is to consider when deciding to order the property sold: (A) the property is perishable or at risk of deterioration, decay, or injury by being detained in custody pending the action; (B) the expense of keeping the property is excessive or is disproportionate to its fair market value; (C) the property is subject to a mortgage or to taxes on which the owner is in default; or (D) the court finds other good cause.

Even if the government makes a sufficient showing under the above factors, the Court is not required to grant the sale. Indeed, the Court has "considerable discretion" in deciding whether to grant or deny a motion for interlocutory sale, including which "factors to consider, and what weight to give them." *81,454 Cans of Baby Formula*, 560 F.3d at 641–42.

**I.     The Government's Motion Fails on the Merits Because the Maintenance Costs are Not Excessive under Rule G, and the Government has Failed to Establish Other Good Cause Shown.**

The government has failed to make the required showing that an interlocutory sale should be ordered. In its motion, the government seeks an interlocutory sale under subsection (B), but misstates what that section provides. The government wrongfully argues that the maintenance costs, in a vacuum, are "excessive" solely by virtue of the dollar amount at issue. Maintaining the Amadea is expensive, but it is not excessive under Rule G. The government then makes the same

6

argument under subsection (D)—that "there is good cause to spare the Government and the public from bearing" the carrying costs for the Amadea. U.S. Mem. at 7. Finally, the government argues that there is good cause to order a sale because Claimants have previously tried to sell the Amadea, and thus would not be prejudiced by a sale. *Id*. at 7–8. For the reasons set forth below, the government's arguments fail legally and factually.

### A. Plaintiff Failed to Present the Required Facts to Determine Whether the Costs for Maintaining the Amadea are Excessive; but Nevertheless, the Costs are Demonstrably Not Excessive.

#### 1. Determining What is Excessive Requires a Comparison to What is Usual, Proper, Necessary, or Normal or a Comparison to the Property's Value.

The government claims that "[u]nlike the 'disproportionate' prong of Rule G(7)(b)(i)(B), the 'excessive' prong does not weigh the carrying costs against the value of the *res*." *Id.* at 4 n.2. And then it goes on to argue that the maintenance costs the government is paying for the Amadea are excessive without comparing those costs to anything else. *Id.* at 4–7. This position is a misinterpretation and misstatement of Rule G(7)(b)(i)(B) and the caselaw analyzing it. Subsection (B) does not contain "an excessive prong" and a "disproportionate prong." Rather, it contains a subsection that requires a showing that it "is excessive or is disproportionate *to its fair market value*" (emphasis added), consistent with rules of statutory construction, the definition of the word "excessive," and caselaw.

Basic tenets of statutory construction compel this result. A canon of statutory construction "provides that a modifier at the beginning or end of a series of terms modifies all the terms." *United States v. Lockhart*, 749 F.3d 148, 152 (2d Cir. 2014), *aff'd*, 577 U.S. 347 (2016) (internal citations omitted). The series qualifier canon applies where "[t]he modifying clause appear[s] . . . at the end of a single, integrated list," and where the modifying clause "undeniably applies to at least one antecedent, and . . . makes sense with all." *Id.* (citing *Jama v. Immigration & Customs*

*Enforcement,* 543 U.S. 335, 344 n. 4 (2005); *United States v. Bass,* 404 U.S. 336, 339–40 (1971)). Subsection (B) provides "the expense of keeping the property is excessive or is disproportionate to its fair market value." Applying this rule demonstrates that "excessive" must be determined in relation to "its fair market value" because the modifying clause "undeniably applies to at least one antecedent and …makes sense with all." *Id.*

Rules, like statutes, must be read to make sense, *id.* at 154, and this is the only reading— that "excessive" must be determined in relation to something else—that makes sense. The word "excessive" is defined as "exceeding what is usual, proper, necessary, or normal."[5] Nothing is objectively "excessive" standing alone. Indeed, this definition has been specifically held to apply in the context of a request for an interlocutory sale. *See Seacor Marine LLC v. FPC Sea Striker*, No. 8:14-cv-114-T-27TBM, 2014 WL 5018888, at *3 (M. D. Fla. Oct. 7, 2014) (finding that claimants, who sought interlocutory sale, failed "to demonstrate that the expenses are excessive as they offer no evidence of what is usual, proper, necessary, or normal" citing the definition above).[6]

The government's proposed interpretation, on the other hand, does not make sense, and is inconsistent with the way courts have analyzed this subsection. The law makes plain that "excessive" is not to be considered in a vacuum. Indeed, contrary to the government's description of the law, courts almost universally compare the cost of the maintenance to the asset's assessed

---

[5] *Excessive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/excessive (last visited Feb. 14, 2024).

[6] This is a private admiralty case, brought under Supplemental Rule E(9)(a)—not Rule G. Rule E(9)(a) lists similar factors for analyzing whether an interlocutory sale should be granted. Most of the government's cases relied on Rule E. But the government failed to bring to the Court's attention a key difference between Rule E and Rule G, which is that Rule E(9)(a)(i)(B) reads "the expense of keeping the property is excessive or disproportionate" and does not contain the language that appears at the end of the factor in Rule G "to its fair market value." Even in private admiralty cases, however, the courts analyze this factor to require a comparison of the costs to the value of the property or to costs under comparable circumstances.

value, even in the private admiralty context where the corresponding "excessive or disproportionate" factor under Rule E does not include "to its fair market value" at the end.

For example, the court in *United States v. Cabasso*, No. 19-CR-582 (DRH) at pp. 6–7, denied an interlocutory sale based on excessive costs because the government failed to provide an assessment of a vessel's fair market value. Ford Decl. Exh. A. Courts outside New York have come to the same conclusion. *See United States v. Kumar*, No. 4:17-CR-5-FL-1, 2018 WL 3025946, at *10 (E.D.N.C. June 1, 2018) (denying motion for interlocutory sale where government sought to sell vessel for two-thirds of its appraised value, but the loss of one-third in value was sufficient to cover maintenance costs for four years); *see also Schoninger v. M/V THREE OLIVES*, No. CIV. 10-69-P-H, 2010 WL 1935855, at *4 (D. Me. May 10, 2010) (denying motion for interlocutory sale where the vessel's monthly charge constituted only 0.3 percent of the value of the vessel, and even if ten months were to elapse and the total charges increased, those custodial charges "would amount to only 3 percent of the vessel's value" which "cannot be said as a matter of law to be an excessive or disproportionate cost"); *see also Adams Offshore, Ltd. v. Con-Dive, LLC*, No. CIV.A. 09-0378-WS-B, 2010 WL 433676, at *1 (S.D. Ala. Feb. 1, 2010) (denying motion for interlocutory sale where the costs only constituted 2% of the property's value); *but see John W. Stone Oil Distrib., L.L.C. v. M/V LUCY*, No. CIV.A. 09-4440, 2009 WL 4166605 (E.D. La. Nov. 20, 2009) (granting motion for interlocutory sale where total custodial expenses, which were 55% of the vessel's value, were excessive and disproportionate compared with total lien amount); *United States v. Guzman*, No. 3:08-CR-00023-2, 2013 WL 12228400, at *2 (M.D. Tenn. Oct. 7, 2013) (granting interlocutory sale where the maintenance costs exceeded the fair market value of the vessel). The government failed to include any discussion of the Amadea's value or normal operating costs, which is fatal to its motion.

9

Nor is the government's argument supported by the cases on which it relies. The government states that the court in *United States v. M/Y Galactica Star*, No. 4:17-cv-02166 (S.D. Tex. Mar. 20, 2019) ordered an "interlocutory sale based on 'excessive' costs without comparing them to the value of the vessel," but failed to disclose that the court's order was contained in a mere docket entry without any analysis. U.S. Mem. at 4 n.2. The government also fails to mention that the motion for interlocutory sale of the Galactica Star was a joint motion by the government and the claimant, and thus was <u>unopposed</u>. In response to the joint motion, the court issued a minute entry order that appears on the docket sheet, and which contains no analysis whatsoever of the factors at issue.[7] But on the facts, it makes sense that the court there would find that the costs of maintaining the vessel were excessive since both parties wanted it sold. Under those circumstances, there is no reason not to order its sale. Thus, paying any amount could be excessive because both parties wanted to sell it.

The government also misplaces reliance on *United States v. Woodland Dream*, No. 5:13-CV-279-JMH, 2013 WL 5775298, at *5 (E.D. Ky. Oct. 24, 2013) to support its proposition that the Court can find the maintenance costs to be "excessive" without comparing the carrying costs against the value of the res. U.S. Mem. at 4 n.2. That case was about a horse that had serious health issues causing a rapid depreciation in her ultimate value, and also her maintenance costs which "would definitely be higher than the average broodmare." *Woodland Dream*, 2013 WL 5775298, at *5. The court in *Woodland Dream* explicitly analyzed the horse's specific maintenance costs based on her health issues and compared it against her ultimate value that could be obtained at sale: "This mare presents a substantial risk of deterioration based on her reproductive history, and

---

[7] Ford Decl. Exh. E, which is the relevant portion of the docket sheet for the *Galactica Star* case that contains the March 20, 2019 minute entry.

her specialized maintenance costs, which must eventually be paid, further decreasing her ultimate value, are borderline excessive." *Id.* at *5. In other words, even when moving under the "excessive" prong, the court conducted an analysis that included comparing her maintenance costs to the cost of a normal horse and her ultimate value. Also notable in *Woodland Dream* is that the eventual order for interlocutory sale came after an evidentiary hearing. *Id.* at *3. Here, the government did not even introduce evidence sufficient to warrant a hearing.

Nor do the government's other cases provide any legal support for an interlocutory sale in this case, as none of them stands for the proposition that costs can simply be deemed excessive if they reach a certain dollar amount in a vacuum. Indeed, they are all private causes of action seeking to sell vessels in the context of foreclosures or to satisfy debts owed to the plaintiffs. U.S. Mem. at 5. Specifically, the two other cases relied on by the government in support of its assertion that courts have ordered interlocutory sales of vessels at a pre-determined price "based on 'excessive' carrying costs," *Id.*, involved unopposed motions for interlocutory sale, and where the parties asserted that the costs were not only "excessive," but also "disproportionate." *Glander Int'l Bunkering Inc. v. M/V Teresa, et al.*, 586 F. Supp. 3d 189, 197-98 (E.D.N.Y. 2022) (ordering what the parties requested, an interlocutory sale, where the parties agreed that the costs were "excessive or disproportionate," and that the vessels were "wasting assets subject to deterioration," an argument that the government does not make about the Amadea); *Vineyard Bank v. M/Y Elizabeth I*, No. 08-CV-2044, 2009 WL 799304, at *2 (S.D. Cal. Mar. 23, 2009) (ordering interlocutory sale that was unopposed because plaintiff claimed that the expenses were not only "excessive," but also "disproportionate."). The courts in those cases considered the maintenance costs in relation to the debts already owed to the plaintiffs as well as the value of the vessels, including deterioration and

depreciation.[8] Here, there is no allegation that there is any mortgage or lien on the vessel (nor is there any). As such, there is no need to sell the vessel to pay any mortgage or other lien holder.

> **2. The Government's Motion Must be Denied Because the Government Has Failed to Provide Facts Required to Evaluate Whether the Costs are Excessive.**

The government fails to include facts that are required for the Court to order an interlocutory sale. Courts have denied motions for interlocutory sale, where like here, the movant fails to supply the court with evidentiary proof of value and ordinary costs. Here, the government did not provide this Court with this information, leaving the Court without the ability to determine whether the government's costs are excessive in relation to anything else. This failure is fatal in itself. *See Cabasso*, No. 19-CR-582, at pp. *6–*7; *Seacor Marine*, 2014 WL 5018888, at *3; *E.N. Visso & Son, Inc. v. One Twenty-two Foot Survey Boat*, 1996 WL 715505, at *2 (E.D. La. Dec. 11, 1996) (denying interlocutory sale because plaintiff did not present evidence showing expense of keeping boat was excessive or disproportionate to the value of the vessel); *Triton Container Int'l Ltd. v. Baltic Shipping Co.*, 1995 WL 217483, at *2 (E.D. La. Apr. 12, 1995) (denying interlocutory sale, despite the parties consenting to the sale, because plaintiff did not inform the court of the magnitude of the costs or value of the vessel leaving the court without the means to evaluate whether the costs were excessive or disproportionate). The Court should deny the government's motion for interlocutory sale.

---

[8] *See, e.g., Merchants Nat'l Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1340–42 (5th Cir. 1981) (noting that costs had to come out of plaintiffs-lienors' pockets "with uncertain hope of reimbursement" in a foreclosure action on preferred ship mortgages where plaintiffs sought interlocutory sale at the same time the vessels were physically arrested); *Waterfront Newport Beach LLC v. P/V Royal Princess*, No. 8:20-CV-01420, 2021 WL 5862167, at *2 (C.D. Cal. Aug. 18, 2021) (ordering interlocutory sale of vessel because plaintiff sued for unpaid wharfage fees and those fees—and thus the debt owed plaintiff—would only continue to accrue if the vessel was not sold).

### 3. The Costs Incurred by the Government are Not Excessive for a Vessel Like the Amadea and When Compared to its Alleged Value.

As demonstrated above, this Court can deny the government's motion for interlocutory sale based on its failure to supply this Court with the requisite facts to determine whether the costs are excessive. Claimants can nevertheless demonstrate that the costs paid by the government to maintain the Amadea, while admittedly substantial, are not excessive when compared to the vessel's value. In addition, the maintenance costs listed in the Crane Declaration are normal and customary maintenance costs for a vessel of nature. Thus, the Court can deny the government's motion for these reasons as well.

Last week, the government alleged that the Amadea—a 106-meter superyacht—is valued at "roughly $300 million or more." Am. Compl. ¶ 12. According to the government, it has spent $14 million to date since June 2022 with another $6 million in payments coming due soon through April 2024. *See* Declaration of Jennifer Crane. The costs of $20 million equates to a mere 6.6% of the vessel's value. Even if one divides those costs by the 22 months that they cover, they amount to $909,090.91 per month, which amounts to 3% of the vessel's value, that includes expenses for a dry dock period. Under the government's usual running costs figure of $600,000 per month, that figure amounts to a mere 2% of the vessel's value. Thus, the government's running costs cannot be said to be excessive relative to the value of the vessel, and this Court should deny the government's motion on this ground. *See Schoninger,* 2010 WL 1935855, at *4 (denying motion for interlocutory sale even where maintenance would amount to "3 percent of the Vessel's value" because that "cannot be said as a matter of law to be an excessive or disproportionate cost"); *Adams Offshore*, 2010 WL 433676, at *1 (denying motion for interlocutory sale where the costs only constituted 2% of the property's value).

In addition, the $600,000 the government claims to be spending monthly for the Amadea is consistent with what is normal and customary for a vessel of its nature, and the government knows this based on figures that they themselves asserted. The April 13, 2022 and April 22, 2022 Bergen Affidavits state that "[a]ccording to open-source reports, the AMADEA has an annual running cost of between $25 and $30 million." Ford Decl. Exh. B ¶ 46 and Exh. F ¶ 39. Agent Bergen then listed expenses for fuel, crew and galley provisions, harbor, dockage, and inspection fees, and garbage disposal as requisite expenses. Ford Decl. Exh. F ¶ 40. There is abundant publicly available information stating that maintenance costs are typically 10% of a vessel's value per year.[9] Assuming the government's valuation of $300 million, annual maintenance costs would equate to $30 million, exactly as estimated in the Bergen Affidavit, or $2.5 million per month. Thus, by the government's own calculations, $600,000 per month should not be considered excessive.

Finally, the categories of costs here are normal and ordinary for a vessel of this nature: crew salaries, fuel, maintenance, crew food, and waste removal, just as Special Agent Bergen stated. In addition, one of the then-captains of the Amadea, also submitted an affidavit in the Fiji litigation ("Captain Affidavit"), in which he called the Amadea "a technically very complex mega yacht" (¶ 3) and detailed the vessel's annual budget ($12.76 million, which is $1,150,000 monthly), and its monthly fixed and variable costs (totaling nearly $800,000 if the vessel is at anchor all month and more than $1 million per month if the vessel is underway for a certain number of days in that month). Ford Decl., Exh. C ¶ 5.

---

[9] For example, the following link contains a report that is often cited in news articles. Adam Summersby, *How Much Does a Super Yacht REALLY Cost?*, TOWERGATE INS., Oct. 17, 2014, https://www.towergateinsurance.co.uk/boat-insurance/the-cost-of-maintaining-a-super-yacht.

A comparison of the monthly costs detailed in the Captain Affidavit to the Declaration of Jennifer Crane submitted in support of the government's motion for interlocutory sale further demonstrates that the government's costs are not unexpected or excessive:

|  | Crane Decl. | Captain Aff. |
|---|---|---|
| Crew Salary | $360,000 | $422,600 |
| Fuel | $75,000 | $127,200-$477,000 |
| Other Expenses | $165,000 | $223,268 (without insurance $135,000) |
| TOTAL: | $600,000 | $773,068-$1,122,868 (without insurance $684,800-1,034,600) |

As demonstrated above, the expenses incurred by the government are actually less than what would typically be spent for the Amadea based on the government's and the former captain's figures.

An expert in this industry agrees. As set forth in the attached Declaration of Tony Rossitto, the expenditures set forth in the Crane Declaration are consistent with what is reasonable, normal, and indeed necessary to maintain a vessel of this nature. For this reason and the reasons set forth above, the Court should deny the government's motion.

## B. The Government's Repackaging of its Flawed "Excessive" Argument Fails to Show "Good Cause" for a Sale.

The government has failed to demonstrate good cause for a sale. The government's argument on this point is a restatement of the flawed argument it made with respect to subsection (B). The government sought out the Amadea, knowing full-well that a vessel like the Amadea would be expensive to maintain. Indeed, the government estimated the annual running costs in the Bergen Affidavit filed on April 13, 2022, as between $25 million to $30 million. The government here can hardly claim surprise or hardship.

In addition, the government waited almost two years to bring this motion for an interlocutory sale, choosing not to file its forfeiture action until October 23, 2023. Indeed,

according to the government, the only reason why the parties are litigating now is because *Claimants* decided the parties had reached an impasse in connection with settlement discussions on October 20, 2023. Had the Claimants not terminated the discussions when they did, the government would have incurred even more costs. The government could have at any time between its seizure in April 2022 and October 23, 2023 filed a forfeiture action sooner, but chose not to do so. Thus, because of the government's delay, the expenditure of these maintenance costs is the "'fault of the government,'" warranting denial of its motion. *United States v. Maye*, No. 08-cr-00194-WMS-JJM, 2011 WL 2533020, at *1 (W.D.N.Y. June 24, 2011) (denying motion for interlocutory sale, in part, because the expenditure of the costs was deemed to be the "'fault of the government'") (quoting *United States v. Esposito*, 970 F.2d 1156, 1161 (2d Cir. 1992)).

The government also claims under this prong that selling the vessel would not prejudice Mr. Khudainatov because he had previously sought to sell the vessel. This is absurd. Mr. Khudainatov wanted to sell the vessel himself to an individual he confirmed would be a good owner and steward of his vessel, and he wanted to sell it for a premium price, consistent with the time and attention he spent on designing and customizing the vessel, and not in a discounted forfeiture sale. Thus, if the Court permits a sale at this time, and the government ultimately fails at proving its entitlement to forfeiture of the Amadea, and Mr. Khudainatov prevails, he will stand to lose this vessel altogether and receive less than its true value. This would certainly be prejudicial and irreparable.

## II.    The Motion for Interlocutory Sale is Premature.

For the reasons set forth above, this Court should deny the government's motion on the merits. However, if the Court is not inclined to do so, Claimants respectfully request that the Court

reserve any decision on this motion until after this Court decides whether the government has set forth a legally cognizable claim for forfeiture of the Amadea before ordering a sale.

An answer has not yet been filed in this case, and thus this Court has not yet determined whether the government has set forth a legally cognizable basis to forfeit the Amadea.[10] In their motion to dismiss, Claimants raised serious questions as to the propriety of the government's legal theories, and argued that all of the government's claims for forfeiture of the Amadea fail as a matter of law. Claimants further argued that, accepting the government's allegations as true (which Claimants do not), at best, the government may be entitled to forfeit the alleged $1.2 million in vendor payments that the government claims constituted sanctions violations. Claimants intend to make these same arguments in their motion to dismiss the government's amended complaint. The threshold question of whether Plaintiff has set forth a legally cognizable basis to forfeit the Amadea should be determined before the Court orders the vessel to be sold.

---

[10] Claimants are not aware of a forfeiture case where an interlocutory sale was ordered before an answer was filed. The procedural posture of all of the cases cited by the government, and all of the cases cited herein, are post-answer or default order.

## CONCLUSION

The government has failed to make its case for an interlocutory sale in this matter, and instead came forward with paltry facts and a fatal misinterpretation of Rule G. The Court can deny the government's motion on that basis alone, but Claimants have demonstrated that nevertheless there is nothing "excessive" about the payments the government has made to maintain the Amadea. Indeed, the only thing excessive in this case is the government's attempt to sell a vessel prior to a determination that it has set forth a legally cognizable claim to forfeit that vessel, and based on allegations that would at best entitle it to a mere $1.2 million. Claimants respectfully request that this Court deny the government's inadequate motion for interlocutory sale on the merits, or, to reserve decision until after an answer is filed in this case.

Dated: February 23, 2024

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: */s/ Adam C. Ford*

    Adam C. Ford
    Renée L. Jarusinsky
    Anjula S. Prasad
    Stephen R. Halpin III
    Bryan W. McCracken
    275 Madison Avenue, 24th Floor
    New York, NY 10016
    Tel.: (212) 858-0040 (main)
    Fax: (212) 256-1047
    aford@fordobrien.com
    rjarusinsky@fordobrien.com
    aprasad@fordobrien.com
    shalpin@fordobrien.com
    bmccracken@fordobrien.com

    *Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Claimants' Memorandum of Law in Opposition to Plaintiff's Motion for Interlocutory Sale as well as the Declarations of Adam C. Ford and Anthony Rossitto were served on all counsel of record via the Court's CM/ECF system.


Dated: February 23, 2024

*/s/ Adam C. Ford*
Adam C. Ford
