# EXHIBIT F

<u>IN THE HIGH COURT OF FIJI AT SUVA</u>
**[CIVIL JURISDICTION]**

**Civil Action HBM NO.      of 2022**

BETWEEN:      **THE DIRECTOR OF PUBLIC PROSECUTIONS** of the Republic of
Fiji, 25 Gladstone Road, Suva, for and on behalf of the STATE.

<u>Applicant</u>

AND      :      **Suleiman Abusaidovich Kerimov** being the beneficial
owner of the Motor Yacht Amadea with International Maritime
Organisation Number 1012531 having his address of service at
Haniff Tuitoga, 12 Vesi Street, Flagstaff.

<u>1st Respondent</u>

AND      :      **Millemarin Investment Ltd** having its' address of service
at Haniff Tuitoga, 12 Vesi Street, Flagstaff.

<u>2nd Respondent</u>

---

**AFFIDAVIT OF TIMOTHY J. BERGEN**

---

I, **Timothy J. Bergen**, Special Agent with the Federal Bureau of Investigation
("FBI") of 26 Federal Plaza, New York, New York 10278, United States of America,
make oath and state as follows:

1.      I have been personally involved in the ongoing investigation by the FBI into

Suleiman Kerimov and the vessel known as the AMADEA (International Maritime

Organization ("IMO") No. 1012531) (the "AMADEA"), which is currently located in the port

of Lautoka, Fiji.

2.      As further described herein, the AMADEA is an asset of Kerimov. On or about

April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC")

designated Kerimov as a Specially Designated National, as further described herein. As

detailed herein, there is probable cause to believe that:

    a. Kerimov and those acting on his behalf and for his benefit caused U.S. dollar transactions for the AMADEA to be sent through U.S. financial institutions, after a time which Kerimov was designated by OFAC. Further, there is probable cause to believe that Kerimov had an interest in the AMADEA and the financial transactions for its benefit, and thus a license was required for U.S. dollar transactions, but not obtained; and

    b. Kerimov and his coconspirators conspired to and did cause funds to be transferred to, from, or through the United States with the intent to promote the carrying on of violations of the International Emergency Economic Powers Act ("IEEPA").

3.    There is probable cause to believe that the AMADEA is subject to seizure and forfeiture based on violations of 50 U.S.C. § 1705(a) (IEEPA), and 18 U.S.C. § 1956(a)(2) & (h) (money laundering & conspiracy). Specifically, 18 U.S.C. § 981(a)(1)(A) & (C), respectively, provide for forfeiture of property that is (i) "involved in" a transaction in violation of 18 U.S.C. § 1956 or (ii) "constitutes" "proceeds traceable" to a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D); here, violations of IEEPA).

## II.    **STATUTES**

### A.    **IEEPA**

4.    This action relates to violations of regulations and executive orders issued pursuant to the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*). Enacted in 1977, IEEPA gives the U.S. President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part,

that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

  5. Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued Executive Order ("E.O.") 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and polices of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660.

  a. Pursuant to his authority under IEEPA and the NEA, on March 16, 2014, the President issued E.O. 13661 to expand the scope of the national emergency declared in E.O. 13660 of March 6, 2014.

  b. Pursuant to his authority under IEEPA and the NEA, on March 20, 2014, the President issued E.O. 13662 to further expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, and expanded E.O. 13661 of March 16, 2014.

  c. Pursuant to his authority under IEEPA and the NEA, on December 19, 2014, the President issued E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine. E.O. 13685 prohibits the exportation or importation of any goods, services, or technology to or from the

Crimea region of Ukraine, and prohibits new investment in the Crimea region of Ukraine by a U.S. person, wherever located.

6.     Together, these orders (hereinafter "the Russia/Crimea sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against persons operating in the arms or related materiel sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

7.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). *See* 31 C.F.R. part 589, Ukraine-Related Sanctions Regulations (the "Regulations") for details.

8.     The Russia/Crimea sanctions also block the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

   a. To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following:

      i. Actions or policies that undermine democratic processes or institutions in Ukraine;

      ii. Actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or

      iii. Misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b. To have asserted governmental authority over any part or region of Ukraine without the authorization of the Government of Ukraine;

c. To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

d. To be an official of the Government of the Russian Federation;

e. To operate in the arms or related materiel sector in the Russian Federation;

f. To operate in such sectors of the Russian Federation economy as may be determined by the Secretary of Treasury, in consultation with the Secretary of State;

g. To operate in the Crimea region of Ukraine;

h. To be a leader of an entity operating in the Crimea region of Ukraine;

i. To be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

j. To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

9.     Blocking sanctions against individuals and entities designated pursuant to the Russia/Crimea sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List because of the Russia/Crimea sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. chapter V are also blocked, regardless of whether the entity itself is listed.

   a.  As defined, "an interest in property" means "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 589.304.

   b.  As defined, "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.308.

10.    In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

11.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. OFAC's licensing authority is located in Washington, D.C.

12.     Transacting with an SDN without first obtaining a license from OFAC is a violation of IEEPA, 50 U.S.C. § 1705(a).

**B.     Correspondent Banking**

13.     Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

14.     According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

### C.   Money Laundering Statutes

15.    Pursuant to 18 U.S.C. § 1956(a)(2), it is a crime to transmit funds to, from, or through the United States for the purpose of promoting certain specified unlawful activities. In particular:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument of funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.
>
> 18 U.S.C. § 1956(a)(2)

16.    For purposes of this statute, "specified unlawful activity" is defined to include violations of IEEPA. *See* 18 U.S.C. § 1956(c)(7)(D).

17.    Thus, U.S. law makes it a crime to transmit funds to, from, or through the United States—including through U.S. correspondent bank accounts—with the intent to promote sanctions evasions under IEEPA or to benefit those on the SDN list pursuant to IEEPA.

### D.   Forfeiture Statutes

18.    Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property, real or personal constituting, derived from, or traceable to any proceeds of a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D); here, violations of IEEPA) is subject to forfeiture.

8

19.    Under 18 U.S.C. § 981(a)(2)(A), the term "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."

20.    Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture. Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to criminal forfeiture. These money laundering forfeiture authorities apply to a larger class of property than traditional forfeiture authorities. Money-laundering based forfeitures are not limited to the proceeds of the crime. Money laundering forfeiture encompasses all property "involved in" the crime, which can include so-called "clean" or "legitimate" money that is comingled with "tainted" money derived from the specified unlawful activity.  When the government proceeds on the basis that property was "involved in" a money laundering offense, it need only show "a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3).

## III.    <u>PROBABLE CAUSE</u>

### A.    **Background on Suleiman Kerimov**

21.    Suleiman Kerimov is a Russian national and member of the Russian Federation Council. Kerimov was first designated by the Treasury Department on April 6, 2018.

22.    From my review of publicly reported information regarding Kerimov, I have learned, among other things, that: In November 2017, Kerimov was detained in France and alleged to have brought hundreds of millions of euros into France – transporting as much as

€20 million at a time in suitcases, in addition to conducting more conventional funds transfers – without reporting the money to French tax authorities.  Kerimov allegedly laundered the funds through the purchase of villas.  Kerimov was also accused of failing to pay €400 million in taxes related to villas. Those charges were dropped in June 2018, after reported pressure from the Russian government, although an additional investigation into tax fraud was opened by French authorities in March 2019.

**B.    Relevant Sanctions**

23.    Pursuant to the Russia/Crimea sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated Kerimov as a specially designated national. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities.  Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

24.    The April 6, 2018, designation listed Kerimov among the "Russian Oligarchs" being designated and stated that Kerimov was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC stated that Kerimov was among those who benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

### C.    The AMADEA

#### i.  Sale of the AMADEA

25.     As described herein, there is probable cause to believe that Kerimov is the true beneficial owner of the AMADEA.

26.     In the course of this investigation, FBI agents have interviewed numerous members of the yacht brokerage community about the AMADEA and other yachts. Based on those interviews, I have learned, in substance and in part, the following:

> a.  In or about 2021, the AMADEA was the subject of a sale by a yacht brokerage company ("Company A"). In connection with its sale of yachts, Company A assists its customers in concealing their ownership. Company A has a practice of concealing yacht ownership behind nested shell companies and listing a straw, unsanctioned individual as the beneficial owner behind the shell companies, in order to conceal the true beneficial owner.

> b.  Members of the yacht brokerage community believe that the AMADEA was sold to Kerimov in a transaction brokered by Company A. In or about late 2020 or early 2021, an inspection of the AMADEA was arranged for Kerimov, and Kerimov personally toured the yacht.

27.     That the AMADEA was, in fact, sold in or about August 2021 is corroborated by Cayman Islands records: The AMADEA is flagged in the Cayman Islands. The Cayman Islands government maintains a Shipping Registry as a division of Maritime Authority of the Cayman Islands. According to its publicly-available website, the Shipping Registry provides "maritime administration and related services" for Cayman Islands-flagged vessels.

a. Business records of the Caymans Islands Shipping Registry show that the AMADEA was initially registered in the Cayman Islands in 2017, but that on August 16, 2021, a new certificate of British registry was issued on transfer of ownership in the name of Millemarin Investment Ltd. *See* Exhibit A.

b. On September 5, 2021, a fee for "Registration of Transfer or Transmission" was paid for by a Cayman Islands-based law firm.

28.    Additionally, in July 2021, a yacht broker corresponded with a representative of Company A about viewing the AMADEA on behalf of a potential purchaser. The Company A representative indicated that the vessel was available for viewing. However, on October 12, 2021, the Company A representative abruptly stated that the vessel was no longer available for viewings. This further corroborates that the vessel was sold (and thus went off the market) sometime between July and October 2021.

### ii. Eduard Khudainatov

29.    In mid-March 2022, authorities from another country conducted a search of the AMADEA. The captain of the vessel provided an email from Company A dated March 8, 2022, with attachments detailing the purported beneficial ownership of the AMADEA. The documents purport to show that the ultimate beneficial owner is Eduard Khudainatov, by way of Millemarin Investment Ltd. (a BVI company), International Finance LTD (a BVI company), and the Boltenko Trust (a Swiss structure). Khudainatov is not personally a subject of U.S. sanctions but is the former president of the Russian state-controlled oil company Rosneft.

30. Consistent with the Company A practice described above, and based on my training and experience, I believe that Company A listed Khudainatov as a straw beneficial owner of the AMADEA in order to conceal Kerimov's ownership.

31. In the course of its investigation, the FBI has found that Khudainatov appears as the purported owner of at least one other superyacht managed by Company A. Specifically, open-source reporting indicates that Khudainatov has been held out to Italian authorities as the owner of the M/Y *Scheherazade,* a superyacht linked to Russian President Vladimir Putin. Both the AMADEA and the *Scheherazade* were constructed at the behest of Company A in or about 2015.

32. Attached hereto as Exhibit B is documentation from the Trust Company of the Marshall Islands confirming that Khudainatov has been held out as the owner of the *Scheherazade.* Specifically, the first three pages of Exhibit B show that a company called KPM Consulting Ltd. established a company called Bielor Asset Ltd. in the Marshall Islands in 2020. The certificate of British Registry of the Caymans Islands Shipping Registry, attached hereto as Exhibit C, show that Bielor Asset Ltd. is the registered owner of record for the *Scheherazade.* And as shown on the final two pages of Exhibit B, KPM Consulting Ltd. recently told the Trust Company of the Marshall Islands that the beneficial owner of Bielor Asset Ltd. is Khudainatov. Thus, KPM Consulting Ltd. effectively stated that the beneficial owner of the *Scheherazade* is Khudainatov.

33. The fact that Khudainatov is being held out as the owner of *two* of the largest superyachts on record, both linked to sanctioned individuals, suggests that Khudainatov is being used as a clean, unsanctioned straw owner to conceal the true beneficial owners of these vessels. While Khudainatov is wealthy, there is no reason to believe he has the financial

resources to purchase both the AMADEA and the *Scheherazade*, which are collectively worth more than $1 billion.[1] Nor is there any apparent reason why a single individual would own both of these sister superyachts.

### iii. Search of the AMADEA and Interview of Its Crew

34.     On or about April 12, 2022, Fijian law enforcement and the FBI interviewed crew members of the AMADEA. Based on those interviews, I have learned, in substance and in part, the following:

a. Multiple crew members identified Kerimov as the true owner of the AMADEA and others described seeing Kerimov's family using the yacht on multiple occasions. One crewmember explained that Kerimov had owned the AMADEA since Fall 2021 and that it had been transferred in a "backdoor Russian deal."

b. AMADEA crewmembers had been given code names they were to use for the Kerimov family: G-0 for Kerimov; G-1 for his wife; G-2 for his daughter; G-3 for his son; and so on.

c. Multiple crewmembers stated that in January 2022, Kerimov's daughter, her children, Kerimov's other daughter, Kerimov's son, and a friend of Kerimov's son had all been on board the AMADEA in the Caribbean.

d. Another crew member described a trip taken by Kerimov's daughter aboard the AMADEA in October 2021 in France.

---

[1] By way of illustration, Khudainatov does not appear as a billionaire on the 2022 Forbes billionaires list. While this list is not necessarily authoritative – some Russian oligarchs are adept at hiding their wealth from the press – it does suggest that Khudainatov is a second-tier oligarch (at best) who would not have anywhere near the resources to purchase and maintain more than $1 billion worth of luxury yachts.

35.    Beginning on or about April 12, 2022, Fijian law enforcement searched the AMADEA pursuant to a mutual legal assistance request from the United States. That search included emails on the vessel's computers that were sent to or received by members of the AMADEA crew. Based on my review of those emails, I have learned, in substance and in part, the following:

a. In a review of those emails, there is no mention of Khudainatov aside from the March 8, 2022 email from Company A about Khudainatov's purported beneficial ownership, described above.

b. Multiple emails refer to Kerimov's daughters and Kerimov's son being aboard the AMADEA in January and February 2022. These emails discuss in detail their preferences and habits aboard the yacht. For example, in an email dated February 22, 2022, the Chief Stewardess sent the Captain a document with the "[d]etailed preferences for each guest from the February trip." *See* Exhibit D. Based on my participation in this investigation and my review of passport photographs, I know that the person pictured under "G2" is Kerimov's elder daughter; the person pictured under "G3" is Kerimov's son; and the person pictured under "G4" is Kerimov's younger daughter.

c. Other emails attached records of Kerimov's wife, children, and grandchildren, including their passports, vaccination records, covid testing records, and other personal information, in order to obtain clearance to enter various countries. For example, in an email dated January 25, 2022, the Purser for the AMADEA sent attachments of passports and vaccination records of Kerimov family

15

members to arrange entry into the British Virgin Islands. *See* Exhibit E (passports).

d.  In an email dated January 21, 2022, the Captain reiterated to crewmembers that the "G" codes were guest call signs. *See* Exhibit F. In a table headed "AMA / Owner Request," the captain lists out that on board the yacht, G0 refers to "Sir"; G1 refers to "Mme"; G2 refers to "Daughter 1"; G3 refers to "Son 1"; and G4 refers to "Daughter 2." In communications with Company A, however, a slightly different numbering was to be used: G1 refers to "Sir"; G2 refers to "Mme"; G3 refers to "Daughter 1"; G4 refers to "Son 1"; and G5 refers to "Daughter 2."

e.  The emails further make clear that Kerimov's family members were more than merely temporary guests aboard the AMADEA. For example, in an email dated January 28, 2022, Kerimov's daughter ("G3") assisted in setting the itinerary and guest list for the January/February 2022 Caribbean trip. *See* Exhibit G. In that same email thread, the Captain reported that Kerimov's wife told him that Kerimov would be joining his family members aboard the AMADEA: "Mme advised me that G1 will be joining her and the kids for phase 2 Caribbean." *Id.*

f.  Kerimov's family members also made long-term plans for the AMADEA: In an email dated February 24, 2022, the Captain described a meeting with Kerimov's daughter ("G3") about setting the AMADEA's travel agenda for 2022-2023 and purchasing new watersports equipment. *See* Exhibit H.

g.  Kerimov's family members also demanded changes to the yacht itself: In an email dated January 21, 2022, a crewmember wrote to the Captain explaining

16

that "G2 [Kerimov's wife] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to a designer along with the request "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." *See* Exhibit I. Several days later, in an email dated January 30, 2022, the Captain emailed Company A to ask whether the designer would be coming to the Caribbean to present the planned changes to Kerimov's wife: "Please advise if Sebastian from [design company] should mobilize to the Carib. to the meeting with G2 rgds renderings?" *See* Exhibit J.

h. Kerimov's family members were also involved in the approval process for a new pizza oven being purchased for the AMADEA's kitchen, *see* Exhibit K, and made requests for a particular brand of spa bed to be installed on the AMADEA, *see* Exhibit L.

i. Kerimov himself also made his preferences known to the crew: In a document entitled "Bosun Handover Notes," crewmembers discuss a possible "upcoming G0 guest trip." *See* Exhibit M, at 8. The document goes on to discuss a specific gym setup for G0, *id.* at 21, and to note specific requests: "Apparently G0 has two things that have to be immaculate. Stainless and teak," *id.* at 11, and "G0 has requested the quickest [jet skis] available so we will be getting new ski's at some point," *id.* at 17.

17

j. Crewmembers also referred indirectly to the Kerimov family as the owners. For example, one of the members of the Kerimov family's security team named Max (*see* Exhibit D, at 6) was saved in a crewmember's phone as "Max Owners" and provided information to the crew on how to send Kerimov's wife's clothes home from the AMADEA. *See* Exhibit N, at 11.

k. On March 17, 2022, the Captain of the AMADEA sent an email to Security, which summarized an inspection conducted by Panamanian authorities. *See* Exhibit O. In it, the Captain described the inspection that was conducted and noted that it was "hard to control the ID aspect." The Captain specifically noted that:

> They have taken photos of all clearances back to 18.06.2021
> so they have
> GUEST TRIP (I) 21.-29.06.21 (previous Gs) &
> GUEST TRIP (II) 09.-26.10.21 (new set of Gs .. but NOT G0

Based on my review of these emails and my participation in the investigation, I believe "G0" here to refer to Kerimov, who is part of the "new set" of owners of the AMADEA after it was sold in or about August 2021, and whose identity the crew of the AMADEA and Company A were seeking to conceal.

36. According to open-source reporting, the AMADEA turned off its automated information system (AIS) [2] on February 24, 2022, almost immediately after the start of the

---

[2]    According to MarineTraffic, which provides a commercial AIS service, the International Maritime Organization requires an AIS to be fitted on every ship, with exceptions for warships, leisure craft, and fishing boats. The system was introduced primarily for safety reasons by helping government authorities to identify vessels, assist in search and rescue operations as well as provide supplementary information from other navigational systems such as radar. AIS automatically transmits the ship's position and a timestamp. The ship's operator may also manually update the

Russian invasion of Ukraine, and did so intermittently thereafter. The automated information system is generally a safety precaution because it allows the location of a vessel to be transmitted for other ocean-going vessels for navigational purposes.

37.     Thus, there is probable cause to believe that Kerimov has owned the AMADEA since 2021, that he purchased it and maintained it while he was designated by the Treasury Department, that Kerimov would have an "interest in" U.S. dollar transactions for the benefit of the AMADEA within the meaning of 31 C.F.R. §§ 589.304, 589.308, and that such transactions would constitute the "contribution or provision of funds, goods, or services by, to, or for the benefit" of Kerimov in violation of E.O. 13661, 31 C.F.R. § 589.201, and IEEPA (50 U.S.C. § 1705).

### ii. Unlicensed U.S. Dollar Payments for the AMADEA

38.     Following the April 6, 2018, designation, Kerimov caused entities and persons to make U.S. dollar payments which transited U.S. financial institutions on his behalf and for his benefit related to the AMADEA.

39.     According to open-source reports, the AMADEA has an annual running cost of between $25 and $30 million.

40.     During the search of the AMADEA, Fijian authorities found numerous documents detailing transactions engaged in on behalf of the AMADEA. Within just the past four months, those financial transactions included:

      a.  A pro forma invoice from a Fijian company dated April 1, 2022, for $280,900 in "[d]iesel duty free" fuel;

---

navigational status, ship's draft, hazardous cargo information, destination and ETA, and waypoints. *See* https://www.marinetraffic.com/blog/information-transmitted-via-ais-signal.

 b. Invoices from a U.S. company dated March 18 and 21, 2022, totaling $263,415 for fuel delivery while in Mexico;

 c. Invoices from a U.S. company dated March 22, 2022, for crew and galley provisions while in Mexico;

 d. A pro forma invoice from a U.S. company dated March 20, 2022, for $13,854.56 for various harbor, dockage, and inspection fees while in Mexico;

 e. A pro forma invoice from a Panamanian company dated March 4, 2022, for $55,720 for Panama Canal transit;

 f. Invoice from an Antiguan company dated March 18, 2022, for "5600 litres of sludge and 240 LT grease trap disposal" while in Antigua;

 g. Invoice from an Antiguan company dated March 18, 2022, for various fees while in Antigua, including health inspection and dockage;

 h. Invoices from an Antiguan company dated March 2022 for provisions while in Antigua;

 i. Multiple invoices from a St. Maarten company dated December 2021 through and February 2022 for various maintenance services, including hull inspection, garbage disposal, sea chest cleaning, oil analysis, as well as harbor fees;

 j. Multiple invoices from a St. Maarten company dated December 2021 through February 2022 for guest and crew provisioning.

Each of the above invoices was addressed to Millemarin Investments Limited and included wire transfer instructions to be paid in U.S. dollars. The U.S. company invoices were to be

paid directly to a U.S. bank, while the others all included international transfer instructions with a listed U.S. correspondent bank and/or SWIFT code.

41.     On other occasions, Company A paid U.S. dollar fees on behalf of the AMADEA directly. For example, on or about February 2, 2022, Company A caused a U.S. dollar wire transfer in the amount of $6,651.50 to transit through a U.S. correspondent bank with a notation that it was for "AMADEA N2552 ANGUILLA ENTRY AND EXIT CLEARANCE AND AGENT FEES." This payment on behalf of the AMADEA violated U.S. sanctions against Kerimov and his property.

42.     Business records of the Caymans Islands Shipping Registry show that the AMADEA has been registered in the Cayman Islands and had various recurring registration and other fees paid on its behalf. Since August 2021, when the Registry reflects the AMADEA transferred ownership, approximately 19 U.S. dollar transactions have been made to the Registry.

43.     When the AMADEA was in Mexico on or about March 24, 2022, crew provided authorities with a customs declaration form indicating the vessel was carrying $102,675.46 and €17,177.86.

44.     According to OFAC, Kerimov and those acting on his behalf failed to obtain licenses for all of the above-described U.S. dollar transactions.

45.     Thus, there is probable cause to believe that Kerimov and those acting on his behalf and for his benefit caused U.S. dollar transactions for the operation and maintenance of the AMADEA to be sent through U.S. financial institutions, after a time which Kerimov was designated by the Treasury Department. Further, there is probable cause to believe that

Kerimov had an interest in the AMADEA and the financial transactions for its benefit, and thus a license was required for U.S. dollar transactions, but not obtained.

46.     There is therefore probable cause to believe that under 18 U.S.C. § 981(a)(2)(A), the AMADEA is "proceeds" of these unlicensed U.S. dollar transactions, in that it is "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." Specifically, there is probable cause to believe that through the execution of the aforementioned conspiracy, scheme, and criminal violations, Kerimov was permitted the use and enjoyment of the AMADEA, and was able to maintain it in good repair, and thus, that the AMADEA is itself "traceable" to the aforementioned violations.

47.     Further, there is probable cause to believe that Kerimov and his coconspirators conspired to and did cause funds to be transferred internationally with the intent to promote the carrying on of his IEEPA violations, in violation of 18 U.S.C. § 1956(a)(2)(A).

48.     Consequently, based on my training and experience under United States law, I believe there is probable cause that, under 18 U.S.C. § 981(a)(1)(A), the AMADEA is property "involved in" money laundering transactions in violation of 18 U.S.C. § 1956(a)(2)(A) insofar as there is a direct and substantial connection between the AMADEA U.S. dollar payments made for the purpose of provisioning the ship, providing it with onboard cash, securing its

passage through the Panama Canal, and maintaining its registration and good standing with

the Cayman Islands Shipping Registry.

**SWORN** by the said Timothy J. Bergen at New York, New York   ]

this .. *22nd* ..... day of     *April*                2022.]..........................

**BEFORE ME:**

.......................................................

**NOTARY PUBLIC**

ALEXANDER LI
NOTARY PUBLIC, STATE OF NEW YORK
No. 02LI6324086
Qualified in New York County
My Commission Expires May 4, 2023

23

IN THE HIGH COURT OF FIJI AT SUVA
**[CIVIL JURISDICTION]**

Civil Action HBM NO.      of 2022

BETWEEN **THE DIRECTOR OF PUBLIC PROSECUTIONS** of the Republic of Fiji, 25 Gladstone Road, Suva, for and on behalf of the STATE.

**APPLICANT**

AND    **Suleiman Abusaidovich Kerimov** being the beneficial owner of the Motor Yacht Amadea with International Maritime Organisation Number 1012531 having his address of service at Haniff Tuitoga, 12 Vesi Street, Flagstaff.

**1ST RESPONDENT**

AND **Millemarin Investment Ltd** having its' address of service at Haniff Tuitoga, 12 Vesi Street, Flagstaff.

**2ND RESPONDENT**

---

AFFIDAVIT OF TIMOTHY J. BERGEN

---

Affidavit Sworn by: Timothy Bergen
Date Sworn: April 22, 2022
Date Filed:
Filed on behalf of: The APPLICANT

THE DIRECTOR OF PUBLIC PROSECUTIONS
PO BOX 2355, GOVERNMENT BUILDINGS
25 GLADSTONE ROAD, SUVA

FILED
25 APR 2022
HIGH COURT CIVIL
SUVA

24