UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,
:
       Plaintiff,
:
       - v. -
:
THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME    :    23 Civ. 9304 (DEH)
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,     :
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER    :
APPURTENANCE THERETO,
:
       Defendant-*In-Rem*.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM IN SUPPORT OF UNITED STATES OF AMERICA'S MOTION FOR INTERLOCUTORY SALE

JENNIFER JUDE
MICHAEL LOCKARD
Assistant United States Attorneys

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

JOSHUA L. SOHN
Trial Attorney,
Money Laundering and Asset
Recovery Section

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset
Recovery Section, Criminal Division
U.S. Department of Justice

YIFEI ZHENG
Trial Attorney,
Counterintelligence and Export
Control Section

JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export
Control Section, National Security
Division
U.S. Department of Justice

As detailed below, Claimants have no valid arguments against interlocutory sale of the M/Y *Amadea*—a yacht whose upkeep is costing U.S. taxpayers $600,000 per month in regular running costs, another $144,000 per month in pro-rated insurance costs, and other periodic costs. These expenses easily meet the legal standard for interlocutory sale. Moreover, Claimants have failed to demonstrate any prejudice from a fair-market sale, which they allege is their own ultimate goal for the boat anyway. Interlocutory sale should be granted.

    **I.    Interlocutory Sale Is Warranted Based on "Excessive" Upkeep Costs Under Supplemental Rule G(7)(b)(i)(B)**

As explained in the Government's opening brief, ECF No. 33, the cost required to maintain the *Amadea* qualifies as "excessive" cost that warrants interlocutory sale under Supplemental Rule G(7)(b)(i)(B). In response, Claimants argue that the Government cannot deem this cost "excessive" because the Government has not compared it against the value of the *Amadea*. ECF No. 53 ("Opp."). This argument fails for two reasons. First, under the "excessive" prong of Rule G(7)(b)(i)(B), there is no need to compare upkeep costs against the value of the *res*. Second, even if such comparison *were* required, the ratio of upkeep costs to asset value for the *Amadea* is similar to ratios that have traditionally justified interlocutory sale.

    **a.    The "Excessive" Prong of Rule G(7)(b)(i)(B) Does Not Require Comparing Upkeep Costs Against Asset Value**

Rule G(7)(b)(i)(B) states that interlocutory sale is justified if "the expense of keeping the property is excessive or is disproportionate to its fair market value." The "disproportionate" prong, by its terms, compares costs to the property's value. The "excessive" prong, by its terms, does not.

Claimants argue that, under "basic tenets of statutory construction," the phrase "to its fair market value" modifies both "disproportionate" and "excessive." Opp. at 7-8. Not so. "Is

excessive" and "is disproportionate to its fair market value" are separate clauses in Rule G(7)(b)(i)(B); they are not "a series of terms" or "a single integrated list" as Claimants argue. *See* Opp. at 7. Claimants cannot wrench words from the latter clause ("to its fair market value") and graft them onto the former clause. This would create a phrase that is not even proper English: "excessive to its fair market value." Furthermore, under Claimants' argument, the "excessive" clause adds nothing to the "disproportionate" clause, for Claimants argue that these clauses mean the same thing and require the same comparison of costs to asset value. Yet it is a "cardinal principle" of statutory construction that clauses should not be deemed superfluous. *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Moreover, numerous courts have ordered interlocutory sale based on "excessive" costs without comparing those costs to asset value. Besides the *Galactica Star* and *Woodland Dream* cases cited in the Government's opening brief,[1] such cases include *Bartell Hotels v. S/L Talus*, 445 F. Supp. 3d 983, 988 (S.D. Cal. 2020); *Vineyard Bank v. M/Y Elizabeth I*, No. 08-CV-2044, 2009 WL 799304, at *2 (S.D. Cal. Mar. 23, 2009); and *Ferrous Fin. Servs. Co. v. O/S Arctic Producer*, 567 F. Supp. 400, 401 (W.D. Wash. 1983).

Claimants argue that "'excessive' must be determined in relation to something else." Opp. at 8. Even if this abstract proposition were true, upkeep costs can be deemed "excessive"

---

[1] Claimants try to distinguish *Galactica Star* on the ground that interlocutory sale in that case was unopposed. *See* Opp. at 10. This is an unconvincing distinction, as the *Galactica Star* court acknowledged its duties under Rule G(7)(b)(i)(B) and expressly found upkeep costs "excessive." *Galactica Star* is thus persuasive authority on what the "excessive" prong does and does not require. Equally unconvincing is Claimants' attempt to distinguish *Woodland Dream*, *see* Opp. at 10-11, where the court never even stated the horse's value and expressly held that her upkeep costs could be "excessive" even without being "disproportionate to her fair market value." *United States v. Woodland Dream*, No. 5:13-CV-279, 2013 WL 5775298, *5 (E.D. Ky. Oct. 24, 2013).

compared to what is fair for taxpayers to pay. Indeed, for very expensive assets, it makes sense that the drafters of the Supplemental Rules would want to enable interlocutory sale even if upkeep costs were a small fraction of asset value—precisely because even a small fraction of a large asset can be a significant drain on the public fisc. Here, it is "excessive" for taxpayers to pay nearly a million dollars per month to maintain the *Amadea* when these expenses could be reduced to zero through interlocutory sale.

For all these reasons, the Court can and should find the upkeep costs for the *Amadea* "excessive" without comparing these costs to the asset's value.

### b. Even if the "Excessive" Prong Did Require Comparing Upkeep Costs to Asset Value, the Comparison Would Justify Interlocutory Sale Here

Even if the "excessive" prong *did* require comparing upkeep costs against asset value, the comparison would justify interlocutory sale. The *Amadea* has been publicly reported as being worth $300 million, and the attached U.S. Marshals Service declaration states that it has been appraised as having a fair market value of $230 million. Supplemental Declaration of Jennifer Crane ("Supp. Crane Decl.") ¶ 3.[2] Using these figures, the $744,000 monthly upkeep bill for the *Amadea* is .25%-.32% of its value. And that only includes *standard* monthly costs, not special fees such as dry-docking (which is periodically required). Crane Decl., ECF No. 34, at ¶ 6. When one adds dry-docking fees and distributes them on a per-month basis over the length of Government custody, it amounts to an extra $178,000 per month,[3] meaning the overall monthly bill for the *Amadea* is $922,000 per month. This is between .31% and .4% of the yacht's value.

---

[2] The parties have conferred and agree that publicly disclosing this figure will not prejudice the ability to conduct interlocutory sale.

[3] $5.6 million for dry docking, minus $1.5 million in regular costs that do *not* need to be paid during dry docking, divided by 23 months of overall Government custody. *See* Crane Decl. ¶ 6.

Courts have ordered interlocutory sale when monthly costs were roughly this percentage of asset value. *See, e.g., Galactica Star*, No. 4:17-cv-02166 (S.D. Tex.), ECF No. 194 and 3.20.19 Minute Order ($170,000 in monthly costs for yacht later re-sold for $37,400,000 (.45% of asset value)); *United States v. One 2005 Lagoon 440 Sailing Catamaran*, No. CV 13-9262, 2017 WL 10573808 (C.D. Cal. Sept. 22, 2017) ($1,200 in monthly costs for boat with list price of $430,500 (.27% of asset value)); *United States v. Any & All Funds in UBS AG, Account Number XXXX1138*, 628 Fed. App'x 296 (5th Cir. 2016) ($1,700 in monthly costs for airplane worth $2,250,000 (.07% of asset value)); *Caterpillar Fin. Servs. Corp. v. Coleman*, No. 99-03821, 1999 WL 33218595 (C.D. Cal. Aug. 19, 1999) ($1,400 in monthly costs for vessel worth $325,000 (.43% of asset value)); *Freret Marine Supply v. M/V ENCHANTED CAPRI*, No. 00-3805, 2001 WL 649764 (E.D. La. June 11, 2001) ($45,000 in monthly costs for cruise ship worth $12,000,000 (.37% of asset value)); *United States v. $1,133,648.97 et al.*, No. 07-175, ECF Nos. 49-2, 68, 125 (D. Haw.) ($2,850 in monthly costs for cars later sold for $1,200,000 (.23% of asset value)).

Claimants' cited cases, by contrast, are distinguishable. In *United States v. Kumar*, No. 4:17-CR-5-FL-1, 2018 WL 3025946, *10 (E.D.N.C. June 18, 2018), the court denied interlocutory sale where the Government stated that it would *not* try to sell the subject vehicles for fair market value but would instead pursue a steeply-discounted sale. In *Schoninger v. M/V THREE OLIVES*, No. CIV. 10-69, 2010 WL 1935855, at *4 (D. Me. May 10, 2010), the court denied interlocutory sale where total custodial costs from arrest to judgment were projected to be only 3 percent of the vessel's value. By contrast, total *Amadea* costs will vastly exceed 3 percent (indeed, they already have). Finally, *Adams Offshore, Ltd. v. Con-Dive, LLC*, No. CIV.A. 09-

4

0378, 2010 WL 433676, at *1 (S.D. Ala. Feb. 1, 2010) is distinguishable on the same basis—in that case, total relevant costs were projected to be only 2 percent of the property's value.

### c. The Government Need Not Show That It Has Been Overpaying for the *Amadea* in Order to Obtain Interlocutory Sale

Claimants next argue that the *Amadea*'s upkeep costs are not "excessive" because they are "consistent with what is normal and customary for a vessel of its nature." Opp. at 14. The *Sailing Catamaran* court rejected a similar argument, explaining: "Claimant argues that Plaintiff failed to establish that the costs were 'excessive' because it has not shown that they are 'more than what is proper or reasonable.' This line of reasoning misses the point. Even if the costs *are* proper and reasonable, these continually accruing costs are disproportionate relative to the average retail price of the vessel . . ." *Sailing Catamaran*, 2017 WL 10573808, at *2 (emphasis in original). Here too, the costs of maintaining the *Amadea* can certainly be deemed "excessive" even if the Government is spending what is necessary and appropriate to maintain a vessel of this nature.

## II. Interlocutory Sale Is Warranted Based on "Other Good Cause" Under Supplemental Rule G(7)(b)(i)(B)

Even if the *Amadea*'s monthly costs were not "excessive" under Rule G(7)(b)(i)(B), these sizable costs would constitute "other good cause" to sell the vessel under Rule G(7)(b)(i)(D), particularly when combined with Claimants' own contention that they have always viewed the *Amadea* as an investment property that they have tried to sell. Claimants' only rebuttal on this point is to say that "Mr. Khudainatov wanted to sell the vessel himself to an individual he confirmed would be a good owner and steward of his vessel, and he wanted to sell it for a premium price . . . not in a discounted forfeiture sale." Opp. at 16. Yet there is no basis for Claimants' speculation that an interlocutory sale under the Court's supervision would be a

"discounted forfeiture sale" that would fail to maximize the asset's value. Courts have rejected this precise argument. *See United States v. Real Prop. & Residence located at 4816 Chaffey Lane*, 699 F.3d 956, 961 (6th Cir. 2012) ("The value of the underlying property is not at risk from an interlocutory sale, because the yacht will be sold 'in a commercially reasonable manner taking into account the characteristics of the yacht.'"). Indeed, this Court could institute a sales process where the *Amadea* was widely marketed by top-tier yacht brokers, potentially with a minimum reserve price to ensure that no drastic underbids would be accepted. *See generally* Supp. R. G(7)(b)(ii-iii) (giving the Court wide discretion in setting interlocutory sale procedures).

In short, "good cause" exists to sell the vessel where it is costing taxpayers nearly a million dollars per month, Claimants themselves have tried to sell it, and the Court has ample powers to ensure that interlocutory sale would yield a fair price. Indeed, it is telling that Claimants fail to identify any prejudice they would suffer from a fair-market sale of the *Amadea* and concede, again, that they have long sought to sell the vessel. Opp. at 16. A fair-market interlocutory sale preserves the Government's interest in avoiding substantial taxpayer burden *and* furthers Claimants' admitted desire to sell the vessel.

### III. Claimants' Allegation of Government Delay Is Outrageous

Claimants argue that interlocutory sale should be denied because "the government waited almost two years to bring this motion for an interlocutory sale, choosing not to file its forfeiture action until October 23, 2023." Opp. at 15; *see also id.* at 3-4 (same argument). But as the Government has explained, the reason it did not file a forfeiture action before October 2023 is that Claimants reached out to the Government and sought repeated audiences in which they tried to convince the Government that the yacht was not forfeitable property. Sohn Decl., ECF No. 35,

6

at ¶ 3. The Government agreed to hear Claimants out and to entertain pre-litigation settlement talks, which lasted until October 2023. *Id.* Claimants' attempt to weaponize the Government's good-faith willingness to listen by arguing that this shows culpable Government delay is outrageous, particularly when paired with Claimants' simultaneous argument that this motion for interlocutory sale is premature. *See* Opp. at 16-17. While Claimants' other arguments against interlocutory sale simply lack merit, this "delay" argument should be rejected in the strongest possible terms.

### IV. The Court Need Not—And Should Not—Defer Interlocutory Sale Until Claimants' Motion to Dismiss Is Decided

Finally, Claimants argue that the Court should defer interlocutory sale until Claimants' forthcoming motion to dismiss ("MTD") is decided. Yet that would create a large and untoward delay, particularly now that Claimants have successfully moved to extend the MTD briefing schedule. Under the new schedule, ECF No. 45, MTD briefing will not be concluded until April 26 and the MTD might not be decided until months after that. Thus, deferring interlocutory sale until the MTD was decided would create a delay of a minimum of several months, with the attendant monthly taxpayer cost of millions of dollars.

Moreover, no legal authority supports Claimants' argument that interlocutory sale is inappropriate while an MTD is pending. Claimants cite no supporting authority. In fact, courts have rejected similar arguments. For example, in *Michaels v. M/Y No Bad Days*, the claimant opposed interlocutory sale "because the court 'has not ruled on the propriety of the [vessel] arrest itself.'" No. 2:06-cv-1185, ECF No. 56 at 3 (C.D. Cal. June 12, 2006). The court rejected this argument, noting that the claimant "cites no authority that prohibits a court from ordering the interlocutory sale of a vessel while a decision on the merits of the case is pending." *Id.* Here too, the fact that Claimants may challenge the merits of the Government's case through Rule 12

7

motion, summary judgment, or trial does not preclude interlocutory sale, which can be ordered if one of four conditions are met—none of which relates to the merits of the underlying action. *See* Supp. R. G(7)(b)(i)(A)-(D). Indeed, "[t]he interlocutory sale of a vessel . . . does not touch on the merits of any particular claim, but instead is a measure taken to 'avoid the recognized complications associated with maintaining a vessel under arrest.'" *Glander Int'l Bunkering Inc. v. M/V TERESA*, 586 F. Supp. 3d 189, 197 (E.D.N.Y. 2022) (citation omitted, brackets deleted).

### V.     Conclusion

For the foregoing reasons and those provided in the Government's opening brief, the Government respectfully requests that the Court order interlocutory sale.

Dated: New York, New York
March 1, 2024

Respectfully submitted,

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
U.S. Department of Justice

By: /s/ *Joshua L. Sohn*
JOSHUA L. SOHN
Trial Attorney
Money Laundering and Asset
Recovery Section

By: /s/ *Jennifer Jude*
JENNIFER JUDE
MICHAEL LOCKARD
Assistant United States Attorneys
Southern District of New York

JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice

By: /s/ *Yifei Zheng*
YIFEI ZHENG
Trial Attorney
Counterintelligence and Export
Control Section