UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO,<br><br>    Defendant-*In-Rem*,<br><br>    and<br><br>EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD.,<br><br>    Claimants. | Case No. 1:23-cv-09304<br><br>The Honorable Dale E. Ho<br><br>**ORAL ARGUMENT REQUESTED** |

**CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR RECONSIDERATION OR CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

RELEVANT PROCEDURAL HISTORY ..................................................................................2

ARGUMENT .................................................................................................................................5

    I.       The Court Should Reconsider and Revise its Ruling Regarding the Applicability of *U.S. v. Verdugo-Urquidez* to Warrants Obtained Within the United States for the Purpose of Presentation to Foreign Tribunals ............................................................5

           A.    The Court's Order Incorrectly Extended *U.S. v. Verdugo-Urquidez* Beyond its Current and Appropriate Reach ..........................................................5

           B.    The Court Should Reconsider its Order, and Either Reverse the Order Entirely, or Revise its Order to Simply Deny Expedited Discovery Without Finding that Claimants Have No Fourth Amendment Rights .............................................12

    II.      In the Alternative, the Court Should Certify its Order for Interlocutory Review of the Fourth Amendment Issue. ...................................................................13

CONCLUSION............................................................................................................................14

## TABLE OF AUTHORITIES

**Cases:**

*Arizona v. Evans*,
    514 U.S. 1 (1995)..................................................................................................11, 12

*Elkins v. United States*,
    364 U.S. 206 (1960)..........................................................................................................12

*Franks v. Delaware*,
    438 U.S. 154 (1978)............................................................................................................1

*Henderson v. Metro. Bank & Trust Co.*,
    502 F. Supp. 2d 372 (S.D.N.Y. 2007) .............................................................................12

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
    552 F.3d 157 (2d Cir. 2008)...............................................................................................6

*Marine Midland Bank, N.A. v. United States*,
    11 F.3d 1119 (2d Cir. 1993)...............................................................................................4

*Millemarin Investments Ltd. v. The Director of Public Prosecutions
and Suleiman Abusaidovich Kerimov*,
    No. CBV 0006 of 2022 (Sup. Ct. Fiji. Suva Apr. 28, 2023).............................9, 10, 11

*Parrish v. Sollecito*,
    253 F. Supp. 2d 713 (S.D.N.Y. 2003) .............................................................................12

*Pen American Center, Inc. v. Trump*,
    18-cv-9433, 2020 WL 5836419 (S.D.N.Y. Oct. 1, 2020).........................................13

*Schoolcraft v. City of New York*,
    298 F.R.D. 134 (S.D.N.Y. 2014) .....................................................................................12

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996)..............................................................................................................7

*Texas v. Brown,*
    460 U.S. 730 (1983)............................................................................................................7

*United States. v. Calandra*,
    313 U.S. 338 (1974)..........................................................................................................12

*United States v. Hasbajrami*,
    945 F.3d 641 (2d Cir. 2019).....................................................................................2, 4, 6

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ............................................................................................... passim

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
  956 F.2d 1245 (2d Cir. 1992) ........................................................................................12

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
  516 U.S. 199 (1996) .......................................................................................................13

**Statutes and Rules:**

28 U.S.C. § 1292(b) ..................................................................................................1, 5, 13, 14

Federal Rule of Civil Procedure 59 ...............................................................................12

Local Rule 6.3 of the United States District Courts
for the Southern and Eastern Districts of New York ................................................12, 13

United Nations Convention against Transnational Organized Crime,
Nov. 15, 2000, S. Treaty Doc. No 108-16, 2225 U.N.T.S. 209 ...................................3, 9

Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd. (collectively, "Claimants") submit this memorandum of law in support of their motion for reconsideration or, in the alternative, certification under 28 U.S.C. § 1292(b).

## PRELIMINARY STATEMENT

Claimants respectfully request that this Court reconsider its ruling set forth in its February 22, 2024 Order denying Claimants' request for expedited discovery. This Order stemmed from Claimants' letter motion to the Court requesting that the Court order the government to comply in an expedited manner with the narrow document requests that Claimants had served on the government. The government opposed Claimants' letter motion, after which Claimants filed a reply letter.

In their letter motion, Claimants stated their intention to oppose the government's previously filed motion for interlocutory sale, in part because the government seized the Amadea in violation of the Fourth Amendment, and thus should be prohibited from selling what it does not lawfully possess. Claimants further explained their intention to seek a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the affidavit used to obtain the seizure warrant contained knowing or reckless false statements and material omissions that were intended to mislead the Court. After the Court questioned whether Claimants had Fourth Amendment rights (during a telephonic status conference on February 22, 2024), Claimants' counsel respectfully requested the opportunity to brief the issue, which this Court denied. On February 22, the Court issued an Order denying Claimants' request for expedited discovery, and further finding that the Fourth Amendment does not apply extraterritorially to foreign citizens with no voluntary attachment to the United States.

Claimants submit that this ruling is based on an incorrect application of *United States v. Hasbajrami*, 945 F.3d 641, 662 (2d Cir. 2019) and *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274–75 (1990) to this case. In contrast to this case, in neither of those cases did a U.S. law enforcement official submit an affidavit to a U.S. court seeking authorization to seize property based on the Fourth Amendment. Thus, this case presents the question of whether the Fourth Amendment applies when the government seeks and obtains a warrant from a U.S. court to seize property owned by a foreigner and located outside of the United States. The resolution of this question has important implications not just for this case, but for all similar forfeiture cases, the number of which is rapidly proliferating in the current political environment.

## RELEVANT PROCEDURAL HISTORY

On April 13, 2022, Magistrate Judge G. Michael Harvey of the United States District Court for the District of Columbia issued a warrant for the seizure of the Amadea, which at the time was located in Fiji.[1] Ford Decl. Exh. A.[2] The application to the court requested that the Amadea be seized as it is "subject to forfeiture to the United States of America." *Id.* The application for the warrant was supported by an affidavit sworn by Timothy Bergen (the "Bergen Affidavit"), a Special Agent of the Federal Bureau of Investigation ("FBI"). *Id.*

Later that day, armed with the seizure warrant, the United States Department of Justice ("DOJ") sent an urgent request for assistance to the appropriate authority in Fiji to seize the Amadea and authorize the United States to take possession of the vessel and sail it to the United States. Ford Decl. Exh. B. The request stated that it was being made pursuant to Arts. 13 and 18

---

[1] The warrant application asserts that the Amadea, at the time, was located in the jurisdiction of the District of Columbia.
[2] Filed with this motion is the Declaration of Adam C. Ford, which will be cited to herein as "Ford Decl."

2

of the United Nations Convention against Transnational Organized Crime ("UNTOC"), to which both the United States and Fiji are parties. UNTOC, Nov. 15, 2000, S. Treaty Doc. No 108-16, 2225 U.N.T.S. 209 (ratified by 192 states, including the US and Fiji), relevant articles are attached to Ford Decl. as Exh. C. Under the UNTOC and the principles of international comity, the DOJ was required to produce a warrant, validly issued under the laws of the United States as a prerequisite to its request that the Fijian court grant it permission to seize the vessel. *See* Ford Decl. Exh. C, UNTOC, arts. 13(3)(b), 18(17). Without a valid US seizure warrant, Fiji would not have been permitted to seize the Amadea and turn it over the United States.

Claimants appeared in the Fiji action to challenge the seizure of the Amadea and litigation ensued through the lower court, the appellate level, and up to the Supreme Court. Ultimately, the DOJ's request that Fiji seize the Amadea and turn it over to American authorities was granted on the basis of the seizure warrant signed by Magistrate Judge Harvey and supported by the Bergen Affidavit. The U.S. sailed the Amadea from Fiji to San Diego in early June 2022, and on October 23, 2023, the DOJ filed the instant forfeiture action.

On Friday, February 9, 2024, the government moved this Court for an order granting an interlocutory sale of the Amadea. On Tuesday, February 13, 2024, Claimants served limited discovery requests on the government, seeking narrowly-tailored expedited discovery for documents necessary to Claimants' opposition to the government's motion for interlocutory sale. The DOJ refused to produce the documents by the expedited date requested by Claimants.

On February 16, 2024, Claimants requested that the Court set an expedited discovery schedule for the document requests referred to above. Claimants made this request because they possess evidence (which has been provided to the Court) suggesting that the Bergen Affidavit contained materially false and misleading statements. But for these misrepresentations, there

would have been no probable cause to support Magistrate Judge Harvey's April 2022 seizure warrant. Given that the U.S. seizure warrant provided the legal basis for the Fijian Restraining Order, if the U.S. seizure warrant was tainted, so was the Fijian order. If the Fijian order was tainted, the Amadea should never have been turned over to the U.S. If the Amadea should never have been turned over to the United States, it follows that the government does not lawfully possess it, and therefore should not be able to sell it. Therefore, Claimants sought discovery in order to determine whether the Bergen Affidavit contained intentional false and misleading statements, and sought an expedited return date that fell before Claimants' opposition to the government's motion for interlocutory sale was due.

However, this Court went beyond the actual issue in dispute and ruled that as a matter of Constitutional law, Claimants are barred from asserting a Fourth Amendment claim because "'the Fourth Amendment (and, in particular, its warrant requirement) does not apply extraterritorially…at least where the '[the defendant] was a citizen and resident of [another country] with no voluntary attachment to the United States.'" In so ruling, the Court quoted *United States v. Hasbajrami*, 945 F.3d 641, 662 (2d Cir. 2019) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990). Neither of these cases, however, is applicable to the facts of this case because neither involved the government obtaining a seizure warrant which was necessary to effectuate its request to a foreign country pursuant to treaty. This Court's Order, should it stand, has far reaching consequences for Claimants, as it deprives them of the opportunity to have their assets returned during the pendency of this action (as this Court acknowledged was possible if the facts here were aligned with those in *Marine Midland Bank, N.A. v. United States*, 11 F.3d 1119 (2d Cir. 1993)). In addition, the government seized documents from the Amadea likely based on the same potentially defective warrant application, and may intend to use these

4

documents as evidence in this case. However, this Court's Fourth Amendment ruling forecloses Claimants' ability to seek suppression of such evidence.

Beyond this case, the Court's ruling could set a dangerous precedent allowing the government to knowingly submit false information to a United States court for a warrant to seize property of foreigners, located outside of the United States, with no consequences.

Claimants do not challenge or question this Court's ruling denying expedited discovery. Rather, Claimants solely and respectfully move this Court to either reconsider its ruling that Claimants have no Fourth Amendment rights in this case, or, in the alternative, given the potentially far-reaching consequences of this ruling, certify it for interlocutory review pursuant to 28 U.S.C. § 1292(b).

**ARGUMENT**

I. **The Court Should Reconsider and Revise Its Ruling Regarding the Applicability of *U.S. v. Verdugo-Urquidez* to Warrants Obtained Within the United States for the Purpose of Presentation to Foreign Tribunals.**

   A. **The Court's Order Incorrectly Extended *U.S. v. Verdugo-Urquidez* Beyond Its Current and Appropriate Reach.**

This Court's ruling regarding Claimants' Fourth Amendment rights effectively distills a rule from *Verdugo-Urquidez* which is tantamount to a presumption that a class of individuals is not entitled to any of the protections guaranteed by the Fourth Amendment. But the Supreme Court in *Verdugo-Urquidez* did not rule that foreigners do not have *any* Fourth Amendment rights in *any* circumstances. Rather, the plurality opinion merely held that the Fourth Amendment has no application to a *warrantless* search by U.S. agents of a nonresident alien's property located in a foreign country. *Verdugo-Urquidez*, 494 U.S. at 261. This is not just Claimants' interpretation. In fact, Justice Kennedy in his concurrence explicitly noted, "the Court has not decided, that persons in the position of respondents [foreigners challenging a search overseas] have no constitutional

5

protection." *Id.* at 278. This Court's Order extends *Verdugo*'s limitation of the Fourth Amendment to apply to *warrants obtained within the United States* even if the warrant is to be presented to a foreign tribunal as a necessary precondition to seize property outside the United States.

*Hasbajrami*, on which this Court relied, addressed only the question of an "as-applied challenge to the constitutionality of *warrantless* collection and review of his communications under Section 702." 945 F.3d at 662 (emphasis added). All the court held in that case was that:

> the government may lawfully collect, without a warrant and pursuant to Section 702, the e-mails of foreign individuals located abroad who reasonably appear to constitute a potential threat to the United States and, once it is lawfully collecting those emails, it does not need to seek a warrant, supported by probable cause, to continue to collect emails between that person and other individuals once it is learned that some of those individuals are United States citizens or lawful permanent residents, or are located in the United States.

*Id.* at 664. Indeed, even the *Hasbajrami* court explained that *Verdugo-Urquidez* and its progeny are rulings limited to the proposition that "the Fourth Amendment does not require the government to obtain a warrant before collecting the emails of foreign individuals abroad." *Id.* at 663. None of these decisions involved a situation where, as here, a valid warrant was a necessary precondition for the government to take its desired action.

The cases that follow *Verdugo-Urquidez* and *Hasbajrami,* and that otherwise address this issue, almost universally deal with the question of *whether a warrant is necessary* to search an alien's property outside the United States. In these cases, relying on *Verdugo-Urquidez*, courts have found that the Fourth Amendment's Warrant Clause does not apply abroad because "warrants issued to conduct overseas searches 'would be a dead letter outside the United States[.]'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 168–69 (2d Cir. 2008) (citing *Verdugo-Urquidez*). These decisions specifically highlight the rationale expressed by Justice Kennedy when he concurred in *Verdugo-Urquidez,* explaining that:

6

> The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertanable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicated that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country.

494 U.S. at 278.

None of these cases touched upon the question presented here: Where the government is required to obtain a seizure warrant in the United States pursuant to a treaty, and there is a reasonable basis to suspect that the warrant was obtained in violation of the Fourth Amendment, can a foreigner litigating in the United States challenge the constitutionality of that seizure warrant? In this case, Claimants have presented evidence that the Bergen Affidavit filed in Fiji, and possibly the one filed in the D.C. District Court in support of the seizure warrant, contained knowingly false statements—including, among others, (i) that "multiple crew members" told the FBI that Suleiman Kerimov owned the Amadea, materially omitting the fact that some crew members actually said that Mr. Khudainatov owned the Amadea, and (ii) that the Amadea turned off its AIS system to evade detection. Prohibiting Claimants from calling the government to account for the statements it made in the Bergen Affidavit in the face of evidence that strongly questions whether probable cause existed—and thus whether the resulting warrant was constitutional—would be a substantial and unwarranted expansion of *Verdugo-Urquidez*.

Moreover, as this Court is aware, *Verdugo-Urquidez* is a plurality decision which has no binding precedential effect in the Second Circuit. *Texas v. Brown,* 460 U.S. 730, 737 (1983) (stating that plurality view of the Supreme Court that does not command majority is not binding precedent); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 66 (1996) ("The [*Union Gas*] decision has, since its issuance, been of questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality."). As noted above, a majority

of the Court in *Verdugo-Urquidez* did *not* subscribe to Chief Justice Rehnquist's opinion, particularly with respect to his discussion and analysis regarding the scope of the Fourth Amendment as it applies to illegal aliens. Although Justice Kennedy joined in the Chief Justice's opinion and agreed that no violation of the Fourth Amendment had occurred, he filed a separate concurrence which diverged, in large part, from the "majority" opinion and expressly *rejected* the Chief Justice's position that foreign aliens have no Fourth Amendment rights when litigating in the United States. *Verdugo-Urquidez,* 494 U.S. at 276 (Kennedy, J., concurring).

In *Verdugo-Urquidez*, five justices unambiguously asserted their position that aliens litigating in the United States have Fourth Amendment rights. 494 U.S. at 278 (Kennedy, J., concurring); *id.* at 279 (Stevens, J., concurring) ("[A]liens who are lawfully present in the United States are among those 'people' who are entitled to the protection of . . . the Fourth Amendment[,] . . . even though he was brought and held here against his will."); *id.* at 296-97 (Brennan, J., dissenting with Marshall, J.) ("When our Government conducts a law enforcement search against a foreign national . . . it must comply with the Fourth Amendment. . . . When we tell the world that we expect all people . . . to abide by our laws, we cannot in the same breath tell the world that our law enforcement officers need not do the same."); *id.* at 297 (Blackmun, J., dissenting) ("when a foreign national is held accountable for purported violations of United States criminal laws, he . . . is entitled to Fourth Amendment protections.").

Perhaps of even more importance is Justice Kennedy's opinion that explicitly stated "[i]f there are to be restrictions on searches and seizures which occur incident to such American action [foreign searches and seizures], they must be imposed by the political branches through diplomatic understanding, treaty, or legislation." *Id.* at 275. In other words, contrary to the Court's ruling here, *Verdugo-Urquidez* expressly states that where, as here, a "diplomatic understanding, treaty, or

8

legislation" requires the making of a formal diplomatic request by presenting the foreign nation with a U.S.-issued warrant, then U.S. law enforcement must abide by the Fourth Amendment when presenting that warrant to a U.S. court, and thus the Fourth Amendment protects foreign nationals and their property overseas. *Id.*

The United States government was only able to seize the Amadea and sail it to the United States from Fiji by virtue of its mutual legal assistance treaty with Fiji. This treaty required the United States to present to Fiji a properly obtained and signed, seizure warrant, as a precondition to taking possession of the sought property. Ford Decl. Exh. C, UNTOC, arts. 13(3)(b), 18(17). The issue of whether Fiji acted within its own laws when it seized the Amadea pursuant to a United States seizure warrant and turned it over to the Americans was the subject of litigation in Fiji, which was ultimately decided by the Fiji Supreme Court in an order dated April 28, 2023. That decision makes clear that the seizure warrant issued by the D.C. District Court was the foundation upon which Fiji was able to restrain and hand over the Amadea to the United States government. The Fiji Supreme Court explained:

> A court in the United States ordered [the Amadea's] seizure, and the United States' authorities sought Fiji's assistance to enable that order to be complied with. The High Court registered that order, and in due course the *Amadea* sailed to the United States.

*Millemarin Investments Ltd. v. The Director of Public Prosecutions and Suleiman Abusaidovich Kerimov*, No. CBV 0006 of 2022, at 2 (Sup. Ct. Fiji. Suva Apr. 28, 2023), Ford Decl. Exh. D. Moreover, the Fiji Supreme Court's ruling explicitly relied on the fact that a judge in the United States scrutinized the underlying facts (i.e., the representations in the Bergen Affidavit) before issuing the seizure warrant:

> On April 13, 2022, Magistrate Judge G. Michael Harvey of the United States District Court for the District of Columbia issued a warrant for the seizure of the *Amadea*. The application to the court had requested that the *Amadea* "be seized as a subject to forfeiture" in the United States. The application for the warrant had

9

been supported by an affidavit sworn by Timothy Bergen, a special agent of the Federal Bureau of Investigation.

[Thereafter,] [o]n April 13, 2022, "the Criminal Division of the United States' Department of Justice sent an urgent request for assistance to the appropriate authority in Fiji. It stated that it was being made pursuant to Arts 13 and 18 of the [UNTOC] to which both the United States and Fiji are parties. The request was for effect to be given to the warrant for seizure of the *Amadea* by detaining it "to prevent its transfer, sale, or other encumbrance or dissipation, as a preliminary step to forfeiture under US law."

The enactment in Fiji which governs how and when Fiji should provide legal assistance to a foreign state is the Mutual Assistance in Criminal Matters Act 1997 (MACMA).

*Id.* at 3–5.

The Fiji Supreme Court ultimately ruled that "the warrant issued by the United States District Court was a 'foreign restraining order' within section 3 of MACMA" and that under section 31(6) of MACMA, "once the foreign restraining order has been registered in Fiji, its effect is as if it had been a restraining order made by the court …" *without the court reviewing the underlying facts for sufficiency*. *Id.* at 17. The Fiji Supreme Court posed the following question:

But why should the facts on which the foreign order was based be scrutinized at all? The inescapable fact is that the United States District Court must be regarded as having scrutinized the facts when it had to decide whether to issue the warrant. It cannot be the function of the High Court [district court level] in Fiji to conduct a similar exercise to that which the District Court [in the United States] has already carried out.

*Id.* at 19. The court went on to explain:

Indeed, if the High Court was required to scrutinize the facts on which the foreign order was based, there would have to be something in MACMA requiring the requesting state to file evidence showing the factual and legal basis on which the foreign order was made and on which the registration of that order was sought. There is no such requirement . . . [because] [s]uch requirements are inconsistent with the whole ethos of mutual assistance – which is to assist in the enforcement of orders made by the courts of a foreign country, and you assume that the courts of that foreign country know their business. Whether that order should have been made in the first place is not for the courts of Fiji to decide."

*Id.* at 19–20.

Finally, while the Supreme Court concluded that it need not determine who is the ultimate beneficial owner of the Amadea, the Supreme Court found that if it "had to address this issue . . . [the court] would have found that there was an issue to be tried on whether the *Amadea* was indeed tainted property[] because there was an issue to be tried on whether Mr. Kerimov is the true beneficial owner." *Id*. at 23.  In other words, the Fiji Supreme Court was not convinced the Bergen Affidavit set forth probable cause that Kerimov owned the Amadea and that it was subject to forfeiture, but believed that given a United States magistrate judge had made the determination, Fiji was obligated under the treaty to respect that decision.

All of this is to say that while the United States Supreme Court and courts in the Second Circuit have suggested that a United States search warrant for a search on foreign soil would be a "dead letter" and therefore a U.S.-issued warrant is not required in such situations, here, not only was the seizure warrant *not* a dead letter, but it was the operative and essential document that permitted the United States to seize the Amadea in Fiji and sail it away. Had there been no warrant, there would have been no seizure, as the Supreme Court of Fiji made clear. If in fact the Bergen Affidavit contains knowingly false and misleading information, as the crew statements provided to this Court suggest, such conduct cannot be countenanced by this Court merely because Claimant (and his entity) is a foreigner. As Justices Brennan and Marshall noted in their dissent, "If we seek respect for law and order, we must observe these principles ourselves. Lawlessness breeds lawlessness." *Verdugo-Urquidez*, 494 U.S. at 285. And "[w]hen we tell the world that we expect all people, wherever they may be, to abide by our laws, we cannot in the same breath tell the world that our law enforcement officers need not do the same." *Id.* at 297. For this reason, Courts have judicially created the exclusionary rule and other sanctions for constitutional violations, to "operate[] as a judicially created remedy designed to safeguard against future violations

of Fourth Amendment rights through the rule's general deterrent effect." *Arizona v. Evans*, 514 U.S. 1, 10 (1995). The rationale underpinning any court-imposed sanction for a Fourth Amendment violation is its "deterrent effect, rather than a personal Constitutional right of the party aggrieved." *United States. v. Calandra*, 313 U.S. 338, 348 (1974). "'The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" *Id.* at 347 (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). As such, this Court has an incentive to take seriously any allegation of a Fourth Amendment violation, particularly one which involved the passing on of critical information to a foreign sovereign for assistance.

    **B.**    **The Court Should Reconsider Its Order, and Either Reverse the Order Entirely, or Revise Its Order to Simply Deny Expedited Discovery Without Finding that Claimants Have no Fourth Amendment Rights.**

The standards governing motions under Local Rule 6.3 along with Federal Rule of Civil Procedure 59 are the same, and a court may grant reconsideration where the party moving for reconsideration demonstrates an "intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Henderson v. Metro. Bank & Trust Co.*, 502 F. Supp. 2d 372, 375–76 (S.D.N.Y. 2007) (quotation marks and citations omitted); *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) ("Reconsideration may be granted to correct clear error, prevent manifest injustice or review the court's decision in light of the availability of new evidence.") (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "The burden is on the movant to demonstrate that the Court overlooked controlling decisions or material facts that were before it on the original motion, and that might 'materially have influenced its earlier decision.'" *Schoolcraft v. City of New York*, 298 F.R.D. 134, 136 (S.D.N.Y. 2014).

Claimants recognize that had the Court merely denied their request for expedited discovery in its discretion to control discovery, a motion under Local Rule 6.3 would be inappropriate. However, since the denial was based on a ruling that that the warrant (1) obtained from a United States Magistrate Judge and (2) presented to the Fijian authorities under the terms of a multilateral treaty, need not comply with the Fourth Amendment and is not subject to Constitutional challenge—a ruling made without briefing by the parties—a motion regarding this part of the Court's ruling is appropriate under Local Rule 6.3.

The ruling that Claimants have no Fourth Amendment rights in this case is clearly erroneous as it is not supported by the caselaw relied on by the Court, and would lead to manifest injustice, in this case and others, including broad and dangerous implications beyond this case. As such, revision on reconsideration is proper.

## II.     In the Alternative, the Court Should Certify Its Order for Interlocutory Review of the Fourth Amendment Issue.

Although ordinarily an appeal in federal court is reserved for a final judgment, Congress has specifically provided for the appeal of orders in advance of a final judgment when the court determines that such orders (a) "involve[] a controlling question of law" (b) "as to which there is substantial ground for difference of opinion" and (c) "that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." 28 U.S.C. § 1292(b). A judge certifies an order, not a question, for appeal. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 204–205 (1996). But a court may frame a controlling question presented by the order being certified. *Pen American Center, Inc. v. Trump*, 18-cv-9433, 2020 WL 5836419, at *1 (S.D.N.Y. Oct. 1, 2020).

Should the Court not reverse or limit its order, Claimants submit that the Fourth Amendment aspect of the Court's order is appropriate for certification under 28 U.S.C. § 1292(b).

13

Should Claimants be able to demonstrate that the government's seizure of the Amadea in Fiji violated the Constitution, it may be dispositive as to this litigation. A contrary ruling that permits the United States to seize and ultimately forfeit property beyond its shores in violation of the U.S. Constitution would also be dispositive as to this litigation, and would foreclose the ability of any foreigner to challenge the seizure of property located outside the United States based on a U.S.-issued warrant. As such, the question of law is "controlling." Moreover, immediate clarity from the Second Circuit, however it rules, could advance the ultimate termination of this litigation. Finally, as set forth above, there is substantial grounds for a difference of opinion.

## CONCLUSION

For all the foregoing reasons, Claimants respectfully request that this Court reconsider its February 22, 2024 Order and revise it with respect to the Fourth Amendment issue addressed therein, or certify it for interlocutory review.

Dated: March 7, 2024                              Respectfully submitted,

                                                  FORD O'BRIEN LANDY LLP


                                                  By: */s/ Adam C. Ford*
                                                      Adam C. Ford
                                                      Renée L. Jarusinsky
                                                      275 Madison Avenue, 24th Floor
                                                      New York, NY 10016
                                                      Tel.: (212) 858-0040 (main)
                                                      Fax: (212) 256-1047
                                                      aford@fordobrien.com
                                                      rjarusinsky@fordobrien.com

                                                      *Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

14

## CERTIFICATE OF SERVICE

I hereby certify that Claimants' Notice of Motion for Reconsideration or Certification Under 28 U.S.C. § 1292(b) and their Memorandum of Law in Support of such motion were served on all counsel of record via the Court's CM/ECF system.

Dated: March 7, 2024

*/s/ Adam C. Ford*
Adam C. Ford