# EXHIBIT D

<u>**IN THE SUPREME COURT OF FIJI**</u>
<u>**AT SUVA**</u>

<u>**CIVIL PETITION NO: CBV 0006 of 2022**</u>
<u>**Court of Appeal No. ABU 24 of 2022**</u>

<u>**BETWEEN:**</u>        <u>**MILLEMARIN INVESTMENTS LIMITED**</u>

<u>***Petitioner***</u>

<u>**AND:**</u>        **(1)**    <u>**THE DIRECTOR OF PUBLIC PROSECUTIONS**</u>

        **(2)**    <u>**SULEIMAN ABUSAIDOVICH KERIMOV**</u>

<u>***Respondents***</u>

<u>**Counsel:**</u>        **Mr F. Haniff for the Petitioner**
                     **Ms J. Prasad for the Respondents**

<u>**Coram:**</u>        **The Hon. Mr. Justice Anthony Gates**
                     **Judge of the Supreme Court**

                     **The Hon. Mr. Justice Brian Keith**
                     **Judge of the Supreme Court**

                     **The Hon. Mr. Justice Madan Lokur**
                     **Judge of the Supreme Court**

<u>**Date of Hearing:**</u>    **12 April, 2023**
<u>**Date of Judgment:**</u>    **28 April, 2023**

1.

# JUDGMENT

## Gates J

[1]     I have had the advantage of reading Keith J's judgment in draft.  I agree with it, and with its reasons and orders.

## Keith J

### *Introduction*

[2]     On 1 March 2022, President Biden gave his State of the Union Address.  In it, he said:

> *"The United States Department of Justice is assembling a dedicated task force to go after the crimes of the Russian oligarchs.*
>
> *We're joining with European Allies to find and seize their yachts, their luxury apartments, their private jets.  We're coming for your ill-begotten gains."*

These remarks heralded part of the response of the United States to what has been perceived in the West to have been Russia's unprovoked military invasion of Ukraine.  On the following day, the Attorney General of the United States announced the creation of a dedicated task force.  Its mission, he said, was "to investigate, arrest and prosecute those whose criminal acts enable the Russian government to continue this unjust war".[1]  However, he added that that one of the functions of the task force would be the seizure of the assets of those people who violated the sanctions which had been imposed by the United States "for prior instances of Russian aggression".  This case concerns the seizure of one such asset at the request of the task force pursuant to that initiative.

[3]     The asset is a yacht, the *Amadea*.  It was berthed at Lautoka.  The United States claim that it is beneficially owned by Suleiman Kerimov, a fabulously wealthy Russian citizen, who has been the subject of sanctions by the United States since 2018.  A court in the United States ordered its seizure, and the United States' authorities sought Fiji's assistance to enable that order to be complied with.  The High Court registered that order, and in due course the *Amadea* sailed to the United States.  An appeal against the registration in Fiji of the order was dismissed by the Court of Appeal.  The application for leave to appeal which

---

[1]  Department of Justice, Office of Public Affairs, press release, 2 March 2022.

2.

is now before the Supreme Court challenges the legality of that registration. The petitioners, Millemarin Investments Ltd ("Millemarin"), the registered owners of the *Amadea*, claim among other things that Mr Kerimov is not the beneficial owner of the *Amadea*, but that its real beneficial owner is Eduard Khudaynatov, another Russian citizen who is not the subject of sanctions by the United States.

*The request for assistance and its background*

[4]  *Mr Kerimov.*  Mr Kerimov is an official of the Government of the Russian Federation (to give Russia its full name) and a member of the Russian Federation Council. He was alleged to have "played a key role in advancing Russia's malign activities". As a result, on 6 April 2018 he was sanctioned by the Department of the Treasury's Office of Foreign Assets Control, and added to the Special Designated Nationals List.[2] The consequence of being sanctioned was that those of his assets which are subject to the jurisdiction of the United States are frozen.[3]

[5]  *The Amadea.*  The *Amadea* is a 106 metre superyacht. There is no direct evidence about its value or how much it was purchased for, but it is plainly an extremely valuable commodity. There is evidence that its annual running costs are between US$25 and $30 million. There is no evidence when it first arrived in Fiji's territorial waters, but by 12 April 2022 it was berthed at Lautoka.

[6]  *The warrant for the seizure of the Amadea.*  On 13 April 2022, Magistrate Judge G Michael Harvey of the United States District Court for the District of Columbia issued a warrant for the seizure of the *Amadea*.[4] The application to the court had requested that the *Amadea* "be seized as subject to forfeiture" in the United States. The application for the warrant had been supported by an affidavit sworn by Timothy Bergen, a special agent of the Federal Bureau of Investigation.

---

[2]  The authority for sanctioning people like Mr Kerimov was the Countering America's Adversaries Through Sanctions Act, which was enacted pursuant to Executive Order 13661.
[3]  These facts are taken from the United States' Supplemental Request to the Government of Fiji for assistance.
[4]  The warrant is at pages 1,570-1,571 of vol 4 of the Record of the High Court.

[7]    *The request for assistance*.  On 13 April 2022, the Criminal Division of the United States' Department of Justice sent an urgent request for assistance to the appropriate authority in Fiji.[5]  It stated that it was being made pursuant to Arts 13 and 18 of the United Nations Convention against Transnational Organized Crime ("the Convention") to which both the United States and Fiji are parties.  The request was for effect to be given to the warrant for the seizure of the *Amadea* by detaining it "to prevent its transfer, sale, or other encumbrance or dissipation, as a preliminary step to forfeiture under US law".[6]  It stated that the request was being made

> " ... for the purpose of investigating and prosecuting conduct required to be criminalized under the [Convention], namely, participation in an organized criminal group and conspiracy to commit a serious crime to obtain a financial benefit and to launder the proceeds of crime, under Articles 5 and 6 of the [Convention]."[7]

The request stated that it was based on the "belief" on the part of the United States' authorities that the *Amadea* was "beneficially owned" by Mr Kerimov, who was alleged to have "violated US criminal laws, including violating US sanctions".[8]

## The legal framework

[8]    *The relevant articles of the Convention*.  Art 13 is headed "International cooperation for purposes of confiscation".  Its focus is on the confiscation of property, not its seizure.  Section 13.1 provides, so far as is material:

> "A State Party that has received a request from another State Party ... for confiscation of ... property shall, to the greatest extent possible within its domestic legal system:
>
> (a)  Submit the request to its competent authorities for the purpose of obtaining an order of confiscation and, if such an order is granted, give effect to it; or
>
> (b)  Submit to its competent authorities, with a view to giving effect to it to the extent requested, an order of confiscation issued by a court in the territory of the requesting State Party ...

---

[5]  The request is at pages 1,554-1,568 of vol 4 of the Record of the High Court.
[6]  Page 2 of the request.
[7]  Page 1 of the request.
[8]  Page 2 of the request.

4.

However, Art 13 also provided for assistance where confiscation of the property was the ultimate goal of the requesting state, and no order for confiscation had yet been made. That is the effect of Art 13.2, the material parts of which read:

> *"Following a request by another State Party ..., the requested State Party shall take measures to identify, trace and freeze or seize ... property ... for the purpose of eventual confiscation to be ordered either by the requesting State Party or, pursuant to a request under paragraph 1 of this article, by the requested State Party."*

[9]     Art 18 of the Convention was the other source of the authority for the United States' request for assistance. Its title is "Mutual legal assistance". In Art 18.3, it set out the purposes for which mutual legal assistance may be requested and afforded. They included "[e]xecuting searches and seizures, and freezing" and "[a]ny ... type of assistance that is not contrary to the domestic law of the requested State Party".

[10]    *The legislation in Fiji*. The enactment in Fiji which governs how and when Fiji should provide legal assistance to a foreign state is the Mutual Assistance in Criminal Matters Act 1997 ("MACMA"). It was enacted before the promulgation of the Convention, and constituted Fiji's response to the United Nations Model Treaty on Mutual Assistance in Criminal Matters, which urged "all states to strengthen further international co-operation and mutual assistance in criminal justice".[9]   MACMA now represents the domestic implementation in Fiji of Fiji's obligations under the Convention. The core provisions for present purposes are sections 31(2) and (3), which provide:

> *"(2)     Where a foreign country requests the Attorney-General to make arrangements for the enforcement of a foreign restraining order, made in respect of a serious offence, against property that is believed to be in Fiji, the Attorney-General may authorize the Director of Public Prosecutions, in writing, to apply for the registration of the order in the court.*
>
> *(3)      Where the Director of Public Prosecutions applies to the Court for registration of a foreign order under this section, the court may register the order."*

---

[9]   Resolution 45/117 of the General Assembly passed on 14 December 1990.

A "serious offence" is defined in section 3 of MACMA, so far as is material, as one "for which the maximum penalty prescribed by law is … imprisonment for not less than 6 months". The effect of the registration of the foreign restraining order was provided for by section 31(6), which provides:

> *"A foreign restraining order registered in the court under this section has effect, and may be enforced, as if it were a restraining order made by the court under the Proceeds of Crime Act 1997 at the time of registration."*

[11]  Millemarin contends that the warrant issued by the United States District Court was not a "foreign restraining order", and that therefore sections 31(2) and (3), pursuant to which the registration of the warrant was sought and made, did not apply. The success of that contention depends on the definition of "foreign restraining order" in section 3 of MACMA. It means

> *"an order, made under the law of a foreign country, restraining a person, or persons, from dealing with property, being an order made in respect of an offence against the law of that foreign country".*

[12]  In view of one of the arguments advanced on behalf of Millemarin, it is necessary to identify some of the provisions of the Proceeds of Crime Act 1997 ("POCA"). Millemarin's legal team rely on section 19B(1) of POCA, which provides that a restraining order is one which prohibits any person from disposing of, or dealing with, such property as

> *"the court is satisfied that there are reasonable grounds for suspecting that the property is tainted property … for which a forfeiture order may be made under section 19E"*

except in the manner specified in the order. "Tainted property" is defined in section 3 of POCA, in relation to a foreign serious offence, as

> *"(a) property used in, or in connection with, the commission of the offence; (b) property intended to be used in, or in connection with, the commission of the offence; (c) proceeds of crime."*

A foreign serious offence is defined in section 3 of POCA as "a serious offence against the law of a foreign country".

*The course of the proceedings*

[13]     *The commencement of the proceedings*.  By a letter dated 18 April 2022, the Attorney-General duly authorized the Director of Public Prosecutions, as required by section 31(2) of MACMA, to apply to the High Court for the registration of the warrant issued by the United States District Court.[10]  The proceedings were commenced on the following day by the filing in the High Court by the Director of Public Prosecutions of an originating summons seeking the registration of the warrant.  The same day an application was made *ex parte for* an injunction to prevent the *Amadea* from leaving Fiji's territorial waters until the application to register the warrant had been determined.  The affidavit in support exhibited, amongst other things, the warrant and the request for assistance.  The application was heard by Amaratunga J.  He granted the application.  Only Mr Kerimov had been named as a respondent in the summons, and within a day or so, Millemarin had successfully applied to be joined as a second respondent on the basis of its claim to be the registered owner of the *Amadea*.  Mr Kerimov has taken no part in these proceedings.

[14]     *The evidence in the High Court*.  The summons for the registration of the warrant was supported by a lengthy affidavit sworn by Mr Bergen on 22 April 2022.[11]  We have been told that it was in substantially the same form as the affidavit he had sworn for the application for the warrant, though we have not seen a copy of that earlier affidavit.  Broadly speaking, Mr Bergen's later affidavit addressed two issues.  First, it set out the basis of the belief that, although Millemarin was the registered owner of the *Amadea*, Mr Kerimov, and not Mr Khudaynatov, was its beneficial owner.  In summary, it alleged that Mr Kerimov became the beneficial owner of the Amadea in or about 2021 when it was sold to Millemarin by a yacht brokerage whose practice was to conceal yacht ownership behind shell companies and to name someone who was not subject to sanctions as the beneficial owner behind the shell companies thereby concealing who the true beneficial owner of the yacht is.  Moreover, Mr Khudaynatov had been held out to be the beneficial owner of another superyacht, the *Scheherazade*, which was linked to President Putin (who is himself subject to United States sanctions).   Mr Bergen contended that the fact that Mr

---

[10]   Pages 1,440-1,441 of vol 4 of the Record of the High Court.
[11]   Pages 1,443-1,546 of vol 4 of the Record of the High Court.

Khudaynatov had been held out as the beneficial owner of two of the largest superyachts on record, both linked to men who were subject to United States sanctions, suggested that he was being used to conceal their true beneficial ownership. Although Mr Khudaynatov was a rich man – he had been the President of Rosneft, the state-controlled Russian oil company – there was no reason to think that he had the resources to purchase two superyachts worth together more than US$1 billion. In addition, interviews of the *Amadea*'s crew and emails found on the *Amadea* were said to show, among other things, the use made of the *Amadea* by members of Mr Kerimov's family.

[15] Secondly, since section 31(2) of MACMA applied only where the foreign restraining order had been made in respect of a "serious offence", Mr Bergen's affidavit set out the serious offences which Mr Kerimov was alleged to have committed, and what the basis of those allegations were. In summary, it was contended that many large payments had been made towards the running costs of the *Amadea* since Mr Kerimov became its beneficial owner. None of these payments had been licenced under the United States' statutory sanctions regime. These payments were therefore alleged to amount to violations of the International Emergency Economic Powers Act of 1977 and the statute criminalizing money laundering and related conspiracies. Money laundering is an offence in Fiji for which the maximum penalty is 20 years' imprisonment.[12]

[16] In the interests of completeness, I should add that an affidavit in opposition to the application for the registration of the warrant was filed on behalf of Millemarin. It was sworn by a member of Millemarin's legal team on 25 April 2022.[13] It exhibited a large number of documents which were said to show that Mr Kerimov was not the beneficial owner of the *Amadea*, but that Mr Khudaynatov was.

[17] *The judgment of the High Court*. The application for the registration of the warrant was heard by Amaratunga J. His judgment was handed down on 3 May 2022. He ordered that the warrant be registered in the High Court. The arguments advanced to Amaratunga J in the written submissions filed on behalf of Millemarin which are relevant for present purposes were that there was no evidence that the *Amadea* was tainted property within the

---

[12] Section 69 of POCA.
[13] Pages 1,037-1,435 of vol 4 of the Record of the High Court.

meaning of POCA, that there was "clear evidence" that Mr Kerimov was not the beneficial owner of the *Amadea*, but that if the court decided to order the registration of the warrant, it should also order that the *Amadea* should remain in Fiji. Amaratunga J found that the warrant amounted to a "foreign restraining order". He held that section 19B(1) of POCA, to the extent that it related to the enforcement of a restraining order made under POCA, was irrelevant because the only issue he had to address was the registration of the warrant, not the enforcement of such order as he made for the registration of the warrant. He did not specifically address the arguments over whether Mr Kerimov was indeed the beneficial owner of the *Amadea* or whether the *Amadea* was tainted property, no doubt because he thought that the merits of the case were not to be determined on an application under section 31(3) of MACMA. Nor, having ordered the registration of the warrant, did he specifically address the application for an order that the *Amadea* should remain in Fiji. Presumably he thought that all he had to decide was whether the warrant should be registered.

[18]   *The judgment of the Court of Appeal*. Millemarin's appeal to the Court of Appeal was heard by Basnayake, Lecamwasam and Guneratne JJA on 18 May 2022. Judgment was handed down on 27 May 2022. There were no individual judgments from the judges, and their judgment was therefore the judgment of the Court. They dismissed the appeal with no order as to the costs of the appeal, save that they set aside an order for costs which Amaratunga J had made. Broadly speaking, although Millemarin's arguments had been slightly refined, the grounds of appeal were the same as those which had been advanced to the High Court in opposition to the registration of the warrant, save that it was now being argued on Millemarin's behalf that the warrant for the seizure of the *Amadea* did not amount to a "foreign restraining order" within the meaning of section 3 of MACMA. Like Amaratunga J, the Court of Appeal found that the warrant amounted to a "foreign restraining order". They held that it was not the function of the courts in Fiji to review the basis on which a foreign restraining order had been made, and it therefore did not address the questions whether there was sufficient evidence that Mr Kerimov was the beneficial owner of the *Amadea* or that the *Amadea* amounted to "tainted property" within the meaning of POCA. Like Amaratunga J, it did not specifically address the application for an order that the *Amadea* should remain in Fiji. Again, I presume that this was because they thought that Amaratunga J's function had been limited to deciding whether the warrant

9.

should be registered.  It is from this judgment that Millemarin now petitions the Supreme Court for leave to appeal.  There is no petition from the Director of Public Prosecutions challenging the orders for costs made by the Court of Appeal.

*Is the appeal academic?*

[19]   On one view of the case, this appeal is entirely academic.  Now that the *Amadea* is in the United States, there is little that the courts in Fiji can do to help Millemarin, even if it is found that the registration in Fiji of the warrant was legally flawed.  Any order of the Supreme Court setting aside the registration of the order would now have been overtaken by subsequent events, provided that its seizure was lawful under the law of the United States – as it was because it was seized pursuant to an order of the United States District Court.  Once the horse has bolted, there is little point in locking the stable door.

[20]   Mr Haniff for Millemarin argued that this appeal was far from academic.  Although the United States' authorities claimed that they had sought the seizure of the *Amadea* as a step towards its forfeiture, nothing had been done with the *Amadea* since it arrived in the United States.  That, he said, was because the United States' authorities were awaiting the *outcome* of this appeal.  I rather doubt that.  I have no reason to doubt Mr Haniff's assertion that the United States' authorities have not taken any further steps to obtain an order for the forfeiture of the *Amadea* while this appeal is pending, but I doubt very much whether they are awaiting the *outcome* of the appeal.  If the court proceedings in Fiji are indeed the reason why no application for the forfeiture of the *Amadea* has yet been made, it will have been because the United States' authorities are simply awaiting the *conclusion* of the litigation in Fiji, not its *outcome*.  Their future conduct will not be affected by whether or not the order in Fiji for the registration of the warrant is set aside.

[21]   Although the general rule is that appeals which are academic in the sense that its outcome has no practical effect on what the litigation is all about, there are exceptions to that principle – for instance, where

> " ... there is a good reason in the public interest for [the appeal to be heard], as for example (but only by way of example) when a discrete point of statutory construction arises which does not involve detailed consideration of the facts and where a large number of similar cases exist or are anticipated so that the issue will most likely need to be resolved in

> *the near future.* *"* (*R v Secretary of State for the Home Department ex parte*
> *Salem* *[1999] 1 AC 450 at page 456, per Lord Slynn*)

This principle has been followed in Fiji – see, for example, *Naidu v Attorney-General of*
*Fiji* [1999] FJCA 55 – in which the Court of Appeal said that the general principle was that

> *" ... even though the actual issue between the parties may no longer be*
> *outstanding, the courts will nevertheless make a decision where there is a*
> *practical advantage in doing so, or where the issue is one of general public*
> *interest. "*

[22]  The public are, of course, interested in the superyachts of Russian oligarchs.  However,
that is to confuse the public interest with what is of interest to the public, and a surer basis
for allowing the appeal to be heard is that the proper construction of the definition of
"foreign restraining order" in section 3 of MACMA is an issue which could well come up
again, and the High Court needs authoritative guidance on how the definition should be
applied.  For that reason, I have concluded that it is appropriate for the appeal to be
determined on its merits.

### *Was the warrant a "foreign restraining order"?*

[23]  Mr Haniff highlighted the differences between an order for the seizure of property, and an
order restraining anyone from dealing with it.  The warrant issued by the United States
District Court was for the *seizure* of the *Amadea.*  It was, Mr Haniff contended, an order *in*
*rem.*  In other words, it was directed at property, not against anyone.  Indeed, it was a
mandatory order.  It was addressed to "[a]ny authorized law enforcement officer", and
*required* the officer to seize the *Amadea* by 27 April 2022.  An order for the seizure of
property is a highly invasive order.  It involves the forcible removal of the property from
where the property is.

[24]  Such an order is to be distinguished from a restraining order in two respects.  First, a
restraining order is not an order *in rem.*  Although it can relate to property, it is an order *in*
*personam.*  In other words, it is directed at anyone, whether corporate or individual,
restraining them from doing something – in this case, restraining them from dealing with
the *Amadea.*  Secondly, a restraining order is not a mandatory order.  It does not require
anyone to do something (unless you say that it requires someone to refrain from doing

something).  It *prohibits* anyone from doing something – in this case, from dealing with the *Amadea*.  To the extent that it relates to property, it is a far less invasive order than an order for the seizure of property.  It merely prevents the property from being dealt with.  The core point advanced on behalf of Millemarin is that the mandatory order *in rem* of the United States District Court requiring an authorized officer to seize the *Amadea* cannot be equated with a prohibitory order *in personam* restraining anyone from dealing with it.  They are two different legal animals – as different as chalk and cheese.  For this reason, the order of the United States District Court could not amount to a "foreign restraining order" within the meaning of section 3 of MACMA.  This argument represented the first of three sets of grounds of appeal advanced on Millemarin's behalf.

[25]   Amaratunga J and the Court of Appeal did not regard these differences as preventing the warrant from amounting to a foreign restraining order.  Amaratunga J dealt with the issue in paras 34-38 of his judgment.  For him, the key point was that the warrant had required the *Amadea* to be seized "as subject to forfeiture", and that the request for assistance stated that its seizure was sought "as a preliminary step to forfeiture under US law".  That preliminary step was to prevent the *Amadea* from being dealt with in the meantime.  Indeed, the request for assistance spelled that out: the seizure of the *Amadea*, it said, was "to prevent its transfer, sale, encumbrance or other disposition".  Amaratunga J went on to conclude that, since the *purpose* of the order for the seizure of the *Amadea* was to prevent it from being dealt with, the order for its seizure also amounted to an order restraining it from being dealt with.

[26]   On one view, it might be said that the *Amadea* did not have to be seized to prevent it from being dealt with until a court in the United States determined whether it should be forfeited.  All that was needed was an order preventing it from being dealt with in the meantime.  But that is to ignore the reality of the situation.  Sometimes an order preventing property from being dealt with may be insufficient.  Something more is required to ensure that it is not dealt with, and seizure may be the only practical way of ensuring compliance with an order that it may not be dealt with.

[27]   The Court of Appeal approached the question differently.  It thought that it should look at the principles for interpreting international conventions, even though neither party had

suggested that this might be appropriate. I do not understand why the Court thought that it was necessary to do that: the Court was not having to interpret any of the provisions in the Convention. It was having to interpret a provision in domestic legislation. Be that as it may, having identified those principles by reference to some English authorities (none of which were cited to the Court), and having repeated the definition of "foreign restraining order" in section 3 of MACMA, the Court said at para 25:

> *"Reading that section, we were persuaded to agree with the DPP's submission that, although the US order ... on the face of it was a 'seizure order subject to forfeiture', nevertheless, in substance, it satisfied the definition of a 'foreign restraining order'."*

The Court did not explain why it came to that conclusion, but the words "in substance" suggest that what it had in mind was that an order for the seizure of property amounted to an order restraining the property from being dealt with because one of its *effects* was to prevent it from being dealt with.

[28]    Some assistance can be derived from authorities in other jurisdictions. Amaratunga J's view differed from the approach of the Supreme Court of Victoria in *Director of Public Prosecutions (Commonwealth) v Peniche* [1999] VSC 288. The legislation governing mutual assistance in Australia was similar to MACMA. It permitted the Attorney General to authorize the Director of Public Prosecutions to apply to the court for the registration of a foreign restraining order, which was defined in the same way as a "foreign restraining order" is defined in Fiji. The order which the Supreme Court of Victoria was being asked to register was an order made in Mexico for the seizure of various documents. Mandie J held at para 9 of his judgment that this was not a foreign restraining order within the meaning of the legislation "because it does not *in terms* restrain a particular person or all persons from dealing with any property" (emphasis supplied). He went on to say:

> *"10.    I accept that an order that property be seized may have the consequence, by controlling possession, that it is more difficult for persons to deal with that property but clearly there is a real distinction between an order calling on [the] appropriate authority to seize property and an order directly restraining a particular person or all persons from dealing with the property.*

> *11.    The concept of restraining a person from dealing with property is not as such concerned with obtaining the physical possession of property but rather with the disposition of the property or any interest in the property. Undoubtedly, the purpose of the law is to assist in the enforcement of foreign legislation in the criminal law area and undoubtedly the seizure of property is one way of preventing persons from dealing with that property or effectively dealing with it.  But it seems to me that one cannot utilise either the purpose of the seizure order or the purpose of the legislation as a whole to extend what is otherwise a clear definition."   (Emphasis supplied)*

The Court of Appeal of the Supreme Court of Victoria dismissed an appeal from Mandie J's decision "for the reasons which he gave": [2000] VSCA 40.

[29]    Two things emerge from Mandie J's judgment.  First, he treated the language of the order as decisive.  The fact that the order did not *in terms* restrain anyone from dealing with the property was for him crucial.  Secondly, his view was that it did not follow that because one of the *purposes* of an order for seizure of property is to prevent the property from being dealt with, such an order could properly be described *as* an order preventing the property from being dealt with.  By parity of reasoning, he would no doubt have said – unlike the Court of Appeal in Fiji – that it did not follow that because one of the *effects* of an order for the seizure of property is to prevent the property from being dealt with, such an order could properly be described *as* an order preventing the property from being dealt with.

[30]    The judgments of the courts in Victoria prompted a swift legislative response.  The term "foreign restraining order" now includes orders expressed as orders for the seizure of property.[14]  Had Fiji followed that route, this point would no longer have been available to Millemarin.

[31]    The Supreme Court of New Zealand took a very different approach to the issue in *Bujak v The Solicitor-General* [2009] NZSC 42.  It had to consider the effect of the definition of "foreign restraining order" in section 2 of the Mutual Assistance in Criminal Matters Act 1992, which was New Zealand's legislation governing mutual assistance.  Although there were differences between the definition in New Zealand's legislation and that in MACMA,

---

[14]   Schedule 2 to the Crimes Amendment (Forensic Procedures) Act 2001.

the core part of the definition is to the same effect.  The term "foreign restraining order" means

> "an order ... made under the law of a foreign country ... in respect of ... [p]roperty that is or may be tainted property in respect of an offence against the law of that country ... [t]hat restrains a particular person, or all persons, from dealing with property".

In that case, the Court was considering an order made by a court in Poland.  In giving the judgment of the Court, Wilson J described the order of the Polish Court in para 20 of his judgment as follows:

> "The Polish Order recorded that the Court had granted an application by the prosecutor 'to impose security on property' 'to secure the fine' to which the appellant was 'likely to be sentenced' and 'claims for repairing property damages' by the 'seizure' of funds in domestic and foreign bank accounts of the appellant and companies in which he is a shareholder, the 'seizure' of other property of the appellant and the imposition of a 'compulsory mortgage' on real estate owned by the appellant outside Poland."

[32]    Having described the order made in Poland, Wilson J went on in para 21 to address its effect:

> "When the Polish Order is looked at as a whole, its intended purpose appears to be the taking of security to ensure that the property thus secured will be available in due course, if required, to satisfy any final orders for penalty, reparation or forfeiture which may be made. The reference in the order to the 'seizure' of the property is, in context, to seizure to provide security rather than to seizure by way of confiscation. The reference in the order to the taking of a mortgage over real property, rather than the forced sale of the property, confirms that the purpose of the Polish Order was to obtain security. The Polish Order therefore operated in very much the same way as a restraining order made in a New Zealand court under section 42 of the Proceeds of Crime Act 1991 directing that property is 'not to be disposed of or otherwise dealt with by any person except as provided in the order'."

[33]    Finally, Wilson J addressed _Peniche_.  In para 23, he said:

> "To the extent that _Peniche_ is authority for the proposition that an order which refers to the seizure of property cannot be a foreign restraining order for the purposes of the Act, it should not be followed in this country.  The substance of the order, rather than the specific words which may appear within it, should determine whether or not it constitutes a foreign

> *restraining order. Looking at the Polish Order as a whole, it is directed to the restraint rather than the seizure of the appellant's property. ... The Polish Order therefore qualifies as a foreign restraining order." (*Emphasis supplied)

The words italicized represent the *ratio* of the Court's decision, and the following sentence reflects the application of that principle to the order which the Court was addressing.

[34]  Mr Haniff argued that the Polish order in *Buzak* was partly a restraining order and partly something else – an order for security and seizure – and that what the Supreme Court of New Zealand held was that such an order can be registered and take effect only to the extent that it was a restraining order. If the foreign order contained anything beyond a restraining order, it should be ignored to the extent that it contained something else. He called that the "pick and mix" approach. For my part, I do not think that that was what the Supreme Court of New Zealand was doing. It acknowledged that the Polish order provided for the seizure of Mr Buzak's funds and other property. However, it held that the order was nevertheless a restraining order because the seizure was only to ensure that there were assets available as security for the payment of the fine which Mr Buzak was likely to be ordered to pay. It did not think that the Polish order was partly a restraining order and partly something else. It thought that the whole of the order was a restraining order, even though it provided for the seizure of funds and property, because the purpose of ordering seizure was to secure Mr Buzak's assets to ensure that his imminent fine would be paid.

[35]  I regard the reasoning of the Supreme Court of New Zealand as convincing. Courts in foreign jurisdictions – even those like the United States which operate a broadly similar legal system to Fiji's when it comes to the application of the common law – often express themselves in language which is different from ours. It is therefore necessary to go behind the language and see what the court is driving at. Accordingly, if the language which the court used was that of seizure, you should look beyond the language to see what the seizure was being ordered for.

[36]  When looked in that light, the warrant issued by the United States District Court is quite clear. It ordered the seizure of the *Amadea* because it was "subject to forfeiture". No order for its forfeiture had been made, and so the District Court was ordering its seizure so that, if an order for forfeiture was eventually made, it would not have been disposed of in the

16.

meantime.  That is why it operated, to adapt the language used by Wilson J to the legal landscape in Fiji, as a restraining order under section 19B of POCA "prohibiting any person from disposing of, or dealing with, property ... except in the manner specified in the order". That this was the basis on which its seizure was sought becomes even plainer from the request for assistance, which sought its seizure "to prevent its transfer, sale, or other encumbrance or dissipation, as a preliminary step to forfeiture under US law".  For that reason, I have concluded that the warrant issued by the District Court was a "foreign restraining order" within the meaning of section 3 of the 1997 Act.

[37]   In the interests of completeness, I should add that I do not disagree with Mr Haniff's argument that an order for seizure is different from a restraining order, though I cannot accept the distinction he drew between orders *in rem* and orders *in personam*.  Both an order for seizure and a restraining order require people to do something or to refrain from doing something.  However, the flaw in his reliance on the differences between the two is that although the order of the District Court provided for the seizure of the *Amadea* (just as the Polish order provided for the seizure of Mr Buzak's funds and property), the order was sought for a purpose which made it a restraining order.

[38]   There is another reason why I am sure that the warrant issued by the United States District Court was a "foreign restraining order" within section 3 of MACMA.  It will be recalled that section 31(6) of MACMA provides that once the foreign restraining order has been registered in Fiji, its effect is as if it had been a restraining order made by the court under POCA.  The effect of such an order is set out in regulations made under section 77(1) of POCA, namely the Proceeds of Crime (Management and Disposal of Property) Regulations 2012 ("the Regulations").  Regulations 4(1) and 4(2) provide, so far as is material:

> "(1)     Any property that has been restrained ... shall immediately become the responsibility of the Attorney-General.
>
> (2)     The Attorney-General has responsibility for the control and management of property that is subject to a restraining order."

Where the restraining order is a foreign restraining order, the Regulations identify what the Attorney-General can do with the property to which the order relates.  Regulation 11 of the Regulations provides:

> *"(1)    The competent authority may enter into an agreement for the control and management of property restrained under a registered foreign restraining order with the foreign competent authority who is required under that order to take control of the property.*
>
> *(2)    The competent authority may perform, in accordance with an agreement referred to in subregulation (1), the same functions in relation to property restrained under a registered foreign restraining order as the person who is required under that order to take control of the property."*

[39]    The effect of these provisions is that once a foreign restraining order has been made, responsibility for what happens to the property to which the order relates is vested exclusively in the Attorney-General. He alone decides what should be done with the property. He does not have to hand it over to the appropriate authorities of the country in which the original order was made. He may, of course, come to an agreement with the United States' authorities for the return of the *Amadea* to the United States, but it was just as open to him to decide that it should be kept in Fiji for the time being – for example, until such time as the courts in the United States ordered its forfeiture. The important point for present purposes is that although the warrant issued by the United States District Court required the seizure of the *Amadea*, the effect of the registration of that warrant in Fiji was not that it could be seized. The effect of registration was that it would now be under the control and management of the Attorney-General who would decide what to do with it. Since that was the effect of the registration of the warrant – despite the warrant requiring the seizure of the *Amadea* – all the more reason for not treating the literal language of the warrant as decisive.

*The function of the High Court*

[40]    Amaratunga J did not address two issues which Mr Haniff argued he was required to address: whether Mr Kerimov was indeed the beneficial owner of the *Amadea*, and whether the *Amadea* was tainted property within the meaning of section 3 of POCA. His unwillingness to address those issues is said to render his order that the warrant issued by the District Court be registered legally flawed. Mr Haniff rhetorically asked: how could the High Court properly register a warrant for the seizure of property without some inquiry as to whether the facts justified the issue of the warrant? Whether Mr Kerimov was the beneficial owner of the *Amadea*, and whether the *Amadea* was tainted property, were both

critical issues. If Mr Kerimov was not the beneficial owner of the *Amadea*, and if the true beneficial owner was someone who was not subject to United States' sanctions, the *Amadea* could not be tainted property because payments made for its running costs would not have had to be licensed under the United States' statutory sanctions regime. This argument represented the second set of grounds of appeal advanced on behalf of Millemarin.

[41]   Mr Haniff's written submissions did not address the level of scrutiny with which the court had to address these issues. Did the court have to be satisfied that Mr Kerimov was indeed the beneficial owner of the *Amadea*? Or would it be sufficient for the Court to conclude merely that there were good reasons for believing that he was its beneficial owner (a test which equated to "probable cause" in United States jurisprudence)? Or should the Court's inquiry be limited to determining whether there was an issue to be tried – for example, a test similar to that used by the courts in Fiji to decide whether to grant an interlocutory injunction?[15] When these various possibilities were put to him in the course of argument, Mr Haniff accepted that the latter would be the appropriate test, thereby conceding that the level of scrutiny was relatively limited.

[42]   But why should the facts on which the foreign order was based be scrutinized at all? The inescapable fact is that the United States District Court must be regarded as having scrutinized the facts when it had to decide whether to issue the warrant. It cannot be the function of the High Court in Fiji to conduct a similar exercise to that which the District Court has already carried out. If it happened to take a different view from that of the District Court, it would in effect be holding itself out as a domestic court of appeals. Of course, it must not defer to a foreign court simply because the foreign court is in a country far richer and more powerful than Fiji, but if the High Court is to be treated as required in effect to address the legality of the order of a foreign court, there would have to be an express requirement to that effect in the relevant legislation. There is no such express requirement. Indeed, if the High Court was required to scrutinize the facts on which the foreign order was based, there would have to be something in MACMA requiring the requesting state to file evidence showing the factual and legal basis on which the foreign

---

[15]   See *American Cyanamid Co v Ethicon Ltd* [1975] AC 396.

order was made and on which the registration of that order was sought. There is no such requirement for that either in MACMA. I am not surprised. Such requirements are inconsistent with the whole ethos of mutual assistance – which is to assist in the enforcement of orders made by the courts of a foreign country, and you assume that the courts of that foreign country know their business. Whether that order should have been made in the first place is not for the courts of Fiji to decide.

[43]   Mr Haniff placed considerable reliance on the concluding words in section 31(6) of MACMA – "at the time of registration". He argued that this showed that the scrutiny which was to be applied to the facts on which the foreign order was based had to be carried out when the registration of the foreign order was being considered – in other words, by the High Court when it considered the application to register the foreign order. I do not agree. Section 31(6) is not concerned with whether the courts in Fiji need to scrutinize the facts on which the foreign order was based. It is concerned with the effect of the registration of the foreign order, and how it is to be enforced, once the order has been registered. In any event, the words "at the time of registration" relate to the restraining order made under POCA. In other words, it deals with the effect of a restraining order made under POCA, and how it would be enforced, if the restraining order had been made at the time of the registration of the foreign order under MACMA.

[44]   There is another problem with the argument advanced on behalf of Millemarin. Mr Haniff contended that the need for the High Court to address whether the *Amadea* is tainted property arose under section 19B(1) of POCA which provides that if a restraining order is to be made against property, the court has to be satisfied that there are reasonable grounds for suspecting that it is tainted property. But it is important to note that section 19B(1) only deals with what the court has to be satisfied about before a restraining order *under POCA* can be made. The High Court in this case was not concerned with whether a restraining order under POCA could be made. It was concerned with whether a warrant issued by the District Court qualified for registration in the High Court. The provisions in POCA were only relevant once an order for its registration had been made, and their relevance was limited by section 31(6) of MACMA to the effect of registration and how a foreign restraining order which had been registered was to be enforced. The provisions of

POCA which were relevant to those issues were the provisions in the Regulations to which I have already referred. It follows that section 19B(1) of POCA is not relevant at all to whether the warrant issued by the United States District Court qualified for registration in Fiji.

[45]   Mr Haniff referred us to the judgment of Hamza J in the High Court in *The Director of Public Prosecutions v Chase and ors* [2017] FJHC 156. In that case, Hamza J ordered that an order of the High Court of New Zealand – which restrained a property in Fiji from being dealt with – be registered in Fiji. In reaching that conclusion, he said that he was satisfied that there were reasonable grounds for suspecting that the property was tainted property. Mr Haniff made the point that Hamza J had carried out the very scrutiny which he claimed should have been carried out by the High Court in the present case, albeit at a different level of scrutiny.

[46]   It is important to understand the route by which Hamza J scrutinized the facts on which the original order had been made. Hamza J understood that the application before him was not just for the registration of the restraining order, but for the High Court to make a restraining order itself.[16] Accordingly, he applied the test for making a restraining order set out in section 35(1) of POCA (the equivalent in Part 3 of POCA of section 19B(1) in Part 2 of POCA), namely that "the court is satisfied that there are reasonable grounds for suspecting that the property is tainted property". In other words, he scrutinized the facts on which the original order had been based because he thought that he was dealing with an application for a restraining order in addition to the application for the registration of the foreign order. *Chase* is no authority for the proposition that the facts on which a foreign order was based have to be scrutinized for the purpose of determining whether the foreign order should be registered in Fiji.

[47]   For these reasons, I have concluded that there was no need for the High Court to address the two factual issues which Mr Haniff contended it ought to have addressed. Subject to one reservation which I shall come to shortly, the High Court's function was to address only three questions: (i) did the warrant issued by the United States District Court amount

---

[16]   See para 7 of Hamza J's judgment.

to a foreign restraining order; (ii) was the warrant issued in respect of a serious offence; and (iii) was the property to which the warrant related believed to be located in Fiji? The High Court answered these three questions in the affirmative. It found that the warrant was indeed a foreign restraining order. It found that it was issued in respect of a serious offence – the offence of money laundering which was punishable in Fiji by a maximum term of 20 years' imprisonment. And there was no dispute that the *Amadea* was believed to be in Fiji.

[48]    The one reservation about all this relates to the language of section 31(3) of MACMA. That is the provision which gives the High Court the power to register a foreign restraining order. But the use of that power is not expressed in mandatory terms: it provides only that the court "may" register the order. The language used in section 31(3) therefore suggests that the power is a discretionary one – in other words, that the power need not be exercised if the court chooses not to. That was, at first blush, a problem for Ms Prasad who appeared for the Director of Public Prosecutions. If the High Court only had to be satisfied about the three matters set out in the previous paragraph, where was there any room for the exercise of any discretion? This was not a question which Mr Haniff posed, but it was one which had occurred to the Court. Ms Prasad did not really have an answer to that question when the Court put it to her. Did that not suggest that something more was required of the Court – perhaps an inquiry of the kind Mr Haniff was advancing?

[49]    Having considered the matter with care, I think that the problem is more apparent than real. Courts over the years have distinguished between conferring a power on a body and requiring the body to exercise that power. As Cotton LJ said in the Court of Appeal in England in *Re Baker* (1890) 44 Ch D 262 at page 270:

> *"I think that great misconception is caused by saying that in some cases 'may' means 'must'. It can never mean 'must', so long as the English language retains its meaning; but it gives a power, and then it may be a question in what cases, where a Judge has a power given him by the word 'may', it becomes his duty to exercise it."*

Similar statements can be found in other authorities – for example, Earl Cairns LC in the House of Lords in *Julius v Lord Bishop of Oxford* (1880) 5 AC 214 at pages 222-223, and

Lord Phillimore in the Privy Council in *Alcock v Chief Revenue Authority* AIR 1923 PC 138.[17]

[50] Whether the creation of the power carries with it a corresponding duty to exercise that power will depend on the context in which the power is given. When it comes to an order made by a foreign country to seize property pending an order for its forfeiture, the power given to the High Court of Fiji to register that order is to enable the property to be preserved until the foreign court can determine whether the property should be forfeited. The purpose of giving that power to the High Court would be thwarted if the High Court was able to decline to exercise that power, even if the conditions for the exercise of the power had been satisfied. In these circumstances, I have concluded that the power of the High Court to register a foreign order under section 31(3) of MACMA included a duty to do so once it was satisfied that the conditions for the exercise of the power had been met.

[51] For these reasons, it is unnecessary for me to address the final set of grounds of appeal advanced on behalf of Millemarin, namely that on a scrutiny of the evidence, the High Court should have found that the *Amadea* was not tainted property because Mr Kerimov was not its beneficial owner, and that its true beneficial owner had not been subject to United States' sanctions. However, had I had to address this issue – albeit with the low level of scrutiny which Mr Haniff accepted would have been appropriate – I would have found that there was an issue to be tried on whether the *Amadea* was indeed tainted property within the meaning of section 3 of POCA because there was an issue to be tried on whether Mr Kerimov is its true beneficial owner.

*Conclusion*

[52] For these reasons, I would give Millemarin leave to appeal to the Supreme Court because the appeal involved a far-reaching question of law – namely whether an order made by a court in a foreign country for the seizure of property can amount to a "foreign restraining order" within the meaning of section 3 of MACMA. In accordance with the Supreme Court's usual practice, I would treat the hearing of the application for leave to appeal as the hearing of the appeal, but I would dismiss the appeal. I see no reason why costs should

---

[17]  I am grateful to Lokur J for drawing my attention to the judgment of the Supreme Court of India in *Dhampur Sugar Mills Ltd v State of Uttar Pradesh and others* [2007] 10 SCR 245 which discusses this line of authority.

not follow the event, and I would order Millemarin to pay the Director of Public Prosecution's costs of the appeal to the Supreme Court summarily assessed at $7,500.

## Lokur J

[53]    I have read the draft judgment prepared by my learned brother Justice Keith and agree with the reasons and conclusions arrived at by him.

*Orders*:

   (1)   Leave to Millemarin to appeal to the Supreme Court granted.

   (2)   Appeal dismissed.

   (3)   Millemarin to pay to the Director of Public Prosecutions his costs of the appeal, summarily assessed at $7,500.


**The Hon. Mr. Justice Anthony Gates**
Judge of the Supreme Court


**The Hon. Mr. Justice Brian Keith**
Judge of the Supreme Court


**The Hon. Mr. Justice Madan Lokur**
Judge of the Supreme Court

24.