## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|       Plaintiff, | |
|       v. | Case No. 1:23-cv-09304 |
| THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, | The Honorable Dale E. Ho **ORAL ARGUMENT REQUESTED** |
|       Defendant-*In-Rem*, | |
|       and | |
| EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD., | |
|       Claimants. | |

## CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE VERIFIED FIRST AMENDED COMPLAINT FOR FORFEITURE

FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

## TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................. iv

PRELIMINARY STATEMENT ......................................................................................... 1

STATUTORY AND FACTUAL BACKGROUND .................................................... 5

LEGAL STANDARD........................................................................................................ 8

ARGUMENT ..................................................................................................................... 9

I.    The Amended Complaint fails to allege sufficient facts that a sanctioned individual owns the *Amadea*, or that payments were made on his behalf. ............................................. 9

II.    The First Claim fails because the *Amadea* neither "constitutes" nor is derived from "proceeds traceable to" IEEPA violations, and the Amended Complaint fails to allege that anyone acted "willfully."...................................................................................... 10

    A.  The *Amadea* cannot be forfeited because it does not constitute "proceeds" of an IEEPA violation............................................................................................................10

    B.  The *Amadea* is not "derived from proceeds traceable to" an IEEPA violation. .............12

    C.  The government fails to allege that anyone acted "willfully," a predicate allegation for forfeiture premised on an IEEPA violation. .............................................15

III.    The Second, Third, and Fourth Claims fail because the government has not alleged facts sufficient to state a claim under 18 U.S.C. § 981(a)(1)(A) that the *Amadea* was either "involved in" or "traceable to" any alleged money laundering. ......................... 19

IV.    Also fatal to the Second Claim, the Amended Complaint fails to allege that anyone willfully violated IEEPA and that anyone intentionally promoted the carrying on of IEEPA violations under 18 U.S.C. § 1956(a)(2)(A). .......................................................... 22

V.    The Third Claim fails because the Amended Complaint does not allege monetary transactions were made with "criminally derived property," and is deficient in alleging facts that satisfy the *mens rea* requirements of this claim. .................................... 25

    A.  The Amended Complaint is devoid of any allegation that the funds used to make the vendor payments were "criminally derived property," a required element of 18 U.S.C. § 1957.........................................................................................................25

    B.  The government fails to allege that anyone willfully violated IEEPA and "knowingly" engaged in a transaction in "criminally derived property." .....................27

VI.    The Fourth Claim predicated on alleged conspiracy to commit money laundering under 18 U.S.C. §§ 1956 & 1957 fails to state a claim upon which relief can be granted, and fails to allege the requisite *mens rea*. .............................................................. 28

VII.   The Amended Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim under admiralty law. ............................................... 29

       A.   This Court's federal question jurisdiction and admiralty jurisdiction are not identical. ..................................................................................................................30

       B.   The government has elected to invoke the Court's admiralty jurisdiction in its Amended Complaint, but the Court lacks *in rem* jurisdiction over the *Amadea* and the Amended Complaint fails to state a claim under admiralty law. .......................30

            1.   The Court lacks admiralty jurisdiction because the *Amadea* is not within the District and the government has no plans to bring it within the District. .................31

            2.   The Amended Complaint should be dismissed because it fails to state a claim under admiralty law. ....................................................................................32

CONCLUSION ...................................................................................................................... 35

CERTIFICATE OF SERVICE ............................................................................................... 36

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Am. Dredging Co. v. Miller*,
    510 U.S. 443 (1994) ...................................................................................... 32

*Am. Ins. Co. v. 356 Bales of Cotton*,
    26 U.S. 511 (1828) ........................................................................................ 30

*Automated Transaction LLC v. New York Cmty. Bank*,
    2013 WL 992423 (E.D.N.Y. Mar. 13, 2013)................................................. 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 8

*Ferrostaal, Inc. v. HACI HASSAN YARDIM*,
    2006 WL 2819585 (S.D.N.Y. Sept. 29, 2006) ............................................. 32

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
    690 F. Supp. 256 (S.D.N.Y. 1988) .............................................................. 17

*Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*,
    413 F.3d 307 (2d Cir. 2005) ......................................................................... 32

*In re 650 Fifth Ave. & Related Props.*,
    777 F. Supp. 2d 529 (S.D.N.Y. 2011) ............................................ 11, 12, 13, 20

*In re Millenium Seacarriers, Inc.*,
    419 F.3d 83 (2d Cir. 2005) ........................................................................... 31

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ........................................................................... 17

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995) ...................................................................................... 33

*Mackensworth v. S.S. Am. Merch.*,
    28 F.3d 246 (2d Cir. 1994) ........................................................................... 31

*Panama R. Co. v. Johnson*,
    264 U.S. 375 (1924) ................................................................................. 30, 32

*Plusgrade L.P. v. Endava Inc.*,
    2023 WL 2402879 (S.D.N.Y. Mar. 8, 2023)................................................ 17

iv

*Rolon v. Henneman*,
   517 F.3d 140 (2d Cir. 2008) ........................................................................ 9, 24

*Romero v. Int'l Terminal Operating Co.*,
   358 U.S. 354 (1959) .......................................................................... 30, 32, 33

*Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*,
   260 F.3d 114 (2d Cir. 2001) ................................................................... 30

*The Charles D. Leffler*,
   100 F.2d 759 (3d Cir. 1938) ................................................................... 33

*The Geneva*,
   187 F. 115 (2d Cir. 1911) ....................................................................... 32

*U.S. v. 3190 Bags, 228 Cases, & 17 Kegs, Containing Rye Whisky & Scotch Whisky*,
   70 F.2d 246 (2d Cir. 1934) ..................................................................... 32

*U.S. v. $1,399,313.74 in U.S. Currency*,
   591 F. Supp. 2d 365 (S.D.N.Y. 2008) ............................................ passim

*U.S. v. $448,342.85*,
   969 F.2d 474 (7th Cir. 1992) ................................................................. 14

*U.S. v. Approximately 250 Documents Containing the Forged Hand Writing of
   President John F. Kennedy and Others*, 2008 WL 4129814 (S.D.N.Y. Sept. 5, 2008) ............ 20

*U.S. v. Bornfield*,
   145 F.3d 1123 (10th Cir. 1998) ............................................................. 21

*U.S. v. Evergreen Int'l*,
   206 F. App'x 71 (2d Cir. 2006) ............................................................. 29

*U.S. v. Goodwin*,
   831 F. App'x 223 (2020) ................................................................. 14, 15

*U.S. v. Herndon*,
   122 F. Supp. 3d 487 (S.D. W. Va. 2015) ................................................. 27

*U.S. v. Howard*,
   245 F. Supp. 2d 24 (D.D.C. 2003) .......................................................... 27

*U.S. v. Iacoboni*,
   221 F. Supp. 2d 104 (D. Mass. 2002) ..................................................... 20

*U.S. v. Johnson*,
   971 F.2d 562 (10th Cir. 1992) ......................................................................... 27

*U.S. v. Kalish*,
   06 Cr. 656, 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009) ......................................... 12

*U.S. v. M/Y Galactica Star*,
   784 F. App'x 268 (5th Cir. 2019) ...................................................................... 34

*U.S. v. Mahaffy*,
   693 F.3d 113 (2d Cir. 2012) ....................................................................... 11, 12

*U.S. v. Miller*,
   911 F.3d 229 (4th Cir. 2018) ........................................................................... 14

*U.S. v. Ness*,
   565 F.3d 73 (2d Cir. 2009) .............................................................................. 27

*U.S. v. Nicolo*,
   597 F. Supp. 2d 342 (W.D.N.Y. 2009) ............................................................ 21, 22

*U.S. v. One 1980 Rolls Royce*, VIN No. SRL 39955,
   905 F.2d 89 (5th Cir. 1990) ............................................................................. 14

*U.S. v. One Gulfstream G-V Jet Aircraft*,
   941 F. Supp. 2d 1 (D.D.C. 2013) .................................................................. 10, 23

*U.S. v. Piervinanzi*,
   23 F.3d 670 (2d Cir. 1994) .............................................................................. 26

*U.S. v. Pierce*,
   224 F.3d 158 (2d Cir. 2000) ............................................................................ 23

*U.S. v. Pole No. 3172, Hopkinton*,
   852 F.2d 636 (1st Cir. 1988) ........................................................................... 14

*U.S. v. Santos*,
   553 U.S. 507 (2008) .................................................................................. 24, 25

*U.S. v. Thorn*,
   317 F.3d 107 (2d Cir. 2003) ............................................................................ 23

*U.S. v. Voigt*,
   89 F.3d 1050 (3d Cir. 1996) ............................................................................ 14

**Statutes:**

18 U.S.C. § 1956 ................................................................................................ 22, 28, 33

18 U.S.C. § 1956(a)(1) ..................................................................................................... 23

18 U.S.C. § 1956(a)(2) ............................................................................................... 23, 29

18 U.S.C. § 1956(a)(2)(A) ........................................................................... 22, 23, 24, 25

18 U.S.C. § 1956(c)(4) ..................................................................................................... 34

18 U.S.C. § 1956(c)(7) ................................................................................................... 2, 5

18 U.S.C. § 1956(c)(9) ..................................................................................................... 26

18 U.S.C. § 1956(h) .......................................................................................................... 28

18 U.S.C. § 1957 ........................................................................................................ passim

18 U.S.C. § 1957(a) .......................................................................................................... 29

18 U.S.C. § 1957(f)(2) ...................................................................................................... 26

18 U.S.C. § 981 ....................................................................................................... 5, 33, 34

18 U.S.C. § 981(a)(1)(A) ............................................................................... 3, 19, 20, 25

18 U.S.C. § 981(a)(1)(C) ............................................................................... 2, 10, 12, 15

18 U.S.C. § 981(a)(2)(A) ............................................................................................. 3, 11

18 U.S.C. § 981(a)(2)(B) ....................................................................................... 3, 11, 12

18 U.S.C. § 983 ................................................................................................................. 34

18 U.S.C. § 983(c)(3) ....................................................................................................... 21

28 U.S.C. § 1292(a)(3) ..................................................................................................... 34

28 U.S.C. § 1331 ............................................................................................................... 30

28 U.S.C. § 1333 ......................................................................................................... 29, 31

28 U.S.C. § 1345 ......................................................................................................... 30, 34

28 U.S.C. § 1355 ................................................................................................. 31

28 U.S.C. § 1355(a) ..................................................................................... 30, 34

50 U.S.C. § 1705(a) ............................................................................................ 5

50 U.S.C. § 1705(c) ................................................................................ 3, 5, 16, 17

U.S. Const. art. III ...................................................................................... 30, 33

**Rules:**

Fed. R. Civ. P. 9(h)(1) ................................................................................. 5, 31

Fed. R. Civ. P. 12(b)(1) ........................................................................... 1, 5, 29

Fed. R. Civ. P. 12(b)(6) ..................................................................... 1, 5, 29, 35

Rule C(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions ................................................................................................. 31

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
    Actions ............................................................................................ 1, 34

**Other:**

12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal
Practice and Procedure* § 3242 (3d ed. 2023) ................................................. 8

Anti-Drug Abuse Act of 1986, Oct. 27, 1986, Pub. L. 99–570, 100 Stat. 3207 ......................... 33

Exec. Order No. 13,661, 79 Fed. Reg. 15535 (Mar. 16, 2014) ................................. 5, 28

Or. Arg. Tr. 19:08–19:32, *United States v. M/Y Galactica Star*,
    No. 18-20781 (Sept. 4, 2019) ................................................................ 34

Order, *In re 650 Fifth Ave. & Related Properties*, No. 1:08-cv-10934 (LAP),
    Exhibit K at 49, ECF No. 1902 at 744 ....................................................... 14

S. Rep. No. 99-433 (1986) ................................................................................. 24

U.S. Dep't Treas., *Treasury Designates Russian Oligarchs, Officials, and Entities
in Response to Worldwide Malign Activity* (Apr. 6, 2018) ................................... 18, 28

Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd. (collectively, "Claimants") respectfully submit this memorandum of law in support of their motion to dismiss the government's Verified First Amended Complaint for Forfeiture (the "Amended Complaint," cited as "Am. Compl." [Dkt. 37]) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule G").

## PRELIMINARY STATEMENT

The government has failed to set forth a legally cognizable claim that would entitle it to forfeit the *Amadea*. Instead, the government asserts factual and legal theories that are divorced from forfeiture, sanctions, and money laundering laws, and unsupported by the cases interpreting those laws. The *Amadea* is Mr. Khudainatov's vessel, and Claimants vigorously deny the overarching allegation that Suleiman Kerimov is the ultimate beneficial owner of the *Amadea*.

Indeed, the government's seizure of the *Amadea* in April 2022 was based on President Biden's foreign-policy mandate to seize luxury assets of wealthy Russians in response to Russia's military action in Ukraine. Despite the government having been presented with evidence prior to the seizure that Mr. Khudainatov owns the *Amadea*, the government ignored the evidence and seized the *Amadea* anyway, contending that Mr. Khudainatov was a straw owner for Kerimov in its application for the seizure warrant.

The government later abandoned this theory, as its initial Complaint (cited as "Compl." [Dkt. 1]) did not even mention Mr. Khudainatov. In its Amended Complaint, the government cobbles both theories together and now alleges that Mr. Khudainatov is a straw owner because he filed a claim in this action, along with unsupported assertions that he is a straw owner for other vessels. *See* Am. Compl. ¶¶ 45–49. The allegations that he is a straw owner for other vessels do

not provide any factual support for the government's claims, and were simply included to pressure Mr. Khudainatov into abandoning his claim.[1]

But even if the government sufficiently alleges Kerimov is the true owner, the Amended Complaint must still be dismissed. The government's basis to forfeit the *Amadea* hangs on the singular theory that routine vendor payments totaling $1.2 million to lawful third-party vendors—that happened to touch U.S. bank accounts over the course of a few months—constitute sanctions violations and money laundering. As a matter of law, the $1.2 million in routine payments for such things as crew uniforms, food, fuel, and garbage disposal do not convert a vessel allegedly worth $300 million or more—that is not alleged to have ever entered U.S. territorial waters prior to its seizure—into proceeds of a sanctions violation or involved in money laundering. The government's attempt to shoehorn these facts into a sanctions evasion and money laundering conspiracy falls flat, warranting dismissal of this case. At most, the government would be entitled to forfeit $1.2 million or the actual items purchased with those payments, not the *Amadea*.

All four of the government's claims depend on alleged criminal violations of the International Emergency Economic Powers Act ("IEEPA"). In its First Claim, the government alleges that the *Amadea* "constitutes or is derived from proceeds traceable to" IEEPA violations "because post-purchase maintenance payments in violation of IEEPA sanctions allowed the [*Amadea*] to continue to exist as an operational vessel." Am. Compl. ¶¶ 70–72; 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7). This theory—that the payments were used to "retain" the vessel—has been rejected by courts. In addition, under the facts alleged, the *Amadea* does not satisfy either

---

[1] In an email on October 23, 2023, an attorney for the government advised that, should Claimants file a claim in this matter, "thereby putting Mr. Khudainatov's ownership at issue, [the government] plan[s] to file an amended Complaint including further details about Mr. Khudainatov, including [its] position that he is actually the straw owner of numerous yachts, including the *Amadea*, *Crescent*, and *Scheherazade*."

definition of "proceeds" applicable to this claim, as (1) the paying of routine vendor invoices is not an inherently "unlawful activity" as required by the first definition, § 981(a)(2)(A), and (2) the *Amadea* is not "money" as required by the second definition, § 981(a)(2)(B). Moreover, the government concludes that crew uniforms, food, garbage disposal, transiting, and docking fees allowed the *Amadea* to exist as an operational vessel without explaining how.

The government asserts in its three remaining claims that this is a money laundering case, but it is not. The Amended Complaint fails to allege any underlying criminal activity that generated criminally derived property, or any efforts by anyone to launder such property. The Second, Third, and Fourth Claims all require that the *Amadea* be "involved in" money laundering or "traceable to" property involved in money laundering. The government does not allege that the *Amadea* itself was being laundered or that the *Amadea* made money laundering easier to accomplish or acted as a conduit, failures that are fatal to these claims. In addition, the Third Claim requires that the monetary transactions at issue involve "criminally derived property." *See* Am. Compl. ¶¶ 80–82; §§ 981(a)(1)(A), 1957. But the Amended Complaint is devoid of allegations that the funds used to make the vendor payments were criminally derived. The Fourth Claim alleges conspiracy, based on the Second and Third substantive money laundering claims. *See* Am. Compl. ¶¶ 84–87. This claim fails because the underlying substantive claims fail and also because the government does not allege facts that anyone conspired together to do anything, much less to violate the law.

Also fatal to the Amended Complaint is that the government fails to adequately plead that anyone acted with the *mens rea* required for these claims. All four claims include allegations of criminal sanctions violations, which must be committed "willfully." *See* 50 U.S.C. § 1705(c). The Second Claim additionally requires the intent to promote the carrying on of sanctions violations,

and the Third Claim additionally requires that someone knowingly engage in a monetary transaction in criminally derived property. *See* Am. Compl. ¶¶ 70, 75, 76, 80, 81, 85.

The substantive amendments to the Amended Complaint attempt to remedy these defects, but fail to do so. In the Amended Complaint, the government has accused, for the first time, two captains of the *Amadea* of engaging in intentional criminal conduct. The Amended Complaint alleges that the captains told the government they knew Kerimov owned the *Amadea* and acted willfully to violate IEEPA and knowingly engaged in money laundering. These allegations that the captains of the vessel engaged in criminal conduct are defamatory and patently false. Even if these new allegations—that the captains knew Kerimov purportedly owned the vessel and that he was sanctioned—were true, however, the government still has not alleged sufficient facts that anyone responsible for the payments knew that paying routine vendor invoices for a vessel that is not alleged to have ever been in the U.S. could be considered a violation of U.S. law.

The following facts are undisputed:

- There is no allegation that Kerimov purchased the vessel with illegal proceeds;

- There is no allegation that the alleged sale of the yacht to Kerimov was a crime under U.S. law;

- There is no allegation that the funds transmitted to pay vendors involved criminal proceeds, were designed to launder criminal proceeds, or were otherwise tainted;

- There is no allegation that the vessel was ever present in the United States, or that any of items paid for or services rendered took place in the United States; and

- Other than the knowingly false allegations regarding the two captains, there is no allegation that any individual sent funds to the United States knowing that it was unlawful; and

In light of these glaring defects, the Amended Complaint should be dismissed in its entirety.

The government has also slipped into its Amended Complaint a new basis of subject matter jurisdiction that calls into question the Court's power to act in this case. The government has now "designate[d] each of its forfeiture claims as admiralty claims under Fed. R. Civ. P. 9(h)(1)." *Id.* ¶ 2. By doing so, the government asserts two competing theories of jurisdiction, which the Supreme Court recognized long ago are distinct under the Constitution. If the government insists on proceeding under admiralty jurisdiction, it has pled itself out of court. The law under admiralty is clear that subject matter jurisdiction is only proper where the property is located. Because the *Amadea* is in San Diego, jurisdiction is improper here. Even if this Court were to conclude admiralty jurisdiction is proper, substantive admiralty law does not recognize claims under 18 U.S.C. § 981, dooming the Amended Complaint. If the government does not withdraw its allegation of admiralty jurisdiction, the Court should dismiss the Amended Complaint under Rule 12(b)(1), or under Rule 12(b)(6) for failure to state a claim under admiralty law.

## STATUTORY AND FACTUAL BACKGROUND

All four claims are predicated on an allegation of "specified unlawful activity" ("SUA"), as defined in 18 U.S.C. § 1956, a violation of IEEPA sanctions. Specifically, § 1956(c)(7)(D) defines SUA to include "an offense under . . . section 206 (relating to penalties) of" IEEPA. Section 206(c) of IEEPA prescribes criminal punishment for "[a] person who *willfully* commits, *willfully* attempts to commit, or *willfully* conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a)." 50 U.S.C. § 1705(c) (emphases added). Subsection (a) provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any . . . order . . . issued under this chapter." *Id.* § 1705(a).

On March 6, 2014, the President issued Executive Order 13,661 pursuant to his authority under IEEPA. Exec. Order No. 13,661, 79 Fed. Reg. 15535 (Mar. 16, 2014). As relevant here, on

April 6, 2018, the U.S. Treasury Department designated Kerimov as an individual whose property is "blocked" under E.O. 13,661. Am. Compl. ¶ 25. Allegations of "specified unlawful activity"—and more specifically alleged IEEPA violations by or for the benefit of Kerimov—undergird all four of the claims in the Amended Complaint.

The government asserts that Kerimov purchased the *Amadea* via a series of transactions between July 2021 and March 2022. But no alleged transfer document mentions Kerimov or any agent of his. *See id.* ¶¶ 28, 30–34. The Amended Complaint alleges in conclusory fashion that these transactions represent a sale to Kerimov, using a straw owner. *See id.* ¶¶ 28, 30, 33. The Amended Complaint does not allege this sale violated any U.S. law, and it does not form the basis of any of the government's forfeiture claims.

The government then alleges that Kerimov or others acting on his behalf engaged in U.S. dollar transactions relating to the *Amadea* that transited U.S. financial institutions. *Id.* ¶¶ 51–53. The government alleges that the unnamed "*Amadea* crew, by way of Millemarin or [the yacht management company], were billed more than $1.3 million" for such expenses, and that "those same individuals and/or entities caused at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts . . . ." *Id.* ¶ 52. The government lists several wire transactions over a seven-month period, but mostly during the three-month period before April 2022. *Id.* ¶ 52(a)–(k).

With respect to these transactions, the government does not identify any individual or individuals responsible for approving the specific invoices or accompanying payments. *See id.* The payments were allegedly made for crew clothing, unspecified equipment, provisions, fuel, garbage disposal, hull inspection, barge fees, dock fees, port fees, safety inspection, telecommunications, unspecified yacht services, and watersports equipment. *Id.* Five of these alleged transactions were

made from a foreign account or location to another foreign account, and happened to transit a U.S. correspondent bank. *Id.* ¶ 52(b), (c), (e), (k), (l). Only two of these alleged transactions were destined for U.S.-based bank accounts. *Id.* ¶ 52(a), (d). According to the government, these U.S. dollar payments "preserved or enhanced the *Amadea*'s overall value." *Id.* ¶ 51.

The government alleges that Evgeny Kochman was the president of the company managing the *Amadea*. *Id.* ¶ 14. The government alleges that Kochman and unnamed employees of the yacht management company knew that Kerimov had purchased the vessel and that Kerimov was sanctioned. *Id.* ¶ 54–55. The government then claims that unnamed employees of the yacht management company "were also aware that [unnamed] persons controlling, operating, and/or maintaining the *Amadea* . . . were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*." *Id.* ¶ 57. The government alleges that when the yacht management company "sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations." *Id.* ¶ 59.[2]

Rather than identify that specific invoices were approved by specific individuals, the government ventures that, based on a "general *Amadea* invoice-approval policy" from 2017, Kochman must have approved the above payments in late-2021 and early-2022. *See id.* ¶¶ 60–61. The government similarly speculates that the two captains of the *Amadea* must have approved the invoices based on "the *Amadea*'s operating procedures." *Id.* ¶ 64. Finally, the government suggests

---

[2] The government quotes a June 2022 statement by the yacht management company's then-General Counsel that the company has "never conducted business or provided services to any parties subject to international sanctions." Am. Compl. ¶ 56 (citation omitted). This statement is consistent with the fact that the *Amadea* was not sold to Kerimov.

that some amorphous "collective knowledge" attributable to the yacht management company means that the company willfully committed IEEPA violations. *See id.* ¶ 67.

While the Amended Complaint alleges that Kochman "himself was aware that *Amadea* crew members were using U.S. companies to perform work and services for the *Amadea* using the U.S. banking system to support and maintain the *Amadea*," Am. Compl. ¶ 58, there is no allegation that he knew or understood that legitimate payments to vendors that passed through the U.S. banking system could constitute U.S. sanctions violations when the *Amadea* was outside the United States. Even sophisticated U.S. lawyers might not be aware of such legal nuances. Yet, the government blithely ascribes such knowledge and understanding to the president of a yacht management company and two vessel captains, none of whom is a lawyer or U.S. citizen.

## LEGAL STANDARD

Given their dramatic consequences, *in rem* forfeiture actions are subject to a heightened pleading standard under Rule G that is "more stringent than the general pleading requirements . . . [,] an implicit accommodation to the drastic nature of the civil forfeiture remedy." *U.S. v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 369 (S.D.N.Y. 2008) (citations omitted). A forfeiture complaint must "assert specific facts supporting an inference that the property is in fact subject to forfeiture." *Id.* This heightened pleading standard "fortifies the procedural-due-process protections against improper use of these remedies" by the government. 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3242 (3d ed. 2023).

The government "may not seize and . . . hold property upon conclusory allegations that [such] property is forfeitable." *$1,399,313.74 in U.S. Currency*, 591 F. Supp. at 369 (citations omitted). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Indeed, a court must disregard "conclusory allegations or legal conclusions

masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

**ARGUMENT**

I.   **The Amended Complaint fails to allege sufficient facts that a sanctioned individual owns the *Amadea,* or that payments were made on his behalf.**

To forfeit the *Amadea*, the government must allege specific facts—consistent with its heightened pleading burden—demonstrating that the vessel is owned by a sanctioned individual. The government has failed to do, satisfying itself to merely set forth vague and conclusory statements that do not link the supposed transactions constituting the alleged sale or the routine vendor payments to Kerimov.

With respect to the sale, the government relies on a series of corporate transactions between July 2021 and March 7, 2022, that it claims represents the sale to Kerimov. *See* Am. Compl. ¶¶ . ¶¶ 28, 30–34. That claim, however, is a conclusion unsupported by facts. Specifically, the government fails to allege facts supporting that Kerimov had any knowledge of, let alone that he was a party to, any of these transactions.[3] The government's bare conclusion that these transactions represented a sale to Kerimov, without any document linking him to these transactions, should be disregarded.[4]

Based on these uncorroborated allegations of ownership by Kerimov, the government leaps to its next deficient allegation: that routine vendor payments that were appurtenant to the *Amadea*

---

[3] In the government's original Complaint, the government prefaced its statements concluding that these transactions represented a sale to Kerimov with the phrase "information and belief." *See* Compl. ¶¶ 32, 36. Because Claimants argued in their original motion to dismiss that allegations based on "information and belief" are insufficient to satisfy the heightened pleading standard in a forfeiture case, the government deleted its repeated usage of "information and belief" from the Amended Complaint, but did not add any facts that support the conclusion that these transactions represented a sale to Kerimov. *See, e.g.,* Am. Compl. (red-lined version ([Dkt. 37-1]) ¶¶ 33, 37.

[4] The allegations that Kerimov and/or his family members were present on the vessel and requested certain changes are susceptible to multiple interpretations, including a long-term charter.

were caused by, or made on behalf and for the benefit of, Kerimov. Yet, there is not one single fact alleged linking any of the delineated payments to Kerimov. There are no allegations that the funds came from any account he controlled, no allegations that the payments originated from him, and no allegations that any of the payments were later reimbursed by or billed to him. These pleading failures doom the Complaint. *See $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 376 (dismissing forfeiture action because government was asking the court to make impermissible "logical leaps in the absence of facts and [to] credit conclusory assertions"); *see also U.S. v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14–16 (D.D.C. 2013) (same). Under these circumstances, this Court should dismiss the Complaint.

## II. The First Claim fails because the *Amadea* neither "constitutes" nor is derived from "proceeds traceable to" IEEPA violations, and the Amended Complaint fails to allege that anyone acted "willfully."

### A. The *Amadea* cannot be forfeited because it does not constitute "proceeds" of an IEEPA violation.

Under § 981(a)(1)(C), property derived from proceeds traceable to specified unlawful activity is forfeitable. In its Amended Complaint, the government simply alleges that "post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel," and therefore the Defendant In Rem is subject to forfeiture to the United States pursuant to § 981(a)(1)(C). Am Compl. ¶¶ 71, 72. But this is an erroneous description of the law. The government's incorrect definition of "proceeds" or "proceeds traceable to" a violation of IEEPA sanctions, which would permit the government to turn $1.2 million dollars of untainted funds sent to innocent third party vendors to transform the entirety of a $300 million dollar vessel into criminal proceeds, is neither supported by the plain language of the statute, nor under the law in this Circuit.

First, the government fails to allege facts that support an inference that the *Amadea* meets either of the statutory definitions of "proceeds" under § 981(a)(2)(A)–(B). "Proceeds" is defined under part (A) of the statute as "property of any kind obtained directly or indirectly" from inherently illegal activities, whereas under part (B), "proceeds" means *money* acquired through illegal transactions involving lawful goods or services, and thus does not apply to property—as the government seeks here. *See U.S. v. Mahaffy*, 693 F.3d 113, 137 (2d Cir. 2012).

The definition of proceeds under part (A) is plainly inapplicable to this case. The government does not allege that anyone associated with the *Amadea* was involved in any underlying criminal enterprise or any dealings with illegal goods. Boating provisions and services such as crew clothing, fuel, garbage disposal, inspections, barge, dock, and port fees, telecommunications, and watersports equipment (Am. Compl. ¶¶ 52(a)–(k), 53) are not illegal goods or services (e.g., dealing in contraband), and paying vendors for routine goods and services is not illegal activity. *See In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 551–52 (S.D.N.Y. 2011) ("normally legal activities" that only were "alleged to be illegal . . . because they were performed for the Iranian government" did not fall under the definition in part (A) above). Under this definition of proceeds, the government is not entitled to forfeit the *Amadea*.

Nor does the *Amadea* constitute "proceeds" under part (B), which refers to the amount of *money* acquired through the illegal transactions resulting in the forfeiture. § 981(a)(2)(B). The government does not allege any underlying criminal activity that generated money, and the *Amadea* itself is not "money" as required by a plain reading of the statute. Indeed, cases in this district have analyzed whether money—not property—meets the definition of proceeds under § 981(a)(2)(B). *See 650 Fifth Ave.*, 777 F. Supp. 2d at 552 (finding that criminally derived money

constituted proceeds under § 981(a)(2)(B) but an entire building did not); *see also Mahaffy*, 693 F.3d at 137–38; *U.S. v. Kalish*, No. 06 Cr. 656, 2009 WL 130215, at *8 (S.D.N.Y. Jan. 13, 2009).

More importantly, proceeds is defined in part (B) as money "acquired" through illegal transactions—not "retained"—presenting an incurable flaw in the government's theory that the entire *Amadea* is forfeitable because vendor payments for crew clothing and dock fees allowed the *Amadea* to be retained. The *650 Fifth Ave.* court rejected this theory. Similar to this case, the government alleged there that a foundation established by the Iranian government owned a building in Manhattan, that the foundation acted as a commercial real estate manager on behalf of the Iranian government, and that those services were in violation of the IEEPA sanctions placed on Iran. *650 Fifth Ave.*, 777 F. Supp. 2d at 550, 552. The government sought to forfeit the entire building under § 981(a)(1)(C), but the court rejected this proposition, finding that the building itself did not constitute "proceeds" under the statute. *Id.* at 556–57. Specifically noting that the statutory definition used the word "obtained," and not "retained," the court stated that it was "not aware of any court that ha[d] permitted an action to proceed under § 981(a)(1)(C) on the basis that property was *retained* as the result of a criminal offense." *Id.* at 556 (emphasis added). The government's attempt to use innocent vendor payments to seize an asset whose value is wildly disproportionate to the amount of those payments should be rejected at this stage.

**B.    The *Amadea* is not "derived from proceeds traceable to" an IEEPA violation.**

Not only does the *Amadea* not constitute proceeds under either definition in Section 981, but the vessel is not "derived from proceeds traceable to" an IEEPA violation. The government alleges that $1.2 million of untainted money, ultimately used for vendor payments and to purchase items such as water sports equipment, fuel, dockage fees, garbage disposal, crew uniforms, and provisions, were IEEPA violations because they transited U.S. bank accounts. The government

12

further alleges that those items allowed the *Amadea* to continue to exist as an operational vessel, rendering the vessel "proceeds traceable" to the alleged IEEPA violations. Am. Compl. ¶ 71. Given, the facts alleged, the *Amadea* is not "derived from proceeds traceable" to a sanctions violation. Court have held that even where illegal funds are used to enhance real property, only the exact portion of the illegal proceeds used to enhance the property's value—not the entire property—can be considered "traceable." In other words, even if the government is correct in its analysis, it would be entitled to forfeit only $1.2 million of payments to innocent vendors or the items purchased with those funds, not a $300 million vessel.

Again, the allegations here are similar to the facts of *650 Fifth Ave.* There, the government sought forfeiture of an entire building under § 981(a)(1)(C). The court rejected the government's argument that the entire building constituted "proceeds" under the statute, simply because "crime proceeds"—i.e., rental income from a building in New York City secretly owned by the Iranian government—were allegedly used to pay for maintenance and renovations, and served to enhance the market value of the building. *650 Fifth Ave.*, 777 F. Supp. 2d at 556–57. As such, even in the case where a criminal funneled illegal proceeds, obtained from a willful violation of sanctions law committed on U.S. soil, directly into a building in New York City over a period of years, the *650 Fifth Ave.* court found that only the exact portion of "the Building would be forfeitable to the extent that it is property 'derived from proceeds,' *i.e.*, rent[,]." This remained the law of the case throughout the trial stage, where the court instructed the jury that: "[i]f property constitutes (or was derived) only in part from the proceeds of an IEEPA violation, that property would be subject for forfeiture, *but only in part*. For example, if a car were bought with $100 that is proceeds of an IEEPA violation and $100 in lawfully derived funds, one half of the car would be subject to

forfeiture." Order, *In re 650 Fifth Ave. & Related Properties*, No. 1:08-cv-10934 (LAP), Exhibit K at 49, ECF No. 1902 at 744.

Other courts have come to the same conclusion. *See U.S. v. Miller*, 911 F.3d 229, 234–35 (4th Cir. 2018) (finding that defendant's equity interest in mortgaged property was forfeitable to extent his use of fraud proceeds to make mortgage payments directly increased his equity interest); *U.S. v. Voigt*, 89 F.3d 1050, 1088 (3d Cir. 1996) (finding that jewelry was not "traceable" to money laundering, even where it was purchased with funds from an account into which money laundering proceeds had been commingled with other funds); *U.S. v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992) (finding that "one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water"); *U.S. v. One 1980 Rolls Royce*, VIN No. SRL 39955, 905 F.2d 89, 91-92 (5th Cir. 1990) (holding that the government cannot forfeit "all properties when there is evidence that the properties were purchased at least in part with legitimate funds"); *U.S. v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 639–40 (1st Cir. 1988) (finding that only the "interest acquired as result of [] payments made with proceeds of [illegal] transactions should be forfeitable" because forfeitability does not "spread[] like a disease from one infected [] payment to [defendant's] entire interest in property acquired prior to the [infected] payment.").

The Eighth Circuit in *U.S. v. Goodwin*, 831 F. App'x 223, 224 (2020), went even further. The defendant Goodwin had purchased a motorcycle with "clean money" before his fraudulent scheme began. He thereafter used fraud proceeds to make payments to service the motorcycle and towards a loan secured by the motorcycle. There, the court reversed the forfeiture of the amount the defendant paid to service his motorcycle, and limited it to the portion of his equity in the motorcycle that was increased by the loan payments made from ill-gotten funds. The court

14

concluded that Goodwin's use of criminally derived proceeds rendered his equity interest in the motorcycle subject to forfeiture, but only to the extent such interest was increased by virtue of payments made with ill-gotten funds. *Id*. In addition, the Eighth Circuit explicitly held that "Goodwin's use of fraud proceeds to pay for service on the motorcycle was insufficient to show that the motorcycle in its entirety constituted or was derived from proceeds traceable to his fraudulent scheme under § 981(a)(1)(C)." *Id*. (finding that property is traceable to criminal offense if its acquisition is attributable to scheme underlying offense rather than money obtained from untainted sources) (citation omitted).

Here, the $1.2 million used to make vendor payments, unlike the rent in *650 Fifth Ave.* or the motorcycle loan payments in *Goodwin*, are not alleged to have been crime proceeds prior to transiting U.S. bank accounts. Nor was the money sent to vendors used to enhance the value of the *Amadea*. But even if the government's theory that clean money sent to vendors increases the value of the vessel, the amount forfeitable is limited to the amount of the increase. According to the government's valuation submitted in connection with its motion for interlocutory sale, the vessel's value is lower than the value alleged in the Amended Complaint. The government's allegations that the items purchased "enhanced" the value of the *Amadea* or allowed it to continue to exist as an operational vessel are conclusory, at best. For the above reasons and since the government fails to allege specific facts explaining how the vendor payments increased the *Amadea's* value or allowed it to continue to exist, this claim fails as a matter of law.

### C.  The government fails to allege that anyone acted "willfully," a predicate allegation for forfeiture premised on an IEEPA violation.

The Amended Complaint fails to plead the necessary *mens rea* elements for each of its claims, which are not premised on the alleged sale, but rather, only on subsequent vendor payments. To forfeit the *Amadea*, the government must prove that these vendor payments

constituted crimes, specifically violations of IEEPA sanctions, the predicate SUA for each of the government's claims. A criminal violation of IEEPA sanctions requires that a person act "willfully." *See* Am. Compl. ¶¶ 16, 24 (citing § 1705(c)).

The government's allegations are unavailing that Kochman, the co-captains, or anyone else approved invoices or payments on those invoices to U.S. vendors (or foreign vendors holding U.S. bank accounts) with knowledge that making these vendor payments was illegal. Indeed, the government does not identify which individual or individuals approved the specific invoices and wire payments on which it relies. *See id.* ¶ 51 (referring generally to "KERIMOV, or those acting on his behalf"); *id.* ¶ 52(a)–(k) (listing alleged wire payments but omitting any identification of specific individuals responsible for approving or sending wires).

The government suggests Kochman approved the payments on the invoices, but fails to allege facts supporting its conclusory allegation. It points to an allegation that, "in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*," *id.* ¶ 58, but it does not allege Kochman in fact approved such quotes or otherwise consummated the transaction, and any payment for this hypothetical transaction is not among the specific wires listed in paragraph 52. The government then cites what it calls a "general *Amadea* invoice-approval policy" from 2017—four years or more before the events at issue—as evidence that Kochman must have approved payments for invoices in 2021 and 2022. *See id.* ¶¶ 60–61. All the reliance on this so-called policy from 2017 does is highlight the government's lack of contemporaneous evidence that Kochman, or anyone else, approved the invoices in late-2021 and 2022 with the willfulness required to allege an IEEPA violation.

The government next targets the co-captains, claiming that "[u]nder the *Amadea*'s operating procedures, the captain [i.e., not Kochman or any employee of Imperial Yachts] needed

to approve invoices." *See id.* ¶ 64. Without distinguishing between the two co-captains, the government continues that "Co-Captains 1 or 2 did in fact approve the invoices cited above[.]" *Id.* Putting aside the falsity of the allegations regarding the captains' knowledge, such a bare, conclusory allegation does not demonstrate criminal intent possessed by either co-captain.

Finally, lacking evidence of a specific individual approving particular invoices or accompanying payments with the requisite *men rea*, the government resorts to the catchall of Imperial Yacht's "employees' and agents' collective knowledge and actions." *See id.* ¶ 67. The government's "group pleading" on this point to allege violations of U.S. criminal law does not pass muster. *See First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."), *aff'd*, 869 F.2d 175 (2d Cir. 1989).[5]

More important, even assuming *arguendo* (1) Kerimov purchased the *Amadea*, (2) either Kochman or one of the co-captains was aware of this, and (3) any of them approved routine invoices from vendors and/or accompanying payments that touched the United States, the government's allegations still fall short of pleading a *willful criminal* violation of U.S. law under 50 U.S.C. § 1705(c). More specifically, the Amended Complaint fails to allege that Kochman, the co-captains, or anyone else would have understood that approving and making routine vendor

---

[5] *See also Jackson v. Abernathy*, 960 F.3d 94, 96, 99 (2d Cir. 2020) (per curiam) (affirming dismissal of securities-fraud complaint because plaintiff had "not identified any individual whose scienter may be imputed to the Corporate Defendants"); *Plusgrade L.P. v. Endava Inc.*, No. 1:21-CV-1530 (MKV), 2023 WL 2402879, at *4 (S.D.N.Y. Mar. 8, 2023) (dismissing complaint for improper "group pleading" where "most of the allegations ambiguously state that the alleged misconduct was carried out by 'defendants,' or by numerous defendants placed into makeshift groups"); *Automated Transaction LLC v. New York Cmty. Bank*, No. 12-CV-3070, 2013 WL 992423, at *4 (E.D.N.Y. Mar. 13, 2013) ("Defendants argue this 'group pleading'—i.e., referring to both Defendants collectively as 'Community' rather than distinguishing between them—is impermissible and insufficient under . . . Rule 8. The Court agrees.").

payments in connection with a yacht that *never* entered the United States would be unlawful under U.S. law, even if the purported owner of the vessel were sanctioned.

In this regard, the government cites an April 6, 2018 press release from the U.S. Department of the Treasury announcing the designation of Kerimov. *See* Am. Compl. ¶ 27. The press release explains: "All assets *subject to U.S. jurisdiction* of the designated individuals . . . are frozen . . . . Additionally, non-U.S. persons could face sanctions for knowingly facilitating *significant transactions* for or on behalf of the individuals . . . blocked today." *See* U.S. Dep't Treas., *Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity* (Apr. 6, 2018) (emphases added)*,* https://home.treasury.gov/news/press-releases/sm0338 (last visited Mar. 14, 2024). There is no indication in this announcement that non-U.S. persons could face criminal liability for transacting with Kerimov.

Here, the government does not allege the *Amadea*—or any other "asset" purportedly owned by Kerimov—was ever "subject to U.S. jurisdiction." Indeed, as to the *Amadea*, the only geographical allegations up to its seizure are of the vessel: sitting in the United Arab Emirates in June 2020, Am. Compl.¶ 29; thereafter traveling from Italy to Nice, France, *id.* ¶ 36; sailing in the Caribbean during January 2022, *see id.* ¶ 43(b); stopping at St. Maarten in the Caribbean in February 2022, *id.* ¶ 52(g); passing through the Panama Canal in March 2022, *id.* ¶ 52(f); interacting with the "Mexican authorities" the same month, *id.* ¶ 62(b); and being seized in Fiji in the South Pacific the following month (April 2022), *see id.* ¶ 4. In other words, this is not a case where the government alleges individuals sought to move a designated individual's property out of or through the United States. The property was never in the United States.

And a few routine vendor payments incidentally touching the United States that totaled approximately 0.4% of the yacht's alleged value can hardly be said to constitute "significant

transactions" on behalf of a designated individual, such that "approving" them or making payments on them would put a non-U.S. person on notice that he might be subject to sanctions, much less violating U.S. criminal law. For example, as to payment for the *Amadea*'s passage through the Panama Canal, the government alleges "[t]hat fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan." *Id.* ¶ 52(f). The government does not allege Company-6 is a U.S. company or located in the United States. Paying a shipping agent who happens to hold a U.S. bank account for passage through the Panama Canal can hardly be said to constitute a criminally willful and "significant transaction" on behalf of a sanctioned individual. Under the terms of the government's own press release cited in the Amended Complaint—presumably drafted to relay the import of its actions against Kerimov and other designated individuals to the public in layman's terms—the government has not alleged how either Kochman or the co-captains would have known their alleged conduct could be considered criminal.[6]

Put simply, the Amended Complaint is devoid of factual allegations Kochman, the co-captains, or anyone else would have known they were violating U.S. law by approving limited payments to U.S. vendors (or to foreign vendors who happened to hold U.S. bank accounts) for a yacht that never entered the United States. As such, the Amended Complaint must be dismissed for failure to adequately allege that anyone willfully violated IEEPA sanctions.

**III.    The Second, Third, and Fourth Claims fail because the government has not alleged facts sufficient to state a claim under 18 U.S.C. § 981(a)(1)(A) that the *Amadea* was either "involved in" or "traceable to" any alleged money laundering.**

The Second, Third, and Fourth Claims allege that the *Amadea* is forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A). Am. Compl. ¶¶ 74, 82, 84, 87. That section permits the government to forfeit any property "involved in" a money laundering transaction, or any property "traceable to"

_____

[6] No one has been criminally charged for any of the conduct alleged in the Amended Complaint.

such property. Here, the government alleges that vendor payments constituted the money laundering transactions. *Id.* ¶¶ 77, 81, 86. Those payments purchased items such as crew uniforms, water sports equipment, food, and fuel, and paid for docking and transfer fees and similar services. *Id.* ¶ 52. These allegations fall short of rendering the *Amadea* "involved in" or "traceable to" for purposes of § 981(a)(1)(A), and these three claims fail for this reason alone.

In the money laundering context, "involved in" is defined as "property that is itself being laundered, [and] property used to facilitate a money laundering offense." *U.S. v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy and Others*, No. 03–CV–8004, 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008); *see also 650 Fifth Ave.*, 777 F. Supp. 2d at 563. There is no allegation that the *Amadea* itself was being laundered.

Nor has the government alleged that the *Amadea* was used to "facilitate" any money laundering offense. The government has not alleged that the *Amadea* facilitated money laundering or served as a conduit for illegal proceeds. Facilitation "occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hinderance." *See 650 Fifth Ave.*, 777 F. Supp. 2d at 564 (citations omitted). Under this definition, the government's theory would be that the *Amadea* somehow makes the money laundering "less difficult or more or less free from obstruction or hindrance." Not only does that not make sense, but the government has not made any such allegations. Because the government does not allege facts that the *Amadea* itself was used to facilitate a money laundering transaction, the *Amadea* cannot be said to have been "involved in" any such transaction. *See 250 Documents*, 2008 WL 4129814, at *3 (finding that fake documents that were sold that generated proceeds that were then laundered did not render the documents "involved in, derived from, or used to facilitate a money laundering offense"); *U.S. v. Iacoboni*, 221 F. Supp. 2d 104, 116 (D. Mass. 2002) (finding that property was not "involved in"

any money laundering transaction where "merely conduct supporting the gambling operation" took place), *aff'd in part and rev'd in part on other grounds*, 363 F.3d 1 (1st Cir. 2004).

For the same reasons that the *Amadea* was not involved in money laundering activity, it is also not "traceable to" any such property. Property "traceable to" means property where the acquisition is attributable to the money laundering scheme. *U.S. v. Nicolo*, 597 F. Supp. 2d 342, 348 (W.D.N.Y. 2009). The Tenth Circuit in *U.S. v. Bornfield* provided a helpful example of the definitions of "involved in" and "traceable to." The court explained that, "if a defendant receives $500,000 in cash in a money laundering scheme and hides the cash in his house, the government may seize that money [but not the house] as property 'involved in' the money laundering offense [under a facilitation theory]. If, on the other hand, the defendant purchases a $500,000 item with that money, the government may seek the item purchased as property 'traceable to' property involved in the money laundering offense [under an acquired theory]." 145 F.3d 1123, 1135 (10th Cir. 1998). The *Amadea*, however, is not alleged to have been acquired with funds attributable to a money laundering scheme or even with funds traceable to any illegal activity.

Lastly, the Amended Complaint falls short of Rule G(2)(f)'s requirement that an *in rem* forfeiture complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Under the rules governing civil forfeiture proceedings, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). The government must show that the nexus between the property and the money laundering offense is strong and more than incidental. *See Nicolo*, 597 F. Supp. 2d at 356 (finding that the house where defendant sent invoices and received

payments in the course of his fraud scheme was too tangentially related to the money laundering offense to satisfy the substantial connection test).

The allegations here demonstrate that the *Amadea* is even more tangential to the alleged money laundering than the house in *Nicolo*. There is no fact alleged that suggests a "substantial connection" between the *Amadea* and money laundering, as is required in a forfeiture proceeding. Even assuming there was a money laundering scheme—which there was not—the fact that vendor payments were made for provisions and services does not render the *Amadea* traceable to such a scheme. Because the government fails to allege that the *Amadea* was involved in or traceable to money laundering, the Second, Third, and Fourth Claims fail.

## IV.    Also fatal to the Second Claim, the Amended Complaint fails to allege that anyone willfully violated IEEPA and that anyone intentionally promoted the carrying on of IEEPA violations under 18 U.S.C. § 1956(a)(2)(A).

For the reasons set forth in Part II.C, *supra*, the Amended Complaint fails to allege sufficient facts that anyone acted willfully to violate IEEPA. Similarly, the government also fails to allege with the required particularity the *additional* specific intent necessary to plead a money laundering violation under 18 U.S.C. § 1956. This defect separately requires dismissal of the Second Claim. This failure is related to, but not entirely dependent upon, the failure to allege a single fact linking any of the delineated payments to Kerimov. There are no allegations that the funds came from any account he controlled, no allegations that the payments otherwise originated from him, and no allegations that any of the payments were subsequently reimbursed by or billed to him. These pleading failures doom the Amended Complaint, which requires allegations of "willfulness" and "intent" to engage in wrongdoing. *See $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 376 (dismissing forfeiture case based on a deficient pleading that impermissibly asked

court to make "logical leaps in the absence of facts and [to] credit conclusory assertions"); *see also One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d at 14–16 (same).

More specifically, § 1956(a)(2)(A) pertains to international transactions which—along with its domestic counterpart in (a)(1)(A)—courts have dubbed "promotion money laundering," as the offenses in both statutes require that the offense be committed "with the *intent* to promote the carrying on of specified unlawful activity." § 1956(a)(2)(A) (emphasis added). For specific intent to commit promotion money laundering, the Second Circuit "demand[s] evidence that [the alleged transactions were] made with the intent to promote the specified underlying unlawful activity, be it, for example, by promoting continued illegal activity." *U.S. v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003) (analyzing § 1956(a)(1)). In *U.S. v. Pierce*, the Second Circuit reversed criminal convictions for conspiracy to commit violations of § 1956(a)(1) & (a)(2) where the alleged SUA was wire fraud, observing that "proof beyond a reasonable doubt that [defendants] had intended to promote wire fraud in the course of their operations was required for conviction on the money laundering charge." 224 F.3d 158, 162 (2d Cir. 2000) (citation omitted). The court of appeals reiterated: "Under § 1956(a)(2)(A), the government had to establish that the Pierces moved funds internationally with 'the intent to promote the carrying on of' the wire fraud scheme." *Id.* at 165.

Here, the Amended Complaint's factual allegations are premised on what Claimants assert are knowingly false allegations and, in any event, are insufficient as a matter of law. Specifically, the Amended Complaint alleges that two captains admitted that they knew Kerimov owned the *Amadea* and that he was sanctioned. Even if this allegation were true, there is no allegation that the captains understood that approving routine invoices for a vessel that is never alleged to have been in the United States was wrongful. The government's latest theory that routine vendor payments incidentally touching the United States were part and parcel of a criminal scheme to

promote more such violative payments (for some unknown reason) defies logic. The government alleges nothing inherently unlawful about sailing a yacht—or anything specifically unlawful about sailing the *Amadea*—that the alleged IEEPA violations facilitated.

Put differently, the Amended Complaint fails to allege how any individual or entity committed money laundering—allegedly paying routine, legitimate expenses to U.S. vendors or foreign vendors holding U.S. bank accounts for a recreational vessel—with the intent to promote continued IEEPA violations. Instead, the government simply recites alleged transactions that it claims constitute IEEPA violations, *see* Am. Compl. ¶ 52, and then asserts in conclusory fashion that individuals affiliated with the yacht management company (1) knew Kerimov beneficially owned the *Amadea*; (2) knew Kerimov was sanctioned by the United States; and (3) intended that routine *de minimis* expenses that passed through the United States, appurtenant to a vessel that never did, would "promote the carrying on of U.S. sanctions violations," *id.* ¶¶ 54–68. This type of conclusory pleading "masquerading as factual conclusions" should not be countenanced. *Rolon*, 517 F.3d at 149. These allegations do not satisfy the government's pleading requirement and mandate dismissal of the Second Claim.[7]

As a final point, the government's apparent theory—that the wire transaction that constitutes the IEEPA violation is the same transaction that constitutes the money laundering, *see* Am. Compl. ¶ 59—raises the "merger problem" identified by the Supreme Court in connection with the money laundering statutes. *U.S. v. Santos*, 553 U.S. 507, 515 (2008) (plurality). Because the government's allegations for the underlying IEEPA violations and those used to satisfy its

---

[7] According to the Senate Judiciary Committee, § 1956(a)(2)(A) was enacted "to authorize the forfeiture of profits earned by launderers" and to disrupt the ability of those involved in profitable criminal enterprises "to disguise the illegal nature and true source of their income." S. Rep. 99-433 at 1-2. This case does not involve allegations of anyone profiting from the alleged laundered funds and is, therefore, inconsistent both with the statute's text and its stated purpose.

claim of money laundering are identical, these two crimes merge. Under the government's theory, "nearly every violation of [IEEPA in this manner] would also be a violation of the money-laundering statute"—an impermissible result under the logic embraced by five Justices in *Santos*. While courts in the Second Circuit have found there to be no merger problem with respect to § 1956(a)(2)(A) in some cases, those cases involve allegations where money transfers were designed to "promote" the underlying crime, i.e., where co-conspirators understood use of foreign bank accounts to be integral to the success of the underlying criminal scheme. The Amended Complaint here fails to make any such allegations. As such, the Second Claim fails to state a claim for money laundering under § 1956(a)(2)(A), as is required to sustain its forfeiture claim.

## V. The Third Claim fails because the Amended Complaint does not allege monetary transactions were made with "criminally derived property," and is deficient in alleging facts that satisfy the *mens rea* requirements of this claim.

### A. The Amended Complaint is devoid of any allegation that the funds used to make the vendor payments were "criminally derived property," a required element of 18 U.S.C. § 1957.

Like the Second and Fourth Claims, the Third Claim is also brought under § 981(a)(1)(A), which provides that any property that is "involved in" a violation under § 1957 or any property "traceable to" such property is subject to forfeiture.[8] Section 1957 criminally penalizes any person "who knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000" that is derived from an SUA, here, violations of IEEPA sanctions. Am. Compl. ¶¶ 80. The government has not alleged that any transactions involved criminally derived property. As a result, the Third Claim fails for this reason as well.

---

[8] For the reasons set forth in Part III above, the Third Claim must be dismissed because the government has failed to allege sufficient facts that the *Amadea* was property either involved in money laundering or traceable to such property for purposes of § 981(a)(1)(A).

Under the statute, "criminally derived property" is "any property constituting, or derived from, proceeds *obtained* from a criminal offense." § 1957(f)(2) (emphasis added). The term "proceeds" is defined as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." § 1956(c)(9). These definitions make clear that the proceeds must be obtained or retained from some form of unlawful activity. The Amended Complaint never alleges that anyone obtained or retained criminally derived property that was then used to commit sanctions violations.[9] In fact, the phrase "criminally derived property" appears in the Amended Complaint only three times and never in connection with a specific allegation. *See* Am. Compl. ¶¶ 9, 80-81.

In *U.S. v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994), the Second Circuit reversed a conviction under § 1957 by holding that this statute "only encompasses transactions in which a defendant first obtains 'criminally derived property' and then engages in a monetary transaction with that property." In analyzing this statute, the Second Circuit noted that the "ordinary meaning of the word 'obtained'" used in both definitions above "entails possession of a thing." The Second Circuit further noted that "the word 'property' implies ownership." *Id.* Drawing on these definitions, the Second Circuit then concluded that "[t]he use of such language demonstrates a congressional intent that the proceeds of a crime be in the defendant's possession before he can attempt to transfer those proceeds in violation of § 1957." *Id.* at 677–78; *see also $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 371–72 (holding that the proceeds must be "obtained from a

---

[9] In its original Complaint in support of this claim, the government relied on a strained theory that clean funds transited inbound to a U.S. correspondent bank on behalf of a sanctioned individual without a license, at which point they became criminally derived property. Then, when the funds transited outbound from the U.S. correspondent bank to their destination, the outbound transaction constituted money laundering in violation of § 1957. Compl. ¶ 64. In its Amended Complaint, the government deleted that theory from this claim, *see* Am. Compl. ¶ 81, but the deletion of that theory does not cure the fatal failure to allege the existence of any criminally derived property.

prior, separate criminal act since money laundering 'must be a crime distinct from the crime by which the money is obtained'" (citations omitted)); *U.S. v. Johnson*, 971 F.2d 562, 568 (10th Cir. 1992) (determining that "Congress viewed a violation of § 1957 as occurring only after the individual involved in the specified criminal activity gained possession or disposal of the proceeds generated by the criminal activity"); *U.S. v. Howard*, 245 F. Supp. 2d 24, 29 (D.D.C. 2003) (vacating § 1957 conviction because jury "did not identify specific unlawful activities from which the laundered funds were acquired that were separate and distinct from" mail and wire fraud).

The government makes no allegation that anyone obtained criminally derived property and then used it to violate sanctions. There is no "separate and distinct" crime. Simply put, the Amended Complaint fails to allege that the funds used to pay the vendor invoices were "criminally derived property" under the statue, and this claim must be dismissed on this basis as well.

### B. The government fails to allege that anyone willfully violated IEEPA and "knowingly" engaged in a transaction in "criminally derived property."

As set forth in Part II.C, *supra*, the Amended Complaint fails to allege sufficient facts that anyone "willfully" violated IEEPA. In addition, "[t]o prove a violation of § 1957(a), the government must present evidence that the defendant *knowingly* engaged or attempted to engage in a monetary transaction *in unlawful funds*." *U.S. v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (emphases added) (reversing conviction where government failed to prove requisite "monetary transaction"). The defendant must know that the monetary transaction involves criminally derived property. *U.S. v. Herndon*, 122 F. Supp. 3d 487, 491 (S.D. W. Va. 2015) (collecting cases and rejecting plea agreement that failed to satisfy *mens rea* requirement of § 1957).

As explained directly above, the Amended Complaint fails to plead any underlying criminal activity or that the funds used to pay vendors were "criminally derived property." Nor does the Amended Complaint allege that any specific individual was aware that the funds were

criminally derived and still acted knowingly. Indeed, the alleged IEEPA violations were not completed until the funds were sent to the vendors, because Executive Order 13661 prohibits only "transfer[s]" and similar *transactions* in property belonging to sanctioned individuals if the property was "in the United States" at the time of the Executive Order, or later "come[s] within the United States" or "within the possession or control of any United States person." Exec. Order No. 13,661, 79 Fed. Reg. 15535 (Mar. 16, 2014). It does not prohibit a mere transfer of money into a U.S. bank account.[10]

Put simply, there is no allegation that any individual or entity became aware that the funds transformed into "criminally derived property" as soon as they touched the United States and then such an individual or entity "knowingly" engaged in a separate transaction to launder such funds by paying for goods and services. This lack of intent provides an additional reason to dismiss the Third Claim. *See, e.g.*, *U.S. v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. at 374 ("There are . . . no allegations supporting a reasonable belief that these funds involved criminally derived property and that Claimants were aware of such illegal origin.").

## VI. The Fourth Claim predicated on alleged conspiracy to commit money laundering under 18 U.S.C. §§ 1956 & 1957 fails to state a claim upon which relief can be granted, and fails to allege the requisite *mens rea*.

Section 1956(h) imposes criminal liability on "[a]ny person who conspires to commit any offense [under § 1956 or § 1957]." For many of the same reasons explained above, the Amended

---

[10] By the same token, it is not a sanctions violation for a sanctioned individual's property simply to be present in the U.S.; otherwise, any unsanctioned individual with a U.S. bank account and is subsequently sanctioned will have by default committed a sanctions violation, even if she does not transact in that bank account after being sanctioned. It is the *transacting* in "blocked" or "frozen" property once it is in the United States that gives rise to a violation. *See* U.S. Dep't Treas., *Treasury Designates Russian Oligarchs, Offs., & Entities in Response to Worldwide Malign Activity* (Apr. 6, 2018) ("All assets subject to U.S. jurisdiction of the designated individuals and entities, and of any other entities blocked by operation of law as a result of their ownership by a sanctioned party, are frozen, and U.S. persons are generally prohibited from dealings with them.").

Complaint fails to allege that any natural person or entity "conspire[d]," i.e., agreed with another, to engage either in (1) "promotion" under § 1956(a)(2) (Second Claim); or (2) a transaction in "criminally derived property" under § 1957(a) (Third Claim).[11]

The Amended Complaint is devoid of any suggestion that anyone entered into a knowing violation of law, let alone conspired to violate U.S. law and promote IEEPA violations, or sought to launder money that could not even be considered "criminally derived property" before the alleged set of transactions constituting the IEEPA violations was initiated. Thus, the Amended Complaint fails to plead conspiracy to commit money laundering, and the Fourth Claim should be dismissed. *Cf. U.S. v. Evergreen Int'l*, 206 F. App'x 71, 75 (2d Cir. 2006) (summary order) ("[E]ven assuming *arguendo* that [defendants] played a role in the transfers to Forex, there was insufficient evidence that in doing so they intended to promote the mail fraud . . . , and their convictions [for conspiracy to commit money laundering] must therefore be reversed.").

## VII. The Amended Complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim under admiralty law.

The government has purported in its Amended Complaint to invoke this Court's admiralty jurisdiction under 28 U.S.C. § 1333. But the Court lacks such jurisdiction, which is distinct from federal-question jurisdiction, because the *res* is not within the District—nor did the government plead it is planning to bring it within the District while this action is pending (in fact, it is seeking permission to sell the vessel). Moreover, the civil forfeiture claims the government asserts do not sound in admiralty law. The Court should thus dismiss the action for lack of subject matter jurisdiction under Rule 12(b)(1); alternatively, the Court should dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim.

---

[11] The Fourth Claim also must be dismissed due to the government's failure to adequately allege that anyone acted willfully. *See supra* Part II.C.

**A.     This Court's federal question jurisdiction and admiralty jurisdiction are not identical.**

The federal courts possess "limited jurisdiction, their powers circumscribed at their most basic level by the terms of Article III of the Constitution[.]" *E.g.*, *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001). As relevant here, Article III provides: "The judicial Power shall extend . . . [1] to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties . . . [and] [2] to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2.

Forty years after the Constitution's enactment, the Supreme Court confronted the question "whether cases in admiralty, and cases arising under the laws and Constitution of the United States, are identical." *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 545 (1828). Chief Justice Marshall—writing for the Court—answered in the negative, reasoning that "[t]he discrimination made between them . . . is . . . conclusive against their identity." *Id.* "A case in admiralty does not, in fact, arise under the Constitution or laws of the United States." *Id.* In contrast to laws of the United States, "the source of admiralty rights [is] a controlling body of federal admiralty law," derived from the general maritime law existing at the time the Constitution was enacted. *See Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 377 (1959). Indeed, Article III "presupposes the existence in the United States of a law of that character." *Panama R. Co. v. Johnson*, 264 U.S. 375, 385 (1924).

**B.     The government has elected to invoke the Court's admiralty jurisdiction in its Amended Complaint, but the Court lacks *in rem* jurisdiction over the *Amadea* and the Amended Complaint fails to state a claim under admiralty law.**

In its original Complaint, the government alleged: "This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a)." Am. Compl. ¶ 2. Section 1331

is the well-worn, general statute for "[f]ederal question" jurisdiction. Section 1345 refers generally to "United States as plaintiff." And § 1355 refers to jurisdiction over forfeiture procedures, but it says nothing about a proceeding *in rem* or admiralty jurisdiction. Nowhere does the original Complaint cite § 1333 ("Admiralty, maritime and prize cases"). Put simply, the government did not invoke this Court's admiralty jurisdiction.

Now, however, the government has added allegations of admiralty jurisdiction and elected to proceed on that basis. More specifically, it has added a reference to § 1333, Am. Compl. ¶ 2, it has elaborated that the *Amadea* was seized on the "navigable waters" of Fiji, *id.* ¶ 4, and it has designated its forfeiture claims as "admiralty claims" under Rule 9(h). *Id.* ¶ 2. In light of the government's election to proceed under the Court's admiralty jurisdiction, the Amended Complaint should be dismissed for at least two reasons.

      **1.**      **The Court lacks admiralty jurisdiction because the *Amadea* is not within the District and the government has no plans to bring it within the District.**

The Second Circuit has explained that "[s]ubject matter jurisdiction in an *in rem* action in admiralty lies in the district court where the vessel or other *res* is located." *Mackensworth v. S.S. Am. Merch.*, 28 F.3d 246, 252 (2d Cir. 1994) (citations omitted); *see also In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 94 (2d Cir. 2005) (Sotomayor, J.) ("In particular, subject matter jurisdiction lies in the district court where the vessel or other *res* is located, but that jurisdiction does not attach until the vessel is arrested within the jurisdiction." (citing Fed R. Civ. P. Supp. R. C(2))). In that vein, Supplemental Rule C(2)(c) requires that an in rem "complaint must . . . state that the property is within the district or will be within the district while the action is pending."

Here, the *Amadea* was seized in Fiji and is docked in San Diego, Am. Compl. ¶ 4—within the Southern District of California. The *Amadea* is not in this District, and Claimants are unaware

of any plans by the government to bring the *Amadea* here. In fact, the government is seeking the Court's permission to sell the vessel while it is in San Diego. The Court does not possess *in rem* jurisdiction over the *Amadea* under admiralty principles, and the Amended Complaint should thus be dismissed for lack of subject matter jurisdiction. *See Ferrostaal, Inc. v. HACI HASSAN YARDIM*, No. 03 CV 4886 (GBD), 2006 WL 2819585, at *4 (S.D.N.Y. Sept. 29, 2006) ("The record . . . contains no evidence that the vessel has been or will be within the territorial jurisdiction of New York. Accordingly, this Court does not have *in rem* jurisdiction over the vessel.").

## 2. The Amended Complaint should be dismissed because it fails to state a claim under admiralty law.

"The source of admiralty rights [is] a controlling body of *federal admiralty law*." *Romero*, 358 U.S. at 377 (emphasis added). Congress can alter the claims cognizable in admiralty by statute, "[b]ut there are limitations which have come to be well recognized," including "that there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without." *See Panama R. Co.*, 264 U.S. at 386.

In that regard, "[t]here is little doubt that an *in rem* suit involving a vessel is decidedly salty—it is an admiralty proceeding." *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 318 (2d Cir. 2005) (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 446–47 (1994)). Under statutes touching on admiralty, the government has historically pursued penalties against—or forfeiture of—a vessel through the procedure of a "libel" in admiralty. *See, e.g.*, *U.S. v. 3190 Bags, 228 Cases, & 17 Kegs, Containing Rye Whisky & Scotch Whisky*, 70 F.2d 246, 248 (2d Cir. 1934) ("The seizure was lawful when made, and under it the vessel and her cargo might be libeled for a violation of either the customs laws or the prohibition laws."); *The Geneva*, 187 F. 115, 115 (2d Cir. 1911) ("The libel claimed a penalty of $200 from the vessel on account of an

alleged violation of rule 8 of the pilot rules of inland waters, adopted by the Board of United States supervising inspectors."). Such laws are maritime in nature and often provide expressly for "forfeiture of a *vessel*." *See The Charles D. Leffler*, 100 F.2d 759, 762 (3d Cir. 1938) (emphasis added) (citing sections of the Tariff Act of 1930, which provide for forfeiture of a vessel for violation of the customs laws in respect to loading or unloading).

Here, each of the government's four claims is predicated on alleged violations of § 981 ("Civil forfeiture"). But civil forfeiture under § 981 is not cognizable under the Court's admiralty jurisdiction. To date, Claimants have not identified a single case where a court has purported to exercise admiralty jurisdiction over claims brought by the government under § 981. Indeed, there is scant, if any, evidence that Congress expanded the federal courts' civil *admiralty* jurisdiction—as opposed to or in conjunction with *federal question* jurisdiction—when it passed the legislation that enacted the statutes at issue here. *See* Anti-Drug Abuse Act of 1986, Oct. 27, 1986, Pub. L. 99–570, 100 Stat. 3207 (codified in scattered titles of the U.S.C.). Those statutes—18 U.S.C. §§ 981, 1956, and 1957—plainly expanded the laws falling under federal question jurisdiction.

But those statutes are not focused on the "protection of maritime commerce through uniform rules of decision," which is "the basic rationale for federal admiralty jurisdiction." *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 544 (1995). Little else suggests that any of those sections otherwise subtlety (but seismically) expanded federal courts' civil admiralty jurisdiction. *Cf. Romero*, 358 U.S. at 378 ("When we apply to the statute, and to the clause of Article III from which it is derived, commonsensical and lawyer-like modes of construction, and the evidence of history and logic, it becomes clear that the words of that statute do not extend, and could not reasonably be interpreted to extend, to cases of admiralty and maritime jurisdiction."). For example, unlike the statutes referenced in the cases above, neither

§ 981 nor § 1957 uses the term "vessel," and the passing reference to "vessel" in § 1956(c)(4) resides in the definition of "the term 'financial transaction.'" There is therefore no support for the proposition that, merely because the government has purported to allege an *in rem* action against a vessel, the government's claims for civil forfeiture under § 981 are based in federal admiralty law. *See* Supp. Rule G, advisory committee's note to 2006 amendment. (acknowledging that civil forfeiture actions and admiralty proceedings may both involve claims *in rem* but are not identical, and explaining that, "[a]s the number of civil forfeiture actions has increased, . . . reasons have appeared to create sharper distinctions within the framework of the Supplemental Rules").

The government acknowledged civil forfeiture claims under § 981 do not sound in admiralty while litigating *U.S. v. M/Y Galactica Star*, 784 F. App'x 268 (5th Cir. 2019) (per curiam) (unpublished). There, "the Government chose to file suit pursuant to 18 U.S.C. §§ 981 (civil forfeiture) and 983 (general rules for civil forfeiture), asserting federal jurisdiction pursuant to 28 U.S.C. §§ 1345 (United States as plaintiff) and 1355(a) (fine, penalty, or forfeiture)," *id.* at 275, in an action seeking to forfeit a vessel, "the M/Y GALACTICA STAR (a 65-meter motor yacht)." *Id.* at 270. On appeal, counsel for the government argued:

> I don't think this is an admiralty case at all. . . . [T]his is a forfeiture case, it is brought under Title 18 [sections] 981 and 983, and those are the statutory provisions that govern, it's not a matter of admiralty law, it is a forfeiture case, and so I don't believe there's a basis there [under admiralty] for the Court's jurisdiction[.]

*See* Or. Arg. Tr. 19:08–19:32, *United States v. M/Y Galactica Star*, No. 18-20781 (Sept. 4, 2019), https://www.ca5.uscourts.gov/OralArgRecordings/18/18-20781_9-4-2019.mp3.[12]

---

[12] The Fifth Circuit in its decision explicitly rejected an argument that it had appellate jurisdiction under 28 U.S.C. § 1292(a)(3)—a special provision for interlocutory appeals of certain admiralty decisions—and dismissed the appeal. *See M/Y Galactica Star*, 784 F. App'x at 276.

Here, the government now has elected to "designate each of its forfeiture claims as admiralty claims" and proceed under the Court's admiralty jurisdiction. But its civil forfeiture claims are "not a matter of admiralty law." For that reason, as well as the reasons in Parts I–VI, *supra*, the Amended Complaint should be dismissed in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## CONCLUSION

The government's attempts here to expand forfeiture, sanctions, and money laundering laws to fit the facts alleged should be rejected. For all the foregoing reasons, the government's Amended Complaint fails to state a claim upon which relief can be granted and should be dismissed. In addition, if the government insists on proceeding under admiralty, the action should be dismissed for lack of subject matter jurisdiction or for failure to state a claim.

Dated: March 15, 2024

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: */s/ Adam C. Ford*
    Adam C. Ford
    Renée L. Jarusinsky
    Anjula S. Prasad
    Stephen R. Halpin III
    Bryan W. McCracken
    275 Madison Avenue, 24th Floor
    New York, NY 10016
    Tel.: (212) 858-0040 (main)
    aford@fordobrien.com
    rjarusinsky@fordobrien.com
    aprasad@fordobrien.com
    shalpin@fordobrien.com
    bmccracken@fordobrien.com

    *Attorneys for Claimants Eduard Yurievich*
    *Khudainatov and Millemarin Investments*
    *Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion to Dismiss the Amended Complaint was served on all counsel of record via the Court's CM/ECF system.

Dated: March 15, 2024

_/s/ Adam C. Ford_____

Adam C. Ford
