UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,
:
        Plaintiff,
:
    - v. -
:
THE M/Y *AMADEA*, A MOTOR YACHT            :        23 Civ. 9304 (DEH)
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,     :
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER    :
APPURTENANCE THERETO,
:
        Defendant-*In-Rem*.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## UNITED STATES OF AMERICA'S OPPOSITION TO
## CLAIMANTS' MOTION TO DISMISS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

JENNIFER JUDE
Assistant United States Attorney

JOSHUA L. SOHN
Trial Attorney,
Money Laundering and Asset
Recovery Section

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset
Recovery Section, Criminal Division
U.S. Department of Justice

YIFEI ZHENG
Trial Attorney,
Counterintelligence and Export
Control Section

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export
Control Section, National Security
Division
U.S. Department of Justice

Table of Contents

Page

I.    Background ...................................................................................................1

II.   Legal Standard .............................................................................................4

III.  Argument .....................................................................................................5

      A.  Claimants' Argument That the FAC Does Not Allege Kerimov Ownership or
          Acts By Kerimov Is Meritless...............................................................5

      B.  The *Amadea* Is Forfeitable as Property "Involved in" International Promotional
          Money Laudering (Claim Two) ............................................................7

          1.  The *Amadea* Was "Involved in" Promotional Money Laundering.......................8

          2.  Claimants' Merger Argument Fails ............................................... 12

      C.  The *Amadea* Is Forfeitable as Property "Involved in" Transactions in
          Criminally-Derived Property (Claim Three) ............................................. 14

      D.  The *Amadea* Is Forfeitable as Proceeds of IEEPA Violations (Claim One)............... 16

      E.  The FAC Pleads Willfulness..................................................................... 24

      F.  The FAC Pleads a Money-Laundering Conspiracy (Claim Four) .............................. 30

      G.  Claimants' Admiralty Arguments Are Meritless ........................................... 30

IV.   Conclusion ................................................................................................ 31

Table of Authorities

Cases                                                                           Page(s)

*Adkins v. United States*,
  2018 WL 7283323 (W.D.N.C. Aug. 7, 2018) ........................................................... 12

*Battino v. Cornelia Fifth Ave., LLC*,
  861 F. Supp. 2d 392 (S.D.N.Y. 2012) ..................................................................... 21

*Bryan v. United States*,
  524 U.S. 184 (1998) ............................................................................................... 22

*C.J. Hendry Co. v. Moore*,
  318 U.S. 133 (1943) ........................................................................................... 26, 28

*Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*,
  413 F.3d 307 (2d Cir. 2005) ................................................................................... 29

*Hofe v. United States*,
  492 F.3d 175 (2d Cir. 2017) ................................................................................... 11

*Idir v. La Calle TV, LLC*,
  2020 WL 4016425 (S.D.N.Y. July 15, 2020) .................................................... 20, 24

*In re 650 Fifth Ave. and Related Prop.*,
  777 F. Supp. 2d 529 (S.D.N.Y. 2011) ............................................................. passim

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
  399 F. Supp. 3d 120 (S.D.N.Y. 2019) ..................................................................... 21

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*,
  879 F. Supp. 2d 243 (E.D.N.Y. 2012) ..................................................................... 21

*Matter of Seizure and Search of Motor Yacht Tango*,
  597 F. Supp. 3d 149 (D.D.C. 2022) ......................................................................... 10

*Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*,
  657 F.3d 1159 (11th Cir. 2011) .............................................................................. 26

*R.M.S. Titanic, Inc. v. Haver*,
  171 F.3d 943 (4th Cir. 1999) .................................................................................. 26

*Romero v. Int'l Terminal Operating Co.*,
  358 U.S. 354 (1959) ............................................................................................... 29

*State v. United Parcel Serv., Inc.*,
  253 F. Supp. 3d 583 (S.D.N.Y. 2017).................................................................. 21

*The Samuel*,
  14 U.S. 9 (1816).................................................................................................. 28

*United States v. 250 Documents*,
  2008 WL 4129814 (S.D.N.Y. Sept. 5, 2008)......................................................... 8

*United States v. $37,564,565.25*,
  2019 WL 5269073 (D.D.C. Oct. 17, 2019) .......................................................... 14

*United States v. Any & All Funds on Deposit in Acct. No. 0139874788*,
  36 ITRD 1394 (S.D.N.Y. 2015).......................................................................... 4, 5

*United States v. Approx. $25,829,681.80, No.*,
  98 CIV. 2682, 1999 WL 1080370 (S.D.N.Y. Nov. 30, 1999) ................................. 5

*United States v. Bornfield*,
  145 F.3d 1123 (10th Cir. 1998) ............................................................................. 9

*United States v. Daccarett*,
  6 F.3d 37 (2d Cir. 1993)...................................................................................... 14

*United States v. Farkas*,
  2011 WL 5101752 (E.D. Va. Oct. 26, 2011) ........................................................ 15

*United States v. Garza-Gonzalez*,
  512 Fed. App'x 60 (2d. Cir. 2013)........................................................................ 8

*United States v. Goodwin*,
  831 F. App'x 223 (8th Cir. 2020) ........................................................................ 18

*United States v. Grant*,
  2008 WL 4376365 n.1 (S.D.N.Y. Sept. 25, 2008)................................................ 15

*United States v. Harder*,
  168 F. Supp. 3d 732 (E.D. Pa. 2016) ................................................................... 12

*United States v. Hawkey*,
  148 F.3d 920 (8th Cir. 1998) ................................................................................ 8

*United States v. Homa Int'l Trading Corp.*,
  387 F.3d 144 (2d Cir. 2004)................................................................................. 22

iii

*United States v. M/Y Galactica Star et al.*,
   784 F. App'x 268 (5th Cir. 2019) ...................................................... 29

*United States v. Miller*,
   911 F.3d 229 (4th Cir. 2018) .................................................... 7, 10, 17, 18

*United States v. Mousavi*,
   604 F.3d 1084 (9th Cir. 2010) ................................................. 20, 22, 24

*United States v. Nazemzadeh*,
   2014 WL 310460 (S.D. Cal. Jan. 28, 2014).................................. 12

*United States v. Nicolo*,
   597 F. Supp. 2d 342 (W.D.N.Y. 2009) ......................................... 9

*United States v. Obaid*,
   971 F.3d 1095 (9th Cir. 2020) ................................................... 5, 29

*United States v. One 1976 Mercedes Benz*,
   618 F.2d 453 (7th Cir. 1980) ................................................. 26, 28

*United States v. One 1987 Mercedes Benz*,
   820 F. Supp. 248 (E.D. Va. 1993) ............................................... 7

*United States v. One Lincoln Navigator*,
   328 F.3d 1101 .......................................................................... 27

*United States v. Pac. Gas & Elec. Co.*,
   2015 WL 9460313 (N.D. Cal. Dec. 23, 2015) ............................. 21, 23

*United States v. Park*,
   825 F. Supp. 2d 644 (D. Md. 2011) ............................................. 16

*United States v. Piervinanzi*,
   23 F.3d 670 (2d Cir. 1994)......................................................... 13

*United States v. Real Prop. Located at 6137 Univ. Drive*,
   2007 WL 1343268 (E.D. Mich. May 7, 2007)............................... 10

*United States v. Robbins*,
   2015 WL 2127025 (W.D.N.Y. May 6, 2015)................................. 8

*United States v. Santos*,
   553 U.S. 507 (2008).................................................................. 11

*United States v. Schlesinger*,
  396 F. Supp. 2d 267 (E.D.N.Y. 2005) ................................................................. 7

*United States v. Tajideen*,
  319 F. Supp. 3d 445 (D.D.C. 2018) .................................................................. 12

*United States v. The Schooner Betsey and Charlotte*,
  8 U.S. 443 (1808) ......................................................................................... 28

*United States v. Thorn*,
  317 F.3d 107 (2d Cir. 2003) ............................................................................ 24

*United States v. Zarrab*,
  2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ..................................................... 12

<u>Statutes</u>

18 U.S.C. § 981 ............................................................................................... 27
18 U.S.C. § 981(a)(1)(A) .................................................................................... 6
18 U.S.C. § 981(a)(1)(C) ............................................................................... 6, 15
18 U.S.C. § 983(c)(1) ......................................................................................... 4
18 U.S.C. § 983(g) ........................................................................................... 10
18 U.S.C. § 1355(b)(1)(A) ................................................................................. 25
18 U.S.C. § 1955 .............................................................................................. 11
18 U.S.C. §§ 1956 ............................................................................................. 6
18 U.S.C. § 1956(A)(1) ...................................................................................... 12
18 U.S.C. § 1956(a)(2)(A) ......................................................................... 6, 11, 13
18 U.S.C. § 1956(c)(7)(D) ................................................................................... 6
18 U.S.C. § 1957 .............................................................................................. 14
28 U.S.C. § 1331 .............................................................................................. 29
28 U.S.C. § 1355 .............................................................................................. 25
50 U.S.C. 1705(a) ......................................................................................... 5, 23

<u>Other Authorities</u>

50A C.J.S. Juries § 101 (March 2024 update) ...................................................... 27

Plaintiff United States of America ("the Government") respectfully requests that this Court deny Claimants' motion to dismiss the First Amended Complaint ("FAC," ECF No. 37) because Claimants ignore the well-pled factual allegations in the FAC and multiple legal bases to forfeit the M/Y *Amadea*.[1] As set forth in more detail below, the FAC provides specific facts to support the allegation that the *Amadea* is owned by sanctioned Russian oligarch Suleiman Kerimov, and that various persons engaged in U.S. monetary transactions in order to maintain the *Amadea* for Kerimov's benefit and enjoyment. Similarly, Claimants' legal arguments against each of the four forfeiture claims either misread applicable law or impose a higher legal burden on the Government than is otherwise required. As such, Claimants' motion should be denied.

## I.    Background

This civil forfeiture case seeks to forfeit to the United States the M/Y *Amadea*, a 348-foot luxury superyacht beneficially owned by Kerimov. For example, the FAC pleads how Kerimov and his assistant Dinar Khalikov ("Dinar") boarded the vessel in October 2021 and immediately began ordering drastic changes and renovations, including ripping out carpets and reconfiguring entire rooms with the assistance of an interior designer. FAC ¶¶ 38-39, 41-42. The FAC also pleads how his family directed further structural changes to the *Amadea* and planned and took voyages on the vessel. *Id.* ¶¶ 28, 43. It even alleges that Kerimov and his agent directed the crew to maintain his shoes aboard the *Amadea*. *Id.* ¶¶ 40(e). The FAC pleads how the *Amadea* captain

---

[1] In filing this opposition brief, the United States does not intend to concede that Claimants have standing in this case. As previously noted, *see* ECF No. 80, the Government anticipates filing a motion to strike the claim under Supplemental Rule G(8)(c)(i)(B) based on Claimants' lack of standing, which "must be decided before any motion by the claimant to dismiss the action." Supp. R. G(8)(c)(ii)(A); *see* Adv. Comm. Note to Supp. R. G(8); *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 85, 91 (2d Cir. 2011); *United States v. $284,950.00 in U.S. Currency*, 933 F.3d 971, 975 (8th Cir. 2019).

and crew repeatedly referred to Dinar as "owner's representative" and referred to a Kerimov family security guard as an "owner's" employee. *Id.* ¶¶ 39, 40(g), 41(a), 43(a). The FAC pleads how the crew circulated numerous messages around September 2021 stating that "the boat has been sold" and a "new owner" was expected for a trip in October 2021, the precise time that Kerimov and Dinar boarded the vessel. *Id.* ¶¶ 40(a-c). The FAC further references transaction documents showing that the vessel was sold to a new corporate entity, Errigal Marine Ltd., in September 2021. *Id.* ¶¶ 30-37. These facts provide ample proof that Kerimov is the current beneficial owner of the vessel and that the Errigal transaction was the transaction by which Kerimov purchased the vessel.

The FAC also pleads facts showing that the *Amadea* was maintained and preserved for Kerimov's benefit through U.S. monetary transactions, in violation of the sanctions against Kerimov and his property. Specifically, the FAC pleads that more than $1.2M in maintenance payments were made to U.S. companies,[2] or to and through U.S. bank accounts, since Kerimov purchased the vessel in September 2021. *Id.* ¶¶ 50-53. These payments went to third-party vendors to pay for fuel, crew provisions, and other goods and services that were necessary to maintain the *Amadea* as a functional vessel. *See id.* The vast majority of these payments were made by Imperial Yachts, the *Amadea*'s management company. *See id.*

The FAC also pleads that multiple individuals knew Kerimov was the *Amadea*'s sanctioned owner and were involved in making the aforementioned U.S. payments, thus willfully

---

[2] For the record, Claimants' preliminary statement that "[t]here is no allegation that . . . any of the items paid for or services rendered took place in the United States," Mot. at 4, is false. For example, some of the items were shipped to the *Amadea* from Miami. FAC ¶ 52(g). In any event, it is undisputed that a transaction need not occur in the United States to constitute an IEEPA violation if the transaction involves U.S. persons (including U.S. financial institutions).

violating sanctions against Kerimov's property. These individuals included Evgeniy Kochman, the President of Imperial Yachts, who boarded the *Amadea* with Kerimov in October 2021 and whose sign-off was necessary for Imperial Yachts to pay *Amadea* vendor invoices. *Id.* ¶¶ 57-61, 68. These individuals also included the *Amadea*'s co-captains, who likewise knew Kerimov was the *Amadea*'s owner and whose sign-off was necessary to pay *Amadea* vendor invoices. *Id.* ¶¶ 62-64. Imperial Yachts as an entity also violated sanctions by paying vendor invoices for the *Amadea*. *Id.* ¶¶ 54-57, 65-68. Thus, Claimants' statement that "[o]ther than the knowingly false allegations regarding the two captains, there is no allegation that any individual sent funds to the United States knowing it was unlawful," Mot. at 4, is false. Claimants are ignoring the FAC's detailed allegations against Kochman and Imperial Yachts.

The Claimants in this case are an unsanctioned Russian businessman, Eduard Khudainatov, and his alleged holding company Millemarin Investment Ltd. Khudainatov alleges that he—not Kerimov—is the *Amadea*'s beneficial owner and that he owns it through Millemarin. Khudainatov's claim, ECF No. 9, included various corporate records purportedly showing that Khudainatov has always been the *Amadea*'s owner. Tellingly, however, Khudainatov's claim did not address the September 2021 Errigal transaction, instead sweeping that transaction under the rug. Furthermore, Khudainatov offers no explanation for why the *Amadea* captain and crew would repeatedly refer to a "new owner" circa September 2021 if Khudainatov has always been the owner (particularly since the crew documents make clear that this "new owner" was a new physical person, not just a change in corporate ownership). Nor has Khudainatov explained why the captain and crew would refer to Kerimov employees and assistants as "owner's" representatives if Kerimov were not the owner. Nor does Khudainatov plausibly explain how Kerimov, his assistant, and his family could order sweeping changes to the

*Amadea* if Kerimov were not the owner. Khudainatov may try to make his ownership case later on, but the facts to date suggest overwhelmingly that Kerimov is the *Amadea*'s true owner and that Khudainatov is just a straw owner put forward to disguise Kerimov's ownership of the vessel.

Indeed, the FAC pleads that Imperial Yachts assists its customers in concealing their ownership of yachts, and has repeatedly used Khudainatov as a straw yacht owner. FAC ¶¶ 13-14, 45-49. For example, Imperial Yachts has held out Khudainatov as the owner of *eight* yachts or yacht projects, an implausible number. *Id.* ¶ 46. At least three of these yachts (the *Amadea*, the *Crescent*, and the *Scheherazade*) are mammoth superyachts well over 100 meters in length and collectively worth more than $1.5B. *Id.* ¶¶ 45(a-b). Finally, the FAC pleads specific facts indicating that the *Crescent* is actually owned by Khudainatov's former boss, Igor Sechin. *Id.* ¶¶ 47-49. The fact that Imperial Yachts has a pattern of using Khudainatov as a straw owner further supports the inference that Khudainatov is just a straw owner of the *Amadea*.

The FAC pleads four claims for forfeiture. Claim One alleges that the *Amadea* is forfeitable as proceeds of sanctions violations under the International Emergency Economic Powers Act ("IEEPA"). *Id.* ¶¶ 69-72. Claim Two alleges that the *Amadea* is forfeitable as property involved in international promotional money laundering. *Id.* ¶¶ 73-78. Claim Three alleges that the *Amadea* is forfeitable as property involved in money laundering transactions in criminally-derived property. *Id.* ¶¶ 79-82. Claim Four alleges that the *Amadea* is forfeitable as property involved in a money laundering conspiracy. *Id.* ¶¶ 83-87.

## II.    Legal Standard

This is a civil forfeiture case, under which the Government will bear the standard civil burden to prove its claims by a preponderance of the evidence. 18 U.S.C. § 983(c)(1). Under that

standard, the Government must only plead "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f); *see In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 541-42 (S.D.N.Y. 2011). Like other civil complaints, the facts in a civil forfeiture complaint are assumed true on a motion to dismiss and all reasonable inferences are drawn in the plaintiff's favor. *United States v. Any & All Funds on Deposit in Acct. No. 0139874788*, 36 ITRD 1394, *5 (S.D.N.Y. 2015).

### III.   Argument

#### A. Claimants' Argument That the FAC Does Not Allege Kerimov Ownership or Acts by Kerimov Is Meritless

Claimants' lead argument is that the FAC does not adequately plead Kerimov's ownership of the *Amadea*. Mot. at 9 ("The Amended Complaint fails to allege sufficient facts that a sanctioned individual owns the *Amadea* . . ."). Claimants' argument, however, sidesteps the extensive, detailed Kerimov ownership allegations cited above explaining how Kerimov acquired the *Amadea,* was recognized as the owner, and exercised the rights of ownership, from directing structural changes to the vessel to using the vessel for his family to plan and take voyages to even storing personal effects on board. Claimants try to avoid these allegations by stating in a short footnote that "[t]he allegations that Kerimov and/or his family members were present on the vessel and requested certain changes are susceptible to multiple interpretations, including a long-term charter." Mot. at 9 n. 4. This "charter" explanation is not actually plausible, as a mere charterer would not order drastic renovations to the vessel nor be called the "owner" by captain and crew. But even if the Government's ownership allegations *were* "susceptible to multiple interpretations," *id.*, that would be an argument to sustain the FAC, not dismiss it. After all, on a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor.

Claimants also argue that "there is not one single fact alleged linking any of the delineated payments to Kerimov. There are no allegations that the funds came from any account he controlled, no allegations that the payments originated from him, and no allegations that any of the payments were later reimbursed by or billed to him." Mot. at 10. But this argument presumes that only IEEPA violations committed or orchestrated by Kerimov personally could support forfeiture of the *Amadea*. As a matter of law, this is incorrect. IEEPA forbids U.S. transactions by anyone to support or otherwise deal with property owned by a sanctioned individual and prohibits making contributions of funds, goods, or services that benefit a sanctioned person. *See* 50 U.S.C. § 1705(a); E.O. Nos. 13660 *et seq*. And as relevant here, civil forfeiture asks whether property is proceeds of unlawful activity or involved in money laundering, regardless of whether the person who committed the illegal acts is the property's owner or a third party. *United States v. Obaid*, 971 F.3d 1095, 1106 (9th Cir. 2020) ("This civil forfeiture action is not premised on Obaid's conduct; rather, the action is predicated on whether the Palantir shares, *i.e.*, the res, are traceable to the proceeds of a crime."); *United States v. Approx. $25,829,681.80*, No. 98 CIV. 2682, 1999 WL 1080370, at *6 (S.D.N.Y. Nov. 30, 1999) ("Clemente's argument that the Government has failed to allege facts giving rise to probable cause to believe that Clemente herself was in a conspiracy with the parties who made the allegedly misleading statements to the investors is irrelevant. As noted earlier, the Government need not detail her involvement in the scheme. Rather, it must allege that the defendant-in-rem funds 'constitute or [are] derived from proceeds traceable to a violation' of the wire fraud statute, 18 U.S.C. § 981(a)(1)(C), regardless of whether that violation involved Clemente.").[3] Here, the

---

[3] In any event, given the FAC's allegations that Kerimov owns the vessel, there is an overwhelming inference that Imperial Yachts' maintenance payments *were* "later reimbursed by

FAC clearly pleads transactions for the benefit of Kerimov and supporting his interests in property.

**B.  The *Amadea* Is Forfeitable as Property "Involved in" International Promotional Money Laundering (Claim Two)**

18 U.S.C. § 981(a)(1)(A) states that forfeitable property includes property "involved in" transactions violative of 18 U.S.C. §§ 1956 and 1957. 18 U.S.C. § 1956(a)(2)(A)—the international promotional money laundering statute—prohibits transmission of funds to, from, or through the United States "with the intent to promote the carrying on of specified unlawful activity." IEEPA violations are "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D).

Under this statutory framework, the *Amadea* is forfeitable as property "involved in" promotional money laundering. The *Amadea* was secretly owned by Kerimov, a sanctioned Russian oligarch, and maintained though U.S. transactions in violation of IEEPA. Each U.S. transaction constitutes a money laundering promotion offense because it benefits Kerimov's property and Kerimov. Further, because each transaction helps maintain the vessel, it also promotes future IEEPA violations by maintaining the object of a future transaction. That is, when Imperial Yachts, Kochman, and others repeatedly transmitted money to or through the United States to preserve the *Amadea* and benefit Kerimov, they were promoting additional IEEPA violations by maintaining the *Amadea* as a functional vessel that could be used to further violate IEEPA over and over again.

To resist this conclusion, Claimants argue that the *Amadea* itself was not "involved in" the alleged promotional money laundering transactions and thus is not forfeitable. Mot. at 19-22.

---

or billed to" Kerimov. Mot. at 10. Imperial Yachts is a yacht management company, the logical inference being that it is reimbursed by the yacht's owner for the management services it provides to that owner.

Claimants also argue that promotional money laundering impermissibly "merges" with the alleged IEEPA violations. *Id.* at 24-25. As detailed below, these arguments fail.

### 1. The *Amadea* Was "Involved in" Promotional Money Laundering

The *Amadea* clearly was "involved in" the above-cited U.S. money laundering transactions, as these transactions were made to support and maintain the *Amadea* and for Kerimov's benefit. It is well-settled that when a money laundering transaction—here, the international transmission of funds to and through the United States—is made to support a car/building/business/etc., the car/building/business/etc. constitutes property "involved in" the money laundering offense. *See, e.g.*, *United States v. Miller*, 911 F.3d 229, 233 (4th Cir. 2018) (real properties were "involved in" money laundering given "the use of laundered funds to finance improvements to the [] properties . . . Although Miller places considerable weight on the fact that his properties were not *purchased* with laundered funds, the statutory test does not require so much. It requires only that property be 'involved in' money laundering transactions.") (emphasis in original); *In re 650 Fifth Ave. and Related Prop.*, 777 F. Supp. 2d 529, 565-66 (S.D.N.Y. 2011) (where laundered funds were used to maintain a building, the building was "involved in" money laundering); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 272-73 (E.D.N.Y. 2005) (where laundered funds were used to pay business loan and make monthly tax payments on business real estate, the business and its real estate were "involved in" money laundering), *aff'd*, 261 F. App'x 355 (2d Cir. 2008); *United States v. One 1987 Mercedes Benz*, 820 F. Supp. 248, 252 (E.D. Va. 1993) (where one car payment was made with laundered funds, the car was "involved in" money laundering).

Indeed, *Miller* stressed that "a property involved in a money laundering offense is forfeitable in its entirety, so it is irrelevant whether the amount spent to improve the properties is

equal to the resulting increases in their equity values." *Miller*, 911 F.3d at 234. When a piece of real estate—or a superyacht—is supported or maintained through money laundering transactions, the real estate or superyacht is "involved in" money laundering and is thus "forfeitable in its entirety." *Id*.

Thus, there is no merit to Claimants' position that the only property "involved in" a money laundering transaction is the money that was laundered. *See In re 650 Fifth Ave.*, 777 F. Supp. 2d at 566 n. 11 ("Section 981(a)(1)(A) does not provide for forfeiture of the proceeds laundered; it provides for forfeiture of '[a]ny property, real or personal, involved in' money laundering"); *see also United States v. Garza-Gonzalez*, 512 Fed. App'x 60, 67 (2d. Cir. 2013) (where defendant used his perfume business to launder $7 million, the entire $30 million receipts of the business were "involved in" money laundering); *United States v. Robbins*, No. 1:10-CR-268, 2015 WL 2127025, at *5-6 (W.D.N.Y. May 6, 2015) (entire car dealership that facilitated money laundering transactions was "involved in" money laundering).[4]

Claimants cite *United States v. Nicolo*, 597 F. Supp. 2d 342, 356 (W.D.N.Y. 2009) for the proposition that the *Amadea* was not "involved in" money laundering. Mot. at 21-22. The

---

[4] Even property that merely "facilitated" a money laundering transaction is "involved in" money laundering and hence forfeitable. *See United States v. 250 Documents,* No. 03–CV–8004, 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008) ("[t]he term 'involved in' refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense."). "Facilitation [of a laundering offense] occurs when the property makes the prohibited conduct 'less difficult or more or less free from obstruction or hindrance.'" *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998) (citations omitted; brackets in original). Here, the *Amadea* did not just make the money laundering transactions less difficult; rather, the *Amadea* was <u>essential</u> to the money laundering transactions. After all, upkeep and use of the *Amadea* were the *raison d'etre* for these transactions, and the fact that the *Amadea* is property of a sanctioned Russian oligarch is what turned these transactions into money laundering. Thus, under the logic of the "facilitating property" caselaw, it follows *a fortiori* that the *Amadea* was "involved in" money laundering.

analogy fails. In *Nicolo*, a criminal defendant performed wrongful acts (such as faxing fraudulent invoices) from two real properties, and the court held that merely faxing invoices from a property was not a sufficient nexus to deem the property forfeitable under an "involved in" theory. *Nicolo*, 597 F. Supp. 2d at 356-57. Under the logic of *Nicolo*, the *Amadea* might not be forfeitable if someone merely committed otherwise-unrelated money laundering while onboard the *Amadea*. But that is not the situation here. The *Amadea* was not merely the location where money laundering transactions were carried out; rather, the money laundering transactions were made for the very purpose of maintaining the *Amadea* for the benefit of Kerimov and his property interests. Thus, this case fits comfortably within the caselaw cited above, which holds that when a money laundering transaction is made to support a car/building/business/etc., the car/building/business/etc. is "involved in" money laundering. Notably, *Nicolo* recognized and endorsed this caselaw. *See id.* at 356-57.

Claimants also mis-quote *United States v. Bornfield*, 145 F.3d 1123 (10th Cir. 1998) in an effort to bolster their legal arguments. Mot. at 21. Specifically, *Bornfield* posited the following short hypothetical: "For example, if a defendant receives $500,000 in cash in a money laundering scheme and hides the cash in his house, the government may seize that money as property 'involved in' the money laundering offense." *Bornfield*, 145 F.3d at 1135. That is the extent of the hypothetical. *Bornfield* said nothing about whether the house would also be forfeitable. Claimants embellished this quote with brackets to read: "if a defendant receives $500,000 in cash in a money laundering scheme and hides the cash in his house, the government may seize that money [but not the house] as property 'involved in' the money laundering offense [under a facilitation theory]." Mot. at 21. The Government is unsure *why* Claimants doctored the quote in this manner, since even the mis-quoted language does not support their argument given

that there is no allegation that the *Amadea* was used to hide otherwise-unrelated laundering proceeds.

Claimants also argue that the laundered money (some $1.2 million) is a small fraction of the overall value of the *Amadea*. Mot. at 2. But that is irrelevant to whether the *Amadea* was "involved in" money laundering and thus potentially forfeitable in full. *Miller*, 911 F.3d at 234 ("a property involved in a money laundering offense is forfeitable in its entirety"). To be sure, 18 U.S.C. § 983(g) does authorize the Court to reduce the forfeiture if forfeiting the entire property would be constitutionally excessive under the Eighth Amendment. However, an excessiveness challenge cannot be heard until after forfeiture is determined. *See United States v. Real Prop. Located at 6137 Univ. Drive*, No. 07-10083, 2007 WL 1343268, at *2 (E.D. Mich. May 7, 2007) ("importantly, any challenge as to excessiveness under the Eighth Amendment should wait until the government has established forfeitability. Thus, the issue of whether the government is over-secured is premature at best."); *accord Matter of Seizure and Search of Motor Yacht Tango*, 597 F. Supp. 3d 149, 153 (D.D.C. 2022) ("any Excessive Fines challenges at this stage are premature as Eighth Amendment issues are not ripe until after a court enters a civil or criminal forfeiture order.").[5] The Government believes forfeiting the entire *Amadea* would not be excessive under the multi-factor excessiveness test and will brief this issue at or near the end of the case. *See von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2017) (listing the factors for this test).

---

[5] The *Tango* court also held that "[e]ven if an Eighth Amendment challenge was ripe now, it utterly fails," due in part to the massive harm caused when sanctioned Russian oligarchs flout IEEPA by hiding their ownership of superyachts. 597 F. Supp. 3d at 153-54. That analysis would apply equally to this case, if and when an Eighth Amendment challenge becomes ripe.

Nevertheless, it would be premature for the Court to decide this multi-factor test at the outset of the case, before any evidence has been presented on the myriad factors.[6]

### 2. Claimants' Merger Argument Fails

Claimants mistakenly also argue that the Government cannot show a Section 1956(a)(2)(A) money laundering violation because the money laundering merges with the substantive IEEPA violations. Mot. at 24-25. The so-called "merger doctrine" is commonly traced to *United States v. Santos*, 553 U.S. 507 (2008), which held that the definition of "proceeds" in the money laundering statute must be limited to "profits" because otherwise any defendant would engage in promotional money laundering by merely using a crime's gross receipts to fund the crime's costs or expenses. *See id.* at 515-16. In *Santos*' view, this would mean that promotional money laundering would "merge" with the underlying crime. *Id.* ("If 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would 'merge' with the money-laundering statute.").

But the *international* promotional money laundering statute, Section 1956(a)(2)(A), does not have the "proceeds" element that gave rise to *Santos*' merger concerns. Thus, numerous courts have found that the merger doctrine does not apply to Section 1956(a)(2)(A). *See, e.g.*,

---

[6] Among other things, the Government plans to present evidence that Claimants have tried to deceive multiple governments about the true owner of the *Amadea*, which is highly relevant to assessing "the culpability of each claimant"—one of the applicable factors. Indeed, if the Court concludes that Kerimov is the true owner, that means Claimants have misled this Court about ownership, which is again highly relevant to their culpability.

*Adkins v. United States*, No. 3:12-CR-259, 2018 WL 7283323, at *9 (W.D.N.C. Aug. 7, 2018) ("Unlike the money laundering provision in *Santos*, 18 U.S.C. § 1956(A)(1), the international money laundering provision, § 1956(a)(2)(A), does not suffer from a merger problem because it does not use the term 'proceeds.'"); *United States v. Harder*, 168 F. Supp. 3d 732, 746 (E.D. Pa. 2016) ("The Government's charging strategy comports with case law recognizing that *Santos* is inapplicable to international promotional money laundering charges.").

Even more specifically, courts have held that there is no merger problem when a defendant moves money internationally to promote IEEPA violations. *See United States v. Tajideen*, 319 F. Supp. 3d 445, 468 (D.D.C. 2018) ("contrary to the defendant's position, § 1956(a)(2) does not require 'a distinct act of money laundering separate and apart from the transactions that allegedly violated [the] IEEPA and constituted the [specified unlawful activity] for money laundering.'") (brackets in original); *United States v. Zarrab*, No. 15 CR 867, 2016 WL 6820737, at *16 (S.D.N.Y. Oct. 17, 2016) ("Zarrab's argument that the conspiracy to commit money laundering charge 'merges' with the IEEPA and bank fraud conspiracies is unpersuasive. Section 1956(a)(2)(A) 'clearly penalizes the transportation of monetary instruments in promotion of unlawful activity, not the underlying unlawful activity; in passing the money laundering statute, Congress determined that the transportation of monetary instruments in promotion of unlawful activity itself constitutes a crime.'"); *United States v. Nazemzadeh*, No. 11 CR 5726, 2014 WL 310460, at *13 (S.D. Cal. Jan. 28, 2014) ("the transmission of the $21,400 advanced the goals of the unlawful exportation of the MRI coil without a license [under IEEPA], and therefore, the wire transfer did not need to constitute a separate offense from the underlying offense. In addition, the Court finds no merger problem.").

Finally, the holding in *United States v. Piervinanzi* is instructive. In *Piervinanzi*, the Second Circuit upheld a Section 1956(a)(2)(A) conviction where defendants tried to fraudulently induce a bank to transfer money to an overseas account controlled by the defendants. *See Piervinanzi*, 23 F.3d 670 (2d Cir. 1994). Specifically, *Piervinanzi* held that transferring the funds overseas would make the money harder to trace and thus promote the bank fraud. *Id.* at 679-82. Even though the attempted bank fraud and attempted international promotional money laundering addressed the same monetary transaction, *Piervinanzi* found that the two violations did not merge into one. *Id.* at 679. *Piervinanzi* also rejected the proposition that "a defendant may be deemed to 'promote the carrying on of specified unlawful activity' *only* when the laundering would promote subsequent criminal activity." *Id.* at 682 (emphasis in original).

Under the foregoing caselaw, the Government could avoid merger problems even if there was just a *single* international transaction made to promote an IEEPA violation. Here, we have that and more. By repeatedly moving money to and through U.S. bank accounts to maintain the *Amadea*, Imperial Yachts, Kochman, and others were keeping the *Amadea* as a functional vessel and thus promoting *future* IEEPA violations. For example, a vendor payment in January 2022 could help maintain the *Amadea* and thus promote future IEEPA violations in February, March, and beyond. Even if the January payment was also a substantive IEEPA violation, there can be no serious argument that it "merges" with the separate February and March IEEPA violations that it promoted.

## C. The *Amadea* Is Forfeitable as Property "Involved in" Transactions in Criminally-Derived Property (Claim Three)

Claim Three alleges that the *Amadea* is forfeitable as property involved in a violation of 18 U.S.C. § 1957, which prohibits monetary transactions in criminally-derived property. Claimants argue that the Government has not alleged any Section 1957 violations because it has

not alleged that anyone first obtained proceeds of criminal activity and then made a transaction with such proceeds. Mot. at 25-27.

But Claimants' argument ignores the nature of the *Amadea* vendor payments, which in many cases flowed through U.S. correspondent accounts. A transaction through a U.S. correspondent account is really two transactions—one inbound transaction from the source to the correspondent and one outbound transaction from the correspondent to the ultimate destination. *See United States v. Daccarett,* 6 F.3d 37, 54 (2d Cir. 1993); *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 94-95 (D.D.C. 2017). Thus, consider the situation when Imperial Yachts paid a vendor invoice that listed a U.S. correspondent account (as many of the invoices did, *see* FAC ¶ 57). By paying this invoice, Imperial Yachts was knowingly putting into motion two monetary transactions, both of which violated IEEPA (since both were designed to support Kerimov's property through the U.S. financial system). The inbound transaction to the U.S. correspondent account renders the money unlawful as proceeds of an IEEPA violation. *See United States v. $37,564,565.25*, No. 18-CV-2795, 2019 WL 5269073, at *5 (D.D.C. Oct. 17, 2019) (when funds are moved into the U.S. financial system through unlawful activity, they become "proceeds" of unlawful activity); *see also Nazemzadeh*, 2014 WL 310460, at *12-13 (for money laundering offense, the illegal activity is the transmission of money). Thus, when the outbound transaction occurred from the U.S. correspondent to the final destination, it was a transaction in criminally-derived property under Section 1957—a transaction that is attributable to Imperial Yachts, which knowingly put both transactions into motion by paying an invoice that listed a U.S. correspondent account. Thus, the Government has alleged Section 1957 violations.

### D. The *Amadea* Is Forfeitable as Proceeds of IEEPA Violations (Claim One)

18 U.S.C. § 981(a)(1)(C) states that property subject to civil forfeiture includes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity . . .'" As stated above, IEEPA violations constitute specified unlawful activity. Thus, the *Amadea* is forfeitable if it constitutes or is derived from "proceeds" of the IEEPA-violating monetary transactions.

"The legal definition of 'proceeds' is broad, and allows for a 'but for' test in determining what constitute proceeds." *In re 650 Fifth Ave. & Related Properties*, No. 08 CIV. 10934 (KBF), 2017 WL 3834795, at *3 (S.D.N.Y. Sept. 1, 2017), *aff'd sub nom. Levin v. United States*, 774 F. App'x 49 (2d Cir. 2019) (internal citations omitted). For purposes of forfeiture, "proceeds are property that a person would not have but for the criminal offense . . . ." *United States v. Grant*, No. 05-CR-1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008). Here, the Government has pled that the *Amadea*'s owner would not continue to preserve his interest in and benefit from the luxury vessel but for more than a million dollars of IEEPA-violating maintenance payments, because these payments went to fuel, crew provisions, and other expenses that were necessary to keep the *Amadea* as a functional vessel. *See* FAC ¶¶ 7, 51, 52(b)-(e), 71. The Government's allegations are detailed, reasoned, and certainly pass the plausibility standard. Indeed, one *Amadea* captain has publicly said that the vessel would "rapidly deteriorate" into an "unsaleable hull" if not given intensive maintenance by a large crew.[7] Thus, the Government has plausibly alleged that the *Amadea* constitutes or is derived from proceeds

---

[7] Kalyeena Makortoff, <u>Mystery Russian superyacht sets sail for the US after Fiji court ruling</u>, THE GUARDIAN (June 7, 2022) (online), *available at* https://www.theguardian.com/world/2022/jun/07/mystery-russian-superyacht-sets-sail-for-the-us-after-fiji-court-ruling.

of the IEEPA-violating maintenance payments because Kerimov's investment and interest in the *Amadea*, a luxury superyacht, would have catastrophically deteriorated without such payments.

One could analogize to forfeiture cases against businesses, in which courts have held that a business constitutes "proceeds" of illegal activity if illegal money allowed the business to continue operations. *See, e.g., United States v. Farkas*, No. 1:10CR200, 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011) ("because fraudulent activity enabled TBW to remain in the business of obtaining mortgage funding, securitizing mortgages, and selling mortgage-backed securities, 'proceeds' must be interpreted sufficiently broadly to capture the defendant's gross receipts even if those receipts cannot be directly attributable to, for example, a particular fraudulent loan."); *United States v. Park*, 825 F. Supp. 2d 644, 648 (D. Md. 2011) ("In the case of a business that would not have been solvent but for the infusion of illegally-obtained funds, the entire business may be subject to forfeiture as the proceeds of the offense"). What is true for a business is equally true for a superyacht. Because the IEEPA-violating maintenance payments allowed the *Amadea* to continue as a functional vessel, the *Amadea* constitutes or is derived from proceeds of the IEEPA violations and is thus forfeitable.

In an effort to avoid the conclusion that the FAC clearly alleges a sufficient basis to meet the "but for" analysis that the illicit transactions were necessary to preserve the *Amadea* as a functioning luxury yacht for his use and benefit, Claimants focus on whether the *Amadea* should be considered gross proceeds or net proceeds under 18 U.S.C. § 981(a)(2)(A) and (B). Under Subsection (a)(2)(A), proceeds broadly encompasses all property obtained directly or indirectly from the commission of an offense and any property traceable thereto, "[i]n cases involving illegal goods, illegal services, unlawful activities…"*,* while Subsection (a)(2)(B) allows for the

deduction of direct costs "in cases involving lawful goods or lawful services that are sold or provided in an illegal manner…" *Id.* As several courts have observed, whether Section 981(a)(2)(A) or (a)(2)(B) applies to a particular defendant's conduct is a difficult question that has been decided without a consistent methodology and sometimes with inconsistent results. *See United States v. Milton,* No. 21-cr-00478 (ER), 2024 U.S. Dist. LEXIS 32501, at *10 (S.D.N.Y. Feb. 26, 2024); *United States v. Percoco*, No. 16-CR-776 (VEC), 2019 U.S. Dist. LEXIS 64306, at *10 (S.D.N.Y. Apr. 15, 2019); *United States v. Sum of $70,990,605,* 4 F. Supp. 3d 189, 206-07 (D.D.C. 2014).[8] In navigating this statutory provision, the Second Circuit has found that gross proceeds applies when the underlying criminal conduct that is "inherently unlawful". *See United States v. Bodouva,* 853 F. 3d 76, 80 (2d Cir. 2017) (finding "[e]mbezzlement…cannot be done lawfully, and therefore is properly considered an 'unlawful activity' under § 981(a)(2)(A)")(citations omitted).

As with embezzlement, the conduct alleged in the FAC is inherently unlawful and fits squarely within the broad definition of gross proceeds under Section 981(a)(2)(A). The applicable Executive Order imposes a sweeping prohibition on the provision of funds or goods to or for the benefit of an Specially Designated National (SDN). *See* E.O. 13661 § 4(a) ("The prohibitions in section 1 of this order include but are not limited to…(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order."). As such, *any*

---

[8] At least one court has concluded that it was not necessary to determine which definition of "proceeds"—§ 981(a)(2)(A) or (B)—is applicable at the motion to dismiss stage. *See United States v. Sum of $70,990,605,* 4 F. Supp. 3d 189, 208 (D.D.C. 2014) (declining to determine whether § 981(a)(2)(A) or (B) provided applicable definition of "proceeds" at motion to dismiss stage "because the government has provided sufficient evidence that the defendant assets are subject to forfeiture as the proceeds of a wire fraud conspiracy").

transaction that benefits an SDN is strictly prohibited, whether it is to purchase lawful or unlawful goods or services.  The FAC more than sufficiently alleges that the transactions at issue in this action benefitted Kerimov by preserving his investments in the *Amadea* and ensuring that it remained a functional luxury yacht for his use and that of his family.

Few courts have considered whether proceeds of a sanctions violation constitute gross proceeds or net proceeds.  In *United States v. All Funds on Deposit in United Bank of Switzerland,* 188 F. Supp. 2d 407 (S.D.N.Y. 2002), a court in this District found that funds held in an account of a currency exchange company for transfer in violation of sanctions under a different sanctions regime involving Iran involved gross proceeds on the grounds that IEEPA violations were "specified unlawful activity" giving rise to proceeds forfeiture under 18 U.S.C. § 981(a)(1)(C) and, therefore, encompassed "unlawful activities" under Section 981(a)(2)(A).[9]  *Id.* at 409-10.  Underscoring the variation in interpretation of this statute, another court in this District found that certain business and management services provided to Iran constituted lawful conduct performed in an illegal manner giving rise only to net forfeiture under Section 981(a)(1)(B), while concealing assets from judgment creditors was never a lawful activity and

---

[9] Although decisions such as *In re: 650 Fifth Ave.* have found that the term "unlawful activity" encompasses less criminal conduct than "specified unlawful activity", the court's rationale in *All Funds on Deposit in United Bank of Switzerland* seems more consistent with the statutory text as grammatically, *specified* modifies *unlawful activity.*  Moreover, in delineating the knowledge requirement for money laundering violations under 18 U.S.C. § 1956, Congress explained that the term "unlawful activity" included more conduct than those offenses enumerated as "specified unlawful activity" under 18 U.S.C. § 1956(c)(7).  *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7)").

gave rise to gross proceeds under Section 981(a)(1)(A).  *In re: 650 Fifth Ave.,* 777 F. Supp. 2d at 551-52.

Relying on *In re: 650 Fifth Ave.,* Claimants contend that the illicit transactions in this case cannot have generated gross proceeds.  However, Claimants fail to note that in *In Re: 650 Fifth Ave.* the conduct at issue were *services* prohibited under a different sanctions regime.  *Id*. at 550. ("[t]he next question, then, and the heart of this case, is whether the properties the government seeks to forfeit are property 'which constitutes or is derived from proceeds' of the Foundation's and Assa Corp.'s alleged 'services to Iran or the Government of Iran.'").  In contrast, the prohibitions at issue in this case under E.O. 13661 include any transaction that provides funds or goods to or for the benefit of an SDN.  The Executive Order does not distinguish between transactions used to purchase illicit narcotics, a new pair of shoes, or any other item that would benefit an SDN – all such transactions are prohibited.  Accordingly, as in the case of embezzlement, the conduct cannot be done lawfully, and is, therefore, inherently unlawful activity that generates gross proceeds for purposes of 18 U.S.C. § 981(a)(2)(A). Moreover, as in *Milton*, applying the definition of proceeds in § 981(a)(2)(A) is consistent with the purposes of the sanctions – a broad, national security prohibition on any transaction benefiting an SDN.  *Milton,* 2004 U.S. Dist. LEXIS 32501 at * 14-15.

In any event, even if the Court determines that the applicable provision for proceeds in this case is 18 U.S.C. § 981(a)(1)(B), the FAC alleges a sufficient basis for forfeiture.   The court's opinion in *In re 650 Fifth Ave.,* on which Claimants primarily rely, holds that "at least" some portion of a building was derived from proceeds of IEEPA violations when IEEPA-violating rent payments were used to support the property. *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 557-58. The *In re 650 Fifth Ave.* jury instructions, also cited by Claimants, stated: "Property

may constitute proceeds traceable to an IEEPA violation if the property was purchased with, improved, *or retained* using funds representing proceeds of the IEEPA violation." *In re 650 Fifth Ave.*, No. 1:08-cv-10934, ECF No. 1902 at 744 (S.D.N.Y. June 30, 2017) (emphasis added); *see United States v. Torres*, 703 F.3d 194, 199 (2d Cir. 2012) (all that is required a "causal nexus between the wrongdoer's possession of the property and her crime" and stating that money that defendant saved or retained as a consequence of the crime is proceeds obtained "indirectly"); *United States v. Wong*, No. CR 11-00691 DDP, 2014 WL 6976080, *2 (C.D. Cal. Dec. 9, 2014) (money defendant saved on import fees by paying others to undervalue and misclassify goods is the "proceeds" of his offense). Here, the *Amadea* was "retained" through IEEPA-violating maintenance payments because it would have ceased to be a functional vessel without those payments.[10] Thus, under the *650 Fifth Ave.* jury instructions, the *Amadea* is proceeds of IEEPA violations.

Claimants hang their hat on a different paragraph of the *650 Fifth Ave.* jury instructions, which stated that "[i]f property constitutes (or was derived) only in part from the proceeds of an IEEPA violation, that property would be subject to forfeiture, but only in part. For example, if a car were bought with $100 that is proceeds of an IEEPA violation and $100 in lawfully derived funds, one half of the car would be subject to forfeiture." *Id.* That is a correct statement of law,

---

[10] Claimant's contention that property that is "retained" cannot constitute proceeds or property derived from proceeds subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because the word is not expressly included in Section 981(a)(2) is incorrect.  The Second Circuit rejected this argument more than a decade ago.  *United States v. Torres*, 703 F.3d 194, 200 (2d Cir. 2012) (We do not accept that the omission of "retained" or "maintained" from § 981 evinces a Congressional intent not to reach property that is nonetheless "traceable to" and constitutes the "net gain" of the defendant's fraud: Congress's inclusion of the broadening and attenuating language just quoted, as well as its use of the modifier "indirectly," easily offset the absence of the words "retained" and "maintained" from the statute. No more is required to support forfeiture under § 981.").

but Claimants cannot show at this juncture that the *Amadea* is derived "only in part" from the illegal maintenance payments. Resolving this question would require determining whether the *Amadea* would have ceased be a functional vessel without the IEEPA-violating maintenance payments (in which case the entire *Amadea* would be proceeds of the IEEPA violations or property derived from such proceeds) or whether the *Amadea* would have no longer been a functioning luxury yacht without the maintenance payments (in which case the *Amadea* would only be proceeds "in part"). The Government has plausibly alleged that the *Amadea* would have ceased to exist without the maintenance payments, thus there is no basis to rule at this juncture that the *Amadea* is only derived "in part" from the IEEPA violations.

Claimants' other cited cases are distinguishable or inapplicable. Claimants first cite *Miller*, 911 F.3d at 234. Mot. at 14, which was primarily an "involved in money laundering" case, not a "proceeds" case. *Miller*, 911 F.3d at 234 ("probable cause supports a finding that Miller involved the properties in money laundering transactions by spending laundered funds to improve and retain them"). While *Miller* did issue an alternative holding based on a "proceeds" theory, it held that the entire properties were forfeitable under this theory as well. *Id.* at 234-35. Thus, *Miller* does not support Claimants on a "proceeds" theory (and strongly supports the Government on an "involved in" theory, *see* Section B(1) above).

Claimants next cite cases involving commingled accounts, which state that laundered funds in a commingled account do not necessarily taint all the rest of the money in this account. Mot. at 14. This is not a commingled account case, so the relevance of these cases is unclear. Claimants next cite caselaw stating the same rule as the *In re 650 Fifth Ave*. jury instructions: namely, that when a property is purchased in part with illegal money under a proceeds theory, the forfeitable fraction of the property corresponds to the fraction of the purchase funds that were

22

illegal money. *Id.* Again, the Government does not dispute this proposition. But that is not the situation here. Instead, this is a situation where the entire property would have plausibly suffered catastrophic deterioration were it not propped up with dirty money. Under these facts, presumed true for purposes of this motion, the property as a whole was "retained" with illegal money and is thus forfeitable in its entirety as proceeds of illegal activity. *In re 650 Fifth Ave.*, No. 1:08-cv-10934, ECF No. 1902 at 744 ("Property may constitute proceeds traceable to an IEEPA violation if the property was purchased with, improved, or retained using funds representing proceeds of the IEEPA violation.").

Finally, Claimants cite *United States v. Goodwin*, which held post-trial that "Goodwin's use of fraud proceeds to pay for service on the motorcycle was insufficient to show that the motorcycle constituted or was derived from proceeds traceable to his fraudulent scheme." 831 F. App'x 223, 224 (8th Cir. 2020); *see also* Mot. at 14-15. But in *Goodwin*, there was no allegation (much less proof) that the service payments were critical to the motorcycle's continued existence.[11] Here, by contrast, the *Amadea*'s captain stated that the yacht would "rapidly deteriorate" into an "unsaleable hull" if not given constant maintenance, and the Government has pled the same. Thus, *Goodwin* is distinguishable.

---

[11] This unreported opinion provides minimal analysis and no detail about the service payment(s) for the motorcycle, but according to the briefing, the evidence at trial concerned only a single payment of $1,302.11 for unknown service on two motorcycles, one of which was not not at issue in the case. *See United States v. Goodwin*, No. 19-1014 (8th Cir.) Dkt. Entry ID 4919202 (appellee brief) at 26 n.4; Dkt. Entry ID 4906628 (supplemental appellant brief) at 12. Indeed, on appeal, the defendant's argument against forfeiture of the at-issue motorcycle on the basis of the service payment was that "[t]here is no evidence in the record establishing what portion of the service bill was attributable to which motorcycle, or even what services were performed." *Id.* Dkt. Entry ID 4906628 at 12.

For all these reasons, the Court should deny Claimants' challenges to Claim One, the "proceeds" forfeiture claim.

### E.  The FAC Pleads Willfulness

Claimants' argument that the FAC fails to plead a willful IEEPA violation, Mot. at 15-19, is meritless. As set forth in the FAC and highlighted below, the FAC pleads willful IEEPA violations by Kochman, Imperial Yachts, and the *Amadea* co-captains. FAC ¶¶ 54-68.

For Kochman, the FAC cites a policy document stating that Kochman's sign-off was required to approve vendor invoices for the *Amadea*. *Id.* ¶ 60. Claimants respond that this document was from 2017 and speculate that the invoice approval policy might have changed by 2021. Mot. at 16. Claimants cite nothing to support this speculation, and it is not the Government's burden to *disprove* speculation that that the approval policy might have changed. If Claimants wish to argue that Kochman was removed from the invoice-approval chain after 2017, they can present evidence to that effect during discovery. But the Government has more than met its pleading burden, especially given that the Government also pled facts showing that Kochman was personally involved in approving *Amadea* purchasing decisions all the way into 2022. *See* FAC ¶ 58 (Kochman was asked to approve *Amadea* crew uniform purchases from a U.S. company in February 2022).

Claimants next argue that the FAC does not plead that Kochman knew what was prohibited under IEEPA. Mot. at 17-19. This argument ignores FAC ¶ 55, which states:

> KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, *and that U.S. law prohibited U.S. persons (including financial institutions) from transacting with, on behalf of, or for the benefit of, KERIMOV, and dealing in KERIMOV's property*, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; (2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s

beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

*Id.* (emphases added). Thus, Paragraph 55 pleads that Kochman knew it was unlawful to support the *Amadea* through payments to U.S. companies or through the U.S. financial system. Because Claimants ignore Paragraph 55 altogether, they do not allege that Paragraph 55 is insufficient or implausible under the applicable pleading standards. Nor could they. Given that Kochman is the President of Imperial Yachts—a company devoted to providing yacht services for Russian oligarchs—it would be implausible for Kochman to *not* understand the sanctions regime applicable to sanctioned Russian oligarchs and their yachts. In the IEEPA context and other contexts, a factfinder can infer knowledge of the law (and resulting willfulness) based on the wrongdoer's sophistication and/or business operations in the areas covered by the law. *See, e.g.*, *United States v. Mousavi*, 604 F.3d 1084, 1094 (9th Cir. 2010) ("A jury could reasonably conclude that a sophisticated and politically connected businessman like Mousavi who lived and conducted business in Iran after 1979 was aware of the 1979 United States trade embargo.") (IEEPA case);[12] *see also Idir v. La Calle TV, LLC*, No. 19-CV-6251, 2020 WL 4016425, at *3 (S.D.N.Y. July 15, 2020) ("the defendant operates in the publishing industry and is presumed to have knowledge of copyright law, supporting a finding that the plaintiff acted willfully.").

Turning to Imperial Yachts as an entity, Claimants allege that the Government has engaged in impermissible "group pleading" by aggregating the collective knowledge and actions of Imperial Yachts personnel. Mot. at 17. Claimants' argument fails for several reasons. First,

_____

[12] Notably, *Mousavi* used this rationale to hold that a jury could infer knowledge of the law and willfulness beyond a reasonable doubt. It follows *a fortiori* that Kochman's position and line of business would allow a factfinder to infer knowledge and willfulness by a preponderance of the evidence, which is all that is required in this civil forfeiture case.

numerous courts have held that it is permissible to aggregate knowledge and wrongful intent from different corporate actors to form a collective corporate *mens rea*. *See, e.g.*, *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 146-47 (S.D.N.Y. 2019) ("To the extent McGraw-Hill suggests that Pelaez cannot rely on the collective knowledge and actions of employees at McGraw-Hill to prove willfulness, the Court disagrees. The general rule in this Circuit, developed in the securities fraud context, is that '[a] corporation is considered to have acquired the collective knowledge of its employees.'"); *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 669 (S.D.N.Y. 2017) ("'a corporation may be charged with the collective knowledge of its employees[.]' Corporations often compartmentalize information, whether for efficiency, practicality, or both. But such compartmentalization does not shield a company from knowledge maintained by employees in such a structure."), *aff'd*, 942 F.3d 554 (2d Cir. 2019); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 271 (E.D.N.Y. 2012) ("Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information."); *see also United States v. Pac. Gas & Elec. Co.*, No. 14-CR-00175, 2015 WL 9460313, at *5 (N.D. Cal. Dec. 23, 2015) ("where a corporation has a legal duty to prevent violations, and the knowledge of that corporation's employees collectively demonstrates a failure to discharge that duty, the corporation can be said to have 'willfully' disregarded that duty.").

Second, even cases that take a narrower view of corporate *mens rea* recognize that the knowledge of a corporation's directors and controlling personnel is imputed to the corporation. *See, e.g.*, *Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 405 (S.D.N.Y. 2012) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is

imputable to that corporation."). For Imperial Yachts, such directors and controlling personnel include Kochman. Thus, when Imperial Yachts made U.S. transactions to support the *Amadea*, it was doing so with Kochman's imputed knowledge of *Amadea* ownership and the IEEPA sanctions regime. Thus, even under this narrower standard, Imperial Yachts as an entity willfully violated IEEPA.

Third, the FAC pleads that Imperial Yachts personnel sought to conceal Kerimov's ownership of the yacht by putting forth straw owners and making false representations to law enforcement about the *Amadea*'s true owner. FAC ¶ 55 (referencing FAC ¶ 30). Such behavior is strong evidence of willfulness. *Mousavi*, 604 F.3d at 1094 ("The evidence showed that Mousavi concealed his income from Al Mal from the government on his tax returns, and the Supreme Court has recognized such evidence of concealment as sufficient to indicate knowledge of unlawfulness."); *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004) ("Gavidel conducted his business practices in stealth, using code words to reference money transfers . . . This activity clearly confirms that Gavidel knew his activities ran afoul of the law.") (IEEPA case);[13] *see also Bryan v. United States*, 524 U.S. 184, 189 (1998) (use of straw purchasers is "unquestionably adequate" to show willfulness for unlawful dealing in firearms).

Fourth, Claimants ignore Paragraph 68 of the FAC, which states:

> As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing

---

[13] Like *Mousavi*, *Homa* was criminal IEEPA case, so its logic applies *a fortiori* to this civil case where the Government must only show willfulness by a preponderance.

> IMPERIAL YACHTS to commit IEEPA violations and to engage in money
> laundering to promote IEEPA violations by willfully depriving his subordinates of
> the UBO information that they needed to avoid making prohibited transactions.

In other words, Kochman either shared his knowledge with subordinates or kept this knowledge

to himself. If Kochman shared the knowledge, then any Imperial Yachts personnel who made

U.S. transactions for the *Amadea* were doing so with knowledge that they were supporting the

property of a sanctioned individual. This makes out a willful IEEPA violation, particularly since

Imperial Yachts' business revolved around yacht services for sanctioned Russian oligarchs and

concomitant familiarity with the U.S. sanctions regime. FAC ¶¶ 13, 46-49, 55. Conversely, if

Kochman hid the ownership knowledge from his subordinates, he was "causing" IEEPA

violations by willfully depriving his subordinates and company of the knowledge they needed to

avoid violations. *See* 50 U.S.C. § 1705(a) ("It shall be unlawful for a person to violate, attempt to

violate, conspire to violate, *or cause a violation of* any license, order, regulation, or prohibition

issued under [IEEPA]") (emphasis added); *Pac. Gas & Elec*, 2015 WL 9460313 at *5 ("where a

corporation has a legal duty to prevent violations, and the knowledge of that corporation's

employees collectively demonstrates a failure to discharge that duty, the corporation can be said

to have 'willfully' disregarded that duty.").

Claimants recycle some of their willfulness arguments for the *Amadea* co-captains. While

Claimants do not dispute the sufficiency of the FAC's allegations that the captains knew

Kerimov was the *Amadea*'s sanctioned owner, they dispute whether the co-captains knew "that

making [U.S.] vendor payments was illegal." Mot. at 16. This creates a dispute of fact and

competing inferences: would the captain of a superyacht, knowing the yacht to be owned by a

U.S.-sanctioned individual, be aware of what U.S. sanctions law prohibits? Or would such a

captain stick his head in the sand and not familiarize himself with what U.S. sanctions law

prohibits? The FAC pleads that a captain would indeed "know all ownership facts relevant to safe and legal operation of the vessel," FAC ¶ 63, an allegation the Government is prepared to support at trial with expert testimony, and the Government believes this is the most reasonable inference to draw. *See Mousavi*, 604 F.3d at 1094 (knowledge of the law and resulting willfulness can be inferred from an actor's sophistication and line of business); *Idir*, 2020 WL 4016425 at *3 (similar). If Claimants wish to argue that the captain of a superyacht would not be aware of what U.S. sanctions law forbids, they can try to make that case on the merits. But the Government has more than met its pleading burden.

Claimants' argument that the FAC does not plead willfulness for promotional money laundering, Mot. at 22-24, adds little and does not make sense. To be clear, willfulness is an element of an IEEPA violation, but it is not an element of promotional money laundering offense. *See* 18 U.S.C. § 1956(a)(2)(A). Because Kochman, Imperial Yachts, and the co-captains were in the approval chain for *Amadea* invoices, they knew the *Amadea* was being repeatedly maintained through U.S. transactions. They also knew that vendor payments were necessary to keep the *Amadea* floating and functional—one of the captains admitted this, as recounted above. So when they paid invoices to keep the *Amadea* floating and functional, they were willfully violating IEEPA *and* willfully promoting future IEEPA violations. *See In re 650 Fifth Ave*, 777 F. Supp. 2d at 562 ("It seems far more than plausible that alleged payments for expenses related to management of the Building were intended to promote that management, and, therefore, to promote an alleged violation of the IEEPA. Accordingly, the complaint states a claim that those payments were promotion money laundering transactions."); *see also* Mot. at 23 (quoting *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003) for the proposition that "promoting continued illegal activity" suffices for promotional money laundering).

**F. The FAC Pleads a Money-Laundering Conspiracy (Claim Four)**

Claimants' argument against Claim Four is threadbare (just five sentences) and references Claimants' prior arguments. Mot. at 28-29. The Government thus incorporates by reference its own arguments stated above. In any event, while Claimants make no distinct argument *against* the existence of a money-laundering conspiracy, the FAC does indeed plead such a conspiracy. *See* FAC ¶¶ 60, 83-87. As detailed above, Kochman and the captains were all in the approval chain for *Amadea* invoices, passing invoices up the chain. They all knew Kerimov was the *Amadea*'s owner. Kochman's knowledge is also imputed to Imperial Yachts. This shows a money-laundering conspiracy among at least Kochman, the captains, and Imperial Yachts.

**G. Claimants' Admiralty Arguments Are Meritless**

Finally, Claimants argue that the FAC should be dismissed because it pleads admiralty jurisdiction and designates its claims as admiralty claims. According to Claimants, this is fatal because the Government's claims are dissimilar from traditional admiralty claims and because admiralty claims must be brought in the district where the vessel is located. Mot. at 29-35.

But Claimants' arguments ignore the fact that the Government has *also* pled civil forfeiture jurisdiction under 28 U.S.C. § 1355. FAC ¶ 2. The claims here are classic civil forfeiture claims—namely, claims for forfeiture of property that is involved in money laundering and/or proceeds of specified unlawful activity. And under the civil forfeiture statute, jurisdiction is proper in this District because some of the acts giving rise to forfeiture occurred in this District—namely, sending money to and through Manhattan bank accounts. *See* 18 U.S.C.

§ 1355(b)(1)(A). Indeed, Claimants do not argue that jurisdiction is lacking under the civil forfeiture statute.[14]

Claimants seemingly assume that a case can be either a civil forfeiture case or an admiralty case, but not both. This premise is mistaken. Numerous authorities have stated that when a *res* is seized on navigable waters, a civil forfeiture case over that *res* is also a case in admiralty. This rule is most often stated in the context of jury trial rights. *See C.J. Hendry Co. v. Moore*, 318 U.S. 133, 152 (1943) ("This Court in suits brought in admiralty sustained the admiralty jurisdiction over forfeitures prescribed by Congress for the violation of federal revenue and other laws where the seizure had occurred on navigable waters. Those decisions held that when the seizure occurred on navigable waters the cause was maritime and hence triable without a jury in the federal courts."); *United States v. One 1976 Mercedes Benz*, 618 F.2d 453, 458-59 (7th Cir. 1980) ("It is difficult to imagine how a proceeding to enforce a statutory forfeiture can resemble in any respect a suit in equity. But how stands the matter with respect to admiralty? The simple truth seems to be that the proceeding is in admiralty when the seizure to which it

---

[14] Jurisdiction would also exist under admiralty law even without the statutory grant in Section 1355. While Claimants argue that admiralty law requires the *res* to be within the district, Mot. at 31-32, that is a misleading oversimplification. The actual rule states that "[w]hile the *res* must be *in custodia legis* (in the court's possession), this possession may be actual or constructive." *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999) (citing *The Brig Ann*, 13 U.S. 289, 291 (1815)). As *The Brig Ann* explained: "In [o]rder to institute and perfect proceedings *in rem*, it is necessary that the thing should be actually or constructively within the reach of the Court . . . it is constructively so, when, by a seizure, it is held to ascertain and enforce a right of forfeiture which can alone be decided by a judicial decree *in rem*." 13 U.S. at 291. Thus, this Court's arrest warrant *in rem* gave this Court at least constructive (if not actual) possession of the *Amadea*. And possession lets district courts exercise admiralty jurisdiction over vessels outside their district. *See Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1175 (11th Cir. 2011) ("While the *Mercedes* itself is not within the United States, that alone does not defeat the court's ability to obtain jurisdiction over it. A court may have either actual or constructive possession over the *res*.").

relates takes place on water; but that when the seizure takes place on land it is a suit at common law."); 50A C.J.S. JURIES § 101 (March 2024 update) ("The Seventh Amendment right to a civil jury trial in federal court applies to an action for the forfeiture of property which was seized on land . . . However, if the seizure is made on navigable waters, the case belongs to the admiralty or maritime jurisdiction and is triable by the court without a jury."); 5B FED. PROC., L. ED. § 10:37 (March 2024 update) ("Proceedings for the forfeiture of property seized on navigable waters are admiralty proceedings, and, as in other admiralty proceedings, no right to a trial by jury is granted"); *United States v. One Lincoln Navigator*, 328 F.3d 1101, 1114 n. 2 (8th Cir. 2003) (stating that "claimants have a Seventh Amendment right to a jury trial in federal non-admiralty civil forfeiture cases," citing *C.J. Hendry* and *One 1976 Mercedes*). Notably, many of these authorities post-date the enactment of 18 U.S.C. §§ 981, 1956, and 1957. Thus, there is no merit to Claimants' argument, Mot. at 33, that those statutes silently changed the long-standing rule that civil forfeiture cases over property seized on water are also admiralty cases.

Nor is there any *logic* to Claimants' argument that Sections 981, 1956, and 1957 silently changed the rules of the game. Claimants argue that these statutes do not address maritime commerce, Mot. at 33-34, but that is not true. For example, one specified unlawful activity ("SUA") listed in Section 1956(c)(7)(D) as giving rise to civil forfeiture is "violence against maritime fixed platforms." Other SUAs cover smuggling and customs violations (Section 1956(c)(7)(B)(v) & (D)), which often occur by sea and which have been a focus of civil forfeiture since the dawn of the United States. *See C.J. Hendry*, 318 U.S. at 152 (citing cases). And this very case implicates maritime commerce, since the *Amadea*'s commercial transactions give rise to this case. In short, there is no reason to say the modern statutory framework silently

erased the long-standing rule that civil forfeiture cases sound in admiralty when the *res* was seized on navigable waters.

Furthermore, IEEPA is essentially a trade sanctions regime, which prohibits U.S. commercial dealings in blocked property. The canonical early Supreme Court cases, which set forth the rule that a civil forfeiture case sounds in admiralty when the *res* was seized on water, were also trade sanctions cases. *See, e,g.*, *United States v. The Schooner Betsey and Charlotte*, 8 U.S. 443 (1808) (trade with prohibited parts of St. Domingo); *The Samuel*, 14 U.S. 9 (1816) (trade in forbidden French and British goods). Thus, there is every reason to apply the Supreme Court rule to this case.

Indeed, while Claimants rely on Chief Justice Marshall's pronouncement that admiralty cases and federal question cases are not "identical," Mot. at 3, Chief Justice Marshall also pronounced the rule that a civil forfeiture case sounds in admiralty when the *res* was seized on water. *See One 1976 Mercedes Benz*, 618 F.2d at 458-59 ("the proceeding [to enforce a statutory forfeiture] is in admiralty when the seizure to which it relates takes place on water; but that when the seizure takes place on land it is a suit at common law. It was Chief Justice John Marshall who first enunciated this proposition . . ."). Thus, while the Government does not dispute Chief Justice Marshall's statement that admiralty and federal-question cases are not "identical"—*i.e.*, any given admiralty case is not *ipso facto* a federal-question case—it is equally true that a civil forfeiture case under a federal statute is also an admiralty case when the *res* was seized on water.

While Claimants cite *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354 (1959), Mot. at 30, 32, 33, that case supports the Government's position, not Claimants'. *Romero* held that the general federal-question statute, 28 U.S.C. § 1331, did not move traditional admiralty claims over to the law side of the court from the admiralty side. It noted that nothing in the language of

Section 1331 suggests that this statute was intended to make a sea-change in traditional admiralty jurisprudence. *Romero*, 358 U.S. at 368-69. Here too, nothing in Section 981, 1956, or 1957 suggests that these statutes meant to erase the traditional rule that civil forfeiture cases sound in admiralty when the *res* is seized on water.

Moreover, Claimants refute their own position by quoting Second Circuit caselaw stating that "[t]here is little doubt that an *in rem* suit involving a vessel is decidedly salty—it is an admiralty proceeding." Mot. at 32 (quoting *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 318 (2d Cir. 2005)). This case is an *in rem* suit involving a vessel. *See Obaid*, 971 F.3d at 1099 ("[a] forfeiture action is *in rem.*"). Thus, under the Second Circuit's holding in *Folksamerica*, this case "is an admiralty proceeding."

Statements made during the oral argument in *United States v. M/Y Galactica Star et al.*, 784 F. App'x 268 (5th Cir. 2019), Mot. at 34, do not suggest a different conclusion. In *Galactica Star*, unlike in this case, the Government did not plead admiralty jurisdiction, and there is good reason for this. While one of the defendant assets in *Galactica Star* was a yacht, the other defendant assets were real property located in New York and California, and a corporate promissory note. *See United States v. M/Y Galactica Star et al.*, No. 4:17-cv-02166 (S.D. Tex.), ECF No. 1. Moreover, by the time the case reached the Fifth Circuit, the relevant claimant had dismissed its claim to the yacht, meaning the only assets in dispute were the non-maritime assets. *Galactica Star*, 784 F. App'x at 271, 274. Given this, it is unsurprising that the Government told the Fifth Circuit that *Galactica Star* was not an admiralty case. The situation is quite different here, where the only defendant asset is a yacht and the Government has pled admiralty jurisdiction.

Finally, even if this Court were to hold that the Government's invocation of admiralty jurisdiction was improper (and the Court should not so hold), that would not be grounds to dismiss the FAC. At most, it would be grounds to disregard the invocation of admiralty jurisdiction. The FAC pleads other bases for jurisdiction that Claimants do not challenge, and thus the survivability of the FAC does not depend on whether the Court deems this case an admiralty case.

## IV.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court deny Claimants' motion to dismiss.

Dated: New York, New York
      April 19, 2024

                                           Respectfully submitted,

MARGARET A. MOESER                        DAMIAN WILLIAMS
Acting Chief                                  United States Attorney for the
Money Laundering and Asset Recovery     Southern District of New York
Section, Criminal Division                   U.S. Department of Justice
U.S. Department of Justice

By:  /s/ *Joshua L. Sohn*               By:  /s/ *Jennifer Jude*
   JOSHUA L. SOHN                 JENNIFER JUDE
   Trial Attorney                     Assistant United States Attorney
   Money Laundering and Asset          Southern District of New York
   Recovery Section

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice

By:  /s/ *Yifei Zheng*
   YIFEI ZHENG
   Trial Attorney
   Counterintelligence and Export
   Control Section