UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

      Plaintiff,

- v. -

THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO,

      Defendant-*In-Rem*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

23 Civ. 9304 (DEH)

# MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES OF AMERICA'S MOTION TO STRIKE THE CLAIM, OR FOR SUMMARY JUDGMENT, FOR LACK OF STANDING

JENNIFER JUDE
Assistant United States Attorney

JOSHUA L. SOHN
Trial Attorney,
Money Laundering and Asset
Recovery Section

YIFEI ZHENG
Trial Attorney,
Counterintelligence and Export
Control Section

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset
Recovery Section, Criminal Division
U.S. Department of Justice

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export
Control Section, National Security
Division
U.S. Department of Justice

Table of Contents

Preliminary Statement ................................................................................................................1

Procedural History ....................................................................................................................2

Statement of Facts .....................................................................................................................3

Argument ...................................................................................................................................9

    I.    The Court Should Strike the Claim for Lack of Standing ............................................9

        A.  Legal Standards ................................................................................................9

        B.  Bare Legal Title to Property Is Insufficient to Establish Standing to Contest Its Forfeiture ................................................................................................. 11

        C.  Claimants Lack Standing to Challenge Forfeiture Because They Are Mere Straw Owners ............................................................................................. 14

Conclusion ............................................................................................................................... 15

## Table of Authorities

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 10, 11

*Anemone v. Metro. Transp. Auth.*,
  629 F.3d 97 (2d Cir. 2011) ............................................................................................ 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................................................... 10

*Matsushita Elec. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...................................................................................................... 10

*Mercado v. U.S. Customs Service*,
  873 F.2d 641 (2d Cir. 1989) ............................................................................................ 9

*Name of Ladislao V. Samaniego, VL: $446,377.36*,
  835 F.3d 1159 (9th Cir. 2016) ....................................................................................... 11

*Shannon v. N.Y.C. Transit Auth.*,
  332 F.3d 95 (2d Cir. 2003) ............................................................................................ 10

*U.S. Currency*,
  2013 WL 2446486 (D. Conn. June 5, 2013) ........................................................... 12, 14

*U.S. Currency*,
  240 F. Supp. 2d 220 (E.D.N.Y. 2003) ........................................................................... 10

*U.S. Currency*,
  307 F. App'x 251 (11th Cir. 2006) .................................................................................. 9

*U.S. Currency*,
  583 F. Supp. 2d 725 (M.D.N.C. 2008) .......................................................................... 12

*U.S. Currency*,
  950 F.2d 1108 (5th Cir. 1992) ........................................................................................ 9

United States v. $829,422.42,
  561 F. App'x 100 (2d Cir. 2014) ................................................................................... 11

United States v. All Assets Held at Bank Julius,
  480 F. Supp. 3d 1 (D.D.C. 2020) .................................................................................... 9

United States v. Cambio Exacto,
  166 F.3d 522 (2d Cir. 1999) ........................................................................... 9, 11, 12, 15

*United States v. Ida*,
  14 F. Supp. 2d 454 (S.D.N.Y. 1998) .................................................................................. 12

*United States v. New Silver Palace Restaurant, Inc.*,
  810 F. Supp. 440 (E.D.N.Y. 1992) ................................................................................... 11

*United States v. One 1974 Jensen Interceptor, Vin #23109665*,
  1985 WL 3814 (S.D.N.Y. Nov. 19, 1985) ........................................................................ 13

*United States v. One 1982 Porsche 928*,
  732 F. Supp. 447 (S.D.N.Y. 1990) ........................................................................ 9, 12, 13

*United States v. One 1986 Volvo 750T*,
  765 F. Supp. 90 (S.D.N.Y. 1991) ....................................................................................... 9

*United States v. One Parcel of Real Estate Commonly Known as 2030 East Monroe Street*,
  884 F. Supp. 1218 (C.D. Ill. 1995) .............................................................................. 12, 14

*United States v. One Red 2003 Hummer H2*,
  234 F.Supp.3d 415 (W.D.N.Y. 2017) .......................................................................... 11, 13

*United States v. PokerStars*,
  2012 WL 1659177 (S.D.N.Y. May 9, 2012) .................................................................... 11

*United States v. Premises & Real Property at 500 Delaware Street*,
  868 F. Supp. 513 (W.D.N.Y. 1994) .................................................................................. 11

*United States v. Premises & Real Property at 9276 Ridge Road*,
  2018 WL 4681773 (W.D.N.Y. Sept. 28, 2018) ................................................................. 10

*United States v. Vehicle: One 1990 Nissan Pathfinder, VIN: JN8HD 17YOLW213075*,
  1994 WL 476704 (N.D.N.Y. Sept. 2, 1994) ..................................................................... 14

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000) ................................................................................................ 10

Plaintiff United States of America (the "Government"), by its undersigned attorneys, respectfully submits this motion to strike the claim of claimants Eduard Khudainatov and Millemarin Investments Ltd. ("Claimants") pursuant to Rule G(8)(c)(i)(B) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, or Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Claimants allege that Eduard Khudainatov is and has always been the ultimate beneficial owner or "UBO" of the *Amadea* and has owned it through his company Millemarin since August 2021. But in September 2021, Claimants entered into an agreement to sell the *Amadea* to Errigal Marine Limited, a company owned by Evgeny Kochman, the president of yacht management and brokerage company Imperial Yachts SARL, for €225 million. Errigal then paid Millemarin that full amount and Millemarin gave away the right to use the vessel, the right to obtain income or additional proceeds from its sale, and the responsibility for paying for its upkeep. Claimants have not had dominion or control over the *Amadea* or any financial stake in it ever since, retaining, at most, only title.

Based on these undisputed facts taken from Claimants' own submissions—their verified claim, their responses to the Government's special interrogatories, and the documents referenced therein—Claimants are mere straw owners of the *Amadea*, holding title to it for another. In the Second Circuit, bare legal title is insufficient to establish standing because straw owners are not "real" owners and thus suffer no injury from the forfeiture of their nominal property. Because Claimants have failed to meet their burden to establish standing to contest forfeiture, the Court should grant this motion and strike Claimants' claim.

## PROCEDURAL HISTORY

On October 23, 2023, the Government commenced this case by filing its verified complaint. ECF No. 1.[1] On November 28, 2023, Claimants filed a verified claim asserting that Khudainatov "is and has always been the ultimate beneficial owner of the Defendant-In-Rem." ECF No. 9 (the "Claim") ¶ 1; *see id.* ¶ 7. Khudainatov claims to own the *Amadea* through Millemarin, a company incorporated in the British Virgin Islands on June 10, 2021. *Id.* ¶ 4. Claimants assert that Millemarin purchased the *Amadea* on July 20, 2021, "by way of a sales purchase agreement concluded with Nereo Management Limited," another entity that Khudainatov also claims to own. Claim Ex. 21; *see also* Ex. A[2] at 8-9. According to Claimants, Millemarin has been the "legal owner" of the *Amadea* since August 16, 2021. Claim ¶¶ 1, 3 & Claim Ex. 3.

On February 9, 2024, the Government served Claimants with a set of special interrogatories requesting information about Claimants' alleged ownership of the *Amadea*. Jude Decl. ¶ 2. Several of the interrogatories requested information about Millemarin's September 2021 agreement to sell the *Amadea* to Errigal Marine Ltd. ("Errigal") for €225 million, a transaction that the Claim had not addressed. *See* Ex. A; *see also* FAC ¶¶ 30, 33-37. Claimants initially refused to provide meaningful responses to most of the special interrogatories, including those concerning the Errigal transaction. *See* ECF Nos. 67, 74, 76. Ultimately, however, Claimants served amended responses, which included their explanation of the Errigal transaction. *See* Ex. A at 13-16. At the Government's request, Claimants also produced copies of four documents related to the Errigal

---

[1] On February 16, 2024, the Government filed its First Amended Complaint, which is the operative complaint. ECF No. 37 ("FAC"). The FAC alleges that Khudainatov "has functioned as a straw owner of the *Amadea* and other superyachts," including for sanctioned persons. FAC ¶ 15; *see id.* ¶ 45.

[2] Unless otherwise stated, all "Ex." citations are to the exhibits to the Declaration of Jennifer Jude ("Jude Decl.") submitted with this motion.

transaction referenced in their amended responses: (1) a September 3, 2021 agreement between Khudainatov and Kochman, Ex. B[3]; (2) a November 22, 2021 addendum to that agreement, Ex. C; (3) an undated document entitled "Addendum Two – Vessel '*Amadea*,'"[4] Ex. D; and (4) a March 10, 2022 Instrument of Transfer of Shares, Ex. E. To date, Claimants have not produced any other documents in discovery. Jude Decl. ¶ 10; *see* ECF No. 86 at 3.

## STATEMENT OF FACTS

The record reveals the following facts, which are undisputed for the purpose of this summary judgment motion, except where indicated.[5]

On July 20, 2021, the *Amadea's* then-holding company, Nereo Management Limited ("Nereo"), entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea* for the purchase price of approximately €243,820,000 (the "July MOA"). Ex. F. The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all running costs would be borne by the seller (Nereo) until the sale was complete. Ex. F. On August 16, 2021, title to the *Amadea* was transferred from Nereo to Millemarin, as contemplated by the July MOA, but the purchase price was only €1.[6] Claim Ex. 3.

---

[3] As Exhibits B and C to the Jude Declaration were in Russian, the Government translated them into English and provides copies of the certified translations as Exhibits B-1 and C-1. On May 9, 2024, the Government provided these translations to Claimants and asked whether they had any objections to the translations and Claimants responded with a few non-substantive changes; copies of redlines showing those changes are provided as Exhibits B-2 and C-2. Jude Decl. ¶ 11

[4] According to Claimants' amended responses to the special interrogatories, the date of this addendum is November 30, 2021. Ex. A at 15.

[5] Given the early stage of discovery, the Government reserves the right to challenge Claimants' factual representations at a later stage of the case when discovery is further developed. However, the Government brings this motion now because, even accepting Claimants' representations as true, they lack standing.

[6] Khudainatov claims that he "is and has always been the ultimate beneficial owner" of the *Amadea*, Claim ¶ 1; that he financed the *Amadea's* building and "caused the creation" of the Nereo

3

On September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, committing to sell the *Amadea* for the purchase price of €225 million (the "September MOA"). Ex. G at IY 000005. Errigal had been incorporated in the Cayman Islands on September 8, 2021, and its shares are owned solely by Kochman. Ex. A at 11; Ex. H.

Pursuant to the terms of the September MOA, the purchase price for the *Amadea* was divided into two payments, the first of which was due within three days (*i.e.*, by September 17, 2021), in the amount of €45 million (20% of the total price), and the second of which was due by November 1, 2021, for the remaining €180 million. Ex. G at IY 00006. Under the September MOA, title to the *Amadea* would be re-registered "upon receipt of full payment" on November 1, 2021. Ex. G at IY 000007. Unlike traditional sales agreements, and unlike the July MOA, the September MOA granted the buyer (Errigal) exclusive use rights to the *Amadea* before the sale was completed. *Id.* at IY 000008. After the initial €45 million payment was made, Errigal was entitled to use the *Amadea* and was required to pay for "all running costs," such as operational, technical, and crew costs. *Id.* at IY 000006-08. It also bore all risk of loss, damage, or destruction of the *Amadea*. *Id.* Millemarin was prohibited from using the yacht going forward, even before the

---

entity, which held the title of the vessel "[f]rom the time it was delivered [by the builder] until August 16, 2021," Ex. A at 8-9; and that he has remained the *Amadea's* UBO through Millemarin since August 16, 2021, *id.* However, Imperial Yachts has repeatedly and across many years represented that the UBO of the *Amadea* is Alexander Smuzikov. Indeed, a March 13, 2017 due diligence letter signed by Imperial Yachts manager Julia Stewart states that Smuzikov was the "primary investor" in the *Amadea* and its UBO. Ex. I. Smuzikov was listed as the UBO of the *Amadea* (owning it through Nereo) on a due diligence form dated March 26, 2018, maintained by Fiduchi, a Bailiwick of Jersey-based financial services company used by Imperial Yachts. Ex. J. Imperial Yachts continued to tell Fiduchi that Smuzikov was the Amadea's UBO until March 16, 2022, when Imperial Yachts "changed" the UBO from Smuzikov to Khudainatov "without explanation or comment" causing Fiduchi to consider "whether we should actually freeze all accounts across the Imperial portfolio until all have been properly reviewed." Ex. K.

initial payment was made. *Id.* at IY 000008. Millemarin was also barred from entering into "any other agreement for the sale of the vessel." *Id.*[7]

Errigal paid Millemarin the first installment of €45 million on September 17, 2021. Ex. A at 19; Ex. G at IY 000002. Errigal paid Millemarin the balance, €180 million, on October 27, 2021. Ex. A at 19; Ex. G at IY 000002. As provided for in the September MOA, the *Amadea* was delivered to the waters off the South of France in October 2021, and Claimants have not had possession since at least then. *See* Ex. G at IY 000006; Ex. L.

According to Claimants, "the Errigal 'transaction' was a contemplated transaction between Mr. Khudainatov and Mr. Kochman" that "was started but never completed." Ex. A at 13. Claimants allege that the two men "had a long-standing disagreement over investment and sales strategy for the Amadea" in that Kochman believed "that the Amadea could be chartered, and that chartering the Amadea would not only cover its running costs, but also could generate profits and improve the prospects of a sale." *Id.* Claimants contend that Khudainatov, on the other hand, "believed that chartering the Amadea would reduce its value and make it harder to sell." *Id.* As a result, the two men reached "a compromise agreement" on September 3, 2021, that Claimants describe as follows:

> Mr. Khudainatov would transfer to Mr. Kochman temporary use of the Amadea, including the right to charter the vessel and search for buyers, and the responsibility for paying its maintenance costs. The agreement provided for a transfer of €225,000,000. It also provided that Mr. Kochman would have right to charter profits and any sale proceeds in excess of €225,000,000.

---

[7] Claimants state that neither party to the September MOA "arranged for a Sea Trial" which was a condition precedent for the transfer of a vessel, Ex. A at 14, however the September MOA explicitly states that Errigal conducted a sea trial of the *Amadea* on September 11, 2021, Ex. G at IY 000007 ("The BUYER has conducted a sea trial of the VESSEL on 11 September 2021 and has accepted the VESSEL."); *id.* at IY 000009 ("The BUYER carried out a sea trail [sic] on 11 September 2021. The VESSEL is sold as seen and as is.").

5

*Id.* at 13-14. Consistent with this description, the purported September 3, 2021 "cooperation agreement" states that Khudainatov "is obligated to transfer the Yacht for use and management of [Kochman] with the possibility of carrying out any actions for the lease of the Yacht and the obligation to bear the costs of maintaining the Yacht, subject to payment by [Kochman] of the full redemption value of the Yacht in the amount of EUR 225,000,000." Ex. B-1. Further, Kochman agreed to "bear all costs for the maintenance of the Yacht" immediately upon the signing of the cooperation agreement, *i.e.*, as of September 3, 2021. *Id.* Kochman received the right to charter the yacht on terms he determined, to keep all payments from charters, to search for "potential buyers of the Yacht," and to keep all proceeds of any sale to any such buyer.[8] *Id.* The document states that Kochman would "[a]rrange the sale of the Yacht no later than" December 1, 2021. *Id.*

According to Claimants, even though the September MOA specified a completion date for the sale of the *Amadea* to Errigal of November 1, 2021, "the intention of the parties as reflected in the September 3, 2021 [cooperation] agreement, was for the completion date to be December 1, 2021, assuming Mr. Kochman was able to find a bona-fide buyer by that date."[9] Ex. A at 14. Claimants represent that Kochman was not able to find a buyer by mid-November and therefore the parties "agreed in writing to delay the deadline by which Mr. Kochman was required to sell the Amadea until May 1, 2022," Ex. A at 14-15, and did so via a November 30, 2021 addendum to the September MOA, *see* Ex. D.[10] This addendum reaffirmed that Errigal was responsible for

---

[8] Consistent with this, Claimants have stated that they have not received any other payments or income in connection with their interest in the *Amadea* since entering into the September MOA and September 3 cooperation agreement (other than the €225 million). *See* Ex. A at 26.

[9] While Claimants state that the September MOA "was drafted to correspond with" the September 3 cooperation agreement, Ex. A at 14, the September MOA contains an integration clause that states that it constitutes "the entire Agreement between the Seller and the Buyer." Ex. G at IY 000010.

[10] Kochman and Khudainatov also entered into a corresponding addendum to the September 3,

all costs and risks associated with the *Amadea* "including but not limited to total loss of the Yacht." Ex. D. None of the parties' agreements contains any provision for returning the *Amadea* to Millemarin/Khudainatov (or for Millemarin/Khudainatov to return the €225 million to Kochman/Errigal) in the event that Kochman failed to find a "bona fide buyer." Exs. B-1, C-1, D, E, G.

During the period immediately after these agreements were signed, in which Kochman and Imperial Yachts were supposedly seeking another buyer for the *Amadea*, Imperial Yachts represented to third parties that the vessel's owner had "decided to withdraw Amadea from sale for the time being," Ex. M, and turned away inquiries from potential purchasers, *see* Ex. N. Meanwhile, Imperial Yachts was facilitating the *Amadea's* use by Suleiman Kerimov and his family who, after directing initial renovations and using the yacht in October 2021, began planning a further major renovation of the vessel, as well as additional voyages on the *Amadea* through late 2023. Specifically, Kerimov and his assistant Dinar Khalikov stayed on the *Amadea* in mid-October 2021. *See* Ex. L (October 17, 2021 *Amadea* manifest); Ex. O (version of same manifest showing Kerimov's was assigned call sign "G1"). The *Amadea's* crew compiled Kerimov's "preferences" for this voyage, Ex. P, and one of the co-captains memorialized feedback from a "walkaround with O.Rep Mr. Dinar" regarding changes to be made to the *Amadea's* interior "[w]ith assistance from ZID [Zuretti Interior Designers] managers," Ex. Q; *see also* Ex. R (October 18, 2021 list of "Action Points" resulting from October 2021 Kerimov voyage describing some of the planned renovations to the *Amadea* in "Spring 2022"). Shortly after this in October 2021 trip, the *Amadea* crew made plans to keep Kerimov's "Nike trainers on board for his next visit . . . [and]

---

2021 cooperation agreement dated November 22, 2021. Ex. C-1.

to always have them on board for him" as well as to have a pair of "On Clouds" as instructed by "DK," *i.e.*, Dinar Khalikov. Ex. S.

In November 2021, Imperial Yachts retained Zuretti Interior Designers to design a "refit" of the *Amadea*, which would take place over a 20-month period and cost €1 million in design fees alone. Ex. T; *see also* Ex. U ("work list" for Amadea refit describing renovations to be made in April/May 2022 and October 2022). Then, in January and February 2022, several members of Kerimov's family took the *Amadea* on a voyage around the Caribbean and nearby areas. *See* Ex. V; Ex. W. While this voyage was underway, the *Amadea's* co-captains and Imperial Yachts' "Client Coordinator" emailed about the destinations Kerimov (G1) proposed for the *Amadea* for later in 2022 and in 2023 as well as Kerimov's daughter's (G3) destination preferences. Ex. X; Ex. Y. Consistent with their agreement to relinquish control over the *Amadea's* use and costs, Claimants were not involved in any of these decisions. *See* Exs. L, O-Y.

On March 7, 2022, Millemarin, its holding company Invest International Finance Ltd. ("IIF"), and Errigal entered into an amendment to the September MOA. Ex. G at IY 000001-04. Pursuant to the amendment, Errigal would acquire 100% of the shares in Millemarin from IIF in exchange for the previous payment of €225 million.[11] *Id.* at IY 000002; *see also* Ex. A at 15. By structuring the transaction in this manner, Errigal would acquire title of the *Amadea* without needing to re-register the vessel with Cayman Islands authorities (as it was already registered in Millemarin's name). Claim Ex. 4. The parties agreed that the share transfer would close on or before March 15, 2022. Ex. G at IY 000003. IIF signed an Instrument of Transfer of Shares dated March 10, 2022, that, if countersigned by Errigal, would have completed the transfer of

---

[11] Khudainatov is the sole sharedholder of IIF. Claim ¶ 1.

Millemarin's shares. *See* Ex. E. However, according to Claimants, this transaction never closed because complications arose following Russia's invasion of Ukraine and "Mr. Kochman told Mr. Khudainatov that he did not want to close the transaction, and Mr. Khudainatov did not object." Ex. A at 15; *see also* Ex. E.

In April 2022, the *Amadea* was seized by authorities in Fiji. ECF No. 35 ¶ 3. It has been in the custody of the U.S. Marshals Service since approximately June 2022. *Id.*; *see* ECF No. 34.

## ARGUMENT

### I. The Court Should Strike the Claim for Lack of Standing

#### A. Legal Standards

"In order to contest a governmental forfeiture action, claimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." *United States v. Cambio Exacto*, 166 F.3d 522, 526 (2d Cir. 1999). Under Supplemental Rule G(8)(c), the Government may move to strike a claim "[a]t any time before trial" for lack of standing. Supp. R. G(8)(c)(i). The Government's motion to strike "must be decided before any motion by the claimant to dismiss the action," Supp. R. G(8)(c)(ii)(A). This serves the important function of "ensur[ing] that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *United States v. All Assets Held at Bank Julius*, 480 F. Supp. 3d 1, 12 (D.D.C. 2020); *see United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1111-13 (5th Cir. 1992) ("Unless claimant can first establish his standing he has no right to put the government to its proof").

A motion to strike may be presented in one of three ways: (1) as a motion for judgment on the pleadings, (2) as a motion for summary judgment, or (3) as a motion following an evidentiary hearing. Supp. R. G(8)(c)(ii)(B). At all stages, the burden of proof to establish standing rests with the claimant. *Mercado v. U.S. Customs Service*, 873 F.2d 641, 644 (2d Cir. 1989); *United States*

9

*v. One 1986 Volvo 750T*, 765 F. Supp. 90, 91 (S.D.N.Y. 1991); *United States v. One 1982 Porsche 928*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990); *see also United States v. Nine Hundred Sixty Thousand Dollars in U.S. Currency*, 307 F. App'x 251, 255 (11th Cir. 2006) ("Since standing is not a mere pleading requirement but, rather, is an indispensable part of a claimant's case, the alleged ownership interest in the seized property must be supported in the same way as any other matter on which the claimant bears the burden of proof.").

"When the government moves for summary judgment in a forfeiture proceeding, that claim of ownership will be scrutinized in a manner consistent with the principles of Rule 56 of the Federal Rules of Civil Procedure." *United States v. $138,381, in U.S. Currency*, 240 F. Supp. 2d 220, 227 (E.D.N.Y. 2003). Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (citing *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also* Fed. R. Civ. P. 56(c)(1).

In reviewing a summary judgment motion, courts construe the evidence "in the light most favorable to the non-movant and draw[s] all reasonable inferences in that party's favor." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011). However, "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), and a factual dispute does not preclude summary judgment where "the evidence is merely colorable, or is not significantly probative," *Anderson*, 477 U.S. at 249 (citation omitted).

In response to a motion to strike for lack of standing, "the claimant bears the burden of establishing standing by a preponderance of the evidence." *United States v. Premises & Real Property at 9276 Ridge Road*, No. 16-CV-318-A, 2018 WL 4681773, at *2 (W.D.N.Y. Sept. 28, 2018) (citing Supp. R. G(8)(c)(ii)(B)). "Although a claimant need not *prove* standing by a preponderance of the evidence to survive summary judgment, a court must determine that 'a fair-minded jury could return a verdict for [the claimant] on the evidence presented.' That is, the evidence set forth must be sufficient for a reasonable factfinder to conclude that the claimant has standing to challenge the forfeiture." *United States v. JP Morgan Chase Bank Acct. No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1164 (9th Cir. 2016) (quoting *Anderson*, 477 U.S. at 252).

### B. Bare Legal Title to Property Is Insufficient to Establish Standing to Contest Its Forfeiture

To have Article III standing, a claimant must demonstrate an "ownership or possessory interest in the seized or forfeited property." *United States v. PokerStars*, No. 11 Civ. 2564 (LBS), 2012 WL 1659177, at *2 (S.D.N.Y. May 9, 2012) (citing *Cambio Exacto*, 166 F.3d at 527). "If the claimant cannot show a sufficient interest in the property to give him Article III standing there is no case or controversy, in the constitutional sense, capable of adjudication in the federal courts." *United States v. New Silver Palace Restaurant, Inc.*, 810 F. Supp. 440, 442 (E.D.N.Y. 1992) (internal quotation marks, alterations, and citations omitted).

Bare legal title alone—that is, "possession of mere title by one who does not exercise dominion and control over the property"—is insufficient to establish standing. *United States v. Premises & Real Property at 500 Delaware Street*, 868 F. Supp. 513, 518 (W.D.N.Y. 1994), *aff'd* 113 F.3d 310 (2d Cir. 1997); *see United States v. $829,422.42*, 561 F. App'x 100 (2d Cir. 2014) ("In order to have standing to challenge the forfeiture of property, one must be more than a mere

'straw owner[]' who holds title for some unknown person."); *United States v. One Red 2003 Hummer H2*, 234 F.Supp.3d 415, 419 (W.D.N.Y. 2017) ("Thus, in determining standing in civil forfeiture cases, the court must look beyond bare legal title and examine whether the record owner is the true owner, or merely a 'strawman' set up to avoid forfeiture."); *United States v. $829,422.42 in U.S. Currency*, No. 3:08-cv-00914 (DJS), 2013 WL 2446486, at *7 (D. Conn. June 5, 2013) ("However, in the context of forfeitures, it is settled law that possession of bare legal title by one who does not exercise dominion and control over the property is insufficient to establish standing to challenge a forfeiture." (internal quotation marks omitted)); *United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990) ("A search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture.").

Straw owners lack standing because they do not have a real interest in the property and therefore do not suffer an actual or imminent injury from its forfeiture. As the Second Circuit explained in *Cambio Exacto*, "an owner of property seized in a forfeiture action will normally have standing to challenge the forfeiture" because ownership is "often [a] reliable indicator[] of injury that occurs when property is seized." 166 F.3d at 527. However, "it is the injury to the party seeking standing that remains the ultimate focus. It is because of the lack of proven injury that we have, for example, denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else. Such owners do not themselves suffer an injury when the property is taken." *Id.* (citing *500 Delaware Street*, 113 F.3d at 312).

"Moreover, numerous cases hold that once the government makes a *prima facie* showing that a third-party claimant is a 'straw,' the claimant must 'present evidence of dominion and control

or other indicia of true ownership' or have its claim dismissed for lack of standing." *United States v. Ida*, 14 F. Supp. 2d 454, 459-60 (S.D.N.Y. 1998); *see United States v. One Parcel of Real Estate Commonly Known as 2030 East Monroe Street*, 884 F. Supp. 1218, 1223 (C.D. Ill. 1995); *United States v. $7,000,000 in U.S. Currency*, 583 F. Supp. 2d 725, 729 & n.4 (M.D.N.C. 2008) (calling this "the 'dominion and control' test"); STEFAN D. CASSELLA, ASSET FORFEITURE LAW IN THE UNITED STATES, 519 (3d ed. 2022) ("[T]he majority rule is that in addition to showing legal title to the property, the claimant must show that he exercised dominion and control over it, consistent with the rights of the true owner."). In such cases, the issue of ownership "turns primarily upon the identity of the individual exercising dominion and control over the vehicle, he (or she) being regarded as its true owner." *One Red 2003 Hummer H2*, 234 F. Supp. 3d at 419 (citing *United States v. One 1974 Jensen Interceptor, Vin #23109665*, No. 82 CIV. 7215-CSH, 1985 WL 3814, at *3 (S.D.N.Y. Nov. 19, 1985)).

For example, in *500 Delaware Street*, the Second Circuit affirmed a grant of summary judgment for the government because the claimant "was only a straw owner and thus lacked standing to contest the forfeiture" where he had legal title to the property but his son "continued in possession and management of the property," "received all rental payments and was responsible for leasing when vacancies occurred," and "made mortgage, property tax, and insurance payments, paid utility bills, and maintained the property and made repairs." 113 F.3d at 312. Similarly, in *One 1982 Porsche 928*, the court held that the claimants lacked standing to challenge forfeiture of a vehicle where they "held neither a possessory nor controlling interest" in it and had "no financial stake" in it and were therefore merely "nominal" owners. 732 F. Supp. at 452.

### C. Claimants Lack Standing to Challenge Forfeiture Because They Are Mere Straw Owners

The undisputed facts show that while Millemarin still holds title to the *Amadea*, Claimants have no financial, possessory, or controlling interest in it. *See* Government's Local Civil Rule 56.1 Statement ("56.1 Stmt."). Claimants are merely nominal owners, and their claim should be stricken.

Claimants have no financial stake in the *Amadea* as they have been fully paid for it and are insulated from any potential losses or gain associated with it. *See 500 Delaware Street*, 113 F.3d at 312 (claimant lacked standing where, despite having title to property, his son managed, maintained, and paid all bills related to the property and was responsible for leasing it and entitled to all rental payments). As of September 2021, Claimants have had no right to any financial benefit from the *Amadea*. 56.1 Stmt. ¶ 29. Under the terms of the agreements with Errigal/Kochman, all proceeds from any charters or from any future sale of the vessel belong to Errigal. *Id.* ¶ 21. Claimants are not permitted to enter into any agreement to sell the *Amadea* to anyone else. *Id.* ¶ 10. Claimants also have had no financial responsibility for the *Amadea* since September 2021 when they transferred "all running costs" for the *Amadea* and all risks to the *Amadea* to Errigal. *Id.* ¶ 30. Finally, by October 27, 2021, Claimants had been fully paid for the *Amadea*, having received the full, agreed purchase price of €225 million in two installments. *Id.* ¶ 28.

Further, Claimants relinquished their right to dominion and control over the *Amadea* when they granted Errigal the exclusive right to use it from September 2021 on. *Id.* ¶ 31. Claimants have also not been in possession of the vessel since at least October 2021 when it was delivered to Errigal in the South of France pursuant to the terms of the September MOA. *Id.* ¶ 32. Additionally, after this time, as permitted and facilitated by Kochman and Imperial Yachts, Suleiman Kerimov and his family planned the renovations to the *Amadea* and its activities and destinations, not

14

Claimants. *Id.* ¶¶ 16-17.; *see United States v. One Parcel of Real Estate Commonly Known as 2030 East Monroe Street*, 884 F. Supp. 1218, 1223 (C.D. Ill. 1995) (straw owner's "lack of involvement in the building of the new garage highlights her lack of control over the defendant property"); *$829,422.42 in U.S. Currency*, 2013 WL 2446486, at *8 (claimant who "did not have the power to make unilateral decision about the" defendant property, was merely a nominal owner who lacked standing to challenge its forfeiture); *United States v. Vehicle: One 1990 Nissan Pathfinder, VIN: JN8HD 17YOLW213075*, No. 92-CV-1336, 1994 WL 476704, at *4 (N.D.N.Y. Sept. 2, 1994) (claimant lacked standing where a third party person "paid for the defendant vehicle and exercised such complete dominion and control over [it] as to confer true ownership upon him.")

In sum, Claimants have conceded that they entered into contracts pursuant to which they gave up dominion, control, possession, and their financial stake in the *Amadea*. They were fully paid for the vessel years ago and have had minimal involvement with it since then. Claimants are not true owners—they are straw owners who are holding title to the vessel on behalf of another. As such, they will suffer no injury in fact from the vessel's forfeiture. *Cambio Exacto*, 166 F.3d at 527. They are merely a facade and lack Article III standing to participate in this case.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court strike the Claim of Khudainatov and Millemarin pursuant to Supplemental Rule G(8)(c)(i)(B) because they have failed to meet their burden to establish standing to contest forfeiture.

Dated: New York, New York
May 17, 2024

Respectfully submitted,

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

By:  /s/ *Joshua L. Sohn*
    JOSHUA L. SOHN
    Trial Attorney
    Money Laundering and Asset
    Recovery Section

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
U.S. Department of Justice

By:  /s/ *Jennifer Jude*
    JENNIFER JUDE
    Assistant United States Attorneys
    Southern District of New York

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice

By:  /s/ *Yifei Zheng*
    YIFEI ZHENG
    Trial Attorney
    Counterintelligence and Export
    Control Section

16