UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,

        Plaintiff,

        - v. -

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,

        Defendant-*In-Rem*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

:      23 Civ. 9304 (DEH)

## UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF MOTION FOR ISSUANCE OF LETTERS OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE

JENNIFER JUDE
Assistant U.S. Attorney
Southern District of New York (SDNY)

DAMIAN WILLIAMS
U.S. Attorney
SDNY

JOSHUA L. SOHN
Trial Attorney
Money Laundering and Asset
Recovery Section

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset
Recovery Section, Criminal Division

YIFEI ZHENG
Trial Attorney
Counterintelligence and Export
Control Section

JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export
Control Section, National Security
Division

Plaintiff United States of America ("the Government") respectfully submits this Memorandum in support of its Motion for Issuance of Letters of Request pursuant to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention").

As the Court is aware, this is a civil forfeiture case alleging that the superyacht M/Y *Amadea* is forfeitable as proceeds of sanctions violations and as property involved in money laundering. The Government alleges that the *Amadea* is owned by sanctioned Russian oligarch Suleiman Kerimov and has been maintained through commercial transactions with U.S. companies and through the U.S. financial system, in violation of the sanctions against Kerimov and his property. Claimant Eduard Khudainatov—a Russian businessman not under U.S. sanctions—claims that he (not Kerimov) is the true owner of the *Amadea* as well as the *Amadea*'s sister ships, the M/Y *Crescent* and M/Y *Scheherazade*.[1]

The Government now seeks testimony pursuant to Chapter I of the Hague Evidence Convention from four foreign witnesses, three located in the United Kingdom and one located in France.

The first UK witness is ███████, the *Amadea*'s co-captain during the period of time (Sept. 2021-April 2022) that the Government alleges Kerimov owned and controlled the *Amadea*. ████ is likely to have knowledge about whether Kerimov was indeed the owner during this time. ████ could also testify about the extent to which the *Amadea*'s co-captains shared ownership knowledge between themselves (*e.g.*, if one co-captain knew who owned the vessel, whether he would have shared that knowledge with the other co-captain). ████ could

---

[1] These three ships were commissioned as part of a three-ship build from Lurssen shipyards in Germany.

also testify about the extent to which the *Amadea*'s management company (Imperial Yachts) and Imperial Yachts' President (Evgeny Kochman) were involved in approving vendor invoices for the *Amadea*. This is relevant to the Government's allegation that Imperial Yachts and Kochman willfully violated IEEPA by helping to pay *Amadea* vendor invoices despite knowing that the *Amadea* was owned by a sanctioned individual and knowing that such sanctions prohibited U.S. monetary transactions to support the vessel.

The second UK witness is ████████████, the *Amadea*'s security officer during the same relevant timeframe. Like █████, ██████████ could testify about whether Kerimov owned the *Amadea*. Indeed, when ███████ was stopped by U.S. Customs and Border Patrol in April 2022 en route to the *Amadea*, he stated that Kerimov owned the vessel.

The third UK witness is ████████, one of the *Amadea*'s co-captains from at least 2020 through September or early October 2021. ████ could also testify about whether he understood Kerimov to own the vessel, as █████ tenure as captain ended just after Kerimov allegedly purchased the vessel in September 2021. Additionally, the Government believes ████could testify about Kerimov family visits to the vessel *before* September 2021, as Kerimov "tested out" the vessel and considered whether to purchase it.

The lone French witness is ████████████, the CEO of ████████████, the company that handled interior design for the *Amadea*, *Crescent*, and *Sheherazade*. As alleged by the Government's First Amended Complaint (Dkt. 37 at ¶ 48), ████████ had a meeting with Russian oligarch Igor Sechin and Sechin's then-wife in 2014 to discuss the interior design of the *Crescent*, which was then under construction. The Government primarily seeks testimony from ████████ about this meeting. The fact that ████████ met with Sechin and his wife to discuss the interior design of the *Crescent* creates a strong inference that Sechin was the true

owner of the *Crescent*, particularly if Sechin or his wife gave substantial design instructions to

███████ during this meeting. Indeed, the Government believes ███████ will testify that he

understood Sechin to be the *Crescent*'s owner. This testimony, in turn, would damage Claimant

Khudainatov's credibility by rebutting his story that he owned all three sister yachts (*Amadea,*

*Crescent, Scheherazade*) from inception.

**ARGUMENT**

I.         The Court Has Authority to Issue the Letters of Request

Congress has authorized this Court to issue Letters of Request for the production of

documents and testimony from non-parties located in foreign countries for use in an action

pending in the United States.  *See* 28 U.S.C. § 1781(b)(2) (permitting "the transmittal of a letter

rogatory or request directly from a tribunal in the United States to the foreign or international

tribunal, officer, or agency to whom it is addressed and its return in the same manner").

The United Kingdom, France, and the United States are signatories to the Hague

Evidence Convention.  *See Status Table*, *Convention of 18 March 1970 on the Taking of*

*Evidence Abroad in Civil or Commercial Matters*, Hague Conference on Private Int'l Law,

https://www.hcch.net/en/instruments/conventions/status-table/?cid=82; *Hague Evidence*

*Convention Acceptances of Accessions*, Hague Conference on Private Int'l Law,

https://assets.hcch.net/docs/ f094fd72-6213-4950-96ea-955f41a311eb.pdf.  Pursuant to the

Hague Evidence Convention, "[i]n civil or commercial matters a judicial authority of a

Contracting State may, in accordance with the provision of the law of that State, request the

competent authority of another Contracting State, by means of a Letter of Request, to obtain

evidence, or to perform some other judicial act."  Hague Evidence Convention, Art. 1, Mar. 18,

1970, 23 U.S.T. 2555.  The Supreme Court has recognized that the Hague Evidence Convention

is "intended to establish optional procedures that would facilitate the taking of evidence abroad." *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 538 (1987).

II.    <u>The Requests are Relevant and Likely to Lead to Material Evidence</u>

"The decision of whether to issue letters rogatory is within the discretion of the court." *SEC v. Rayat*, No. 21-CV-4777, 2023 WL 1861498, at *3 (S.D.N.Y. Feb. 9, 2023) (quoting *Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019)).  In deciding whether to issue Letters of Request, "U.S. courts apply the discovery principles contained in Rule 26" of the Federal Rules of Civil Procedure.  *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 776 (S.D.N.Y. 2012); *accord Rayat*, 2023 WL 1861498, at *3; *Villella v. Chem. & Mining Co. of Chile Inc.,* No. 15 CIV. 2106, 2018 WL 2958361, at *3 (S.D.N.Y. June 13, 2018).  Federal Rule of Civil Procedure 26(b)(1) permits parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," and such material need not be admissible. Fed. R. Civ. P. 26(b)(1).  "Courts routinely issue such letters where the movant makes a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence." *Netherby Ltd. v. Jones Apparel Grp., Inc.*, No. 04 CIV. 7028, 2005 WL 1214345, at *1 (S.D.N.Y. May 18, 2005).

The Rule 26 relevance and proportionality standard is easily met here. As summarized above, the three UK witnesses could each provide testimony about the true beneficial owner of the *Amadea*, which is perhaps the pre-eminent factual dispute in this case. As for the French witness ███, his testimony about the *Crescent*'s ownership could be key to testing Claimant

Khudainatov's credibility by challenging Khudainatov's story that he owned the *Amadea*, *Crescent*, and *Scheherazade.*

III.     Comity Considerations Favor Issuing the Letters of Request

When considering whether to authorize international discovery through the Hague Evidence Convention, courts in this District consider international comity concerns. *See Lantheus Med. Imaging, Inc*, 841 F. Supp. 2d at 791-92 (considering comity issues raised by motion for issuance of letters rogatory). Courts generally apply the following comity factors, endorsed by the Supreme Court, to determine whether to grant a request for issuance of a Letter of Request:

> (1) the importance to the litigation of the documents requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Société Nationale Industrielle Aérospatiale*, 482 U.S. at 544 n.28.

Here, these factors support issuing the Letters of Request. *First*, as set out above, the testimony sought is particularly important to the Government's claims in this litigation. *Second*, the testimonial requests are narrow and specific, as shown by the attached Letters of Request, and are directly relevant to key disputed issues in this case. *Third* and *fourth*, the witnesses have no presence in the United States, so the information they possess "originates" outside the United States and is unlikely to be found in the United States, which counterbalances the foreign origin of their information and favors disclosure. *See Lantheus Med. Imaging*, 841 F. Supp. 2d at 793; *Jaguar Land Rover Ltd. v. DR. ING. H.C.F. Porsche AG*, No. 21-mc-62, 2021 WL 3075698, *2 (D.D.C. June 22, 2021) (even if

the third factor weighs against issuing the letters, "the fourth [factor] . . . can overcome the third"). *Finally*, the Government has a strong and compelling interest in addressing sanctions violations under IEEPA and associated money laundering. Moreover, "[w]hen a court orders resort to the [Hague] Convention or to other means of international judicial assistance, it commits the issue whether compliance with the request would undermine important interests of the state where the information is located to the courts or other authorities of that state." Restatement (Third) of Foreign Relations Law § 473 Reporter's Note 5 (quoted in *Jaguar*, 2021 WL 3075698 at *2).

Accordingly, comity considerations favor issuing the Letters of Request to obtain limited testimony from the four identified witnesses.

For the foregoing reasons, the Government respectfully requests that the Court grant this motion and execute the attached Letters of Request.

Dated: New York, New York
       May 29, 2024

                                        Respectfully submitted,


MARGARET A. MOESER                      DAMIAN WILLIAMS
Acting Chief                            United States Attorney for the
Money Laundering and Asset Recovery     Southern District of New York
Section, Criminal Division              U.S. Department of Justice
U.S. Department of Justice


By:  /s/ *Joshua L. Sohn*               By:  /s/ *Jennifer Jude*
    JOSHUA L. SOHN                          JENNIFER JUDE
    Trial Attorney                          Assistant United States Attorney
    Money Laundering and Asset              Southern District of New York
    Recovery Section



JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


By:  /s/ *Yifei Zheng*
    YIFEI ZHENG
    Trial Attorney
    Counterintelligence and Export
    Control Section

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:23-cv-9304-DEH |
| ) | |
| M/Y AMADEA ET AL. ) | |
| ) | |
| Defendant-in-Rem. ) | |
| ) | |

**[PROPOSED] REQUEST FOR INTERNATIONAL JUDICIAL
ASSISTANCE TO COMPEL EVIDENCE FROM UNITED KINGDOM WITNESSES
PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970
ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York ("District Court") presents its compliments to the Senior Master of the High Court (King's Bench Division) of England and Wales, and requests assistance in obtaining evidence to be used in civil proceedings before this Court in the above captioned matter ("the Action"). This request is made pursuant to, and in conformity with, the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("the Hague Convention"), to which both the United States and United Kingdom are party, the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "1975 Act"), the English Civil Procedure Rules, and any other appropriate authority under the law of the United Kingdom.

Specifically, the District Court requests assistance in obtaining oral testimony for use at trial from a non-party witness who resides within your jurisdiction, ██████████.

This Court is authorized by Title 28, United States Code, sections 1781 and 1782 to extend similar assistance on request of the judicial authorities of England and Wales.

The United States District Court, through the offices of the representatives of the Plaintiff, will reimburse your court and/or office for all costs incurred in executing this Request, and the assurance of its heighted consideration.

The particulars of the Hague Evidence request are as follows:

## SECTION I

1.     **SENDER AND REQUESTING JUDICIAL AUTHORITY:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

2.     **CENTRAL AUTHORITY OF REQUESTED STATE:**

Competent Authority for England and Wales
Senior Master of the King's Bench Division
High Court of Justice
Royal Courts of Justice
Strand
LONDON WC2A 2LL
United Kingdom

3.     **PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

United States of America

***With a Copy to the Parties' Legal Representatives:***

Joshua L. Sohn
Trial Attorney, United States Department of Justice, Money Laundering and Asset Recovery
Section
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Tel:  (202) 353-2223
Fax:  (202) 616-2547
Email:  joshua.sohn@usdoj.gov

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

## 4.      SPECIFICATION OF THE DATE BY WHICH THE REQUESTING AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF REQUEST:

The requesting authority would greatly appreciate a response to the Request for

Assistance within 21 days or as soon thereafter as is practicable, so as to ensure that the

testimony is received prior to the close of discovery on August 30, 2024, and in a timely manner

for use at trial in the Action.

## <u>SECTION II</u>

In conformity with Article 3 of the Hague Convention, the undersigned applicant has the

honor to submit the following information regarding the instant request:

## 5.      (a)      REQUESTING JUDICIAL AUTHORITY (Article 3(a)):

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

United States of America

**(b)     TO THE COMPETENT AUTHORITY OF (Article 3):**

The United Kingdom of Great Britain and Northern Ireland

**I     NAMES OF THE CASE AND ANY IDENTIFYING NUMBER:**

*United States v. M/Y Amadea et al.*, No. 1:23-cv-9304-DEH, United States District Court for the Southern District of New York, New York, NY, USA

**6.     NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES (Article 3(b)):**

**(a)     Plaintiff(s):**

The United States of America, Plaintiff
c/o United States Department of Justice, Money Laundering and Asset Recovery Section (MLARS)
1400 New York Ave. NW, Suite 10100
Washington, DC 20530

Represented in the US by:

Margaret A. Moeser
Acting Chief, MLARS

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov

Represented in the UK by:

> Karen Denny
> CMS Cameron McKenna Nabarro Olswang LLP
> Cannon Place
> 78 Cannon Street
> London
> EC4N 6AF
> United Kingdom
> Telephone: +44 20 7524 6470
> Mobile: +44 7818 454381

Email: karen.denny@cms-cmno.com

(b)     **Claimant(s)[1]:**

Millemarin Investments, Ltd. and Eduard Khudainatov

Represented by:

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email: aford@fordobrien.com

**7.     (a)     NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS (Article 3(c)):**

This is a civil *in rem* forfeiture action seeking to forfeit the M/Y *Amadea*, a 106-meter superyacht.

**(b)     Summary of complaint**

In seeking to forfeit the *Amadea*, the U.S. Government alleges that the *Amadea* is beneficially owned by Suleiman Kerimov, a Russian oligarch who is under U.S. sanctions pursuant the International Emergency Economic Powers Act (IEEPA) and associated regulations. The U.S. Government further alleges that the *Amadea* has been maintained in willful violation of the sanctions against Kerimov and his property and is therefore forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C).

---

[1] In a civil *in rem* forfeiture case such as this one, the "defendant" is the *res* itself, which cannot defend itself and has no counsel. The "claimant" is the litigating party adverse to the U.S. Government, who contests the U.S. Government's right to forfeiture. By statute, claimants must be parties with an interest in the defendant *res*.

**(c)**     **Summary of defense and counterclaim**

Claimants dispute that Kerimov is the ultimate beneficial owner of the *Amadea*. Even if Kerimov is the owner, Claimants dispute whether anyone *willfully* violated IEEPA in maintaining the *Amadea* and further dispute whether maintaining the *Amadea* in violation of IEEPA would justify forfeiture of the entire vessel.

**8.     DOCUMENTS TO BE OBTAINED OR OTHER JUDICIAL ACT TO BE PERFORMED (Article 3(d)):**

**(a)**     **Description of the evidence**

The assistance requested of the United Kingdom consists of the following:

1.     The taking of oral testimony from ███████, pursuant to oath or affirmation, regarding the matters described in plaintiff's complaint for use in Court in this Action. Such testimony will be taken at a transcribed deposition. This individual is not a Defendant and is only a witness to this matter. The Plaintiff is not seeking any relief against this individual. The movant (Plaintiff U.S. Government) intends to elicit testimony from ███████ on the following topics: (a) his captaincy of the M/Y *Amadea*; (b) his knowledge of the *Amadea*'s ownership, including any actual or contemplated transfers of ownership; (c) any interactions that Suleiman Kerimov or his family had with the *Amadea*; (c) the protocols and standards for communicating information between the two co-captains of the *Amadea*; and (d) the protocols and standards for payment of vendor invoices for the *Amadea*.

**(b)**     **Purpose of the evidence sought**

The oral testimony sought in this Letter of Request pertains to the allegations described above and are to be used at trial of the Action.

## SECTION III

9.      **IDENTITY AND ADDRESS OF ANY PERSON TO BE EXAMINED (Article 3(e)):**



Also reachable through his counsel:

Susan Brune
Brune Law
450 Park Ave.
New York, NY 10022
(212) 668-1900

10.     **QUESTIONS TO BE PUT TO THE PERSONS TO BE EXAMINED OR STATEMENT OF THE SUBJECT MATTER ABOUT WHICH THEY ARE TO BE EXAMINED (Article 3(f)):**

The questions to be put to ▮▮▮▮▮▮ relate to the subject matter described in Paragraph

8 above, in addition to questions relating to preliminary matters of witness knowledge and

competence. The movant also requests the ability to ask related questions, including questions

intended to clarify any response, of ▮▮▮▮▮▮ as appropriate.

11.     **ANY REQUIREMENT THAT THE EVIDENCE BE GIVEN ON OATH OR AFFIRMATION AND SPECIFIC FORM TO BE USED (Article 3(h)):**

The Witness should be examined under oath or affirmation, or in the alternative should

be instructed on the consequences for the giving of untruthful and false answers under the laws

of England and Wales. It is also requested that the parties may, by agreement, conduct the

deposition and/or trial testimony by video or telephonic link.

12.     **SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED (Article 3(i) & 9):**

The District Court respectfully requests, with respect to the oral testimony:

(1) That the High Court appoints an Examiner for the purpose of compelling oral testimony from the witness for use at trial;

(2) That the parties' representatives or their designees, a court reporter and a videographer be permitted to be present during the examination; that the parties' representatives or designees be permitted to examine and cross-examine the witness directly, and that a court reporter and videographer be permitted to make a verbatim record of the proceedings;

(3) That, in connection with the taking of testimony of the witness, the parties have permission to refer the witness to documents previously produced or available in the Action. It is requested that counsel for the parties be notified in advance of the time and place of the proceedings and that counsel be permitted to attend in person, or by video or audio teleconference for those not able to attend in person.

It is further requested that the affirmation and oral examination be transcribed verbatim stenographically and that the written transcript be provided to:

Hon. Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America


*With a Copy to the Parties' Legal Representatives:*

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov
Counsel for Plaintiff United States of America

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com
Counsel for Claimants Millemarin Investments Ltd. and Eduard Khudainatov

It is further requested that, if any portion of this Request is deemed to be unacceptable under the laws of United Kingdom, that counsel for the parties, please be informed of that fact and be allowed to respond substantively prior to the decision and that the UK Central Authority please comply with as much of the Request as possible.

13.    **REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED (Article 7)**

It is requested that the testimony to be taken at such place, date and time as ordered by the Senior Master and/or as otherwise scheduled by the representatives of the witness and the respective representatives of the parties as listed in Paragraphs 6 and 12 above.

14.    **REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERSONNEL OF THE REQUESTING AUTHORITY AT THE EXECUTION OF THE LETTER OF REQUEST (Article 8):**

None.

15.     **SPECIFICATION OF PRIVILEGE OR DUTY TO REFUSE TO PRODUCE DOCUMENTS OR TESTIFY IN THE FORM OF A DEPOSITION UNDER THE LAW OF THE STATE OF ORIGIN (Article 11(b)):**

In relation to claims for privilege under the laws of the United States or the laws of England and Wales, regard shall be had to Section 3 of the Evidence (Proceedings in other Jurisdictions) Act 1975.

For the avoidance of doubt, under the laws of the United States, a witness has the privilege to refuse to give evidence if the evidence discloses a confidential communication between that party and an attorney for that party that was made for the purpose of obtaining legal advice. U.S. laws also recognize a privilege against criminal self-incrimination.

16.     **THE FEES AND COSTS INCURRED WHICH ARE REIMBURSABLE UNDER THE SECOND PARAGRAPH OF ARTICLE 14 OR UNDER ARTICLE 26 OF THE CONVENTION WILL BE BORNE BY:**

The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or Article 26 of the Hague Evidence Convention. The costs of this Hague Convention process will be borne by the Plaintiff.  Each party will be responsible for the fees and expenses, if any, of its own attorneys relating to any proceedings arising from this Hague Convention process.

## SECTION IV

This District Court expresses its gratitude to the authorities of the United Kingdom for their assistance and courtesy under the terms of the Hague Evidence Convention.

Signature and Seal of the Requesting Judicial Authority:


Dated: _____            _____
                                          HON. DALE E. HO
                                          UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                        :

UNITED STATES OF AMERICA,

                                        :

        Plaintiff,

                                          :

        - v. -                                VERIFIED FIRST AMENDED
                                          COMPLAINT
THE M/Y *AMADEA*, A MOTOR YACHT       FOR FORFEITURE[1]
BEARING INTERNATIONAL MARITIME     :
ORGANIZATION NO. 1012531, INCLUDING   1:23-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,     :
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER    :
APPURTENANCE THERETO,

                                          :

        Defendant-*In-Rem*.

                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

       Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified First Amended Civil Complaint,

alleges as follows:

## I. JURISDICTION AND VENUE

       1.     This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for
a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. P. 9(h)(1).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.     The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. **NATURE OF THE ACTION**

5.     This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.     On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges. Economic sanctions are an essential means for the

United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.    In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

### A.  Statutory Basis for Forfeiture

8.    The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

9.    The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity. The Defendant In Rem is also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

10. The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

**B. Relevant Persons and Entities**

11. At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

12. At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as roughly $300 million or more.

13. At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to

4

Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

14.     At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.     At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S. sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are

collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O. 13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O.

13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

a.     To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b.     To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

c.     To be an official of the Government of the Russian Federation;

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

d. To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

e. To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22. In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23. An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List.

24. Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. Sanctions Against KERIMOV

25. Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the

disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

**B. KERIMOV's Ownership of the *Amadea***

Overview of KERIMOV's Ownership of the *Amadea*

28.     As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the

10

vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

<u>The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's<br>Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV</u>

29.     In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"), traveled to the United Arab Emirates in or about June 2020 in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

30.     Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

31.     In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea*

11

for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

32.     On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

33.     In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, he was instead putting himself forward as a straw owner on behalf of KERIMOV.

34.     Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA,

although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

35.     The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

36.     Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ 34.

37.     Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point. Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. In this manner, KERIMOV acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have notified Cayman Islands government officials (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

38.     Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with an October 2021 voyage of the *Amadea*. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's

representative, *see infra* ¶¶ 39, 40.e., 40.g. The third individual listed on the guest manifest was KOCHMAN.

39.     Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

40.     Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

        a.      In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

        b.      According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened

14

for the purpose of a "New Owner Lunch with Captain[3] & ETO,[4]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

        c.      In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

        d.      In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ 38-39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

        e.      In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

---

[3] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[4] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

f.       In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow."

g.       Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

h.       In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

41.       KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

a.      In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[5] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b.      In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.      In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

---

[5] "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

d.    In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

42.    Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

a.    The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

18

b.     The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets; (4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

c.     As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht</u>

43.     Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

19

a.      On or about February 22, 2022, an *Amadea* crew member sent the Captain

of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest

from the February trip." One of the attached documents, entitled "Guest Preferences – Feb

2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2";

KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was

identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is

a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano."

In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea*

an email with several attachments, one of which contained a screenshot of a WhatsApp message

between that crew member and an individual saved under the contact name "Max Owners," and,

in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal,

undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

b.      In a prior email, dated January 21, 2022, an IMPERIAL YACHTS

employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter]

has requested to add a socket in all guests bathrooms in more accessible for guests location.

Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in.

Please could you pass this comment to the designers to be prepared for their arrival on board."

In response, the Captain forwarded the email to employees of the Interior Designer with the

request: "Please add new / more accessible plug socketing in the bathrooms with your designs

for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain

emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer

would be coming to the Caribbean to present the planned changes: "Please advise if [employee]

should mobilize to the Carib. to the meeting with G2 rgds renderings?"

c.      In an email dated February 24, 2022, the Captain of the *Amadea* circulated
meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a
meeting with "G3"[6] that had taken place earlier that day, regarding setting the *Amadea*'s travel
agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the
*Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and
listed a number of recommendations, including "Investigate upgraded sound system (G4[7] always
wanted music)," referencing the addition of another requested structural change to the *Amadea*
for the benefit of one of KERIMOV's children.

d.      In a memo sent between *Amadea* crew members dated "November 2021,"
and maintained on an electronic device aboard the *Amadea*, the following notation was included:
"A new pizza oven was requested by owner's representative and has to be sourced for
installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL
YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the
*Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest
daughter]/EK already to seek approval?" to which another employee responded, "yes please we
need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS

_____

[6] In separate communications, the Captain of the *Amadea* instructed crew members to use a
different guest designation system when referring to KERIMOV family members in
communications with IMPERIAL YACHTS. For example, in certain communications:
KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3"
in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard
the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest
daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications
with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this
email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[7] Given the foregoing, *see supra* n.6, "G4" in this context is either a reference to KERIMOV's
son or KERIMOV's youngest daughter.

employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

e.      In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[8]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023.

44.      Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

<u>KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts</u>

45.      KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the

---

[8] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.6.

ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

      a.     With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

      b.     With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

46.    According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47.     In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48.     For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

49.     Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

50.     During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

51.     After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV,

24

would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 34. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional vessel. By that measure, the USD payments for fuel, fees, provisions, crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

52.     From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*. These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

a.     Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea.* On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by

Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

b.       On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea.* Superyachts like the *Amadea* require fuel for voyages and to maintain the operation of essential equipment aboard the vessel both while it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

c.       Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

d.       Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy

26

and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

   e.  Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. The wire instructions associated with the payments all refer to the *Amadea*.

   f.  In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

   g.  On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

   h.  Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices

also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

    i.    In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

    j.    On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

    k.    Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

53.    Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.     KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that
KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about
September 2021.

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that
KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons
(including financial institutions) from transacting with, on behalf of, or for the benefit of,
KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they
structured the sale of the *Amadea* to conceal KERIMOV's ownership; (2) subsequent false
representations to law enforcement made directly and indirectly by IMPERIAL YACHTS
regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of
providing yacht services for sanctioned Russian individuals.

56.     Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the
sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel
Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided
services to any parties subject to international sanctions."[9] This statement necessarily indicates
that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides
services.

57.     IMPERIAL YACHTS employees were also aware that persons controlling,
operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were
transacting with U.S.-based companies and using the U.S. banking system to support and
maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to

---

[9] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an
Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online);
https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

59.     Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[10] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

---

[10] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

62. Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

a. When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

b. Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

c. The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63. The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

64.     Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system. When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the

*Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA violations by willfully depriving his subordinates of the UBO information that they needed to avoid making prohibited transactions.

## FIRST CLAIM FOR FORFEITURE

69.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

70.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

71.     As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

72.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

73.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

74.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

75.     Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
>     (A) with the intent to promote the carrying on of specified unlawful activity;

76.     For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

77.     As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

78.     Therefore, the Defendant In Rem is subject to forfeiture to the United States
pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18
U.S.C. § 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

79.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set
forth herein.

80.     Section 1957 imposes criminal penalties on any person who "knowingly engages
or attempts to engage in a monetary transaction in criminally derived property of a value greater
than $10,000 [that] is derived from specified unlawful activity." For purposes of § 1957,
"specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA
sanctions.

81.     As set forth above, the Defendant In Rem was involved in, or is traceable to,
monetary transactions or attempted monetary transactions involving criminally derived property
of a value greater than $10,000 and, as detailed above, the funds involved in those transactions
were derived from specified unlawful activity, namely, violations of IEEPA sanctions.

82.     Therefore, the Defendant In Rem is subject to forfeiture to the United States
pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to
transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such
property.

## FOURTH CLAIM FOR FORFEITURE

83.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set
forth herein.

84.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

85.     Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

86.     As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

87.     Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff, the United States of America prays:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

36

Dated: New York, New York
February 16, 2024


FOR THE U.S. DEPARTMENT OF JUSTICE:


MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
U.S. Department of Justice


By: _/s/ *Joshua L. Sohn*
    JOSHUA L. SOHN
    Trial Attorney
    Money Laundering and Asset
    Recovery Section

By: _/s/ *Jennifer Jude*
    JENNIFER JUDE
    Assistant United States Attorney
    Southern District of New York


JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


By: _/s/ *Yifei Zheng*
    YIFEI ZHENG
    Trial Attorney
    Counterintelligence and Export
    Control Section (CES)

**VERIFICATION**

STATE OF NEW YORK         )
COUNTY OF NEW YORK       :
SOUTHERN DISTRICT OF NEW YORK  )

        TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

                                   _Timothy Bergen_
                                   Timothy J. Bergen
                                   Special Agent
                                   Federal Bureau of Investigation

Executed on this 16th day of February, 2024

# EXHIBIT A







UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,
:
        Plaintiff,
:
        - v. -                              VERIFIED FIRST AMENDED
:                                 COMPLAINT
THE M/Y *AMADEA*, A MOTOR YACHT           FOR FORFEITURE[1]
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING    1:23 C_ _ _v._ _ _ _ _-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,
:
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER
:
APPURTENANCE THERETO,
:
        Defendant-*In-Rem*.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified civil First Amended Civil

Complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

       1.    This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. 1345, and 1355(aP. 9(h)(1).

3.  Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.  The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. NATURE OF THE ACTION

5.  This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.  On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, ~~monetary transactions~~dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if ~~such transactions are~~ conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges.

2

Economic sanctions are an essential means for the United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.      In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent ~~hundreds of thousands of~~more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. ~~Such~~By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

**A.  Statutory Basis for Forfeiture**

8.      The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

~~9.~~      The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

~~10.~~9.    The Defendant In Rem is ~~further subject to forfeiture pursuant to~~also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

~~11.~~10.    The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

### B. Relevant Persons and Entities

~~12.~~11.    At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

~~13.~~12.    At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as ~~between~~roughly $300 million ~~and $500 million~~or more.

~~14.~~13.    At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their

4

purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

15.14.   At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.     At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S.

5

sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.　　IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.　　Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O.

6

13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O. 13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (~~79~~87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

        a.     To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability,

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include ~~"money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements,~~ but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

       b.     To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

       c.     To be an official of the Government of the Russian Federation;

       d.     To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

       e.     To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. OFAC's licensing authority is located in Washington, D.C.

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. <u>FACTUAL ALLEGATIONS</u>

### A.  Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

10

## B. KERIMOV's Ownership of the *Amadea*

### Overview of KERIMOV's Ownership of the *Amadea*

27.28.   As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. BetweenRecords also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

### The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV

28.29.   In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"),[3] traveled to the United Arab Emirates in or about June 2020

---

[3] Dinar's status as KERIMOV's representative is evidenced by numerous emails and text messages from Dinar to third-parties, or between third-parties discussing Dinar, in which Dinar held himself out as KERIMOV's representative, or third-parties referred to him as such.

11

in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

29.30.   Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

30.31.   In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea* for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

31.32.   On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

32.33.   In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, on information and belief, KOCHMAN did not have the means to purchase a luxury superyacht at that price andhe was instead putting himself forward as a straw owner on behalf of KERIMOV.

12

33.34.   Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. ~~Unlike traditional sales agreements, and unlike~~Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those ~~granted to~~of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA, although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

34.35.   The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

35.36.   Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ ~~33~~34.

13

36.37.  Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. ~~On information and belief, by structuring the transaction in~~In this manner, KERIMOV ~~was able to acquire~~acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have ~~necessarily~~ notified Cayman Islands government officials[4] (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

37.38.  ~~In~~Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with ~~the *Amadea*'s~~an October 2021 voyage, ~~a guest manifest was prepared of the *Amadea*~~. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's representative, *see infra* ¶¶ ~~38,~~39, 40.e., ~~39~~40.g. The third individual listed on the guest manifest was KOCHMAN.

38.39.  Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent

---

[4] ~~In March 2022, the *Amadea* was registered in the Cayman Islands.~~

communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

~~39.~~40.   Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

a.    In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

b.    According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened for the purpose of a "New Owner Lunch with Captain[5] & ETO,[6]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

c.    In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new

---

[5] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[6] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

      d.      In a document titled "G1 Guest preferences October 2021," "G1," *i.e.,* KERIMOV, *see supra* ¶¶ ~~37~~-38-39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." ~~On information and belief, this~~This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

      e.      In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.,* KOCHMAN] and G1 [*i.e.,* KERIMOV] said to keep his [*i.e.,* KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

      f.      In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.,* KERIMOV] for tomorrow." ~~On information and belief, crew uniform changes are matters that would typically be requested by a new owner of a vessel.~~

      g.      Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an

Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

      h.    In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." ~~On information and belief, the~~The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

    ~~40.~~41.   KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. ~~On information and belief, the~~The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

      a.    In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[7] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing

---

[7] ~~On information and belief,~~ "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b.       In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.       In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ ~~37~~ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

d.       In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." ~~Subsequent~~Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

18

41.42.   Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

      a.    The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

      b.    The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets;

(4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

       c.     As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht</u>

~~42.~~43.   Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with ~~the~~ requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

       a.     On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano."

In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

        b.      In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?" ~~On information and belief, the Captain would not have authorized structural changes to the *Amadea* unless they were requested by the owner's authorized representative or family member.~~

        c.      In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[8] that had taken place earlier that day, regarding setting the *Amadea*'s travel

---

[8] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications:

agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[9] always wanted music)," referencing the addition of another requested structural change to the *Amadea.* for the benefit of one of KERIMOV's children.

        d.      In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

---

KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[9] Given the foregoing, *see supra* n.~~76~~, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

e.      In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[10]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel at the time, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023. On information and belief, the Captain of a vessel would not have scheduled multi-year itineraries for a temporary guest, but would have done so for the family member of the vessel's beneficial owner.

44.      Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts

45.      KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

a.      With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a

_____

[10] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.76.

23

Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

b. With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

46. According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47. In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48. For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's

24

then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

43.49.   Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

## C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

44.50.   During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

45.51.   After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV, would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 3334. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional

25

vessel. By that measure, ~~on information and belief,~~ the USD payments for fuel, fees, provisions, ~~and~~ crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

~~46.~~52.   From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea,* ~~which.~~  These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

   a.   Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea.* On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

   b.   On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea.* ~~On information and belief, superyachts~~Superyachts like the *Amadea* require fuel for voyages and to maintain the

operation of essential equipment aboard the vessel both while ~~the *Amadea*~~it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

       c.     Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. ~~On information and belief, such~~Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

       d.     Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. ~~On information and belief, such~~Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy~~.~~ and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent

account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

e.     Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. *See supra* ¶ 46.b. The wire instructions associated with the payments all refer to the *Amadea*.

f.     In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

g.     On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

h.     Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. ~~On information and belief, these~~These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

~~1.~~53.    Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.    KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021. ~~Upon information and belief,~~

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons (including financial institutions) from transacting with, on behalf of, or for the benefit of, KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; —(2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

47.56.   Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided services to any parties subject to international sanctions."[11] This statement necessarily indicates that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides services.

48.57.   IMPERIAL YACHTS employees were also aware that persons controlling, operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

---

[11] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online); https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

49.59.   Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[12] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

62.     Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

---

[12] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

a.      When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

b.      Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

c.      The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63.      The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

64.      Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system.

32

When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the *Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with

33

his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA violations by willfully depriving his subordinates of the UBO information that they needed to avoid making prohibited transactions.

## FIRST CLAIM FOR FORFEITURE

50.69.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

51.70.   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

52.71.   As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

53.72.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

34

## SECOND CLAIM FOR FORFEITURE

54.73.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

55.74.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

56.75.   Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
> (A) with the intent to promote the carrying on of specified unlawful activity;

57.76.   For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

58.77.   As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

59.78.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

60.79.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

35

61.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

62.   Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

63.80.   For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

64.81.   As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions. More specifically, funds used to purchase or maintain the *Amadea* became criminally-derived property as soon as they transited inbound to a U.S. correspondent bank account in violation of IEEPA sanctions. Thus, when such funds then transited outbound from a U.S. correspondent bank account to their final destination, the outbound monetary transaction was in violation of § 1957.

65.82.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

## FOURTH CLAIM FOR FORFEITURE

66.83.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

36

67.84.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

68.85.   Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

69.86.   As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

70.87.   Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
        ~~October 23, 2023~~February 16, 2024

FOR THE U.S. DEPARTMENT OF JUSTICE:

MARGARET A. MOESER                    DAMIAN WILLIAMS
Acting Chief                          United States Attorney for the
Money Laundering and Asset Recovery   Southern District of New York
Section, Criminal Division            U.S. Department of Justice
U.S. Department of Justice

By:  /s/ *Joshua L. Sohn*             By:  /s/ ~~*Sarah Mortazavi*~~*Jennifer Jude*
     JOSHUA L. SOHN                        ~~SARAH MORTAZAVI~~JENNIFER
     Trial Attorney                   JUDE
     Money Laundering and Asset            Assistant United States Attorney
     Recovery Section                      Southern District of New York

JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice

By:  /s/ ~~*Andrew D. Beaty*~~*Yifei Zheng*
     ~~ANDREW D. BEATY~~YIFEI ZHENG
     Trial Attorney
     Counterintelligence and Export
     Control Section (CES)

38

## VERIFICATION

STATE OF NEW YORK                  )
COUNTY OF NEW YORK             :
SOUTHERN DISTRICT OF NEW YORK  )

           TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Timothy J. Bergen
Special Agent
Federal Bureau of Investigation


Executed on this 21st16th day of October, 2023February, 2024

# EXHIBIT A







UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-9304-DEH |
| | ) | |
| M/Y AMADEA ET AL. | ) | |
| | ) | |
| Defendant-in-Rem. | ) | |
| | ) | |

**[PROPOSED] REQUEST FOR INTERNATIONAL JUDICIAL
ASSISTANCE TO COMPEL EVIDENCE FROM UNITED KINGDOM WITNESSES
PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970
ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York ("District Court") presents its compliments to the Senior Master of the High Court (King's Bench Division) of England and Wales and requests assistance in obtaining evidence to be used in civil proceedings before this Court in the above captioned matter ("the Action"). This request is made pursuant to, and in conformity with, the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("the Hague Convention"), to which both the United States and United Kingdom are party, the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "1975 Act"), the English Civil Procedure Rules, and any other appropriate authority under the law of the United Kingdom.

Specifically, the District Court requests assistance in obtaining oral testimony for use at trial from a non-party witness who resides within your jurisdiction, ▇▇▇▇▇▇▇▇▇▇.

This Court is authorized by Title 28, United States Code, sections 1781 and 1782 to extend similar assistance on request of the judicial authorities of England and Wales.

The United States District Court, through the offices of the representatives of the

Plaintiff, will reimburse your court and/or office for all costs incurred in executing this Request,

and the assurance of its heighted consideration.

The particulars of the Hague Evidence request are as follows:

## SECTION I

1. **SENDER AND REQUESTING JUDICIAL AUTHORITY:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

2. **CENTRAL AUTHORITY OF REQUESTED STATE:**

Competent Authority for England and Wales
Senior Master of the King's Bench Division
High Court of Justice
Royal Courts of Justice
Strand
LONDON WC2A 2LL
United Kingdon

3. **PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

United States of America

***With a Copy to the Parties' Legal Representatives:***

Joshua L. Sohn
Trial Attorney, United States Department of Justice, Money Laundering and Asset Recovery Section
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Tel:  (202) 353-2223
Fax:  (202) 616-2547
Email:  joshua.sohn@usdoj.gov

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

4.      **SPECIFICATION OF THE DATE BY WHICH THE REQUESTING AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF REQUEST:**

The requesting authority would greatly appreciate a response to the Request for

Assistance within 21 days or as soon thereafter as is practicable, so as to ensure that the

testimony is received prior to the close of discovery on August 30, 2024, and in a timely manner

for use at trial in the Action.

**SECTION II**

In conformity with Article 3 of the Hague Convention, the undersigned applicant has the

honor to submit the following information regarding the instant request:

5.      (a)      **REQUESTING JUDICIAL AUTHORITY (Article 3(a)):**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

3

United States of America

**(b)      TO THE COMPETENT AUTHORITY OF (Article 3):**

The United Kingdom of Great Britain and Northern Ireland

**I      NAMES OF THE CASE AND ANY IDENTIFYING NUMBER:**

*United States v. M/Y Amadea et al.*, No. 1:23-cv-9304-DEH, United States District Court for the Southern District of New York, New York, NY, USA

**6.      NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES (Article 3(b)):**

**(a)      Plaintiff(s):**

The United States of America, Plaintiff
c/o United States Department of Justice, Money Laundering and Asset Recovery Section (MLARS)
1400 New York Ave. NW, Suite 10100
Washington, DC 20530

Represented in the US by:

Margaret A. Moeser
Acting Chief, MLARS

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov

Represented in the UK by:

    Karen Denny
    CMS Cameron McKenna Nabarro Olswang LLP
    Cannon Place
    78 Cannon Street
    London
    EC4N 6AF
    United Kingdom
    Telephone: +44 20 7524 6470
    Mobile: +44 7818 454381

Email: karen.denny@cms-cmno.com

       **(b)**     **Claimant(s)[1]:**

Millemarin Investments, Ltd. and Eduard Khudainatov

Represented by:

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

**7.**     **(a)**     **NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS (Article 3(c)):**

     This is a civil *in rem* forfeiture action seeking to forfeit the M/Y *Amadea*, a 106-meter superyacht.

     **(b)**     **Summary of complaint**

     In seeking to forfeit the *Amadea*, the U.S. Government alleges that the *Amadea* is beneficially owned by Suleiman Kerimov, a Russian oligarch who is under U.S. sanctions pursuant the International Emergency Economic Powers Act (IEEPA) and associated regulations. The U.S. Government further alleges that the *Amadea* has been maintained in willful violation of the sanctions against Kerimov and his property and is therefore forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C).

---

[1] In a civil *in rem* forfeiture case such as this one, the "defendant" is the *res* itself, which cannot defend itself and has no counsel. The "claimant" is the litigating party adverse to the U.S. Government, who contests the U.S. Government's right to forfeiture. By statute, claimants must be parties with an interest in the defendant *res*.

**(c)     Summary of defense and counterclaim**

Claimants dispute that Kerimov is the ultimate beneficial owner of the *Amadea*. Even if

Kerimov is the owner, Claimants dispute whether anyone *willfully* violated IEEPA in

maintaining the *Amadea* and further dispute whether maintaining the *Amadea* in violation of

IEEPA would justify forfeiture of the entire vessel.

**8.     DOCUMENTS TO BE OBTAINED OR OTHER JUDICIAL ACT TO BE PERFORMED (Article 3(d)):**

**(a)     Description of the evidence**

The assistance requested of the United Kingdom consists of the following:

1.     The taking of oral testimony from ███████████████, pursuant to oath or

affirmation, regarding the matters described in plaintiff's complaint for use in Court in this

Action. Such testimony will be taken at a transcribed deposition. This individual is not a

Defendant and is only a witness to this matter. The Plaintiff is not seeking any relief against this

individual. The movant (Plaintiff U.S. Government) intends to elicit testimony from ███████

███████ on the following topics: (a) his employment the M/Y *Amadea*; (b) his knowledge of

the *Amadea*'s ownership, including any transfers of ownership; and (c) any interactions that

Suleiman Kerimov or his family had with the *Amadea*.

**(b)     Purpose of the evidence sought**

The oral testimony sought in this Letter of Request pertains to the allegations described

above and are to be used at trial of the Action.

## SECTION III

**9.     IDENTITY AND ADDRESS OF ANY PERSON TO BE EXAMINED (Article 3(e)):**



6

10.   **QUESTIONS TO BE PUT TO THE PERSONS TO BE EXAMINED OR STATEMENT OF THE SUBJECT MATTER ABOUT WHICH THEY ARE TO BE EXAMINED (Article 3(f)):**

The questions to be put to ███████████ relate to the subject matter described in Paragraph 8 above, in addition to questions relating to preliminary matters of witness knowledge and competence. The movant also requests the ability to ask related questions, including questions intended to clarify any response, of ███████████ as appropriate.

11.   **ANY REQUIREMENT THAT THE EVIDENCE BE GIVEN ON OATH OR AFFIRMATION AND SPECIFIC FORM TO BE USED (Article 3(h)):**

The Witness should be examined under oath or affirmation, or in the alternative should be instructed on the consequences for the giving of untruthful and false answers under the laws of England and Wales. It is also requested that the parties may, by agreement, conduct the deposition and/or trial testimony by video or telephonic link.

12.   **SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED (Article 3(i) & 9):**

The District Court respectfully requests, with respect to the oral testimony:

(1) That the High Court appoints an Examiner for the purpose of compelling oral testimony from the witness for use at trial;

(2) That the parties' representatives or their designees, a court reporter and a videographer be permitted to be present during the examination; that the parties' representatives or designees be permitted to examine and cross-examine the witness directly, and that a court reporter and videographer be permitted to make a verbatim record of the proceedings;

(3) That, in connection with the taking of testimony of the witness, the parties have permission to refer the witness to documents previously produced or available in the

7

Action. It is requested that counsel for the parties be notified in advance of the time and place of the proceedings and that counsel be permitted to attend in person, or by video or audio teleconference for those not able to attend in person.

It is further requested that the affirmation and oral examination be transcribed verbatim stenographically and that the written transcript be provided to:

Hon. Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America


*With a Copy to the Parties' Legal Representatives:*

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov
Counsel for Plaintiff United States of America

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com
Counsel for Claimants Millemarin Investments Ltd. and Eduard Khudainatov


It is further requested that, if any portion of this Request is deemed to be unacceptable under the laws of United Kingdom, that counsel for the parties, please be informed of that fact

and be allowed to respond substantively prior to the decision and that the UK Central Authority

please comply with as much of the Request as possible.

13.     **REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED (Article 7)**

It is requested that the testimony to be taken at such place, date and time as ordered by

the Senior Master and/or as otherwise scheduled by the representatives of the witness and the

respective representatives of the parties as listed in Paragraphs 6 and 12 above.

14.     **REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERSONNEL OF THE REQUESTING AUTHORITY AT THE EXECUTION OF THE LETTER OF REQUEST (Article 8):**

None.

15.     **SPECIFICATION OF PRIVILEGE OR DUTY TO REFUSE TO PRODUCE DOCUMENTS OR TESTIFY IN THE FORM OF A DEPOSITION UNDER THE LAW OF THE STATE OF ORIGIN (Article 11(b)):**

In relation to claims for privilege under the laws of the United States or the laws of

England and Wales, regard shall be had to Section 3 of the Evidence (Proceedings in other

Jurisdictions) Act 1975.

For the avoidance of doubt, under the laws of the United States, a witness has the

privilege to refuse to give evidence if the evidence discloses a confidential communication

between that party and an attorney for that party that was made for the purpose of obtaining legal

advice. U.S. laws also recognize a privilege against criminal self-incrimination.

16.     **THE FEES AND COSTS INCURRED WHICH ARE REIMBURSABLE UNDER THE SECOND PARAGRAPH OF ARTICLE 14 OR UNDER ARTICLE 26 OF THE CONVENTION WILL BE BORNE BY:**

The fees and costs incurred which are reimbursable under the second paragraph of Article

14 or Article 26 of the Hague Evidence Convention. The costs of this Hague Convention process

will be borne by the Plaintiff.  Each party will be responsible for the fees and expenses, if any, of its own attorneys relating to any proceedings arising from this Hague Convention process.

## **SECTION IV**

This District Court expresses its gratitude to the authorities of the United Kingdom for their assistance and courtesy under the terms of the Hague Evidence Convention.

Signature and Seal of the Requesting Judicial Authority:

Dated: _____        _____

HON. DALE E. HO
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

:

UNITED STATES OF AMERICA,

:

        Plaintiff,

:

        - v. -

:              VERIFIED FIRST AMENDED
                          COMPLAINT

THE M/Y *AMADEA*, A MOTOR YACHT
                            FOR FORFEITURE[1]
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING      1:23-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,

:

STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER

:

APPURTENANCE THERETO,

:

        Defendant-*In-Rem*.

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

      Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified First Amended Civil Complaint,

alleges as follows:

## I. JURISDICTION AND VENUE

      1.    This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for
a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

     a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. P. 9(h)(1).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.     The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. <u>NATURE OF THE ACTION</u>

5.     This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.     On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges. Economic sanctions are an essential means for the

United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.     In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

### A.  Statutory Basis for Forfeiture

8.     The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

9.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity. The Defendant In Rem is also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

10. The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

**B. Relevant Persons and Entities**

11. At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

12. At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as roughly $300 million or more.

13. At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to

Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

14.     At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.     At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S. sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are

collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O. 13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O.

13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.    The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

a.    To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b.    To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

c.    To be an official of the Government of the Russian Federation;

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

      d.     To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

      e.     To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List.

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. **FACTUAL ALLEGATIONS**

### A. **Sanctions Against KERIMOV**

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the

disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.    The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.    In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

**B. KERIMOV's Ownership of the *Amadea***

Overview of KERIMOV's Ownership of the *Amadea*

28.    As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the

vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

<u>The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV</u>

29.     In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"), traveled to the United Arab Emirates in or about June 2020 in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

30.     Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

31.     In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea*

for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

32.     On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

33.     In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, he was instead putting himself forward as a straw owner on behalf of KERIMOV.

34.     Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA,

although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

35.     The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

36.     Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ 34.

37.     Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. In this manner, KERIMOV acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have notified Cayman Islands government officials (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

38.     Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with an October 2021 voyage of the *Amadea*. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's

representative, *see infra* ¶¶ 39, 40.e., 40.g. The third individual listed on the guest manifest was KOCHMAN.

39.     Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

40.     Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

        a.      In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

        b.      According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened

for the purpose of a "New Owner Lunch with Captain[3] & ETO,[4]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

      c.    In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

      d.    In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ 38-39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

      e.    In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

---

[3] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[4] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

f.      In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow."

g.      Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

h.      In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

41.      KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

a.  In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[5] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b.  In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.  In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

---

[5] "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

d.      In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

42.      Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

a.      The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

b.       The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets; (4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

c.       As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with
KERIMOV's Ownership of the Yacht</u>

43.     Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

a.      On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano." In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

b.      In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?"

20

c.      In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[6] that had taken place earlier that day, regarding setting the *Amadea*'s travel agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[7] always wanted music)," referencing the addition of another requested structural change to the *Amadea* for the benefit of one of KERIMOV's children.

d.      In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS

---

[6] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications: KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[7] Given the foregoing, *see supra* n.6, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

   e. In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[8]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023.

   44. Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

<u>KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts</u>

   45. KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the

---

[8] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.6.

ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

> a.     With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

> b.     With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

46.     According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47.     In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48.     For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

49.     Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

50.     During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

51.     After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV,

would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 34. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional vessel. By that measure, the USD payments for fuel, fees, provisions, crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

52.     From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*. These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

        a.     Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea.* On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by

Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

   b.   On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea*. Superyachts like the *Amadea* require fuel for voyages and to maintain the operation of essential equipment aboard the vessel both while it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

   c.   Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

   d.   Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy

26

and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

e.      Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. The wire instructions associated with the payments all refer to the *Amadea*.

f.      In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

g.      On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

h.      Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices

also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

        i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

        j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

        k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

53.      Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.     KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021.

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons (including financial institutions) from transacting with, on behalf of, or for the benefit of, KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; (2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

56.     Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided services to any parties subject to international sanctions."[9] This statement necessarily indicates that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides services.

57.     IMPERIAL YACHTS employees were also aware that persons controlling, operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to

---

[9] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online); https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

59.     Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[10] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

---

[10] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

62.     Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

a.      When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

b.      Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

c.      The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63.     The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

31

64.     Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system. When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the

32

*Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA violations by willfully depriving his subordinates of the UBO information that they needed to avoid making prohibited transactions.

## FIRST CLAIM FOR FORFEITURE

69.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

70.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

71.     As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

72.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

73.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

74.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

75.     Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
>       (A) with the intent to promote the carrying on of specified unlawful activity;

76.     For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

77.     As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

78.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

79.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

80.     Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

81.     As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions.

82.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

## FOURTH CLAIM FOR FORFEITURE

83.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

84.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

85.     Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

86.     As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

87.     Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
        February 16, 2024


FOR THE U.S. DEPARTMENT OF JUSTICE:


MARGARET A. MOESER                    DAMIAN WILLIAMS
Acting Chief                          United States Attorney for the
Money Laundering and Asset Recovery   Southern District of New York
Section, Criminal Division            U.S. Department of Justice
U.S. Department of Justice


By: __/s/ *Joshua L. Sohn*            By: __/s/ *Jennifer Jude*
    JOSHUA L. SOHN                        JENNIFER JUDE
    Trial Attorney                        Assistant United States Attorney
    Money Laundering and Asset            Southern District of New York
    Recovery Section


JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


By: __/s/ *Yifei Zheng*
    YIFEI ZHENG
    Trial Attorney
    Counterintelligence and Export
    Control Section (CES)

## **VERIFICATION**

STATE OF NEW YORK       )
COUNTY OF NEW YORK     :
SOUTHERN DISTRICT OF NEW YORK  )

           TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

                                *Timothy Bergen*
                                Timothy J. Bergen
                                Special Agent
                                Federal Bureau of Investigation

Executed on this 16th day of February, 2024

# EXHIBIT A







UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                                    :

UNITED STATES OF AMERICA,

                                                    :

        Plaintiff,

                                                    :

        - v. -                           :     VERIFIED FIRST AMENDED
                                                         COMPLAINT
                                                    :     FOR FORFEITURE[1]

THE M/Y *AMADEA*, A MOTOR YACHT          :
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING      :     1:23 Civ. ____-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND         :
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,                    :

                                                    :

        Defendant-*In-Rem*.

                                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified civilFirst Amended Civil

Complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

       1.     This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

   a. the M/Y *Amadea*, International Maritime Organization ("IMO") No.
   1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and
   each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,
1333, 1345, and 1355(a). While the United States does not concede that such designation is
necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed.
R. Civ. ~~1345, and 1355(a~~P. 9(h)(1~~)~~.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of
the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.     The Defendant In Rem is currently located in San Diego, California, after it was
previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant
In Rem are appended to this Complaint as Exhibit A.

## II. NATURE OF THE ACTION

5.     This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y
*Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.     On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign
Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN")
under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA").
As a result of this designation, ~~monetary transactions~~dealings involving KERIMOV's property, or
that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are
generally prohibited if ~~such transactions are~~ conducted by U.S. persons (including U.S. financial
institutions) or occur in the United States. The United States sanctions program is a critical
component of the nation's ability to address national security and foreign policy challenges.

2

Economic sanctions are an essential means for the United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.      In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent ~~hundreds of thousands of~~more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. ~~Such~~By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

### A.  Statutory Basis for Forfeiture

8.      The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

~~9.~~      The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

3

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

10.9.    The Defendant In Rem is ~~further subject to forfeiture pursuant to~~also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

11.10.   The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

### B.  Relevant Persons and Entities

12.11.   At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

13.12.   At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as ~~between~~roughly $300 million ~~and $500 million~~or more.

14.13.   At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their

4

purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

15.14.  At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.    At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S.

sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O.

6

13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O. 13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.    Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.    On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (~~79~~87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.    "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.    The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

a.    To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability,

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include ~~money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements,~~ but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b.     To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

c.     To be an official of the Government of the Russian Federation;

d.     To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

e.     To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. OFAC's licensing authority is located in Washington, D.C.

9

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. FACTUAL ALLEGATIONS

### A. Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

10

### B. KERIMOV's Ownership of the *Amadea*

Overview of KERIMOV's Ownership of the *Amadea*

~~27.~~28.   As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. ~~Between~~Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's
Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV

~~28.~~29.   In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"),[3] traveled to the United Arab Emirates in or about June 2020

---

[3] ~~Dinar's status as KERIMOV's representative is evidenced by numerous emails and text messages from Dinar to third-parties, or between third-parties discussing Dinar, in which Dinar held himself out as KERIMOV's representative, or third-parties referred to him as such.~~

in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

29.30.   Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

30.31.   In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea* for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

31.32.   On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

32.33.   In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, on information and belief, KOCHMAN did not have the means to purchase a luxury superyacht at that price and he was instead putting himself forward as a straw owner on behalf of KERIMOV.

33.34.   Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. ~~Unlike traditional sales agreements, and unlike~~Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those ~~granted to~~of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA, although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

34.35.   The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

35.36.   Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ ~~33~~34.

13

36.37.   Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. ~~On information and belief, by structuring the transaction in~~In this manner, KERIMOV ~~was able to acquire~~acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have ~~necessarily~~ notified Cayman Islands government officials[4] (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

37.38.   ~~In~~Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with ~~the *Amadea*'s~~an October 2021 voyage~~, a guest manifest was prepared of the *Amadea*~~. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's representative, *see infra* ¶¶ ~~38,~~39. 40.e., ~~39~~40.g. The third individual listed on the guest manifest was KOCHMAN.

38.39.   Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent

[4] ~~In March 2022, the *Amadea* was registered in the Cayman Islands.~~

communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

~~39.~~40.    Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

a.    In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

b.    According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened for the purpose of a "New Owner Lunch with Captain[5] & ETO,[6]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

c.    In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new

---

[5] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[6] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

d.      In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ ~~37~~38~~-39~~, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." ~~On information and belief, this~~This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

e.      In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

f.      In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow." ~~On information and belief, crew uniform changes are matters that would typically be requested by a new owner of a vessel.~~

g.      Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an

Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

h.   In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." ~~On information and belief, the~~The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

~~40.~~41.   KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. ~~On information and belief, the~~The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

a.   In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[7] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing

---

[7] ~~On information and belief,~~ "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

17

draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

       b.      In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

       c.      In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ ~~37~~ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

       d.      In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." ~~Subsequent~~ Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

41. 42.   Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL

YACHTS, and the Interior Designer planned to effectuate the structural changes raised by

KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial

owner of the *Amadea* and consequently had the authority to order major renovations to the vessel.

For example:

a.      The Captain of the *Amadea* and the Interior Designer had a "refit meeting"

on or about November 10, 2021 in which the following modifications to the *Amadea* were

discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be

provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for

neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall

panels that contained false book spines with "plain wall paneling," visual renderings of which were

"ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings

"to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include

installation of new floors, new plug outlets, and potentially replacing the doors to accommodate

the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside

the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master

cabin suite; and (9) removing the bar in the main deck.

b.      The renovations discussed in the "refit meeting" were memorialized in a

"Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that

KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to

the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to

KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold

fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets;

19

(4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

       c.     As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht</u>

   42.43.  Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with ~~the~~ requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

       a.     On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano."

In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

        b.      In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?" ~~On information and belief, the Captain would not have authorized structural changes to the *Amadea* unless they were requested by the owner's authorized representative or family member.~~

        c.      In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[8] that had taken place earlier that day, regarding setting the *Amadea*'s travel

---

[8] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications:

agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[9] always wanted music)," referencing the addition of another requested structural change to the *Amadea*. for the benefit of one of KERIMOV's children.

        d.      In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

---

KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[9] Given the foregoing, *see supra* n.76, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

e.      In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[10]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel ~~at the time~~, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023. ~~On information and belief, the Captain of a vessel would not have scheduled multi-year itineraries for a temporary guest, but would have done so for the family member of the vessel's beneficial owner.~~

44.      Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

### KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts

45.      KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

a.      With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a

---

[10] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.~~7~~6.

Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

       b.     With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

46.    According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47.    In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48.    For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's

24

then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

43.49.   Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

44.50.   During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

45.51.   After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV, would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 3334. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional

25

vessel. By that measure, ~~on information and belief,~~ the USD payments for fuel, fees, provisions, ~~and~~ crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

~~46.~~52.   From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*, ~~which.~~   These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

a.    Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea*. On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

b.    On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea*. ~~On information and belief, superyachts~~Superyachts like the *Amadea* require fuel for voyages and to maintain the

26

operation of essential equipment aboard the vessel both while ~~the *Amadea*~~it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

   c.  Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. ~~On information and belief, such~~Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

   d.  Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. ~~On information and belief, such~~Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy~~.~~ and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent

account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

     e.    Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. *See supra* ¶ 46.b. The wire instructions associated with the payments all refer to the *Amadea*.

     f.    In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

     g.    On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

     h.    Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. ~~On information and belief, these~~These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

~~1.~~53.    Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.      KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021. ~~Upon information and belief,~~

29

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that

KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons

(including financial institutions) from transacting with, on behalf of, or for the benefit of,

KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they

structured the sale of the *Amadea* to conceal KERIMOV's ownership; —(2) subsequent false

representations to law enforcement made directly and indirectly by IMPERIAL YACHTS

regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of

providing yacht services for sanctioned Russian individuals.

47.56.   Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the

sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel

Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided

services to any parties subject to international sanctions."[11] This statement necessarily indicates

that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides

services.

48.57.   IMPERIAL YACHTS employees were also aware that persons controlling,

operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were

transacting with U.S.-based companies and using the U.S. banking system to support and

maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to

IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed

work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S.

correspondent accounts.

---

[11] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an
Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online);
https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

49.59.   Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[12] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

62.     Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

---

[12] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

a.    When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

b.    Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

c.    The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63.    The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

64.    Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system.

32

When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the *Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with

33

his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA violations by willfully depriving his subordinates of the UBO information that they needed to avoid making prohibited transactions.

### FIRST CLAIM FOR FORFEITURE

50.69.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

51.70.   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

52.71.   As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

53.72.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

~~54.~~73.   The United States incorporates by reference ¶¶ 1 through ~~49~~68 above as if fully set forth herein.

~~55.~~74.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. ~~§§§~~ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

~~56.~~75.   Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
>     (A) with the intent to promote the carrying on of specified unlawful activity;

~~57.~~76.   For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

~~58.~~77.   As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

~~59.~~78.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

~~60.~~79.   The United States incorporates by reference ¶¶ 1 through ~~49~~68 above as if fully set forth herein.

61. ~~Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.~~

~~62.~~ Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

~~63.~~80.   For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

~~64.~~81.   As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions. ~~More specifically, funds used to purchase or maintain the *Amadea* became criminally-derived property as soon as they transited inbound to a U.S. correspondent bank account in violation of IEEPA sanctions. Thus, when such funds then transited outbound from a U.S. correspondent bank account to their final destination, the outbound monetary transaction was in violation of § 1957.~~

~~65.~~82.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

**FOURTH CLAIM FOR FORFEITURE**

~~66.~~83.   The United States incorporates by reference ¶¶ 1 through ~~49~~68 above as if fully set forth herein.

36

67.84.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

68.85.   Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

69.86.   As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

70.87.   Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)    That the Court grant the United States such other relief as this Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
          ~~October 23, 2023~~February 16, 2024

FOR THE U.S. DEPARTMENT OF JUSTICE:


MARGARET A. MOESER                         DAMIAN WILLIAMS
Acting Chief                                United States Attorney for the
Money Laundering and Asset Recovery         Southern District of New York
Section, Criminal Division                  U.S. Department of Justice
U.S. Department of Justice


By:   /s/ *Joshua L. Sohn*                   By:   /s/ *~~Sarah Mortazavi~~Jennifer Jude*
     JOSHUA L. SOHN                               ~~SARAH MORTAZAVI~~JENNIFER
     Trial Attorney                          JUDE
     Money Laundering and Asset                   Assistant United States Attorney
     Recovery Section                             Southern District of New York



JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


 By:   /s/ *~~Andrew D. Beaty~~Yifei Zheng*
      ~~ANDREW D. BEATY~~YIFEI ZHENG
      Trial Attorney
      Counterintelligence and Export
      Control Section (CES)

# VERIFICATION

STATE OF NEW YORK               )
COUNTY OF NEW YORK         :
SOUTHERN DISTRICT OF NEW YORK   )

         TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

_Timothy Bergen_
_____
Timothy J. Bergen
Special Agent
Federal Bureau of Investigation


Executed on this ~~21st~~16th day of ~~October, 2023~~February, 2024

# EXHIBIT A







UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-9304-DEH |
| | ) | |
| M/Y AMADEA ET AL. | ) | |
| | ) | |
| Defendant-in-Rem. | ) | |
| | ) | |

**[PROPOSED] REQUEST FOR INTERNATIONAL JUDICIAL
ASSISTANCE TO COMPEL EVIDENCE FROM UNITED KINGDOM WITNESSES
PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970
ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York ("District Court")

presents its compliments to the Central Authority of Scotland and requests assistance in

obtaining evidence to be used in civil proceedings before this Court in the above captioned

matter ("the Action"). This request is made pursuant to, and in conformity with, the Hague

Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial

Matters ("the Hague Convention"), to which both the United States and United Kingdom are

party, and any other appropriate authority under the law of the United Kingdom.

Specifically, the District Court requests assistance in obtaining oral testimony for use at

trial from a non-party witness who resides within your jurisdiction, ▮▮▮▮▮▮▮▮.

This Court is authorized by Title 28, United States Code, sections 1781 and 1782 to

extend similar assistance on request of the judicial authorities of Scotland.

The United States District Court, through the offices of the representatives of the

Plaintiff, will reimburse your court and/or office for all costs incurred in executing this Request,

and the assurance of its heighted consideration.

The particulars of the Hague Evidence request are as follows:

<u>**SECTION I**</u>

1.      **SENDER AND REQUESTING JUDICIAL AUTHORITY:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

**2.      CENTRAL AUTHORITY OF REQUESTED STATE:**

Scottish Government Justice Directorate
Central Authority & International Law Team
St. Andrew's House (GW15)
EDINBURGH EH1 3DG

**3.      PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

United States of America

***With a Copy to the Parties' Legal Representatives:***

Joshua L. Sohn
Trial Attorney, United States Department of Justice, Money Laundering and Asset Recovery Section
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Tel:  (202) 353-2223
Fax:  (202) 616-2547
Email:  joshua.sohn@usdoj.gov

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

**4.     SPECIFICATION OF THE DATE BY WHICH THE REQUESTING AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF REQUEST:**

The requesting authority would greatly appreciate a response to the Request for

Assistance within 21 days or as soon thereafter as is practicable, so as to ensure that the

testimony is received prior to the close of discovery on August 30, 2024, and in a timely manner

for use at trial in the Action.

## <u>SECTION II</u>

In conformity with Article 3 of the Hague Convention, the undersigned applicant has the

honor to submit the following information regarding the instant request:

**5.     (a)     REQUESTING JUDICIAL AUTHORITY (Article 3(a)):**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

3

United States of America

    **(b)**    **TO THE COMPETENT AUTHORITY OF (Article 3):**

The United Kingdom of Great Britain and Northern Ireland

    **I**    **NAMES OF THE CASE AND ANY IDENTIFYING NUMBER:**

*United States v. M/Y Amadea et al.*, No. 1:23-cv-9304-DEH, United States District Court for the Southern District of New York, New York, NY, USA

**6.**    **NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES (Article 3(b)):**

    **(a)**    **Plaintiff(s):**

The United States of America, Plaintiff
c/o United States Department of Justice, Money Laundering and Asset Recovery Section (MLARS)
1400 New York Ave. NW, Suite 10100
Washington, DC 20530

Represented in the U.S. by:

Margaret A. Moeser
Acting Chief, MLARS

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov

Represented in the UK by:

    Karen Denny
    CMS Cameron McKenna Nabarro Olswang LLP
    Cannon Place
    78 Cannon Street
    London
    EC4N 6AF
    United Kingdom
    Telephone: +44 20 7524 6470
    Mobile: +44 7818 454381

Email: karen.denny@cms-cmno.com

**(b)    Claimant(s)[1]:**

Millemarin Investments, Ltd. and Eduard Khudainatov

Represented by:

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

**7.    (a)    NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS (Article 3(c)):**

This is a civil *in rem* forfeiture action seeking to forfeit the M/Y *Amadea*, a 106-meter

superyacht.

**(b)    Summary of complaint**

In seeking to forfeit the *Amadea*, the U.S. Government alleges that the *Amadea* is

beneficially owned by Suleiman Kerimov, a Russian oligarch who is under U.S. sanctions

pursuant the International Emergency Economic Powers Act (IEEPA) and associated

regulations. The U.S. Government further alleges that the *Amadea* has been maintained in willful

violation of the sanctions against Kerimov and his property and is therefore forfeitable under 18

U.S.C. §§ 981(a)(1)(A) and (C).

---

[1] In a civil *in rem* forfeiture case such as this one, the "defendant" is the *res* itself, which cannot defend itself and has no counsel. The "claimant" is the litigating party adverse to the U.S. Government, who contests the U.S. Government's right to forfeiture. By statute, claimants must be parties with an interest in the defendant *res*.

(c)      **Summary of defense and counterclaim**

Claimants dispute that Kerimov is the ultimate beneficial owner of the *Amadea*. Even if Kerimov is the owner, Claimants dispute whether anyone *willfully* violated IEEPA in maintaining the *Amadea* and further dispute whether maintaining the *Amadea* in violation of IEEPA would justify forfeiture of the entire vessel.

## 8.      DOCUMENTS TO BE OBTAINED OR OTHER JUDICIAL ACT TO BE PERFORMED (Article 3(d)):

(a)      **Description of the evidence**

The assistance requested of the United Kingdom consists of the following:

1.      The taking of oral testimony from ███████, pursuant to oath or affirmation, regarding the matters described in plaintiff's complaint for use in Court in this Action. Such testimony will be taken at a transcribed deposition. This individual is not a Defendant and is only a witness to this matter. The Plaintiff is not seeking any relief against this individual. The movant (Plaintiff U.S. Government) intends to elicit testimony from ███████ on the following topics: (a) his captaincy of the M/Y *Amadea*; (b) his knowledge of the *Amadea*'s ownership, including any actual or contemplated transfers of ownership; (c) any interactions that Suleiman Kerimov or his family had with the *Amadea*; (c) the protocols and standards for communicating information between the two co-captains of the *Amadea*; and (d) the protocols and standards for payment of vendor invoices for the *Amadea*.

(b)      **Purpose of the evidence sought**

The oral testimony sought in this Letter of Request pertains to the allegations described above and are to be used at trial of the Action.

6

## SECTION III

**9.     IDENTITY AND ADDRESS OF ANY PERSON TO BE EXAMINED (Article 3(e)):**



**10.    QUESTIONS TO BE PUT TO THE PERSONS TO BE EXAMINED OR STATEMENT OF THE SUBJECT MATTER ABOUT WHICH THEY ARE TO BE EXAMINED (Article 3(f)):**

The questions to be put to ████████ relate to the subject matter described in Paragraph 8 above, in addition to questions relating to preliminary matters of witness knowledge and competence. The movant also requests the ability to ask related questions, including questions intended to clarify any response, of ████████ as appropriate.

**11.    ANY REQUIREMENT THAT THE EVIDENCE BE GIVEN ON OATH OR AFFIRMATION AND SPECIFIC FORM TO BE USED (Article 3(h)):**

The Witness should be examined under oath or affirmation, or in the alternative should be instructed on the consequences for the giving of untruthful and false answers under the laws of Scotland. It is also requested that the parties may, by agreement, conduct the deposition and/or trial testimony by video or telephonic link.

**12.    SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED (Article 3(i) & 9):**

The District Court respectfully requests, with respect to the oral testimony:

(1) That the High Court appoints an Examiner for the purpose of compelling oral testimony from the witness for use at trial;

(2) That the parties' representatives or their designees, a court reporter and a videographer be permitted to be present during the examination; that the parties' representatives or designees be permitted to examine and cross-examine the witness directly, and that a

7

court reporter and videographer be permitted to make a verbatim record of the proceedings;

(3) That, in connection with the taking of testimony of the witness, the parties have permission to refer the witness to documents previously produced or available in the Action. It is requested that counsel for the parties be notified in advance of the time and place of the proceedings and that counsel be permitted to attend in person, or by video or audio teleconference for those not able to attend in person.

It is further requested that the affirmation and oral examination be transcribed verbatim stenographically and that the written transcript be provided to:

Hon. Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

*With a Copy to the Parties' Legal Representatives:*

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov
Counsel for Plaintiff United States of America

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com
Counsel for Claimants Millemarin Investments Ltd. and Eduard Khudainatov

It is further requested that, if any portion of this Request is deemed to be unacceptable under the laws of United Kingdom, that counsel for the parties, please be informed of that fact and be allowed to respond substantively prior to the decision and that the UK Central Authority please comply with as much of the Request as possible.

**13.     REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED (Article 7)**

It is requested that the testimony to be taken at such place, date and time as ordered by the Central Authority of Scotland and/or as otherwise scheduled by the representatives of the witness and the respective representatives of the parties as listed in Paragraphs 6 and 12 above.

**14.     REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERSONNEL OF THE REQUESTING AUTHORITY AT THE EXECUTION OF THE LETTER OF REQUEST (Article 8):**

None.

15.    **SPECIFICATION OF PRIVILEGE OR DUTY TO REFUSE TO PRODUCE DOCUMENTS OR TESTIFY IN THE FORM OF A DEPOSITION UNDER THE LAW OF THE STATE OF ORIGIN (Article 11(b)):**

In relation to claims for privilege under the laws of the United States or the laws of Scotland, due regard shall be had to Section 3 of the Evidence (Proceedings in other Jurisdictions) Act 1975.

For the avoidance of doubt, under the laws of the United States, a witness has the privilege to refuse to give evidence if the evidence discloses a confidential communication between that party and an attorney for that party that was made for the purpose of obtaining legal advice. U.S. laws also recognize a privilege against criminal self-incrimination.

16.    **THE FEES AND COSTS INCURRED WHICH ARE REIMBURSABLE UNDER THE SECOND PARAGRAPH OF ARTICLE 14 OR UNDER ARTICLE 26 OF THE CONVENTION WILL BE BORNE BY:**

The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or Article 26 of the Hague Evidence Convention. The costs of this Hague Convention process will be borne by the Plaintiff. Each party will be responsible for the fees and expenses, if any, of its own attorneys relating to any proceedings arising from this Hague Convention process.

<u>**SECTION IV**</u>

This District Court expresses its gratitude to the authorities of the United Kingdom for their assistance and courtesy under the terms of the Hague Evidence Convention.

Signature and Seal of the Requesting Judicial Authority:


Dated: _____        _____
                                     HON. DALE E. HO
                                     UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

         Plaintiff,

         - v. -

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,

         Defendant-*In-Rem*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VERIFIED FIRST AMENDED
COMPLAINT
<u>FOR FORFEITURE</u>[1]

1:23-cv-9304 (DEH)

Plaintiff United States of America, by its attorneys, Damian Williams, United States Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the Counterintelligence and Export Control Section, for its verified First Amended Civil Complaint, alleges as follows:

## I. JURISDICTION AND VENUE

1.    This action is brought pursuant to Title 18, United States Code, Sections 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. P. 9(h)(1).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.      The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. <u>NATURE OF THE ACTION</u>

5.      This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.      On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges. Economic sanctions are an essential means for the

2

United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.      In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

**A.  Statutory Basis for Forfeiture**

8.      The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

9.      The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity. The Defendant In Rem is also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

10.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

**B.  Relevant Persons and Entities**

11.     At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

12.     At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as roughly $300 million or more.

13.     At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to

Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

14. At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15. At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S. sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are

collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

### III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.    IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.    Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O. 13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O.

13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

a.     To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

b.     To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

c.     To be an official of the Government of the Russian Federation;

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

d.      To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

e.      To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List.

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the

disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

**B. KERIMOV's Ownership of the *Amadea***

Overview of KERIMOV's Ownership of the *Amadea*

28.     As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the

vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

### The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV

29.     In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"), traveled to the United Arab Emirates in or about June 2020 in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

30.     Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

31.     In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea*

11

for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

32.     On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

33.     In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, he was instead putting himself forward as a straw owner on behalf of KERIMOV.

34.     Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA,

although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

35.     The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

36.     Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ 34.

37.     Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. In this manner, KERIMOV acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have notified Cayman Islands government officials (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

38.     Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with an October 2021 voyage of the *Amadea*. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's

representative, *see infra* ¶¶ 39, 40.e., 40.g. The third individual listed on the guest manifest was KOCHMAN.

39.     Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

40.     Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

        a.     In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

        b.     According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened

for the purpose of a "New Owner Lunch with Captain[3] & ETO,[4]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

        c.      In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

        d.      In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ 38-39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

        e.      In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

---

[3] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[4] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

f.      In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow."

g.      Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

h.      In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

41.     KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

a.　In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[5] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b.　In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.　In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

---

[5] "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

d.      In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

42.      Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

a.      The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

b.     The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets; (4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

c.     As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

#### KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht

43.     Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

a. On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano." In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

b. In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?"

20

c.        In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[6] that had taken place earlier that day, regarding setting the *Amadea*'s travel agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[7] always wanted music)," referencing the addition of another requested structural change to the *Amadea* for the benefit of one of KERIMOV's children.

d.        In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS

---

[6] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications: KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[7] Given the foregoing, *see supra* n.6, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

       e.     In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[8]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023.

      44.     Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

<u>KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts</u>

      45.     KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the

---

[8] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.6.

ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

      a.      With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

      b.      With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

      46.      According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47. In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48. For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

49. Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

50. During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

51. After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV,

24

would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 34. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional vessel. By that measure, the USD payments for fuel, fees, provisions, crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

52.     From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*. These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

a.     Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea*. On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by

Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

b.      On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea.* Superyachts like the *Amadea* require fuel for voyages and to maintain the operation of essential equipment aboard the vessel both while it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

c.      Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

d.      Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy

and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

e.      Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. The wire instructions associated with the payments all refer to the *Amadea*.

f.      In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

g.      On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

h.      Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices

also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

            i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

            j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

            k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

    53.      Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

28

54.     KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021.

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons (including financial institutions) from transacting with, on behalf of, or for the benefit of, KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; (2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

56.     Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided services to any parties subject to international sanctions."[9] This statement necessarily indicates that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides services.

57.     IMPERIAL YACHTS employees were also aware that persons controlling, operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to

---

[9] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online); https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

59.     Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[10] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

---

[10] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

62. Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

a. When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

b. Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

c. The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63. The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

64.     Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system. When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the

32

*Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors

regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and

that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with

his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who

paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money

laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO

information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea*

was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL

YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA

violations by willfully depriving his subordinates of the UBO information that they needed to

avoid making prohibited transactions.

## FIRST CLAIM FOR FORFEITURE

69.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set

forth herein.

70.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which

constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified

unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is

defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

71.     As set forth above, the Defendant In Rem constitutes or is derived from proceeds

traceable to violations of IEEPA sanctions because post-purchase maintenance payments in

violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an

operational vessel.

72. Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

73. The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

74. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

75. Section 1956(a)(2) imposes criminal penalties on any person who:

Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

. . .

(A) with the intent to promote the carrying on of specified unlawful activity;

76. For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

77. As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

78.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

### THIRD CLAIM FOR FORFEITURE

79.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

80.     Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

81.     As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions.

82.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

### FOURTH CLAIM FOR FORFEITURE

83.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

35

84.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

85.     Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

86.     As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

87.     Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

36

Dated:  New York, New York
          February 16, 2024


FOR THE U.S. DEPARTMENT OF JUSTICE:


MARGARET A. MOESER                    DAMIAN WILLIAMS
Acting Chief                          United States Attorney for the
Money Laundering and Asset Recovery   Southern District of New York
Section, Criminal Division            U.S. Department of Justice
U.S. Department of Justice


By:   /s/ *Joshua L. Sohn*            By:   /s/ *Jennifer Jude*
     JOSHUA L. SOHN                         JENNIFER JUDE
     Trial Attorney                         Assistant United States Attorney
     Money Laundering and Asset             Southern District of New York
     Recovery Section



JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


By:   /s/ *Yifei Zheng*
     YIFEI ZHENG
     Trial Attorney
     Counterintelligence and Export
     Control Section (CES)

# <u>VERIFICATION</u>

STATE OF NEW YORK              )
COUNTY OF NEW YORK          :
SOUTHERN DISTRICT OF NEW YORK   )

        TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

                                     _Timothy Bergen_
                                     Timothy J. Bergen
                                     Special Agent
                                     Federal Bureau of Investigation

Executed on this 16th day of February, 2024

# EXHIBIT A







UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                              :

UNITED STATES OF AMERICA,

                              :

         Plaintiff,

                              :

        - v. -                   :        VERIFIED FIRST AMENDED COMPLAINT FOR FORFEITURE[1]

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME   :
ORGANIZATION NO. 1012531, INCLUDING        1:23 Civ. _____-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,   :
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER   :
APPURTENANCE THERETO,

                              :

        Defendant-*In-Rem*.

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified civil First Amended Civil

Complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

       1.     This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. ~~1345, and 1355(a~~P. 9(h)(1).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4.      The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. NATURE OF THE ACTION

5.      This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6.      On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, ~~monetary transactions~~dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if ~~such transactions are~~ conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges.

2

Economic sanctions are an essential means for the United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.      In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent ~~hundreds of thousands of~~more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. ~~Such~~By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

### A.  Statutory Basis for Forfeiture

8.      The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

~~9.~~      The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

10.9.   The Defendant In Rem is ~~further subject to forfeiture pursuant to~~also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

11.10.   The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

### B. Relevant Persons and Entities

12.11.   At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

13.12.   At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as ~~between~~roughly $300 million ~~and $500 million~~or more.

14.13.   At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their

4

purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

15.14.  At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.    At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S.

sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O.

13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O. 13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (~~79~~87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

        a.     To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability,

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include ~~money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements,~~ but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

8

sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

      b.     To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

      c.     To be an official of the Government of the Russian Federation;

      d.     To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

      e.     To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. ~~OFAC's licensing authority is located in Washington, D.C.~~

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. FACTUAL ALLEGATIONS

### A. Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

10

## B. KERIMOV's Ownership of the *Amadea*

### Overview of KERIMOV's Ownership of the *Amadea*

~~27.~~28.  As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. ~~Between~~Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

### The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV

~~28.~~29.  In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"),[3] traveled to the United Arab Emirates in or about June 2020

---

[3] ~~Dinar's status as KERIMOV's representative is evidenced by numerous emails and text messages from Dinar to third-parties, or between third-parties discussing Dinar, in which Dinar held himself out as KERIMOV's representative, or third-parties referred to him as such.~~

in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

29.30.   Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

30.31.   In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea* for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

31.32.   On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

32.33.   In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, on information and belief, KOCHMAN did not have the means to purchase a luxury superyacht at that price and he was instead putting himself forward as a straw owner on behalf of KERIMOV.

12

33.34.   Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. ~~Unlike traditional sales agreements, and unlike~~Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those ~~granted to~~of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA, although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

34.35.   The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

35.36.   Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ ~~33~~34.

13

36.37.   Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. ~~On information and belief, by structuring the transaction in~~In this manner, KERIMOV ~~was able to acquire~~acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have ~~necessarily~~ notified Cayman Islands government officials[4] (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

### KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht

37.38.   ~~In~~Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with ~~the *Amadea*'s~~an October 2021 voyage, ~~a guest manifest was prepared of the *Amadea*~~.  The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's representative, *see infra* ¶¶ ~~38,~~39, 40.e., ~~39~~40.g. The third individual listed on the guest manifest was KOCHMAN.

38.39.   Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent

---

[4] ~~In March 2022, the *Amadea* was registered in the Cayman Islands.~~

14

communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

39.40.   Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

a.      In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

b.      According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened for the purpose of a "New Owner Lunch with Captain[5] & ETO,[6]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

c.      In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new

---

[5] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[6] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

       d.      In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ ~~37~~-38-39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." ~~On information and belief, this~~This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

       e.      In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

       f.      In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow." ~~On information and belief, crew uniform changes are matters that would typically be requested by a new owner of a vessel.~~

       g.      Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an

16

Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

h.    In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." ~~On information and belief, the~~The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

~~40.~~41.   KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. ~~On information and belief, the~~The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

a.    In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[7] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing

---

[7] ~~On information and belief,~~ "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b.      In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.      In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ ~~37~~ 38 39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

d.      In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." ~~Subsequent~~ Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

41.42.  Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

a.      The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

b.      The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets;

19

(4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

      c.     As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht</u>

    ~~42.~~43.   Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with ~~the~~ requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

      a.     On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano."

In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

        b.      In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?" ~~On information and belief, the Captain would not have authorized structural changes to the *Amadea* unless they were requested by the owner's authorized representative or family member.~~

        c.      In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[8] that had taken place earlier that day, regarding setting the *Amadea*'s travel

---

[8] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications:

agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[9] always wanted music)," referencing the addition of another requested structural change to the *Amadea*. for the benefit of one of KERIMOV's children.

        d.    In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

---

KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[9] Given the foregoing, *see supra* n.~~7~~6, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

e.      In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[10]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel ~~at the time~~, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023. ~~On information and belief, the Captain of a vessel would not have scheduled multi-year itineraries for a temporary guest, but would have done so for the family member of the vessel's beneficial owner.~~

44.      Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts

45.      KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

a.      With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a

---

[10] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.~~7~~6.

Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

        b.    With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

    46.    According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

    47.    In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

    48.    For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's

24

then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

43.49.   Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

44.50.   During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

45.51.   After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV, would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 33 34. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional

25

vessel. By that measure, ~~on information and belief,~~ the USD payments for fuel, fees, provisions, ~~and~~ crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

~~46.~~52.   From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*, ~~which.~~  These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

a.   Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea.* On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

b.   On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea.* ~~On information and belief, superyachts~~Superyachts like the *Amadea* require fuel for voyages and to maintain the

26

operation of essential equipment aboard the vessel both while ~~the *Amadea*~~it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

      c.     Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. ~~On information and belief, such~~Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

      d.     Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. ~~On information and belief, such~~Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy~~.~~ and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent

account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

      e.     Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. ~~*See supra* ¶ 46.b.~~ The wire instructions associated with the payments all refer to the *Amadea*.

      f.     In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

      g.     On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

      h.     Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. ~~On information and belief, these~~These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

~~l.~~53.     Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.     KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021. ~~Upon information and belief,~~

29

55.      KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that

KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons

(including financial institutions) from transacting with, on behalf of, or for the benefit of,

KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they

structured the sale of the *Amadea* to conceal KERIMOV's ownership; —(2) subsequent false

representations to law enforcement made directly and indirectly by IMPERIAL YACHTS

regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of

providing yacht services for sanctioned Russian individuals.

47.56.   Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the

sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel

Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided

services to any parties subject to international sanctions."[11] This statement necessarily indicates

that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides

services.

48.57.   IMPERIAL YACHTS employees were also aware that persons controlling,

operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were

transacting with U.S.-based companies and using the U.S. banking system to support and

maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to

IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed

work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S.

correspondent accounts.

---

[11] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an
Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online);
https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

49.59.   Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[12] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

62.     Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

---

[12] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

        a.      When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

        b.      Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

        c.      The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

    63.      The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

    64.      Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system.

32

When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the *Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with

33

his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA violations by willfully depriving his subordinates of the UBO information that they needed to avoid making prohibited transactions.

## FIRST CLAIM FOR FORFEITURE

50.69.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

51.70.   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

52.71.   As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

53.72.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

54.73.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

55.74.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

56.75.   Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
> (A) with the intent to promote the carrying on of specified unlawful activity;

57.76.   For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

58.77.   As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

59.78.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

60.79.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

61.      Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

62.      Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

63.80.   For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

64.81.   As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions. More specifically, funds used to purchase or maintain the *Amadea* became criminally-derived property as soon as they transited inbound to a U.S. correspondent bank account in violation of IEEPA sanctions. Thus, when such funds then transited outbound from a U.S. correspondent bank account to their final destination, the outbound monetary transaction was in violation of § 1957.

65.82.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

### FOURTH CLAIM FOR FORFEITURE

66.83.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

36

67.84.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

68.85.   Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

69.86.   As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

70.87.   Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
~~October 23, 2023~~February 16, 2024

FOR THE U.S. DEPARTMENT OF JUSTICE:

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
U.S. Department of Justice

By: ___/s/ *Joshua L. Sohn*
    JOSHUA L. SOHN
    Trial Attorney
    Money Laundering and Asset
    Recovery Section

By: ___/s/ *~~Sarah Mortazavi~~Jennifer Jude*
    ~~SARAH MORTAZAVI~~JENNIFER
JUDE
        Assistant United States Attorney
        Southern District of New York

JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice

By: ___/s/ *~~Andrew D. Beaty~~Yifei Zheng*
    ~~ANDREW D. BEATY~~YIFEI ZHENG
    Trial Attorney
    Counterintelligence and Export
    Control Section (CES)

## **VERIFICATION**

STATE OF NEW YORK                                    )
COUNTY OF NEW YORK                             :
SOUTHERN DISTRICT OF NEW YORK   )

           TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

 

                                         _Timothy Bergen_
                                       Timothy J. Bergen
                                       Special Agent
                                        Federal Bureau of Investigation


Executed on this ~~21st~~16th day of ~~October, 2023~~February, 2024

39

# EXHIBIT A







UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-9304-DEH |
| | ) | |
| M/Y AMADEA ET AL. | ) | |
| | ) | |
| Defendant-in-Rem. | ) | |
| | ) | |

## [PROPOSED] LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the Southern District of New York ("District Court") presents its compliments to the Central Authority of France and requests assistance in obtaining evidence to be used in civil proceedings before this Court. This request is made pursuant to, and in conformity with, the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("the Hague Convention"), to which both the United States and France are party.

Specifically, the District Court requests assistance in obtaining oral testimony for use at trial from ███████████, a French citizen whose place of business is ███████████ ███████████.

## SECTION I

**1.      SENDER AND REQUESTING JUDICIAL AUTHORITY:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

**2.      CENTRAL AUTHORITY OF REQUESTED STATE:**

Ministère de la Justice
Direction des Affaires Civiles et du Sceau
Département de l'entraide, du droit international privé et européen
(DEDIPE)
13, Place Vendôme
75042 Paris Cedex 01

**3.      PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

***With a Copy to the Parties' Legal Representatives:***

Joshua L. Sohn
Trial Attorney, United States Department of Justice, Money Laundering and Asset Recovery
Section
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Tel:  (202) 353-2223
Fax:  (202) 616-2547
Email:  joshua.sohn@usdoj.gov

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

**4.      SPECIFICATION OF THE DATE BY WHICH THE REQUESTING
         AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF
         REQUEST:**

The requesting authority would greatly appreciate a response to the Request for

Assistance within 21 days or as soon thereafter as is practicable, so as to ensure that the

testimony is received prior to the close of discovery on August 30, 2024, and in a timely manner

for use at trial and otherwise in the civil proceedings described below.

## SECTION II

In conformity with Article 3 of the convention, the undersigned applicant has the honor

to submit the following information regarding the instant request:

**5.      (a)      REQUESTING JUDICIAL AUTHORITY (Article 3(a)):**

The Honorable Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

**        (b)      TO THE COMPETENT AUTHORITY OF (Article 3):**

The French Republic

**        (c)      NAMES OF THE CASE AND ANY IDENTIFYING NUMBER:**

*United States v. M/Y Amadea et al.*, No. 1:23-cv-9304-DEH, United States District Court for the
Southern District of New York, New York, NY, USA

3

6.    **NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES (Article 3(b)):**

    (a)    **Plaintiff(s):**

The United States of America
c/o United States Department of Justice, Money Laundering and Asset Recovery Section (MLARS)
1400 New York Ave. NW, Suite 10100
Washington, DC 20530

Represented by:

Margaret A. Moeser
Acting Chief, MLARS

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov

    (b)    **Claimant(s)[1]:**

Millemarin Investments, Ltd. and Eduard Khudainatov

Represented by:

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com

---

[1] In a civil *in rem* forfeiture case such as this one, the "defendant" is the *res* itself, which cannot defend itself and has no counsel. The "claimant" is the litigating party adverse to the U.S. Government, who contests the U.S. Government's right to forfeiture. By statute, claimants must be parties with an interest in the defendant *res*.  See Exhibit B for a more complete description of this type of U.S. proceeding.

7.     (a)      **NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS (Article 3(c)):**

This is a civil *in rem* forfeiture action seeking to forfeit the M/Y *Amadea*, a 106-meter superyacht.

**(b)     Summary of complaint**

In seeking to forfeit the *Amadea*, the U.S. Government alleges that the *Amadea* is beneficially owned by Suleiman Kerimov, a Russian oligarch who is under U.S. sanctions pursuant the International Emergency Economic Powers Act (IEEPA) and associated regulations. The U.S. Government further alleges that the *Amadea* has been maintained in willful violation of the sanctions against Kerimov and his property and is therefore forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C). (See attached Exhibit B for an explanation of how an IEEPA violation may be the basis for civil forfeiture under U.S. federal law).

**(c)     Summary of defense and counterclaim**

Claimants dispute that Kerimov is the ultimate beneficial owner of the *Amadea* and instead contend that Claimant Khudaintov (who is not under U.S. sanctions) is the owner of the *Amadea*. Even if Kerimov is the owner, Claimants dispute whether anyone *willfully* violated IEEPA in maintaining the *Amadea* and further dispute whether maintaining the *Amadea* in violation of IEEPA would justify forfeiture of the entire vessel.

Importantly, the *Amadea* was allegedly part of a three-ship build project that included two other superyachts, the M/Y *Crescent* and M/Y *Scheherazade*. Claimant Khudainatov claims to be the owner of all three superyachts (*Amadea*, *Crescent*, *Scheherazade*). Thus, evidence bearing upon the true ownership of *any* of these three yachts is relevant to assessing Khudainatov's credibility, and this topic animates the request for Francois Zuretti's testimony.

8.  **DOCUMENTS TO BE OBTAINED OR OTHER JUDICIAL ACT TO BE PERFORMED (Article 3(d)):**

    (a)  **Description of the evidence**

The assistance requested of the Republic of France consists of the following:

    1.  Obtaining oral testimony from ███████████, pursuant to oath or affirmation, regarding the matters described in plaintiff's complaint. Such testimony will be taken at a transcribed deposition. The movant (Plaintiff U.S. Government) intends to elicit testimony from ███████████ on the questions contained in the attached Exhibit A as well as other questions related to the subject matter of this dispute as set forth in paragraph 7 above.

    (b)  **Purpose of the evidence sought**

The oral testimony sought in this Letter of Request pertains to the allegations described above and are to be used at trial and other proceedings relating to the matter described.

## SECTION III

9.  **IDENTITY AND ADDRESS OF ANY PERSON TO BE EXAMINED (Article 3(e)):**



10. **QUESTIONS TO BE PUT TO THE PERSONS TO BE EXAMINED (Article 3(f)):**

The questions to be put to ███████████ relate to the subject matter described in Paragraph 7 above, in addition to questions relating to preliminary matters of witness knowledge and competence. Certain specific questions relating to this subject matter that the movant seeks to elicit from ███████████ are contained in the attached Exhibit A. The movant also requests the ability to ask related questions, including questions intended to clarify any response, of ███████████ as appropriate, provided always that such questions are related to the subject matter set out above.

11. **ANY REQUIREMENT THAT THE EVIDENCE BE GIVEN ON OATH OR AFFIRMATION AND SPECIFIC FORM TO BE USED (Article 3(h)):**

It is requested that all evidence be given under oath in accordance with applicable procedures of French law in a form that is admissible in U.S. courts. It is requested that the testimony be taken and transcribed by a qualified court reporter and videographer chosen by mutual agreement of the parties. It is also requested that the parties may, by agreement, conduct the deposition and/or trial testimony by video or telephonic link.

12. **SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED (Article 3(i) & 9):**

The United States has authorized Alexander Blumrosen of Polaris Law to represent its interests and serve as its counsel in the execution of this Request. Please contact Alexander Blumrosen for any questions and notices regarding this Letter of Request. Please notify the Court that shall be designated to execute this Letter of Request that Alexander Blumrosen shall represent the Commission in connection with any procedures, hearings, and motions that shall be taken and heard in connection with the examination of the witnesses and presentation of documents. Alexander Blumrosen's contact information is:

> Alexander Blumrosen
> Partner
> Polaris Law
> 4 Avenue Hoche
> 75008 Paris, France
> E-mail: ablumrosen@polarislaw.eu
> Telephone: +33 680011413

It is requested that the oral testimony requested be taken through questioning by Alexander Blumrosen and/or U.S. Government counsel or such counsel's designee, with an opportunity afforded to counsel for Claimants Millemarin and Khudainatov to ask questions of (cross examine) each witness on the topics raised by the questions included in Exhibit A after the initial examination of the witness. Counsel may continue thereafter to ask questions of the

witness, each having the opportunity to cross-examine the witness, until there are no more questions. The duration of the deposition may not exceed 7 hours of testimony on the record.

It is requested that counsel for the parties be notified in advance of the time and place of the proceedings, and further that counsel be permitted to attend in person, or by video or audio teleconference for those not able to attend in person. Mr. Blumrosen will be able to assist the French court as may be needed with organizing remote attendees if permitted, at the cost if any of the U.S. government.

It is further requested that the affirmation and oral examination be transcribed verbatim stenographically in English, as well as be video-recorded by a videographer, both of which can be organized for the French court through the assistance of Mr. Blumrosen and at the cost of the U.S. government, and that the written transcript and video recording from the videographer be provided to:

Hon. Dale E. Ho
United States District Court Judge
The United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007
United States of America

*With a Copy to the Parties' Legal Representatives:*

Joshua L. Sohn
Trial Attorney
MLARS
United States Department of Justice
1400 New York Ave. NW, Suite 10100
Washington, DC 20530
Telephone: (202) 353-2223
Email: joshua.sohn@usdoj.gov
Counsel for Plaintiff United States of America

Adam C. Ford
Ford O'Brien Landy LLP
275 Madison Ave., Floor 24
New York, NY 10016
Tel:  (212) 858-0040
Email:  aford@fordobrien.com
Counsel for Claimants Millemarin Investments Ltd. and Eduard Khudainatov

If the witness testifies in French, it is requested that that an interpreter assist the witness during the deposition as may be needed such that the verbatim transcript in English will reflect the questions in English asked by the examining attorney and the responses of the witness translated into English. No French language verbatim transcript is requested. The engagement and the cost of the interpreter and videographer will be borne by the U.S. government, and Mr. Blumrosen will assist the French court in making such arrangements.

It is further requested that, if any portion of this Request is deemed to be unacceptable under the laws of France, that counsel for the parties, please be informed of that fact and be allowed to respond substantively prior to the decision and that the France Central Authority please comply with as much of the Request as possible.

**13.     REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED (Article 7)**

It is requested that notice of the execution of the Request be provided to the Parties' representatives listed in Paragraphs 6 and 12 above.

9

14. **REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERSONNEL OF THE REQUESTING AUTHORITY AT THE EXECUTION OF THE LETTER OF REQUEST (Article 8):**

None.

15. **SPECIFICATION OF PRIVILEGE OR DUTY TO REFUSE TO PRODUCE DOCUMENTS OR TESTIFY IN THE FORM OF A DEPOSITION UNDER THE LAW OF THE STATE OF ORIGIN (Article 11(b):**

The movant will not seek to elicit testimony from ████████ that would disclose information protected by the attorney-client privilege, the work product doctrine, or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of the United States or of the French Republic.

16. **THE FEES AND COSTS INCURRED WHICH ARE REIMBURSABLE UNDER THE SECOND PARAGRAPH OF ARTICLE 14 OR UNDER ARTICLE 26 OF THE CONVENTION WILL BE BORNE BY:**

This Court understands that certain fees and costs incurred in the execution of this Request may be reimbursable under the second paragraph of Article 14 or Article 26 of the Hague Evidence Convention. The costs of this Hague Convention process will be borne by the U.S. Government, which may be contacted through the counsel identified above.  Each party will be responsible for the fees and expenses, if any, of its own attorneys relating to any proceedings arising from this Hague Convention process.

## SECTION IV

This District Court expresses its gratitude to the authorities of the French Republic for their assistance and courtesy under the terms of the Hague Evidence Convention.

Signature and Seal of the Requesting Judicial Authority:

Dated: _____        _____
                                       HON. DALE E. HO
                                       UNITED STATES DISTRICT JUDGE

**Exhibit A: Deposition Questions for** ▮▮▮▮▮▮▮

1. Are you the CEO of ▮▮▮▮▮▮?

2. Was ▮▮▮▮▮▮ the interior design company for the M/Y *Crescent*, aka Project Thunder?

3. Who did you understand to be the owner of the *Crescent*?

4. What was your understanding of Igor Sechin's connection to the *Crescent*?

5. Please describe all instances in which you met with Igor Sechin or his then-wife Olga Rozhkova in connection with the *Crescent*.

6. Did you have a meeting in Moscow in or about December 2014 with Sechin and Rozhkova in which they discussed the fitting-out of the *Crescent*? If so, please describe this meeting.

<u>Exhibit B</u>

Civil in rem remedies under U.S. federal law are legal actions directed against property rather than against a person.

These remedies are most commonly associated with asset forfeiture, where the government seeks to seize property connected to criminal activity. The principal statute authorizing in rem actions in the context of federal forfeiture is the Civil Asset Forfeiture Reform Act (CAFRA) of 2000, codified in 18 U.S.C. §§ 981-987.

<u>Key Features of Civil In Rem Proceedings</u>

**1. Statutory Basis:**

> *"The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."* 18 U.S.C. § 981(a)(1)(A):

This pending in rem case of the U.S. government against the Amadea is based on an alleged violation of **International Emergency Economic Powers Act** (IEEPA) (50 U.S.C. §§ 1701-1707), which grants the President the authority to regulate commerce after declaring a national emergency in response to any unusual and extraordinary threat to the United States that has a foreign source.  Violations frequently involve, as in this case, engaging in prohibited financial transactions or dealing in blocked assets, which can constitute illegal financial transactions under U.S. federal law.

The U.S. money laundering statutes (18 U.S.C. §§ 1956 and 1957) criminalize financial transactions involving proceeds of specified unlawful activities or transactions to promote specified unlawful activities. Violations of IEEPA can be considered specified unlawful activities under these statutes. If property (real or personal) is involved in a transaction that violates IEEPA, and such a transaction also constitutes money laundering or another financial crime, it can be subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

**2. Civil Nature of Proceedings:**

- <u>No Criminal Charges Required</u>: Unlike criminal forfeiture, civil in rem proceedings do not require a criminal conviction, or even a pending criminal proceeding against an individual. The action is against the property itself based on the allegation that the property was used in connection with a criminal enterprise or represents the proceeds of illegal activity.
- <u>Burden of Proof: Under CAFRA</u>, the government must prove by a preponderance of the evidence that the property is subject to forfeiture. This is a lower standard of proof than in criminal cases, which require proof beyond a reasonable doubt.

**3. No Right to a Jury Trial:**

In civil in rem actions, there is no right to a jury trial, at least where (as here) the property is seized on navigable waters. Such cases are typically decided by a judge. This contrasts with criminal

proceedings where the Sixth Amendment of the U.S. Constitution guarantees an individual defendant, in a criminal prosecution, the right to a jury trial.

**4. Available Remedies:**

- <u>Forfeiture of Property</u>: The primary recovery in a civil in rem proceeding is the forfeiture of the property itself. This can include real estate, vehicles, cash, bank accounts, and other assets.
- <u>Monetary Recoveries</u>: In some cases, the government may pursue monetary judgments equivalent to the value of the property if the actual property cannot be seized.

**5. Process Overview**

- <u>Seizure and Complaint</u>: The government begins by seizing the property and then files a civil complaint against the property.
- <u>Notice and Claim</u>: The government must provide notice to interested parties, who then have an opportunity to file a claim contesting the forfeiture.
- <u>Judicial Process</u>: The case proceeds in federal court in a civil action, where the government must demonstrate that the property is connected to illegal activity. Claimants can present evidence and argue against the forfeiture; the procedure is governed by the Federal Rules of Civil Procedure (the Federal Rules of Criminal Procedure do not apply to this civil action) .
- <u>Judgment</u>: The judge decides whether the property should be forfeited to the government. If the government prevails, the property is forfeited. If the claimant prevails, the property is returned.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                       :

UNITED STATES OF AMERICA,

                                       :

        Plaintiff,

                                       :

        - v. -                              :           VERIFIED FIRST AMENDED
                                             COMPLAINT

THE M/Y *AMADEA*, A MOTOR YACHT     :           <u>FOR FORFEITURE</u>[1]
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING   :           1:23-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND      :
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,             :

                                       :

        Defendant-*In-Rem*.

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

       Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified First Amended Civil Complaint,

alleges as follows:

## I. JURISDICTION AND VENUE

       1.     This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for
a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. P. 9(h)(1).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4. The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. <u>NATURE OF THE ACTION</u>

5. This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6. On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges. Economic sanctions are an essential means for the

2

United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7.      In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

### A.  Statutory Basis for Forfeiture

8.      The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

9.      The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity. The Defendant In Rem is also forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

10.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

**B.  Relevant Persons and Entities**

11.     At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

12.     At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as roughly $300 million or more.

13.     At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to

4

Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

14.     At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.     At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S. sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are

collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O. 13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O.

13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (87 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

7

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

        a.      To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

        b.      To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

        c.      To be an official of the Government of the Russian Federation;

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

d.      To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

e.      To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

22.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

23.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List.

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. FACTUAL ALLEGATIONS

### A. Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the

disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

**B.  KERIMOV's Ownership of the *Amadea***

<u>Overview of KERIMOV's Ownership of the *Amadea*</u>

28.     As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the

vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

<u>The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV</u>

29.      In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"), traveled to the United Arab Emirates in or about June 2020 in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

30.      Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

31.      In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea*

11

for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

32.     On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

33.     In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, he was instead putting himself forward as a straw owner on behalf of KERIMOV.

34.     Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA,

although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

35.     The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

36.     Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ 34.

37.     Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. In this manner, KERIMOV acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have notified Cayman Islands government officials (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

38.     Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with an October 2021 voyage of the *Amadea*. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's

13

representative, *see infra* ¶¶ 39, 40.e., 40.g. The third individual listed on the guest manifest was KOCHMAN.

39.     Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

40.     Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

        a.     In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

        b.     According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened

14

for the purpose of a "New Owner Lunch with Captain[3] & ETO,[4]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

      c.     In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

      d.     In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ 38-39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel— further indicates that KERIMOV was the ultimate beneficial owner.

      e.     In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

---

[3] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[4] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

        f.      In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow."

        g.      Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

        h.      In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

    41.      KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

a. In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[5] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b. In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c. In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

_____

[5] "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

     d.     In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

42.     Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL YACHTS, and the Interior Designer planned to effectuate the structural changes raised by KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial owner of the *Amadea* and consequently had the authority to order major renovations to the vessel. For example:

     a.     The Captain of the *Amadea* and the Interior Designer had a "refit meeting" on or about November 10, 2021 in which the following modifications to the *Amadea* were discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall panels that contained false book spines with "plain wall paneling," visual renderings of which were "ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings "to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include installation of new floors, new plug outlets, and potentially replacing the doors to accommodate the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master cabin suite; and (9) removing the bar in the main deck.

b. The renovations discussed in the "refit meeting" were memorialized in a "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets; (4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

c. As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with KERIMOV's Ownership of the Yacht</u>

43. Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

a.     On or about February 22, 2022, an *Amadea* crew member sent the Captain
of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest
from the February trip." One of the attached documents, entitled "Guest Preferences – Feb
2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2";
KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was
identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is
a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano."
In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea*
an email with several attachments, one of which contained a screenshot of a WhatsApp message
between that crew member and an individual saved under the contact name "Max Owners," and,
in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal,
undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

b.     In a prior email, dated January 21, 2022, an IMPERIAL YACHTS
employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter]
has requested to add a socket in all guests bathrooms in more accessible for guests location.
Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in.
Please could you pass this comment to the designers to be prepared for their arrival on board."
In response, the Captain forwarded the email to employees of the Interior Designer with the
request: "Please add new / more accessible plug socketing in the bathrooms with your designs
for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain
emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer
would be coming to the Caribbean to present the planned changes: "Please advise if [employee]
should mobilize to the Carib. to the meeting with G2 rgds renderings?"

c.　　In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[6] that had taken place earlier that day, regarding setting the *Amadea*'s travel agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[7] always wanted music)," referencing the addition of another requested structural change to the *Amadea* for the benefit of one of KERIMOV's children.

d.　　In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS

---

[6] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications: KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[7] Given the foregoing, *see supra* n.6, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

       e.     In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[8]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023.

      44.     Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

KHUDAINATOV Is a Straw Owner of the <em>Amadea</em> and Other Yachts

      45.     KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the

---

[8] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.6.

ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

      a.     With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

      b.     With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

    46.     According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47. In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48. For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

49. Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

## C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

50. During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

51. After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV,

would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 34. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional vessel. By that measure, the USD payments for fuel, fees, provisions, crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

52.     From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*. These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

a.     Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea.* On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by

Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

b.     On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea.* Superyachts like the *Amadea* require fuel for voyages and to maintain the operation of essential equipment aboard the vessel both while it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

c.     Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

d.     Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy

and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

e.      Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. The wire instructions associated with the payments all refer to the *Amadea*.

f.      In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

g.      On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

h.      Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices

also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

53.      Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.     KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021.

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons (including financial institutions) from transacting with, on behalf of, or for the benefit of, KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; (2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

56.     Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided services to any parties subject to international sanctions."[9] This statement necessarily indicates that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides services.

57.     IMPERIAL YACHTS employees were also aware that persons controlling, operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to

---

[9] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online); https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

59.     Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[10] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

---

[10] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

62.     Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

a.     When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

b.     Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

c.     The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63.     The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

31

64.     Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system. When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the

*Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors

regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and

that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with

his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who

paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money

laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO

information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea*

was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL

YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA

violations by willfully depriving his subordinates of the UBO information that they needed to

avoid making prohibited transactions.

## FIRST CLAIM FOR FORFEITURE

69.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set

forth herein.

70.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which

constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified

unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is

defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

71.     As set forth above, the Defendant In Rem constitutes or is derived from proceeds

traceable to violations of IEEPA sanctions because post-purchase maintenance payments in

violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an

operational vessel.

72. Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

73. The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

74. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

75. Section 1956(a)(2) imposes criminal penalties on any person who:

Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

. . .

(A) with the intent to promote the carrying on of specified unlawful activity;

76. For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

77. As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

78.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

### THIRD CLAIM FOR FORFEITURE

79.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

80.     Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

81.     As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions.

82.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

### FOURTH CLAIM FOR FORFEITURE

83.     The United States incorporates by reference ¶¶ 1 through 68 above as if fully set forth herein.

84. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

85. Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

86. As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

87. Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1) That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2) That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3) That the Court grant the United States such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
        February 16, 2024


FOR THE U.S. DEPARTMENT OF JUSTICE:


MARGARET A. MOESER                      DAMIAN WILLIAMS
Acting Chief                            United States Attorney for the
Money Laundering and Asset Recovery     Southern District of New York
Section, Criminal Division              U.S. Department of Justice
U.S. Department of Justice


By:  /s/ *Joshua L. Sohn*               By:  /s/ *Jennifer Jude*
     JOSHUA L. SOHN                          JENNIFER JUDE
     Trial Attorney                          Assistant United States Attorney
     Money Laundering and Asset              Southern District of New York
     Recovery Section


JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


By:  /s/ *Yifei Zheng*
     YIFEI ZHENG
     Trial Attorney
     Counterintelligence and Export
     Control Section (CES)

## <u>VERIFICATION</u>

STATE OF NEW YORK       )
COUNTY OF NEW YORK      :
SOUTHERN DISTRICT OF NEW YORK  )

        TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

 

Timothy J. Bergen
Special Agent
Federal Bureau of Investigation


Executed on this 16th day of February, 2024

# EXHIBIT A







UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :

UNITED STATES OF AMERICA,
                                                  :

        Plaintiff,
                                                  :

        - v. -                            :        VERIFIED FIRST AMENDED
                                                  :        COMPLAINT
THE M/Y *AMADEA*, A MOTOR YACHT               FOR FORFEITURE[1]
BEARING INTERNATIONAL MARITIME    :
ORGANIZATION NO. 1012531, INCLUDING         1:23 Civ. _____-cv-9304 (DEH)
ALL FIXTURES, FITTINGS, MANUALS,     :
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER    :
APPURTENANCE THERETO,
                                                  :

        Defendant-*In-Rem*.
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff United States of America, by its attorneys, Damian Williams, United States

Attorney for the Southern District of New York, Margaret A. Moeser, Acting Chief of the Money

Laundering and Asset Recovery Section, and Jennifer Kennedy Gellie, Acting Chief of the

Counterintelligence and Export Control Section, for its verified civil First Amended Civil

Complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

      1.     This action is brought pursuant to Title 18, United States Code, Sections 981 and

983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions, by the United States of America, seeking forfeiture of the

following Defendant-*in-rem*:

---

[1] While Plaintiff does not demand a jury trial at this time, Plaintiff reserves the right to move for a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).

a. the M/Y *Amadea*, International Maritime Organization ("IMO") No. 1012531, including all fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat, tender, and other appurtenance thereto (the "Defendant In Rem").

2. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1333, 1345, and 1355(a). While the United States does not concede that such designation is necessary, the United States designates each of its forfeiture claims as admiralty claims under Fed. R. Civ. ~~1345, and 1355(a~~P. 9(h)(1~~)~~).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), as some of the acts or omissions giving rise to the forfeiture took place in the Southern District of New York.

4. The Defendant In Rem is currently located in San Diego, California, after it was previously seized in the navigable waters of Fiji in or about April 2022. Images of the Defendant In Rem are appended to this Complaint as Exhibit A.

## II. NATURE OF THE ACTION

5. This is an action *in rem* to forfeit a 348-foot luxury superyacht—the M/Y *Amadea*—that is beneficially owned by Suleiman KERIMOV ("KERIMOV"), a Russian national.

6. On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated KERIMOV as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"). As a result of this designation, ~~monetary transactions~~dealings involving KERIMOV's property, or that involve the provision of funds, goods, or services to or for the benefit of KERIMOV, are generally prohibited if ~~such transactions are~~ conducted by U.S. persons (including U.S. financial institutions) or occur in the United States. The United States sanctions program is a critical component of the nation's ability to address national security and foreign policy challenges.

2

Economic sanctions are an essential means for the United States government to repel the malign activity of rogue nations, actors, and transnational security threats. Regulating access to domestic financial institutions, entities, and currency enables the United States to effectuate these interests by preventing the misuse and exploitation of the U.S. financial system.

7. In 2021, after KERIMOV's OFAC designation, KERIMOV, acting through a third party, entered into an agreement to purchase the *Amadea*. Since that time, KERIMOV or others acting on his behalf have spent ~~hundreds of thousands of~~more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions. ~~Such~~By dealing in KERIMOV's blocked property, such transactions violated the sanctions imposed under IEEPA and therefore constitute "specified unlawful activity" as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7). The *Amadea* could not remain a functional vessel without such transactions. Ongoing payments for maintenance, fuel, and fees are necessary for the operation and continued upkeep of the *Amadea*, a luxury superyacht.

**A. Statutory Basis for Forfeiture**

8. The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of sanctions under IEEPA, which covers the sanctions that were levied on KERIMOV and his property, as detailed below.

~~9.~~ The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property. Section 1956(a)(2)(A) prohibits transferring funds from a place in the United States to or through a place outside the

3

United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

10.9.    The Defendant In Rem is further subject to forfeiture pursuant toalso forfeitable under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property. Section 1957 prohibits knowingly engaging in or attempting to engage in monetary transactions in criminally-derived property of a value greater than $10,000, where the property is derived from specified unlawful activity.

11.10.  The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

### B. Relevant Persons and Entities

12.11.  At all times relevant to this Complaint, Suleiman KERIMOV was a Russian billionaire who primarily amassed his fortune through stakes in the Russian gold producer Polyus Gold and other commodities companies. He is also a member of the Russian Federation Council, a legislative body in Russia. On April 6, 2018, OFAC designated KERIMOV as an SDN, as detailed below.

13.12.  At all times relevant to this Complaint, the M/Y *Amadea* (International Maritime Organization ship identification number 1012531) was a luxury superyacht whose value has been reported as betweenroughly $300 million and $500 millionor more.

14.13.  At all times relevant to this Complaint, IMPERIAL YACHTS SARL ("IMPERIAL YACHTS") was a company that caters to wealthy Russian yacht owners and purchasers. IMPERIAL YACHTS's principal business involved managing luxury yachts and brokering their

4

purchase and sale. On or about June 2, 2022, OFAC designated IMPERIAL YACHTS pursuant to Executive Order ("E.O.") 14024, in order to block property with respect to specified harmful foreign activities of the Government of the Russian Federation. In announcing the designation, OFAC stated that "Imperial Yachts conducts business with U.S.-designated oligarchs, including through providing management services to at least one yacht linked to an OFAC-designated individual." IMPERIAL YACHTS assists its customers in concealing their ownership of yachts. Specifically, IMPERIAL YACHTS offers to prospective owners the opportunity to set up a chain of shell companies to conceal the identity of the true owner of the yacht. In doing so, IMPERIAL YACHTS would identify on corporate documents an individual who was not the actual user or owner of the vessel at the end of the chain of shell companies so that even if law enforcement, the media, or regulatory authorities uncovered the title holder of a vessel, that vessel would not appear tied to the real owner.

15.14. At all times relevant to this Complaint, Evgeny KOCHMAN was the President of IMPERIAL YACHTS. As part of his duties brokering the sale of luxury yachts, KOCHMAN, through IMPERIAL YACHTS, would at times set up shell companies through which KOCHMAN would nominally purchase a luxury yacht on behalf of a buyer who wished to shield his identity and/or involvement in the yacht purchase. On or about June 2, 2022, in conjunction with the designation of IMPERIAL YACHTS, OFAC designated KOCHMAN, pursuant to E.O. 14024, for operating or having operated in the marine sector of the Russian Federation economy.

15.    At all times relevant to this Complaint, Eduard KHUDAINATOV was a Russian businessman who is the former CEO of the Russian oil company Rosneft. In this role, KHUDAINATOV was subordinate to Igor Sechin, the Chairman of Rosneft and one of the most powerful persons in Russia. As detailed below, KHUDAINATOV, who is not subject to U.S.

5

sanctions, has functioned as a straw owner of the *Amadea* and other superyachts, which are collectively worth well over $1 billion. For at least one of these other superyachts, the true beneficial owner is Sechin. OFAC sanctioned Sechin and designated him as an SDN on or about April 28, 2014.

## III. STATUTORY AND REGULATORY FRAMEWORK FOR UKRAINE-RELATED SANCTIONS

16.     IEEPA, 50 U.S.C. § 1701 *et seq.*, grants the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 50 U.S.C. § 1705(a), (c).

17.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued E.O. 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660 pursuant to his authority under IEEPA and NEA, including through: (1) E.O. 13661, issued to expand the scope of the national emergency declared in E.O.

6

13660, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,533 (Mar. 19, 2014); (2) E.O. 13662 to further expand the scope of the national emergency declared in Executive Orders 13660 and 13661, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014); and (3) E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine and prohibit the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and any new investment in the Crimea region of Ukraine by a U.S. person, wherever located, *see* Exec. Order No. 13685 (Dec. 19, 2014), 79 Fed. Reg. 77,357 (Dec. 24, 2014).

18.     Together, these orders (hereinafter "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against certain persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

19.     On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). On May 2, 2022, OFAC issued an update with a more comprehensive set of regulations (7987 Fed. Reg. 26094, May 2, 2022). *See* 31 C.F.R. part 589, Ukraine-/Russia-Related Sanctions Regulations (the "Regulations").

20.     "Blocking" sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons (including U.S. financial institutions) or occurring in the United States are prohibited if they involve transferring, paying,

exporting, withdrawing, or otherwise dealing in the "property" or "interests in property"[2] of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V (which includes the Russia/Crimea Sanctions) are also blocked, regardless of whether the entity itself is listed.

21.     The Russia/Crimea Sanctions "block" the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

a.      To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following: (1) actions or policies that undermine democratic processes or institutions in Ukraine; (2) actions or policies that threaten the peace, security, stability,

---

[2] As defined in the relevant regulations, "an interest in property" means "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 589.321, and "property" and "property interest" include ~~money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements,~~ but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.331.

sovereignty, or territorial integrity of Ukraine; or (3) misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

   b.  To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

   c.  To be an official of the Government of the Russian Federation;

   d.  To be controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

   e.  To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

  22.  In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *See, e.g.*, E.O. 13661 at § 4(a).

  23.  An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. ~~OFAC's licensing authority is located in Washington, D.C.~~

24.     Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).

## IV. FACTUAL ALLEGATIONS

### A. Sanctions Against KERIMOV

25.     Pursuant to the Russia/Crimea Sanctions (specifically, E.O. 13661), on or about April 6, 2018, the Treasury Department designated KERIMOV as an SDN. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

26.     The April 6, 2018 designation listed KERIMOV among the "Russian Oligarchs" being designated and stated that KERIMOV was "designated for being an official of the Government of the Russian Federation." In imposing sanctions, OFAC determined that KERIMOV benefited from the regime of Vladimir Putin, President of the Russian Federation, and played a key role in advancing Russia's malign activities.

27.     In 2018, the Treasury Department issued a press release regarding KERIMOV's designation, the Federal Register published a Notice of OFAC Sanctions Actions that further announced the designation, and public media reports disseminated news of the Treasury Department's designation of KERIMOV.

10

## B. KERIMOV's Ownership of the *Amadea*

### Overview of KERIMOV's Ownership of the *Amadea*

~~27.~~28.  As set forth in greater detail below, between in or about July 2021 and in or about October 2021, beneficial ownership of the *Amadea* was transferred to an entity that appeared, on paper, to be owned by KOCHMAN, but which was in fact beneficially owned by KERIMOV. In or about September and October 2021, emails circulated among *Amadea* crew members discussed various arrangements for the "new owner" of the vessel, indicating their understanding that the beneficial ownership had transferred to a new person. Various documents maintained aboard the vessel reflected that KERIMOV was the beneficial owner of the yacht, including a guest manifest at the time the new owner was expected to travel aboard the yacht, in which KERIMOV was the first-listed guest, and emails reflecting planned changes to the structure and function of the yacht, as requested by the owner's representative, a KERIMOV associate. ~~Between~~Records also revealed that between in or about January and February 2022, members of KERIMOV's family spent multiple weeks aboard the *Amadea*, during which time one of KERIMOV's children requested structural modifications to the yacht, consistent with the changes that would be made by the owner, his family, or a representative. These contemporaneous records reflect that KERIMOV was the beneficial owner of the yacht, irrespective of the titleholder of the vessel.

### The *Amadea* Was Quickly Transferred in a Manner Designed to Obscure KERIMOV's Beneficial Ownership and Evade U.S. Sanctions Against KERIMOV

~~28.~~29.  In connection with the anticipated purchase of the *Amadea*, KERIMOV and his associate, Dinar Khalikov ("Dinar"),~~3~~ traveled to the United Arab Emirates in or about June 2020

---

~~3 Dinar's status as KERIMOV's representative is evidenced by numerous emails and text messages from Dinar to third-parties, or between third-parties discussing Dinar, in which Dinar held himself out as KERIMOV's representative, or third-parties referred to him as such.~~

in order for KERIMOV to view the *Amadea*. Communications establish that Dinar held himself out as KERIMOV's representative and that *Amadea* crew members and other third parties treated him as such.

29.30.   Between in or about July 2021 and in or about September 2021, ownership of the *Amadea* was transferred from the former title holder, Nereo Management Ltd. ("Nereo"), to a company incorporated approximately thirty days before the sale called Millemarin Investments Ltd. ("Millemarin"), and then again to yet another newly-incorporated company called Errigal Marine Limited ("Errigal"), an entity which on paper appeared to be owned by KOCHMAN but which, in reality, was used to obscure KERIMOV's beneficial ownership of the *Amadea*.

30.31.   In the first transfer, on or about July 20, 2021, the vessel's then-holding company, Nereo, entered into a Memorandum of Agreement with Millemarin, committing to sell the *Amadea* for the price of approximately €243,820,000 (the "July MOA"). The July MOA stipulated that the sale must be executed on or before August 16, 2021, and that all of the yacht's running costs would be borne by Nereo—the seller—until the sale was complete.

31.32.   On or about August 16, 2021, title to the *Amadea* was nominally transferred from Nereo to Millemarin, as contemplated by the July MOA, but records maintained by the sales broker, IMPERIAL YACHTS, reflected a purchase price of €1.

32.33.   In the second transfer, on or about September 14, 2021, Millemarin entered into a Memorandum of Agreement with Errigal, which had been incorporated one week earlier, committing to sell the *Amadea* for the purchase price of €225 million (the "Sept. MOA"). While KOCHMAN appeared to be the sole owner of Errigal, on information and belief, KOCHMAN did not have the means to purchase a luxury superyacht at that price and he was instead putting himself forward as a straw owner on behalf of KERIMOV.

33.34.   Pursuant to the terms of the Sept. MOA, the sale price for the *Amadea* was divided into two payments, the first of which was due to be remitted on or about September 17, 2021, in the amount of €45 million, and the second of which was due to be remitted on or about November 1, 2021, for the remaining €180 million. ~~Unlike traditional sales agreements, and unlike~~Unlike the July MOA, the Sept. MOA permitted the buyer (KERIMOV, by way of Errigal) use rights to the *Amadea* consistent with those ~~granted to~~of a beneficial owner even before the buyer had paid in full. Under the Sept. MOA, the buyer was entitled to use the vessel after the initial €45 million payment was remitted, at which point the buyer was required to pay for all "running costs" of the *Amadea*, such as operational, technical, and crew costs, and to bear all risk of loss, damage, or destruction of the *Amadea*. The seller, *i.e.*, Millemarin, agreed not to use the yacht moving forward, even before the initial payment was remitted, and agreed to deliver the vessel to the new owner in the vicinity of the South of France. Under the Sept. MOA, although use rights and running cost responsibility transferred upon the first payment, title to the *Amadea* was set to transfer only upon full payment.

34.35.   The first payment toward the sale of the *Amadea* was made on or about September 17, 2021, in the amount of €45 million, transferring responsibility for the *Amadea*'s running costs to the buyer—KERIMOV, by way of Errigal. By on or about October 27, 2021, the purchase price of the *Amadea* had been paid in full.

35.36.   Following the remittance of the first initial payment, the *Amadea* traveled from Italy to Nice, France in or about October 2021, consistent with the expectation in the Sept. MOA that the yacht would be delivered to the new owner in the vicinity of the South of France. *See supra* ¶ ~~33~~34.

13

36.37.   Although payment for the *Amadea* was made in full in October 2021, title to the *Amadea* did not automatically transfer from the seller to the buyer at that point.  Rather, transfer of the *Amadea* was formally executed on or about March 7, 2022 when the buyer, Errigal, acquired 100% of the shares in Millemarin from Millemarin's holding company, Invest International Ltd., effectively transferring legal ownership of the *Amadea* to Errigal. ~~On information and belief, by structuring the transaction in~~In this manner, KERIMOV ~~was able to acquire~~acquired ownership of the *Amadea* without a documented title transfer of the vessel itself, which would have ~~necessarily~~ notified Cayman Islands government officials[4] (the *Amadea* was registered in the Cayman Islands) and other third parties to the *Amadea*'s sale.

<u>KERIMOV and His Representative Boarded the *Amadea* Immediately After the Sale and Directed Renovations, Consistent with KERIMOV's Ownership of the Yacht</u>

37.38.   ~~In~~Shortly after KERIMOV's acquisition of the *Amadea*, a guest manifest was prepared in connection with ~~the *Amadea*'s~~an October 2021 voyage,~~ a guest manifest was prepared of the *Amadea*~~. The guest manifest, dated October 17, 2021, listed KERIMOV as the first individual, namely, the lead guest on the *Amadea* at that time. The second individual listed on the manifest was Dinar Khalikov, KERIMOV's representative, *see infra* ¶¶ ~~38,~~39, 40.e., ~~39~~40.g. The third individual listed on the guest manifest was KOCHMAN.

38.39.   Yacht crews, including the *Amadea*'s crew, assign generic guest designations to individuals aboard a yacht, such as "G1" or "Guest 1," and "G2" or "Guest 2." *Amadea* crew members referred to KERIMOV in emails as "G1." *Amadea* crew members referred to Dinar as the "Owner's representative," "O. Rep.," and/or "Dinar." KOCHMAN, the third-listed guest on the manifest, was the only individual listed on the guest manifest who had the initials "EK." *Amadea* crew members referred to KOCHMAN using those initials in subsequent

---

[4] ~~In March 2022, the *Amadea* was registered in the Cayman Islands.~~

14

communications. KHUDAINATOV, the purported owner of the *Amadea* (*see infra*), was not listed on this guest manifest at all.

~~39.~~40.   Immediately after the initial payment was remitted in September 2021, *Amadea* crew members exchanged communications reflecting that the yacht had a new beneficial owner, namely, KERIMOV, indicating that—consistent with the Sept. MOA—use rights and maintenance obligations for the *Amadea* in fact transferred after the seller received the first payment toward the purchase of the *Amadea*. For example:

       a.     In a memorandum dated September 18, 2021, an *Amadea* crew member wrote: "The boat has been sold," "Boss trip expected in the middle of October, we need to hire more crew (as above). Contracts are about to change," and "Trip with a new Owner mid-October."

       b.     According to an "Amadea Wine Inventory" spreadsheet maintained aboard the *Amadea*, on September 18, 2021—one day after the first payment for the *Amadea* and one day after KERIMOV, as the buyer, was entitled to use the *Amadea*—two bottles of wine were opened for the purpose of a "New Owner Lunch with Captain[5] & ETO,[6]" indicating crew members' understanding that the *Amadea* had been transferred to a new ultimate beneficial owner.

       c.     In a September 29, 2021 Accounts Approval Form for the *Amadea*, a crew member requested new coffee equipment, with the following comment: "We currently only have one Cimbali coffee machine in the main deck pantry and we need to be guest ready for the new

---

[5] As is typical of superyachts, the *Amadea* employed two individuals as "Co-Captains" who each independently captained the vessel for a fixed period of a few months to provide the other relief. All references to the "Captain" in this Complaint reference either of these two individuals, each serving in their capacity as a Captain of the *Amadea*.

[6] "ETO" is an acronym for Electro-Technical Officer, which refers to the individual on a yacht responsible for electrical equipment.

owner," further establishing that use rights of the *Amadea* had in fact transferred to a new ultimate beneficial owner after remittance of the first payment pursuant to the Sept. MOA.

      d.    In a document titled "G1 Guest preferences October 2021," "G1," *i.e.*, KERIMOV, *see supra* ¶¶ ~~37~~ 38 39, was slated to occupy the "Owner's deck master Cabin." "Dinar" was slated to occupy the "Bridge deck Terracotta Cabin." ~~On information and belief, this~~ This trip—which occurred at approximately the time the *Amadea* crew expected the "new owner" to travel aboard the vessel—further indicates that KERIMOV was the ultimate beneficial owner.

      e.    In an October 19, 2021 email from one *Amadea* crew member to another, a crew member wrote, "When I was packing up G1s clothes – Ek [*i.e.*, KOCHMAN] and G1 [*i.e.*, KERIMOV] said to keep his [*i.e.*, KERIMOV's] Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him," indicating that KERIMOV intended to board the *Amadea* frequently. The receiving crew member responded, in substance, that the crew member "had checked with DK [Dinar Khalikov]," and that Dinar had instructed that the Nike trainers be maintained onboard.

      f.    In an October 21, 2021 email thread, employees of IMPERIAL YACHTS and *Amadea* crew members discussed providing a proposal for amended crew uniforms to "G2," and noted that they were "add[ing] the uniform proposal to the Agenda with G1 [*i.e.*, KERIMOV] for tomorrow." ~~On information and belief, crew uniform changes are matters that would typically be requested by a new owner of a vessel.~~

      g.    Dinar Khalikov, the representative of KERIMOV, was listed as the "Owners representative" in multiple documents requesting changes to the *Amadea*, further indicating that KERIMOV was the new ultimate beneficial owner of the *Amadea*. For example, an

Account Approval Form for the *Amadea*, dated November 2, 2021, requested authorization for a satellite TV subscription, writing "Request from Owners representative Dinar," *i.e.*, Dinar Khalikov. An IMPERIAL YACHTS Account Approval Form for an "AVIT" (*i.e.*, Audio-Visual Information Technology) refit for the *Amadea*, dated November 17, 2021, likewise listed "Dinar" as the "Owners Representative."

      h.    In an October 29, 2021 email sent from one *Amadea* crew member to another, the sender stated: "One of the comments for the new owner was to source portable reading lamps for the exterior decks." ~~On information and belief, the~~The reference to "the new owner" approximately two days after the final payment for the *Amadea* was remitted further indicates that beneficial ownership of the yacht had transferred to a new individual, consistent with the Sept. MOA.

    ~~40.~~41.   KERIMOV and his representatives directed the *Amadea* crew to make renovations, improvements, and alterations to the *Amadea*, consistent with KERIMOV's recent acquisition of the vessel. ~~On information and belief, the~~The structural changes to the *Amadea* are inconsistent with the changes that would be implemented for a temporary guest, and consistent with the changes that would be ordered by a new owner. For example:

      a.    In an October 14, 2021 email from the *Amadea* Captain to other crew members, the Captain relayed "comments" stemming from a "walkaround with O.Rep[7] Mr. Dinar" that the Captain had conducted the previous day. Among the "comments" the *Amadea* Captain noted were the following structural changes to the vessel: (1) installing new carpets; (2) removing

---

[7] ~~On information and belief,~~ "O.Rep" stands for "Owner's Representative," further demonstrating that KERIMOV was the "owner," for whom Dinar Khalikov, KERIMOV's associate, was the representative.

draped curtains and tassels; and (3) removing the ceiling silk rosette and trimmings on the master suite.

b.      In an October 14-15, 2021 email thread circulated among *Amadea* crew members, IMPERIAL YACHTS employees, and a company responsible for the interior design of the vessel (the "Interior Designer"), IMPERIAL YACHTS employees discussed a proposal to renovate the gym in the *Amadea*, during the course of which an IMPERIAL YACHTS employee asked the Interior Designer employees for catalogues of gym equipment "in order for G1 to see all the available equipment and to make a choice[.]"

c.      In an October 18, 2021 log of "Guest Comments and Instructions" related to the October 2021 trip, *see supra* ¶¶ ~~37~~ 38-39, the log recorded several major structural changes to the *Amadea* scheduled to begin in Spring 2022, including the following: (1) transforming the existing gym into a spa, which would require "a new layout and design" and would include a new sink, massage bed, and the removal of frosted glass windows from a cupboard; (2) converting the "Wintergarden" to a gym, requiring the installation of new "gym floor" and "bolt[ing] down/secur[ing]" gym equipment; (3) removing the bar in the main deck salon; (4) uninstalling the jacuzzi; and (5) implementing an "AVIT refit" of the "Whole vessel," referencing "Dinar," *i.e.*, Dinar Khalikov, in connection with that request.

d.      In a Work Order Form maintained by the crew, on or about October 21, 2021, a "G1 Request" directed that "Guest cabin fridges . . . be removed by crew, void to be filled with same colour wood or alternative." ~~Subsequent~~ Additional notations on or about October 20, 2021 and November 2, 2021 indicated that the guest cabin fridges had been removed, and that the crew was directed to cut the wood support for the fridges and add a custom shelf.

18

41. 42.   Following the October trip with KERIMOV, the crew of the *Amadea*, IMPERIAL
YACHTS, and the Interior Designer planned to effectuate the structural changes raised by
KERIMOV and his representative, further demonstrating that KERIMOV was the beneficial
owner of the *Amadea* and consequently had the authority to order major renovations to the vessel.
For example:

      a.    The Captain of the *Amadea* and the Interior Designer had a "refit meeting"
on or about November 10, 2021 in which the following modifications to the *Amadea* were
discussed: (1) replacing the guest cabin reading lamps, visual renderings of which would be
provided "to G1/G2" and "presented when G's onboard"; (2) replacing gold wall fittings for
neutral alternatives, visual renderings of which would be proposed "to G1/G2"; (3) replacing wall
panels that contained false book spines with "plain wall paneling," visual renderings of which were
"ready for proposal to G1/G2"; (4) uninstalling carpeting, with a note to provide visual renderings
"to G1/G2"; (5) conversion of the "Winter Patio" to a "GYM," which was anticipated to include
installation of new floors, new plug outlets, and potentially replacing the doors to accommodate
the flooring; (6) converting the gym to a "MASSAGE ROOM"; (7) replacing wine fridges beside
the bar with solid doors to hide the interior shelving; (8) installing hardwood floors in the master
cabin suite; and (9) removing the bar in the main deck.

      b.    The renovations discussed in the "refit meeting" were memorialized in a
"Refit Work & Specification Order" document prepared by IMPERIAL YACHTS, indicating that
KERIMOV and his representative, "G1/G2," had the authority to effectuate structural changes to
the *Amadea* and that IMPERIAL YACHTS intended to renovate the *Amadea* according to
KERIMOV's specifications. The planned renovations to the *Amadea* included: (1) removing gold
fittings and trims; (2) replacing false bookshelf panels and door buttons; (3) replacing carpets;

19

(4) converting the guest gym to a massage room and installing a new gym in the "winter patio"; (5) replacing the wine fridges with bookshelves; (6) replacing the flooring in the master cabin; (7) updating the crew uniform; (8) replacing all existing toilets and bidets with larger models; and "AV Upgrades" that would be made in conjunction with the "Owners representative."

        c.    As reflected on a "Work List" maintained aboard the *Amadea*, the anticipated renovations discussed between KERIMOV, the Captain of the *Amadea*, and IMPERIAL YACHTS were scheduled to begin in the Spring of 2022. A "Work List" maintained aboard the *Amadea* prepared in anticipation of "April/May 2022" listed anticipated renovations to the *Amadea*, which substantially overlapped with the requested renovations as recorded in the "Refit Work & Specification Order" document prepared by IMPERIAL YACHTS.

<u>KERIMOV's Family Members Also Directed Changes to the *Amadea*, Consistent with
KERIMOV's Ownership of the Yacht</u>

~~42.~~43.   Between in or about January and February 2022, KERIMOV's family members were aboard the *Amadea* for multiple weeks, during which they discussed long-term travel plans and additional renovations to the *Amadea*, consistent with ~~the~~ requests that would be made by those with authority to order major changes and direct the *Amadea*'s months-long travel itinerary. For example:

        a.    On or about February 22, 2022, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, writing, "Detailed preferences for each guest from the February trip." One of the attached documents, entitled "Guest Preferences – Feb 2022," included photographs of: KERIMOV's eldest daughter, who was identified as "G2"; KERIMOV's son, who was identified as "G3"; KERIMOV's youngest daughter, who was identified as "G4"; and an individual named "Max," who was listed under "Security 1." "Max" is a reference to the first name of a security guard the KERIMOV family retained, "Massimiliano."

In an earlier, February 15, 2022 email, an *Amadea* crew member sent the Captain of the *Amadea* an email with several attachments, one of which contained a screenshot of a WhatsApp message between that crew member and an individual saved under the contact name "Max Owners," and, in the body of the email, relayed requests from G1, G2, and G4, among others. In an internal, undated crew document reflecting cabin assignments, "Max" was described as the "Owners rep."

b.     In a prior email, dated January 21, 2022, an IMPERIAL YACHTS employee wrote to the Captain of the *Amadea*, stating, "G2 [*i.e.*, KERIMOV's eldest daughter] has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in. Please could you pass this comment to the designers to be prepared for their arrival on board." In response, the Captain forwarded the email to employees of the Interior Designer with the request: "Please add new / more accessible plug socketing in the bathrooms with your designs for presentation to the G2." Several days later, in an email dated January 30, 2022, the Captain emailed an IMPERIAL YACHTS employee to ask whether an employee of the Interior Designer would be coming to the Caribbean to present the planned changes: "Please advise if [employee] should mobilize to the Carib. to the meeting with G2 rgds renderings?" ~~On information and belief, the Captain would not have authorized structural changes to the *Amadea* unless they were requested by the owner's authorized representative or family member.~~

c.     In an email dated February 24, 2022, the Captain of the *Amadea* circulated meeting notes with *Amadea* crew members and IMPERIAL YACHTS employees describing a meeting with "G3"[8] that had taken place earlier that day, regarding setting the *Amadea*'s travel

---

[8] In separate communications, the Captain of the *Amadea* instructed crew members to use a different guest designation system when referring to KERIMOV family members in communications with IMPERIAL YACHTS. For example, in certain communications:

agenda for 2022-2023 and purchasing new watersports equipment. The Chief Officer of the *Amadea* later responded to the circulated meeting notes, stating, "As discussed in person," and listed a number of recommendations, including "Investigate upgraded sound system (G4[9] always wanted music)," referencing the addition of another requested structural change to the *Amadea*. ~~for the benefit of one of KERIMOV's children.~~

        d.      In a memo sent between *Amadea* crew members dated "November 2021," and maintained on an electronic device aboard the *Amadea*, the following notation was included: "A new pizza oven was requested by owner's representative and has to be sourced for installation in April/May 2022." In an email thread dated January 12-13, 2022, IMPERIAL YACHTS employees discussed sourcing a pizza oven proposed by the new Head Chef of the *Amadea*. One employee wrote, "do you want to run it by "G2 [*i.e.*, KERIMOV's eldest daughter]/EK already to seek approval?" to which another employee responded, "yes please we need to present to EK and G2." On or about January 20, 2022, an IMPERIAL YACHTS employee wrote that "Mr Kochman" [*i.e.*, "EK"] has confirmed order and installation of proposed pizza oven." An IMPERIAL YACHTS employee forwarded the email chain to the Captain, Chef, and Purser of the *Amadea*, among others, confirming that their proposed pizza oven had been approved, writing, "Please place the order for installation in Spring yard period."

---

KERIMOV's eldest daughter is referred to as "G2" amongst *Amadea* crew members but as "G3" in communications with IMPERIAL YACHTS; KERIMOV's son is referred to as "G3" aboard the *Amadea* but as "G4" in communications with IMPERIAL YACHTS; KERIMOV's youngest daughter is referred to as "G4" amongst *Amadea* crew members but as "G5" in communications with IMPERIAL YACHTS. Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter.

[9] Given the foregoing, *see supra* n.~~7~~6, "G4" in this context is either a reference to KERIMOV's son or KERIMOV's youngest daughter.

e.      In an email dated January 28, 2022, the Captain of the *Amadea* circulated an email to IMPERIAL YACHTS employees with the Subject line, "G3[10]/Captain Meeting," in which he discussed G3's travel requests. Following that meeting, on or about February 10, 2022, the Co-Captain of the *Amadea*, who was ashore at the time, sent an email to his Co-Captain, who was aboard the vessel ~~at the time~~, in which he confirmed that he had scheduled a meeting with "G1" to discuss the *Amadea*'s itinerary, and attached various timelines and possible itineraries for travel in 2022 and 2023. ~~On information and belief, the Captain of a vessel would not have scheduled multi-year itineraries for a temporary guest, but would have done so for the family member of the vessel's beneficial owner.~~

44.      Between in or about September 2021 and in or about April 2022, when the *Amadea* was seized by law enforcement, there were no guest trips on the *Amadea* that did *not* include either KERIMOV or his family members. Furthermore, based on review of *Amadea* records, there are no apparent records of KHUDAINATOV being on the yacht between September 2021 and the time the *Amadea* was seized by law enforcement in April 2022.

KHUDAINATOV Is a Straw Owner of the *Amadea* and Other Yachts

45.      KHUDAINATOV has filed a claim in this case, falsely claiming to be the ultimate beneficial owner of the *Amadea*. KHUDAINATOV has also held himself out as the ultimate beneficial owner of at least two other superyachts, collectively worth over $1 billion: the M/Y *Scheherazade* and the M/Y *Crescent*.

a.      With respect to the *Scheherazade*, this yacht is nominally owned by a Marshall Islands company called Bielor Asset Ltd. ("Bielor"). KHUDAINATOV signed a

---

[10] Given that IMPERIAL YACHTS employees were included in this email, the "G3" referenced in this email is likely a reference to KERIMOV's eldest daughter. *See supra* n.~~7~~6.

Declaration of Nomineeship on April 23, 2020, stating that he was the beneficial owner of all shares of Bielor, and signed a "UBO [Ultimate Beneficial Owner] Statement" on March 7, 2022, making the same representation. The *Scheherazade* is alleged to be worth approximately $700 million.

       b.    With respect to the *Crescent*, this yacht is nominally owned by a Cayman Islands company called Densiarly Enterprises ("Densiarly"), which is wholly owned by Alemil Holdings Limited ("Alemil"), a Cyprus entity. On March 22, 2022, a declaration was prepared and purportedly signed by Alemil as a corporate entity, in which KHUDAINATOV was set forth as the ultimate beneficial owner of Densiarly. The *Crescent* is alleged to be worth approximately $600 million.

46.    According to information that IMPERIAL YACHTS provided to Fiduchi, a trustee and service provider for yacht management companies, KHUDAINATOV is supposedly the beneficial owner of at least eight yachts or yacht projects: the *Amadea*; the *Scheherazade*; the *Crescent*; a 77-meter yacht project called Project Blue Marlin; a 54-meter sailing yacht project called Project Wind; and three smaller yachts (the *Divina Barbara*, *Maria Virginia*, and *Milagro 2*). The cost to own and maintain eight yachts, at least three of which (the *Amadea*, *Crescent*, and *Scheherazade*) are enormous superyachts collectively worth well more than $1 billion, is further indicia that KHUDAINATOV is a nominee or straw owner for at least some of these yachts.

47.    In fact, the true beneficial owner of the *Crescent* is not KHUDAINATOV; it is KHUDAINATOV's former superior, Igor Sechin.

48.    For example, the CEO of an Interior Design Firm that designed the *Crescent*'s interior ("W-1"), stated that he understood Sechin to be the ultimate beneficial owner of the *Crescent*. W-1 had a meeting in Moscow in or about December 2014 with Sechin and Sechin's

24

then-wife Olga Rozhkova in which they discussed the fitting-out of the *Crescent*, at a time when it was still under construction.

43.49.   Additionally, in January 2017, the *Crescent*'s corporate owner Densiarly wired approximately $7,000 from a Swiss bank account to a luxury hotel in the Maldives called the Amilla Fushi. Sechin's then-wife Rozhkova logged in to her Instagram account in the vicinity of the Amilla Fushi during this time, suggesting that the wire transfer was used to pay for her and/or Sechin's hotel expenses at the Amilla Fushi. This, in turn, suggests that Sechin is the ultimate owner of Densiarly, and by extension the ultimate beneficial owner of the *Crescent*.

### C. KERIMOV Maintained the *Amadea* Through Transactions that Transited Through the United States Financial System

44.50.   During the entire time KERIMOV has beneficially owned the *Amadea*, he has been designated as an SDN by OFAC. At no point did KERIMOV or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or using the *Amadea*.

45.51.   After KERIMOV or those acting on his behalf submitted payment for the *Amadea* between in or about September and October 2021, KERIMOV, or those acting on his behalf, caused entities and persons to make U.S. dollar ("USD") payments, which transited through U.S. financial institutions, on his behalf and for his benefit, related to the *Amadea*. This is consistent with the terms of the Sept. MOA, which dictated that the *Amadea*'s buyer, *i.e.*, KERIMOV, would be responsible for all the *Amadea*'s running costs following remittance of the first installment payment for the *Amadea*'s purchase. *See supra* ¶ 33 34. A superyacht the size and complexity of the *Amadea* needs constant maintenance from a trained crew and also requires fuel for its essential operations. In turn, provisioning a crew and delivering fuel requires docking, harbor, and registration fees. Such costs are essential to maintain a superyacht as a functional

25

vessel. By that measure, ~~on information and belief,~~ the USD payments for fuel, fees, provisions, ~~and~~ crew salaries, maintenance, and other necessary expenses preserved or enhanced the *Amadea*'s overall value and benefitted KERIMOV.

~~46.~~52.   From in or about September 2021 up to and including in or about April 2022, the *Amadea* crew, by way of Millemarin or IMPERIAL YACHTS, were billed over $1.3 million USD in expenses for the upkeep and/or improvement of the *Amadea*. During that same time period, those same individuals and/or entities sent or caused to be sent at least $1.2 million USD in wire transfers through U.S. correspondent accounts and/or to U.S.-based demand deposit accounts, all for the provisioning, upkeep, movement, registration, and benefit of the *Amadea*, ~~which.~~ These transactions were essential to maintaining and/or increasing the value of the vessel and benefitted KERIMOV. For example:

> a.     Company-1, which is a Florida-based yacht supply company, invoiced Millemarin over $115,000 in expenses for the benefit of the *Amadea.* On or about February 4 and March 22, 2022, approximately six wire payments, totaling over $52,000, were sent from an IMPERIAL YACHTS account in the Bailiwick of Jersey ("IY Jersey Account"), through a correspondent account at a financial institution located in New York, New York ("Bank-1"), to Company-1's bank account at a financial institution located in the United States ("Bank-2"). The wire instructions associated with the payments all refer to the *Amadea*, and the invoices issued by Company-1 reflect expenses for, among other things, crew clothing, equipment, and other provisions.

> b.     On or about December 14, 2021, Company-2, a fuel supplier, billed approximately $167,213.49 USD in fuel costs for the benefit of the *Amadea.* ~~On information and belief, superyachts~~Superyachts like the *Amadea* require fuel for voyages and to maintain the

operation of essential equipment aboard the vessel both while ~~the *Amadea*~~it is at anchor and while it is sailing. The lapse in such operations may contribute to the deterioration of the yacht. On or about January 26, 2022, a wire payment of approximately $167,213.49 USD was sent from the IY Jersey Account through a correspondent bank account at a financial institution located in Manhattan ("Bank-3") to Company-2's bank account at a financial institution located outside the United States ("Bank-4").

c.      Between on or about December 26, 2021, and on or about March 15, 2022, Company-3, a yacht services company, billed approximately $214,331.27 USD in expenses for the benefit of the *Amadea*, including costs of garbage disposal, hull inspection, and provisions. ~~On information and belief, such~~Such services are fundamental to using and maintaining the value of a superyacht. Separately, on or about March 4 and March 22, 2022, multiple wire payments totaling approximately $30,301.65 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent account at a financial institution located in New York ("Bank-5"), to Company-3's bank account at a financial institution located outside the United States ("Bank-6").

d.      Between on or about March 18 and 22, 2022, Company-4, a Florida-based yacht support company, billed Millemarin approximately $285,474.44 USD in expenses for the benefit of the *Amadea*, including for provisions, barge fees, dock fees, port fees, and a safety inspection. ~~On information and belief, such~~Such expenses are necessary to ensure that a vessel like the *Amadea* remains seaworthy~~.~~ and to enable it to be used. On or about March 24 and 25, 2022, two wire payments totaling approximately $285,474.44 USD were sent from the IY Jersey Account, through a correspondent account at Bank-1 in Manhattan, to a second correspondent

27

account at a financial institution located in the United States ("Bank-7") to Company-4's bank account at Bank-7.

e.       Between on or about January 18, 2022, and on or about March 7, 2022, three wires totaling approximately $490,089.50 USD were sent from the IY Jersey account to Company-5, a fuel supply company, through a correspondent account at a financial institution in Manhattan ("Bank-8"), to pay for fuel for the *Amadea*, a necessary expense to maintaining the *Amadea*'s value. ~~*See supra* ¶ 46.b.~~ The wire instructions associated with the payments all refer to the *Amadea*.

f.       In or about March 2022, Millemarin received an invoice billing approximately $55,720 USD in expenses for the *Amadea* to transit the Panama Canal. That fee was paid to a bank account held by Company-6, a shipping agent, at a financial institution in Manhattan ("Bank-9").

g.       On or about February 22, 2022, Company-7, a watersport equipment company, invoiced to Millemarin approximately $35,543.16 USD for equipment for the benefit of the *Amadea*. The vendor invoice stated that the equipment would be shipped by air freight from Miami, Florida to the *Amadea*'s location in St. Maarten. The vendor invoice also listed routing information for a correspondent bank at a financial institution in Manhattan ("Bank-10") for USD wire payments.

h.       Between on or about March 9, 2022, and on or about March 22, 2022, Company-8, a Florida-based yacht supply company, invoiced to Millemarin approximately $37,917.02 USD in equipment and freight charges for the benefit of the *Amadea*. The invoices also listed routing information for Company-8's bank account at a financial institution in the United States ("Bank-11"), for purposes of remitting payment.

i.      In or about February 2022, an *Amadea* crew member paid approximately $518.99 USD to purchase water sports equipment for the *Amadea* from Company-9, a Seattle-based e-commerce company.

j.      On or about April 1, 2022, Company-10, a yacht services company, invoiced to Millemarin approximately $280,900 USD in fuel costs for the benefit of the *Amadea*.

k.      Between in or about November 2021, and in or about January 2022, Company-11, a superyacht telecommunications provider, billed Millemarin approximately $54,500.07 USD for services for the benefit of the *Amadea*. Between in or about November 19, 2021, and in or about March 2022, four wires totaling approximately $111,656.13 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-9 in New York, to a bank account held by Company-11 at a financial institution located outside the United States. ~~On information and belief, these~~These four wires sent to Company-11 appear to reflect payment of the invoiced amount, and funds in excess of the $54,500.07 USD billed to Millemarin for the *Amadea*. The wire instructions associated with the payments all refer to the *Amadea*.

~~1.~~53.     Between on or about March 4, 2022, and on or about March 22, 2022, three wires totaling approximately $37,442.31 USD were sent from an overseas branch of Bank-1 through (among others) a correspondent account at Bank-7, to a bank account held by Company-12, a yacht services company, at a financial institution located outside the United States for the benefit of the *Amadea*.

54.     KOCHMAN and his colleagues at IMPERIAL YACHTS were aware that KERIMOV had been the ultimate beneficial owner of the *Amadea* since at least in or about September 2021. ~~Upon information and belief,~~

29

55.     KOCHMAN and his colleagues at IMPERIAL YACHTS were also aware that KERIMOV had been sanctioned by the United States, and that U.S. law prohibited U.S. persons (including financial institutions) from transacting with, on behalf of, or for the benefit of, KERIMOV, and dealing in KERIMOV's property, based on: (1) the manner in which they structured the sale of the *Amadea* to conceal KERIMOV's ownership; —(2) subsequent false representations to law enforcement made directly and indirectly by IMPERIAL YACHTS regarding the *Amadea*'s beneficial ownership; and (3) IMPERIAL YACHTS' history of providing yacht services for sanctioned Russian individuals.

47.56.   Further buttressing KOCHMAN's and IMPERIAL YACHTS' knowledge of the sanctions status of their clients is a public statement by IMPERIAL YACHTS' General Counsel Simon Clark stating that IMPERIAL YACHTS has "never conducted business or provided services to any parties subject to international sanctions."[11] This statement necessarily indicates that IMPERIAL YACHTS *knows* the sanctions status of the various parties to which it provides services.

48.57.   IMPERIAL YACHTS employees were also aware that persons controlling, operating, and/or maintaining the *Amadea* (including IMPERIAL YACHTS itself) were transacting with U.S.-based companies and using the U.S. banking system to support and maintain the *Amadea*, as shown by the fact that several *Amadea* vendor invoices were directed to IMPERIAL YACHTS for payment, came from U.S.-based companies which had performed work for the *Amadea*, contained charges denominated in U.S. dollars, and/or listed U.S. correspondent accounts.

---

[11] Michael Forsythe, Gaia Pianigiani and Julian E. Barnes, "The Middlemen at the Heart of an Oligarch-Industrial Complex, NEW YORK TIMES (June 1, 2022) (online); https://www.nytimes.com/2022/06/01/world/europe/russia-oligarchs-yachts-middlemen.html

58.     KOCHMAN himself was aware that *Amadea* crewmembers were using U.S. companies to perform work and services for the *Amadea* and using the U.S. banking system to support and maintain the *Amadea*. As just one example, in February 2022, KOCHMAN was asked to approve quotes from a Florida-based uniform provider to supply crew uniforms for the *Amadea*.

49.59.   Thus, when IMPERIAL YACHTS sent money in satisfaction of invoices to U.S. companies or through the U.S. financial system to support and maintain the *Amadea*, they were doing so with the intent to promote the carrying on of U.S. sanctions violations.

60.     Furthermore, under the general policies and procedures for the *Amadea*, KOCHMAN played a personal role in approving *Amadea* invoice payments. For example, an *Amadea* Captain memo from 2017 listed the following flow of approval for invoices: "Wed-Thurs: All invoices that need to be are to IY managers. Sat: Captain does accounts and moves to signed folder. Monday: All invoices that will be presented for payment are sent to Natalia[12] with invoice tracker. Wednesday: EK [*i.e.* KOCHMAN] reviews and approves payments."

61.     Given this general *Amadea* invoice-approval policy, KOCHMAN approved payment on the above-cited invoices to U.S. companies and/or through the U.S. financial system. By doing so, KOCHMAN willfully violated IEEPA and engaged in promotional money laundering.

62.     Furthermore, members of the *Amadea* crew knew that KERIMOV was the ultimate beneficial owner of the *Amadea*. For example:

---

[12] IMPERIAL YACHTS Finance Manager Natalia Filyaeva.

      a.      When *Amadea* Co-Captain 1 was questioned by U.S. law enforcement in April 2022, he admitted both that KERIMOV was the true UBO of the *Amadea* and that he knew KERIMOV was under U.S. sanctions.

      b.      Co-Captain 2 was the on-duty captain in October 2021 when KERIMOV boarded the vessel with his assistant Dinar and began ordering drastic changes to the vessel. Co-Captain 2 personally referred to Dinar as "O.Rep." [*i.e.* Owner's Representative] and personally approved work order forms calling Dinar the "Owners Representative." Although in March 2022 Co-Captain 2 provided Mexican authorities with a document falsely stating that KHUDAINATOV was the ultimate beneficial owner of the vessel, in a text message string with an *Amadea* vendor dated March 13, 2022, Co-Captain 2 stated that he was aware of the "internet gossip" stating that the *Amadea*'s owner was on the sanctions list.

      c.      The *Amadea*'s Head of Security stated in a CBP (Customs and Border Patrol) questionnaire on April 12, 2022 that he was aware KERIMOV was the *Amadea*'s UBO and that KERIMOV was under U.S. sanctions.

63.      The standard of care for superyacht captains is to know as much as possible (within reason) about the owner of their vessel, and certainly to know all ownership facts relevant to safe and legal operation of the vessel. If a superyacht captain knew that a Russian oligarch like KERIMOV was the owner of his vessel, then no reasonable captain would not even check public sources to see whether that individual was under sanctions unless she or he was deliberately trying to be blind to that fact.

64.      Under the *Amadea*'s operating procedures, the captain needed to approve invoices. Co-Captains 1 or 2 did in fact approve the invoices cited above, which stated on their face that payment was to be made to U.S. companies and/or through the U.S. financial system.

When they approved these invoices for payment, knowing that KERIMOV was the sanctioned UBO of the *Amadea*, they were willfully committing IEEPA violations and promoting the carrying on of future IEEPA violations.

65.     Co-Captains 1 and 2, like other *Amadea* crew members, were IMPERIAL YACHTS employees or contractors who exercised authority to approve payments from IMPERIAL YACHTS for goods and services related to the *Amadea*. Thus, their knowledge, actions, and legal violations are properly imputed to IMPERIAL YACHTS.

66.     The foregoing facts show that at least KOCHMAN and the Co-Captains willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations. Their actions as agents of IMPERIAL YACHTS are imputable to IMPERIAL YACHTS.

67.     In addition, IMPERIAL YACHTS willfully violated IEEPA and engaged in money laundering transactions to promote IEEPA violations based on its employees' and agents' collective knowledge and actions. This includes KOCHMAN's and the Co-Captains' knowledge that KERIMOV was the sanctioned UBO, as discussed above. It includes their knowledge that the *Amadea* was being supported by U.S. companies and through payments transiting the U.S. financial system, as discussed above. That same knowledge (*i.e.*, of U.S. payments for the *Amadea*) was shared by any IMPERIAL YACHTS employees who helped pay the foregoing invoices, given that the invoices listed U.S. companies and/or U.S. correspondent accounts on their face. Finally, IMPERIAL YACHTS' General Counsel, Simon Clark, also knew that the *Amadea* was contracting with U.S. vendors, as he corresponded with one of those U.S. vendors regarding the *Amadea* in March 2022.

68.     As stated above, KOCHMAN knew that KERIMOV was the *Amadea*'s UBO and that KERIMOV was subject to U.S. sanctions. If KOCHMAN shared the UBO information with

his subordinates at IMPERIAL YACHTS, then any IMPERIAL YACHTS subordinates who paid the above-cited U.S. invoices were willfully violating IEEPA and conducting money laundering transactions to promote an IEEPA violation. Conversely, if KOCHMAN hid the UBO information from his subordinates at IMPERIAL YACHTS, despite knowing that the *Amadea* was transacting with U.S. companies, then KOCHMAN was willfully causing IMPERIAL YACHTS to commit IEEPA violations and to engage in money laundering to promote IEEPA violations by willfully depriving his subordinates of the UBO information that they needed to avoid making prohibited transactions.

## **FIRST CLAIM FOR FORFEITURE**

50.69.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

51.70.   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

52.71.   As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to violations of IEEPA sanctions because post-purchase maintenance payments in violation of IEEPA sanctions allowed the Defendant In Rem to continue to exist as an operational vessel.

53.72.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

34

## SECOND CLAIM FOR FORFEITURE

54.73.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

55.74.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

56.75.   Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

> . . .

> (A) with the intent to promote the carrying on of specified unlawful activity;

57.76.   For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

58.77.   As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

59.78.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(2)(A), or is traceable to such property.

## THIRD CLAIM FOR FORFEITURE

60.79.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

61.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

62.     Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

63.80.   For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include violations of IEEPA sanctions.

64.81.   As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, namely, violations of IEEPA sanctions. More specifically, funds used to purchase or maintain the *Amadea* became criminally-derived property as soon as they transited inbound to a U.S. correspondent bank account in violation of IEEPA sanctions. Thus, when such funds then transited outbound from a U.S. correspondent bank account to their final destination, the outbound monetary transaction was in violation of § 1957.

65.82.   Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

**FOURTH CLAIM FOR FORFEITURE**

66.83.   The United States incorporates by reference ¶¶ 1 through 4968 above as if fully set forth herein.

36

67.84.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

68.85.   Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

69.86.   As set forth above, the Defendant In Rem was involved in or was traceable to property involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and/or 1957.

70.87.   Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A), on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, the United States of America prays:

(1)      That the Court enter judgment against the Defendant In Rem, and in favor of the United States, on all claims alleged in the Complaint.

(2)      That the Court issue process to enforce the forfeiture of the Defendant In Rem, requiring all persons having an interest in the Defendant In Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant In Rem to the United States for disposition according to law; and

(3)    That the Court grant the United States such other relief as this Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
~~October 23, 2023~~February 16, 2024

FOR THE U.S. DEPARTMENT OF JUSTICE:

MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
U.S. Department of Justice

By:   /s/ *Joshua L. Sohn*
    JOSHUA L. SOHN
    Trial Attorney
    Money Laundering and Asset
    Recovery Section

By:   /s/ *~~Sarah Mortazavi~~Jennifer Jude*
    ~~SARAH MORTAZAVI~~JENNIFER
JUDE
        Assistant United States Attorney
        Southern District of New York

JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice

By:   /s/ *~~Andrew D. Beaty~~Yifei Zheng*
    ~~ANDREW D. BEATY~~YIFEI ZHENG
    Trial Attorney
    Counterintelligence and Export
    Control Section (CES)

## **VERIFICATION**

STATE OF NEW YORK       )
COUNTY OF NEW YORK      :
SOUTHERN DISTRICT OF NEW YORK  )

           TIMOTHY J. BERGEN, pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of

Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to the best of his knowledge, information and belief; and that the sources of

his information and the grounds of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement officers and

others.

Timothy J. Bergen
Special Agent
Federal Bureau of Investigation

Executed on this 21st16th day of October, 2023February, 2024

# EXHIBIT A





