UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

THE M/Y AMADEA, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531,

        Defendant-*In-Rem*.

23 Civ. 9304 (DEH)

**OPINION AND ORDER**

---

DALE E. HO, United States District Judge:

    In this action, Plaintiff the United States (the "Government") sues the *Amadea*, a 106-meter superyacht, *in rem*. *See* Mem. of L. in Supp. of U.S.'s Mot. For Interlocutory Sale ("Gov't Br.") 1, ECF No. 33. The Government seeks forfeiture of the *Amadea*, claiming that it is beneficially owned by Suleiman Kerimov, an individual subject to sanctions issued under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq*. *See* First Am. Compl. ¶¶ 5-6, ECF No. 37. Eduard Khudainatov and Millemarin Investments Ltd. (together, "Claimants") contest the forfeiture, arguing that they are the actual owners of the *Amadea*. *See* Claim for Prop., ECF No. 9. Following seizure and transport by the Government in or around April 2022, the *Amadea* is currently in the Government's custody in San Diego. First Am. Compl. ¶ 4.

    On October 23, 2023, approximately one and a half years after seizing the *Amadea*, the Government initiated this action. *See* Compl., ECF No. 1. Approximately three months later, on February 9, 2024, the Government moved for interlocutory sale of the *Amadea* pending resolution of this action under Supplemental Rule G(7)(b)(i).[1] *See* ECF No. 32. Oral argument

---

[1] All references to Rules to the Federal Rules of Civil Procedure.

was held on the motion on May 24, 2024.  *See* May 24, 2024 Minute Entry.  For the reasons given below, the motion is **DENIED.**

## DISCUSSION

As is relevant here, Supplemental Rule G allows a court hearing a forfeiture action *in rem* to order interlocutory sale of the subject property if "(B) the expense of keeping the property is excessive or is disproportionate to its fair market value; . . . or (D) the court finds other good cause."  Suppl. Fed. R. Civ. P. G(7)(b)(i).  "[S]ince [Supplemental Rule G(7)(b)(i)] does not state any criteria to guide the judge[,] . . . the judge can range widely in deciding what factors to consider, and what weight to give them, in making his ruling."[2] *United States v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638, 641 (7th Cir. 2009) (affirming the denial of interlocutory sale of baby formula under Supplemental Rule G(7)(b)(i), due to potential health risks to purchasers from mislabeling of the products and unhygienic conditions); *accord United States v. Any & All Funds in UBS AG, Account No. XXXX1138*, 628 F. App'x 296, 297 (5th Cir. 2016) (affirming interlocutory sale due to depreciation in the value of the *res*, an airplane, and its associated maintenance costs).  "[T]he court must carefully weigh the competing interests in each case when deciding whether to order the interlocutory sale of property . . . [and] [t]he directive to carefully weigh is a general one affording considerable discretion to the district court[.]"  *United States v. Furando*, 40 F.4th 567, 581 (7th Cir. 2022).

---

[2] In all quotations from cases, internal quotation marks, footnotes, citations, brackets, ellipses, and other alterations are omitted, unless otherwise indicated.

A.     **Excessiveness**

The Government's principal argument for interlocutory sale relies on the expense of maintaining the *Amadea*, which the Government argues "is excessive or is disproportionate to [the *Amadea*'s] fair market value." Gov't Br. 4 (quoting Suppl. Fed. R. Civ. P. G(7)(b)(i)(B)). The Government introduces evidence that the *Amadea*'s monthly expenses are at least $743,750, reflecting approximately $600,000 in maintenance costs, as well as a monthly portion of an annual insurance premium of $1.725 million. *See* Crane Decl. ¶¶ 3, 5, ECF No. 34.[3] While these costs are undoubtedly quite sizeable, the Court declines to exercise its discretion to order interlocutory sale on the basis of the purported excessiveness of the *Amadea*'s expenses. As explained below, the Court construes "excessive" in Supplemental Rule G(7)(b)(i)(B) to require a comparison to the typical maintenance costs for property similar to the *res* at issue, at least for purposes of interlocutory sale in this case. Because the Government has not established that the *Amadea*'s maintenance costs are out of the ordinary for motor yachts like the *Amadea* or that these costs are not inherent in seizure of this type of property, the Court declines to order interlocutory sale.

   1.   **The Meaning of Supplemental Rule G(7)(b)(i)(B)**

The parties dispute the meaning of Supplemental Rule G(7)(b)(i)(B) (the "Rule"), which permits interlocutory sale while a forfeiture action *in rem* proceeds if "the expense of keeping the

---

[3] The Court does not include expenses related to dry docking the *Amadea*, because it is unclear how ordering interlocutory sale now would avoid any expenses related to the *Amadea*'s March 2024 dry docking. *See Adams Offshore, Ltd. v. Con-Dive, LLC*, No. 09 Civ. 378, 2010 WL 433676, at *1 (S.D. Ala. Feb. 1, 2010) ("The plaintiff does not explain the relevance of its sunk costs . . . in determining whether the expense is excessive or disproportionate. Certainly no order of sale can recoup the plaintiff's past expenditures. . . . [T]he Court limits its consideration to the future expenses of keeping the property.").

property is excessive or is disproportionate to its fair market value." Suppl. Fed. R. Civ. P. G(7)(b)(i)(B).  The Government argues that the Rule sets forth a disjunctive standard, permitting interlocutory sale if the cost of maintenance "is disproportionate" to the fair market value of the property *or* if it "is excessive" in an absolute sense.  *See* Gov't Br. 4.  According to the Government, the modifier "to its fair market value" applies only to the adjective "disproportionate," while the adjective "excessive" refers solely to the absolute amount of carrying costs.  *See id*. ("[Supplemental Rule G] thus sets a disjunctive test: interlocutory sale may be ordered if the expense of keeping the property is disproportionate to its fair market value or if this expense is simply excessive."); Reply Mem. in Supp. of U.S.'s Mot. for Interlocutory Sale ("Gov't Reply") 1, ECF No. 58 ("[U]nder the excessive prong . . . there is no need to compare upkeep costs against the value of the *res*.").  The Government's principal argument is that the cost of maintaining the *Amadea* (i.e., more than $743,000.00 a month) is high in the absolute sense and therefore "excessive," justifying interlocutory sale.

By contrast, Claimants argue that the Rule sets forth a unitary test.  *See* Claimants' Mem. of L. in Opp'n to Pl.'s Mot. for Interlocutory Sale ("Claimants' Opp'n") 7, ECF No. 54 ("Subsection B does not contain an excessive prong and a disproportionate prong.").  According to them, the clause "to its fair market value" modifies both "excessive" and "disproportionate," meaning that excessiveness is measured as against the value of the *res*.  *See id.* at 8 ("[E]xcessive must be determined in relation to [the *res*'s] fair market value.").  Claimants argue that the cost of maintaining the *Amadea* is small relative to the vessel's value, and therefore, it is not "excessive," such that interlocutory sale would be appropriate.  *See id*. at 13.

The parties do not identify—and the Court, in its research, has not found—binding authority on the meaning of the Rule.  Moreover, as explained below, the relatively few cases applying the Rule are generally quite brief and do not directly address the Rule's meaning.  The

4

Court therefore conducts its own independent analysis of the Rule, and the meaning of "excessive" as used in the Rule.

As an initial matter, both sides' interpretations of the Rule are unpersuasive. Claimants' argument that the Rule sets forth a unitary test, such that "excessive" means excessive in comparison to the fair market value of the *res*, fails for several reasons. First, under this interpretation, "excessive" and "disproportionate" would be redundant of each other. *Cf. United States v. Epskamp*, 832 F.3d 154, 164-65 & n.10 (2d Cir. 2016) (noting that when two provisions "would otherwise be duplicative" is "a most compelling indication" that they should be construed differently). The use of the verb "is" prior to "excessive" and then again prior to the phrase "disproportionate to its fair market value" further suggests that the Rule has two prongs: one authorizing sale if the cost of maintenance "is excessive," and another authorizing sale if it "is disproportionate to [the property's] fair market value," with the phrase "to its fair market value applying only to "disproportionate." Finally, to read the phrase "to its fair market value" in connection with "excessive" seems unnatural; describing maintenance expenses as "excessive . . . to [a property's] fair market value" would be an odd phrase at best. The Court therefore agrees with the Government that the Rule creates a disjunctive test: a court may exercise its discretion to order sale when the expense of maintaining the property is (1) disproportionate to the property's fair market value, or (2) excessive.

But the Government's proffered definition of the meaning of "excessive" as higher than an (unspecified) absolute value is unpersuasive. Again, there is no binding precedent, and little caselaw, to guide the Court on the meaning of "excessive" as used in the Rule, so the Court must engage in its own independent analysis. In essence, the Government's principal argument is that "excessive" means "a lot," and that because $700,000 is a lot of money, the Government should be permitted to sell the *Amadea*. But the word "excessive" does not simply mean "a lot" in the

5

absolute sense—it means more than "what is usual, proper, necessary, or normal." Excessive, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/excessive; *accord* Excessive, *Adj.*, Sense 2.b, Oxford English Dictionary (Sept. 2023), https://doi.org/10.1093/OED/1611810980 ("Exceeding what is right, proportionate, or desirable; immoderate, inordinate, extravagant."); Excessive, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=excessive ("Exceeding a normal, usual, reasonable, or proper limit."); Excessive, Black's Law Dictionary, 6th ed. (1991) ("Greater than what is usual or proper"). Describing a cost as "excessive" implies some sort of reasonable baseline of expenses that is being exceeded—i.e., it requires some standard for comparison. *Cf. Seacor Marine LLC v. FPC Sea Striker*, No. 14 Civ. 114, 2014 WL 5018888, at *2 & n.5 (M.D. Fla. Oct. 7, 2014) (finding that the ordinary meaning of the term "excessive," as defined by Merriam-Webster's Dictionary, implies a baseline being exceeded, and stating in *dicta* that the party seeking interlocutory sale under Supplemental Rule E, an analogous provision, "fail[ed] to demonstrate that the expenses are excessive as they offer no evidence of what is usual, proper, necessary, or normal").

      Indeed, in a variety of areas of law, courts have held that determining whether something is "excessive" is not an assessment in terms of absolute magnitude, but instead requires some reference to context. The Fourth Amendment's prohibition on excessive force, for example, is not a prohibition on a certain quantum of force when making an arrest, but rather calls for a judgment based on the totality of circumstances in a given case. *See Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) ("The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive . . . requires careful attention to the facts and circumstances of each particular case."). That is, whether a certain amount of force is excessive depends on a variety of factors, including the nature of the conduct of and the degree

of resistance by the subject. Similarly, the Eighth Amendment's prohibition on excessive fines is not a bar on fines above a certain dollar value—it is a requirement that the Government not impose a fine that is grossly inappropriate when compared to the offense at issue. *See United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016) ("A forfeiture is unconstitutionally excessive if it is grossly disproportional to the gravity of a defendant's offense."). In other words, a fine of a particular amount might be excessive for one offense, but not excessive for a more serious one.

It is true that some cases interpreting Supplemental Rule G have treated costs as "excessive" based on their size alone, at least implicitly. *See United States v. King*, No. 10 Crim. 122, 2010 WL 4739791 (S.D.N.Y. Nov. 12, 2010) (finding, with respect to nine horses, that "the expense of keeping them is excessive" where monthly costs were around $27,000); Minute Entry, *United States v. M/Y Galactica Star*, No. 17 Civ. 2166 (S.D. Tex. Mar. 20, 2019) ("The Court finds that continued possession of the Galactica Star would result in excessive costs for maintenance and storage, estimated at around $170,000 per month."), *available at* Ford Decl. Ex. E, ECF No. 54-7.[4]

---

[4] It is also true that cases applying Supplemental Rule E, which applies in admiralty cases and similarly allows for interlocutory sale if "the expense of keeping the property is excessive or disproportionate," Suppl. Fed. R. Civ. P. E(9)(a)(i)(B), have implied that excessiveness refers to an absolute value. *See, e.g.*, *Adams Offshore, Ltd. v. Con-Dive, LLC*, No. 09 Civ. 378, 2010 WL 433676 (S.D. Ala. Feb. 1, 2010) ("[T]he plaintiff's monthly expense is $5,092. Compared to the cases on which the plaintiff relies—in which monthly expenses were $17,000 (thirty years ago), $45,000 and $130,000—this is a mere pittance. The plaintiff has not shown its expense to be excessive."); *John W. Stone Oil Distrib., LLC v. M/V Lucy*, No. 09 Civ. 4440, 2009 WL 4166605, at *1-2 (E.D. La. Nov. 20, 2009) (finding that monthly expenses of approximately $16,000 "is excessive and disproportionate when compared to the amount of the liens [in total, $91,731.67]"); *Caterpillar Fin. Servs. Corp. v. Coleman*, No. 99 Civ. 3821, 1999 WL 33218595, at *2 (C.D. Cal. Aug. 19, 1999) ("[T]he expense of keeping the Bruin in custody, specifically $1,400.00 per month, also appears to be excessive."); *Triton Container Int'l Ltd. v. Baltic Shipping Co.*, No. 95 Civ. 427, 1995 WL 217483, *2 (E.D. La. Apr. 12, 1995) ("Although [Triton] provides that substantial expenses are required . . . , Triton has not informed the Court of the magnitude of either the expenses or the value of the vessel. The Court thus has no means to determine if the expenses of keeping the vessel are excessive or disproportionate.").

These cases, however, are binding on this Court, and their persuasive weight is limited for several reasons. For one, none of these decisions considered the meaning of the term "excessive," and the reasoning they provide is limited, often due to the procedural posture in which they ordered sale. For example, *United States v. M/Y Galactica Star*, 13 F.4th 448 (5th Cir. 2021), which involved a large yacht (though one considerably smaller[5] than the *Amadea*), and which the Government cites as "the most analogous precedent," ECF No. 33 at 4, offers little guidance. The entirety of the district court order authorizing sale was a brief minute order. *See* Minute Entry, *United States v. M/Y Galactica Star*. Furthermore, the motion for interlocutory sale in that case was jointly filed by the United States and the lead claimant, *see id.* at ECF No. 169, and it was unopposed by the other two claimants in the case, *see id.* at ECF No. 172; *accord* 13 F.4th at 452 (noting that "[t]he Government and Nigeria . . . filed a joint motion for an order authorizing interlocutory sale of the yacht," i.e., that the motion was unopposed).

Moreover, in each of the other cases cited by the Government in which interlocutory sale was ordered, the size of the maintenance fees was not the sole reason justifying the sale. *See King*, 2010 WL 4739791, at *3 (noting that, in addition to excessive maintenance costs, "the horses are declining assets" and the expenses were "disproportionate to their fair market value"); *John W. Stone Oil Distributor, LLC*, 2009 WL 4166605, at *2 (ordering sale because expenses were both "excessive and disproportionate when compared to the amount of the liens," and there had been unreasonable delay in securing release of the property, another consideration under Supplemental Rule E); *Caterpillar Fin. Servs. Corp.*, 1999 WL 33218595, at *2 ("Four months having passed since the commencement of this action, the Colemans have yet to secure the

---

[5] The *Galactica Star* is a "65-meter yacht," 13 F.4th at 451, while the *Amadea* measures 106 meters, *see* ECF No. 33 at 1.

8

release of the Bruin by posting a bond. An interlocutory sale of the vessel is proper on this ground alone.").

Given the absence of binding precedent or helpful authority discussing the meaning of "excessive" as used in the Rule, this Court will give the word its common, ordinary meaning of "more than what is usual or proper." That is how courts have generally understood the term in other contexts. Thus, in assessing whether the maintenance costs of the *Amadea* are excessive, the Court must not look solely at the total dollar amount of the maintenance costs, but must principally consider whether those amounts are more than what is usual as compared to the maintenance costs for other similar yachts.[6] This is akin to the approach taken by the Court in *United States v. Woodland Dream*, No. 13 Civ. 279, 2013 WL 5775298 (E.D. Ky. Oct. 24, 2013). There, the Court credited testimony that for the *res* at issue, a horse, "the veterinarian costs would definitely be higher than the average broodmare" and referred to "specialized maintenance costs," applicable to the *res* in finding the expenses excessive. *See id.* at *4-5 (ordering interlocutory sale under 21 U.S.C. § 853(e)(1)(B), while noting that the standards under Supplemental Rule G, "while not controlling, provide guidance").

---

[6] The Government also argues that the correct benchmark against which to compare the *Amadea*'s maintenance costs is "what is fair for taxpayers to pay" (and does not provide a figure for this amount). Gov't Reply 3. This is simply another way of saying that "excessive" means "a lot." And rather than resolving the problem of how to determine when expenses are too large, this argument simply restates it, only now in terms of fairness rather than excessiveness. Ultimately, the Government's interpretation is unpersuasive because of the many different types of *res* subject to forfeiture: an identical dollar figure of maintenance costs may be excessive for one type of property and paltry for another. Instead, the nature of the *res* in this case—"a 348-foot luxury superyacht," First Am. Compl. ¶ 5—suggests that maintenance costs are likely to be unavoidably large.

### 2. Applying the Rule to the *Amadea*

Having determined the meaning of "excessive," the Court now turns to whether the maintenance costs of the *Amadea* are in fact "more than what is usual or proper" for similar yachts. Admittedly, this inquiry could entail difficult judgments as to what constitutes a vessel that is "similar" to the *Amadea* for purposes of establishing a benchmark for usual or proper maintenance costs. But here, the Government does not introduce any evidence regarding the typical costs of maintaining a large motor yacht or that its maintenance costs here are atypical for similar vessels; nor does it identify what a similar vessel could be for purposes of a benchmark comparison.[7] At oral argument, the Government instead framed the excessiveness inquiry as a holistic one, going to the reasonableness of carrying costs, current and expected, over the anticipated period of time that the case will take to litigate. Even so framed, the record before it does not convince the Court that the *Amadea*'s undeniably large maintenance costs are unreasonable for a *res* of this nature. Accordingly, in the absence of this showing, the Court cannot conclude that the Government's maintenance costs for the *Amadea* are in fact "excessive." *See Approximately 81,454 Cans of Baby Formula*, 560 F.3d at 641 ("[W]e do not

---

[7] To the extent the Government might argue that the $170,000 monthly maintenance costs for the *Galactica* provides a benchmark, the Court notes that the *Galactica* is little more than half the length of the *Amadea*, *see supra* n.4, and was alleged to be "worth approximately $144 million" at the time of the 2017 complaint in that case, *M/Y Galactica Star*, 13 F.4th at 451, as compared to the estimated current value of the *Amadea* as of at least $230 million, and possibly more than $300 million, *see infra* n.9. And while the Court concludes, *supra*, that the Rule's use of the word "excessive" (unlike "disproportionate") is not limited only to a comparison between the maintenance costs and the value of a property, a property's value may be one factor in the totality of circumstances that a court considers in determining whether maintenance costs are excessive, i.e., more than what is usual or proper for a property like the one at issue.

see why the burden of proof should not be on the moving party [seeking interlocutory sale]—which is the default rule for burdens of proof.").[8]

Indeed, the Government concedes that it "is spending what is necessary and appropriate to maintain a vessel of this nature," Gov't Reply 5, but argues that even if this is the case, costs may still be deemed excessive, citing *United States v. One 2005 Lagoon 440 Sailing Catamaran Named the Bohemian Rhapsody*, No. 13 Civ. 9262, 2017 WL 10573808 (C.D. Cal. Sept. 22, 2017). However, the court in that case relied on the "disproportionate" prong of the Rule, holding that the maintenance costs were "disproportionate relative to the average retail price of the vessel"—meaning that it was irrelevant that the movant had not shown the costs were "more than what is proper and reasonable." *Id.* at *2. The *Bohemian Rhapsody* ruling is simply a reflection that the test under Supplemental Rule G(7)(b)(i)(B) is disjunctive and does not shed light on the excessiveness inquiry.

The Government finally argues that the costs are still excessive (or, perhaps disproportionate) in light of the value of the *Amadea*, noting that courts have ordered sale when monthly costs were near or lower than 0.32% of the estimated value of the *res*.[9] That may be so,

---

[8] Although neither side offers competent evidence as to the typical maintenance costs for a vessel like the *Amadea*, Claimants argue that typical annual maintenance costs could be as high at 10% of a vessel's stated value. Claimants' Opp'n 14 (citing public sources). The Government does not dispute this representation.

[9] The Government offers evidence that the *Amadea* has monthly maintenance costs of $600,000, as well an annual insurance premium of $1.725 million, giving a total of $743,750 in monthly expenses. *See* Crane Decl. ¶¶ 3, 5. The Government also offers evidence that the *Amadea*'s fair market value was appraised by an independent surveyor in October 2022 at $230 million. *See* Suppl. Crane Decl. ¶ 3, ECF No. 58-1. It also alleges in the First Amended Complaint that the *Amadea*'s value "has been reported as roughly $300 million or more." First Am. Compl. ¶ 12; *see also* Compl. ¶ 13 (alleging that the *Amadea*'s value "has been reported as between $300 million and $500 million). While Claimants argue that the Government's evidence of the *Amadea*'s fair market value is impermissible hearsay, *see* Claimants' Sur-Reply 4-6, ECF No. 63, they do not offer more credible estimates. Even assuming the $230 million valuation, i.e.,

11

but courts have also declined to do so when faced with similar ratios. *See, e.g.*, *United States v. Kumar*, No. 17 Crim. 5, 2018 WL 3025946, at *10 (E.D.N.C. June 18, 2018) (declining to order interlocutory sale where monthly maintenance costs were 0.69% of estimated value of the *res*); *Schoninger v. M/V Three Olives*, No. 10 Civ. 69, 2010 WL 1935855, at *4 (D. Me. May 10, 2010) (declining to order sale when monthly maintenance costs were 0.3% of the estimated value of the *res*), *recommendation rendered moot by id.* ECF No. 51 (D. Me. June 3, 2010).

On the record before the Court, the Government has not established that the *Amadea*'s maintenance costs are excessive so as to justify an interlocutory sale. While the Court acknowledges that the *Amadea*'s maintenance costs are undeniably large in an absolute sense, this seems a natural consequence of seizure of a *res* of this type. The Government's position that it may sell the *Amadea* because it is quite expensive to maintain does not comport with the plain meaning of "excessive." Its logic would allow for sale in any case where the Government seized a particularly valuable *res* with substantial maintenance fees. This would be the case even where, as here, the monthly maintenance costs were foreseeable, appear to be in line for a *res* of its nature (at least on the record before the Court), and are relatively small compared to the total value of the *res*. Accordingly, the Court declines to exercise its discretion to order sale due to the excessiveness of the *Amadea*'s maintenance costs.

**B.     Other Good Cause**

The Court also declines to find that "other good cause" justifies interlocutory sale. *See* Suppl. Fed. R. Civ. P. G(7)(b)(i)(D); *see also id.* Adv. Comm. Notes (noting that, notwithstanding more specific provisions for mortgages and tax liens, other lien interests can be

---

the one most favorable to the Government, is correct, the Court finds that the ratio of maintenance costs to value does not justify sale.

addressed through "the general good-cause provision, [where] [t]he court must carefully weigh the competing interests in each case," and providing as an example, "good cause may be shown when the property is subject to diminution in value"). The Government makes two additional arguments: (1) that even if the *Amadea*'s maintenance costs were not excessive, they are large enough to provide good cause for sale, and (2) that Claimants previously tried to sell the *Amadea*, meaning no prejudice would result from sale. Gov't Reply 5-6.

Neither is availing. As to the former, the Court finds that, whether framed in terms of excessiveness or good cause, the *Amadea*'s maintenance costs do not, in and of themselves, support interlocutory sale. The only case the Government cites in support of its argument regarding good cause relied on the depreciation of the *res*, in addition to storage costs. *See United States v. One 2010 Dodge Ram*, No. 14 Civ. 1065, 2015 WL 685208, at *1 (D. Md. Feb. 18, 2015) ("The court finds that the government's desire to avoid storage costs and the risk of depreciation in value constitute 'good cause' for the interlocutory sale[.]"); *see also* Suppl. Fed. R. Civ. P. G, Adv. Comm. Notes ("Paragraph (b)(i)(D) establishes authority to order sale for good cause. Good cause may be shown when the property is subject to diminution in value."); *United States v. 272 Old Montauk Highway*, 298 F.R.D. 43, 52-53 (E.D.N.Y. 2014) (finding good cause under Rule G(7)(b)(i)(D) existed because the *res* was subject to diminution in value, quoting advisory committee notes). Furthermore, if absolute maintenance costs alone were enough to provide good cause, it is unclear why the drafters of the Supplemental Rule would incorporate a requirement of excessiveness or disproportionality in Rule G(7)(b)(i)(B). In any event, the Court is wary of relying solely on maintenance costs to justify sale, when those costs represent a small fraction of the value of the *res* and do not appear to be (on the record before the Court) atypical for property of this type.

As to the Government's second point, the fact that Claimants may have previously sought to sell the *Amadea* does not provide good cause to sell it now.  While a previous sale attempt by Claimants would tend to undercut any argument from them regarding, e.g., sentimental attachment, they do not make such an argument.  Instead, as the movant, the Government bears the burden of showing interlocutory sale is appropriate.  *See Approximately 81,454 Cans of Baby Formula*, 560 F.3d at 641.  For the reasons stated above, the Court, in its discretion, determines that the Government has not met that burden here.

## CONCLUSION

For the reasons given above, Plaintiff's motion is **DENIED.**

The Clerk of Court is respectfully directed to close the motion at ECF. No. 32.

SO ORDERED.

Dated: June 11, 2024
New York, New York

DALE E. HO
United States District Judge