# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO,<br><br>    Defendant-*In-Rem*,<br><br>    and<br><br>EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD.,<br><br>    Claimants. | Case No. 1:23-cv-09304<br><br>The Honorable Dale E. Ho<br><br>**ORAL ARGUMENT REQUESTED** |

**CLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE THE CLAIM, OR FOR SUMMARY JUDGMENT, FOR LACK OF STANDING**

FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS .................................................................................................5

LEGAL STANDARD........................................................................................................14

ARGUMENT ....................................................................................................................15

    A.  Claimants have title to and possession of the Amadea, have exercised dominion and control over the vessel, and will be injured if the Amadea is forfeited.................................16

    B.  This case bears no resemblance to cases involving nominee straw owners who solely possess bare legal title to the property. ....................................................................20

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*:

*Torres v. $36,256.80 U.S. Currency*,
25 F.3d 1154 (2d Cir. 1994) ............................................................................ 14

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
959 F. Supp. 2d 81 (D.D.C. 2013) .................................................................... 21

*United States v. Any and All Funds on Deposit in Account No. 12671905,
Held in the Name of Landlocked Shipping Company at Wells Fargo
Brokerage Services, LLC*, No. 09 CV 3481 (HB),
2010 WL 3185688 (S.D.N.Y. Aug. 10, 2010) ........................................ 14, 16, 17

*United States v. $557,933.89 More or Less, in U.S. Funds*,
287 F.3d 66 (2d Cir. 2002) ................................................................ 4, 14, 15, 20

*United States v. $557,933.89, More or Less in U.S. Funds*,
No. 95-CV-3978 (JG), 1998 WL 817651 (E.D.N.Y. Mar. 2, 1998) ....................... 20

*United States v. $829,422.42 in US Currency*,
No. 3:08-cv-00914 (DJS), 2013 WL 2446486 (D. Conn. June 5, 2013)................... 24

*United States v. Cambio Exacto, S.A.*,
166 F.3d 522 (2d Cir. 1999) ......................................................................Passim

*United States v. One 1982 Porsche 928, Three-Door,
License Plate 1986/NJ Temp./534807 (auto.)*,
732 F. Supp. 447 (S.D.N.Y. 1990) .................................................................... 21

*United States v. One Parcel of Real Estate Commonly Known as
2030 East Monroe Street*, 884 F. Supp. 1218 (C.D. Ill. 1995)................................ 23

*United States v. One Red 2003 Hummer, H2*,
234 F. Supp. 3d 415 (W.D.N.Y. 2017).......................................................... 18, 22

*United States v. Premises & Real Prop. with Bldgs., Appurtenance &
Improvements at 500 Delaware St., Tonawanda, New York*,
113 F.3d 310 (2d Cir. 1997) .............................................................................. 22

*United States v. Premises & Real Prop. With Buildings, Appurtenances, & Improvements*,
16-CV-318-A, 2018 WL 4681773 (W.D.N.Y. Sept. 28, 2018) .............................. 24

*United States v. Vehicle: One 1990 Nissan Pathfinder*,
No. 92-CV-1336, 1994 WL 476704 (N.D.N.Y Sept. 2, 1994) .......................... 23, 24

Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd. (collectively, "Claimants") submit this memorandum of law along with the Declarations of Adam C. Ford, Eduard Yurievich Khudainatov, Dinar Khalikov, Viktoria Pastukhova, Lesley Reynard, and François Zuretti, and accompanying exhibits, in support of their memorandum of law in opposition to Plaintiff's motion to strike the claim, or for summary judgment, for lack of standing.[1]

## INTRODUCTION

The sole question for the Court to decide now—on a motion to strike filed at the inception of discovery—is whether Claimants have demonstrated a colorable property interest in the M/Y **Amadea**. The declarations and exhibits submitted with this opposition answer this question in the affirmative. Indeed, they go beyond showing a colorable property interest by Mr. Khudainatov and Millemarin. Claimants' evidence makes plain that Mr. Khudainatov commissioned and built the Amadea in 2012 to his specifications and has been its ultimate beneficial owner ("UBO") ever since. He never sold the Amadea to Suleiman Kerimov, or to anyone else. Indeed, the government's motion to strike does not even attempt to introduce evidence of a sale to Kerimov or any other sanctioned individual, the *sine qua non* of a valid forfeiture claim against the Amadea. Rather, it now posits that Claimants sold the vessel to Evgeniy Kochman of the yacht management company that had overseen the build of the Amadea and served as its exclusive yacht manager and sales broker, and who was not sanctioned at the time of the alleged sale, or during any time period relevant to this case.

---

[1] The government's memorandum of law in support of its motion to strike and exhibits to the Declaration of Jennifer Jude will be cited to as "MTS."

The government's motion to strike is premised on its argument that the "Errigal Arrangement"[2] is evidence that Mr. Khudainatov is a nominal straw owner with nothing more than bare legal title to the Amadea. That position is neither supported by the facts nor the law. The Errigal Arrangement was effectively a temporary use deal that occurred between September 2021 and March 2022, whereby Mr. Khudainatov, frustrated by Imperial Yachts' inability to find a buyer for the Amadea over the years, granted *temporary* use rights of the Amadea—without a change of ownership—to Mr. Kochman to permit him to charter the vessel and look for a buyer. The parties agreed that no transfer of title/ownership would take place until Mr. Kochman found a buyer, and even modified the agreement to give Mr. Kochman more time to find one.

No transfer of ownership ever took place. In March 2022, a month before the Amadea's seizure, this temporary use deal was canceled, as its goals (to charter the vessel and find a buyer for the Amadea) were thwarted by the events that followed Russia's military action in Ukraine. And, in its Rule 56.1 Statement, the government even admits that a sale to Mr. Kochman was never consummated. Gov. R. 56.1 Statement ¶ 26. As a result, any temporary use rights Mr. Kochman possessed beginning in September 2021 were terminated less than six months later. At that point, Mr. Khudainatov retained unfettered rights to, and all responsibility for, the Amadea, as its UBO. Indeed, as evidence that the parties reverted to their respective positions vis-à-vis the Amadea (Mr. Khudainatov as owner with complete dominion and control over the vessel and Imperial Yachts/Kochman as the yacht manager), Mr. Khudainatov's company Millemarin and Imperial

---

[2] This temporary use deal is referred to herein as the "Errigal Arrangement" because Errigal is the name of the entity that Mr. Kochman created to enter into the temporary use deal with Millemarin, the owning company of the vessel. The "Errigal Arrangement Period" begins when the first agreement was signed September 3, 2021 until the arrangement was terminated, shortly after March 10, 2022. The Errigal Arrangement encompasses the series of agreements between Mr. Khudainatov and Mr. Kochman during the Errigal Arrangement Period.

2

Yachts signed a Management Agreement on April 4, 2022 (approximately six months *after* the government claims that Mr. Khudainatov sold it) which places sole financial responsibility for the yacht's expenses on Millemarin (and thus Mr. Khudainatov), and limits Imperial Yachts' access to the vessel solely for purposes of managing the vessel. In addition, Mr. Khudainatov approved the locations which the vessel would travel to in March and April 2022 for a required maintenance period, including a stop in Fiji. Thus, when the vessel was seized in Fiji in April 2022, Claimants formally appeared in court to fight for the return of their long-standing property and have continued to do so to this day. No one else – not Kerimov, not Kochman, has ever asserted a claim to the Amadea.

The government's argument that Claimants will suffer no injury if the Amadea is forfeited is also without merit. The government bases this argument on the fact that Claimants received €225 million as part of the Errigal Arrangement. But the government ignores the obvious consequence of the termination of the Errigal Arrangement—that Mr. Khudainatov is liable to repay Mr. Kochman. Because of very public threats made by U.S. authorities when they seized the Amadea, such as the Deputy Attorney General's numerous public statements threatening criminal prosecution of individuals involved in Russian yachts, Mr. Khudainatov and Mr. Kochman agreed not to make the repayment until it was clear that such transaction would not be used as evidence of any wrongdoing. Claimants stand to lose €225 million, the amount owed to Errigal/Kochman, plus the entire value of the Amadea if it is forfeited. This palpable harm establishes standing.

The government's position is also unsupported by the Second Circuit's instructions that all that is needed to show standing is "an allegation of ownership and some evidence of ownership," or put another way, a "facially colorable interest in the proceedings sufficient to satisfy the case or controversy requirement and precedential considerations defining and limiting the role of the

court." *United States v. $557,933.89 More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002) (internal citations omitted).

Claimants have easily shown "some evidence of ownership," based solely on Claimants' Verified Claim filed in this action on November 28, 2023 (ECF No. 9) ("Claim"), which demonstrates, with 26 corroborating exhibits, the ownership structure of the Amadea by Claimants in this action since August 16, 2021. In addition, in Claimants' Amended Responses and Objections to Plaintiff's Special Interrogatories ("Response(s)"), Mr. Khudainatov explained that the Errigal Arrangement was ultimately canceled. Here, Mr. Khudainatov has come forward with a declaration that attaches the documents that support his Responses, from his original commissioning of the Amadea in 2012 to the April 4, 2022 management agreement with Imperial Yachts to manage the Amadea. He also submits proof that he is, in fact, a billionaire several times over, putting to rest the absurd allegations that he is insufficiently wealthy to have purchased the assets he has asserted he owns.[3]

Claimants have also come forward with the declarations of other witnesses who are wholly unconnected to Claimants including Dinar Khalikov, on whom the government relies heavily as evidence that the Amadea was sold to Kerimov because crew members referred to him as an "owner's representative." Khalikov explains in detail how he knows that Kerimov did not purchase the Amadea, as Kerimov strongly disliked the Amadea because of several technical flaws. Khalikov further explains that his overnight stay on the vessel, the suggestions and requests he made during his walkarounds, and his suggestion that certain sneakers be purchased are in no way

---

[3] In fact, Mr. Khudainatov's company—of which he is the sole shareholder—has been valued at between $8.2 billion and $48.4 billion between 2015 and 2022. Khudainatov Dec. ¶ 6, Ex. 1.

evidence of any sale to Kerimov, but are rather evidence that his adult daughter Gulnara Kerimova was planning long-term charters of the Amadea.

Not only have Claimants come forward with more than "some evidence," but the cases the government relies on for the farcical notion that Mr. Khudainatov is a mere straw owner are clearly distinguishable for reasons including the fact that they are largely *post-trial* decisions where a convicted defendant attempted to transfer his or her property in order to avoid forfeiture. In those circumstances, of course, bare legal title is insufficient to establish standing. But here, the government makes no allegation that Mr. Khudainatov transferred the vessel to Mr. Kochman in order to hide it from U.S. or any other law enforcement authorities. Indeed, such an allegation would not make sense as the vessel was never in the United States and neither Mr. Khudainatov nor Mr. Kochman was sanctioned at the time of the alleged "transfer" (or at any time relevant to this case). At the time the Amadea was seized, Claimants had possession of, title to, and dominion and control over, the Amadea, have been injured by its seizure, and would be injured by its forfeiture. Accordingly, the motion to strike should be denied.

## STATEMENT OF FACTS

The government claims that the facts relevant to its motion are undisputed, but they are wrong, as myriad factual disputes are demonstrated in Claimants' response to the government's Rule 56.1 Statement. The government recites details of the transfer of the Amadea's title from Nereo to Millemarin on August 16, 2021. MTS p. 3. This transfer did in fact occur, but was in no way related to the Errigal Arrangement, or any transfer of title to a third party. Khudainatov Dec. ¶ 31. The Nereo to Millemarin transaction was a completed transfer from one entity to another, both controlled by Mr. Khudainatov. *Id.* He effectuated this change in ownership for reasons having nothing to do with the Errigal Arrangement. *Id.* Indeed, there is no evidence that Kerimov,

or anyone acting on his behalf, visited the Amadea prior to mid-September 2021, and thus no evidence that he would have decided to buy it prior to the Nereo to Millemarin transfer. MTS p. 7; Khalikov Dec. ¶¶ 13, 18.

The Errigal Arrangement, on the other hand, was a *contemplated*, but never completed, transaction between Mr. Khudainatov and Mr. Kochman. Khudainatov Dec. ¶¶ 33–41. By way of background, Mr. Kochman and Mr. Khudainatov had a long-standing disagreement over investment and sales strategy for the Amadea. *Id.* ¶ 33. On several occasions, Mr. Kochman told Mr. Khudainatov that the Amadea could be chartered, and that chartering the Amadea would not only cover its running costs, but also could generate profits and improve the prospects of a sale. *Id.* However, Mr. Khudainatov believed that chartering the Amadea would reduce its value and make it harder to sell. *Id.* Toward the summer of 2021, Mr. Khudainatov had grown frustrated with Imperial Yachts' inability to sell the Amadea. *Id.* ¶ 34. Mr. Kochman told Mr. Khudainatov that the market was at a high point and that he thought that he could sell the Amadea for more than €225,000,000 by the end of the year. *Id.* However, Mr. Khudainatov wanted a more immediate solution. *Id.* Given their longstanding relationship, they were able to reach a compromise agreement, described below. *Id.* ¶ 35.

On September 3, 2021, Mr. Khudainatov and Mr. Kochman agreed in writing that Mr. Khudainatov would transfer to Mr. Kochman temporary use of the Amadea, including the right to charter the vessel and search for buyers, and the responsibility for paying its maintenance costs. MTS Ex. B; Khudainatov Dec. ¶ 36. The agreement provided for a transfer of €225,000,000. MTS Ex. B; Khudainatov Dec. ¶ 36. It also provided that Mr. Kochman would have the right to charter profits and any sale proceeds in excess of €225,000,000. MTS Ex. B; Khudainatov Dec. ¶ 36. The agreement expressly stated that it was not conferring a transfer of ownership. MTS Ex. B ¶ 3.  The

agreement also obligated Mr. Kochman to arrange for the sale of the Amadea by December 1, 2021. *Id.* ¶ 5.

A MYBA form contract designated as the September 14, 2021 Memorandum of Agreement ("September 14 MOA") was drafted to correspond with this September 3, 2021 agreement. MTS Exs. A (Response 4(v)), F. The September 14 MOA was between Millemarin and Errigal, the entity Mr. Kochman created for the purpose of this agreement. *Id.* This MYBA form contract did not effectuate a sale, or any transfer of ownership or title. *Id.* This is because, first, a MYBA form contract does not transfer title of a vessel, and also Mr. Khudainatov and Mr. Kochman  agreed that a transfer of ownership (title) would only take place if and when Mr. Kochman was able to find a bona-fide buyer for the Amadea, as illustrated by the fact that both the September 3, 2021 agreement and the September 14 MOA contemplated a sale months in the future. MTS Exs. A (Response 4(v)), B, G. Because ownership was not transferred in September 2021, neither party arranged for a Sea Trial, Technical Survey, Bill of Sale, Protocol of Delivery and Acceptance, or Resolution of Directors, all of which are necessary conditions precedent for sales and transfers of title of a vessel, such as the Amadea. MTS Ex. A (Response 4(v), 4(viii)). (To the extent the form MYBA agreement states otherwise, it is on account of it including boilerplate MYBA language.)

Actual title did not transfer on November 1, 2021, or at any time. Khudainatov Dec. ¶ 39. By the middle of November, Mr. Kochman informed Mr. Khudainatov that he had not yet found a buyer for the Amadea. *Id.*; MTS Ex. A (Response 4(vi)). Therefore, on November 22, 2021, the parties agreed in writing to delay the deadline by which Mr. Kochman was required to sell the Amadea until May 1, 2022. Khudainatov Dec. ¶ 39; MTS Ex. C. This new agreement resulted in the drafting of the subsequent Addendum Two (to the September 14 MOA) which corresponded

with the parties' agreement to delay title transfer to Errigal until May 1, 2021. Khudainatov Dec. ¶ 39; MTS Exs. A (Response 4(vi)), D.

Following the February 24, 2022 Russian military action in Ukraine, the U.S. government and its allies around the world issued public statements targeting Russian-owned yachts. Khudainatov Dec. ¶ 40; MTS Ex. A (Response 4(vii)). Recognizing that these events might frustrate their objectives to find a buyer for the Amadea, Mr. Khudainatov was prepared to complete the transaction if Mr. Kochman believed he was still able to sell the vessel. Khudainatov Dec. ¶ 40; MTS Ex. A (Response 4(vii)). The parties decided that the transaction could be effectuated by transferring shares in Millemarin from Millemarin's parent company, Invest International Finance Ltd. ("IIF"), to Errigal. *Id.* The parties' agreement was set forth in the March 7, 2022 Amendment to the September 14 MOA. Khudainatov Dec. ¶ 40; MTS Exs. A (Response 4(vii)), G pp. 1–4.

IIF signed a March 10, 2022 Share Transfer Agreement to transfer the shares in Millemarin from IIF to Errigal. Khudainatov Dec. ¶ 40; MTS Ex. D. However, despite the March 7 and March 10 agreements, the transfer of the shares would not alone suffice to transfer title to the Amadea, which would also require a Protocol of Delivery and Acceptance, an Official Resolution of Directors, a Bill of Sale, and a New Certificate of Registry. MTS Ex. A (Response 4(v), 4(viii)). After the March 10 Share Transfer Agreement was signed by IIF, Mr. Kochman told Mr. Khudainatov that he did not want to close the transaction, and Mr. Khudainatov did not object. Khudainatov Dec. ¶ 40; MTS Ex. A (Response 4(viii)). The Errigal Arrangement was terminated. Khudainatov Dec. ¶ 40. Among other reasons, it now appeared likely that because of the unexpected change in the geopolitical situation, there would be issues maintaining Amadea's flag, without which it could not be chartered or sold. MTS Ex. A (Response 4 (viii)). This would have the effect of making the Amadea unseaworthy. *Id.* In addition to the decision to cancel the

transaction, closing of the transaction became a legal impossibility as the directors of Errigal resigned from their positions, leaving the entity without any formal legal representative with the legal authority to complete the transaction. *Id.* As a result of the decision to not complete the transaction, and the transaction being precluded as a matter of law, as well as the flag issue, the Share Transfer Agreement was never fully executed, shares never transferred, and Mr. Khudainatov remained the Amadea's UBO. *Id.* Neither Mr. Kochman nor Errigal has ever asserted that title transferred to them as a result of the aborted Errigal Arrangement.[4] Thus, it is undisputed that Mr. Khudainatov is, and always has been, the UBO of the Amadea.

With the Errigal Arrangement aborted in early March 2022, the parties reverted to their respective roles with respect to the Amadea—Mr. Khudainatov was UBO with title to and possession of the vessel as well as all financial responsibilities relating to the vessel, and Imperial Yachts was the yacht manager. Khudainatov Dec. ¶ 44, Ex. 22. Accordingly, Millemarin as owner of the Amadea entered into a new management agreement with Imperial Yachts on April 4, 2022, as owner of the Amadea, in which Millemarin appointed Imperial Yachts to act as the vessel's manager. *Id.* That agreement specifically provides that Millemarin "shall at all times remain solely responsible for all costs and expenses related to the Yacht . . . ." *Id.* ¶ 6.3. In addition, Mr. Khudainatov was consulted about and approved the locations the vessel would travel to for a required maintenance period in the Phillippines, including the route it would take, and where it would stop for refueling (Mexico and Fiji). Khudainatov Dec. ¶ 45.

The Amadea was seized in Fiji on or about April 13, 2022 and litigation ensued there. Khudainatov Dec. ¶ 45; Ford Dec. ¶¶ 3–6. Mr. Khudainatov was and remains the Amadea's only and undisputed UBO and, as such, immediately appeared through counsel in the Fiji litigation to

---

[4] Neither Mr. Kochman nor Errigal has asserted a claim of ownership in this action.

challenge the seizure of the Amadea. Khudainatov Dec. ¶ 46; Ford Dec. ¶¶ 3–6. Within several weeks, Claimants had retained the undersigned to assert their ownership over the vessel in the United States, and on September 8, 2023, the undersigned reached out to the Department of Justice demanding the return of the vessel to Claimants. Khudainatov Dec. ¶ 47; Ford Dec. ¶ 7.

The government's assertion in its Rule 56.1 Statement that "[n]one of the parties' agreements contains any provision for returning the Amadea to Millemarin/Khudainatov or for Millemarin/Khudainatov to return the 225 million to Kochman/Errigal" is disputed. Gov. R. 56.1 Statement ¶ 27. The cancelation of the Errigal Arrangement returned possession and all use rights back to Mr. Khudainatov. Khudainatov Dec. ¶ 41. Also, the government's assertion is contradicted by the September 14 MOA, which requires return of the vessel upon termination of the agreement. MTS Ex. G, September 14 MOA ¶ 28 ("In the event of this Agreement being terminated under any of the terms and conditions…the Buyer shall return the Vessel to the port shown at Box H of this Agreement."). The September 14 MOA also contains a force majeure clause, which under the governing law would also permit termination and the return of any funds. MTS Ex. G, September 14 MOA ¶ 34. In addition, the September 14 MOA provided for two separate payments, and only the initial smaller payment was deemed "non-refundable." MTS Ex. G ¶ 7. The second payment of €180 million was not deemed "non-refundable," and must be returned under English Law, which governs the agreement. *Id.*

Accordingly, once the Errigal Arrangement was nullified, Mr. Khudainatov became liable to return the full amount of the funds that he had received in connection with the Errigal Arrangement. Khudainatov Dec. ¶ 41. However, after February 24, 2022, it became clear that Mr. Kochman would not be able to sell the Amadea, and neither Mr. Khudainatov nor Mr. Kochman knew how long the situation in Ukraine, and the targeting of Russian-owned assets, would last. *Id.*

Once the Amadea was seized in Fiji in April 2022 based on the serious—although false—allegations by the U.S. government that the vessel was owned by Kerimov and had been involved in U.S. sanctions evasion and money laundering, and the U.S. government's express intentions to target individuals connected to the Amadea,[5] the parties agreed that the repayment should not be effectuated until it was clear that such transaction would not be used as evidence of any wrongdoing. *Id.*

The facts submitted by the government regarding the Kerimov family's use of the vessel—and the import the government seeks to assign to those facts—are also disputed. The facts show that Gulnara Kerimova and her mother *only* chartered (but did not buy) the vessel from Millemarin, as set forth in the Charter Agreement (Ford Dec., Ex. A), and as corroborated Dinar Khalikov and Viktoria Pastukhova. Khalikov Dec. ¶ 23; Pastukhova Dec. ¶¶ 5, 16, 17, 19. That Charter Agreement provided for a month-long charter in the Caribbean in early 2022, as well as a sea trial

---

[5] The following statements are examples of some of the statements the U.S. government has made, which have resulted in Claimants' decision to not transfer any funds in connection with the Amadea: "This yacht seizure should tell every corrupt Russian oligarch that they cannot hide – not even in the remotest part of the world.  We will use every means of enforcing the sanctions imposed in response to Russia's unprovoked and unjustified war in Ukraine." "This seizure demonstrates the FBI's persistence in pursuing sanctioned Russian oligarchs attempting to evade accountability for their role in jeopardizing our national security." "The FBI, along with our international partners, will continue to seek out those individuals who contribute to the advancement of Russia's malign activities and ensure they are brought to justice, regardless of where, or how, they attempt to hide." "This seizure of Suleiman Kerimov's vessel, the Amadea, nearly 8,000 miles from Washington, D.C., symbolizes the reach of the Department of Justice as we continue to work with our global partners to disrupt the sense of impunity of those who have supported corruption and the suffering of so many." "This Task Force will continue to bring to bear every resource available in this unprecedented, multinational series of enforcement actions against the Russian regime and its enablers. *$300 Million Yacht of Sanctioned Russian Oligarch Suleiman Kerimov Seized by Fiji at Request of United States*, DOJ (May 5, 2022), https://www.justice.gov/opa/pr/300-million-yacht-sanctioned-russian-oligarch-suleiman-kerimov-seized-fiji-request-united.

of the vessel for three nights in October 2021. Ford Dec. Ex. A That Charter Agreement also contemplated a much longer-term charter later in 2022. *Id.* It did not contemplate a sale. *Id.*

The declarations of the following first-hand witnesses support Claimants' standing in this matter and disprove many of the "facts" upon which the government relies in connection with Gulnara's charter. Notably, all of these witnesses are wholly unconnected to Claimants in this case.

1. Dinar Khalikov, the individual the government has falsely claimed to be Kerimov's "owner's representative," denies being the "owner's representative," and explains why the government's theory of a sale to Kerimov is false, and that all of Khalikov's discussions with the crew in the lead up to a charter by Gulnara Kerimova (Kerimov's adult daughter) and her mother Firuza, were unambiguously referring to a charter and *not a sale to Kerimov or anyone else*. In addition, Khalikov makes clear that suggestions or requests for modifications he made during any walkaround were just that: some were requests consistent with Firuza's and Gulnara's preferences for their upcoming charter and others were suggestions to make the Amadea a more appealing experience overall, as he understood Imperial Yachts had hoped to charter it to other individuals.

2. Lesley Reynard, who was a stewardess on the Amadea, explains, among other things, that the use of "G" codes or "O rep" or "owners rep" or "boss" all refer to a guest on board and have nothing to do with assertions of, or knowledge about, ownership, as the government has repeatedly alleged. In addition, Reynard explains that G1 relates to the main guest on a particular trip, and at times was used to refer to Firuza, contradicting the government's assertion that "G1" in documents is always a reference to Suleiman Kerimov. MTS pp. 7-8.

3. Viktoria Pastukhova, who was the Client Coordinator at Imperial Yachts, communicated with Mr. Khudainatov about the Amadea, including before, during, and after the temporary use deal because he wanted to be kept informed of the charter and the guest's comments and requests, and also during the time the vessel was in Fiji, and therefore understood him to be the UBO. Her references to "G1" in documents were either to Mr. Khudainatov or Firuza.

Thus, contrary to the government's assertion (MTS p. 7), no one from the Kerimov family "direct[ed]" any modifications, particularly not in anticipation of purchasing the yacht. Khalikov Dec. ¶ 50. The types of requests for modifications such as those here made by charterers, particularly long-term charterers, are not at all unusual. Khalikov Dec. ¶ 23; Reynard Dec. ¶ 13, 16; Pastukhova Dec. ¶ 9. Thus, the fact that Gulnara and her mother looked into making certain

modifications—most of which were never made—and discussed location plans for a longer-term charter in the months ahead are irrelevant to the government's motion to strike, as they are not inconsistent with Mr. Khudainatov's ownership, title, and his continued exercise of some level of dominion and control over the vessel, even during the Errigal Arrangement Period. Pastukhova Dec. ¶¶ 7, 10; Reynard Dec. ¶ 13; Khalikov Dec. ¶¶ 35–53; Khudainatov Dec. ¶¶ 35–36.

In addition, the government's claim that the Amadea was taken off the market in October 2021 (MTS p. 7) is refuted by its own Exhibit M, an email dated September 20, 2021, which makes clear that a decision was made to take the vessel off the market in order to restrict viewings to serious buyers only. MTS Ex. M. This email is consistent with the Errigal Arrangement, the point of which was for Mr. Kochman to find a bona-fide purchaser for the Amadea. Khudainatov Dec. ¶ ¶ 35–36. The government's support for their contention that the Amadea was sold because it was not taken off the market is also undermined by its own Exhibit N, an email dated October 12, 2021, which simply states that viewings were not possible at the moment because the vessel had various plans, which was true. MTS Ex. N. This was during or just before Gulnara's sea trial and Mr. Khalikov's contemporaneous walkaround (Khalikov Dec. ¶¶ 35–36), as well as Suleiman Kerimov's brief visit, which took place on October 17, 2021. MTS Ex. L; Khalikov Dec. ¶ 57.

Likewise, the government's allegation regarding the November 2021 contract with Zuretti Interior Design to refit the Amadea, according to the government, for the benefit of Kerimov, provides no evidence that Kerimov had anything to do with this agreement, as neither he, nor anyone working at his direction, signed the agreement. MTS Ex. T. But, as described in Mr. Khudainatov's declaration, he, as the owner, was kept apprised of requests for major changes to the Amadea. Khudainatov Dec. ¶ 45; Pastukhova Dec. ¶¶ 4–7. But, ultimately, no major changes were made. *Id.*; Khalikov Dec. ¶ 54; Pastukhova Dec. ¶ 10 . The only "renovations" that took place

were the replacement of mattresses, a new spa bed, the removal of mini refrigerators from guest cabins, and the purchase of a pizza stone. Pastukhova Dec. ¶¶ 6, 10; Khalikov Dec. ¶ 42.

## LEGAL STANDARD

In order to establish constitutional standing,[6] a claimant's burden is low, even on summary judgment. All a claimant needs to show is a sufficient interest in the property to create a case or controversy by coming forth with "[a]n allegation of ownership and some evidence of ownership . . . ." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (quoting *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158 (2d Cir. 1994)). This standard is met when a claimant demonstrates a "facially colorable interest" in the property at issue. *United States v. $557,933.89 More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002). As the Second Circuit explained in *$557,933.89 More or Less, in U.S. Funds*:

> to establish standing 'the claimant need not prove the full merits of [his] underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court (internal citations omitted). The function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture. Thus, the only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required 'facially colorable interest, not whether he ultimately proves the existence of that interest.'

*Id.* (internal citations omitted). "Courts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable possessory interest in it." *United States v. Any and All Funds on Deposit in Account No. 12671905, Held in the Name of Landlocked Shipping Company at Wells Fargo Brokerage Services, LLC*, No. 09 CV 3481 (HB), 2010 WL 3185688 (S.D.N.Y. Aug. 10, 2010), at *5 (hereinafter "*Landlocked Shipping*") (quoting *United States v.*

---

[6] While Claimants must also satisfy statutory standing, the government does not challenge Claimants' statutory standing.

*Contents of Accounts Numbers 3034504504 and 144-07143 at Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 971 F.2dd 974, 985 (3d Cir. 1992). In addition, an owner or possessor of property that has been seized who necessarily suffers an injury that can be redressed at least in part by the return of the seized property has standing. *See Cambio Exacto*, 166 F.3d at 527–28 (finding that claimants who produced evidence of a "distinct and palpable injury" had standing) (citation omitted).

To be sure, the rationale behind forcing claimants in forfeiture proceedings to promptly satisfy standing requirements is that "in a civil forfeiture action the *government* is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated. If the government fails to meet its burden of proof (formerly probable cause, now preponderance), the claimant need not produce any evidence at all—i.e., the claimant has no 'case' that he must present or 'elements' to which he bears the burden of proof." *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 79 (emphasis in original). But critically, if the government fails to meet its burden of proof that the property is forfeitable, "the property is not forfeited—regardless of whether or not the claimant turns out to be the actual owner of the property." *Id.* at 77.

## ARGUMENT

Mr. Khudainatov's assertion of his ownership of the Amadea has been unequivocal. Mr. Khudainatov had Millemarin immediately appear in Fiji to challenge the Amadea's seizure in April 2022, and hired the undersigned within weeks after the vessel was brought to the United States. At no point have Claimants wavered or taken inconsistent positions on the issue of ownership. As set forth below, Claimants have demonstrated their long-standing ownership of the Amadea, their dominion and control over the Amadea, and the fact that they will suffer an injury in fact if the Amadea is forfeited. This case, therefore, bears no resemblance to those cited by the government, which involved claims to ownership based on bare legal title.

**A.**     **Claimants have title to and possession of the Amadea, have exercised dominion and control over the vessel, and will be injured if the Amadea is forfeited.**

The facts here more than amply demonstrate that Claimants have standing. As is documented in his declaration and the exhibits attached thereto, Mr. Khudainatov commissioned and built the Amadea, paid for it with his own funds, and took trips on it. He was the financially responsible party for Amadea's upkeep and maintenance for the vast majority of the time the Amadea has existed, particularly when the vessel was seized by the U.S. government. He also hired Imperial Yachts to manage the vessel, including at the time the vessel was seized by the U.S. government. His control over the Amadea's holding companies, Nereo and Millemarin, is proven by the documentary evidence of both entities' ownership. Under these circumstances, Claimants have standing. *See Landlocked Shipping*, 2010 WL 3185688, at *5–*6 (finding that claimants demonstrated a colorable interest in a residence and were not straw owners where, like here, they came forward with evidence that they controlled the entity that owned the residence, paid for its purchase, and vacationed at the residence, even where claimants had permitted the individual the government claimed to be the owner to use the residence and make renovations there).

The Court would be justified in ending its inquiry here, as contrary to the government's position, the Errigal Arrangement did not deprive Mr. Khudainatov of standing in this case. The facts do not support the government's claim that "Claimants relinquished their right to dominion and control over the Amadea when they granted Errigal the exclusive right to use it from September 2021 on." (MTS p. 14) That set of agreements between trusted business partners gave Mr. Kochman temporary use of the Amadea in order to try to find a buyer, and did not result in Mr. Khudainatov relinquishing all dominion and control over the Amadea. Those agreements did not result in a change in ownership of the Amadea, as they expressly stated that title would not transfer until the closing, but the transaction never closed. Indeed, Millemarin remained the

Amadea's holding company throughout the Errigal Arrangement Period, and Mr. Khudainatov remained the vessel's UBO throughout.

In addition, Mr. Khudainatov continued to exercise dominion and control over the Amadea during the Errigal Arrangement Period, as he asked Mr. Kochman to keep him apprised of major changes proposed for the Amadea, and Mr. Kochman did so. In March 2022, Mr. Khudainatov was consulted about where the vessel would go for a required maintenance period, and ultimately gave his approval for the Amadea go to the Philippines for this maintenance, and also approved the route and the locations of the refueling stops. He would not have been asked for, nor would he have given, his approval if he were not the owner.

The government asserts that Claimants did not exercise dominion and control over the vessel after October 2021 because members of the Kerimov family used the vessel and requested changes. However, the facts show that Gulnara Kerimova and her mother chartered the vessel from Millemarin, which included a sea trial in mid-October 2021, a month-long charter in the Caribbean, and the possibility of a 20-week charter later in 2022. The fact that Gulnara and her mother looked into making certain modifications to make these charters more suitable for their preferences and needs—most of which never even took place—and discussed location plans are not at all unusual for long-term charterers, and do not disprove Mr. Khudainatov's ownership, title, and continued exercise of some level of dominion and control over the vessel. *See Landlocked Shipping*, 2010 WL 3185688, at *5–*6 (claimant survived standing challenge even where she permitted another to use and make renovations to the real property at issue); Khalikov Decl. ¶¶ 35–53.

The facts further show that by mid-March 2022, the Errigal Arrangement had been terminated. Thus, to the extent that Mr. Kochman had gained certain rights and liabilities with respect to the Amadea between September 2021 and March 10, 2022, once Kochman terminated

the agreements, any temporary rights that Errigal or Mr. Kochman could have arguably possessed, vanished. To the extent that Mr. Khudainatov had shared dominion and control over the vessel with Mr. Kochman, that was no longer the case, and Mr. Khudainatov once again had sole dominion and control over the vessel. The Errigal Arrangement Period ended a month prior to any allegations of wrongdoing by anyone in connection with the Amadea.

It follows that after mid-March, when the temporary use agreement was terminated, Imperial Yachts reverted to its previous role solely as manager of the Amadea on behalf of its owner Millemarin (always owned by Mr. Khudainatov). This is reflected in the April 4, 2022, Management Agreement between Millemarin and Imperial Yachts, which eight days before the seizure, made Millemarin "solely responsible for all costs and expenses related to the Yacht." Khudainatov Dec. ¶ 44, Ex. 22 ¶ 6.3. Critically, under the terms of that Agreement, the Manager, Imperial Yachts was only permitted "access to the Yacht [Amadea] in order to carry out the Management Services." *Id.* ¶ 6.5. In addition, from the time Millemarin became the owning entity of the Amadea, the Amadea was insured in Millemarin's name, and Millemarin is demonstrably owned by Mr. Khudainatov. The facts here amply demonstrate Claimants' dominion and control over the Amadea. *See United States v. One Red 2003 Hummer, H2*, 234 F. Supp. 3d 415, 419 (W.D.N.Y. 2017) (finding claimant exercised dominion and control over a vehicle sufficient to establish standing where he purchased the vehicle, held title to the vehicle, insured the vehicle, maintained the vehicle, and allowed others to use it with his permission).

Finally, the government's argument that "Claimants have no financial stake in the Amadea as they have been fully paid for it and are insulated from any potential losses or gain associated with it" (MTS p. 14) is incorrect. Mr. Khudainatov currently has a €225 million obligation to Mr. Kochman on account of their terminating the Errigal Arrangement before it closed. Mr.

Khudainatov has not yet transferred this money, but that is not because he is not obliged to do so. Rather, given the U.S. government's public threats to prosecute individuals involved in the Amadea, neither Mr. Khudainatov nor Mr. Kochman wanted to risk an allegation of wrongdoing by transferring money in relation to the Amadea. As such, the money has remained in place pending resolution of this case. But it is undisputed that Mr. Khudainatov owes Mr. Kochman €225 million. If the Amadea is forfeited, Mr. Khudainatov will lose the Amadea and will still have to return the money. That is injury in fact.

*Cambio Exacto* is instructive. In that case, the Second Circuit reversed a district court's order finding of lack of standing and found that two of the claimants, money transmitters who had the misfortune of one of their customers using them to send wires laundering drug proceeds, established standing because even if they did not own the money in their customer remittance accounts, they "had a financial stake in the funds because they had a liability to their customers in an amount equal to the forfeited funds." 166 F.3d at 528.  Such "liabilities exposed [claimants] to substantial economic loss, if they made up the shortfall created by the forfeiture, or to potential loss of the bonds that they were required to post according to New York law in order to operate as money transmitters." *Id.* In other words, if a forfeiture creates a liability, that is sufficient "distinct and palpable injury" to confer standing. *Id.* at 527.[7]

---

[7] Notably, the court in *Cambio Exacto* noted that another injury the claimants faced which conferred standing was the "putatively illegal" government action in the form of an allegedly unlawful forfeiture. And that "this injury would be redressed by a successful challenge to the forfeiture. Article III does not require more." *Cambio Exacto*, 166 F.3d at 528. As this Court is well aware, Claimants intend to present a fulsome picture of the illegality of this seizure, in which following a Presidential address instructing the seizing of Russian assets, FBI agents presented a Magistrate Judge with a knowingly false affidavit. Under *Cambio Exacto*, Claimants' allegations in this regard provide a separate basis for conferring standing.

The Second Circuit's decision in *$557,933, More or Less, in U.S. Funds* also compels a finding of standing here. There, the Second Circuit, after setting forth the guiding law of our Circuit on this issue, held that the district court correctly determined, prior to trial, that claimant had standing to contest the forfeiture. 287 F.3d at 80. Notably, before finding the claimant had standing, the district court had ruled that the claimant had failed to establish standing because the claimant had not set forth sufficient facts to support either of the alternative interests he claimed to have in the seized money orders. *United States v. $557,933.89, More or Less in U.S. Funds*, No. 95-CV-3978 (JG), 1998 WL 817651, at *3 (E.D.N.Y. Mar. 2, 1998). The district court explained, "[w]ith respect to his claim of ownership, his conclusory allegation that he is the owner directly contradicts the statement he allegedly made at the airport that the money orders in fact belonged to his employer." *Id*. Even in those circumstances, the district court permitted the claimant to put the issue of ownership before the jury, and the Second Circuit agreed with that ruling.

**B.    This case bears no resemblance to cases involving nominee straw owners who solely possess bare legal title to the property.**

Upon a reading of the facts set forth above, the absurdity of the government's argument that Mr. Khudainatov solely had "bare legal title" and was acting as nothing more than a straw owner becomes clear. Thus, the cases the government relies on are inapposite. The cases that find a claimant lacks standing because the claimant solely had bare legal title and was acting as a mere straw owner arise in situations, unlike here, where a criminal defendant transfers property to a third party for the purpose of circumventing government seizure of the proceeds or facilitators of illegal activities. *See, e.g., United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807 (auto.),* 732 F. Supp. 447, 451 (S.D.N.Y. 1990). As the Court in *One 1982 Porsche 928* explained:

> The rationale for the rule that bare legal title may be insufficient is that appearances may be manipulated and deceptive, especially in the world of drug trafficking and

20

> other illegal operations. It has been recognized that people engaged in illegal activities, especially when needing to conceal illegitimate funds and being aware of forfeiture statutes, often attempt to disguise their interests in property by not placing title in their own names. A search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the "real" owner or merely a "strawman" set up either to conceal illegal dealings or to avoid forfeiture.

(internal citations omitted).

To be sure, Claimants do not disagree with the proposition that a "nominee," i.e., "one who holds bare legal title to property for the benefit of another" does not suffer an injury when the property is taken. *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.,* 959 F.Supp.2d 81, 105 (D.D.C. 2013) (citing *Cambio Exacto*, 166 F.3d at 527). The concern, of course, as stated above, is that this tactic can be used as a "subterfuge" to evade forfeiture and benefit the criminal whose illegal conduct gave rise to the forfeiture. *Id*. (internal citations omitted).

Nor do Claimants take issue with the government's assertions that a "straw man" who was merely "set up to avoid forfeiture" (MTS p. 12) will not have standing to challenge a forfeiture. While it is true that "bare legal title by one who does not exercise dominion and control over the property is insufficient to establish standing" (MTS p. 12) and that a claimant alleged to be a straw owner must "present evidence of dominion and control or other indicia of true ownership" (*Id*. pp. 12–13) to have a claim survive a standing challenge, neither of these statements bears any relevance to this case. To the extent the government has even made a *prima facie* showing sufficient to question Claimants' standing—Claimants' evidence satisfies these requirements. As the court in *One Red 2003 Hummer*, 234 F. Supp. 3d at 419, explained, "the issue of ownership 'turns primarily upon the identity of the individual exercising dominion and control over the vehicle, he (or she) being regarded as its true owner.'" Thus, in determining standing in civil

forfeiture cases, the court must look beyond bare legal title and examine whether the record owner is the true owner, or merely a "strawman" set up to avoid forfeiture. *Id.* (internal citations omitted).

The evidence plainly establishes that Mr. Khudainatov was not "set up" as a nominal straw owner to avoid forfeiture after the owner was convicted of a crime, or while the owner was engaging in criminal activity. Unlike the typical "straw owners," Mr. Khudainatov is a wealthy businessman with the means to purchase and own the Amadea. He commissioned the Amadea in 2012, he took possession of it when it was completed in 2017, used it for his own pleasure, owned it for years, attempted to sell it, and transferred temporary use to his trusted business partner which temporary use was subsequently canceled. Millemarin owned the Amadea throughout this period, and Mr. Khudainatov continued to maintain dominion and control over his vessel until it was seized.

While the Court's analysis here is fact-based, the government's caselaw actually compels a finding that on this record, Claimants, at a minimum, have standing to contest this forfeiture. Take for example, the government's lead case, *United States v. Premises & Real Prop. with Bldgs., Appurtenance & Improvements at 500 Delaware St., Tonawanda, New York*, 113 F.3d 310, 312 (2d Cir. 1997) in which two parents gave real property in fee simple, in a transaction that fully closed, to their son. After their son was arrested, he purported to transfer it back to his father for $1.00, explicitly for the purpose of avoiding forfeiture, but he otherwise continued to live in the home. *Id.* Under those facts, the court found the father appearing with the deed that he received for $1.00 after their son was arrested, was an instance of straw ownership. *Id.* Here, the facts are the opposite. There was no finalized transfer of legal title, and the fact that the contemplated transfer was not completed is memorialized in various writings, including the non-fully executed

March 10 Share Transfer Agreement, and the April 4, 2022 Management Agreement between Millemarin and Imperial Yachts.

The government's other cases are even further off the mark. Like every case the government cites for the proposition that a "straw owner" does not have standing to challenge a forfeiture, the decision in *United States v. One Parcel of Real Estate Commonly Known as 2030 East Monroe Street*, 884 F. Supp. 1218, 1223 (C.D. Ill. 1995) followed a full trial on the merits. That case also involved a situation where an individual, Willis, was arrested for, and pled guilty to cocaine distribution, and the government sought forfeiture of his home because it had been used to commit the crime. *Id.* at 1219. Willis's mother filed a claim on the home asserting that her other son, Richard, had bought the property from Willis, but that Richard could not keep up with the payments and so deeded the property to the mother. *Id.* But none of these facts bore out, Richard had plenty of cash, the mother did not live in the home, Willis did, and the court saw through the sham for what it was: an attempt to shield forfeitable property following a criminal conviction. *Id.* at 1220–24. This case is inapplicable to the facts here.

The government cites to *United States v. Vehicle: One 1990 Nissan Pathfinder*, No. 92-CV-1336, 1994 WL 476704 (N.D.N.Y Sept. 2, 1994), another decision on the merits *after trial*. In *One 1990 Nissan Pathfinder*, the defendant was convicted of drug possession found in the Pathfinder. *Id.* at *1. The defendant's aunt appeared as a claimant claiming ownership of the car. *Id.* The evidence, however, showed that the defendant purchased the car with his money, put his aunt's name on the registration, but that he was the only one who used the car. *Id.* at 1–2. The court asked for proof that the money to purchase the car came from the aunt, but no such proof was produced. The facts here are again the opposite. *Id.* Claimants have presented proof of payment

for the Amadea, owned and used it for many years, and exercised dominion and control over the vessel.

In *United States v. $829,422.42 in US Currency*, No. 3:08-cv-00914 (DJS), 2013 WL 2446486, at *2 (D. Conn. June 5, 2013), the claimant testified that although he was the owner of the bank account holding the funds to be forfeited, he admitted that he did not know who was depositing money into his account and he made no efforts to determine the identity of those making deposits into the account. The claimant had never registered with FinCEN until after the seizure occurred and the claimant had no interaction or relationship with the entities who wired in funds or to whom funds were transmitted, but merely "acted as the middleman in these transactions" to receive a kickback commission for his role in a money laundering and unlicensed money remitter violations. *Id*. at *5. This case is also inapplicable here.

Finally, *United States v. Premises & Real Prop. With Buildings, Appurtenances, & Improvements*, No. 16-CV-318-A, 2018 WL 4681773, at *2 (W.D.N.Y. Sept. 28, 2018), is also distinguishable. There, it was undisputed that "[the claimant] transferred fee title to the defendant real property to his father by delivery of a deed. Dkt. No. 45-1; *see* N.Y. Real Prop. Law § 291. There is no evidence that delivery of the deed was conditional. *Id.* And the plain language of the deed shows that claimant retained no other interest in the property. Dkt. No. 45-1, pp. 2-3." This is not the case here.

The facts here bear no resemblance to cases involving actual straw owners who merely hold bare legal title. To the contrary, Mr. Khudainatov is anything but a straw owner—he commissioned the vessel at great expense and has always maintained legal title to it. The allegations the government makes to establish this argument do not hold up to scrutiny and are all refuted by the evidence presented by the Claimants.

## CONCLUSION

The government's motion to strike borders on the frivolous. The government has not even set forth a *prima facie* showing of straw ownership by Claimants. But in any event, Claimants have come forward with more than an assertion of ownership and "some evidence" of a colorable interest in the Amadea. Indeed, through the declarations and documentary support submitted herewith, Claimants have demonstrated long-standing ownership in the Amadea, possession, dominion and control, and injury in fact. Simply put, Claimants have standing. For the foregoing reasons, Claimants respectfully request that this Court deny the government's motion to strike Claimants' Claim.

Dated: June 13, 2024

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: */s/ Adam C. Ford*
    Adam C. Ford
    Renée L. Jarusinsky
    Bryan W. McCracken
    275 Madison Avenue, 24th Floor
    New York, New York 10016
    (212) 858-0040 (main)
    aford@fordobrien.com
    rjarusinsky@fordobrien.com

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing, as well as Claimants' Local Rule 56.1 Statement, and the Declarations of Adam C. Ford, Eduard Yurievich Khudainatov, Dinar Khalikov, Viktoria Pastukhova, Lesley Reynard, and François Zuretti, and accompanying exhibits, were served on all counsel of record via the Court's CM/ECF system.


Dated: June 13, 2024

*/s/ Adam C. Ford*
Adam C. Ford
