**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-09304 |
| THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, | The Honorable Dale E. Ho |
| Defendant-*In-Rem*, | |
| and | |
| EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD., | |
| Claimants. | |

**DECLARATION OF CLAIMANT EDUARD YURIEVICH KHUDAINATOV IN**
**SUPPORT OF CLAIMANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE**

I, Eduard Yurievich Khudainatov, hereby declare and state the following under the penalty of perjury under the laws of the United States of America:

1.      My name is Eduard Yurievich Khudainatov, I am above the age of 18, and a citizen of the Russian Federation. I am a Claimant in the above-referenced action. I respectfully submit this declaration in support of Claimants' Opposition to Plaintiff's Motion to Strike.

*Background & Career*

2.      I was born on September 11, 1960, in the former Soviet Union, what is currently Chimkent, Kazakhstan.

3.      In the early 1980s, I began my career in oil and gas by installing oil rigs in Nefteyugansk, a remote Siberian city. In 1989, I founded an industrial pig farm in Nefteyugansk, which supplied food for the region. Given Nefteyugansk's abundance in natural resources and underdeveloped infrastructure, I started to build diversified business holdings in the region in the early 1990's, and obtained multiple licenses for oil production. By the early 2000's, my multi-level branched business interests in the region included gas stations, shopping malls, restaurants, and many other assets. In 2000, I was invited to St. Petersburg to become a federal inspector in the Northwestern Federal District. In order to accept this position, I was required to sell my business holdings in the Nefteyugansk region, which I did for approximately $600,000,000. I then invested those funds in various projects including real estate and other operating companies within the Russian Federation.

4.      I later returned to the oil and gas sector because I felt there were untapped opportunities in that sector in Western Siberia. In 2003, I became the General Director of Tyumen-region subsidiary of state-owned gas company Gazprom, OJSC Severneftegazprom, a joint venture of the German BASF and Gazprom. While there, I developed and commissioned the Yuzho-Russkoye field, which ensured gas supplies via the Nord Stream gas pipeline to Europe. This field was completed under budget and put into operation earlier than expected at the end of 2007.

5.      In 2008, I joined Rosneft as Vice President, one of Russia's and the world's largest oil and gas companies. In 2009, I was promoted to First Vice President. In these roles, I led the headquarters for the constriction and commissioning of the Vankor Field, an oil field located in Eastern Siberia and one of Russia's largest industrial projects, which was officially launched on August 21, 2009. From 2010 until May 2012, I served as Rosneft's President, and from May 2012 until 2013, I served as First Vice President and Deputy Chairman of the Management Board.

2

6.      I left Rosneft in 2013 to create my own oil company, Independent Oil and Gas Company ("NNK"), where I serve as President and sole shareholder. I started NNK with my own funds and loans, and acquired the requisite licenses for oil and gas production. The funds I invested in NNK consisted of proceeds from the sale of my businesses in 2000, my salary and bonuses from my positions at Gazprom and Rosneft, and the sale of my Rosneft shares which netted me $100 million. The company began with thirty employees and now has more than 30,000 employees. Over the past decade, NNK has been quite successful, as it has sold billions of dollars in assets, bringing me significant revenues as I am its sole shareholder. Attached as Exhibit 1 is a copy of the registered shareholder information for NNK from VTB Registrar showing that I am the sole shareholder of NNK (in Russian and English). Deloitte and its successor Russian entity has issued valuations of NNK over the years, as follows:

- As of June 30, 2015, $8.6 billion USD;

- As of December 31, 2015, $8.2 billion USD;

- As of June 30, 2016, $10.6 billion USD;

- As of December 31, 2016, $11 billion USD;

- As of June 30, 2017, $10.6 billion USD:

- As of December 31, 2017, $14.1 billion USD;

- As of June 30, 2018, $16 billion USD;

- As of December 31, 2018, $17.1 billion USD;

- As of June 30, 2019, $26.9 billion USD;

- As of December 31, 2019, $28.6 billion;

- As of June 30, 2020, $48.4 billion USD;

- As of December 31, 2022, $25 billion USD

*Commissioning the Amadea*

7.      In 2012, I commissioned the building of the Amadea and I have been its ultimate beneficial owner ("UBO") ever since. Throughout its existence, the Amadea has been held in the name of two different entities: first, Nereo Management Limited, and second, Millemarin Investments Ltd. ("Millemarin"), the other claimant in this action.

8.      I have known Evgeniy Kochman for approximately 20 years. Over the years, we have engaged in business transactions together. I decided to commission the building of the Amadea in or about 2011, and to have Mr. Kochman and his project management team from Imperial Yachts oversee the Amadea's build. This was the first time I commissioned the build of a super yacht. On or about September 23, 2011, I entered into an Investment Agreement with Mr. Kochman and his sister to build what became the Amadea. A copy of that Investment Agreement that has been maintained in my files is attached hereto as Exhibit 2.

9.      I caused the creation of an entity named Nereo Management Limited ("Nereo"), which was incorporated on February 13, 2012 in the Cayman Islands, to act as the buyer in a shipbuilding agreement with FR. Lürssen Werft GmbH & Co. KG ("Lürssen"), a German shipbuilding company. A copy of Nereo's corporate documents, including its certificate of incorporation, which have been maintained in my files, are attached hereto as Exhibit 3.

10.     That shipbuilding agreement, entitled "Agreement for the Construction of a 90 Metre Motor Yacht Hull Number 13688 'Project Mistral'" was entered into by Nereo and Lürssen on or about February 24, 2012 (the "Shipbuilding Agreement"). "Project Mistral" was the name of the Amadea while the Amadea was being built. The contract sum in that Shipbuilding Agreement was €112,125,000 that I was required to pay in eight installments over the course of approximately five years between the signing of the Shipbuilding Agreement and the vessel's

delivery. A copy of that shipbuilding agreement, which has been maintained in my files, is attached hereto as Exhibit 4.

11.     I later decided to increase the length of the yacht to 105.1 meters. As a result, the Shipbuilding Agreement was amended on December 19, 2012, in a document entitled "Amendment Agreement No. 2 to the Agreement Dated 24 February 2012 for the Construction of Motor Yacht Hull No. 13688 (Project 'Mistral')" entered into by Nereo and Lürssen, and the contract sum was accordingly increased to €166,500,000. A copy of that amendment, which has been maintained in my files, is attached hereto as Exhibit 5.

12.     Additional amendments to the shipbuilding agreement were entered into by Nereo and Lürssen, including those dated June 15, 2012, April 18, 2013; and February 9, 2016. A copy of those amendments, which have been maintained in my files, are attached hereto as Exhibit 6, respectively.

*Ownership Structure - Nereo*

13.     From the time it was delivered to until August 16, 2021, while I was the UBO of the Amadea, title to the vessel was held in the name of Nereo. I controlled Nereo, as my company Elearco Holdings Ltd. ("Elearco"), of which I was the sole shareholder, was the Optionholder of Nereo.

a.      A copy of the Elearco Certificate listing me as the sole shareholder of Elearco, which has been maintained in my files, is attached hereto as Exhibit 7.

b.      A copy of the Call Option Agreement No. 1/12-2015, which has been maintained in my files, is attached hereto as Exhibit 8.

c.      A copy of the confirmation of the Call Option Agreement No. 1/12-2015, which has been maintained in my files, is attached hereto as Exhibit 9.

d.    A copy of the letter regarding Consideration under Call Option Agreement No. 1/12-2015 dd.31/12/2015, which has been maintained in my files, is attached hereto as Exhibit 10.

14.    Share Transfer agreements were prepared in the event that I decided to exercise the option. These documents were signed by all parties except Elearco (me). Had I decided to exercise the option, all I needed to do was countersign these documents. As the Optionholder, I could take ownership of Nereo upon demand at any time. Copies of these Share Transfer agreements, which have been maintained in my files, are attached hereto as Exhibit 11.

*Payments for the Amadea*

15.    Between 2012 and 2017, when the Amadea was completed and delivered, I paid approximately €212,824,677 to Lürssen for the Amadea, which included the contract price plus change orders, as detailed in the chart below. Documents reflecting these payments are attached hereto as Exhibit 12.

| Date | Amount, EUR | Payer | Payee | Details | Source of funds |
|---|---|---|---|---|---|
| 09.03.2012 | -28 031 250,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | First pmnt - 25% - Instalment 1 | Eduard Khudaynatov |
| 27.12.2012 | -11 468 750,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | First pmnt - 25% - Instalment 2 | Eduard Khudaynatov |
| 28.12.2012 | -2 000 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | First pmnt - 25% - Instalment 3 | Eduard Khudaynatov |
| 27.06.2013 | -8 300 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Second pmnt - 10% - Instalment 1 | Eduard Khudaynatov |
| 27.06.2013 | -8 300 000,00 | NEREO MANAGEMENT LIMITED | Hill Dickinson | Second pmnt - 10% - Instalment 2 | Eduard Khudaynatov |
| 24.10.2013 | -585 060,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | For change orders | Eduard Khudaynatov |
| 24.10.2013 | -12 450 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Third pmnt - 15% - Instalment 1 | Eduard Khudaynatov |
| 25.10.2013 | -12 450 000,00 | NEREO MANAGEMENT LIMITED | Hill Dickinson | Third pmnt - 15% - Instalment 2 | Eduard Khudaynatov |
| 24.02.2014 | -2 059 810,09 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | For change orders | Eduard Khudaynatov |
| 24.02.2014 | -8 710 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Fourth pmnt - 15% - Instalment 1 | Eduard Khudaynatov |
| 24.02.2014 | -16 190 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Fourth pmnt - 15% - Instalment 2 | Eduard Khudaynatov |
| 19.06.2014 | -6 801 196,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | For change orders | Eduard Khudaynatov |
| 19.06.2014 | -16 600 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Fifth pmnt - 10% | Eduard Khudaynatov |
| 28.01.2015 | -8 211 481,65 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | For change orders | Eduard Khudaynatov |
| 28.01.2015 | -16 600 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Sixth pmnt - 10% | Eduard Khudaynatov |
| 18.06.2015 | -9 617 539,11 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | For change orders | Eduard Khudaynatov |
| 18.06.2015 | -16 600 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Seventh pmnt - 10% | Eduard Khudaynatov |
| 04.01.2017 | -500 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Additional pmnt for the delivery date modification | Loan from Lurssen |
| 04.01.2017 | -8 300 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Final pmnt - 5% | Loan from Lurssen |
| 04.01.2017 | -19 049 589,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | For change orders | Loan from Lurssen |

16.     To make the final payments in 2017, I asked Lürssen for a loan. Attached hereto as Exhibit 13 is the Loan Agreement between Nereo and Lürssen for the Amadea dated December 21, 2016, which has been maintained in my files. This loan was secured by a registered mortgage against the yacht, which mortgage was registered with the German Shipping Registry. Nereo re-paid the loan by September 18, 2020, and the mortgage registration was accordingly annulled.

17.     I also paid approximately €10 million to the designers and to pay for furniture, fixtures, fittings, and other appurtenances to the Amadea.

18.     All of the payments referenced in paragraphs 15, 16, and 17, above, were paid from the bank accounts of Nereo, which was an entity I funded by loans to Nereo from other entities I controlled.

### *Design and Delivery of the Amadea*

19.     I was fully involved with the design of the Amadea. Not only was this a significant financial investment, but I thoroughly enjoyed engaging in the design process to create a vessel that reflected my style and vision.

20.     During the build, I visited the shipyard on at least 3 occasions, including for undocking day of the Amadea, which was April 16, 2016, and December 10, 2016.

21.     Imperial Yachts produced an undocking day video and photos where I am seen engaging and celebrating with Peter Lürssen (the owner of the shipyard), Espen Øino (the exterior/hull designer), Mr. Zuretti, and Evgeniy Kochman, who functioned as the construction manager of the project and oversaw a large team of highly skilled professionals created solely to oversee the construction of the Amadea on my behalf. The video and photos accurately reflect my recollection of what took place on that day as depicted.

a.     The undocking day video is attached hereto as Exhibit 14.

7

b.      A copy of a photograph from the April 16, 2016 visit is attached hereto as Exhibit 15. The individuals who appear in that photo from left to right are: Evgeniy Kochman, me, Peter Lürssen, and Espen Øino. This photo was taken standing outside of the Amadea.

c.      Copies of eight photographs from the December 10, 2016 visit are attached hereto as Exhibits 16A-16H.

i.      The individuals who appear in Exhibit 16A from left to right are: Peter Lürssen and me. This photo was taken at the shipyard.

ii.      The individuals who appear in Exhibit 16B from left to right are: me and Evgeniy Kochman. This photo was taken inside the Amadea.

iii.      The individuals who appear in Exhibit 16C from left to right are: me and Evgeniy Kochman. This photo was taken inside the Amadea.

iv.      The individuals who appear in Exhibit 16D from left to right are: Michael Breman (from Lürssen), me, Evgeniy Kochman, and Peter Lürssen. This photo was taken at the shipyard.

v.      The individuals who appear in Exhibit 16E from left to right are: me (sitting) and François Zuretti on the right. This photo was taken inside the Amadea.

vi.      The individuals who appear in Exhibit 16F from left to right are: Espen Øino, François Zuretti, Nick Flashman (who worked for Imperial Yachts), Michael Breman (from Lürssen), and me. This photo was taken at the shipyard.

vii.      The individuals who appear in Exhibit 16G from left to right in the front row are: Evgeniy Kochman and me. This photo was taken inside the Amadea.

22.      In connection with the build of the Amadea, I met with Peter Lürssen, the head of the Lürssen shipyard that built the Amadea, no fewer than 10 times.

23.     I met with interior designer, François Zuretti, more than a dozen times, each meeting lasting several hours, to select the interior finishes for the vessel. Those meetings took place in Moscow and at the shipyard. The design agreement that was entered into with Mr. Zuretti and his interior design firm for the interior design of the Amadea dated April 12, 2012, which has been maintained in my files, is attached hereto as Exhibit 17.

24.     I asked the exterior designer, Espen Øino, to create a unique design for the bow, which was the albatross that he designed specifically for the Amadea. I met with Mr. Øino no fewer than 10 of times to discuss the exterior design for the Amadea. The agreement that was entered into with Mr. Øino and his firm for the exterior design of the Amadea, which has been maintained in my files, is attached hereto as Exhibit 18.

*Post-Delivery Use and Plans for the Amadea*

25.     The Amadea was completed and delivered in 2017, and thus it took five years to be built.

26.     While Imperial Yachts served as my representative and liaison to the builder and designers during the build, once the Amadea was delivered, I retained Imperial Yachts to act as the vessel's management company, which included hiring and managing crew, overseeing vessel maintenance, acting as sales marketer and broker, and coordinating guest trips. The Imperial Yachts Management Agreement for the Management of the MY Amadea dated March 6, 2017, which has been maintained in my files, is attached hereto as Exhibit 19. From the time of the Amadea's delivery in 2017 to the time the Amadea was seized in Fiji in 2022, my contacts at Imperial Yachts were Evgeniy Kochman and the Client Coordinator named Viktoria.

27.     As the UBO of the Amadea, I was financially responsible for paying the costs of operating and maintaining the Amadea (including insurance) from January 1, 2017 until

approximately September 17, 2021, and did pay such costs. As an example, a copy of an Imperial Yachts invoice covering the time period of July 2020 through August 2021 and a copy of the SWIFT demonstrating that I paid this invoice through Nereo's account, both of which are maintained in my files, are attached hereto as Exhibit 20. As reflected by this payment, due to my close relationship with Mr. Kochman, maintenance costs were reconciled irregularly.

28.    I took approximately four trips on the Amadea. The first one was in May 2017, when I vacationed in the French Riviera with Marina Amaffi and our two daughters, as well as my brother Yuri and his wife Elena. The second trip was in July 2017, when I vacationed in Greece with Marina Amaffi and our two daughters. The third trip was in August 2017, when I vacationed in Croatia with Marina Amaffi, our two daughters, my brother Yuri, his wife Elena, and their son. The fourth trip was in June 2021, when I vacationed in Greece with Marina Amaffi, our two daughters, and Marina's mother. For all of these trips, we were accompanied by security and household staff.

29.    I built the Amadea not only to use myself, but also because of the prospect of profiting from selling the vessel. As yachts of this nature take several years to build, there is a strong resale market for buyers who do not want to wait that long to own a new yacht. After taking those first three trips on the Amadea in 2017, I decided to try to sell the Amadea in 2018. I tasked Imperial Yachts, as my sales broker, to put the Amadea on the market with an asking price of €320 million. The Amadea was marketed at the 2019 Monaco Yacht Show. However, the offers to buy it were low, such that I would realize little to no profit. Efforts to resell the vessel continued into 2020, but Covid travel restrictions and quarantines halted yacht shows and slowed the market.

30.    After three years since the Amadea first went on the market, I grew frustrated with Imperial Yachts' inability to sell the vessel. To maximize the marketing and sales efforts, I

permitted Imperial Yachts to enter into a joint central sales agency agreement with another yacht broker named Edmiston. I was told that the addition of Edmiston allowed the Amadea to be marketed to Edmiston's U.S. clientele, to which the Amadea had never been exposed.

*Transfer from Nereo to Millemarin*

31.      As time went on and the prospects of selling the vessel seemed to become slimmer while the vessel aged, in early 2021, I decided change the ownership of the Amadea to a structure that led back to me individually, as opposed to the option structure that existed with Nereo. This change was for personal wealth and estate planning purposes, and I wanted the vessel to be held within a trust structure. Millemarin was subsequently incorporated on June 10, 2021 to be the new holding company for the Amadea. The transfer from Nereo to Millemarin took place on August 16, 2021, and I remained the UBO of the Amadea. This transfer had nothing to do with the later agreements I entered into with Mr. Kochman in September and November 2021, which I agreements I discuss below.

32.      A more detailed explanation of the transfer from Nereo to Millemarin, and the ownership structure of the Amadea from the time of that transfer to the present are described in the Verified Claim that was filed on my behalf in this case on November 28, 2023 ("Claim"). I fully incorporate into this declaration the statements in that Claim and the documents attached thereto, as if fully set forth herein. The Claim and the attached documents demonstrate that I was and am the UBO of the Amadea. In short, when Millemarin was incorporated, its parent company, Invest International Finance Ltd. ("IIF"), was Millemarin's shareholder, and the shares of IIF were held by a trust set up for my benefit called the September Trust. *See generally* Claim, and particularly ¶¶ 2, 4, 6, and Claim Exhibits 1-2, 6-11, 15-26. Upon the transfer of the Amadea from Nereo to Millemarin on August 16, 2021, the Amadea too became an asset held in the September

Trust. *See generally* Claim, and particularly ¶¶ 3, 6, and Claim Exhibits 3-5 and 15-26. The trustee

of the September Trust was Boltenko Trust AG located in Switzerland. *See* Claim ¶ 6(b) and Claim

Exhibits 19-21. In Spring 2022, because of the events in Ukraine, it became almost impossible for

European trustees to provide trust services to Russian citizens, like myself. As a result, the shares

of IIF were transferred directly to me. *See* Claim ¶¶ 5, 6(d) and Claim Exhibits 12-14. Thus, I am

the UBO of the Amadea, as I am the sole shareholder of Millemarin's parent company, IIF. This

is the current ownership structure of the Amadea and it has not changed since May 23, 2022.

*Errigal*

33.     After the ownership of the Amadea was transferred to Millemarin, I continued to

push Imperial Yachts to sell the Amadea. Up to that point, Mr. Kochman and I had a long-standing

disagreement over the investment and sales strategy for the Amadea. On several occasions, Mr.

Kochman told me that the Amadea could be chartered, and that chartering the Amadea would not

only cover its running costs, but also could generate profits and improve the prospects of a sale. I

was opposed to the idea of chartering the Amadea, as I believed that doing so would reduce the

Amadea's value, making the vessel harder to sell.

34.     Around the summer of 2021, I had grown frustrated with Imperial Yachts' inability

to sell the Amadea for what I thought was a reasonable selling price. Mr. Kochman told me that

the market was at a high point and that he thought that he could sell the Amadea for more than

€225,000,000 by the end of the year. However, I wanted a more immediate solution.

35.     As a result of our joint yachting projects over the years, Mr. Kochman and I have

developed a strong mutual trust in our business endeavors. Thus, we were able to reach a

compromise agreement that involved granting temporary use of the Amadea to Mr. Kochman, and

requiring that he pay me €225,000,000 for the vessel while he endeavored to sell it. To me, giving

Mr. Kochman this heavy financial obligation as well as the ability to profit from the sale would further incentivize him to sell the Amadea as quickly as possible, which he assured me was highly likely. As I had commissioned and built the Amadea over the course of five years and put much time and effort into its design in order to have it for my own use and enjoyment and in order for it to be a fruitful investment for me, I did not want to transfer ownership of the Amadea to Mr. Kochman at this time, and I wanted to maintain some level of control over the vessel. In addition, notwithstanding the payment I requested, if Mr. Kochman was not able to sell the Amadea, I intended to return those funds to him knowing that such an expenditure would impose a significant financial hardship on him long-term. Therefore, Mr. Kochman and I agreed that a transfer of ownership would only take place if and when Mr. Kochman was able to find a bona-fide buyer for the Amadea.

36.     Our compromise was memorialized in a September 3, 2021 "Cooperation Agreement" (Motion to Strike, Exhibit B). In that agreement, Mr. Kochman and I agreed that I would transfer to Mr. Kochman temporary use of the Amadea, including the right to charter the vessel and search for buyers, and the responsibility for paying its maintenance costs. The agreement provided for a transfer of €225,000,000 to me by Mr. Kochman. It also provided that Mr. Kochman would have right to charter profits and any sale proceeds in excess of €225,000,000. That agreement explicitly stated that I was not transferring ownership of the Amadea to Mr. Kochman. It also stated that Mr. Kochman should organize the sale of the Amadea no later than December 1, 2021, which provided time pressure to further incentivize Mr. Kochman to find a buyer.

37.     Shortly thereafter, I understand that Mr. Kochman incorporated an entity called Errigal Marine Limited ("Errigal") on for purposes of this agreement, and that Mr. Kochman is and has always been the only UBO of Errigal.

38.     In September and October 2021, Mr. Kochman effectuated the payment of €225,000,000, as set forth in our September 3, 2021 agreement.

39.     By the middle of November, Mr. Kochman told me that he had not yet found a buyer for the Amadea. Therefore, on November 22, 2021, we amended our prior cooperation agreement to delay the deadline by which Mr. Kochman was required to sell the Amadea until May 1, 2022. This new agreement resulted in the Additional Agreement to the Cooperation Agreement of September 3, 2021, dated November 22, 2021, which both me and Mr. Kochman signed, and which extended the time for Mr. Kochman to organize the sale of the Amadea until May 1, 2022 (Motion to Strike, Exhibit C).

40.     Following the February 24, 2022 Russian military action in Ukraine, the U.S. government, including the President, and U.S. allies around the world, issued public statements targeting Russian-owned yachts. Mr. Kochman and I recognized that these events would frustrate the goals of our arrangement to organize the Amadea's sale. Nevertheless, I was prepared to complete the transaction if Mr. Kochman still believed he could ultimately sell the vessel. We decided that the transaction could be closed by transferring shares in Millemarin from Millemarin's parent company, IIF, to Errigal. The parties' agreement was set forth in the March 7, 2022 Amendment to the September 14, 2021 Memorandum of Agreement (Motion to Strike, Exhibit G). To that end, IIF signed a March 10, 2022 Share Transfer Agreement to transfer the shares in Millemarin from IIF to Errigal (Motion to Strike, Exhibit E). After the March 10 Share Transfer Agreement was signed by IIF, Mr. Kochman told me that he did not want to close the transaction,

and I did not object. As a result of the decision to not close the transaction, the Share Transfer Agreement was never fully executed, shares never transferred, and I remained the Amadea's UBO. In addition, Mr. Kochman and I agreed that the prior "Errigal" agreements between us were made impossible to effectuate, and the entirety of the transaction was terminated. I, therefore, became financially responsible to pay all expenses relating to the Amadea going forward.

41.    Once the agreements were canceled, I became liable to pay Mr. Kochman back for the full amount. Given our close relationship, at the time we entered into the Errigal agreements, I never intended to leave Mr. Kochman in financial peril by keeping the €225,000,000 should he not be able to sell the Amadea. This was why I kept agreeing with him to extend the closing date. However, after the events of February 2022, it became clear that Mr. Kochman would not be able to sell the Amadea, and neither of us knew how long the situation in Ukraine, and the targeting of Russian-owned assets, would last. Once the Amadea was seized in Fiji in April 2022 based on the serious—although false—allegations by the U.S. government that the vessel was owned by Kerimov and had been involved in U.S. sanctions evasion and money laundering, and the U.S. government's express intentions to target for criminal prosecution individuals connected to the Amadea, Mr. Kochman and I agreed that the repayment should not be effectuated until it was clear that such transaction would not be used as evidence of any wrongdoing or until the situation with the Amadea resolved. It is for these reasons that I have not made any financial transfers to Mr. Kochman in connection with the Amadea.

**Post-Errigal Transaction Events**

42.    Throughout the contemplated, but never completed, Errigal "transaction," I remained the Amadea's UBO and the Amadea remained owned by Millemarin, which I owned through my being the sole shareholder of its parent company, IIF. Upon the transfer Nereo to

Millemarin, the insurance for the vessel was changed to reflect this change in ownership. As can be seen in the Confirmation of Cover for the period of August 16, 2021 (the date of the transfer from Nereo to Millemarin) to August 16, 2022, the registered owner of the Amadea is Millemarin. A copy of the Confirmation of Cover, which was maintained in my files, is attached hereto as Exhibit 21.

43.     Around the time that Mr. Kochman and I entered into our arrangement in September 2021, he told me that he had a group interested in chartering the Amadea for a potential long-term charter. I then asked Mr. Kochman to keep me updated about any significant modifications to the interior he wanted to implement in order to make the vessel more attractive for the sale and the charters. To my knowledge, while certain changes were being considered, only minor changes were actually implemented on board the vessel.

44.     Consistent with Millemarin's (and therefore my) ownership of the Amadea, after the decision to not complete the Errigal transaction, a new yacht management agreement was entered into on or about April 4, 2022 between Millemarin and Imperial Yachts. A copy of the Imperial Yacht Management Agreement for the Management of M/Y Amadea, which was maintained in my files, is attached hereto as Exhibit 22.

45.     At some point around early 2022, Mr. Kochman informed me that the Amadea would need maintenance to be completed that year. I approved that the Amadea would go to the Pacific to have this maintenance completed. I also approved that it would go to Mexico for fueling before making its trans-Pacific journey, and that it would stop also in Fiji for re-fueling before heading to the Philippines. As the Amadea's UBO, I was financially responsible to pay for this journey and the subsequent maintenance, but as detailed below the vessel was seized in Fiji and

this maintenance never took place. I remain financially responsible for the costs of this journey to Fiji.

*Seizure in Fiji*

46.     On or about April 12, 2022, the U.S. authorities sought the seizure of the Amadea upon its arrival in Fiji. I kept in regular close touch with Mr. Kochman during this time. In addition, while the vessel was in Fiji, I asked Mr. Kochman to give me regular updates as to what was happening there, and he called me every week or thereabouts to provide me with those updates.

47.     As UBO of the Amadea, I instructed Mr. Kochman to assist me with finding local counsel in Fiji to represent Millemarin's (and my) interests in the proceedings there. I authorized local counsel to represent Millemarin and to appear in that litigation to challenge the U.S. government's attempt to seize Amadea. Unfortunately, after several weeks of litigation, we lost that fight, and the U.S. government seized the Amadea and sailed the vessel to the United States.

48.     In the summer of 2022, I hired my counsel, Ford O'Brien Landy LLP, who in September 2022 made a demand to the U.S. government for the return of the Amadea to me.

This declaration was read to me in the Russian language and I agree with its contents. I reviewed a certified Russian translation of this declaration before I signed it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 13, 2024

_____
Eduard Yurievich Khudainatov

17

**ОКРУЖНОЙ СУД США**
**ЮЖНЫЙ РАЙОН НЬЮ-ЙОРКА**

СОЕДИНЕННЫЕ ШТАТЫ АМЕРИКИ,

Заявитель,

против

М/Я AMADEA, МОТОРНАЯ ЯХТА, НОМЕР
МЕЖДУНАРОДНОЙ МОРСКОЙ
ОРГАНИЗАЦИИ 1012531, ВКЛЮЧАЯ ВСЕ
ПРИСПОСОБЛЕНИЯ, ДЕТАЛИ,
РУКОВОДСТВА, ЗАПАСЫ, СКЛАДЫ,
ИНВЕНТАРЬ, А ТАКЖЕ КАЖДУЮ
СПАСАТЕЛЬНУЮ ШЛЮПКУ, ЗАЯВКУ
НА ПОДРЯД И ДРУГИЕ
ПРИНАДЛЕЖНОСТИ К НЕЙ,

Ответчик *по вопросам материального
имущества,*

и

ХУДАЙНАТОВ ЭДУАРД ЮРЬЕВИЧ,
КОМПАНИЯ MILLEMARIN
INVESTMENTS LTD.,

Истцы.

Дело № 1:23-cv-09304

Судья Дейл Э. Хо

### ЗАЯВЛЕНИЕ ИСТЦА ХУДАЙНАТОВА ЭДУАРДА ЮРЬЕВИЧА В <u>ПОДДЕРЖКУ ВОЗРАЖЕНИЯ ИСТЦОВ ПРОТИВ ХОДАТАЙСТВА ЗАЯВИТЕЛЯ ОБ ИСКЛЮЧЕНИИ</u>

Я, Худайнатов Эдуард Юрьевич, настоящим заявляю следующее под страхом

наказания за лжесвидетельство в соответствии с законодательством Соединенных Штатов

Америки:

1.      Меня зовут Худайнатов Эдуард Юрьевич, мой возраст старше 18 лет, я

гражданин Российской Федерации. Я являюсь Истцом по вышеуказанному иску. Я со всем

уважением представляю данное заявление в поддержку возражения Истцов против ходатайства Заявителя об исключении.

*Общая информация и профессиональный рост*

2. Я родился 11 сентября 1960 года в бывшем Советском Союзе, в настоящее время г. Шымкент, Казахстан.

3. В начале 1980-х годов я начал свою карьеру в нефтегазовой отрасли, установив нефтяные буровые установки в отдаленном сибирском городе Нефтеюганск. В 1989 году я основал промышленную свиноводческую ферму в г. Нефтеюганск, которая поставляла продукты питания для региона. Учитывая изобилие природных ресурсов и недостаточно развитую инфраструктуру в Нефтеюганске, я начал строить разнообразные коммерческие холдинги в регионе в начале 1990-х годов и получил несколько лицензий на добычу нефти. К началу 2000-х годов мои многоуровневые филиалы бизнеса в регионе включали в себя заправочные станции, торговые центры, рестораны и многие другие активы. В 2000 году меня пригласили в Санкт-Петербург на должность федерального инспектора Северо-Западного федерального округа. Чтобы принять эту должность, мне необходимо было продать свои активы в Нефтеюганской области, что я сделал примерно за 600 000 000 долларов США. После чего эти средства были инвестированы мной в различные проекты, включая недвижимость и другие действующие компании на территории Российской Федерации.

4. Позже я вернулся в нефтегазовый сектор, поскольку почувствовал, что в этом секторе в Западной Сибири есть нереализованные возможности. В 2003 году я стал генеральным директором дочерней компании по Тюменскому региону государственной газовой компании «Газпром», ОАО «Севернефтегазпром», совместного предприятия

2

немецкого BASF и «Газпрома». Находясь там, я разработал и ввел в эксплуатацию Южно-Русское месторождение, которое обеспечивало поставки газа через газопровод «Северный поток» в Европу. Разработка этого месторождения была завершена в рамках бюджета и введена в эксплуатацию раньше, чем ожидалось в конце 2007 года.

5.      В 2008 году я пришел в «Роснефть» на должность вице-президента, одной из крупнейших нефтегазовых компаний России. В 2009 году меня повысили до первого вице-президента. На этих должностях я возглавлял штаб-квартиру по сужению и вводу в эксплуатацию Ванкорского месторождения, нефтяного месторождения, расположенного в Восточной Сибири, и одного из крупнейших промышленных проектов России, который официально стартовал 21 августа 2009 года. С 2010 года по май 2012 года я занимал должность президента «Роснефти», а с мая 2012 года по 2013 год я занимал должность первого вице-президента и заместителя председателя Правления.

6.      В 2013 году я покинул «Роснефть» для создания собственной нефтяной компании «Независимая нефтегазовая компания» («ННК»), где я являюсь президентом и единственным акционером. На создание компании «ННК» я использовал собственные средства и займы, а также приобрел необходимые лицензии на добычу нефти и газа. Средства, которые я инвестировал в компанию «ННК», включали доходы от продажи моих предприятий в 2000 году, мою зарплату и бонусы от моих должностей в «Газпроме» и «Роснефти», а также продажу моих акций «Роснефти», что принесло мне 100 миллионов долларов США. Компания начала работу с тридцати сотрудников, и в настоящее время ее штат насчитывает более 30 000 сотрудников. За последнее десятилетие компания «ННК» была достаточно успешной, поскольку продала миллиарды долларов активов, принося мне значительные         доходы,         так         как         я         являюсь         единственным         акционером.         Копия

3

зарегистрированной информации об акционерах компании «ННК» от ВТБ-регистратора, которая показывает, что я являюсь единственным акционером компании «ННК» (на русском и английском языках) представлена в Приложении 1. Компания Deloitte и ее правопреемник, Российская компания, в течение многих лет проводили оценку компании «ННК», данные которой приведены ниже:

- По состоянию на 30 июня 2015 года, 8,6 млрд долл. США;

- По состоянию на 31 декабря 2015 года, 8,2 млрд долл. США;

- По состоянию на 30 июня 2016 года, 10,6 млрд долл. США;

- По состоянию на 31 декабря 2016 года, 11 млрд долл. США;

- По состоянию на 30 июня 2017 года, 10,6 млрд долл. США;

- По состоянию на 31 декабря 2017 года, 14,1 млрд долл. США;

- По состоянию на 30 июня 2018 года, 16 млрд долл. США;

- По состоянию на 31 декабря 2018 года, 17,1 млрд долл. США;

- По состоянию на 30 июня 2019 года, 26,9 млрд долл. США;

- По состоянию на 31 декабря 2019 года, 28,6 млрд долл. США;

- По состоянию на 30 июня 2020 года, 48,4 млрд долл. США;

- По состоянию на 31 декабря 2022 года, 25 млрд долл. США

*Ввод в эксплуатацию яхты Amadea*

7.     В 2012 году я заказал строительство яхты Amadea и с тех пор являюсь ее конечным бенефициарным собственником (КБС). На протяжении всего своего существования яхтой Amadea владели две различные компании: сначала компания Nereo Management Limited, а затем Millemarin Investments Ltd. (Millemarin), другой истец по данному иску.

4

8.     Я знаю Евгения Кочмана примерно 20 лет. На протяжении многих лет мы вместе вели деловые операции. Я решил ввести в эксплуатацию яхту Amadea примерно в 2011 году и попросить г-на Кочмана и его команду по управлению проектами компании Imperial Yachts контролировать строительство яхты Amadea. Я заказал строительство суперяхты впервые. Примерно 23 сентября 2011 года я заключил инвестиционное соглашение с г-ном Кочманом и его сестрой, чтобы построить яхту, которая впоследствии стала яхтой Amadea. Копия этого инвестиционного соглашения, которое хранится в моих документах, прилагается к настоящему документу в качестве Приложения 2.

9.     Я организовал создание компании под названием Nereo Management Limited (Nereo), которая была учреждена 13 февраля 2012 г. на Каймановых островах, чтобы выступать в качестве покупателя в договоре о судостроении с компанией FR. Lürssen Werft GmbH & Co. KG (Lürssen), немецкой судостроительной компанией. Копия корпоративных документов компании Nereo, включая свидетельство о регистрации компании, которые хранятся в моих документах, прилагается к настоящему документу в качестве Приложения 3.

10.    Примерно 24 февраля 2012 года компании Nereo и Lürssen заключили договор о судостроении под названием «Договор о строительстве 90-метрового моторного яхтного корпуса № 13688 Project Mistral» («Договор о судостроении»). Project Mistral — это название яхты Amadea на период ее строительства. Сумма контракта в этом Договоре о судостроении составила 112 125 000 евро, которые я должен был заплатить восемью частями в течение приблизительно пяти лет с момента подписания Договора о судостроении до поставки яхты. Копия этого Договора о судостроении, который хранится в моих документах, прилагается к настоящему документу в качестве Приложения 4.

11.     Позже я решил увеличить длину яхты до 105,1 метров. В результате, 19 декабря 2012 года в Договор о судостроении были внесены изменения в документ под названием «Договор No 2 о внесении изменений в Договор от 24 февраля 2012 года о строительстве моторного яхтного корпуса № 13688 (Project Mistral)», заключенный между компаниями Nereo и Lürssen, и сумма договора была соответственно увеличена до 166 500 000 евро. Копия этой поправки, которая хранится в моих документах, прилагается к настоящему документу в качестве Приложения 5.

12.     Дополнительные поправки к Договору о судостроении были внесены компаниями Nereo и Lürssen, включая поправки от 15 июня 2012 г., 18 апреля 2013 г. и 9 февраля 2016 г. Копия этих поправок, которые хранятся в моих документах, прилагается к настоящему документу в качестве Приложения 6 соответственно.

*Структура собственности — компания Nereo*

13.     С момента поставки до 16 августа 2021 года, пока я являлся конечным бенефициарным собственником яхты Amadea, право собственности на яхту сохранялось у компании Nereo. Я контролировал Nereo, поскольку моя компания Elearco Holdings Ltd. (Elearco), единственным акционером которой я являлся, была держателем опциона Nereo.

a.     Копия Сертификата компании Elearco, в котором я являюсь единственным акционером компании Elearco, который хранится в моих документах, прилагается к настоящему документу в качестве Приложения 7.

b.     Копия Договора об опционе с правом покупки № 1/12-2015, который хранится в моих документах, прилагается к настоящему документу в качестве Приложения 8.

6

c.     Копия подтверждения Договора об опционе с правом покупки № 1/12-2015, которое хранится в моих документах, прилагается к настоящему документу в качестве Приложения 9.

d.     Копия письма, касающегося Рассмотрения по Договору об опционе с правом покупки № 1/12-2015 от 31/12/2015, которое хранится в моих документах, прилагается к настоящему документу в качестве Приложения 10.

14.     Соглашения о передаче акций были подготовлены на случай, если бы я решил воспользоваться опционом. Эти документы были подписаны всеми сторонами, кроме компании Elearco (меня). Если бы я решил воспользоваться опционом, все, что мне нужно было сделать, это подписать эти документы. Как держатель опциона я мог в любое время взять на себя ответственность за компанию Nereo по требованию. Копии этих соглашений о передаче акций, которые хранятся в моих документах, прилагаются к настоящему документу в качестве Приложения 11.

*Платежи за яхту Amadea*

15.     В период с 2012 по 2017 год, когда строительство яхты Amadea было завершена и яхта доставлена, я заплатил компании Lürssen приблизительно 212 824 677 евро за яхту Amadea, включая контрактную цену плюс заказы на внесение изменений, как указано в таблице ниже. Документы, отражающие эти платежи, прилагаются к настоящему документу в качестве Приложения 12

| Дата | Сумма, евро | Плательщик | Получатель платежа | Сведения | Источник средств |
|---|---|---|---|---|---|
| 09.03.2012 г. | -28 031 250,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Первый платеж - 25% - Взнос 1 | Эдуард Худайнатов |
| 27.12.2012 г. | -11 468 750,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Первый платеж - 25% - Взнос 2 | Эдуард Худайнатов |
| 28.12.2012 г. | -2 000 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Первый платеж - 25% - Взнос 3 | Эдуард Худайнатов |
| 27.06.2013 г. | -8 300 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Второй платеж - 10% - Взнос 1 | Эдуард Худайнатов |
| 27.06.2013 г. | -8 300 000,00 | NEREO MANAGEMENT LIMITED | Хилл Дикинсон | Второй платеж - 10% - Взнос 2 | Эдуард Худайнатов |
| 24.10.2013 | -585 060,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Для распоряжений о внесении | Эдуард Худайнатов |

| | | | | изменений | |
|---|---|---|---|---|---|
| 24.10.2013 г. | -12 450 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Третий платеж - 15% - Взнос 1 | Эдуард Худайнатов |
| 25.10.2013 г. | -12 450 000,00 | NEREO MANAGEMENT LIMITED | Хилл Дикинсон | Третий платеж - 15% - Взнос 2 | Эдуард Худайнатов |
| 24.02.2014 г. | -2 059 810,09 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Для распоряжений о внесении изменений | Эдуард Худайнатов |
| 24.02.2014 г. | -8 710 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Четвертый платеж - 15% - Взнос 1 | Эдуард Худайнатов |
| 24.02.2014 г. | -16 190 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Четвертый платеж - 15% - Взнос 2 | Эдуард Худайнатов |
| 19.06.2014 г. | -6 801 196,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Для распоряжений о внесении изменений | Эдуард Худайнатов |
| 19.06.2014 г. | -16 600 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Пятый платеж - 10% | Эдуард Худайнатов |
| 28.01.2015 г. | -8 211 481,65 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Для распоряжений о внесении изменений | Эдуард Худайнатов |
| 28.01.2015 г. | -16 600 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Шестой платеж - 10% | Эдуард Худайнатов |
| 18.06.2015 г. | -9 617 539,11 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Для распоряжений о внесении изменений | Эдуард Худайнатов |
| 18.06.2015 г. | -16 600 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Седьмой платеж - 10% | Эдуард Худайнатов |
| 04.01.2017 г. | -500 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Дополнительный платеж за изменение даты доставки | Кредит от Lurssen |
| 04.01.2017 г. | -8 300 000,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Окончательный платеж - 5% | Кредит от Lurssen |
| 04.01.2017 г. | -19 049 589,00 | NEREO MANAGEMENT LIMITED | Lurssen Werft GmbH & Co | Для распоряжений о внесении изменений | Кредит от Lurssen |

16.     Чтобы произвести окончательные платежи в 2017 году, я попросил компанию Lürssen предоставить кредит. К настоящему документу в качестве Приложения 13 прилагается Кредитный договор между компаниями Nereo и Lürssen в отношении яхты Amadea от 21 декабря 2016 г., который хранится в моих документах. Этот кредит был обеспечен зарегистрированной ипотекой в отношении яхты, которая была зарегистрирована в Немецком реестре судоходства. Компания Nereo погасила кредит до 18 сентября 2020 года, и регистрация ипотеки была соответственно отменена.

17.     Я также заплатил дизайнерам около 10 миллионов евро и оплатил мебель, приспособления, детали и другие принадлежности для яхты Amadea.

18.     Все платежи, упомянутые в пунктах 15, 16 и 17 выше, были выплачены с банковских счетов компании Nereo, которая являлась юридическим лицом, которое я финансировал кредитами от других юридических лиц, подконтрольных мне.

*Проектирование и доставка яхты Amadea*

19.   Я был полностью вовлечен в проектирование яхты Amadea. Это было не только значительными финансовыми инвестициями, но также я с большим удовольствием участвовал в процессе проектирования, чтобы создать яхту, отражающую мой стиль и видение.

20.   Во время строительства я посетил верфь не менее 3 раз, в том числе в день вывода яхты AMADEA из дока, который состоялся 16 апреля 2016 года и 10 декабря 2016 года.

21.   Компания Imperial Yachts сняла невероятный дневной видеоролик и фотографии, в которых было видно, как я участвовал и праздновал с Питером Люрсеном (владельцем верфи), Эспеном Ойно (проектировщиком фасада/корпуса), г-ном Зуретти и Евгением Кочманом, который работал менеджером по строительству проекта и руководил большой командой высококвалифицированных специалистов, созданной исключительно для надзора за строительством яхты AMADEA от моего имени. Видео и фотографии точно отражают мои воспоминания о том, что произошло в тот день.

a.   Видео о дне вывода из дока прилагается к настоящему документу в качестве Приложения 14.

b.   Копия фотографии, сделанной во время визита 16 апреля 2016 г., прилагается к настоящему документу в качестве Приложения 15. Лица на этой фотографии слева направо: Евгений Кочман, я, Питер Люрсен и Эспен Ойно. Эта фотография была сделана на фоне яхты Amadea.

c.   Копии восьми фотографий с визита 10 декабря 2016 г. прилагаются к настоящему документу в виде Приложений 16A-16H.

9

i.       Лица в Приложении 16A слева направо: Питер Люрсен и я. Эта фотография была сделана на верфи.

ii.      Лица в Приложении 16B слева направо: я и Евгений Кочман. Эта фотография была сделана внутри яхты Amadea.

iii.     Лица в Приложении 16C слева направо: я и Евгений Кочман. Эта фотография была сделана внутри яхты Amadea.

iv.      Лица в Приложении 16D слева направо: Майкл Бреман (из компании Lürssen), я, Евгений Кочман и Питер Люрсен. Эта фотография была сделана на верфи.

v.       Лица в Приложении 16E слева направо: я (в положении сидя) и Франсуа Зуретти справа. Эта фотография была сделана внутри яхты Amadea.

vi.      Лица в Приложении 16F слева направо: Эспен Ойно, Франсуа Зуретти, Ник Флэшман (который работал в компании Imperial Yachts), Майкл Бреман (из компании Lürssen) и я. Эта фотография была сделана на верфи.

vii.     Лица в Приложении 16G слева направо в первом ряду: Евгений Кочман и я. Эта фотография была сделана внутри яхты Amadea.

22.     В связи со строительством Amadea я встречался с Питером Люрсеном, руководителем верфи Lürssen, на которой была построена яхта Amadea, не менее 10 раз.

23.     Я встречался с дизайнером интерьеров Франсуа Зуретти более десяти раз, каждая встреча длилась несколько часов, чтобы выбрать отделку интерьера для яхты. Эти встречи проходили в Москве и на верфи. Договор о дизайне, заключенный с г-ном Зуретти и его фирмой по дизайну интерьеров для создания интерьера яхты Amadea от 12 апреля

2012 г., который хранится в моих документах, прилагается к настоящему документу в качестве Приложения 17.

24.     Я попросил дизайнера по экстерьеру Эспена Ойно создать уникальный дизайн носовой части судна — это был альбатрос, спроектированный специально для яхты Amadea. Я встречался с г-ном Ойно не менее 10 раз, чтобы обсудить внешний дизайн яхты Amadea. Договор, заключенный с г-ном Ойно и его фирмой в отношении внешнего дизайна яхты Amadea, который хранится в моих документах, прилагается к настоящему документу в качестве Приложения 18.

*Использование и планы в отношении яхты Amadea после поставки*

25.     Строительство яхты Amadea было завершено и яхта поставлена в 2017 году, таким образом, строительство заняло пять лет.

26.     В то время как компания Imperial Yachts выступала в качестве моего представителя и связующего звена со строителем и дизайнерами во время строительства, после поставки яхты Amadea я нанял компанию Imperial Yachts в качестве управляющей компании яхты, в обязанности которой входили наем и управление экипажем, надзор за обслуживанием яхты, работа в качестве продавца и брокера, а также координация поездок гостей. Договор об управлении М/Я Amadea, заключенный с компанией Imperial Yachts 6 марта 2017 г., который хранится в моих документах, прилагается к настоящему документу в качестве Приложения 19. С момента поставки яхты Amadea в 2017 году до момента изъятия яхты Amadea на Фиджи в 2022 году моими контактными лицами в компании Imperial Yachts были Евгений Кочман и координатор по работе с клиентами по имени Виктория.

27.     Будучи конечным бенефициарным собственником яхты Amadea, я отвечал за оплату расходов на ее эксплуатацию и обслуживание (включая страхование) с 1 января 2017 года по приблизительно 17 сентября 2021 года и оплачивал такие расходы. Например, в Приложении 20 к настоящему документу представлены копии хранящихся в моих документах счетов-фактур компании Imperial Yachts за период с июля 2020 года по август 2021 года и сообщения SWIFT, подтверждающих, что я оплатил эти счета-фактуры со счета Nereo. Как видно из этого платежа, ввиду моих близких отношений с г-ном Кочманом сверка расходов на техническое обслуживание производилась нерегулярно.

28.     Я совершил примерно четыре путешествия на яхте Amadea. Первое путешествие было в мае 2017 года, когда я отдыхал на Лазурном Берегу с Мариной Амаффи и двумя нашими дочерьми, а также с моим братом Юрием и его женой Еленой. Второе путешествие состоялось в июле 2017 года, когда я отдыхал в Греции с Мариной Амаффи и двумя нашими дочерьми. Третье путешествие состоялось в августе 2017 года, когда я отдыхал в Хорватии с Мариной Амаффи, двумя нашими дочерьми, моим братом Юрием, его женой Еленой и их сыном. Четвертое путешествие состоялось в июне 2021 года, когда я отдыхал в Греции с Мариной Амаффи, двумя нашими дочерьми и матерью Марины. Во время всех этих путешествий нас сопровождали сотрудники службы безопасности и домашние работники.

29.     Я построил яхту Amadea не только для использования в своих целях, но и с учетом перспективы получения прибыли от продажи судна. Поскольку постройка яхт такого рода занимает несколько лет, существует устойчивый рынок перепродажи для покупателей, которые не хотят так долго ждать, чтобы стать владельцем новой яхты. После первых трех путешествий на яхте Amadea в 2017 году я решил попытаться продать ее в 2018

году. Я поручил компании Imperial Yachts, как своему брокеру, выставить яхту Amadea на продажу по первоначальной цене 320 млн евро. Яхта Amadea была представлена на выставке яхт Monaco Yacht Show 2019. Тем не менее, предлагаемые цены покупки были настолько низкими, что я бы практически не получил прибыли. Попытки перепродать судно продолжались и в 2020 году, однако ограничения на поездки и карантины, введенные в связи с пандемией коронавируса, приостановили работу выставок яхт и замедлили рынок.

30.     Спустя три года после того, как яхта Amadea была впервые выставлена на продажу, я был разочарован неспособностью компании Imperial Yachts продать судно. Чтобы максимизировать усилия по маркетингу и продаже, я разрешил Imperial Yachts заключить центральный агентский договор о совместной продаже с другим яхтенным брокером под названием Edmiston. Мне сказали, что привлечение компании Edmiston обеспечило возможность реализации Amadea клиентам Edmiston в США, которым Amadea ранее не предлагалась.

### *Передача права собственности от Nereo к Millemarin*

31.     С течением времени и по мере сужения перспектив продажи судна в связи с его возрастом, в начале 2021 года я решил изменить структуру владения яхтой Amadea на такую, которая замыкалась бы на мне лично, в отличие от структуры опционов, действовавшей в компании Nereo. Это изменение было осуществлено для целей планирования собственного капитала и имущества, и я хотел, чтобы судно находилось в трастовой структуре. 10 июня 2021 года была учреждена компания Millemarin в качестве новой холдинговой компании для яхты Amadea. Передача права собственности от Nereo к Millemarin состоялась 16 августа 2021 года, при этом я остался конечным бенефициарным собственником яхты Amadea. Эта передача не имела никакого отношения к более поздним

соглашениям, заключенным мной с г-ном Кочманом в сентябре и ноябре 2021 года, о которых идет речь ниже.

32.     Более подробные объяснения относительно передачи права собственности от Nereo к Millemarin и структуры владения яхтой Amadea с момента такой передачи по настоящий момент приводятся в Подтвержденном иске, который был подан от моего имени в рамках этого дела 28 ноября 2023 года («Иск»). Я полностью включаю в настоящее заявление все заявления, содержащиеся в указанном Иске и прилагаемых к нему документах, как если бы они были полностью изложены в настоящем документе. Иск и прилагаемые документы подтверждают, что я являлся и продолжаю являться бенефициарным собственником яхты Amadea. В нескольких словах, когда была учреждена компания Millemarin, ее материнская компания Invest International Finance Ltd. («IIF») являлась акционером Millemarin, а акции IIF находились в собственности траста под названием September Trust, созданного в моих интересах. *См. общую информацию* в Иске, в частности, пп. 2, 4, 6 и Приложения 1-2, 6-11, 15-26 к Иску. После передачи права собственности на яхту Amadea от Nereo к Millemarin 16 августа 2021 года она также стала активом, принадлежащим September Trust. *См. общую информацию* в Иске, в частности, пп. 3, 6 и Приложения 3-5 и 15-26 к Иску. Попечителем September Trust была компания Boltenko Trust AG с местом нахождения в Швейцарии. *См.* п. 6(b) Иска и Приложения 19-21 к Иску. Весной 2022 года в связи с событиями в Украине европейские попечители практически утратили возможность оказывать трастовые услуги российским гражданам, таким как я. В результате акции IIF были переданы непосредственно мне. *См.* пп. 5, 6(d) Иска и Приложения 12-14 к Иску. Таким образом, я являюсь конечным бенефициарным собственником яхты Amadea, поскольку являюсь единственным акционером IIF,

материнской компании Millemarin. Это текущая структура владения яхтой Amadea, которая не изменилась с 23 мая 2022 года.

***Компания Errigal***

33.   После того как право собственности на яхту Amadea было передано Millemarin, я продолжал настаивать на продаже яхты Amadea компанией Imperial Yachts. На тот момент у нас с г-ном Кочманом имелись давние разногласия по поводу стратегии инвестиций в яхту Amadea и ее продажи. Несколько раз г-н Кочман говорил мне, что яхту Amadea можно сдавать в чартер и что чартер яхты Amadea не только покроет текущие расходы на нее, но и может принести прибыль, а также улучшить перспективы продажи. Я возражал против идеи сдавать яхту Amadea в чартер, поскольку считал, что это уменьшит ее стоимость и затруднит продажу судна.

34.   Примерно летом 2021 года я был разочарован неспособностью компании Imperial Yachts продать яхту Amadea за сумму, которую я считал обоснованной ценой продажи. Г-н Кочман сказал мне, что рынок находится на высоком уровне и что, по его мнению, к концу года он сможет продать яхту Amadea более чем за 225 000 000 евро. Однако я хотел найти более быстрое решение.

35.   За многие годы реализации совместных проектов по яхтингу мы с г-ном Кочманом выработали большое взаимодоверие к нашим бизнес-начинаниям. Поэтому мы смогли прийти к компромиссному соглашению, которое предполагало предоставление яхты Amadea во временное пользование г-ну Кочману с требованием о том, чтобы он заплатил мне 225 000 000 евро за судно, пока он пытался его продать. Мне казалось, что обременение г-на Кочмана таким тяжелым финансовым обязательством, а также возможность получить прибыль от продажи станет для него дополнительным стимулом

продать яхту Amadea в кратчайшие сроки, что, по его заверению, было весьма вероятным. Поскольку я строил яхту Amadea в течение пяти лет и вложил в ее дизайн много времени и усилий, чтобы владеть и пользоваться ею в собственных целях и чтобы она стала для меня выгодной инвестицией, я не хотел передавать г-ну Кочману право собственности на нее в то время и хотел сохранить некоторый уровень контроля над судном. Кроме того, несмотря на требуемую мной сумму, я намеревался вернуть г-ну Кочману эти средства, если бы он не смог продать яхту Amadea, понимая, что такие расходы принесут ему значительные финансовые трудности в долгосрочной перспективе. Поэтому мы с г-ном Кочманом согласились, что передача права собственности произойдет только в том случае, если и когда г-н Кочман сможет найти добросовестного покупателя на яхту Amadea.

36.   Наш компромисс был зафиксирован в «Соглашении о сотрудничестве» от 3 сентября 2021 года (Ходатайство об исключении из материалов дела, Приложение B). В этом соглашении мы с г-ном Кочманом договорились, что я передам яхту Amadea г-ну Кочману во временное использование, включая право на сдачу ее в чартер и на поиск покупателей, а также ответственность за оплату расходов на ее техническое обслуживание. Соглашение предусматривало передачу мне 225 000 000 евро г-ном Кочманом. В нем также предусматривалось право г-на Кочмана на прибыль от чартера и на любую выручку от продажи по цене выше 225 000 000 евро. В этом соглашении прямо указывалось, что я не передаю г-ну Кочману право собственности на яхту Amadea. В нем также указывалось, что г-н Кочман должен организовать продажу яхты Amadea не позднее 1 декабря 2021 года, что ставило г-на Кочмана в условия дефицита времени для поиска покупателей.

37.   Насколько мне известно, вскоре после этого для целей настоящего соглашения г-н Кочман учредил юридическое лицо под названием Errigal Marine Limited

(«Errigal»), и г-н Кочман является и всегда являлся единственным конечным бенефициарным собственником компании Errigal.

38.    В сентябре и октябре 2021 года г-н Кочман выплатил 225 000 000 евро в соответствии с нашим соглашением от 3 сентября 2021 года.

39.    К середине ноября г-н Кочман сказал мне, что он еще не нашел покупателя на яхту Amadea. Таким образом, 22 ноября 2021 года мы внесли изменения в наше первоначальное соглашение о сотрудничестве, чтобы отодвинуть срок, в течение которого г-н Кочман должен был продать яхту Amadea, до 1 мая 2022 года. Это новое соглашение было оформлено Дополнительному соглашению от 22 ноября 2021 года к Соглашению о сотрудничестве от 3 сентября 2021 года, которое мы с г-нм Кочманом подписали, и которое продлевало срок, в течение которого г-н Кочман должен был организовать продажу яхты Amadea до 1 мая 2022 года (Ходатайство об исключении из материалов дела, Приложение C).

40.    После начала российских военных действий в Украине 24 февраля 2022 года правительство США, включая президента и союзников США по всему миру, опубликовало публичные заявления в отношении принадлежащих российским гражданам яхт. Мы с г-ном Кочманом поняли, что эти события могут подорвать цели нашей договоренности об организации продажи яхты Amadea. Тем не менее, я был готов закрыть сделку, если г-н Кочман все еще полагал, что он сможет в конечном итоге продать судно. Мы решили, что сделка может быть закрыта путем передачи акций компнии Millemarin ее материнской компанией IIF компании Errigal. Соглашение сторон было изложено в Дополнении от 7 марта 2022 года к Протоколу о соглашении от 14 сентября 2021 года (Ходатайство об исключении из материалов дела, Приложение G). С этой целью компания IIF подписала

Соглашение о передаче акций Millemarin от 10 марта 2022 года, чтобы IIF передала акции Millemarin компании Errigal (Ходатайство об исключении из материалов дела, Приложение E). После того как Соглашение о передаче акций от 10 марта было подписано со стороны IIF, г-н Кочман сказал мне, что он не хочет закрывать сделку, и я не возражал. В результате решения не закрывать сделку, Соглашение о передаче акций никогда не было подписано всеми сторонами, акции не были переданы, и я остался конечным бенефициарным собственником яхты Amadea. Кроме того, мы с г-ном Кочманом согласились, что предыдущие соглашения с Errigal между нами невозможно исполнить, и сделка была полностью аннулирована. Поэтому далее я стал нести финансовую ответственность за оплату всех расходов, связанных с яхтой Amadea.

41.     После расторжения соглашений моим обязательством было возместить г-ну Кочману полную сумму. Учитывая наши тесные отношения, на момент заключения соглашений с Errigal я не намеревался подвергать г-на Кочмана финансовым рискам, оставляя себе 225 000 000 евро, если он не сможет продать яхту Amadea. Поэтому я продолжал соглашаться с ним о переносе срока закрытия сделки. Тем не менее, после событий февраля 2022 года стало ясно, что г-н Кочман не сможет продать яхту Amadea, и ни один из нас не знал, как долго продлится ситуация в Украине и действие санкций в отношении принадлежащих российским гражданам активов. После того как яхта Amadea была арестована на Фиджи в апреле 2022 года на основании серьезных, хотя и ложных, обвинений правительства США в том, что судно принадлежит Керимову и вовлечено в уклонение от санкций США и отмывание денег, после того как правительство США объявило о намерении привлечь к уголовной ответственности лиц, связанных с яхтой Amadea, мы с г-ном Кочманом договорились, что сумма не будет возмещена до тех пор,

пока не станет ясно, что такая сделка не будет использована в качестве доказательства каких-либо правонарушений, или пока ситуация с яхтой Amadea не разрешится. Именно по этим причинам я не совершал никаких финансовых переводов в пользу г-на Кочмана в связи с яхтой Amadea.

*Cобытия, произошедшие после сделки с Errigal*

42.     На протяжении всей предполагаемой, но никогда не закрытой «сделки» с компанией Errigal я оставался конечным бенефициарным собственником яхты Amadea, а она оставалась собственностью компании Millemarin, которой я владел в качестве единственного акционера ее материнской компании IIF. После передачи права собственности от Nereo к Millemarin условия страхования судна были изменены для отражения этого изменения в праве собственности. Как видно из Подтверждения страхового покрытия за период с 16 августа 2021 года (дата передачи права собственности от Nereo к Millemarin) по 16 августа 2022 года, зарегистрированным владельцем яхты Amadea является компания Millemarin. Копия хранившегося в моих документах Подтверждения страхового покрытия прилагается к настоящему документу в качестве Приложения 21.

43.     Примерно в то же время, когда мы с г-ном Кочманом заключили наше соглашение в сентябре 2021 года, он сказал мне, что у него есть группа, заинтересованная в том, чтобы взять яхту Amadea в потенциально долгосрочный чартер. Я также попросил г-на Кочмана держать меня в курсе любых существенных изменений в интерьере, которые он хотел произвести, чтобы сделать судно более привлекательным для продажи и чартеров. Насколько мне известно, хотя рассматривались некоторые варианты внесения изменений, на борту судна фактически были произведены лишь незначительные изменения.

44.     В соответствии с тем, что право собственности на яхту Amadea принадлежит компании Millemarin (и, соответственно, мне), после принятия решения не закрывать сделку с компанией Errigal, примерно 4 апреля 2022 года между компаниями Millemarin и Imperial Yachts было заключено новое соглашение об управлении яхтой. Копия хранящегося в моих документах Соглашения об управлении яхтой Amadea с компанией Imperial Yacht прилагается к настоящему документу в качестве Приложения 22.

45.     В какой-то момент примерно в начале 2022 года г-н Кочман сообщил мне, что яхта Amadea требует проведения технического обслуживания в текущем году. Я подтвердил, что яхта Amadea отправится в Тихоокеанский регион для проведения технического обслуживания. Я также подтвердил, что перед тем, как переплыть Тихий океан, она зайдет в Мексику для заправки топливом, и что она также остановится на Фиджи для заправки перед отплытием на Филиппины. Как конечный бенефициарный собственник яхты Amadea, я отвечал за оплату этого плавания и последующего технического обслуживания, но, как подробно описано ниже, судно было арестовано на Фиджи, и соответствующее техническое обслуживание не проводилось. Я продолжаю нести финансовую ответственность за расходы, связанные с этим плаванием на Фиджи.

*Арест на Фиджи*

46.     Примерно 12 апреля 2022 года власти США потребовали арестовать яхту Amadea по ее прибытии на Фиджи. В течение этого времени я поддерживал постоянный тесный контакт с г-ном Кочманом. Кроме того, пока судно находилось на Фиджи, я попросил г-на Кочмана регулярно сообщать мне о том, что там происходит, и он звонил мне каждую неделю или около того, чтобы держать меня в курсе событий.

47.     Как конечный бенефициарный собственник яхты Amadea, я поручил г-ну Кочману помочь мне найти местного адвоката на Фиджи, чтобы он представлял интересы компании Millemarin (и мои интересы) в рамках местного разбирательства. Я уполномочил местного юриста представлять интересы компании Millemarin и участвовать в этом судебном разбирательстве, чтобы оспорить попытку правительства США арестовать яхту Amadea. К сожалению, после нескольких недель судебного разбирательства мы проиграли это дело, и правительство США арестовало яхту Amadea и отправило судно в США.

48.     Летом 2022 года я нанял компанию Ford O'Brien Landy LLP в качестве своих адвокатов, и в сентябре 2022 года они подали требование к правительству США о возврате мне яхты Amadea.

Это заявление было зачитано мне на русском языке, и я согласен с его содержанием. Я ознакомился с заверенным переводом данного заявления на русский язык до его подписания.

Я заявляю под страхом наказания за лжесвидетельство в соответствии с законодательством Соединенных Штатов Америки, что вышеизложенные сведения являются точными и достоверными.

Подписано: 13 июня 2024 г.

_____
Эдуард Юрьевич Худайнатов



City of New York, State of New York, County of New York

I, Coral Cruz, hereby certify that the document "Declaration of Eduard Khudainatov MTS FINAL" is, to the best of my knowledge and belief, a true and accurate translation from English into Russian.

_____

Coral Cruz

Sworn to before me this
June 10, 2024

_____

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____

Stamp, Notary Public