# EXHIBIT 4

Execution Form

**NEREO MANAGEMENT LIMITED**

**and**

**FR. LÜRSSEN WERFT GmbH & Co. KG**

---

**AGREEMENT FOR THE CONSTRUCTION
OF A
90 METRE MOTOR YACHT
HULL NUMBER 13688
"Project MISTRAL"**

---

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY          EK000008

EKMM0000008

Execution Form

## INDEX

| Clause Heading | Page |
|---|---|
| 1. DEFINITIONS | 2 |
| 2. CONSTRUCTION | 6 |
| 3. CONTRACT SUM AND TERMS OF PAYMENT, | 8 |
| 4. APPROVAL OF DESIGN DRAWINGS AND CONSTRUCTION DRAWINGS | 11 |
| 5. INSTRUCTIONS AND INSPECTION | 14 |
| 6. VARIATIONS | 16 |
| 7. SEA TRIALS | 18 |
| 8. DELIVERY | 20 |
| 9. LATE PAYMENT | 22 |
| 10. BREACH | 24 |
| 11. REJECTION AND/OR CANCELLATION BY THE OWNER | 25 |
| 12. DELAY, FORCE MAJEURE AND PERFORMANCE WARRANTIES | 26 |
| 13. INSURANCE | 30 |
| 14. WARRANTY AND RESPONSIBILITY OF BUILDER | 32 |
| 15. TAXES AND DUTIES | 34 |
| 16. OWNER'S SUPPLY AND OWNER'S INPUT | 35 |
| 17. PLANS AND DRAWINGS | 35 |
| 18. ASSIGNMENT AND SUB-CONTRACT | 37 |
| 19. NOTICES | 37 |
| 20. ARBITRATION | 38 |
| 21. LAW | 39 |
| 22. CONFIDENTIALITY | 39 |
| 23. MISCELLANEOUS | 41 |

| | |
|---|---|
| SCHEDULE I | SPECIFICATIONS |
| SCHEDULE II | GENERAL ARRANGEMENT PLAN |
| SCHEDULE III | DECISION LIST |
| SCHEDULE IV | DEMARCATION PLAN |
| SCHEDULE V | FORM OF BUILDER'S CERTIFICATE |
| SCHEDULE VI | LIST OF CONSTRUCTION DRAWINGS |
| SCHEDULE VII | PROTOCOL OF DELIVERY AND ACCEPTANCE |
| SCHEDULE VIII | VARIATION CERTIFICATE |
| SCHEDULE IX | STAGE CERTIFICATE |
| SCHEDULE X | FINAL STAGE CERTIFICATE |
| SCHEDULE XI | REFUND GUARANTEE |
| SCHEDULE XII | PRODUCTION SCHEDULE |
| SCHEDULE XIII | DECLARATION OF RELEASE OF GUARANTEE |
| SCHEDULE XIV | DECLARATION OF WARRANTY |
| SCHEDULE XV | ESCROW AGREEMENT |
| SCHEDULE XVI | LOSS PAYABLE CLAUSE |
| SCHEDULE XVII | CONFIDENTIALITY POLICY |

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY          EK000009

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                         EKMM0000009

Execution Form

**THIS AGREEMENT** is made the 23rd day of February 2012

**BETWEEN:**

(1)     **NEREO MANAGEMENT LIMITED**, a company incorporated under the laws of the Cayman Islands, with its registered office at Trident Trust Company (Cayman) Limited, Fourth Floor, One Capital Place, P.O. Box 847, Grand Cayman, KYI – 1103, Cayman Islands ("the Owner"); and

(2)     **FR LÜRSSEN WERFT GmbH & Co. KG** having its principal place of business at Zum Alten Speicher 11, D-28759 Bremen, Federal Republic of Germany and registered in the register of commerce at Bremen Amtsgericht under no. HRA 10066 ("the Builder")

Each of them referred to as a "Party" and collectively, the "Parties".

1.     **DEFINITIONS**

1.1     In this Agreement, unless the context otherwise requires, the following terms shall have the following meanings:

1.2     "this Agreement" shall mean this shipbuilding agreement including all the Schedules attached which form an integral part thereof, as the same may be amended, supplemented or modified from time to time;

1.3     "Builder's Bank" shall mean a first class European bank or finance institution to be nominated by the Builder;

1.4     "Builder's Certificate" shall mean a certificate issued by the Builder in the form attached as Schedule V to be delivered to the Owner on delivery of the Motor Yacht;

1.5     "Builder's Premises" shall mean any and all of the premises of the Builder, its Sub-Contractors, and its or their subsidiary and associated companies;

1.6     "Business Day" shall mean a day (other than a Saturday, Sunday or holiday) on which banks are open for business in London, UK and in Bremen, Germany;

1.7     "Classification Certificate" shall mean a certificate issued by the Classification Society confirming that the Motor Yacht complies with the rules of the Classification Society for the notation set out in Clause 2.3;

1.8     "Classification Society" shall mean Lloyds Register of Shipping;

1.9     "Completion Date" shall mean 31 July 2016 subject to any alteration pursuant to the terms of this Agreement;

1.10     "Components" shall mean any parts or materials used or intended to be used in the construction of the Motor Yacht;

1.11     "Construction Drawings" shall mean the plans, drawings, sketches and calculations to be produced by the Builder in connection with the design and construction of the Motor Yacht as set out in the List of Construction Drawings attached as Schedule VI;

1.12     "Contract Sum" shall mean the sum set out in Clause 3.1, as adjusted from time to time in accordance with the provisions of this Agreement;

Execution Form

1.13    "Date of this Agreement" shall mean the date on which this Agreement is signed by the duly authorised representatives of the Builder and the Owner;

1.14    "Decision List" shall mean the list of decisions to be made, actions carried out and Design Drawings to be delivered by the Owner or the Designer or Owner's Team, and the dates by which they are to be made, essential for the Builder's Work, as set out in the list attached or to be attached as Schedule III;

1.15    "Declaration of Release of Guarantee" shall mean the declaration of release of the Refund Guarantee to be issued by the Owner in the form attached as Schedule XIII;

1.16    "Delivery Date" shall mean the date on which the Motor Yacht is actually delivered by the Builder to the Owner under the terms of this Agreement;

1.17    "Demarcation Plan" shall mean the drawings and descriptions attached as Schedule IV;

1.18    "Designer" shall mean either or both of the Exterior Designer and the Interior Designer as the context so requires;

1.19    "Design Drawings" shall mean either or both of the Exterior Design Drawings and the Interior Design Drawings as the context so requires;

1.20    "Exterior Design Drawings" shall mean the drawings, plans and other documents relating to the exterior styling of the Motor Yacht, to be delivered by the Exterior Designer to the Builder in accordance with Clause 4.1 and the Decision List;

1.21    ""Exterior Designer" shall mean Espen Øino International of La Castellara, 9, Av. du President JF Kennedy, MC98000 Monaco and shall include, as the context requires, its employees, servants, representatives and agents, acting at the expense and under the risk and responsibility of the Owner;

1.22    "€" and "Euro" shall mean the single currency of the European Monetary Union as established pursuant to the Maastricht Treaty (which was signed at Maastricht on 7th February 1992 and came into force on 1st November 1993);

1.23    "EURIBOR" shall mean the offered rate for deposits in Euro for a three (3) months period equivalent to such interest period which appears on the page of the Reuters screen which displays the average Euribor rate as agreed with the Banking Federation of the European Union for deposits in Euro of the relevant amount at or about 11 a.m. London time;

1.24    "Equipment" shall include all such machinery, equipment and fittings that is to be incorporated in the Motor Yacht as may be referred to in the Specifications;

1.25    "Final Stage Certificate" shall mean the stage certificate in the form attached as Schedule X and which is to be signed in accordance with Clause 7.8;

1.26    "Flag" shall mean the flag and register of ships of the Cayman Islands;

1.27    "General Arrangement Plan" shall mean the general arrangement plan for the Motor Yacht attached as Schedule II, as the same may be amended, modified, supplemented or replaced from time to time;

1.28    "Germany" shall mean the Federal Republic of Germany;

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY    EK000011    

EKMM0000011

Execution Form

1.29    "Interest Rate" shall mean the rate of two percent (2%) per annum above one month's EURIBOR;

1.30    "Interior Designer" shall mean Zuretti Interior Designers of 41 boulevard Gambetta, BP 81142, 06003 Nice Cedex 1 France and shall include, as the context requires, its employees, servants, representatives and agents, acting at the expense and under the risk and responsibility of the Owner;

1.31    "Interior Design Drawings" shall mean the drawings, plans and other documents to be delivered by the Interior Designer to the Builder in accordance with Clause 4.41 and the Decision List;

1.32    "List of Construction Drawings" shall mean the list of Construction Drawings to be attached as Schedule VI as the same may be amended from time to time;

1.33    "Maker's List" means the list of major items and Suppliers or Sub-Contractors as per Section 10000 of the Specification referred to in Clause 4.7;

1.34    "MCA" means the Maritime and Coastguard Agency of the United Kingdom;

1.35    "MCA Code" shall mean the Large Commercial Yacht Code (LY2) issued by the MCA in 2004 as the same may have been amended and/or supplemented prior to the date of this Agreement;

1.36    "Minor Non-Conformity" shall mean any aspect of the Motor Yacht not in compliance with the Specifications that does not (a) adversely affect the sea-worthiness of the Motor Yacht; or (b) prevent the proper operation of any material Equipment or system of the Motor Yacht; or (c) materially impair the use of the Motor Yacht;

1.37    "Motor Yacht" shall mean an approximately 90 metre motor yacht (which shall be extended by a bow ornament to a maximum of 92 metres) with, for identification purposes, Builder's hull no. 13688, as from time to time constructed hereunder (including, without limitation, its interior parts) and as more specifically referred to in this Agreement, the Specifications, and the General Arrangement Plan;

1.38    "Netspace Drawings" shall mean the drawings to be provided by the Builder to the Owner in respect of the Interior of the Motor Yacht as provided in Clause 4.3;

1.39    "Owner's Representative" shall mean such entity (individual or corporate) as shall be notified by the Owner to the Builder in accordance with Clause 5.2 and shall include, where the context shall so require, its employees, servants, representatives and agents;

1.40    "Owner's Supply" shall mean all Equipment, Components and other items to be purchased or supplied by or on behalf of the Owner, and to be delivered by the Owner to the Builder at the Builder's Premises, which are set out in the Specifications and the cost of which is not part of the Contract Sum;

1.41    "Owner's Team" shall mean the Owner's Representative, the officers and crew of the Owner, and such other representatives, advisors and consultants as may be retained by the Owner to assist the Owner in matters relating to this Agreement (including, without limitation, the Designer) and anyone else acting on behalf of the Owner, some or all of whom may be sent to the Builder's Premises in accordance with Clause 5.1 and all of them acting at the expense and under the risk and responsibility of the Owner;

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY    EK000012    

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    EKMM0000012

1.42 "Permissible Delay" shall mean any delay which, under the terms of this Agreement, shall have the effect of extending the Completion Date;

1.43 "Production Schedule" shall mean the production schedule attached as Schedule XII and as the same may be amended and replaced from time to time by the Builder in accordance with Clause 2.13, setting out the timetable for the construction, completion and delivery of the Motor Yacht;

1.44 "Protocol of Delivery and Acceptance" shall mean the protocol of delivery and acceptance of the Motor Yacht to be executed by the Builder and the Owner (or by the Owner's Representative on behalf of the Owner) on delivery of the Motor Yacht in the form attached as Schedule VII;

1.45 "Refund Guarantee" shall mean the refund guarantee in the amount equal to the instalment no. 1 as per Clause 3.2 to be issued by the Builder's Bank pursuant to Clause 3.8 in the form attached as Schedule XI or in such other form as requested by the Builder's Bank and as the Builder and the Owner may agree, acting reasonably, and as the same may be amended, supplemented, modified or replaced from time to time by agreement between the Builder, the Owner and the Builder's Bank; and which shall be returned in the original to the Builder together with the Declaration of Release of Guarantee upon transfer of title to the Owner pursuant to Clauses 3.8 and 8.4.

1.46 "Regulatory Bodies" shall mean those regulatory bodies with authority in respect of the Motor Yacht to inspect and enforce those rules, regulations and requirements referred to in Section 0210 and 0220 of the Specifications;

1.47 "Reference Yacht" shall mean the Builder's hull no. 13659 delivered by the Builder in 2010 and named "Phoenix²";

1.48 "Sea Trials" shall mean the sea trials undertaken in accordance with the Sea Trials Programme and the provisions of Clause 7;

1.49 "Sea Trials Programme" shall mean the programme setting out the details of the sea trials to be undertaken by the Builder prior to delivery of the Motor Yacht to be delivered by the Builder to the Owner's Representative as provided in Clause 7.1, as the same may be modified, supplemented or replaced from time to time;

1.50 "Specifications" shall mean the specifications, attached as Schedule I, and such amendments thereto, plans and drawings as may be agreed upon between the Parties and which are or will be signed by the Builder and by the Owner's Representative on behalf of the Owner;

1.51 "Stage Certificate" shall mean an interim stage certificate in the form attached as Schedule IX;

1.52 "Sub-Contractor" shall mean any sub-contractor employed or otherwise engaged by the Builder in relation to the design, the construction and the testing of the Motor Yacht or parts thereof;

1.53 "Supplier" shall mean any person responsible for the manufacture and/or supply to the Builder of any item of the Equipment or the Components;

1.54 "Taxes" shall mean all levies, imposts, taxes (whether of a capital or revenue nature), duties, deductions, withholdings or charges now or hereafter imposed or assessed by any competent government authority or agency together with any interest thereon and penalties in respect thereof;

Execution Form

1.55   "Tender Date" shall mean the date upon which the Builder tenders the Motor Yacht to the Owner for acceptance in accordance with Clause 8.2;

1.56   "Total Loss" shall mean an actual, constructive, arranged or compromised total loss as defined under the terms of the insurance policy established as per Clause 13.1 of the Motor Yacht or, as the case may be, of any of the Equipment or the Components;

1.57   "Variation" shall mean any alteration to or modification of the Work which is agreed pursuant to Clause 6 and includes, without limitation, the addition to, omission or substitution of any of the Work and the alteration of the kind or standard of any of the Work or of any of the Equipment or the Components and the consequences thereof in respect of the Completion Date and/or the Contract Sum and/or one or more performance requirements of the Motor Yacht;

1.58   "Variation Certificate" shall mean a certificate in the form attached as Schedule VIII setting out, inter alia, the amendment or amendments to the Specifications, the Contract Sum and/or the Completion Date and/or certain performance characteristics of the Motor Yacht following a request for a Variation pursuant to Clause 6.2;

1.59   "Warranted Noise Levels" shall mean each of the noise levels referred to in Section 0340 of the Specifications of, and measured in the conditions and in the manner described in Sections 0342 and 0344 of the Specifications;

1.60   "Warranted Range" shall mean the range referred to an measured in a manner and under the conditions described in Section 0320 of the Specifications;

1.61   "Warranted Speed" shall mean the speed referred to, and measured in a manner and under the conditions described in Section 0320 of the Specifications;

1.62   "Warranted Vibration Levels" shall mean in respect of each of the spaces mentioned in Section 0350 of the Specifications the vibration levels referred to in respect of such space in Section 0352 of the Specifications and measured under the conditions and in the manner described in Sections 0354 and 0360 of the Specifications;

1.63   "Warranty Period" shall mean the period of twelve (12) months following the Delivery Date, as such period may be extended in accordance with Clause 14; and

1.64   "Work" shall mean all work related to the design, (subject to the Design Drawings to be produced or procured by the Owner) construction, testing and delivery of the Motor Yacht pursuant to the terms of this Agreement.

2.     **CONSTRUCTION**

2.1    The Builder hereby agrees to design (subject to the Design Drawings which shall be produced by the Designers), construct, launch, complete, test and deliver the Motor Yacht in accordance with this Agreement, the Specifications and the General Arrangement Plan, and the Owner hereby agrees to take delivery of the Motor Yacht and to pay the Contract Sum, all upon the terms and subject to the conditions set out in this Agreement. It is agreed the Motor Yacht shall (i) be designed for carrying not more than twelve passengers, and not for use as a passenger ship (within the meaning of the Merchant Shipping (Passenger Ship Construction: Ships of Classes I, II and II(A) Regulations 1998 (UK)) and for registration under the Flag and (ii) have a final certified tonnage of less than 3,000 GT measured in accordance with the International Convention on Tonnage Measurement of Ships (1969).

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY          EK000014

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          EKMM0000014

Execution Form

2.2     The Owner has retained the Designer to provide the hull concept, preliminary design and interior design of the Motor Yacht as detailed in the Specification and to produce the Design Drawings. Subject as hereinafter provided, the Builder shall be responsible for reviewing and verifying the Design Drawings and shall be responsible for the design and construction of the Motor Yacht in accordance with the Design Drawings as if the Builder had provided the Design Drawings **provided that** the Owner expressly acknowledges that the Builder shall not be responsible for any aspects (save only for the engineering aspects) of the layout or aesthetic appearance of the Motor Yacht in each case provided for by the Design Drawings, which shall at all times remain the responsibility of the relevant Designer and/or the Owner. Subject to the prior written approval of the Builder (which the Builder may freely withhold if it considers that the change will have a material effect on its other commitments), the Owner may change the identity of the Designer and the Owner shall be responsible for any additional costs or production time (which shall be a Permissible Delay) necessarily incurred by the Builder as a result of any such change.

2.3     Subject to Clause 2.1, the Builder shall construct the Motor Yacht to classification notation ✠100A1 SSC Yacht Mono, G6✠ LMC UMS with the Classification Society and notwithstanding anything to the contrary in this Agreement, it shall be the duty of the Builder to construct, complete and deliver the Motor Yacht in compliance with the rules and regulations of the Classification Society applicable to that classification notation and other Regulatory Bodies in force at the Date of this Agreement at no extra cost to the Owner.

2.4     Subject to Clause 2.1 the Builder shall construct the Motor Yacht so that the Motor Yacht complies also with the MCA Code and with the rules, regulations and requirements in force and applicable to this size and type of motor yacht, registered under the Flag, as at the Date of this Agreement as set out in Section 0220 of the Specifications.

2.5     The Builder shall arrange for the appointment by the Classification Society and (if required in order to ensure that the Motor Yacht complies with all relevant rules, regulations and requirements) by each of the Regulatory Bodies for a representative or representatives to inspect the Motor Yacht during construction. The Builder shall pay all fees and charges incidental to the classification and compliance with the Classification Society's and each of the Regulatory Bodies' rules, regulations and requirements in relation to the construction of the Motor Yacht.

2.6     The Builder shall arrange for the relevant Construction Drawings (as set out in the List of Construction Drawings) to be submitted to the Classification Society and/or to each of the Regulatory Bodies for approval (where relevant). The Builder shall arrange that all the Equipment and the Components used and to be used in the construction of the Motor Yacht shall, where relevant, be available for inspection and testing by the Classification Society and/or the Regulatory Bodies and the Builder, where relevant, shall make all necessary facilities available (at the Builder's cost) so that such inspections and tests can be carried out safely and conveniently.

2.7     Where the standard or quality of construction, or of design or finish, is not set out in the Specifications, or in the Variation Certificate issued pursuant to Clause 3.1.1 in respect of the Interior Outfit, the Motor Yacht shall be constructed, designed and finished to a standard and quality equivalent to that of the respective areas of the Reference Yacht.

2.8     The decisions of the Classification Society and/or any of the Regulatory Bodies as to the Motor Yacht's and/or the Equipment's and/or the Components' compliance or non compliance, as the case may be, with the rules and regulations of the Classification Society and/or such Regulatory Bodies shall be final and binding on both parties.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Execution Form

2.9     The Motor Yacht shall achieve the Warranted Speed to the tolerances set out in Clause 12.6 and in the conditions set out in the Specifications.

2.10    The Warranted Noise Levels shall be achieved to the tolerances set out in Clause 12.8 and in the conditions set out in the Specifications.

2.11    The Warranted Vibration Levels shall be achieved to the tolerances set out in Clause 12.9 and in the conditions set out in the Specifications.

2.12    The Warranted Range shall be achieved to the tolerance set out in Clause 12.10 and in the conditions set out in the Specifications.

2.13    The Builder may amend at its sole discretion the Production Schedule **provided that** (i) any such amendment shall not have the effect of delaying the Completion Date and/or bringing forward the dates by which the Owner shall make a decision as set out in the Decision List and (ii) the Builder shall give notice of any material amendments promptly to the Owner's Representative. During the building process of the Motor Yacht the Builder may, acting reasonably and so as to allow reasonably sufficient time for decisions required from the Owner, add detail to the Decision List and shall provide such detailed Decision List to the Owner which shall thereby replace the Decision List attached to this Agreement as of the Date of this Agreement.

3.      **CONTRACT SUM AND TERMS OF PAYMENT.**

3.1     The Contract Sum is One hundred and twelve million one hundred and twenty five thousand Euros ( €112,125,000) as a firm and fixed price subject to the provisions of Clause 3.1.1 and 3.1.3.

        3.1.1   The Contract Sum does not include any sum in respect of the outfit and the interior decoration for the areas shown hatched in the Demarcation Plan (the "Owner's and Guests' Interior Outfit") as described in detail in the Specifications, Sections 6000 and 6100. The Builder will, in consultation with the Owner, invite quotations from suitably qualified Sub-Contractors for the Owner's and Guests' Interior Outfit and, following assessment of such quotations and discussion with such Sub-Contractors, the Owner and Builder shall no later than the date set out in the Decision List agree the details of and a price (based on the actual cost to the Builder, being the disclosed price(s) agreed with the Sub-Contractors and the disclosed direct costs of the Builder) for the Owner's and Guests' Interior Outfit in accordance with Clause 6 such agreement to be a Variation to which the provisions of Clause 6 shall apply, **provided that** (i) in lieu of the percentage surcharges for overhead and profit for the specified Owner's and Guests' Interior Outfit, the Owner shall pay to the Builder a fixed surcharge of twelve and a half percent (12.5%) and (ii) the Builder shall not be entitled to suspend Work and claim Permissible Delay whilst the Variation Certificate is being agreed in accordance with Clause 6.2 for the period up to the date set out in the Decision List (but without prejudice to the Builder's rights after such date). If, on the Owner's request, the specified details of the Owner's and Guests' Interior Outfit (once agreed) shall be modified, such later modification shall also be treated as a Variation and the provisions of Clause 6 shall apply **provided that** the fixed surcharge of twelve and a half percent (12.5%) shall continue to apply.

        3.1.2   It is the Builder's opinion that, on the basis of (i) the information available to it as at the Date of this Agreement as to the Owner's and the Designer's intentions, (ii) the Owner's and Guests' Interior Outfit being no more complex in scope of design, supply, construction and installation than that of the Reference Yacht and (iii)



Execution Form

there are no delays in supply which is not reasonably foreseeable at the Date of this Agreement; and **provided that** the Owner and the Designer observe the dates in the Decision List, reasonably sufficient time has been allowed by the Builder in the Production Schedule and the Completion Date for the supply, construction and installation of the Owner's and Guests' Interior Outfit and the installation of the items of Owner's Supply.

3.1.3    Additional Items

The Contract Sum does not include any sum in respect of the following items, in each case as more particularly described in the Specifications:  exterior deck furniture (Spec. Section 1715), entertainment system / core infrastructure and end user equipment (Spec. Section 3971); Rescue Boat (Spec. Section 4225) (together, the "Additional Items").  The Owner and the Builder shall agree by the dates set out in the Decision List upon the details of, and a price for (based on the actual cost to the Builder, being the disclosed price(s) agreed with the Sub-Contractors and the disclosed direct costs of the Builder), each of the Additional Items, which agreement will be treated as a Variation to which the provisions of Clause 6 shall apply **provided that** in lieu of the percentage surcharges for overhead and profit for the Additional Items, the Owner shall pay to the Builder a fixed surcharge of twelve and a half percent (12.5%).

3.1.4    The Contract Sum does not include any items of Owner's Supply.

3.2    The Owner shall pay the Contract Sum to the Builder in instalments as follows:

| Instalment No. and Event | | Percentage of Contract Sum |
|---|---|---|
| 1. | Promptly upon the signing of this Agreement, but no later than three (3) Business Days from the Date of this Agreement and against issue of the Refund Guarantee; | 25% |
| 2. | Upon the date of receipt by the Owner of a telefax notice from the Builder attaching a Stage Certificate signed as per Clause 3.3 certifying approval of the Classification Society (in accordance with Schedule VI, items 43 and 85) of the hull and superstructure drawings but in any event not earlier than the date that falls 12 months after the Date of this Agreement; | 10% |
| 3. | Upon the date of receipt by the Owner of a telefax notice from the Builder attaching a Stage Certificate signed as per Clause 3.3 certifying that steel cutting of 50 tons of steel for the Motor Yacht has been completed , but not earlier than 20 months after the Date of this Agreement; | 15% |
| 4. | Upon the date of receipt by the Owner of a telefax notice from the Builder attaching a Stage Certificate signed as per Clause 3.3 certifying that placing of the first block of the Motor Yacht's hull | 15% |



Execution Form

|   | | |
|---|---|---|
| | in the building berth has been completed, but not earlier than 25 months after the Date of this Agreement; | |
| 5. | Upon the date of receipt by the Owner of a telefax notice from the Builder attaching a Stage Certificate signed as per Clause 3.3 certifying that the main engines and the auxiliary engines have been put in place but not earlier than 32 months after the Date of this Agreement; | 10% |
| 6. | Upon the date of receipt by the Owner of a telefax notice from the Builder attaching a Stage Certificate signed as per Clause 3.3 certifying that all structural welding of the hull and superstructure have been completed (including the joining of the hull and the superstructure), but not earlier than 38 months after the Date of this Agreement; | 10% |
| 7. | Upon the date of receipt by the Owner of a telefax notice from the Builder attaching a Stage Certificate signed as per Clause 3.3 certifying that the installation of the Owner's and Guests' Interior Outfit has been commenced, but not earlier than 42 months after the Date of this Agreement; | 10% |
| 8. | Upon signing of the Protocol of Delivery & Acceptance. | 5% |

3.3     The Builder shall by ten (10) days notice in writing advise the Owner of the date upon which it is estimated that instalments 2 to 7 of the Contract Sum shall become due and payable. The instalments of the Contract Sum referred to in Clause 3.2 instalment numbers 2 to 7 (inclusive) shall become due and payable three (3) Business Days after (a) the relevant event or date referred to in Clause 3.2 instalment numbers 2 to 7 (inclusive) has been reached, (b) an invoice of the relevant amount of the instalment together with any additional costs or credits due to or from the Builder respectively has been provided to the Owner and (c) only if applicable, the relevant Stage Certificate has been signed by the Builder and by the Owner's Representative or, if the Owner's Representative does not sign the relevant Stage Certificate, although duly notified by the Builder, signed by the Classification Society on behalf of the Owner, and the Owner shall accept the relevant Stage Certificate so signed and shall effect the instalment payment related thereto.

3.4     By way of security for the repayment obligations of the Builder under Clause 11, the payments of instalments numbers 2 and 3 referred to in Clause 3.2 shall be paid as to 50% to the Builder's Bank, and as to 50% to a Euro escrow account (the "Escrow Account") to be established in the name of the Owner's solicitors, Hill Dickinson LLP ("Hill Dickinson") with Barclays Bank plc, 48-50 Lord Street, Liverpool, L2 1TD (the "Escrow Bank"). Not later than seven (7) days prior to the estimated date for payment of instalment number 2, the Parties will sign an escrow agreement with Hill Dickinson in the form set out at Schedule XV pursuant to which Hill Dickinson will (a) give directions to the Escrow Bank as to the investment of the sums in the Escrow Account in accordance with the instructions of the Builder, (b) release the sums in the Escrow Account (including any accrued interest) to the

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY                    EK000018



Execution Form

Builder on receipt of an original or certified copy of the Stage Certificate relating to instalment no. 4 referred to at Clause 3.2 , and (c) otherwise deal with the sums in the Escrow Account in accordance with written directions signed by authorized representatives of both the Owner and the Builder, or in accordance with a final award of the Arbitration Board referred to in Clause 20.

3.5     The final instalment due upon signing the Protocol of Delivery & Acceptance shall become due and payable as follows:

3.5.1     the Builder shall give the Owner not less than twenty (20) Business Days written notice of the expected Delivery Date;

3.5.2     not later than the Business Day before the expected Delivery Date the Owner shall,  upon agreement with the Builder, either remit the final instalment by electronic transfer (i) by conditional SWIFT payment to the Builder's Bank for automatic release to the Builder's account pursuant to Clause 3.6 against presentation to the Builder's Bank of a copy of the Protocol of Delivery and Acceptance or (ii) to Hill Dickinson for onwards electronic transfer to the Builder's account at the Builder's Bank pursuant to Clause 3.6 at the time of and as a condition of delivery of the Motor Yacht by the Builder to the Owner.

3.6     Upon signature of the Final Stage Certificate by the Builder and by the Owner's Representative on behalf of the Owner, the Motor Yacht shall be deemed to have been technically accepted by the Owner and the Motor Yacht shall then be delivered to the Owner in accordance with and subject to the terms of Clause 8.

3.7     Subject to Clause 3.4, all payments due from the Owner hereunder shall be paid to such account of the Builder as specified in the respective invoice or payment document and shall be paid free of any withholding and, save in the case of any credits in accordance with Clauses 3.3 and 6.6 of this Agreement, set-off, or deduction whether for Taxes, bank charges (other than bank charges levied by the Builder's receiving bank) or otherwise howsoever unless the Owner is required by law or regulation to make any such payment subject to such withholding or deduction in which event the Owner shall pay such increased amount as shall ensure that the Builder receives a net amount which, after such withholding or deduction is equal to the full amount the Builder would have received had the payment not been subject to such withholding or deduction. Nothing in this Clause 3.7 shall make the Owner liable for any Taxes assessed on the Builder's income.  To the extent that the Builder subsequently receives any credit or other repayment of a withholding or deduction which has been the subject of grossing up in accordance with this Clause 3.6, such that the total payments that the Builder receives and is entitled to retain (without right of appeal or reassessment) exceed those the Builder would have received had there been no such withholding or deduction, the Builder shall account to the Owner for such excess payment.

3.8     The Builder shall deliver to the Owner a Refund Guarantee issued by the Builder's Bank in an amount equal to Clause 3.2 instalment number 1 promptly after the Date of this Agreement and such original Refund Guarantee shall be returned to the Builder promptly upon transfer of title to the Owner pursuant to Clause 8.4 together with the Declaration of Release of Guarantee.

## 4.     APPROVAL OF DESIGN DRAWINGS AND CONSTRUCTION DRAWINGS

4.1     The Owner shall procure that all Interior Design Drawings and Exterior Design Drawings are delivered to the Builder by the Designer in three (3) copies before, but latest on the respective



Execution Form

dates mentioned in the Decision List. Any delay in delivery of one or more Design Drawings shall entitle the Builder to claim an equivalent period of Permissible Delay.

4.2 The Builder shall within ten (10) Business Days after receipt of those Design Drawings which have to be approved by the Builder either approve those Design Drawings, in which case the Builder shall sign one copy of each Design Drawing and return them forthwith to the relevant Designer with a copy to the Owner by international courier service, or reject those Design Drawings, indicating to the Designer in writing and in detail in what respects the Builder considers the Design Drawings, or any of them, to be deficient or incorrect. The Builder shall be entitled to reject the Design Drawings solely on the basis that the Design Drawings do not conform with the Specifications and/or to the General Arrangement Plan and/or the Construction Drawings approved by the Owner's Representative in accordance with Clause 4.3 and/or this Agreement and shall not be entitled to require that the Design Drawings be amended or altered in any way which would make them inconsistent with the Construction Drawings approved by the Owner's Representative in accordance with Clause 4.3 and/or this Agreement. If the Builder does not notify the Designer of its approval or rejection within the period referred to in this Clause 4.2 the Builder shall be deemed to have approved the relevant Design Drawings.

4.3 The List of Construction Drawings attached hereto as of the Date of this Agreement is for information purposes only. The List of Construction Drawings will be updated by the Builder and submitted to the Owner or the Owner's Representative replacing the List of Construction Drawings attached hereto. The Builder further agrees to prepare the Construction Drawings and to submit three (3) copies of each Construction Drawing, one (1) to the Owner's Representative, and the others to the Classification Society and/or the Regulatory Bodies (if applicable) in order to obtain the approval of the Construction Drawings by the Classification Society and/or the Regulatory Bodies (as the case may be). The Builder will also prepare and submit to the Owner or the Owner's Representative, with a copy to the Interior Designer, Netspace Drawings on or before the dates set out in the Decision List, delineating the limits in three dimensions of the interior space of the Motor Yacht available for the interior accommodation of the Motor Yacht in accordance with Section 6000 and 6100 of the Specifications.

4.4 The Owner shall procure that the Owner's Representative shall latest within ten (10) Business Days after receipt of those Construction Drawings which have to be approved by the Owner's Representative either approve the Construction Drawings, in which case the Owner's Representative shall sign one copy of each of the Construction Drawings and return them forthwith to the Builder, or indicate to the Builder in writing and in detail in what respects the Owner's Representative considers any of the Construction Drawings to be deficient or incorrect. In such case only the part of the Construction Drawing, which is considered deficient or incorrect shall require further approval; the remaining part of the Construction Drawing shall be deemed approved. The Owner's Representative shall be entitled to reject the Construction Drawings or any of them only on the basis that the Construction Drawings do not conform with the Specifications, the General Arrangement Plan or the Design Drawings approved in accordance with Clause 4.2 and/or this Agreement and shall not be entitled to require that the Construction Drawings be amended or altered in any way which would make them inconsistent with the Specifications, the General Arrangement Plan or the Design Drawings approved in accordance with Clause 4.2 and/or this Agreement. In case of permitted rejection the Builder shall correct the respective Construction Drawing and re-submit it to the Owner's Representative, who shall latest within four (4) days give approval or not approval in this respect as set out in this Clause 4.4. If the Owner's Representative does not notify the Builder within the respective period referred to in this Clause 4.4, then the Owner's Representative shall be deemed to have approved the relevant Construction Drawing(s). The Builder shall have the right in its discretion to re-submit approved



Execution Form

Construction Drawings for a second approval by the Owner as a result of any changes in design details.

4.5     The Parties acknowledge that the Decision List is the basis for the Builder to meet the Completion Date. Each approval required in the Decision List must be notified in writing by the Owner and/or the Designer not later than the final date of the relevant approval period stated in the Decision List, time being of the essence for the receipt of such approvals. Accordingly any change or rejection of the matter for which approval is required must be requested and processed within the relevant approval period. Any delay in receipt of final approval shall be a Permissible Delay, unless and to the extent such delay is caused by the Builder.

4.6     Any conflict, inconsistency or incompatibility between the terms and contents of this Agreement, the Specifications, the General Arrangement Plan, Construction Drawings and the Design Drawings shall be dealt with as follows:

4.6.1     in case of any inconsistency between any provision in this Agreement and any provision in the Specifications, the General Arrangement Plan, the Design Drawings and/or the Construction Drawings, this Agreement shall prevail;

4.6.2     in case of any inconsistency between any provision of the Specifications and any provision of the Construction Drawings approved in accordance with Clause 4.4, the Construction Drawings shall prevail;

4.6.3     in case of any inconsistency between any provision of the Construction Drawings approved in accordance with Clause 4.4 and any provision of the Design Drawings approved in accordance with Clause 4.2, the Construction Drawings approved as aforesaid shall prevail;

4.6.4     in case of any inconsistency between any provision of the Construction Drawings approved in accordance with Clause 4.4 or any provision of the Design Drawings approved in accordance with Clause 4.2 and the General Arrangement Plan, the Construction Drawings or the Design Drawings so approved (as the case may be) shall prevail;

4.6.5     in case of any inconsistency between any provision of the Specifications and any other provision of the Specifications or between one of the Design Drawings and another of the Design Drawings, or between one of the Construction Drawings and another of the Construction Drawings, the provisions of the Specifications or Design Drawings or Construction Drawings (as the case may be) later in date shall prevail;

4.6.6     this Agreement, the Specifications, the General Arrangement Plan, the Design Drawings and the Construction Drawings shall be read as complementary to one another, so that any item or standard referred to in one of them that is not included in another shall nonetheless be incorporated, as applicable into the Motor Yacht.

4.7     There is in Section 10000 of the Specifications a Maker's List (the "Maker's List") of Suppliers and/or Sub-Contractors to be used in respect of major items for the Motor Yacht. The Builder may choose any of the Suppliers and/or Sub-Contractors set out in the Maker's List in relation to any specific item. Should the Owner notify the Builder that it would prefer a particular Supplier and/or Sub-Contractor other than the one chosen by the Builder (whether or not originally proposed by the Builder) and the Owner's preference involves a cost and/or time or other change, the Owner shall within five (5) days from being notified of that change, notify the Builder whether it accepts that change, in which case the Builder will follow the



Execution Form

Owner's preference and the amount of the cost and/or time and/or other change shall be added to or deducted from the Contract Sum and/or the Completion Date and/or otherwise respected, or that it does not (or fails to so notify the Builder), in which case the Builder shall follow its own choice. For all other items not on the Maker's List, the Builder shall be free to choose its Supplier or Sub-Contractor.

4.8    Subject to giving effect to the provisions of Clauses 3.1.1 and 3.1.3, it is agreed that all and any written communications or other contact with the Builder's Suppliers and/or Sub-Contractors concerning Builder's supplies, the Equipment and/or Components shall be made by the Builder only.

5.    **INSTRUCTIONS AND INSPECTION**

5.1    The Owner may send the Owner's Team to the Builder's Premises at which the Motor Yacht is to be constructed (and maintain it there at its own responsibility, risk, cost and expense) to assist in performing the terms of this Agreement and to supervise the construction of the Motor Yacht. The Owner's Team maintained in the Builder's Premises shall not exceed 3 in number at any time, but the Owner may include others for short periods and/or for limited purposes. In addition, the Owner may send as further members of the Owner's Team its officers and crew of the Motor Yacht to the shipyard of the Builder at such times as shall be agreed by the Builder and the Owner.

5.2    The Owner will within ninety (90) days after the Date of this Agreement notify the Builder of any individual member who will be the head of Owner's Team (hereinafter the "Owner's Representative") with whom the Builder is to liaise primarily in accordance with the terms of this Agreement. The Owner shall promptly notify the Builder if any of the members of the Owner's Team has ceased to be a representative of the Owner. If the Builder has a reasonable objection to a person nominated as a member of the Owner's Team, the Builder may reject that person.

5.3    Members of the Owner's Team shall have the right to inspect at the Builder's Premises during normal working hours the Motor Yacht and all the Equipment and the Components wherever such Equipment and/or Components are stored or the Work is being done for the purpose of confirming that the Motor Yacht is being constructed in accordance with the terms of this Agreement provided that nothing in this Agreement shall oblige the Builder to permit or obtain access to any location to which access is restricted due to security requirements. The Owner's Representative shall notify the Builder promptly in writing if he or his Team discovers any Work, Equipment or Component which they believe does not or will not conform to the requirements of this Agreement and the Builder shall comply with the reasonable demands of the Owner's Representative concerning the necessary rectification or replacement of such non-conforming Work, Equipment or Component.

5.4    The Owner undertakes that the Owner's Representative shall promptly sign all such documents, give decisions and take all other action (including, without limitation, attending at the Builder's Premises and promptly executing the Stage Certificates and the Final Stage Certificate promptly approving the Construction Drawings, attending tests and trials, approving the results thereof, executing protocols etc.) at all times as may be necessary to enable the Builder duly and punctually to perform its obligations under this Agreement. In case the Owner's Representative unreasonably fails to perform any of the acts required to be done by the Owner or Owner's Team under this Agreement, then the Builder shall (unless another remedy is expressly provided in this Agreement in respect of that required act, when that remedy shall apply) have the right to require that a representative of an independent party, appointed upon the recommendation of the Classification Society and at the cost of the Owner, perform the required act and the Owner shall be bound by such performance. Approvals and/or decisions made or actions taken by the Owner's Representative, the



Execution Form

Designer and any other member of Owner's Team expressly authorised in writing by the Owner to do so shall bind the Owner. Subject to Clause 16.5, an election or decision made by the Owner and communicated to the Builder on any aspect of the Motor Yacht, its layout and outfitting shall not relieve the Builder of its responsibilities to comply with the requirements of this Agreement.

5.5   The Owner undertakes that the members of the Owner's Team shall not, whilst carrying out their inspections pursuant to this Agreement, unduly obstruct the Builder, and that only the agreed number of members of the Owner's Team will be permitted to visit or remain on the Builder's Premises at any one time.

5.6   The Builder shall provide, at the Owner's cost, office space and such other facilities for the 3 permanent members of Owner's Team (including, without limitation, access to copying and fax machines, telephone and DSL or equivalent internet access) at, or in the immediate vicinity of, the Builder's Premises where the Motor Yacht is to be constructed as may be necessary to enable them effectively to carry out their work. The Owner shall pay respective charges (including tax as applicable) incurred by the Owner's Team and/or the Owner's officers and crew of the Motor Yacht for the office space and other facilities such as fax machines, telephone lines and internet, as well as other services provided by the Builder to the Owner's Team such as courier services, rental car etc. quarterly upon receipt of the relevant invoices.

5.7   The Builder and the Sub-Contractors shall be under no liability whatsoever to the Owner and/or the members of the Owner's Team for the death of or personal injuries sustained by any such person or for any damage to or loss or destruction of the property of any such person during the time any such person is on the Motor Yacht or within the Builder's Premises or the premises of any Sub-Contractors or Suppliers or otherwise engaged in or on the construction of the Motor Yacht, unless and to the extent that such death or personal injuries or such damage, loss or destruction shall have been caused by the reckless disregard with knowledge of the probable consequences of the Builder or of any of its employees acting within the scope of their employment or of its agents or Sub-Contractors or Suppliers. The Owner undertakes and agrees to indemnify the Builder and its employees, agents, Sub-Contractors and Suppliers from and against all proceedings, costs, claims, expenses, damages and liabilities whatsoever which the Builder or any of its employees, agents, Sub-Contractors or Suppliers may suffer, incur or sustain by reason of the matters referred to in this Clause 5.7.

5.8   The Owner shall procure that the members of the Owner's Team shall adhere to all safety and other regulations as shall be from time to time in force at the Builder's Premises and the premises of Sub-Contractors (as such shall have been notified to the Owner's Team by the Builder and/or its Sub-Contractors) and that they shall obey all reasonable instructions issued by the Builder, its representatives or employees. The Owner shall be responsible at its cost for procuring such permits, visas, insurances and any other applicable requirements for the maintenance of members of the Owner's Team at the Builder's Premises or such other place as the Owner sends the members of the Owner's Team.

5.9   The Owner shall be under no liability whatsoever to the Builder or any of the Builder's servants, agents or employees, or Sub-Contractors or Suppliers or any of its or their employees for the death of or personal injuries sustained by any such person or for any damage to or loss or destruction of the property of any such person unless and to the extent that such death or personal injuries or such damage, loss or destruction shall have been caused by the reckless disregard with knowledge of the probable consequences of the Owner and/or members of the Owner's Team acting within the scope of their employment. The Builder undertakes and agrees to indemnify the Owner and/or the members of the Owner's Team Motor Yacht from and against all proceedings, costs, claims, expenses, damages and

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY

EK000023

EKMM0000023

Execution Form

liabilities whatsoever which the Owner and/or the members of the Owner's Team may suffer, incur or sustain by reason of the matters referred to in this Clause 5.9.

5.10  The Builder and its Sub-Contractors and their respective employees and agents shall co-operate with the Owner's Team in the performance of his or their duties as representatives of the Owner at all times until acceptance of the Motor Yacht by the Owner, including providing access to the premises of Sub-Contractors (in so far as the Builder is able to obtain permission from Sub-Contractors for such access).

5.11  The Builder shall inform the Owner's Representative not less than five (5) Business Days before tests and trials of the Motor Yacht and/or any of the Equipment and/or Components are due to start. The Builder reserves the right to change the date of such tests or trials provided that (i) reasonable time is allowed for the Owner's Representative to attend and (ii) a change of date shall not in itself constitute Permissible Delay.. All expenses in connection with factory tests, installation tests, dockside trials and other tests and trials required to be carried out by the Builder will be paid by the Builder.

5.12  The failure of the Owner or any of the members of the Owner's Team to be present at any tests or trials, or to inspect any of the Work after notice has been given in accordance with Clause 5.11 shall not invalidate any such tests or trials.  In the absence of prior written notice by the Owner's Representative to the Builder that a member of the Owner's Team will not be present at the relevant time, the Builder shall be entitled to conduct such tests or trials, or carry out such of the Work as if the member(s) of the Owner's Team had been present and the Owner shall have no right to object thereto.  If prior written notice is received as aforesaid, then the Builder shall delay the tests or trials or the Work until the Owner or the members of the Owner's Team can be present, provided, however, such delay shall be a Permissible Delay and, additionally, if the delay exceeds seven (7) Business Days from the original scheduled date, the Builder shall have the right to proceed with the tests/trials or the Work as if no prior written notice as aforesaid has been obtained.

5.13  The Builder shall within sixty (60) days after the Date of this Agreement designate an English speaking employee of the Builder as having responsibility for communications with the Owner's Representative, such person to be available for discussions with the Owner's Representative at all reasonable times.

## 6.   VARIATIONS

6.1   This Agreement, the General Arrangement Plan and the Specifications may be modified and changed from time to time by written agreement between the Builder and the Owner.  For the avoidance of doubt, but without limitation, each of the following, if they occur after the Date of this Agreement  and if they affect the scope of the Work, the Completion Date and/or the Contract Sum and/or any other aspect, description or performance criteria of the Motor Yacht, shall be regarded as Variations and the provisions of this Clause 6 shall apply:

6.1.1   agreement upon the Owner's and Guests' Interior Outfit as per Clause 3.1.1 and the Additional Items as per Clause 3.1.3 and (once agreed) any changes in these respects;

6.1.2   any changes to the Motor Yacht and/or to the Specifications which are requested by the Owner or by the Builder in accordance with the terms of this Agreement, including changes to decisions made in accordance with Clauses 3.1.1 and 6.1.1 in respect of the accommodation or the Owner's and Guests' Interior Outfit;

6.1.3   any amendments required  by the Owner to the Design Drawings after their approval or deemed approval by the Builder;



Execution Form

6.1.4    a change of the Classification Society, or of the Flag; and

6.1.5    any changes to the items of Owner's Supply.

6.2    Either Party may request from the other Party in writing a Variation **provided that** each Party reserves the right to reject requests of the other Party which exceed and/or substantially alter the concept of the Motor Yacht as of the Date of this Agreement and in such case the Builder shall not propose a Variation Certificate. The Builder shall then promptly after (i) receipt of a request from the Owner or (ii) proposing a Variation (as the case may be) inform the Owner of the additional cost or credit (which for the avoidance of doubt will be based upon the man hour rates and surcharge levels set out in the form of Variation Certificate forming Schedule VIII to this Agreement), the effect (if any) on the Warranted Speed, the Warranted Noise Levels, the Warranted Vibration Levels or other technical performances of the Motor Yacht, any postponement or bringing forward of the Completion Date and any other consequential variations required as a result of the requested Variation, by sending to the Owner a Variation Certificate in the form set out in Schedule VIII to this Agreement. If the Builder has proposed a Variation Certificate to the Owner, the Builder shall have the right to suspend Work or parts thereof until agreement is reached between the Builder and the Owner on the matters referred to in this Clause 6 and such suspension shall be a Permissible Delay. The Builder shall not be obliged to agree to any Variation until the Builder shall have obtained from the Classification Society and/or the Regulatory Bodies (as the case may be) any consents or approvals as necessary together with any amended Exterior and/or Interior Design Drawings and/or the approval of the Owner to any amendments required to the Construction Drawings as may be required in connection with such Variation. If no agreement can be reached within fifteen (15) Business Days of receipt by the Owner of the relevant Variation Certificate, the Builder shall have the right to proceed with the construction of the Motor Yacht as if such Variation had not been requested by the Owner or proposed by the Builder except that any period of Permissible Delay shall remain valid. Once a Variation Certificate has been signed by the Builder and the Owner, it shall form part of this Agreement which shall be deemed to be varied in accordance with such Variation Certificate.

6.3    This Agreement (other than by way of a Variation as provided in Clause 6.2) may be amended only by an addendum to be made in writing and signed by the Builder and the Owner.

6.4    The Parties hereby agree that the Builder shall have the right to alter or change the General Arrangement Plan or the Specifications not affecting the Motor Yacht's performance characteristics or general appearance as a result of the development by the Builder of the Construction Drawings, and not a result of any Variation; and when such alteration or change is made it shall form part of the Agreement, which shall be deemed to be varied accordingly. The same applies for minor changes to the Specifications and Construction Drawings, not affecting the Motor Yacht's performance characteristics, if found necessary by the Builder to suit the Builder's Premises, local conditions and facilities and the availability of materials and equipment, the introduction of improved production methods or otherwise. The Builder shall notify the Owner of any such alteration or change which is material.

6.5    If after the Date of this Agreement any mandatory requirements of the Classification Society, or any applicable rules, regulations, requirements and recommendations of the Regulatory Bodies are changed then either Party upon receiving notice thereof shall forthwith notify the other and the Owner shall instruct the Builder in writing as to alterations, if any, that are to be made in the Motor Yacht. The Builder shall comply with those instructions **provided that** the Owner shall first have agreed with the Builder as provided in Clause 6.2 any additional cost or credit, the effect (if any) upon the Warranted Speed, the Warranted Noise Levels, the Warranted Vibration Levels and/or other technical performances of the Motor Yacht, any postponement or bringing forward of the Completion Date and any other consequential



variations (including those necessary to take account of the Builder's other commitments) required as a result of such alterations. The Builder shall have the right to suspend the part of the Work which is affected by the change and shall give the Owner written notice of any such suspension. If the Builder and the Owner cannot agree on those matters within fifteen (15) Business Days after receipt by the Owner of a request from the Builder as to whether the Owner (a) agrees to a Variation on the terms proposed by the Builder or (b) contests or seeks a waiver of the application of such changes to the Motor Yacht (in which case the Owner shall have forty (40) Business Days to obtain such a waiver), then the Builder shall proceed with the construction of the Motor Yacht-as if there had been no such change and the Owner shall accept the Motor Yacht notwithstanding any failure to meet the relevant requirement upon delivery. Any actual delay caused to Work as a result of the Owner's request, or the seeking of a waiver, shall be a Permissible Delay.

6.6    Any additional cost payable, together with all costs incurred by the Builder, in connection with any Variation or change agreed pursuant to this Clause 6 shall be payable pro rata together with the instalments under Clause 3.2 remaining to be paid following the date when the relevant Variation has been agreed by the Builder and the Owner. If there is a credit to be made to the Owner, the Builder shall issue a credit note to the Owner and the amount of that credit will be deducted from the next instalment under Clause 3.2 following the issue of the credit note **provided that** the Builder has received in full all instalments of the Contract Sum then due and payable.

6.7    If any of the materials required by the Specifications for the construction of the Motor Yacht cannot be obtained, the Builder may supply other materials which conform to the requirements of the Specifications, the Classification Society and the Regulatory Bodies and the Builder shall have the right to ask for a Variation in this respect in the manner set out in Clause 6.2 whereby the Owner's approval shall not be unreasonably withheld or delayed.

7.    **SEA TRIALS**

7.1    The Builder will provide to the Owner's Representative a programme of the sea trials of the Motor Yacht no later than three (3) months before such trials are scheduled to start, such schedule to set out the trials to be performed and are relevant protocols for assessing their results. The Builder reserves the right to change the date of such trials or the order in which they are performed, **provided that** such changes shall not, of themselves, constitute Permissible Delay. The Sea Trials will be carried out in the manner specified in the Sea Trials Programme. Should any extension be made to the Production Schedule in accordance with this Agreement prior to the commencement of the Sea Trials, the timing of the Sea Trials shall be amended accordingly.

7.2    The Builder will give the Owner, the Classification Society and the Regulatory Bodies (as necessary) not less than ten (10) Business Days' written notice of the time, departure port and place of the Sea Trials. The Owner's Team (being no more than 6 members in total) will be permitted on board to witness and to comment on the performance of the Motor Yacht during the Sea Trials. Any delay caused by the failure of the Owner's Representatives to be present after notice has been given will be a Permissible Delay; additionally if the Sea Trials are so delayed for more than ten (10) days from the date originally notified by the Builder, the Owner will be deemed to have waived its rights to have the relevant Owner's Representatives on board the Motor Yacht for the Sea Trials. The Builder may thereafter conduct the Sea Trials without the relevant member of the Owner's Team being present and the Owner will accept the Motor Yacht on the basis of a certificate signed by the Builder and the representatives of the Classification Society and the Regulatory Bodies that at the Sea Trials the Motor Yacht conformed with this Agreement. The Builder will be responsible for ensuring the attendance of the Classification Society and/or the Regulatory Bodies at the Sea Trials. If any of the Sea Trials have to be postponed as a result of the failure of the

Execution Form

Classification Society and/or Regulatory Bodies, as required, to attend following notice from the Builder, any resulting delay to the Sea Trials Programme will be a Permissible Delay. The Builder may conduct preliminary sea trials of the Motor Yacht at which the Owner's Team will be entitled to be present.

7.3    If the weather conditions on the dates finally scheduled for a Sea Trial are not as set out in the Specifications and the Sea Trials Programme, the Builder may postpone the Sea Trials to the next Business Day thereafter that the weather conditions are as set out and any delay caused thereby shall be a Permissible Delay. Provided that if, notwithstanding such weather conditions, in the Builder's opinion (which will be conclusive in this respect) the safety of the Motor Yacht and the crew will not be endangered, the Builder may elect not to postpone, but to hold the Sea Trials, in which case the results of the Sea Trials shall be adjusted according to industry standards to take account of the difference between the actual weather conditions and the conditions stated in the Specifications and the Sea Trials Programme.

7.4    If the Motor Yacht or any of the Equipment breaks down during the Sea Trials, and causes an interruption to the proceedings or the irregular performance of the Sea Trials, and the breakdown can be repaired by the normal means available on board the Motor Yacht, the Sea Trials will continue after the necessary repairs have been made. If, however, the Motor Yacht has to return to a port to enable the repairs to be made, further Sea Trials will be held in respect of that part of the Motor Yacht and/or Equipment and/or the Components which was defective. Any delay resulting from such breakdown shall not constitute Permissible Delay unless and to the extent so provided under some other provision of this Agreement.

7.5    The expenses for the Sea Trials of the Motor Yacht will be paid by the Builder, including cost for the necessary crew for the safe navigation of the Motor Yacht and all fuel oil, lubricating oil, grease and fresh water and other necessary stores required in connection with the Sea Trials, together with the ballast (sea and fresh water and such other ballast as may be required) needed to bring the Motor Yacht to the trial load drafts specified in this Agreement and the Sea Trials Programme. The Sea Trials will be conducted in the manner and under the conditions stated in this Agreement and the Sea Trials Programme and will demonstrate that the Motor Yacht conforms to the terms of this Agreement.

7.6    If the Builder and/or the Owner's Representative considers that the Motor Yacht or any part thereof requires alteration or correction in order to conform to the terms of this Agreement or the Specifications, then the Builder and the Owner's Representative will draw up a list of such alterations or corrections (hereinafter "the Status List"). The Status List will be updated from time to time and the Builder will carry out the required corrections or alterations and will further demonstrate the conformity of the Motor Yacht to the terms of this Agreement by such new sea trials or other tests as the Builder considers appropriate **provided that** items of Minor Non-Conformity shall be left on the Status List to be made good by the Builder after the Delivery Date pursuant to Clause 14 at the Builder's cost and in accordance with a timetable approved by the Owner (acting reasonably). The Owner shall not be entitled to reject the Motor Yacht or refuse or delay acceptance thereof on account of items of Minor Non-Conformity.

7.7    Upon the Motor Yacht being tendered by the Builder to the Owner for delivery, if the Owner considers that, except for Minor Non-Conformities left on the Status List as aforesaid, the remaining items on the Status List are such that the Motor Yacht does not conform to the terms of this Agreement, the Owner will promptly notify the Builder thereof with a notice of rejection (to be given within three (3) days upon receipt of information that the Motor Yacht is tendered for delivery together with the results of the Sea Trials) and state therein in which respect(s) the Motor Yacht does not conform to the terms of this Agreement. On receipt of such notice, the Builder shall, if it agrees with the Owner, make such alterations or changes as may be necessary to correct such non-conformities and will thereafter prove by such new



trials or other tests that, save for Minor Non-Conformities left on the Status List as aforesaid, the other remaining items on the Status List have been rectified so that the Motor Yacht conforms to the terms of this Agreement. The Owner will within three (3) days of receipt of notice of completion of (i) such alterations and changes, and (ii) if applicable, new trials or tests, again notify the Builder in writing of its acceptance or final rejection of the Motor Yacht. Failure by the Owner to notify the Builder of rejection within such three (3) day period shall constitute acceptance of the Motor Yacht by the Owner. For the avoidance of doubt, the Builder shall have the right to attempt a rectification of any remaining item on the Status List (save for Minor Non-Conformities) until the time when the Owner's right to cancel this Agreement for non permissible delay in accordance with Clause 12.6 has arisen, and the procedures set out in this Clause 7.7 shall be repeated as many times as is necessary.

7.8     If the Owner finally rejects the Motor Yacht under Clause 7.7, the Owner may cancel this Agreement if, except in respect of Minor Non-Conformities left on the Status List, the Motor Yacht has not been constructed in accordance with the terms of this Agreement, and the provisions of Clause 11 shall apply to such cancellation.

        If the Owner accepts the Motor Yacht, the Owner and the Builder will promptly sign the Final Stage Certificate and the Motor Yacht will be delivered to the Owner in accordance with the provisions of Clause 8.

7.9     The Owner's acceptance of the Motor Yacht in accordance with this Clause 7 will be conclusive so far as conformity of the Motor Yacht to this Agreement (subject to any Minor Non-Conformities then left on the Status List) is concerned.

7.10    Fuel oil, lubricating oil, grease and other consumables consumed up to the time of acceptance of the Motor Yacht will be paid for by the Builder, and any balance of any fuel oil, lubricating oil, grease and other consumables remaining on board the Motor Yacht will be handed over to the Owner on delivery and acceptance of the Motor Yacht and will be paid for by the Owner at the Builder's net contract price plus value-added tax, or similar Taxes, if applicable.

8.      **DELIVERY**

8.1     The Motor Yacht will be delivered to the Owner safely afloat, alongside at the Builder's Premises on Incoterms "ex works" basis.

8.2     The Owner will take delivery of the Motor Yacht promptly upon it being tendered for delivery by the Builder and the Owner and the Builder will then sign the Protocol of Delivery and Acceptance and the Owner will thereby accept delivery of the Motor Yacht.

8.3     At the same time as the Protocol of Delivery and Acceptance is signed by the Parties:

        8.3.1    the instalment of the Contract Sum due on delivery in accordance with Clause 3.2 will be released in accordance with Clause 3.4;

        8.3.2    The Builder will deliver to the Owner the Builder's Certificate and such other documentation as may reasonably be required by the Owner in order to enable it to effect registration of the Motor Yacht under the Flag;

        8.3.3    The Builder will deliver to the Owner the following documents (all of which will be in the English language):

                 (1)    a report on the Sea Trials;

                 (2)    the drawings and plans of the Motor Yacht as stated in the Specifications;



Execution Form

(3)     the Classification Certificate and all other certificates and approvals required to be provided on delivery of the Motor Yacht pursuant to this Agreement, **provided that**, if through no fault of the Builder, definitive certificates are not available at the time of delivery, interim certificates will be accepted by the Owner and the Builder shall provide the definitive versions as soon as possible thereafter;

(4)     a declaration of warranty of the Builder materially in the form set out in Schedule XIV that the Motor Yacht is delivered to the Owner free and clear of any claims, mortgages and other encumbrances of the Builder upon the Owner's title thereto, and in particular that the Motor Yacht is absolutely free of all liabilities of the Builder to the Sub-Contractors, the Suppliers, employees and officers and crew, and of all liabilities arising from the operation of the Motor Yacht in the Sea Trials or otherwise prior to acceptance by the Owner, other than in respect of encumbrances granted by the Owner; and

(5)     a commercial invoice.

8.4     Title, including contingent title, to the Motor Yacht, the Equipment and the Components shall automatically pass to the Owner upon receipt by the Builder of the fourth instalment of the Contract Sum set out in Clause 3.2, instalment number 4 or upon their later delivery to the Builder's Premises or, if later, when drawn from the Builder's inventory, as applicable. Such transfer of title will automatically be executed without actual delivery. From the date of such transfer of title, the Builder will hold on trust and look after the Motor Yacht, the Equipment and the Components for the Owner. The Builder will (where reasonably practicable) mark items of Equipment and Components with the Motor Yacht's hull number upon delivery to the Builder's Premises and will use all reasonable efforts consistent with normal practice in Germany to ensure that its contracts with Suppliers and Sub-Contractors with an order value in excess of One Million Euros are consistent with the terms of this Clause 8.4. Notwithstanding title to the Motor Yacht, the Equipment and the Components passing to the Owner, the Builder shall take out and maintain insurance cover as provided in Clause 13 for the Motor Yacht, the Equipment and the Components.

8.5     The Owner shall take possession of, and if it has not already passed to the Owner pursuant to Clause 8.4, title to the Motor Yacht shall pass to the Owner, immediately upon delivery and acceptance thereof and, if so requested by the Builder, the Owner shall remove the Motor Yacht from the Builder's Premises promptly or with reasonable despatch after delivery.

8.6     It is expressly agreed that nothing in this Agreement shall affect any Builder's lien or right that the Builder may otherwise be entitled to in the Motor Yacht, the Equipment and the Components. The Builder will cooperate with the Owner in registering its title in the Motor Yacht, the Equipment and the Components in the applicable local register of ships under construction (the "Register") provided that:

8.6.1     the Owner shall provide the Builder with a copy (commercial terms redacted, in the Owner's option) of the shareholder's loan agreement ("Shareholder's Loan") made on arms' length terms with an entity in the same beneficial ownership as the Owner (the "Shareholder");

8.6.2     the Builder's lien over in the Motor Yacht, the Equipment and the Components shall be registered on the Register as a first ranking mortgage;

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY     EK000029



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     EKMM0000029

Execution Form

8.6.3 the Owner's title in the Motor Yacht, the Equipment and the Components shall be registered on the Register together with as a second ranking mortgage securing the Owner's obligations under the Shareholder's Loan;

8.6.4 prior to the registration of any mortgage in accordance with Clause 8.6.2 and 8.6.3, the Builder, the Owner and the Shareholder shall first agree a coordination agreement in such terms as the Builder shall require, acting reasonably, to give effect to the principles set out in this Clause 8.6.

8.7 Delivery of the Motor Yacht shall be deemed for all the purposes of this Agreement to have taken place at the time and on the day set out in the Protocol of Delivery and Acceptance and all responsibility for the Motor Yacht on the part of the Builder shall cease at that time.

9. **LATE PAYMENT**

9.1 If any instalment of the Contract Sum or other amount becoming due to the Builder hereunder shall remain unpaid without legitimate cause (a) for more than eight (8) days after the due date for payment thereof as provided in Clause 3 the Builder shall be entitled to interest at the Interest Rate on such instalment or other amount with effect from the due date of payment thereof as provided in Clause 3, (b) for more than fifteen (15) days after the due date for payment thereof as provided in Clause 3 or for more than forty five (45) days in aggregate in respect of all delays in payment in respect of any instalments which at the relevant time have been paid and/or have become due then, in each case, without prejudice to the Builder's entitlement under (a), the Completion Date shall be extended by the number of days equal to the period from the due date for payment thereof until the date upon which such instalment or other sum is paid in full which extension shall automatically constitute a Permissible Delay, and (c) after a further period of nine (9) days has elapsed without the Builder being paid, without prejudice to the Builder's entitlements under (a) and (b), the Builder shall have the right (but shall not be obliged) to suspend the Work until the date the instalment or other amount together with interest (if any) is paid by the Owner.  If such delay in payment exceeds thirty (30) days after the due date for payment, the Builder shall, in addition, have the right to require a Variation in the Contract Sum (equal to fifty percent (50%) of the amount per day as agreed under Clause 12.5 for the number of days of delay after the date which is thirty (30) days after the due date for payment) and other details of this Agreement to take into account the consequences of such delay. After a period of sixty (60) days from the due date of payment has elapsed without the Builder being paid all amounts then due to it hereunder in respect of a single instalment, or one hundred and twenty (120) days in aggregate in respect of all delays in payment in respect of any instalments which at the relevant time have been paid and/or have become due, the Builder shall be entitled, without prejudice to its other rights arising in respect of such breach, to terminate this Agreement by and upon giving notice in writing to the Owner.

9.2 In the event of the termination of this Agreement under this Clause 9, the Builder shall have the option either to complete or not to complete the Motor Yacht as it considers appropriate. The Builder will use reasonable endeavours to sell the Motor Yacht (incomplete or completed as the case may be and, if incomplete, with or without the Equipment and the Components) on such terms and conditions as the Builder may consider appropriate. If the title to the Motor Yacht has been transferred to the Owner, on such termination title in the Motor Yacht shall automatically revert to the Builder, free of any charge, lien or other encumbrance whatsoever. The Owner shall procure forthwith upon the Builder's request the discharge of any encumbrance registered against the Owner's title to the Motor Yacht. The Owner hereby agrees to execute, and for this purpose the Owner hereby irrevocably appoints the Builder its attorney and authorises the Builder to execute such Bills of Sale or other documents as may be required or appropriate to transfer unencumbered title to the Motor Yacht (and as applicable the Equipment and the Components) to any purchaser of the Motor Yacht.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY EK000030



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER EKMM0000030

Execution Form

9.3    A sale of the Motor Yacht for the purposes of this Clause 9 may, as the Builder considers appropriate, take the form of an agreement to complete the Motor Yacht and deliver her to a third party, to use the Equipment and Components to build a vessel with different specifications for delivery to a third party or agreements to sell the Equipment and Components to a third party or third parties. However the sale is structured, it shall be considered to be a sale of the Motor Yacht (i) in an incomplete state for the purposes of Clause 9.4 if the sales proceeds represent payment for the stage of construction of the Motor Yacht reached, or value of the items of Equipment and Components existing, at the time that the sale is effected and (ii) in a complete state for the purposes of Clause 9.5 if the sales proceeds represent payment in full for a completed vessel.

9.4    If the Motor Yacht is sold by the Builder in an incomplete state pursuant to Clause 9.2 above the Builder shall retain the instalments already paid by the Owner pursuant to Clause 3.2. In addition the Builder shall apply the proceeds of sale in payment of:

First, the expenses of the sale and all other costs and expenses incurred by reason of the Owner's default including, but without limitation, the Builder's liability to the Sub-Contractors and Suppliers;

Second, the total amount of the pre-delivery instalments listed in Clause 3.2 due at the time of termination but not paid by the Owner;

Third, interest on any unpaid instalments at the Interest Rate from the due date for the payment thereof until the date of receipt by the Builder of the proceeds of sale;

Fourth, the cost of additional work done and materials (if any) supplied by the Builder in the construction of the Motor Yacht not covered by any of the pre-delivery instalments that have fallen due, whether paid or unpaid, together with interest at the Interest Rate from the date such work was done or materials supplied, until the date of receipt by the Builder of the proceeds of sale;

Fifth, an amount equal to 5 % of the Contract Sum representing the Builder's reasonably estimated loss of profit in respect of this Agreement together with the Builder's damages and/or other costs, claims, expenses or amounts whatsoever arising out of or connected with the termination of this Agreement.

Thereafter any surplus remaining from the proceeds of sale shall be paid to the Owner (subject to a maximum payment equal to the instalment(s) already paid by the Owner pursuant to Clause 3.2). Any balance owing to the Builder in respect of the items listed in paragraphs First to Fifth inclusive above will be paid by the Owner to the Builder.

9.5    If the Motor Yacht is sold by the Builder in a completed state pursuant to Clause 9.2 above the Builder shall retain the instalment(s) already paid by the Owner pursuant to Clause 3.2. In addition, the Builder shall apply the proceeds of sale in payment of:

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY

EK000031



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                            EKMM0000031

Execution Form

First, the expenses of the sale and all other costs and expenses incurred by reason of the Owner's default including, but not limited to, the Builder's liability to Sub-Contractors and Suppliers;

Second, the total amount of the instalments listed in Clause 3.2 due at the time of termination but not paid by the Owner;

Third, interest on any unpaid instalments at the Interest Rate from the due date for the payment thereof until the date of receipt by the Builder of the proceeds of sale;

Fourth, all other instalments of the Contract Sum not paid or not due at the time of termination (i.e. not retained by the Builder or paid under "Second" above);

Fifth, any costs to modify the Motor Yacht to comply with the requirements of the purchaser.

Sixth, an amount equal to 5 % of the Contract Sum representing the Builder's reasonably estimated loss of profit in respect of this Agreement together with the Builder's damages and/or other costs, claims, expenses or amounts whatsoever arising out of or connected with the termination of this Agreement.

Thereafter any surplus remaining from the proceeds of sale shall be paid to the Owner (subject to a maximum payment equal to the instalment(s) already paid by the Owner pursuant to Clause 3.2). Any balance owing to the Builder in respect of the items listed in paragraphs First to Sixth inclusive above will be paid by the Owner to the Builder.

9.6     Upon any termination of this Agreement in accordance with this Clause 9:

    9.6.1     the Owner shall forthwith return the original Refund Guarantee to the Builder; and

    9.6.2     the Owner's rights in the insurances of the Motor Yacht shall terminate.

9.7     Nothing in this Clause 9 shall affect the Builder's rights or the Owner's liabilities in circumstances where, following termination of the Agreement under this Clause 9, the Builder, having used reasonable endeavours, does not sell the Motor Yacht (whether complete or incomplete).

9.8     Upon termination of this Agreement by the Builder in accordance with this Clause 9, the rights and remedies of the Builder and any liability of the Owner under this Agreement shall be limited to the remedies expressly provided for in this Clause 9 and (save in respect of Clauses 17 and 22) there shall be no further liability whatsoever of the Owner under this Agreement and/or at law, whether in contract or in tort (including without limitation, negligence) for any damages, losses or expenses whatsoever.

10.     **BREACH**

10.1    If the Builder:

    10.1.1     is in material breach of this Agreement and the Builder shall not have commenced appropriate action within ten (10) Business Days following the receipt of notice by the Builder from the Owner to cure or remedy such breach; or

    10.1.2     the Builder itself has applied for protection under the German law of insolvency ("Eigenantrag auf Insolvenzeröffnung"); or

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY

EK000032 

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0000032

Execution Form

10.1.3   the competent court ("Insolvenzgericht") has opened the proceedings in insolvency ("Insolvenzeröffnungsbeschluß") or has dismissed the petition in insolvency due to a shortage of assets ("Abweisung des Insolvenzantrages mangels Masse");

the Owner may terminate this Agreement forthwith by written notice to the Builder and its Custodian ("Sachwalter"), the respective preliminary receiver in insolvency ("vorläufiger Insolvenzverwalter") or the receiver in insolvency ("Insolvenzverwalter")(as the case may be) whereupon the provisions of Clause 11 shall apply.

10.2   If the Owner:

10.2.1   other than in respect of the payment of instalments of the Contract Sum, is in material breach of this Agreement and the Owner shall not have commenced appropriate action within ten (10) Business Days following the receipt of notice by the Owner from the Builder to cure or remedy such breach; or

10.2.2   stops, or threatens to stop, payment of, or is unable to or admits its inability to pay, its debts as they fall due (within the meaning of S.123 of the UK Insolvency Act 1986); or

10.2.3   has a winding-up order made against it in any court other than in respect of unjustified or frivolous claims to which the Owner supplies a bona fide defence within fourteen (14) days of such order or which the Owner has immediately available funds to meet, or passes a resolution for the winding up of the Owner or a committee of inspection or an administrator, administrative receiver or receiver or similar officer is appointed of the whole or a substantial part of the assets and undertaking of the Owner; or

10.2.4   convenes a meeting of all or any class or group of or makes any arrangement with, or assignment in favour of, all or any class or group of its creditors; or

10.2.5   is wound up or goes into liquidation;

then, subject as hereinafter provided, the Builder may terminate this Agreement forthwith by written notice to the Owner, whereupon the provisions of Clause 9 shall apply.

## 11.   REJECTION AND/OR CANCELLATION BY THE OWNER

11.1   If the Owner shall have the option under any provision of this Agreement to terminate this Agreement and shall exercise such right, the Owner will notify the Builder in writing and such termination shall be effective as of the date notice thereof is received by the Builder.

11.2   If the Owner terminates this Agreement in accordance with Clause 11.1, the Owner shall be entitled either:

11.2.1   to require the Builder promptly to pay to the Owner an amount in Euros equal to the aggregate of all instalments paid by the Owner to the Builder prior to such termination and an amount equal to the cost of rectification and/or restoration (reasonably estimated by the Builder) of those items of Owner's Supply which, when returned to the Owner, are not in the same condition as when they were received by the Builder together with (in the case of termination for the Builder's breach, but not otherwise) all directly and reasonably incurred costs, losses and expenses directly and reasonably incurred by the Owner pursuant to this Agreement and/or arising from its termination (including, without limitation, the



Execution Form

directly and reasonably incurred costs of the Owner's external bank financing of the Motor Yacht, if any). In such event, the Builder will pay to the Owner interest at the Interest Rate upon the amount of all instalments paid prior to such termination for the period from the date of payment of the relevant amounts by the Owner to the Builder to the date that the said payment is made to the Owner **provided that** if such termination arises under Clause 13.4 no interest shall be paid; or

11.2.2    to elect (such election to be notified to the Builder within thirty (30) days of termination of this Agreement) to remove the Motor Yacht, Equipment and all Components from the Builder's Premises, in which case the Builder shall remain liable to pay to the Owner an amount equal to the lower of (i) the difference, if any, between (a) the aggregate of the instalments paid by the Owner under Clause 3.2 and the cost of completing the Motor Yacht in accordance with the Specifications and the General Arrangement Plan and (b) the Contract Sum or (ii) fifteen per cent. (15%) of the Contract Sum and, promptly upon payment of such amount, the Owner shall return the original Refund Guarantee and provide the Declaration of Release of Guarantee to the Builder **provided that** if the Owner has not removed the Motor Yacht and all Components from the Builder's Premises within sixty (60) days of notification of its election, the provisions of clause 11.2.1 will be deemed to apply in place of the election set out in this Clause 11.2.2.

If the Owner requires repayment under Clause 11.2.1, the Builder shall pay the aggregate of all instalments paid by the Owner to the Builder prior to such termination together with interest, if applicable, to the client account of Holman Fenwick Willan LLP ("HFW"), the Builder's solicitors, to be held together with interest accruing thereon by HFW in escrow and released to the Owner upon:

(a)    the Owner procuring the discharge of any claim, mortgage or other encumbrance registered against the Owner's title to the Motor Yacht other than any such claim, mortgage or other encumbrance registered in favour, or at the behest, of the Builder; and

(b)    the transfer by the Owner to the Builder of property and title in the Motor Yacht, the Equipment and Components free of encumbrances (save for any encumbrance registered against the Owner's title in favour, or at the behest, of the Builder), and the Owner will execute and deliver all such bills of sale or other documents as the Builder may reasonably require to effect or document such transfer; and

(c)    the return of the original Refund Guarantee and the provision of the Declaration of Release of Guarantee by the Owner to the Builder.

11.3    Upon termination of this Agreement by the Owner in accordance with this Clause 11, the rights and remedies of the Owner and any liability of the Builder under this Agreement shall be limited to the remedies expressly provided for in this Clause 11 and (save in respect of Clauses 17 and 22) there shall be no further liability whatsoever of the Builder under this Agreement and/or at law, whether in contract or in tort (including without limitation, negligence) for any damages, losses or expenses whatsoever.

## 12.    DELAY, FORCE MAJEURE AND PERFORMANCE WARRANTIES

12.1    The Completion Date will automatically be extended, without giving rise to any claim on the part of the Owner for damages or otherwise, by the following:-

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY                    EK000034    

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                                    EKMM0000034

Execution Form

12.1.1    any failure or delay of the Owner and /or any member of Owner's Team duly and punctually to sign documents, give decisions and/or carry out its or their obligations under this Agreement where, and to the extent that, such failure or delay continues for more than sixty (60) days after the Builder's written notice of default to the Owner, and the Owner shall in addition make a lump sum payment to the Builder in respect of each day of failure or delay after such sixty (60) day period equal to twenty five (25%) of the amount per day as agreed under Clause 12.5;

12.1.2    any failure or delay of the Owner or the Owner's Team to provide decisions on or before the dates specified in the Decision List and/or to provide deliveries on or before the dates required for items of Owner's Supply where, and to the extent that, such failure or delay continues for more than sixty (60) days after the Builder's written notice of default to the Owner, and the Owner shall in addition make a lump sum payment to the Builder in respect of each day of failure or delay after such sixty (60) day period equal to twenty five (25%) of the amount per day as agreed under Clause 12.5;

12.1.3    (i)   acts of God, acts of princes or rulers, directives of government authorities, war or other hostilities or preparation therefore, blockade, embargoes, revolution, insurrections, mobilisation, civil war, civil commotion, riots, sabotage, epidemics, quarantines, earthquakes, floods, hurricanes or storms, other extreme weather conditions, lightning, explosions, failure of electricity or other services, failures/defects of castings or forgings, collisions or strandings, import restrictions (such event not being reasonably foreseeable at the Date of this Agreement), insolvency or the like of a Sub-Contractor or Supplier (such event not being reasonably foreseeable at the Date of this Agreement), destruction of the whole or part of the Builder's Premises or of the whole or part of the premises of any of its Sub-Contractors or any of its Suppliers, fire, strikes, lockouts or loss of workmen or industrial disputes affecting the Builder or any of the Sub-Contractors or any of the Suppliers or their servants or agents (but not strikes, lockouts or loss of workmen or industrial disputes which are limited in their effect to only the Builder or its Sub-Contractors or Suppliers),  the destruction of any of the Equipment and/or the Components whilst in transit and/or the inability of the Builder to obtain any of the materials required in connection with the construction of the Motor Yacht (such event not being reasonably foreseeable at the Date of this Agreement), in each case such event being outside the control of the Builder and for which the Builder could not reasonably have been expected to make provision or (ii) any other event outside the control of the Builder and for which the Builder could not reasonably have been expected to make provision.

12.2    The Builder will within ten (10) Business Days after having knowledge of an event as per Clause 12.1.3 advise the Owner in writing thereof.

12.3    After any such delay as per Clause 12.1.3 ends, the Builder shall promptly advise the Owner in writing of the date that the delay ended and of the applicable extension of the Completion Date.

12.4    If the total number of days of delay occurring as a result of the matters referred to in Clauses 12.1.3 and/or 13.3 exceeds nine hundred and twelve (912) days, the Owner shall have the right, by notice in writing to the Building to cancel this Agreement, **provided that** the Builder may at any time after such nine hundred and twelve (912) days of delay have occurred by notice in writing to the Owner request the Owner to elect either to cancel this Agreement or to agree a revised Completion Date specified by the Builder and if within twenty one (21) days of receipt of such notice the Owner had not given notice to the Builder cancelling this



Execution Form

Agreement the said revised Completion Date shall be the Completion Date for the purposes of this Agreement. The provisions of Clause 11 shall apply to any cancellation of this Agreement under this Clause 12.4.

12.5    If the Tender Date occurs for causes for which the Builder is liable after the Completion Date (as the same may be extended from time to time under the terms of this Agreement), the Builder shall pay to the Owner on the Delivery Date by way of liquidated damages and not as a penalty the sum of twenty thousand Euros (€20,000) for each completed day of delay commencing the thirty first (31st ) completed day following the Completion Date (as the same may be extended from time to time under the terms of this Agreement) and ending on the Tender Date, but in any event for a maximum period of three hundred and thirty five (335) days. If the Owner elects not to rescind this Agreement, a revised Delivery Date will be agreed between the Builder and the Owner and this Agreement, the Sea Trials Programme (if applicable) shall be deemed to be amended accordingly.

12.6    If the Tender Date has not occurred before three hundred (300) completed days or more have elapsed beyond the Completion Date (as the same may be extended from time to time under the terms of this Agreement), the Owner will have the right by notice in writing to the Builder to cancel this Agreement (in which case the provisions of Clause 11 shall apply) **provided that** the Builder may at any time after such three hundred (300) days of delay have occurred by notice in writing to the Owner request the Owner to elect either to cancel this Agreement or to agree a revised Completion Date specified by the Builder and if within twenty one (21) days of receipt of such notice the Owner had not given notice to the Builder cancelling this Agreement the said revised Completion Date shall be the Completion Date for the purposes of this Agreement.

12.7    In respect of the Warranted Speed:

    12.7.1    if the actual speed of the Motor Yacht determined in accordance with the Sea Trials Programme and the Specifications is below the Warranted Speed the Builder will pay to the Owner on the Delivery Date by reduction of the balance of the Contract Sum, as liquidated damages the following amounts:

        (1)    in respect of a shortfall of up to 0.25 of a knot, no reduction;

        (2)    in respect of a shortfall from 0.25 of a knot to 1.5 knots,

            (a)    in respect of a shortfall from  0.25 knots to 1 knot, sixty thousand Euros (€60,000) for each full one tenth (0.10);

            (b)    in respect of a shortfall from  1.01 knots to 1.50 knots, one hundred thousand Euros (€100,000) for each full one tenth (0.10).

    12.7.2    If the actual speed of the Motor Yacht determined in accordance with the Sea Trials Programme and the Specifications is more than 1.5 knots below the Warranted Speed, the Owner shall accept the Motor Yacht with a reduction in the Contract Sum attributable to a shortfall of knots, or as an alternative to accepting the Motor Yacht with that reduction in the Contract Sum, have the option to terminate this Agreement in accordance with Clause 11.

12.8    In respect of the Warranted Noise Levels:

    12.8.1    if the actual noise levels, taking the highest deviation from the relevant measurements taken in the conditions set out in, measured in the manner and in accordance with the conditions of the Specifications (the "Measured Noise

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY

EK000036



EKMM0000036

Execution Form

Levels") are less than two (2) dB(A) above the Warranted Noise Levels, there shall be no reduction in the Contract Sum;

12.8.2    if the Measured Noise Levels measured in harbour conditions and in cruising conditions in accordance with the Specifications as aforesaid are, under either conditions of measurement, more than two (2) dB(A) above the Warranted Noise Levels then, in respect of each of the areas and under either condition of measurement specified in Section 0342 and 0344 of the Specifications, the Builder shall pay liquidated damages by way of reduction in the Contract Sum in the amount of eight thousand Euros (€8,000 for each full 1 dB(A) by which the Measured Noise Levels in each such area measured under such conditions are greater than two (2) dB(A) above the Warranted Noise Levels up to a maximum of five (5) dB (A) in the case of each of the Owner's cabin, the VIP cabins and the saloon/dining areas and up to a maximum of six (6) dB (A) in the case of all other areas;

12.8.3    if the Measured Noise Levels measured in accordance with the Specifications as aforesaid exceed the Warranted Noise Levels by more than five (5) dB(A) in the case of each of the Owner's cabin, the VIP cabins and the saloon/dining areas and up to a maximum of six (6) dB (A) in the case of all other areas, and under either condition of measurement specified in Section 0342 and 0344 of the Specifications, then the Owner shall, as an alternative to accepting the Motor Yacht with the above mentioned reductions in the Contract Sum, have the option to terminate this Agreement in accordance with Clause 11.

12.9    In respect of the Warranted Vibration Levels:

12.9.1    if the actual vibration levels, taking the highest deviation from the relevant measurements in each of the areas specified in Section 0354 and 0360 of the Specifications "the Measured Vibration Levels" and measured in accordance with the provisions of the Specifications, exceed the Warranted Vibration Levels by:

(1)    0.5 mm/sec in respect of velocity levels for vibration frequencies above 6 Hertz; and

(2)    17 mm/sec$^2$ in respect of acceleration levels for vibration frequencies below 6 Hertz,

then the Builder shall pay liquidated damages by way of reduction in the Contract Sum in the amount of eight thousand Euros (€8,000) in respect of each such area;

12.9.2    the Contract Sum shall be reduced by a further eight thousand Euros (€8,000) for each area specified in Clause 12.9.1 for each further increase in the Measured Vibration Levels above the Warranted Vibration Levels as increased by the levels set out in Clause 12.9.1 of:

(1)    1 mm/sec in respect of velocity levels for vibration frequencies above 6 Hertz; and

(2)    38 mm/sec$^2$ in respect of acceleration levels for vibration frequencies below 6 Hertz,

up to a maximum velocity level of 4 mm/sec in respect of vibration frequencies above 6 Hertz and a maximum acceleration level of 130 mm/sec$^2$ in respect of vibration frequencies below 6 Hertz;

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY    EK000037    

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    EKMM0000037

Execution Form

12.9.3      if the Measured Vibration Levels measured in accordance with the Specifications as aforesaid exceed the maximum velocity level and the maximum acceleration level referred to in Clause 12.9.2, the Owner shall accept the Motor Yacht with a reduction in the Contract Sum corresponding to an excess of 9 mm/sec, in respect of vibration frequencies above 6 Hertz and acceleration level of 130 mm/sec$^2$ in respect of vibration frequencies below 6 Hertz or as an alternative to accepting the Motor Yacht with that reduction in the Contract Sum, have the option to terminate this Agreement in accordance with Clause 11.

12.10      In respect of the Warranted Range, if the range of the Motor Yacht calculated as set out in the Specifications is more than ten percent (10%) below the Warranted Range (in respect of any Warranted Range in the Specifications), the Owner shall have the option:

     (1)      to accept the Motor Yacht on such terms as might be mutually agreed between the Builder and the Owner; or

     (2)      to terminate this Agreement in accordance with Clause 11.

12.11      For the avoidance of doubt, prior to any liability for liquidated damages as per Clause 12.7 to 12.9, the Builder shall have the right to attempt a remedy of the deficiency up until the time when the Owner's right to cancel this Agreement for non permissible delay in accordance with 12.6 has arisen. It is further understood that the reductions in the Contract Sum referred to in Clauses 12.5 to 12.9 (inclusive) shall be cumulative and receipt of a reduction for one such deficiency shall not preclude further reductions for others. Any liquidated damages shall be determined prior to the Delivery Date and shall be deducted from the final instalment of the Contract Sum due on delivery of the Motor Yacht. The Parties agree that the liquidated damages payable under this Clause 12 constitute a genuine pre-estimate by them of the Owner's loss, and not a penalty. No liquidated damages shall be payable by the Builder under this Clause 12 if the Owner terminates this Agreement. Payment of liquidated damages pursuant to any of Clauses 12.5 to 12.9 (inclusive) shall be in full and final settlement of the delay or deficiency to which they relate and the Owner shall not be entitled to make any further claim whatsoever against the Builder in respect of any delay in the delivery of the Motor Yacht or any deficiency in the Warranted Speed, the Warranted Noise Levels, the Warranted Vibration Levels and the Warranted Range or in respect of any losses, damages or expenses arising therefrom.

12.12      The total reduction in the Contract Sum on payment by the Builder of any liquidated damages effective pursuant to this Clause 12 shall not exceed five per cent (5%) of the Contract Sum.

## 13.      INSURANCE

13.1      The Motor Yacht, the Equipment, the Components and (subject to receipt of the Owner's notice regarding their respective value) items of Owner's Supply from the date of their delivery to the Builder's Premises, will be insured by the Builder at the Builder's expense with a first class insurance company or companies or at Lloyds of London in the name of the Builder and with the Owner named as co-assured (as its interest may be determined from time to time) in accordance with the "Institute Clauses for Builder's Risks" (with appropriate amendments if the Sea Trials are to be conducted more than one thousand (1000) nautical miles from the Builder's shipyard) until delivery of the Motor Yacht or termination of this Agreement (whichever is earlier) whereupon the liability of the Builder so to insure shall cease. Such insurances will be in an amount not less than the aggregate amount of (a) the total amount from time to time of the instalments paid by the Owner in accordance with Clause 3.2 and (b) the cost (as notified by the Owner to the Builder) of those items of Owner's Supply delivered to the Builder's Premises but not to exceed **Three Million Euros (€ 3,000,000)**. If items of Owner's Supply exceed **Three Million** Euros, (€ **3,000,000**) in value

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY      EK000038



the Builder shall, upon the Owner's request extend the insurances to cover such excess value and the Owner will promptly reimburse to the Builders any additional premium incurred in insuring the excess of such value. Upon the Owner's request, the Builder shall provide evidence of such insurances in the form of brokers' or insurers' cover notes.

13.2    The Owner acknowledges that the insurance available to the Builder contains the following provision:

"War, Strikes, Riots and Civil Commotions including Malicious Damage in accordance with Institute War Clauses Builders' Risks 1/6/88 (CL.349) amended to include under Clause 2 Perils, "2.4 – any terrorist or any person acting maliciously or from a political motive" Institute Strikes Clauses Builders' Risks 1/6/88 (CL.350) with Clause 1.2. deleted and with Clause 7 deemed replaced by Institute Radioactive Contamination, Chemical, Biological, Bio-chemical and Electromagnetic Weapons Exclusion Clause (Cl.370) and Institute War and Strikes Clauses Hulls – Time 1/10/83 (CL.281) as applicable, whose provisions shall remain paramount.

Notwithstanding the provisions of the clause as above, terrorism coverage in respect of vessels under construction and/or repair is maintained at all times whether afloat or on land. Subject to 7 days notice of cancellation as per clause [●]."

The insurers have informed the Builder that in case of such cancellation, terrorism coverage may be reinstated subject to payment of an additional premium and terms of insurance to be agreed at that time. The Parties agree that in the event of such a cancellation, the Builder's obligation to insure the Motor Yacht, the Equipment, the Components and items of Owner's Supply against such terrorism risks will not extend to payment of such additional premium, and in the absence of agreement as to an alternative basis of insurance for the Motor Yacht, the Equipment, the Components and items of Owner's Supply, against such risks, the risk of loss or damage to the Motor Yacht, the Equipment and the Components and items of Owner's Supply resulting from terrorism risks or causes will remain with the Owner and the Builder will be under no liability with respect to the loss of or damage to the Motor Yacht, the Equipment, the Components or the items of Owner's Supply resulting from terrorism risks or causes. Upon such cancellation the liability of the Builder to insure the Motor Yacht, the Equipment, the Components and items of Owner's Supply in respect of terrorism risks will automatically cease, provided always that the Builder thereafter agrees to use best endeavours to secure alternative terrorism coverage, at the best rates then reasonably available, subject to the payment of any additional premium in respect thereof by the Owner.

13.3    If the Motor Yacht and/or the Equipment and/or the Components including items or Owner's Supply sustain damage not constituting a Total Loss by any cause whatsoever prior to the delivery, the insurance proceeds in respect of such damage will be payable to the Builder and be applied by the Builder in or towards the repair of such damage so that the Motor Yacht, the Equipment and/or the Components (as the case may be) meets the requirements of this Agreement and the Specifications. The Completion Date shall be postponed by a period equal to any delay because of such damage or insurance claim and the period of repair of such damage, which postponement shall automatically constitute a Permissible Delay save where such damage resulted from the wilful default or reckless disregard with knowledge of the probable consequences of the Builder. The Owner shall not on account of such damage or repair be entitled to reject or to make any objection to the Motor Yacht or any part thereof or her Equipment **provided that** such damage shall have been made good in accordance with the provisions of this Clause 13.3.

13.4    If the Motor Yacht is a Total Loss, then either:

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY

EK000039



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0000039

Execution Form

13.4.1     the insurance proceeds in respect of the Total Loss will be paid to the Owner up to the amount of all instalments of the Contract Sum paid to the Builder in accordance with Clause 3.2 and the insured cost of items of Owner's Supply (provided that the Builder will have the option of returning the items of Owner's Supply, if in good condition, to the Owner instead of paying the cost thereof), and the Builder shall procure the endorsement of a loss payable clause in the form of Schedule XVI in respect of the Builder's insurances when these are placed under and in accordance with Clause 13.1 of this Agreement. On receipt of such payment by the Owner, this Agreement will be deemed to be terminated and all rights, powers, duties and liabilities of each of the Owner and the Builder to the other shall terminate forthwith. The balance of any insurance proceeds in respect of Total Loss will be retained by the Builder; or

13.4.2     the Owner will have the option, declarable by notice in writing to the Builder not later than sixty (60) days following the declaration of the Total Loss to request the Builder to construct and deliver to the Owner a new Motor Yacht, in all respects conforming to the Specifications, with such amendments as may be agreed, such new Motor Yacht to be delivered to the Owner on such date and price as the Builder may specify to the Owner (and the Builder agrees that subject to its other commitments it will offer the earliest delivery slot reasonably practicable), the construction of such new vessel to be governed by terms equivalent, mutatis mutandis, to the terms of this Agreement and the insurance proceeds in respect of the Total Loss shall be paid to the Builder and applied against the payment terms so agreed. If not so agreed within sixty (60) days of Owner's notice of declaration, this Agreement will be deemed to have been terminated by the Owner and the provisions of Clause 13.4.1 shall apply. The Owner shall forthwith return the original Refund Guarantee to the Builder and provide the Declaration of Release of Guarantee to the Builder. On repayment in full of all amounts payable to the Owner in accordance with Clause 13.4.1 the Owner will promptly assign to the Builder the benefit of its interest in the insurance proceeds; and

13.4.3     if, as a result of the Builder's negligence or wilful default, the insurance proceeds in respect of the Total Loss are less than the aggregate amount of (i) the Contract Sum paid by the Owner and (ii) the cost (as was notified by the Owner to the Builder) of those items of the Owner's Supply delivered to the Builder's Premises and not returned to the Owner in accordance with Clause 13.4.1, the Builder will (a) pay to the Owner (in the case of Clause 13.4.1) the shortfall between such aggregate amount and the insurance proceeds actually received by the Owner (if any); or (b) apply against the new payment terms agreed between the Builder and the Owner (in the case of Clause 13.4.2) the shortfall between such aggregate amount and the insurance proceeds actually received by the Builder (if any).

13.5     The Builder's liability to the Owner in respect of any damage or Total Loss of the Motor Yacht shall not in any event extend further or otherwise than provided in this Clause 13.

## 14.     WARRANTY AND RESPONSIBILITY OF BUILDER

14.1     The Builder guarantees for the Warranty Period the Motor Yacht as constructed by the Builder under this Agreement (including the installation of the Owner's Supply as per Clause 16.2 but otherwise excluding the Owner's Supply) against all defects due to the bad workmanship of the Builder and/or defective Equipment and/or defective Components that may occur or be discovered during the Warranty Period **provided that** the Builder shall not be liable for any defects in the Motor Yacht and/or the Equipment and/or the Components (i) for which the Builder is not responsible in accordance with Clause 2.2 or (ii) which are caused by any of the following:



Execution Form

    14.1.1   fair wear and tear;

    14.1.2   fire or accidents at sea or elsewhere;

    14.1.3   mismanagement, negligence or wilful neglect on the part of the Owner, its employees, agents or servants (including the Motor Yachts officers, crew and the Owner's guests);

    14.1.4   failure to comply with the paint maintenance procedures and requirements of the manufacturer of the paint system applicable to the Motor Yacht as have been notified to the Owner by the Builder;

    14.1.5   overloading or improper loading or stowage;

    14.1.6   the repair or replacement of any part by any other person otherwise than in accordance with the provisions of Clause 14.4 (save only for works reasonably undertaken in an emergency and then only to the extent immediately necessary).

14.2    The Owner or its duly authorised representatives will notify the Builder in writing as soon as possible (but in any event within fifteen (15) days) after the discovery of any defect for which a claim is to be made under this Clause, such notice to describe the nature of the defect or defects.

14.3    The Builder's liability under this Clause 14 shall be limited to carrying out the work, or making the payments, as provided in Clause 14.4 and 14.6, and to the assignment provided for in Clause 14.8 and the Builder shall have no liability, whether under this Agreement or otherwise howsoever, for (i) any defects discovered after the expiry of the Warranty Period nor in respect of defects discovered prior to such expiry if notice of such defects is not given by the Owner within fifteen (15) days of such expiry or (ii) any damage resulting from defects notified under this Clause 14 (unless such damage itself constitutes a defect under and in accordance with Clause 14.1) or (iii) any damage or loss, including economic loss, suffered by the Owner or the Vessel, whether during the carrying out of such work or otherwise howsoever.

14.4    The Builder will remedy at the Builder's Premises and at its expense any defect in the Motor Yacht which is covered by the warranty in Clause 14.1. However, if it is impractical to bring the Motor Yacht to the Builder's Premises the Owner may give the Builder appropriate notice in writing of the time and place at which it wishes such warranty work to be carried out and the Builder will be entitled to approve the place so proposed by the Owner and to examine by its own representatives the nature and extent of the defects. If the defects complained of are covered by the warranty in this Clause 14 and the Builder approves the place, then the Builder will pay the cost for the necessary repairs and/or replacements **provided that** the Builder's liability for the cost of such repairs or replacements shall be limited to one hundred percent (100%) of the cost of effecting the same at the Builder's Premises. Upon payment of such cost the Builder shall be deemed to have fulfilled its obligations pursuant to this Clause 14 and this Agreement. To the extent that it is practical to do so, defects complained of from time to time shall be repaired at the same time.

14.5    The Builder guarantees any defect identified and repaired or replaced under and in accordance with this Clause 14 for a further period of twelve (12) months from the time of completion of the repair or replacement but subject always to a maximum warranty period of twenty four (24) months from the Delivery Date.

14.6    The Builder will pay the travelling expenses between and within the Builder's Premises and Northern Europe or the Mediterranean of any employee, servant or agent of the Builder, its



Execution Form

Sub-Contractors or Suppliers incurred in connection with the inspection or repair of any defect as referred to in this Clause 14. The Owner shall be responsible for and shall pay the travelling expenses of any employee, servant or agent of the Builder, its Sub-Contractors or Suppliers to and from any location outside Northern Europe and the Mediterranean incurred in connection with the inspection or repair of any defect covered by the warranty in Clause 14. The Owner shall further be responsible for and shall pay the travelling and other expenses of the Builder, its Sub-Contractors or Suppliers incurred in respect of any item that is not covered by this Clause 14.

14.7 The express provisions of this Clause 14 shall replace and exclude any other liability, guarantee or warranty of the Builder or any similar terms or conditions expressly stated or implied by law, custom or otherwise howsoever, in respect of the Motor Yacht. Notwithstanding the generality of the foregoing, the express provisions of this Clause 14 shall constitute the full extent of the Builder's obligations in respect of the Motor Yacht after the Delivery Date.

14.8 Without prejudice to Builder's warranty granted to the Owner under this Clause 14 (including without limitation to the length of the Warranty Period in accordance with Clause 1.63) the Builder agrees: (i) on a reasonable endeavours basis (but without obligation to agree any increase in price) to seek to negotiate at a warranty period expiring fifteen (15) months after the Delivery Date in its contracts with Sub-contractors and Suppliers of major items of Equipment and Components and in relation to the Owner's and Guests' Interior Outfit; and (ii) after the expiry of the Warranty Period to assign to the Owner all extended warranty rights the Builder may have against any and all Sub-Contractors and Suppliers under the relevant contracts in respect of the Motor Yacht, and subject to applicable law and the terms of the relevant contracts.

15. **TAXES AND DUTIES**

15.1 Taxes incurred in Germany in connection with the Work of the Builder will be paid by the Builder **provided that** if at any time any sales, value added or similar tax shall be payable on the Contract Sum or any part thereof, such tax will be payable by the Owner.

15.2 The Builder will be liable for all Taxes in respect of procurement of the Equipment and the Components necessary for the construction of the Motor Yacht which the Builder may acquire at its cost from abroad (except for items of Owner's Supply).

15.3 Subject to Clause 15.2, the Owner will pay all Taxes incurred in connection with the construction of the Motor Yacht and/or in connection with this Agreement outside Germany and all Taxes incurred in connection with the registration of the Motor Yacht under Flag and the operation and use of the Motor Yacht after delivery. The Owner will also pay all Taxes payable by or in respect of Owner's Team, the Designer[s] and other Owner's personnel in Germany (if any) as well as in respect of Owner's Supply.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY

EK000042 

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0000042

Execution Form

16.    **OWNER'S SUPPLY AND OWNER'S INPUT**

16.1    Items of Owner's Supply will be supplied by the Owner at the times specified in the Decision List or at such time as the Builder will specify at a later stage (with appropriate time for the Owner to deliver the item of Owner's Supply) and be delivered to the Builder's Premises at the risk of the Owner.  They will be subject to the Builder's reasonable right of rejection if they are found to be unsuitable or not in proper condition for installation or not to be in compliance with the Specifications and/or the Design Drawings and/or the Decision List.  The Builder shall supply covered storage within the Builder's Premises and security for all items of Owner's Supply.

16.2    The Builder will not be liable for any defect in items of Owner's Supply but will, other than in respect of art works, specialised supplies, loose furnishing and equipment (which will be installed and arranged by the Owner's Team or Owner's specialised sub-contractors/suppliers, and in respect of which the Builder's responsibility will be to place them at the disposal of the Owner's Team alongside the Motor Yacht), be responsible for their installation and, only where expressly provided in the Specifications, commissioning, the cost of which is included in the Contract Sum (as adjusted in accordance with the terms of this Agreement).

16.3    Upon the arrival of an item of Owner's Supply at the Builders Premises, it will be insured by the Builder subject to, and in accordance with Clause 13 **provided that** the Owner will notify the Builder in writing, of the value of each item of Owner's Supply not less than twenty one (21) days before its delivery to the Builder's Premises.

16.4    If the Owner does not deliver any one of the items of Owner's Supply(other than any minor items not requiring to be affixed and/or not requiring to be specially fitted to the Motor Yacht) in time or in unsuitable or not in proper condition for installation or not in compliance with the Specifications, then at the discretion of the Builder:

16.4.1    the period until delivery of the item in accordance with the Agreement shall be a Permissible Delay, or

16.4.2    the Builder shall continue construction and deliver the Motor Yacht without installation of the item. However, upon agreement by the Parties, such item may be installed by the Builder after delivery of the Motor Yacht whereby such installation is not included in the Contract Sum and shall be paid for by the Owner on times and material basis at the rates set out in Schedule VIII (Variation Certificate) plus Taxes (as applicable).

The Builder shall inform the Owner in writing which of the two alternatives it selects.

16.5    Without prejudice to Clause 17.5, the Builder shall not be responsible for any input (whether in relation to the design of the Motor Yacht, or items of Owner's Supply, or decisions or otherwise) given by the Owner and which the Owner requires the Builder to incorporate in the Motor Yacht, against the Builder's recommendation (in performance of its obligations under this Agreement). If a claim arises from this input of the Owner, either directly or indirectly, the Owner undertakes and agrees to indemnify the Builder against all proceedings, costs, claims, expenses, damages and liabilities (including legal fees on a full indemnity basis) incurred by or awarded against the Builder in connection with any claim brought against the Builder in this respect.

17.    **PLANS AND DRAWINGS**

17.1    The Builder will retain the Specifications and Design Drawings prepared by the Owner and/or the Owner's Representative and/or the Designer(s) and given to the Builder and the Owner



Execution Form

will be entitled to copies of the same upon request to the Builder against payment of appropriate expenses. The Design Drawings will remain the property of the Owner or the relevant Designer, as the case may be, but the Builder will be entitled to make and /or retain copies of them and to use them in connection with the design and construction of the Motor Yacht. In any event, the General Arrangement Plan, Specifications, the Construction Drawings, and the Builder's plans and workshop drawings, technical descriptions, calculations, test result and other data, information and documents concerning the design and construction of the Motor Yacht (the "Builder's Confidential Information") will remain the property of the Builder and the Builder retains all rights therein. The Owner undertakes not to bring any Builder's Confidential Information into the knowledge of third parties without the prior written consent of the Builder and the Owner agrees to use the Builder's Confidential Information only for approval of drawings, inspection, operation and maintenance of the Motor Yacht and for no other purpose whatsoever. The Owner further agrees to procure that the Designers and/or the Owner's Team shall use the Confidential Information solely for purpose as permitted to the Owner.

17.2   Without prejudice to the generality of Clause 23.3, the Owner shall promptly after the Date of this Agreement obtain a contractual obligation from the Exterior Designer not to repeat the design of the Motor Yacht.

17.3   The Builder agrees for a period commencing on the Date of this Agreement and ending on the earlier of a change in the beneficial ownership of the Motor Yacht and thirty six (36) months after the Delivery Date not to commence construction of a motor yacht that from her outward appearance and size, to an independent and reasonably knowledgeable viewer, has (i) a superstructure and (ii) a hull, that are both very substantially the same as the Motor Yacht (in outward appearance and size).

17.4   All royalties, licence fees and other similar charges payable to third parties on account of the Equipment and the Components supplied by the Builder will be paid by the Builder. In relation thereto the Builder undertakes and agrees to indemnify the Owner against all proceedings, costs, claims, expenses, damages and liabilities (including legal fees on a full indemnity basis) incurred by or awarded against the Owner in connection with any claim brought against the Owner for infringement of any patent, copyright or other intellectual property (as defined by Section 72 of the UK Senior Courts Act 1981) where such claim arises from:

17.4.1   the design of the Motor Yacht (other than as represented by the Design Drawings for which the Builder shall have no liability) or any part thereof or of any of the Equipment or the Components; and/or

17.4.2   the Specifications, plans and drawings, instructions and documents prepared by the Builder,

**provided that** the Owner has informed the Builder forthwith upon the Owner's becoming aware of such claim, and provided further that the Builder shall have the right to defend such claim on behalf, and in the name, of the Owner though at the Builder's expense.

17.5   The Owner undertakes and agrees to indemnify the Builder against all proceedings, costs, claims, expenses, damages and liabilities (including legal fees on a full indemnity basis) incurred by or awarded against the Builder in connection with any claim brought against the Builder for infringement of any patent, copyright or other intellectual property (defined as aforesaid) arising out of the performance of this Agreement where such claim arises in relation to the Design Drawings and/or the items of Owner's Supply.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY          EK000044



Execution Form

17.6  The Equipment and the Components may bear patent numbers, trademarks, or trade names of the relevant manufacturer. Nothing contained herein is to be construed as transferring any patent or trademark rights or copyrights in such Equipment and Components so marked and all such rights are hereby expressly reserved to the true and lawful owners thereof.

17.7  The acknowledgements and indemnities contained in this Clause 17 shall survive performance, or termination for whatever reason, of this Agreement.

18.  **ASSIGNMENT AND SUB-CONTRACT**

18.1  Save as expressly provided in this Agreement, neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement or under the Refund Guarantee without the prior consent in writing of the other Party, which consent shall not be unreasonably withheld or delayed.

18.2  The Owner may (i) subject to Clause 23.4 and provided that the Owner will continue to be liable for the performance of this Agreement, assign its rights under this Agreement to its bank ("the Owner's Financing Bank") as security for sums advanced by the Owner's Financing Bank to the Builder (or to the Owner in repayment of sums it has paid to the Builder under this Agreement) in connection with the Owner's payment of the Contract Sum and (ii) freely assign its rights and/or, provided that the Owner will continue to be liable for the performance of this Agreement, transfer its rights and obligations under this Agreement to an associate of the Owner, to a company in the same beneficial ownership as the Owner or to a company controlled by the Owner or its associate. For the purposes of this Clause "associate" will mean a wife, sibling, parent, nephew, niece or child and "control" will have the same meaning attributed to it by S.416 of the UK Income and Corporation Taxes Act of 1918.

18.3  In the case of any assignment or transfer by the Owner other than in accordance with Clause 18.2, the Builder shall be entitled to a fee equal to one and a half per cent (1.5%) of the Contract Sum.

18.4  The Builder may freely sub-contract the Work and/or parts thereof.

18.4  The Builder may freely assign any of its rights under this Agreement to:

18.4.1  any company associated or affiliated with the Builder; and/or

18.4.2  the Builder's Bank as security for the issue of the Refund Guarantee;

and the Owner agrees to enter into such acknowledgements as the Builder may reasonably request in connection therewith.

19.  **NOTICES**

19.1  Any notice or other document to be given or served hereunder shall be in the English language and may be delivered by hand, or sent by facsimile transmission or posted by first class airmail pre-paid post, addressed, if to the Builder, at its address stated in Clause 19.2 and, if to the Owner, as provided in Clause 19.3, or to such other person or address as may be designated by like notice hereunder. Notices and documents sent by first class airmail pre-paid post will be deemed served seven (7) days after posting. Notices and documents sent by facsimile transmission will be deemed served when transmitted and confirmed by a sending protocol.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY  EK000045  

EKMM0000045

Execution Form

19.2   All notices and documents to be sent to the Builder shall be delivered to it at Zum Alten Speicher 11, D-28759 Bremen, Germany (Attention: Mr. Frithjof Schmidt: Facsimile No.

19.3   All notices and documents to be sent to the Owner shall; be delivered to it c/o Imperial Yachts Sarl, Ermanno Palace, 27 Boulevard Albert 1er, MC 98000 Monaco, Attention of Julia Stewart, Fax No                           and in copy for information purposes only to Hill Dickinson LLP, Irongate House, Dukes Place, London EC3A 7HX, Attention of James Lawson / Fergal Quinn, Fax No                           and after the Owner's Representative has been sent to the Shipyard of the Builder, a copy to the Owner's Representative as well. All notices and documents to be sent solely to the Owner's Representative under the terms of this Agreement shall be sent to its address and on its Facsimile No. as aforesaid, **provided that** after the Owner's Representative has established its office at the Builder's Premises in accordance with Clause 5.1, drawings and plans may be delivered by the Builder to the Owner's Representative at that office.

19.4   Any changes in above addresses shall be immediately notified to each other. Otherwise, any notifications made to the old address shall be deemed as valid.

20.   **ARBITRATION**

20.1   Any dispute that may arise during the design and construction of the Motor Yacht as to the conformity of any construction or material with Classification Society requirements and which has not been resolved between the Parties may be submitted by either Party, in writing with a copy of that submission to the other Party, to the Classification Society whose decision as to whether or not such construction or material meets Classification Society requirements shall be final.

20.2   Any dispute or disagreement between the Parties hereto as to any technical matter not governed by or relating to the rules and regulations of the Classification Society, or which the Classification Society declines to decide, may be referred by either Party (at any time before, or up to fifteen (15) Business Days after, that dispute or disagreement has been referred to arbitration by the other Party), in writing with a copy of such referral to the other Party, to an expert to be agreed between the Parties, or if not so agreed within seven (7) days of either Party nominating an expert, appointed upon the request of either Party by the Classification Society. Such expert shall give his opinion as an expert and not as an arbitrator and his opinion shall be binding on the Parties.

20.3   If any dispute or difference shall arise between the Parties hereto concerning any matter or thing herein contained or the operation or construction thereof or any matter or thing in any way connected with this Agreement or the rights, duties or liabilities or either Party under or in connection with this Agreement, then in every such case, unless determined pursuant to Clause 20.1 or 20.2, the dispute or difference shall be settled by arbitration in London in accordance with the UK Arbitration Act 1996 or any statutory modification or re-enactment thereof for the time being in force, and be referred to three arbitrators, one arbitrator to be appointed by each Party hereto and third arbitrator to be appointed by agreement between the two arbitrators appointed by the Parties. If the two arbitrators are unable to agree upon the third arbitrator within twenty (20) days after appointment of the second arbitrator, either of the said two arbitrators may apply to the President for the time being of the London Maritime Arbitrators Association to appoint the third arbitrator and the three arbitrators shall constitute the Board of Arbitration (herein called "the Arbitration Board") for the settlement of the question or questions. The English language shall be used in all arbitration proceedings.

20.4   The award of the Arbitration Board shall be final and binding upon both Parties hereto.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY   EK000046   

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Execution Form

20.5    Either Party may demand arbitration of any such dispute by giving written notice to the other Party. Any demand for arbitration by either of the Parties hereto shall state the name of the arbitrator appointed by such Party and shall also state specifically the question or questions as to which such Party is demanding arbitration. Within thirty (30) days after receipt of notice of such demand for arbitration the other Party shall in turn appoint a second arbitrator and give notice in writing of such appointment to the Party demanding arbitration.

20.6    If a party fails to appoint an arbitrator as aforementioned within fourteen (14) days following receipt of notice of demand for arbitration by the other party, the party failing to appoint an arbitrator shall be deemed to have accepted and appointed, as its own arbitrator, the arbitrator appointed by the party demanding arbitration and the arbitration shall proceed before this sole arbitrator who whole alone in such event shall constitute the Arbitration Board.

20.7    The arbitrators appointed by the Parties shall be impartial, and unrelated directly or indirectly, by employment or otherwise, to the Party appointing them.

20.8    The Arbitration Board shall determine in its award which Party shall bear the expenses of the arbitration including the fees and charges of the Arbitration Board or the proportion of such expenses which each Party shall bear which determination shall be binding as between the Parties.

20.9    In the event of the arbitration of any dispute or disputes arising or occurring prior to redelivery of the Motor Yacht to the Owner, the award by the Arbitration Board in relation to the said dispute or disputes shall include a finding as to whether or not the Completion Date should be in any way altered.

20.10   If a dispute referred to arbitration concerns the dates upon which any instalment of the Contract Sum has become due under Clause 3.2 the Owner shall not by reason of any continuing arbitration on the issue delay payment of the relevant instalment beyond the date on which it contends such payment shall have become due.

20.11   Judgement on an award by the Arbitration Board may be entered in any court of competent jurisdiction for enforcement thereof.

21.     **LAW**

        This Agreement and any non contractual obligations arising out of or in connection with this Agreement shall be construed in accordance with and shall be governed by English Law.

22.     **CONFIDENTIALITY**

22.1    The Parties hereby agree that at all times both during the construction of the Motor Yacht and after the Delivery Date (i) the Builder shall hold in confidence and not disclose to any third party any information of any nature whatsoever relating to the Owner or the identity of the Owner's beneficial owners and their associates (the "Owner's Confidential Information"), and (ii) each of them shall hold in confidence and not disclose to any third party the commercial terms of this Agreement including without limitation the Contract Sum (the "Commercial Terms", which together with the Owner's Confidential Information and the Builder's Confidential Information shall be referred to herein collectively as the "Confidential Information") unless the disclosure of all or any part of the Confidential Information is required by any applicable law or by stock market or similar regulations (including, without limitation, by government agencies), or for the performance by either Party of this Agreement (including, without limitation, to the Parties' respective banks and professional advisers, the Suppliers and/or the Sub-Contractors, in each case on a "need-to-know" basis only) or is expressly authorised under this Agreement or by any agreement in writing signed by the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Execution Form

Builder and the Owner. The provisions of this Clause shall not apply to any information that from time to time comes within the public domain other than as a result of a breach of this Clause.

22.2   The Parties agree to exercise reasonable precautions to prevent the unauthorised disclosure of all or any part of the Confidential Information. Without prejudice to the generality of the foregoing, the Builder confirms that such reasonable precautions shall include:

22.2.1   prior to the launching of the Motor Yacht, the placing of a prominent sign at the entrance to the shed in which the Motor Yacht is under construction stating that it is forbidden to take photographs of the Motor Yacht without the express written consent of the managing directors of the Builder; and

22.2.2   adherence to the Builder's confidentiality policy in respect of its Suppliers and Sub-Contractors as constituted in:

(1)   the written confidentiality obligation set out in the Builder's standard purchasing contract with its Sub-Contractors;

(2)   the written confidentiality obligation set out in the Builder's standard general purchasing conditions and terms of contract with its Suppliers;

(3)   the written confidentiality obligations required by the Builder of any visitors attending at the Builder's Premises;

(4)   the written confidentiality obligations required by the Builder of any member of the Owner's Team attending at the Builder's Premises; and

(5)   the limited written permit for any still or moving photography of the Motor Yacht expressly authorised by the Builder;

each such written obligation or permit in substantially the form set out in Schedule XVII **provided that** in the case of (1) and (2) above the Builder shall use reasonable endeavours to agree its standard terms with each of its Sub-Contractors and Suppliers.

22.3   The Builder shall account to the Owner for, and to the extent of, the amount of liquidated damages which the Builder recovers from any of its Sub-Contractors for any breach of the confidentiality obligation given pursuant to Clause 22.2.2(1).

22.4   If prior to the Delivery Date either (i) the identity of the beneficial owners of the Motor Yacht or (ii) any still or moving photographs of the interior of the Motor Yacht are first published in the public domain as a direct result of breach of Clause 22.1 by any of the directors or heads of department or any member of the marketing department of the Builder, or any of the employees of the Builder appointed as project manager for the construction of the Motor Yacht, the Builder shall be liable to pay to the Owner by way of liquidated damages and not as a penalty the sum of fifty thousand Euros (€50,000).

22.5   The Owner undertakes to procure that any member of the Owner's Team attending at the Builder's Premises shall first enter into a written non-disclosure agreement with the Builder (in substantially the form disclosed to the Owner pursuant to Clause 22.2.2(4)).

22.6   The provisions of Clause 22.1 shall survive the performance or termination of this Agreement for any reason whatsoever.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY      EK000048   

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    EKMM0000048

Execution Form

## 23.   MISCELLANEOUS

23.1   The registration of the Motor Yacht shall be carried out by the Owner and the costs and expenses thereof shall be for the Owner's account. If the Owner decides not to register the Motor Yacht under Flag, all costs of, or consequential upon, or registration of the Motor Yacht by the Owner in the new jurisdiction or its choice shall be for the account of the Owner.

23.2   The Builder shall be entitled to fix its name on board the Motor Yacht and at her sides, location and size subject to the approval of the Owner, similarly as done on the Reference Yacht.

23.3   The Owner shall procure that the terms of his agreements with the Designer(s) shall not conflict or be inconsistent with the terms of this Agreement, and in any case the terms of this Agreement shall prevail.

23.4   The Builder's consent to any assignment or transfer of the Refund Guarantee and/or this Agreement by the Owner to the Owner's Financing Bank shall be subject to (i) prior agreement on (a) the nature and form of all security which may be requested by the Owner and/or its Financing Bank over the Motor Yacht, this Agreement and/or the Refund Guarantee (including, without limitation, any mortgage) and (b) a coordination agreement to be made between the Builder, the Owner's Financing Bank and the Owner in such form as the Builder shall require, acting reasonably, providing for equal ranking (including, without limitation, a mandatory consultation period before enforcement and payment of enforcement proceeds on a *pari passu* basis) of the first equal ranking mortgage in favour of the Owner's Financing Bank and the first equal ranking mortgage in favour of the Builder, in each case applying the principle of the priority of the Builder's lien over the Motor Yacht, the Equipment and the Components set out in Clause 8.6; and (ii) the deletion of any mortgage registered by the Owner and/or the Builder in accordance with Clause 8.6.

23.5   No waiver by either Party of any breach of any provision of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision of this Agreement.

23.6   In the case that any one or more of the provisions contained in this Agreement should be held to be invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions herein contained shall not in any way thereby be affected or limited.

23.7   A person who is not a party to this Agreement may not enforce, or otherwise have the benefit of, any provision of this Agreement under the UK Contracts (Rights of Third Parties) Act 1999, and, without limitation, no consent of any such person shall be required for the rescission or amendment of this Agreement.

23.8   References herein to Clauses, Sub-Clauses and Schedules are to Clauses, Sub-Clauses and Schedules of this Agreement except where otherwise specified.

23.9   Reference herein to "approval", "approve", "approved" or to "consent" shall, where the context permits, be to such approval or consent not to be unreasonably withheld or delayed by the Party from whom such approval or consent is required.

23.10   The headings to the Clauses shall not form part of this Agreement nor shall they be relied upon in the construction hereof.

23.11   Words in the singular shall include where appropriate the plural and vice versa.

FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY          EK000049



Execution Form

23.12   Subject always to the terms hereof, this Agreement together with all of its Schedules and, in particular, the Specifications forms the entire agreement between the Parties and supersedes all previous agreements and understandings between the Parties, and no warranty, condition, description, term or representation is given or to be implied by anything said or written in the negotiations between the Parties or their representatives prior to this Agreement.

23.13   This Agreement may be executed in any number of counterparts and by the Parties hereto on separate counterparts, each of which when executed shall constitute an original, but all the counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF each of the Parties hereto have duly executed this Agreement the day and year first above written.

SIGNED by **JULIA STEWART**          )   *Julia Stewart*
as duly authorised Attorney-in-Fact   )
for and on behalf of                  )
NEREO MANAGEMENT LIMITED              )
in the presence of:                   )

JAMES LAWSON
8 ST JAMES'S SQURE
LONDON SW1Y 4JU

SIGNED by MICHAEL BREHAN   ANDREAS   )
for and on behalf of              HILTNER   )
FR. LÜRSSEN WERFT GmbH & Co. KG       )
in the presence of:                   )
        JESSICA TAYLOR
        HOLMAN FENWICK
        WILLAN.



Execution Form



FOIA EXEMPTION REQUESTED - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY          EK000051

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                          EKMM0000051