# EXHIBIT 8

CALL OPTION AGREEMENT NO. 3/12-2015

BETWEEN

ELEARCO HOLDINGS LTD

AS OPTION BUYER

ALEMIL HOLDINGS LTD

AS SELLER

AND

JULIA STEWART

AS BENEFICIAL OWNER

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**THIS AGREEMENT** is dated 31 December 2015

**BETWEEN:**

(1) **ELEARCO HOLDINGS LTD**, a company incorporated under the laws of the Republic of Cyprus (registration No. HE 327184), whose registered office is at Anagnostara, 3, CHRISTOFOROU, Flat/Office 11, 3076, Limassol, Cyprus (the "**Option Buyer**");

(2) **ALEMIL HOLDINGS LTD**, a company incorporated under the laws of the Republic of Cyprus (registration No. HE 179747), whose registered office is at 205, Christodoulou Chatzipavlou, Louloupis Court, 2nd floor, Flat 201, P.C. 3036, Limassol, Cyprus (the "**Seller**"); and

(3) **Julia Stewart**, a British citizen, born on ▇▇▇▇▇▇ (passport details: ▇▇▇▇ issued by UKPA on 15 February 2006) and residing at ▇▇▇▇ Monaco (the "**Beneficial Owner**"),

each the "**Party**" and together the "**Parties**".

**BACKGROUND**

(A) The Seller is the sole legal owner and the Beneficial Owner is the sole beneficial owner of one hundred per cent (100%) fully paid-up share capital of the Company, being shares carrying in total voting rights representing one hundred per cent (100%) of the voting rights in the Company.

(B) The Company is a private company limited by shares incorporated in the Cayman Islands with an authorised share capital of US$ 50,000 fully paid and issued and divided into 50,000 ordinary shares with a par value of US$ 1 each.

(C) The Parties have agreed that the Seller grants to the Option Buyer a call option (the "**Option**") to require the Seller to sell (or procure the sale of) the Option Shares (as defined in Clause 1.1) to the Option Buyer on the terms and subject to the conditions set out in this Agreement.

**AGREED TERMS**

1. **INTERPRETATION**

1.1 The definitions and rules of interpretation in this Clause 1 apply in this Agreement.

**Affiliate**: any person that, directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, the individual or company specified and shall, in the case of an individual, include any spouse, son, daughter, father, mother or other relative of such individual.

**Agreement**: this agreement.

**Asset:** 135 metre Motor Yacht "Project THUNDER" with Builder's hull No. 13693 which is under construction on date of the Agreement and owned by the Company in accordance with the Shipbuilding Agreement.

**Business Day**: a day (other than a Saturday, Sunday or public holiday) when banks in Moscow (Russia), Limassol (the Republic of Cyprus) are open for general business.

2

1360474868488

888888888888888888888

**Option Buyer:** ELEARCO HOLDINGS LTD, a company incorporated under the laws of the Republic of Cyprus (registration No. HE 327184), whose registered office is at Anagnostara, 3, CHRISTOFOROU, Flat/Office 11, 3076, Limassol, Cyprus.

**Company**: DENSIARLY ENTERPRISES LIMITED, a company incorporated under the laws of the Cayman Islands (company registration number: 266369) whose registered office is at Cricket Square, Willow House, 4th Floor, P.O. Box 268, Grand Cayman KY1-1104, Cayman Islands.

**Control** (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**"): as used with respect to any company, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies or substantially all the management and policies of such company, whether through the ownership of voting shares, by contract or otherwise.

**Date of the Agreement**: the date of the signing of the Agreement which is stated at the beginning of the Agreement.

**Encumbrance**: any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement.

**Event of Default**: the events or circumstances described in Clause 8.3.

**Financial Indebtedness**: any indebtedness for or in respect of:

(a)     moneys borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with IFRS (the International Financial Reporting Standards as issued by the International Accounting Standards Board from time to time), be treated as a finance or capital lease;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0001805

(i)    the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

**Lapse**: the lapse of the Option, as applicable, in accordance with Clause 3.2.

**Mortgage Agreement:** any mortgage agreement between the Option Buyer and the Company concerning the Asset (the first preferred mortgage) and dated on or about the Date of the Agreement, and any other pledge or mortgage given or to be given by the Company in favour of the Option Buyer over its Asset.

**Option**: the option to purchase the Option Shares granted in favour of the Option Buyer by Clause 2.

**Option Completion**: the completion of the exercise of the Option as described in Clause 6.

**Option Consideration**: the purchase price for the Option Shares payable by the Option Buyer to the Seller on Option Completion, equals to US$ 100,000.

**Option Exercise Notice**: the written notice given by the Option Buyer in accordance with Clause 4.1 the form of which is set out in Schedule 1 to the present Agreement.

**Option Fee:** the fee in the amount of US$ 1 paid by the Option Buyer to the Seller for the right of the Option.

**Option Period**: the time during which the Option Buyer may exercise the Option, as set out in Clauses 3.1 and 3.2.

**Option Shares**: 50 000 ordinary shares of US$ 1 each in the share capital of the Company, equal to 100% (one hundred per cent.) of the issued share capital of the Company, legally owned by the Seller and beneficially owned by the Beneficial Owner.

**Representative**: any Affiliate, agent, subcontractor, or consultant of the Seller, including any officer or employee thereof.

**Seller:** ALEMIL HOLDINGS LTD, a company incorporated under the laws of the Republic of Cyprus (registration No. HE 179747), whose registered office is at 205, Christodoulou Chatzipavlou, Louloupis Court, 2nd floor, Flat 201, P.C. 3036, Limassol, Cyprus.

**Share Pledge Agreement:** share pledge agreement between the Option Buyer and the Seller dated on or about the Date of the Agreement and concerning the charge over shares granted by the Seller in favour of the Option Buyer over the entire issued share capital of the Company. The Beneficial Owner hereby agrees to execution of Share Pledge Agreement by the Seller.

**Shipbuilding Agreement:** Agreement for the Construction of 135 metre Motor Yacht hull number 13693 "Project THUNDER" dated 28 March, 2013 between FR. LÜRSSEN WERFT GmbH & Co. KG and the Company.

**Term of the Agreement**: from the date of the Agreement until the Seller performs all its liabilities under this Agreement or under any document relating to the Agreement or the Option in full or until the lapse of the Option.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                          EKMM0001806

**US Dollars** or **US$**: the lawful currency of the United States of America from time to time.

1.2    Clause, schedule and paragraph headings shall not affect the interpretation of this Agreement.

1.3    A **person** includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.4    The schedules form part of this Agreement and shall have effect as if set out in full in the body of this Agreement and any reference to this Agreement includes the schedules.

1.5    References to clauses and schedules are to the clauses and schedules of this Agreement; references to paragraphs are to paragraphs of the relevant clauses or schedule.

1.6    A reference to one gender shall include a reference to the other genders.

1.7    Words in the singular shall include the plural and vice versa.

1.8    A reference to a statute or statutory provision is a reference to it as it is in force for the time being, taking account of any amendment, extension or re-enactment and includes any subordinate legislation for the time being in force made under it.

1.9    **Writing** or **written** includes e-mail.

1.10   Where the words **include(s)**, **including** or **in particular** are used in this Agreement, they are deemed to have the words "without limitation" following them. The words **other** and **otherwise** are illustrative and shall not limit the sense of the words preceding them.

1.11   Any obligation in this Agreement on a person not to do something includes an obligation not to agree or allow that thing to be done.

## 2.    GRANT OF THE OPTION

2.1    In consideration of the payment of the Option Fee by the Option Buyer to the Seller (receipt of which is hereby acknowledged by the Seller), the Seller grants to the Option Buyer an option to purchase the Option Shares in accordance with terms and conditions set out in the present Agreement and the Beneficial Owner undertakes its obligations under this Agreement.

## 3.    OPTION PERIOD

3.1    The Option may only be exercised after the execution of the present Agreement.

3.2    The Option shall lapse if it has not been exercised before **28 March 2023**.

## 4.    EXERCISE

4.1    The Option shall be exercised only by the Option Buyer giving the Seller an Option Exercise Notice in accordance with Clause 15 which shall include:

(a)    the date on which the Option Exercise Notice is given;

5

    (b)    a statement to the effect that the Option Buyer is exercising the Option;

    (c)    a date, which is no more than 15 (fifteen) Business Days after the date of the Option Exercise Notice, on which the Option Completion is to take place; and

    (d)    a signature by or on behalf of the Option Buyer.

## 5.     OPTION FEE

5.1    The Option Fee shall be paid in cash by the Option Buyer to the Seller on the date of execution of the Agreement, unless otherwise provided by this Agreement or agreed by the Parties.

5.2    The payment of the Option Fee to the Seller in accordance with present clause 5 shall discharge the Option Buyer's obligations in respect of the payment of the Option Fee, and the Parties agree that (a) the Option Buyer shall have no obligation in respect of any application of the Option Fee to the Beneficial Owner, and (b) the Option Buyer shall have no liability to make any payment to the Beneficial Owner for the Option Shares.

## 6.     OPTION COMPLETION

6.1    The Option Completion shall be in the place mutually agreed by the parties on:

    (a)    the date specified in the Option Exercise Notice; or

    (b)    on such other later dates as the Parties may agree in writing.

6.2    The Seller shall deliver to the Option Buyer at least 4 (four) Business Days prior to the Option Completion any certificates, instruments, agreements, and other documents which are required or as the Option Buyer may request (in its absolute discretion) to release any Encumbrances which have been created with the Option Buyer's prior written consent.

6.3    Before or on the date of the Option Completion the Option Buyer shall pay or procure or cause the payment of the Option Consideration to the Seller or by cash. The Beneficial Owner consents to the sale of the Option Shares by the Seller to the Option Buyer in accordance with this Agreement, and further agrees that full legal and beneficial title to the Option Shares shall be transferred to the Option Buyer upon the Completion and, to the extent that the Seller is not able to transfer the Option Shares free from the beneficial interest of the Beneficial Owner, the Beneficial Owner covenants to transfer such interest to the Option Buyer upon the Completion free of any payment by the Option Buyer additional to the Option Buyer's obligations under clause 5.1.

6.4    The Seller shall deliver to the Option Buyer at the Option Completion:

    (a)    an instrument of transfer in respect of the Option Shares duly completed in favour of the Option Buyer (or such persons as the Option Buyer may direct) in the form specified in Schedule 2 to the present Agreement;

    (b)    share certificates in respect of the Option Shares;

    (c)    a waiver of any applicable pre-emption rights, duly signed by (or on behalf of) all members of the Company;

6

EKMM0001808

(d) a resolution of the board of directors of the Company approving the transfer of the Option Shares; and

(e) any other document or actions necessary to effect completion of the transfer.

6.5 The Seller shall procure or cause that on presentation of the stamped stock transfer forms relating to the applicable Option Shares to the Company together with the relevant share certificate, it shall be approved and the Option Buyer (or other transferee) shall be entered in the Company's shareholder register as the holder of the Option Shares.

6.6 Following the Option Completion, each of the Parties shall use its reasonable endeavours to ensure the registration of the Option Buyer (or as it directs) as the holder of the Option Shares in the Registrar of Companies, Cayman Islands.

6.7 If the Option Buyer has complied with its obligation to pay the Option Consideration in accordance with Clause 6.3 but the Seller fails to comply with its obligations under Clauses 6.4 and 6.5, any director of the Company may give a good discharge for the Option Consideration on behalf of the Seller and may execute and deliver to the Option Buyer a transfer of the Option Shares on behalf of the Seller. The Seller hereby:

(a) irrevocably and by way of security for its obligations under this Agreement appoints a director of the Company nominated in writing by the Option Buyer as its attorney following the exercise of the Option to execute, on the Seller's behalf, a transfer of the Option Shares, as applicable, in favour of the Option Buyer (or as the Option Buyer directs) and to execute such other documents and do all such other acts as may be necessary to transfer title to the Option Shares to the Option Buyer (or as it directs); and

(b) authorises the directors of the Company to approve the registration of such transfers or other documents.

7. WARRANTIES

7.1 The Seller represents and warrants to the Option Buyer that:

(a) it has full power and authority to grant the Option on the terms of this Agreement;

(b) it has the power to enter into and perform this Agreement, and has taken all necessary actions to authorise the execution and performance of this Agreement and the transactions contemplated by this Agreement, and all consents, licences, approvals and authorisations required in connection with the entry into, performance, validity and enforceability of this Agreement have been obtained and are in full force and effect and will be so maintained throughout the Term of the Agreement;

(c) it is, and will remain, during the Term of the Agreement, the sole legal owner of the Option Shares (save for the Beneficial Owner and the Option Buyer), free from any Encumbrances (save only the Option, interest of the Beneficial Owner, and any Encumbrances which have been created with the Option Buyer's prior written consent);

7

EKMM0001809

(d)     the Option Shares represent 100% (one hundred per cent) of the share capital of the Company issued or agreed to be issued and there is no option or right outstanding in favour of any third party to subscribe for any share or loan capital of the Company;

(e)     it has not received any notice of any claim by any person in respect of the ownership of the Option Shares or any interest in the Option Shares and the Seller and the Company are not aware of any grounds upon which any person could contest or claim ownership of the Option Shares, other than under this Agreement or any agreement between the Parties in connection with the Option and the Option Shares;

(f)     it has not increased or resolved to increase charter capital of the Company by way of making any additional contribution or otherwise and has not granted any options or any other rights to participation interests in charter capital or securities of the Company, other than under this Agreement or any agreement between the Parties in connection with the Option and the Option Shares;

(g)     the Company is, and will remain, during the Term of the Agreement, the legal and beneficial owner of the Asset, free from any Encumbrances (save only any Encumbrances which have been created with the Option Buyer's prior written consent);

(h)     the entry into and performance by it of this Agreement does not and will not during the Term of the Agreement violate in any respect (1) any law or regulation of any governmental or official authority or body or (2) constitutional documents of the Seller or (3) any agreement which is binding upon the Seller;

(i)     it is fully aware of and agrees to all the provisions of this Agreement and all other documents connected to the Option and the Agreement; and

(j)     all information furnished by the Seller in connection with the negotiation of this Agreement or delivered to the Option Buyer under this Agreement was true and accurate when given and there were no other facts or matters the omission of which would have made any statement or information contained therein misleading.

7.2     The Beneficial Owner represents and warrants to the Option Buyer that:

(a)     she holds beneficial title to the Option Shares; and

(b)     she will procure the transfer of the beneficial title to the Option Shares to the Option Buyer in case of exercise of the Option upon the Completion.

7.3     The representations and warranties of the Seller and Beneficial Owner set out in Clauses 7.1 and 7.2 shall survive the execution of this Agreement and shall be deemed to be repeated by the Seller and Beneficial Owner on each day during the Term of the Agreement.

## 8.     BUYER'S PROTECTION

8.1     Until the earlier of:

(a)     the Option Completion; or

8

EKMM0001810

(b)   Lapse of the Option;

the Seller shall:

(i)   not, without the prior written consent of the Option Buyer or pursuant to this Agreement, sell, transfer or otherwise dispose of, or mortgage, charge, pledge or otherwise create an Encumbrance over its legal or beneficial interest in any of the Option Shares (or any interest in any of them);

(ii)   not, without the prior written consent of the Option Buyer or pursuant to this Agreement, allow any alteration to be made to the Company' constitutional documents or any internal regulations that are inconsistent with them to be adopted;

(iii)   procure that the Company does not, without the prior written consent of the Option Buyer, make any material change to its business;

(iv)   procure that the Company does not, without the prior written consent of the Option Buyer, incur any Financial Indebtedness; and

(v)   procure that the Company does not, without the prior written consent of the Option Buyer, sell, transfer or otherwise dispose of, or mortgage, charge, pledge or otherwise create an Encumbrance over its legal or beneficial interest in any of the Asset (or any interest in any of them).

8.2   During ten (10) Business Days from the date of the execution of this Agreement the Seller shall:

(i)   enter into a Share Pledge Agreement in respect of the Option Shares in favour of the Option Buyer to secure its obligations under this Agreement; and

(ii)   procure that the Company enters into a Mortgage Agreement in respect of the Asset in favour of the Option Buyer to secure the Seller's obligations under this Agreement,

(iii)   and to ensure the registration of these pledges and mortgages in the appropriate registrars of the Cayman Islands (if necessary).

8.3   An Event of Default occurs if:

(i)   the Seller fails to comply with its obligations under Clauses 6.2, 6.4 and 6.5 or other obligations under the Agreement or under any document relating to the Agreement or the Option within ten (10) Business Days of its due date or, as the case may be, within ten (10) Business Days of demand;

(ii)   any representation, warranty or statement made by the Seller or an officer or a director of the Seller in the Agreement or in any document relating to the Agreement or any other notice, certificate, statement, opinion or document relating to the Option and the Option Shares is untrue, inaccurate or misleading in any material respect when it is made; and

(iii)   other breaches stated by law or any agreement between the Parties in connection with the Option and the Option Shares.

9

EKMM0001811

8.4     On, or at any time after, the occurrence of an Event of Default the Option Buyer may:

      (i)     serve on the Seller and Beneficial Owner a notice stating that the obligation of the Seller under this Agreement or under any document relating to the Agreement or the Option or the Option Shares are immediately due; and/or

      (ii)    take any other action which, as a result of the Event of Default, the Option Buyer is entitled to take under any applicable law or this Agreement or any agreement between the Parties in connection with the Option and the Option Shares.

## 9.     CONFIDENTIALITY AND ANNOUNCEMENTS

9.1     The Parties undertake to each other to keep confidential the existence of this Agreement and, in the case of the Option Buyer, all information which it has acquired about the Company, and to use the information only for the purposes contemplated by this Agreement.

9.2     Either Party may disclose any information that it is otherwise required to keep confidential under this Clause 9:

      (a)     to such of its professional advisers, consultants and employees or officers as are reasonably necessary to advise on this Agreement, or to facilitate the exercise of the Option, provided that the disclosing Party procures that the people to whom the information is disclosed keep it confidential as if they were that Party; or

      (b)     with the written consent of the other Party; or

      (c)     to the extent that the disclosure is required:

            (i)     by law; or

            (ii)    by a regulatory body, tax authority or securities exchange,

but shall use reasonable endeavours to consult the other Party and to take into account any reasonable requests it may have in relation to the disclosure before making it.

9.3     No announcement, circular or other publicity in connection with the subject matter of this Agreement (other than as permitted by this Agreement) shall be made prior to the Option Completion by or on behalf of the Seller or the Option Buyer without the approval of the other (such approval not to be unreasonably withheld or delayed).

9.4     Where an announcement is required by law or any governmental or regulatory authority (including, without limitation, any relevant securities exchange), or by any court or other authority of competent jurisdiction, the Party required to make the Announcement shall promptly notify the other Party. The Party concerned shall make all reasonable attempts to agree the contents of the announcement before making it.

10

EKMM0001812

**10.    FURTHER ASSURANCE**

10.1    At all times after the date of this Agreement the Party shall, at their own expense, execute all such documents and do all such acts and things as may reasonably be required for the purpose of giving full effect to this Agreement.

**11.    ASSIGNMENT**

11.1    All rights of the Seller under this Agreement are personal to the Seller and may not be assigned by the Seller without the prior written consent of the Option Buyer.

11.2    The Option Buyer may not assign any of its rights or transfer any of its obligations under this Agreement without the prior written consent of the Seller (such consent not to be unreasonably withheld or delayed); provided however that the Option Buyer may assign any of its rights or transfer any of its obligations under this Agreement to an Affiliate of the Option Buyer without the consent of the Seller.

11.3    Each Party that has rights under this Agreement is acting on its own behalf and not for the benefit of any other person.

11.4    If there is an assignment by the Option Buyer pursuant to Clause 11.2:

(a)    the Seller may discharge its obligations under this Agreement to the Option Buyer until it receives written notice of the assignment having taken effect;

(b)    the assignee may enforce this Agreement as if it were a Party to it, but the Option Buyer will remain liable for its obligations under this Agreement.

11.5    Notwithstanding Clause 9, both the Option Buyer and the Seller may disclose to a proposed assignee any information in its possession that relates to this Agreement or its subject matter, the negotiations relating to it and the other Party which is reasonably necessary to disclose for the purposes of the proposed assignment.

**12.    WHOLE AGREEMENT**

12.1    This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any previous arrangement, understanding or agreement between them relating to the subject matter they cover.

12.2    Nothing in this Clause 12 operates to limit or exclude any liability for fraud.

**13.    VARIATION AND WAIVER**

13.1    A variation of this Agreement shall be in writing and signed by or on behalf of each Party.

13.2    Any waiver of any right under this Agreement is only effective if it is in writing and signed by the waiving or consenting Party and it applies only in the circumstances for which it is given, and shall not prevent the Party who has given the waiver from subsequently relying on the provision it has waived.

13.3    Except as expressly stated, no failure to exercise or delay in exercising any right or remedy provided under this Agreement or by law constitutes a waiver of such right or remedy or shall prevent any future exercise in whole or in part thereof.

11

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                  EKMM0001813

13.4   No single or partial exercise of any right or remedy under this Agreement shall preclude or restrict the further exercise of any such right or remedy.

13.5   Unless specifically provided otherwise, rights arising under this Agreement are cumulative and do not exclude rights provided by law.

## 14.   COSTS

14.1   Save as otherwise provided in this Agreement, each Party shall bear its own legal, accountancy and other costs, charges and expenses connected with the negotiation, preparation and implementation of this Agreement and any other agreement incidental to or referred to in this Agreement.

## 15.   NOTICE

15.1   A notice given under this Agreement:

(a)   shall be in writing in the English language (or be accompanied by a properly prepared translation into English);

(b)   shall be sent for the attention of the person, and to the address or e-mail address, given in this Clause 15 (or such other address, e-mail address or person as the relevant Party may notify to the other Party); and

(c)   shall be:

    (i)   delivered personally; or

    (ii)   sent by e-mail; or

    (iii)   sent by pre-paid first-class post or recorded delivery; or

    (iv)   (if the notice is to be served by post outside the country from which it is sent) sent by airmail.

15.2   The addresses for service of notice are:

**For the Option Buyer**:

Anagnostara, 3, CHRISTOFOROU,
Flat/Office 11, 3076, Limassol, Cyprus

Attention to: ELEARCO HOLDINGS LTD
E-mail:

**For the Seller**:

Christodoulou Chatzipavlou, 205,
Louloupis Court, 2nd floor, Office 201,
P.C. 3036, Limassol, Cyprus

Attention to: ALEMIL HOLDINGS LTD
E-mail:

12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**For the Beneficial Owner:**

 Monaco

Attention to: Julia Stewart
E-mail:

15.3   A notice is deemed to have been received:

(a)   if delivered personally, at the time of delivery; or

(b)   in the case of e-mail, at the time of transmission, provided confirmation of transmission if received by the transmitting Party; or

(c)   in the case of internationally recognised courier, 5 (five) days from the date of posting; or

(d)   if deemed receipt under the previous paragraphs of this Clause 15.3 is not within business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a day that is not a Business Day), when business next starts in the place of receipt.

15.4   To prove service, it is sufficient to prove that the notice was transmitted by e-mail to the e-mail address of the Party or, in the case of post, that the envelope containing the notice was properly addressed and posted.

## 16.   SEVERANCE

16.1   If any provision of this Agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

16.2   If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the Parties.

## 17.   THIRD PARTY RIGHTS

A person who is not a party to this Agreement has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, but this does not affect any right or remedy of a third party that exists or is available apart from that Act.

## 18.   COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.

13

19.     **LANGUAGE**

If this Agreement is translated into any language other than English, the English language text shall prevail.

20.     **GOVERNING LAW AND JURISDICTION**

20.1    This Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including any non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales.

20.2    Unless otherwise agreed by the Parties the Parties agree that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including any non-contractual disputes or claims) that arises out of or in connection with this Agreement or its subject matter or formation.

21.     **COMPLIANCE WITH LAWS**

21.1    The Seller shall comply fully with all laws applying to the provision of services under this Agreement.

21.2    Until the Option Completion the Seller shall retain accurate detailed records of any expenses related to the operation of the Company and the Asset, which records shall be maintained for review by Buyer upon request.  The Option Buyer shall be allowed reasonable access to the books and records of the Seller, the Company and the Asset, and shall have the right to audit the Seller, the Company and the Asset on a periodic basis to ensure compliance with this Agreement.

This Agreement has been entered into on the date stated at the beginning of it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0001816

## Schedule 1

### Form of Option Exercise Notice

To:     **ALEMIL HOLDINGS LTD**

Christodoulou Chatzipavlou, 205, Louloupis Court, 2nd floor, Office 201, P.C. 3036, Limassol, Cyprus

**Julia Stewart**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Monaco

Date: _____

Dear Sirs,

### Option Shares in DENSIARLY ENTERPRISES LIMITED

We refer to the Call Option Agreement dated 31 December 2015 between you and us (the "**Agreement**"). This is the Option Exercise Notice pursuant to Clause 4.1 of the Agreement. Unless otherwise defined in this Option Exercise Notice, capitalised terms used in it shall have the meanings given to them in the Agreement.

We give you notice pursuant to Clause 4.1 of the Agreement of our exercise of the Option in relation to the Option Shares. In accordance with the Agreement, the number of Option Shares to be acquired by us and the Consideration to be paid to you by us is set out below.

### DENSIARLY ENTERPRISES LIMITED

| | |
|---|---|
| Number of Call Option Shares to be acquired | _____Shares |
| Consideration | _____ |

In accordance with Clause 6 of the Agreement, Option Completion in respect of the Option Shares set out in this Option Exercise Notice shall take place on the __ (___) Business Day following the date on which you shall be deemed to have received this Option Exercise Notice in accordance with Clause 15.

Yours faithfully,

...............................................
For and on behalf of
ELEARCO HOLDINGS LTD

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                           EKMM0001817

**Schedule 2**

**FORM OF SHARE TRANSFER**

**DENSIARLY ENTERPRISES LIMITED**
(the "**Company**")

---

**Share Transfer**

---

We, **ALEMIL HOLDINGS LTD** (the "**Transferor**"), for good and valuable consideration received by us, do hereby transfer to Elearco Holdings Ltd (the "**Transferee**") fifty thousand (50,000) shares in the capital of the Company, a Cayman Islands company, standing in our name to hold the same unto the Transferee, subject to the terms and conditions of the memorandum and articles of association of the Company, and, the Transferee does hereby agree to take such shares subject thereto as aforesaid and hereby requests that the Transferee's name be entered in the Company's register of members.

This transfer may be executed in any number of counterparts and by the parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

Signed by _____ )
for and on behalf of                          )
ALEMIL HOLDINGS LTD                    )
in the presence of                             )

_____
Transferor
Dated:_____ 20__

_____
Witness

Signed by _____ )
for and on behalf of                          )
Elearco Holdings Ltd                         )
in the presence of                             )

_____
Transferee
Dated:_____ 20__

_____
Witness

Signed by                                          )
Julia Stewart                                      )

Vu uniquement pour la légalisation de la
signature de Mme STEWART
Julia
Cette légalisation ne comporte aucune
vérification de l'exactitude des faits
et qualités mentionnés dans le présent
document.    1 0 MAI 20
MONACO, le

16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0001818

**Signed** for and on behalf of
ELEARCO HOLDINGS LTD

ATHINA RIALA , Director of
KPM INVEST LIMITED

*Witness:*

*Name:* Olga Zotov

**Signed** for and on behalf of
ALEMIL HOLDINGS LTD

GIANNOULA DALITI , Director of
KPM INVEST LIMITED

*Witness:*

*Name:* Eugenia Sarobne

**Signed** by
JULIA STEWART

*Witness:*

*Name:*

EUGENY Kotchman

Vu uniquement pour la légalisation de la signature de Mme STEWART Julia
Cette légalisation ne comporte aucune vérification de l'exactitude des faits et qualités mentionnés dans le présent document.
MONACO, le   1 0 MAI 2016

Maître Magali CROVETTO-AQUILINA, notaire.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EKMM0001819