**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-09304 |
| THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, | The Honorable Dale E. Ho |
| Defendant-*In-Rem*, | |
| and | |
| EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD., | |
| Claimants. | |

**<u>DECLARATION OF VIKTORIA PASTUKHOVA</u>**

I, VIKTORIA PASTUKHOVA, hereby declare and state the following under the penalty of perjury under the laws of the United States of America.

1. My name is Viktoria Pastukhova, I am over the age of 18, and I am a citizen of the Russian Federation.

2. In 2011, I began working for a company associated with Imperial Yachts as a Financial Manager. In or about 2017, my position changed to Client Coordinator, a role I had in connection with the M/Y Amadea, until in mid-2022.

3. My duties and responsibilities as Client Coordinator included liaising between

the clients and other Imperial Yachts staff and crew regarding a particular vessel. For example, if the client had a particular request regarding his vessel, I was responsible for ensuring that those requests were met by the crew. In addition, if information needed to be passed to the client from other Imperial Yachts staff or the crew, I would inform the client of that information. This included, for example, information about charters or requests for modifications by charterers.

4. In my role as Client Coordinator, I was assigned to the Amadea. I served in this role for the Amadea from 2017 through its seizure in Fiji. As such, I had direct contact with Mr. Eduard Khudainatov, the owner of the AMADEA, one of the vessels managed by Imperial Yachts between the years 2017 and through the Amadea's seizure in Fiji until approximately mid-2022. I communicated directly with Mr. Khudainatov, most often by telephone, to help him prepare his trips on the AMADEA, and he at times called me during his trips to provide updates and feedback. I also met with him in person at his office or home, typically with Evgeniy Kochman, my boss at Imperial Yachts.

5. In or about September 2021, I learned that Gulnara Kerimova would be chartering the AMADEA. Typically, charters like this one are handled solely by the Charter Manager. However, Mr. Khudainatov told me that he was interested in being informed of certain details, including for example significant comments from guests, and it was my role as Client Coordinator to pass this information to him, which I did.

6. In my role, I helped prepare for a "test" of the AMADEA by Gulnara and her mother in or about October 2021, in preparation of a long-term charter early in 2022, and the possibility of an even longer-term charter later in 2022. After that test, I received comments from Gulnara and her mother, Firuza, regarding noise and vibration, as well as her requests to

change the mattresses, to move the electrical sockets in the bathroom, for certain sports equipment, and for new water equipment, in particular that she wanted to have the best equipment on the market with the highest speed. I passed some of these comments along to Mr. Khudainatov. Gulnara also requested to have a pizza oven installed on the AMADEA. Often, these types of requests required research and time to review what they would involve and what the cost would be before a decision would be made about whether to implement them. The logistics of installing a pizza oven were explored. However, due to the technical difficulties in installing one in the current galley configuration, it was not installed, and instead a pizza stone was purchased.

7. I also recall receiving requests for other changes to the interior of the AMADEA from Gulnara and Firuza to modify the look of the interior by, for example, removing carpets on the stairs between decks and changing curtains. I conveyed these requests to Mr. Kochman and at times directly to Mr. Khudainatov. I recall subsequent discussion of consulting with the interior designers to get their advice on these overall requests, but I do not believe anything ever happened.

8. During this time period, I prepared presentations regarding certain proposed changes to the Amadea that I understood Mr. Kochman used to present to Mr. Khudainatov.

9. Given the high price that came with chartering a vessel in Imperial's fleet, particularly for a long-term charter that Ms. Kerimova was contemplating, her requests for renovations, certain equipment, and other modifications to be made at her expense were not unusual, so long as the owner approved the changes.

10. Gulnara chartered the vessel for four weeks starting in mid-January 2022. To my knowledge, very few of the changes proposed were actually implemented for that charter,

except for new mattresses, a new spa bed, some new water sports equipment, and other minor work.

11. Gulnara informed me of the names of her guests for both her test charter in October 2021 and her charter in early 2022. They included Gulnara and her children, her adult siblings, nannies, and security, and for the October visit her mother as well.

12. As was typical for yachts in the Imperial Yachts fleet, Gulnara and her family were referred to amongst the crew and Imperial Yachts staff with "G" code names, "G" meaning "guest," such as G1, G2, and G3. This was common in the industry, as guests often prefer confidentiality, and it is a shorthand way for the management staff and crew to communicate quickly with one another about the guests without having to remember, or using, names. The use of "G" codes has nothing to do with a guest's relationship to the vessel, as "G" codes are used regardless of whether the owner is using the vessel or a charter guest is chartering the vessel. On a private vessel, like the Amadea, "G1" is typically used for the owner or principal user of the vessel. There were times, therefore, that I used G1 to refer to Mr. Khudainatov.

13. For a charter, G1 is typically used for the main charter guest for that particular trip. When a traditional family charters a vessel, typically the main charterer is the father. So, a father is typically G1. Here, Gulnara's mother, as the eldest guest, was considered the main charterer, so I referred to her as G1. To me, Gulnara was G2. However, since neither Gulnara's father nor her husband were part of these charters, there was sometimes confusion as to which "G" codes to associate with Firuza and Gulnara. In emails around this time with other Imperial Yachts staff and the crew that I either sent or received, there were times that Firuza was referred to as G1, and other times as G2. There were times that Gulnara was referred to as G2,

4

and other times as G3. The crew and the management staff, including myself, used G-codes inconsistently to refer to each of these two women.

14. I have reviewed several emails where the inconsistent usage of the G-codes is demonstrated. For example:

a. In an email dated October 21, 2021 bearing the number US000341 at the top, Maja Jung referred to an amended uniform lookbook for "G2." However, in my response on page US000340, I wrote that I had added the uniform proposal to the Agenda with G1 for tomorrow. While I am not sure who Maja was referring to in her email, I was referring to Firuza when I wrote G1 in my response.

b. In a series of emails from Document 100-28, the inconsistent usage of G-codes is demonstrated as follows:

   i. In an email dated February 8, 2022 that I sent to the Captain of the Amadea, p. 7, with the subject line "AMA: Planning for 2022," I wrote that "Please be advised that G1 has requested to consider the amended planning for 2022 . . . ." In this email I was referring to Mr. Khudainatov, as he had asked to be kept aware of the location plans for the Amadea.

   ii. In an email dated February 15, 2022 that I wrote to the Captain of the Amadea, pp. 5-6, with the subject line "AMA: Planning for 2022 – update dd 14.02.2022," my references to G1 in this email refer to Firuza. I know this because I discussed these detailed itinerary options with her around that time.

   iii. In the email dated February 15, 2022, p. 4, in which the Captain responds to my prior email referred to above, he stated that he had "just come out of a meeting with G3." I understood his use of G3 to mean Gulnara. This is because Gulnara was on board for her

5

charter at that time, was the principal guest on board, and would have been the person to have discussions with the Captain about the upcoming itinerary proposals.

    iv.  I responded to the above email, p. 3, by adopting the Captain's usage of G3 to refer to Gulnara. To me, Gulnara should have been G2, but there were times I just adopted the usage used by the sender so as to not confuse matters further. Later in the email, I used G1 to refer to Mr. Khudainatov because, as the owner, he would be the one to be made aware of surveys and servicing, not a charterer. I would normally provide this type of information to Mr. Khudainatov regarding the Amadea.

  15.  I never spoke to Suleiman Kerimov at any time, so any references to G1 in emails I wrote would have been to either Mr. Khudainatov or Firuza.

  16.  In my role as Client Coordinator for the AMADEA, I typically communicated most often with the Captain, but also with the Purser and the Chief Stewardess at times, depending upon the issue. In my communications with the crew about Gulnara's visits and charters of the AMADEA, I never told anyone from the crew that she and her guests, or anyone for that matter, were "new owners" of the AMADEA. In my presence, no one from Imperial Yachts ever told any crew members of the Amadea that the vessel had been sold. I believe that certain crew members had a misunderstanding about the charters undertaken by Gulnara and her family because the vessel was a private vessel, and not a commercial charter vessel. In addition, the Amadea had also not been used regularly for quite some time until Mr. Khudainatov's trip in June 2021, and then there was a flurry of activity surrounding the long-term charters for Gulnara and her family. I believe these factors led to certain members of the Amadea crew assuming that the vessel had been sold.

  17.  Similarly, in emails I received around that time, I saw crew members refer to an

individual named Dinar as "O. Rep," such as the document bearing US000361-66. I believe that crew members used the term "O. Rep." as a shorthand way of referring to this individual, who from my perspective, served as a liaison between Firuza and Gulnara and the crew to convey their preferences for the charter. Dinar did not represent Mr. Khudainatov, who I knew to be the Amadea's owner.

18. Once the American authorities attempted to seize the vessel in Fiji, I began giving Mr. Khudainatov updates at first weekly, and later periodically. I also gave updates to Mr. Kochman who I understood passed the information along to Mr. Khudainatov. The last time I spoke to Mr. Khudainatov about the AMADEA was during the time that the vessel was in Fiji.

19. During my time working for the company associated with Imperial Yachts, the only owner of the AMADEA with whom I communicated was Mr. Khudainatov, and I never learned of any sale of the AMADEA to anyone else.

20. I have no financial or other motive to make the statements contained herein, other than to tell the truth.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 13, 2024

_____
Viktoria Pastukhova