UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,

Defendant-*In-Rem*,

and

EDUARD YURIEVICH KHUDAINATOV,
MILLEMARIN INVESTMENTS LTD.,

Claimants.

Case No. 1:23-cv-09304

The Honorable Dale E. Ho

## DECLARATION OF DINAR KHALIKOV

I, DINAR KHALIKOV, hereby declare and state the following under penalty of perjury
under the laws of the United States of America:

1.     My name is Dinar Khalikov, I am above the age of 18, and a citizen of the
Russian Federation.

2.     I studied for six years in a medical university in Russia. In 2001, I was introduced
to an individual who discussed a business plan related to "smart homes," specifically the idea of
providing excellent service in the area of high-end technical support for homes. I became
interested in this concept and taught myself programming. I started a business servicing clients

and developing smart homes in 2001. I now have more than 20 years of experience in the technology field with a focus on Audio-Visual and Information Technology ("AVIT"). I founded a company that both sets up and services smart homes, as well as provides an educational component, teaching in the field of AVIT for homes and boats. I have extensive experience in building AVIT programs for smart homes and boats, programming and designing them, and educating others in this field.

3.      I have significant experience in reverse engineering technical projects, which has taken me beyond smart homes and into superyachts. On occasion, I have been called upon to provide this expertise where a particular system does not work properly and there is no documentation that explains the system. In such circumstances, it is my job to examine the system, reverse engineer it, and replace it with a different system that works properly. In particular, I have significant experience in reverse engineering control systems, such as those that control TVs, HVAC, lights, and any other AVIT systems.

4.      My introduction to the Kerimov family occurred sometime after 2011, and it started when I was hired by another subcontractor to look at the AVIT systems of a vessel called M/Y ICE. I met Alan Weaver, who was the Captain of ICE, at this time. I obtained a long-term contract by this subcontractor with the assignment to improve and upgrade all the AVIT and electrical systems on ICE.

5.      In or about 2012, I was called by that same subcontractor who had hired me to work on ICE. I understood that both the subcontractor and the family office of the ICE's owner were impressed with the work that I had done on the vessel.  Thus, when a speaker caught on fire in the family house, I was asked to address the problem.

6.     After that, my company was hired to provide AVIT services on the owner's family house in Moscow. At this time, I learned the owner of ICE was Sulieman Kerimov. I was asked to and completed AVIT upgrades to the entire home. For this job, I billed by the hours actually spent on property, plus any out-of-pocket costs for equipment, and I charged an additional fee for emergency work. My bills were submitted to the owner's family office through the subcontractor and my invoices were paid by the subcontractor.

7.     Mr. Kerimov's family office subsequently hired my company directly to perform AVIT work at his home and my company still provides those services to him and his family to the present day. My main contact has always been a secretary in the family office, as well as the Property Director at the Family's House.

8.     From my experience working on ICE starting in 2012 until 2015, I learned how the crew works on a large vessel, and I started getting involved with, and understanding, yacht operations. It was an exciting experience, as ICE was a masterpiece from every perspective. Around this time period, I personally met with Mr. Kerimov on a few occasions and offered my technology advice.

9.     At no time have I been directly employed by Mr. Kerimov or any of his entities. I have always been an independent contractor, owning my own business, and servicing multiple other clients. I am not the personal assistant or representative in any formal sense of Mr. Kerimov or anyone in his family. While his family is among my company's largest clients, I have worked for approximately 50 other clients over the years. At no time has Mr. Kerimov or his family been an exclusive client.

10.     After Mr. Kerimov sold ICE in 2015, I started looking at other boats for Mr. Kerimov, which I believe was around late 2015 or 2016. I recall a meeting around this time that I

attended with a personal assistant to Mr. Kerimov, who told me that Mr. Kerimov wanted to buy a new boat, and that since I had been working on ICE for a long time, Mr. Kerimov wanted to know if I would be interested in taking a look at several boats with Alan Weaver to provide feedback. By this time, given my experience working on ICE, other customers had hired me to look at and advise on boats as a consultant. This seemed to be a great opportunity for me personally and professionally, as I would be paid to travel and inspect large boats and potentially re-do a new large yacht's AVIT system.

11.     By this time, I had developed knowledge of Mr. Kerimov's preferences regarding vessels, specifically his strong distaste for noise and vibration, and his requirements for quick service times when something was requested. Since I had spent a lot of time on board working on the ICE's AVIT system, I eventually learned the routines and habits of the crew and the family, including each family member's preferences while on board the vessel. I was suited for this type of assistance as by this time I knew how large yachts worked, and I knew the highest benchmarks from a technical perspective. I served as interpreter for Mr. Kerimov as well, given my fluency in English.

12.     During this time that I was looking at other boats for Mr. Kerimov, I was operating as a consultant. I do not recall whether I even billed or was paid for all of my time, but I did it because Mr. Kerimov was a good client and I wanted to maintain a long-term relationship with him for my technology business.

13.     Mr. Kerimov asked Alan Weaver and me to attend the Monaco Yacht Show in 2019 and to let him know if we saw any yachts that we would recommend to him to view. By this time, Alan was no longer the Captain of the ICE, which had been sold. He had no formal relationship to Mr. Kerimov at that time, to my knowledge. I understood him to be attending this

show as a personal favor. Alan and I visited several large yachts at the yacht show that year. One

of the vessels we toured was the M/Y Amadea. I have a vague recollection that this visit to the

Amadea was facilitated by Henry Craven-Smith from Burgess Yachts. I knew that Mr. Craven-

Smith had been Mr. Kerimov's yacht broker for years. I also understood that members of the

Kerimov family had previously chartered yachts through Burgess for years. My immediate

concern with the Amadea was that it was extremely noisy, both from sounds and vibrations.

Because I had gotten to know Mr. Kerimov's preferences, I knew that the noise and vibration of

the Amadea would be a deal killer. In addition, the AVIT system was starting to be outdated.

Moreover, I believed that the interior was neither pleasant to the eye, nor relaxing, and not Mr.

Kerimov's style. In short, I was not impressed, and I did not recommend the Amadea, or any

other vessel at the Monaco Yacht Show that year, to Mr. Kerimov. I also conveyed to Henry

Craven-Smith that Mr. Kerimov was not interested in the Amadea.

14.     I have read the First Amended Verified Complaint for Forfeiture filed by the

United States of America in the above-captioned case ("the Complaint").

15.     I am the individual identified in paragraph 29 of the Complaint and referred to

therein as Dinar Khalikov and in subsequent paragraphs as Dinar. I have also reviewed the

government's memorandum of law in support of the government's motion to strike and note that

I am the "Dinar Khalikov" named therein. The assertions made by the government that involve

me, which purport to suggest that my communications with crew members regarding the

Amadea were in connection with a sale of the Amadea to Suleiman Kermiov are false. Because

Mr. Kerimov was my client for many years, and asked me to assist in looking for yachts for him

to purchase, I know that Mr. Kerimov never had any interest in purchasing the Amadea. All of

my communications with the Amadea crew members were in connection with an upcoming

month-long charter, and the possibility of a longer-term charter by his adult daughter, Gulnara,

her mother Firuza, and other family members including Gulnara's children. Gulnara and Firuza

Kerimova agreed to charter the Amadea only because their preferred charter vessel, the Flying

Fox, was not available for long-term charters. I firmly believe that no one from the Kerimov

family would have ever purchased the Amadea because of its many technical faults that could

not be cured with any economically rational spend.

16.     Below I set forth an accurate statement of facts, which I am asserting to refute the

government's false allegations about me and to correct the false allegations that my

communications and interactions with crew members of the Amadea in any way evidence a sale

of the Amadea to anyone in the Kerimov family.

17.     As set forth in paragraph 29 of the Complaint, I traveled to the United Arab

Emirates in or about June 2020 with Mr. Kerimov to view the Amadea. I understood that Mr.

Kerimov had been invited to spend the night on board, such as to use it as a hotel for the night.

This would also provide an opportunity to do a short sea trial, which really gives one a better

impression of the boat. To give a little more background, Mr. Kerimov loves boats and cars. In

getting to know him, I learned that if he is given an opportunity to test or rent a new car, he will

do that, not only to see if it is suitable for him to purchase, but also to simply survey the market.

The idea for this overnight visit to the Amadea was to take another look at it, notwithstanding my

prior report back that I did not believe Mr. Kerimov would be interested in the Amadea for

purchase, and also to enjoy the opportunity to take a "test drive."

18.     During the visit to the Amadea in Abu Dhabi in June 2020, Mr. Kerimov

expressed to me his disinterest in the Amadea, given a number of issues he had with the vessel

including the sound and vibration. During this conversation, we discussed how noisy the HVAC

was, something that bothered Mr. Kerimov a lot. We both complained that our respective cabins were noisy, and he relayed to me that he had had difficulty sleeping as a result of the noise. Fixing the HVAC system would be complicated because the ducting would need to be significantly wider throughout the vessel in order to decrease or eliminate the noise, which would involve significant work to replace the ducts throughout the vessel. The WiFi, which was less than perfect, was also a concern for Mr. Kerimov. In addition, I told him that the AVIT system on board was old and outdated, such that it would be impossible to find spare parts. I told Mr. Kerimov that if the Amadea was too noisy for him, he should not even consider buying it, and he agreed. It was clear to me in Abu Dhabi that Mr. Kerimov had no interest in purchasing the Amadea for all of these reasons.

19.    During the visit, I spent several hours reviewing the system, and then five to six hours going through the entire list of issues with the system with the ETO (the electronics engineer) on board. I had a dual purpose for spending so much time on the AVIT system: I had been asked by Mr. Kerimov to do so, but I also decided to do a thorough review of the system for my own business purposes. I was hoping that if I mastered the system, either the Amadea's owner or Imperial Yachts would want to hire me to overhaul the Amadea's AVIT system. During this trip, Evgeniy Kochman from Imperial Yachts also spent the night. I mentioned to Mr. Kochman that the Amadea's AVIT system was obsolete.

20.    About a year later, in early September 2021, I had a conversation in Moscow at the home of Firuza Kerimova, where Ms. Kerimova told me that she and her daughter Gulnara were going to charter the Amadea and that Gulnara was going to do a charter in the Caribbean. Firuza told me that it was possible that she and Gulnara were going to charter the boat for an extended time, they needed to make sure the boat would not be too noisy, as neither woman liked

excess noise on a vessel. I was aware of this fact because they had previously chartered the

Flying Fox the prior year, which both Gulnara and Firuza really loved. Firuza told me that they

had wanted to continue to charter the Flying Fox, but it was not available, and that the Amadea

was offered to them instead, as it was available for extended charters. Firuza asked me to visit

the Amadea and take a very thorough look to see if there was anything I could do to improve

their experience during the charter.

21.    Shortly after this conversation, I received a phone call from Suleiman Kerimov

who told me that Firuza was going to charter "the boat." I understood he was referring to the

Amadea given my prior conversation with Firuza. During this phone call Mr. Kerimov asked me

to make sure everything goes fine with the charter. During this conversation, he said, in

substance, "I know the boat isn't perfect, not a perfect replacement for Flying Fox."

22.    I recall visiting the Amadea in early to mid-September 2021 in connection with

the upcoming charter. I spent one night on board the vessel. The purpose of this visit was to

review and propose technical improvements that could be made to the Amadea in connection

with the upcoming charter, which I was told would last about a month, scheduled for January.

At no point during this walkaround did I suggest that Mr. Kerimov—or anyone from the

Kerimov family—had purchased or intended to purchase the Amadea.

23.    As mentioned, Firuza had explicitly told me that she and Gulnara were chartering

it, and I knew no one in the family would purchase the Amadea given its flaws. I also believed

that they were chartering the vessel, given the types of requests they made to me. Firuza and

Gulnara had asked me to ensure that the WiFi was sufficiently strong for Zoom for the yoga

instructor. They also wanted Russian television on board for the children. They also wanted me

to collect the different ideas for improving the experience on board in terms of aesthetics and

technical aspects as well as to minimize dust and other allergy-inducing materials given that Gulnara has allergies. These requests were consistent with chartering. Had they purchased the vessel, the requests would have been for a complete overhaul of the interior, as I knew it was not their style. I also know that Firuza and Gulnara had previously promised to yacht brokers to do long-term charters in order get a discount on the price, which seemed to be the case with the Amadea. Indeed, during the conversation with Firuza, she suggested that the more things I could find "wrong" with the Amadea the better, as that would enable them to argue for a greater discount on the price of the charter.

24.       In my experience, as far as I understood how charters work, when a guest wishes to make certain upgrades for their charter, they may do so if they pay for it. There are certain changes a charterer can make without owner approval. More significant changes require owner approval. Sometimes, a charterer can negotiate for the owner to pay for a change if it will enhance the overall value of the vessel. But my initial task was to suggest various changes to them, get a quote, and present to the quote to Firuza so that she and Gulnara could understand what it will cost. And if they want to pay for it the next step was to make sure we had owner approval. During all my discussions with Firuza and Gulnara, they were speaking in terms of their understanding that any requested improvements needed to be approved by the owner. At no time did anyone suggest that they owned the vessel and could decide to make whatever improvements they wanted.

25.       During this September visit, I did a walkaround to look for ways to improve the vessel. I made comments to the Amadea crew that accompanied me that I thought were helpful in this regard, for example cleaning the ice machine that smelled. In addition, I knew from both of my prior visits to the Amadea that the interior aesthetics is not pleasing. It was to a particular

9

taste, and not a style that many charter guests would appreciate. I suggested to remove the gold wall fittings, which I did not see as much of a lift. It was important to get rid of as much gold and bright red as possible to make the charter more relaxing. I did not believe that we even needed a subcontractor to do it. I asked the Captain if these changes could be done on board, as an inexpensive way to improve the guest experience during the charter.

26.    I spoke with Captain ▇ about the requested upgrades so that he could get the quotes. I understood that the process was for Imperial Yachts to collect the quotes and then direct them to either me or directly to Firuza. I recall presenting some proposals to Firuza. I did not discuss or present any proposals to Mr. Kerimov. As far as I understood it, he had nothing to do with the charter and he specifically told me he was not planning on going to the Caribbean.

27.    I vaguely recall being involved in discussions of a new gym. The existing gym was very small. Captain ▇ and I had a discussion with Firuza regarding a larger space for a gym. I recall a conversation about moving the gym, but I thought this idea came from the owner. It was not my idea or Firuza's, but it made sense. We requested the quote for the changes to see if it made economic sense.

28.    Among the things I requested authorization for was subscription for Russian TV, as Gulnara wanted her children to have access to Russian TV shows. I asked for a three-month subscription, as I thought that would cover the term of the Caribbean charter and any prior use.

29.    During this trip I spent time considering an AVIT refit for the Amadea, as the system on board was outdated. I suggested a refit to Mr. Kochman, who suggested that I prepare a quotation. I recall a conversation with Mr. Kochman where he expressed an interest in hearing my opinions on how to make the vessel more competitive on the charter market. We had these discussions in the context of changing the registration from private to commercial. My sense

was that Mr. Kochman was thinking ahead about how to make money chartering the Amadea. There was absolutely no suggestion that Mr. Kerimov owned the boat at this time. And indeed, I know that Mr. Kerimov would have had zero interest in chartering the Amadea if he had just purchased it. The conversation would have been focused on how to make it perfect for him and his family. Instead, the conversations I was having with Mr. Kochman was how to make the vessel appealable to the largest group of potential charterers.

30.    I did not know who was going to pay for a new system, as I was never involved in such a discussion. But I assumed it was Imperial Yachts since they were the manager of the yacht and because if they wanted to continue to charter or sell the boat, they would need to redo the AVIT. I did not send Imperial Yachts any invoice for my time preparing the quotation. I knew Mr. Kochman, and I hoped that when any decision was made, Imperial Yachts would hire my company to do the work. I also knew that any AVIT refit would not be able to be completed by the Caribbean trip, because it sometimes takes more than a year to receive the required equipment.

31.    During this September 2021 visit, I recall Mr. Kochman, but not Mr. Kerimov, being present. I do not have a strong recollection of a lunch, but it is possible that we had one. Nothing about the lunch would have been particularly celebratory. There was certainly no suggestion by anyone that there were new owners of the Amadea. I do not recall any wine being served nor would that have made any sense, as I do not drink alcohol when working. I do not recall Mr. Kochman having any wine that day, or any other day I saw him. Whenever I was around Mr. Kochman, he was working and always appeared focused on whatever was at hand.

11

32.    While I do not remember the timing, I recall learning that the Amadea was registered as a private vessel, not commercial. In practical terms, this meant that the Amadea was not supposed to be chartered.

33.    I next visited the Amadea on or around October 13-17, 2021, when the vessel was docked around Portofino, Italy. I recall spending one or two nights on board, and the other nights onshore at a villa. I spent these nights on board so that I could understand the full guest experience.

34.    The background to this visit was that Firuza had called me and said that "we've been on board, the boat is noisy, and there is no Russian tv or radio." Since one of my original assignments from September was to ensure there was Russian TV, I was surprised about this issue. As it turns out, the issue was that my prior idea (which I explained at the time was an inexpensive "quick fix") of streaming Russian TV through Ipads was insufficient. I understood her to mean that the "we" was Firuza and Gulnara. She asked me if I could call Alan Weaver and ask if he could also come to visit the boat to provide comments in advance of their upcoming charter. By this time, I understood that Mr. Weaver was employed by Imperial Yachts working on another project (not the Amadea), and that his consultation with respect to the Amdea was done at the direction of Imperial Yachts, as well as at the request of Firuza.

35.    Once I arrived, I did a preliminary walk through with Firuza, and then I did a walk through with Captain ██ to pass along Firuza's comments. My English is better than Firuza's and so she asked me to pass along her comments. During these few days, I did multiple walkarounds with certain crew members including the Purser and the Captain. These walk arounds had three related but separate goals. One, I was trying to make the charter experience as pleasant as possible. Two, I was intentionally finding things wrong with the Amadea to assist

the Kerimov's in negotiating a better price for the cost of the long-term charter. Three, I was trying to impress and curry favor and work with Mr. Kochman, hoping to impress him with my knowledge, in the hopes he would hire my company to do the AVIT work on the Amadea, as well as other vessels I knew they managed.

36.    I believe it was during this walkaround that I raised the issue of getting new portable reading lamps. The whole family enjoys reading. Firuza and Gulnara have reading lamps in their family home in Moscow which I worked in, and so I know that they like nice reading lamps.

37.    At another point during the walk through I asked that they pull down the silk rosette on the ceiling in the master cabin because Firuza told me she did not like it. I specifically recall saying in connection with the silk rosette, words to the effect of, "can you please pull it down, even if the owner would resist, please pull it down, put sound proofer in, and then put it back up when we the charter is over." I said this to the engineer who in my presence pulled the silk rosette down. Captain ███ was also present for this conversation. During this conversation, it was clear to me that my reference to "the owner" was not anyone I was in contact with, it was certainly no one from the Kerimov family.

38.    I recall discussions about removing the bar. The Kerimov family are devout Muslims and do not drink alcohol, so I knew they would not want to look at a bar filled with alcohol. In addition, the bar was placed in the main salon, a space that guests would use, and so it was not a space where the crew should be preparing drinks for the guests. This was another instance of a change that was both particular to Gulnara and Kerimov, but also for the purpose of making the vessel more appealing to a wider range of potential charter guests. Removing the bar was an obvious change that I did not believe to be structural. I asked for a quote and also recall

13

asking that the owner be asked for permission to make such a change. We believed this was possible since we understood the owner did not use the Amadea very often and the vessel was usually sitting in a port in a marina.

39.    I also recall discussions about removing the jacuzzi. I thought the jacuzzi on the stern was useless, so either Alan Weaver or I or someone else suggested it could be removed. This was never discussed with anyone from the Kerimov family to my recollection. This suggestion was probably more in the bucket of improvements suggested for greater guest experience beyond the Kerimova family.

40.    I recall explicitly requesting that Imperial Yachts get permission from the owner for these changes. At no point was anyone acting as if anyone from the Kerimov family owned the vessel or had purchased it, or was even considering buying it.

41.    I recall a discussion about replacing wall panels that contained false book spines, which I thought looked horrible. The options discussed were replacing the wall panels and the other was to just cover them with fabric. I think the resolution was to just cover them with fabric. This was not a structural change.

42.    I recall speaking to Alan Weaver about removing the mini refrigerators that were in the guest cabins and replacing them with wood shelves. Cabin refrigerators make a lot of noise and were unnecessary as the interior crew is tasked with servicing the guests, including by serving drinks upon request. Removing the refrigerators and using the space for much-needed storage made sense, and either I or Alan Weaver made this common-sense suggestion. This was not a structural change, and would be inexpensive.

43.    I suggested to install hardwood floors in the main cabin. Changing the flooring in the main cabin is not a structural change or one that I considered likely to be either too expensive

or time consuming. I was told that it would have to be done in port, and so I just asked for a quote to decide if it was worth it.

44.    There was a discussion about making changes in the Winter Patio. In my presence, no one discussed any structural changes to this (or any other) room. Rather, the room had a fixed table in it that was mounted to the floor. The discussion I recall was that it was easy enough to unbolt and remove the table, but then there would be holes in the floor and that might be expensive to repair and thus removing the table may not be worth it. Again, this was discussed as a proposal that we would consider.

45.    Firuza and Gulnara raised the issue of whether it would be possible to replace the toilets and bidets because the existing ones were difficult to use. We asked for a quote this so we could decide whether it was worth it.

46.    At one point, I did put in a request to update the sound system. I happen to know that Said Kerimov (Gulnara's brother) enjoys listening to music. Nobody asked me to make this request, but I did so believing that it fell within my range of authority of requests to make to ensure a pleasurable experience.

47.    I requested other items that I knew Gulnara and Firuza would want, such as a certain type of toothbrush that the family used, and certain types of pillows and linens, particularly hypoallergenic ones. All of this seemed to me at the time to be perfectly in line with the notion that Gulnara was doing a charter. Nothing indicated they were new owners

48.    I probably had conversation about the Nike trainers and On Clouds, but it was not a conversation of any significance. By way of background, Mr. Kerimov exercises a lot. To the extent someone said to keep a pair of Nike trainers or On Clouds on board, it was because Firuza and Gulnara planned to charter the vessel and perhaps he would stop by in the future. Any

request I made to ensure sneakers were on board for Mr. Kerimov's use was certainly not in the context of Mr. Kerimov having just purchased the vessel. I knew that the family was considering a longer term charter and it was possible that Mr. Kerimov might visit the family for a day at some point. If he did so, he would want to be able to exercise, as he did every day. I recall having a discussion about a request for new crew uniforms. The idea was to make the female crew uniforms more conservative. I requested these uniforms knowing what type of uniform the family would prefer for their charter.

49.     Regarding the pizza oven, this conversation occurred as a result of Gulnara enjoying her time chartering the Flying Fox. The Flying Fox has a brilliant outside kitchen. So my general advice was to have something outside on the Amadea to improve guest service, a nice outside space with service right next to it, basically suggesting that they try to make a copy of the Flying Fox in this regard.

50.     I have seen allegations that I directed or demanded structural changes to the Amadea. At no point during any visit to the Amadea did I "direct" or "demand" any changes to be made to the Amadea. Rather, I made suggestions of things that could be done to improve the charter experience. I was never in a position to direct anything happening on the Amadea. My clients were chartering the vessel and I was asked to make suggestions or requests. Second, the changes that I proposed were not structural, they were cosmetic and entirely in line with the types of changes that a charterer on a high-end yacht would request. There were discussions around removing gold accents, and replacing carpets and drapes to absorb sound and make the boat less noisy.

51.     Because the boat had not been used very often, the crew was not full, and not filled with experienced crew members. I asked Captain ▇▇▇ to make clear to the crew that a new family was coming on board and had high expectations of the crew.

16

52.     In my mind, it was clear that the walkthroughs I did on the Amadea were in connection with the upcoming month-long charter. It was not in connection with any sale. Indeed, I understood that the work we were requesting regarding the carpet on the staircase, the master medallion, the drapes, and the mirror trims was all work to be done in advance of the January charter.

53.     In my experience, all of the above types of requests are usual for ultra-high net worth charterers, especially long-term charterers. The way I thought of this and having had significant experience working on and being around high-end yacht charters, if I was an owner or broker that offered boat for long term charter, some of the requests will be done on my dollar because I know I will be compensated, i.e., make my money back in either tips or additional charters. Many of these suggestions were the types of suggestions that the family might be forced to pay for as part of the charter, or that the brokerage company or owner would pay for themselves because it generally made the vessel more appealing, which would make it more competitive for the charter and sale markets. All of my comments about the Amadea and proposed changes were simply based on how certain families with a certain level of income would like things to be done.

54.     I did not discuss any of the above requests with Mr. Kerimov, and to my knowledge he was not involved in any of these conversations. To my knowledge Mr. Kerimov never made any suggestions for changes to the Amadea or said anything about it other than what has been described herein.

55.     I have another specific recollection that during this October visit, a female crew member made a comment in front of me about the Terracotta cabin being assigned to the "owner's representative, Dinar." Shortly thereafter, this woman referred to me to a third person

as the "owner's representative." I did not correct the crew member in that moment, because I did not want to break chain of command. I was just a guest on board; not the owner's representative.

56.    Later that day, I had a conversation with Captain ███, during which I mentioned the incident to him, and told him that I wanted to make clear I was not the "owner's representative." Captain ███ responded that this was just the way the crew talks, that he knew the Kerimov family did not own the vessel. I have seen the allegations in the Complaint that I was the "owner's representative," suggesting that Mr. Kerimov bought the Amadea. However, Mr. Kerimov was not the owner of the Amadea, nor was anyone in his family. To the extent anyone referred to me as the "owner's representative" or "O. Rep," that is factually inaccurate.

57.    During this trip, crew members would have seen me talking to Firuza and Gulnara and then to Mr. Kerimov when he visited the Amadea for a day on October 17. Having tried to piece together what this was about, I imagine the crew thought I was a representative of the guests, and because I was assigned to a guest cabin as a courtesy by Mr. Kochman. I also knew that the crew would be well aware that the Amadea was a private boat and not a commercial vessel available for charters, as I knew that crew members received different safety training based on whether the boat was private or commercial. I imagine the crew did the training for a private vessel and therefore believed it to be private, not able to be chartered. These facts, as well as news on the boat that new guests were coming on board, must have contributed to mistaken belief among some of the crew members that the Amadea had a new owner, and I was the "owner's representative." This was, of course, not true. It was mere gossip, and I did speak to Captain ███ about correcting the record. Based on our discussions, Captain ███ knew that Mr. Kerimov did not purchase or own the Amadea.

58.     I am familiar with the use of G-codes or guest codes for use on superyachts. This is standard in the yachting industry. During the time I was on the board the Amadea, Mr. Kerimov was never mentioned as G1. Firuza would have been G1 on account of her being the most senior member of the family while on charter. That said, I also know that "G Schemes" or the use of G codes is particular to each vessel and crew. There is not necessarily a standard. Some boats use Gold – 1, 2, 3, or Red -1, 2, 3. Nothing about the use of G codes suggests any intent to hide anyone's identities. The use of such codes is standard operating procedures in super yachts, as I have learned in the course of my experience over the past decade plus.

59.     I understood Mr. Kochman to understand that Gulnara and Firuza would not charter the Amadea long-term if the boat was in the same condition as it was when I was doing my walkarounds, and thus Mr. Kochman was receptive to the changes I suggested. There was nothing about any of these discussions with the family or on board that ever led me to believe anyone from the Kerimov family had purchased the Amadea. Indeed, these conversations were all indicative of a situation where the female part of the family chartered the vessel and were considering chartering it for several weeks over the coming year. Indeed, when Gulnara chartered the Flying Fox a couple years prior, I did the same type of walkaround with the captain of that boat. The only difference was that because the Flying Fox was built so well, we did not need to make the same types of suggestions.

60.     I never met with François Zuretti or anyone from Zuretti Interior Design.

61.     I am providing this affidavit of my own free will, and for no other reason than to tell the truth.

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.


Dated: June _6_ , 2024

Dinar Khalikov