UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          :

UNITED STATES OF AMERICA,

          :

      Plaintiff,

          :

     - v. -

          :

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME     :      23 Civ. 9304 (DEH)
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,     :
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER     :
APPURTENANCE THERETO,

          :

      Defendant-*In-Rem*.

          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES OF AMERICA'S MOTION TO STRIKE THE CLAIM, OR FOR SUMMARY JUDGMENT, FOR LACK OF STANDING

JENNIFER JUDE
DOMINIKA TARCZYNSKA
Assistant United States Attorneys

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

JOSHUA L. SOHN
Trial Attorney,
Money Laundering and Asset
Recovery Section

MARGARET A. MOESER
Chief
Money Laundering and Asset
Recovery Section, Criminal Division
U.S. Department of Justice

YIFEI ZHENG
Trial Attorney,
Counterintelligence and Export
Control Section

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export
Control Section, National Security
Division
U.S. Department of Justice

1

**Table of Contents**

Preliminary Statement ................................................................................................1

Argument ....................................................................................................................2

I.    Claimants Bear the Burden to Establish That They Are the True Owners
of the *Amadea* ................................................................................................2

II.    Claimants Lack Standing Because They Fail the Dominion and Control Test .................5

    A.  Claimants Have Conceded That They September MOA Divested Them of
       Dominion and Control ........................................................................5

    B.  Claimants Have Failed to Set Forth Sufficient Evidence to Genuinely Suggest That
       the September MOA Was Terminated ........................................................8

        1.  Termination of the September MOA Requires a Separate Valid
           Contract ..............................................................................9

        2.  Other Evidence Demonstrates That the September MOA Was
           Not Terminated .................................................................. 12

    C.  Evidence Regarding Suleimon Kerimov's Plans for Long-Term
       Use of the *Amadea* Further Demonstrates That Claimants Surrendered
       Dominion and Control Permanently .......................................................... 16

Conclusion ............................................................................................................ 19

# Table of Authorities

*Arnow v. Aeroflot Russian Airlines*,
    980 F. Supp. 2d 477 (S.D.N.Y. 2013) .................................................................. 8, 14

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 2

*Scott v. Harris*,
    550 U.S. 372 (2007) .............................................................................................. 14

*United States v. $122,,640.00 in U.S. Currency*,
    81 F. Supp. 3d 482 (D. Md. 2015) ........................................................................ 14

*United States v. $960,000 in U.S. Currency*,
    307 F. App'x 251 (11th Cir. 2006) ......................................................................... 2

*United States v. $133,420.00 in U.S. Currency*,
    672 F.3d 629 (9th Cir. 2012) ................................................................................ 14

*United States v. $225,894 in U.S. Currency*,
    852 F. Supp. 2d 578 (D.N.J. 2012) ....................................................................... 15

*United States v. $119,303.00 in U.S. Currency*,
    955 F. Supp. 2d 569 (W.D. Va. 2013) .................................................................. 11

*United States v. $447,815.00 in U.S. Currency*,
    2011 WL 4083640 (M.D.N.C. July 26, 2011) ...................................................... 15

*United States v. $41,475.00 in U.S. Currency*,
    2016 WL 337380 (C.D. Cal. Jan. 6, 2016) ........................................................... 14

*United States v. $557,933.89 More or Less, in U.S. Funds*,
    1998 WL 817651 (E.D.N.Y. Mar. 2, 1998) ............................................................ 3

*United States v. 110 Firearms*,
    2010 WL 1408892 (D. Ariz. Apr. 7, 2010) ............................................................ 2

*United States v. $557,933.89*,
    287 F.3d 66 (2d Cir. 2002) ..................................................................................... 4

*United States v. All Assets Held at Bank Julius Baer & Co.*,
    664 F. Supp. 2d 97 (D.D.C. 2009) ......................................................................... 3

*United States v. Any And All Funds on Deposit In Acct. No. 12671905, Held In The Name of Landlocked Shipping Co.*,
    2010 WL 3185688 (S.D.N.Y. Aug. 10, 2010) ........................................................ 4

*United States v. Cambio Exacto,*
   166 F.3d 522 (2d Cir. 1999)................................................................. 2, 3

*United States v. Carroll,*
   470 F. App'x 192 (4th Cir. 2012) ............................................................ 15

*United States v. Ida,*
   14 F. Supp. 2d 454 (S.D.N.Y. 1998)......................................................... 2

*United States v. One Parcel of Land, Known as Lot 111–B,*
   902 F.2d 1443 (9th Cir. 1990) ................................................................. 2

*United States v. Phillips,*
   883 F.3d 399 (4th Cir. 2018) ................................................................. 14

*United States v. Premises & Real Prop. at 500 Delaware St.,*
   868 F. Supp. 513 (W.D.N.Y. 1994) .......................................................... 6

*United States v. Zarrab,*
   2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ........................................... 12

Statutes

50 U.S.C. § 1702(a)(1)............................................................................... 12

Plaintiff United States of America (the "Government"), by its undersigned attorneys, respectfully submits this reply memorandum in further support of its motion to strike Claimants'[1] claim, or for summary judgment, ECF No. 97.

## PRELIMINARY STATEMENT

Claimants fail to carry their burden to show that they are the true owners of the *Amadea* who, at the time of its seizure, did not merely hold bare legal title to the yacht but also exercised dominion and control over it. There is no genuine dispute as to the facts that are material to the Government's motion: when Claimants entered into the September MOA in 2021, they bargained away dominion and control over the *Amadea* in exchange for €225 million; Claimants could not cancel this contract without entering into a separate, enforceable termination agreement with Errigal/Kochman; and the parties never did so. Claimants attempt to save their claim by arguing that they terminated the September MOA in March 2022 but provide no supporting documentation nor even simple details about how or on what terms termination was accomplished. They have provided no written termination agreement nor the evidence of an oral termination agreement that is required under the governing (English) law. Rather, Claimants' evidentiary support for this critical fact rests entirely on a single vague sentence in Khudainatov's self-serving declaration. Such a scintilla of evidence cannot be used to create a factual dispute to preclude summary judgment, particularly in light of other evidence in the record showing that no termination occurred, including—as Claimants admit—the fact that Claimants never returned the €225 million

---

[1] Unless otherwise stated, all defined terms have the meaning given to them in the Government's opening brief, ECF No. 98, and all "Ex. __" citations are to the exhibits to the Declaration of Jennifer Jude, ECF No. 100 (for Ex. A through Ex. Y), or to the Supplemental Declaration of Jennifer Jude (for Ex. Z through Ex. JJ).

they were paid for the *Amadea* in 2021 under the MOA. Claimants are merely the *Amadea's* straw owners and, as such, the Court should grant the Government's motion and strike their claim.

## ARGUMENT

### I.    Claimants Bear the Burden to Establish That They Are the True Owners of the *Amadea*

Claimants have the burden to establish standing and must present evidence that they had dominion and control over the *Amadea* to do so. *See* ECF No. 98 ("MTS Mem.") at 11-13; *United States v. $960,000 in U.S. Currency*, 307 F. App'x 251, 255 (11th Cir. 2006) (standing is not a mere pleading requirement but "an indispensable part of a claimant's case" and a claimant "must move forward 'with the manner and degree of evidence required at the successive stages of the litigation.'") (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992)). Although Claimants lean heavily on the various formulations that courts have used to describe what a claimant must show to carry its burden, such as a "colorable property interest" and "an allegation of ownership and some evidence of ownership," ECF No. 123 ("Opp.") at 1, 3-4, none of these descriptions relieves them of the obligation to "present evidence of dominion and control or other indicia of true ownership" to survive a motion to strike at the summary judgment stage. *United States v. Ida*, 14 F. Supp. 2d 454, 459-60 (S.D.N.Y. 1998); *see United States v. 110 Firearms*, No. CV-09-243-PHX-MHB, 2010 WL 1408892, at *5 (D. Ariz. Apr. 7, 2010) ("Establishing ownership of property, without an exercise of 'dominion and control over the property is insufficient' to establish standing to challenge a forfeiture.") (quoting *United States v. One Parcel of Land, Known as Lot 111–B*, 902 F.2d 1443, 1444 (9th Cir. 1990) (per curiam)). Indeed, in *Cambio Exacto*, the Second Circuit both acknowledged the "some evidence of ownership" standard while also reaffirming the rule that straw owners "who do indeed 'own' the property, but hold title to it for somebody else" lack standing. *See United States v. Cambio Exacto*, 166 F.3d 522, 527 (2d Cir.

2

1999). Moreover, on summary judgment, a claimant must present not just "some evidence of ownership" but "some evidence . . . that would allow a reasonable factfinder to conclude that such an interest exists." *United States v. All Assets Held at Bank Julius Baer & Co.*, 664 F. Supp. 2d 97, 105 (D.D.C. 2009).

There is no support for Claimants' argument that the dominion and control test is limited to cases in which "a convicted defendant attempted to transfer his or her property to avoid forfeiture." Opp. at 5, *see id.* at 20-24. According to Claimants, this test should only apply where the straw owner "was merely set up to avoid forfeiture," to be consistent with the law's "concern . . . that this tactic can be used as a 'subterfuge' to evade forfeiture and benefit the criminal whose illegal conduct gave rise to the forfeiture." Opp. at 21 (internal quotation marks omitted). But the reason a nominal owner lacks standing is that it will suffer no Article III injury from forfeiture, *Cambio Exacto*, 166 F.3d at 527, and that is the case regardless of why it became a nominal owner. In any event, there is an obvious reason for resorting to subterfuge here as the real person-in-interest who purchased the *Amadea*, Suleiman Kerimov, was under U.S. sanctions and the use of a straw owner would make it easier to maintain the yacht through transactions with U.S. persons and companies and more difficult to seize in the event of a sanctions violation.

Claimants are also wrong that *United States v. $557,933.89 More or Less, in U.S. Funds*, No. 95-CV-3978 (JG), 1998 WL 817651 (E.D.N.Y. Mar. 2, 1998) "compels a finding of standing here." Opp. at 20. Claimants argue that in that case the district court held that the claimant's "conclusory allegation that he is the owner [which] directly contradicts the statement he allegedly made at the airport that the money orders in fact belonged to his employer," *id.* (quoting *United States v. $557,933,89*, 1998 WL 817651, at *3), was sufficient evidence of ownership "to put the issue of ownership before the jury, and the Second Circuit agreed with that ruling," *id.* at 20. But

3

the district court in fact held the exact opposite—that the claimant's "conclusory assertions" were insufficient to establish standing—and granted the Government's motion to strike. *United States v. $557,933,89*, 1998 WL 817651, at *3. The district court then gave the claimant an opportunity to file an amended claim, which he did, *United States v. $557,933.89*, Case No. 95-CV-3978 (JG), Amended Notice of Verified Claim, ECF No. 40 (E.D.N.Y. Mar. 26, 1998), and the case proceeded. Following a trial on the merits, the Second Circuit stated that the district court had "correctly determined, prior to trial, that claimant had standing to contest the forfeiture" based on his assertion in his *amended* claim that he had possession of the property at the time of seizure, although the Circuit also characterized that determination as "questionable." *United States v. $557,933.89*, 287 F.3d 66, 79 & n.10 (2d Cir. 2002).

The facts of this case are also distinguishable from *Landlocked Shipping*, *see* Opp. at 16-17, in which the claimants demonstrated a property interest in a ski lodge sufficient to establish standing where there was evidence that the claimants "personally used [the lodge] for vacation," paid its taxes, and received its rental payments. *United States v. Any And All Funds on Deposit In Acct. No. 12671905, Held In The Name of Landlocked Shipping Co.*, No. 09CV3481HB, 2010 WL 3185688, at *6 (S.D.N.Y. Aug. 10, 2010). Here, on the other hand, it is undisputed that Claimants have not used the *Amadea*, have not paid for any of its expenses, and have not received any of its "charter" payments since entering into the September MOA. *See* ECF No. 124 ("56.1 Responses")[2] ¶¶ 29-33; Ex. A at 25-26; Ex. Z at 15-16.

---

[2] Claimants appended a "Statement of *Undisputed* Facts" to the end of their responses to the Government's Rule 56.1 Statement. *See* 56.1 Responses at 15-19 (emphasis added). However, Local Civil Rule 56.1(b) does not permit this; rather it permits a party opposing summary judgment to provide "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," *i.e.*, *disputed* material facts. As such, the Government is not providing a response to these

**II.     Claimants Lack Standing Because They Fail the Dominion and Control Test**

Claimants have failed to carry their burden to demonstrate that they are more than nominal owners of the *Amadea*. Claimants concede that after entering into the September MOA they did not use or possess the *Amadea* or have any financial stake or responsibility for it and that they received payment of its full value. Claimants' argument that, after giving away dominion and control, they regained it by terminating the September MOA in March 2022 does not create a genuine dispute of material fact where it is supported by only a single conclusory statement in Khudainatov's declaration and is contradicted by other credible evidence, including documents demonstrating the Kerimov family's plans to renovate and use the *Amadea* over the course of the next several years.

**A.     Claimants Have Conceded That the September MOA Divested Them of Dominion and Control**

Undisputed facts demonstrate that Claimants gave up dominion, control, possession, and their financial stake in the *Amadea* when they entered into the September MOA. Although Claimants attempt to avoid directly conceding this point by characterizing the period between September 17, 2021, and approximately March 10, 2022, as one of "shared dominion and control," Opp. at 18, they fail to provide any evidence showing that they retained any authority over the *Amadea* during this period. *See* 56.1 Responses ¶¶ 28-34.

Claimants do not dispute the Government's material facts about dominion and control as to this September 2021-March 2022 time period. Specifically, they do not dispute that during that period, (1) Claimants had no right to any financial benefit from the *Amadea* and received no

_____

additional paragraphs, which serve no purpose for resolving this motion. In so doing, however, the Government does not intend to concede that any of these facts are undisputed or material to the question of Claimants' standing.

financial benefit, s*ee* 56.1 Responses ¶¶ 29, 33; (2) Claimants had no financial responsibility for the *Amadea* and paid none of its expenses, *see id.* at ¶ 30, 33; *see also* ECF No. 126 ("Khudainatov Decl.") ¶ 27; Ex. Z at 15-16; (3) Claimants were not permitted to use the *Amadea* and did not use it, *see* 56.1 Reponses ¶¶ 31, 33; *see also* Khudainatov Decl. ¶ 28; and (4) Claimants were never in possession of the *Amadea*, *see* 56.1 Responses*.* at ¶¶ 32, 33. It is also undisputed that in exchange for giving up all of their rights to the *Amadea*, Claimants received the full €225 million value of the vessel, *see* 56.1 Responses ¶ 28; Khudainatov Decl. ¶¶ 38, 41.

Despite these admissions, Claimants make several unsuccessful arguments that they retained some measure of control over the *Amadea* during this period. First, they argue that the September MOA "did not result in Mr. Khudainatov relinquishing all dominion and control over the Amadea" because those agreements "expressly state that title would not transfer until the closing" and "Millemarin remained the holding company." Opp. at 16-17. But this ignores the distinction between title and paper "ownership" on the one hand, and dominion and control, on the other, at the heart of the rule that straw owners lack standing. *See* MTS Mem. at 11-13; *United States v. Premises & Real Prop. at 500 Delaware St.*, 868 F. Supp. 513, 519-20 (W.D.N.Y. 1994) ("To accept this line of argument would be to reject the rule that possession of mere legal title of property by one who does not actually exercise dominion and control over that property is insufficient to establish standing.") *aff'd*, 113 F.3d 310 (2d Cir. 1997).

Second, Claimants argue that they continued to exercise dominion and control over the *Amadea* during this period because Khudainatov "asked Mr. Kochman to keep him apprised of major changes proposed for the Amadea, and Mr. Kochman did so." Opp. at 17; *see* Khudainatov Decl. ¶ 45; *see also* ECF No. 127 ("Pastukhova Decl.") ¶¶ 6-8. Claimants provide no contemporaneous evidence of such updates, but even so, Khudainatov's mere receipt of

information about the Kerimov family's proposed renovations to the *Amadea* does not demonstrate dominion or control over the vessel.

Finally, Claimants argue that in "March 2022, Mr. Khudainatov was consulted about where the vessel would go for a required maintenance period, and ultimately gave his approval for the Amadea to go to the Philippines for this maintenance, and also approved the route and the locations of the refueling stops" in Mexico and Fiji. Opp. at 17; *see* Khudainatov Decl. ¶ 45. Claimants fail to provide any emails or other contemporaneous documentation that such consultations in fact occurred or the nature of the supposed "approvals." In contrast, it is well documented that the decision to cancel the *Amadea's* planned spring 2022 maintenance period at a shipyard in Europe was not made by Khudainatov but by the Kerimov family. *See* Ex. X at 3, 5 (discussing 2022-23 *Amadea* itineraries with G1, including delaying the EU shipyard maintenance and noting that "G3 [Gulnara Kerimova] doesn't want to come back to EU this year"); Ex. AA (noting EU maintenance period had been cancelled).[3] Moreover, that cancellation and the decision that the *Amadea* would instead travel to the Philippines had been made by at least February 16, 2022. Ex. CC at 1, 3. If Khudainatov was consulted about the plan to travel to the Philippines and the route to get there,

---

[3] Imperial Yachts' Viktoria Pastukhova states in her declaration that "G1" in her February 8, 2022 email in Exhibit X refers to Khudainatov, Pastukhova Decl. ¶ 14(b)(i) (discussing Ex. X at 7), but that "G1" in her February 15, 2022 email in the same chain refers to Firuza Kerimova, *id.* ¶ 14(b)(ii) (discussing Ex. X at 5-6). It is not plausible that Pastukhova, whose job was to be a liaison between the *Amadea* and its clients (owners), would mistakenly use the same call sign for two different people in the same email chain. A legend emailed by Co-Captain 1 during the course of the Kerimov family's January-February 2022 Caribbean voyage entitled "AMA [*Amadea*] Guest Call Sign Confirmation Table" establishes that Suleiman Kerimov's call sign was either G0 or G1 and that at that time all "G" codes were assigned to members of the Kerimov family. Ex. BB; *see also* Exs. O, V, W. Khudainatov was not assigned an *Amadea* "G" code. Additionally, Pastukhova's statement that G1 was a reference to Khudainatov in February 2022 is further directly contradicted by Lesley Reynard's explanation that G1 refers to the main guest on a particular trip and only to guests who are on board at the time (which Khudainatov was not). ECF No. 128 ¶ 9.

under the binding terms of the September MOA (which Claimants do not dispute was in effect in February 2022), he had no authority over the *Amadea's* travels and any consultation would have been purely advisory.

Thus, even crediting these assertions, they do not show that Claimants were anything more than nominal owners during the September 2021-March 2022 time period. Thus, Claimants' standing depends on whether they have presented sufficient evidence that the parties terminated the September MOA such that Claimants regained the dominion, control, and financial stake in the *Amadea* that they had already sold for full value.

### B. Claimants Have Failed to Set Forth Sufficient Evidence to Genuinely Suggest That the September MOA Was Terminated

Claimants argue that they terminated the September MOA in March 2022, thereby reversing its effect and returning dominion and control over the *Amadea* to Millemarin just weeks before it was seized in Fiji on or about April 13, 2022. Opp. at 2, 8-9, 18. But Claimants have failed to provide any evidence of this termination other than one vague sentence in Khudainatov's declaration. *See* Khudainatov Decl. ¶ 40. The Court need not credit this uncorroborated and self-serving statement. *See Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013). ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment.").

As an initial matter, Claimants are cagey as to how this supposed termination occurred. According to Claimants, after IIF signed the March 10, 2022 Share Transfer Agreement, "Mr. Kochman told Mr. Khudainatov that he did not want to close the transaction, and Mr. Khudainatov did not object. The Errigal Arrangement was terminated." Opp. at 8 (internal citations omitted). The only evidence Claimants cite in support of this assertion is paragraph 40 of Khudainatov's declaration, which provides in relevant part:

> As a result of the decision to not close the transaction, the Share Transfer Agreement was never fully executed, shares never transferred, and I remained the Amadea's UBO. In addition, *Mr. Kochman and I agreed that the prior 'Errigal' agreements between us were made impossible to effectuate, and the entirety of the transaction was terminated.* I, therefore, became financially responsible to pay all expenses relating to the Amadea going forward.

Khudainatov Decl. ¶ 40 (emphasis added).

This bald statement alone is insufficient to create a genuine issue as to whether the September MOA was terminated, such that Khudainatov went from a straw owner to a true owner. Nevertheless, the Government has retained Professor Ewan McKendrick, KC, an expert in English contract law (which governs the September MOA per its choice-of-law clause) to provide expert opinions about how the parties could have terminated the September MOA under English law. *See* Declaration of Professor Ewan McKendrick, KC ("McKendrick Decl.") ¶ 4. As Professor McKendrick explains, the September MOA is a valid and binding contract to sell the *Amadea* that "would remain binding until it was discharged by performance or another ground recognized by English law." *Id.* ¶ 6. That did not occur here.

### 1. Termination of the September MOA Requires a Separate Valid Contract

Claimants argue that several provisions of the September MOA "require[] return of the vessel upon termination of the agreement," Opp. at 10, but none of those clauses apply to the parties' situation in March 2022. As Professor McKendrick explains, the September MOA contains no general termination provision, McKendrick Decl. ¶ 10, and the two specific provisions Claimants cite, Clause 28 ("Cancellation") and Clause 34 ("Force Majeure"), are inapplicable to these facts, *id.* ¶¶ 12-14.[4] Furthermore, Clause 7, which states that the initial payment of €45

---

[4] Claimants argue that Clause 28 "requires return of the vessel on termination of the agreement," quoting for the Court the relevant portion of that provision. Opp. at 10. However, Claimants' quotation omits a key portion of Clause 28 (replacing it with an ellipsis) that makes it

million is "non-refundable," does not support Claimants' position that they are contractually required to return the entire €225 million to Kochman/Errigal. *See* Opp. at 10. Instead, this clause undermines Claimants' argument by demonstrating that even upon termination of the agreement, Khudainatov/Millemarin were legally permitted to keep at least the €45 million. *See* McKendrick Decl. ¶ 14. Thus, no provision of the September MOA itself permitted the parties to unwind the contract under the circumstances present in March 2022.

Nor did the parties' failure to fully execute the March 10, 2022 Share Transfer Agreement result in the termination of the September MOA. As Professor McKendrick explains, the Share Transfer Agreement is part of a proposed *amendment* to the September MOA and failure to follow through with the amendment does not result in the termination of the underlying contract itself. *See id.* ¶ 16. And, of course, the April 4, 2022 management agreement between Imperial Yachts and Millemarin (discussed further below) is a contract for management services and does not purport to modify the terms of the agreement with Errigal (nor could it without Errigal as a party to it). *See* Khudainatov Decl. Ex. 22.

Given the lack of any applicable termination provision in the September MOA itself, the only way Claimants could have terminated this agreement is by entering into a separate termination contract. McKendrick Decl. ¶ 17. Khudainatov claims that he and Kochman "agreed that . . . the entirety of the transaction was terminated," but he does not specify when, how (in writing or orally), or on what terms they did so. *See* Khudainatov Decl. ¶ 40; *see* Opp. at 2 n.2 (termination

---

inapplicable to the facts of this case. *See* McKendrick Decl. ¶ 12. In addition, Clause 28 specifies that if the contract is terminated on the specified grounds, "the Buyer shall return the Vessel to the port shown in Box H of this Agreement," which is Nice, France. Ex. G at IY 000005, IY 000009. It is undisputed that there was no effort to return the *Amadea* to France in March 2022. *See* Khudainatov Decl. ¶ 45; Exs. AA, CC.

occurred "shortly after March 10, 2022"). And Claimants have not produced a copy of a written termination agreement. While under English law an oral agreement to terminate may be enforceable, an English court would require proof that an oral agreement was made by examining other evidence, such as the parties' correspondence about the agreement. McKendrick Decl. ¶ 18. Claimants have not produced any correspondence discussing the purported termination agreement. Further, under English law any oral contract would need to be "sufficiently certain for the courts to give effect to it" and where "fundamental matters remained to be resolved" a court would find that no binding contract was formed. *Id.* ¶ 19. As Professor McKendrick explains, "in the absence of evidence of an oral agreement which covers *all essential matters*, an English court would not find the existence of a contract to nullify, terminate or cancel the [September MOA] with the consequence that the Agreement would remain operative." *Id.* ¶ 20 (emphasis added). Khudainatov's cursory statement in his declaration that he and Kochman agreed to terminate the agreement does not establish that an enforceable oral agreement, *i.e.*, one that covers all essential matters, was in fact created. *Cf. United States v. $119,030.00 in U.S. Currency*, 955 F. Supp. 2d 569, 583 (W.D. Va. 2013) (denying standing to claimant who claimed to be owner of property through an oral trust because she failed to show the elements required to create a valid oral trust under applicable law).

Claimants further contend that because the September MOA was terminated, they are liable to Kochman/Errigal to reimburse the €225 million purchase price and that this liability is sufficient injury to establish standing. Opp. at 19. But, as noted, Claimants have failed to establish as a matter of English contract law that the September MOA was terminated or that such a termination would make them liable to refund the purchase monies. Nor do Claimants provide any evidence of a

11

finding of any such actual liability. Moreover, under the September MOA, Errigal bore the risk of loss of the vessel, which includes loss to seizure, not Millemarin. McKendrick Decl. ¶ 9.

### 2. Other Evidence Demonstrates That the September MOA Was Not Terminated

Additionally, other evidence supports the conclusion that the September MOA was not in fact terminated. First, Claimants admit that a key component of the unwinding of the September MOA has not taken place—they have not returned any of the €225 million. Claimants' explanation for this peculiarity, that the "parties agreed that the repayment should not be effectuated until it was clear that such transaction would not be used as evidence of any wrongdoing," makes no sense. Opp. at 11 (citing Khudainatov Decl. ¶ 41). To begin, the fear of unspecified "wrongdoing," referencing a May 5, 2022 DOJ press release about the *Amadea*, is unfounded as U.S. sanctions law does not prohibit Millemarin, Khudainatov, Errigal, or Kochman (all of whom are outside the U.S.) from transacting in Euros or other foreign currencies outside of the U.S. financial system. *See* 50 U.S.C. § 1702(a)(1); *United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 6820737, at *10 (S.D.N.Y. Oct. 17, 2016). Nor do Claimants provide any explanation for why they did not return any of the money during the month between March 10, 2022, when the September MOA was allegedly terminated, and April 13, 2022, when the *Amadea* was seized. Furthermore, Claimants' alleged rationale for failing to return the money—that "transferring money in relation to the *Amadea*" could result in criminal liability, Opp. at 19—is belied by the fact that during the same period they entered into the April 4, 2022 management agreement, which purports to do the same thing, *i.e.*, transfer money (management fees) in relation to the *Amadea*.

Additionally, although Claimants allege that they had responsibility for paying *Amadea's* expenses after approximately March 10, 2022, they also admit that they did not actually pay any of them. *See* 56.1 Responses ¶¶ 30, 33; Khudainatov Decl. ¶¶ 27, 45; Ex. Z at 15-16. Claimants

also argue that the existence of the April 4, 2022 management agreement demonstrates that the September MOA had been cancelled such that Millemarin had resumed responsibility for paying Imperial Yachts' management fees. *See* Opp. at 3, 9, 18; Khudainatov Decl. ¶ 44 & Ex. 22. But such an inference cannot reasonably be drawn from this agreement for two reasons. First, while the agreement is dated April 4, 2022, Khudainatov Decl. Ex. 22 at 1, it was not fully executed until May 10, 2022, nearly a month after the *Amadea's* seizure in Fiji, *id.* at 20. Second, the agreement is backdated in that it specifies that its commencement date and the "[s]tart date for payment" is August 21, 2021. *Id.* at 1, Appendix 1, Appendix 2. It is undisputed that Millemarin was *not* responsible for making payments throughout the post-MOA period—rather, Errigal became responsible per the terms of the September MOA. Based on this and the fact that the prior *Amadea* management agreement was between Imperial Yachts and Nereo, *see* Khudainatov Decl. Ex. 19, it is clear that the purpose of this agreement was to transfer the prior management services agreement to the successor *Amadea* holding company, *i.e.*, Millemarin, which the parties had failed to do when Millemarin purchased the *Amadea* from Nereo in August 2021. This agreement is not evidence that Millemarin actually resumed paying the expenses for the *Amadea* (as noted above, it is undisputed that it did not). It also does not demonstrate any departure from the terms of the September MOA, which required Errigal to pay all expenses and provided that Millemarin remained the holding company. Pursuant to this arrangement, Millemarin remained the addressee on *Amadea* invoices and the insured on the yacht's insurance policy, consistent with its role as the nominee. *See* Opp. at 18 & Khudainatov Decl. ¶ 42 & Ex. 21. For example, when Zuretti Interior Designs invoiced Millemarin for its professional services in October 2021, Imperial Yachts

13

explained that it would be paying Zuretti's fees "on behalf of Millemarin." Ex. DD.[5] This procedure of keeping Millemarin as the invoiced entity is consistent with the parties' plan, as demonstrated by the March Amendment, to have Errigal formally acquire the *Amadea* by purchasing the shares of Millemarin rather than by assuming title to the *Amadea* directly. *See* Exs. E, G at IY 000001-04.

Finally, Claimants have provided no documentary evidence corroborating the existence of any termination contract—not even a single email. This is wholly inconsistent with their general practice of memorializing agreements related to the *Amadea* in written and signed contracts. *See* Exs. B, C, D, E, G; Khudainatov Decl. Exs. 20, 22; McKendrick Decl. ¶ 18; *see also* Khudainatov Decl. Exs. 2, 4-5, 8-11, 13, 17, 18-19. Claimants appear to recognize the importance of memorializing legal agreements, even arguing in their brief that "the fact that the contemplated transfer was not completed is memorialized in various writings." Opp. at 22-23. Indeed, the parties' failure to memorialize an agreement to terminate the September MOA is a stunning departure from their usual practice and is particularly implausible given the amount of money at stake.[6] *See* McKendrick Decl. ¶ 18.

---

[5] Notably, this document dated October 6, 2021, also states that "Imperial Yachts Limited is the management company to Millemarin" and would be making payments "on behalf of Millemarin [] in accordance with Operational Management Agreement." This is further evidence that the April 4, 2022 management agreement was entered into to rectify an oversight, failing to switch the Imperial Yachts management agreement over to Millemarin from Nereo.

[6] Claimants' own statements further undermine the plausibility of their contention that they agreed to terminate the September MOA and became liable to Errigal for repayment of €225M. Claimants contend that by the summer of 2021 Khudainatov wanted a "more immediate solution" to sell the *Amadea* and "had grown frustrated with Imperial Yachts' inability to sell the Amadea for what Mr. Khudainatov thought a reasonable selling price, i.e., €225,000,000." Ex. A at 13. Khudainatov received the €225,000,000 due under the contract that he considered to be the full value of the yacht and has offered no rationale for his accepting to terminate the agreement in March 2022, the opposite of his stated goal of selling the *Amadea*.

In sum, the evidence that Claimants and Kochman/Errigal did not in fact terminate the September MOA prior to seizure is overwhelming. In contrast, Claimants offer merely Khudainatov's say-so. But such a conclusory statement in a "self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638-39 (9th Cir. 2012) (internal quotation marks and citation omitted); *see Scott v. Harris*, 550 U.S. 372, 380 (2007); *United States v. Phillips*, 883 F.3d 399, 405 (4th Cir. 2018) ("Although courts must refrain from weighing the evidence on summary judgment, courts may lawfully put aside testimony that is undermined either by other credible evidence or by physical impossibility.") (internal quotation marks omitted); *Arnow*, 980 F. Supp. 2d at 482. Numerous other courts have granted motions to strike where the claimant's evidence of ownership was only his own uncorroborated testimony. *See United States v. $41,475.00 in U.S. Currency*, No. CV 15-00696-R(SHSX), 2016 WL 337380, at *2 (C.D. Cal. Jan. 6, 2016) (sworn interrogatory responses stating that claimant owned car but "could not find the receipt for [its] sale" was insufficient to raise a genuine issue of material fact as to his standing); *United States v. $122,640.00 in U.S. Currency*, 81 F. Supp. 3d 482, 495 (D. Md. 2015) (claimant failed to carry her burden to establish standing where her account was "blatantly contradicted" by other evidence); *United States v. $225,894 In U.S. Currency*, 852 F. Supp. 2d 578, 581 (D.N.J. 2012) (striking claim where claimant's proof of ownership was his interrogatory responses and deposition testimony without other corroborating evidence); *United States v. $447,815.00 in U.S. Currency*, No. 1:09CV204, 2011 WL 4083640, at *3-4 (M.D.N.C. July 26, 2011) ("[W]ithout some other evidence of ownership, Claimant's testimony does not establish a "facially colorable interest" sufficient to confer standing to contest the forfeiture."), *aff'd sub nom. United States v. Carroll*, 470 F. App'x 192 (4th Cir. 2012).

There is no genuine dispute that the September MOA had not been terminated in March 2022. Rather, that contract "remain[ed] binding." McKendrick Decl. ¶ 6.

### C. Evidence Regarding Suleiman Kerimov's Plans for Long-Term Use of the *Amadea* Further Demonstrates That Claimants Surrendered Dominion and Control Permanently

The Government need not prove that Suleiman Kerimov purchased the *Amadea* to prevail on its motion. However, the evidence that he exercised control that only an owner would have, including ordering a major refit of the *Amadea* and making plans for his family's use of it for years into the future, further demonstrates that Claimants gave up dominion and control over the vessel permanently.

Claimants' attempts to distance the *Amadea* from the Kerimovs are easily rebutted. Claimants argue that Kerimov could not have purchased the *Amadea* because neither he nor anyone acting on his behalf visited it before mid-September 2021 (when the September MOA was executed). Opp. at 6. But Claimants themselves have offered evidence that Kerimov sent emissaries to examine the *Amadea* for him at the 2019 Monaco Yacht Show and that he stayed on the yacht in 2020. Khalikov Decl. ¶¶ 13, 17-18. Claimants also speculate that Kerimov wouldn't have purchased the *Amadea* because, according to his assistant Dinar Khalikov, he didn't like its "noise and vibration," interior design style, and outdated AVIT system. ECF No. 130 ("Khalikov Decl.") ¶¶ 13, 15; *see* Opp. at 4-5. But not only are Khalikov's opinions about Kerimov's state of mind inadmissible, *see* Fed. R. Evid. 602 and 701,[7] the planned renovations were designed to

---

[7] Khalikov's opinions are also hearsay to the extent that they rely on Kerimov's out-of-court statements about the *Amadea*. *See* Fed. R. Evid. 803. Portions of the Reynard and Pastukhova declarations are also inadmissible under Rules 602 and 701 because they are lay opinion testimony and/or are made without personal knowledge. *See* Reynard Decl. ¶¶ 3, 6, 8, 13, 16; Pastukhova Decl. ¶¶ 8-9, 12-13, 16-17.

remedy each of these issues. *See* Ex. Q (interior design changes); Ex. R ("AVIT Refit"); Ex. U (interior design changes); Ex. EE at 7-8 (results of noise and vibration survey); *id.* at 14 ("Dinar Upgrades" to AVIT); Ex. FF (interior design changes). Further, while Claimants note that only some of the renovations to the *Amadea* were actually made, Opp. at 13-14, that is because the yacht was seized before the major construction phase of the work was due to begin. Ex. T at 20; Ex. GG at 42 ("Big refit to take place for winter 2022-2023 . . . Zuretti is working on it"). There is no reason to believe further renovations were not in the works as considerable sums had already been spent on the project. *see* Ex. T at 21; Ex. DD.

Claimants' counter-narrative that Gulnara Kerimova had merely chartered the *Amadea* does not hold water. As Claimants themselves note, the *Amadea* was not registered as a commercial vessel that could take charters at the time. *See* Khalikov Decl. ¶¶ 32, 57; Ex. HH at 2 ("To achieve a cruising permit for the region [we need] a letter stating that the vessel is here in a purely private capacity . . . ."). When the Kerimov family wanted to visit the British Virgin Islands ("BVI") during this supposed charter trip, Millemarin provided Co-Captain 1 with proof that the *Amadea* was being used in a non-charter capacity for BVI authorities: a letter dated February 3, 2022, that stated that "all guests aboard are private guests of the Owner *and the members of his family*." Ex. II (emphasis added). That is, Millemarin told BVI that that Gulnara and the other family members were not charterers, *they were the family of the owner, Suleiman Kerimov*. Claimants' attempt to rebrand Suleiman's October 2021 voyage on the *Amadea* as "Gulnara's sea trial," fails because Suleiman was the only Kerimov family member on the October 17 manifest. *See* Ex. O; *see also* Ex. P (discussing G1 (Suleiman) preferences only). Moreover, it is difficult to determine just how often Suleiman used the *Amadea* after the October voyage because his ordinary practice was to conceal his presence on board, as explained in an October 14, 2021 note by Co-

Captain 2 in the *Amadea's* "Chronicles" log discussing the upcoming October trip: "Dinar informed me of the *common practice that G1 is not declared on the Guest list*. Only Security is listed as guest *as cover…(false declaration can put us (the Capt. in particular) into serious trouble if inspected*) [h]owever, reportedly G1 has a diplomatic [p]assport … if this is correct and management agrees to this I am willing to subscribe to the above." Ex. EE at 25 (emphasis added); *see also* Ex. HH at 4 (email from Co-Captain 1 to Viktoria Pastukhova stating that G3 [Gulnara] "advised me that G1 [Suleiman] will be joining her and the kids for phase 2 Caribbean."). Finally, Claimants argue that it should not be considered unusual that Suleiman and his wife and children were discussing future voyages on the *Amadea* given the "possibility of a 20-week charter later in 2022." Opp. at 17. However, the Kerimovs' planning went well past the end of that time period into at least the middle of 2023. *See* Ex. X; Ex. Y at 3; Ex. JJ at 3.

These facts provide further context for the Errigal transaction, which is implausible as anything other than a means to set Khudainatov up as a straw owner of the *Amadea* and to conceal the fact that Kerimov was its true, beneficial owner. Indeed, Khudaintov appears to have been just one of the Russians in Imperial Yachts' stable of *Amadea* straw owners. While Claimants' brief repeatedly emphasizes Khudainatov's *Amadea* origin story—that he "commissioned the vessel at great expense" and has always been its UBO, *see* Opp. at 1, 9, 15, 24—it is conspicuously silent on the role of Alexander Smuzikov. As discussed in the Government's opening brief, Imperial Yachts, Khudainatov's "trusted business partner," Opp. at 16, 22, has repeatedly represented to financial institutions that Smuzikov, not Khudainatov, was the primary investor in the *Amadea* (through Nereo) and its UBO. *See* MTS Mem. at 3 n.6; Ex. I, J, K. Claimants did not address any of this evidence in their opposition papers.

**CONCLUSION**

For the foregoing reasons and those in the Government's opening brief and supporting materials, the Government respectfully requests that the Court strike the Claim of Khudainatov and Millemarin pursuant to Supplemental Rule G(8)(c)(i)(B) because they have failed to meet their burden to establish standing to contest forfeiture. Should the Court deny the Government's motion, the Government expects to request an evidentiary hearing at which Claimants must establish their standing by a preponderance of the evidence. *See* Supp. R. G(8)(c)(ii)(B); STEFAN D. CASSELLA, ASSET FORFEITURE LAW IN THE UNITED STATES, 463, 472 (3d ed. 2022) ("If its motion for summary judgment is denied, but the Government continues to press its challenge to the claimant's standing, the court must hold an[] evidentiary hearing at which the claimant must establish standing by a preponderance of the evidence.").

Dated:  New York, New York
        June 27, 2024

                                        Respectfully submitted,


MARGARET A. MOESER                      DAMIAN WILLIAMS
Chief                                   United States Attorney for the
Money Laundering and Asset Recovery     Southern District of New York
Section, Criminal Division              U.S. Department of Justice
U.S. Department of Justice

By:   /s/ *Joshua L. Sohn*              By:   /s/ *Jennifer Jude*
     JOSHUA L. SOHN                          JENNIFER JUDE
     Trial Attorney                          DOMINIKA TARCZYNSKA
     Money Laundering and Asset              Assistant United States Attorneys
     Recovery Section                        Southern District of New York




JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export Control
Section, National Security Division
U.S. Department of Justice


 By:   /s/ *Yifei Zheng*
     YIFEI ZHENG
     Trial Attorney
     Counterintelligence and Export
     Control Section