UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :

UNITED STATES OF AMERICA,
                                                 :

       Plaintiff,
                                                 :

   - v. -
                                                 :

THE M/Y *AMADEA*, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME     :     23 Civ. 9304 (DEH)
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND     :
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,                  :     FILED UNDER SEAL

                                               :

       Defendant-*In-Rem*.
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND MOTION FOR PERMANENT SEALING

Third-party witness ▮▮▮▮▮ ("Witness") moves to quash the government's subpoena for deposition testimony dated September 7, 2024 because he justifiably fears for his family's and his own safety and because other authoritative, but less vulnerable sources could provide much stronger evidence for the government's claims.

Federal Rule of Civil Procedure 45(d)(3)(A)(iv) requires that the Court quash a subpoena that subjects the recipient to "undue burden." Here the burden on Witness is "undue" given the threat to safety and the immateriality of the evidence he could provide, especially when compared with other sources at the government's disposal.

Witness is a U.S. citizen, aged 54, who has lived in ▮▮▮▮▮ with his spouse and now three small children since early 2018. Witness is also the primary caregiver for his very

elderly, blind father, now also in the ▮▮▮ area, whose situation is central to the threats that Witness now endures.

### A. Threats to the Safety of Witness's Family and Himself

Witness is a finance professional who previously held senior positions at ▮▮▮▮▮▮ in New York, London and Moscow. While in Moscow, he was part of ▮▮▮▮▮▮'s team providing investment advice to the family investment vehicles of Suleyman Kerimov ("SK"), a Russian businessman. In that role and a subsequent role as a direct investment advisor to SK's family investment vehicles, as a financial professional giving investment advice – along with many other American professionals who also provided financial and legal advice to SK's family investment vehicles – Witness became aware of the relationship between Nariman Gadzhiev ("NG") and NG's uncle SK. But Witness's role had already substantially diminished in 2017 and ended entirely in 2018 when Witness followed through on an existing plan to return to the U.S. and the U.S. government designated SK under the sanctions program. (Witness Declaration, Exhibit 1, ¶2)

When Witness and his family left Moscow in 2018, his aged, blind father remained in Moscow pending arrangements to securely relocate to the U.S., as well. During a return trip to Moscow to visit his father for the New Year's holiday in early 2019, Witness refused to deal with SK due to the U.S. sanctions. In response, SK threatened Witness, including initiating a Russian Federal Security Service investigation designed to imprison Witness. Witness narrowly escaped Russia, forced to leave his father, spouse and two young children behind to have a chance to escape. While Witness's spouse and children later managed to escape, his blind father remained in Moscow, effectively as leverage for SK over Witness. The trauma of that near death experience defines every aspect of the Witness and his family's lives. (Ex. 1 ¶3)

The vulnerable situation of Witness's father, and Witness's own inability to bring him home, lasted for several years and were consistently acknowledged by the American professionals who – unlike Witness – continued to advise SK's financial vehicles and – unlike Witness – remained in contact with NG and SK.

Attorney David Cohen, then of WilmerHale and now Deputy Director of the Central Intelligence Agency, demonstrated NG and SK's relationship in correspondence to NG on April 24, 2019 on behalf of Cohen's client James Langdon, another American lawyer at Akin Gump then serving as Protector, Investment Advisor, Designated Representative and Distribution Adviser to SK's family investment vehicle the Heritage Trust. (Exhibit 2) In that letter, Cohen told NG "I understand that you have a business and familial relationship with [SK], and that before [SK's] designation you occasionally acted on [SK's] behalf. Cohen also referred to the Grantor of the Heritage Trust, SK's mother, as a person "on whose behalf I understand you occasionally communicate."

Because Witness was aware of Cohen's and Langdon's continuing relationship with NG, Witness appealed to Cohen to remedy the escalating threat to Witness, his father and family. To emphasize his desperation, on May 3, 2019, Witness sent Cohen a Torah commentary emphasizing "there is nothing more sacred, valuable and inherently irreplaceable, than a human being." (Exhibit 1, ¶5; Exhibit 3)

Cohen, Langdon and Akin Gump remained in contact with NG through 2019, corresponding specifically on the issue which we understand is the subject as to which the government now seeks evidence: the relationship between NG and SK.

On May 17, 2019, James Langdon shared a draft of his message to NG, intended for SK, that referred to "a dispute with the Trust" – an oblique reference to SK's threats against Witness.

3

The urgency of the threat prompted Akin Gump to send partner Paul Butler, who represented SK, to Moscow for an immediate meeting with SK to address SK's threats against Witness. Akin Gump emphasized the "compliance issues for the trust" stemming from various U.S. professionals' rejection or threatened rejection of transactions for the Heritage Trust. (Exhibits 1, ¶6; 4, 5)

Akin Gump highlighted one U.S. investment advisor's "request to OFAC for written communication that the [Heritage] trust is not blocked property" – meaning that U.S. professionals were seeking assurance that SK did not retain property interest in the Heritage Trust. (Exhibits 4, 5) To this end, Langdon sought a legal opinion from Cohen, and Akin Gump dispatched partner Paul Butler to meet with SK in Moscow on May 21, 2019 specifically because of the severity of SK's threat to Witness for raising the sanctions as an issue preventing Americans from dealing with SK. (Exhibits 1 ¶7; 4, 5)

Upon his return from Moscow on May 22, 2019, Butler explicitly acknowledged that SK had admitted threats against Witness, including initiating the Russian criminal investigation, and that SK will maintain the pressure against Witness to deter him from interfering with SK's interests and until Witness came to Moscow to speak with SK. (Exhibit 1 ¶8)

None of Witness's efforts to get those Americans actually in contact with NG and SK to help provided any relief – and Witness's father's medical condition continued to deteriorate. In January 2020, when Witness's father was placed on life support in Intensive Care, Witness wrote to Langdon about "the dire medical condition that has recently hit my father in Moscow. What has been particularly difficult is that none of his sons can be with him." (Exhibits 1 ¶9; 4)

Witness appealed to Langdon citing his "intense fear that exists for the safety of my father in Moscow and the safety of my family in the United States due to the facts that you know," and

4

asked for Langdon's help in finding "a civilized and lawful path so that I could be there for my father, and so that my family could live without fear." (Exhibit 6).

Langdon acknowledged that Witness's "situation [was] made all the more difficult by the separation and other circumstances surrounding your father's situation in Moscow," but closed by warning Witness that "until these matters are resolved our communication on this subject should be confined to those occasions when my lawyers are present." (Exhibit 6)

Shortly after this message, doctors treating Witness's father suddenly demanded to remove him, still in Intensive Care at the time, from the hospital – a demand that Witness believes must have come from SK. (Exhibit 1 ¶9)

In March 2020, Langdon contacted Witness to tell him to expect "reports on the actions which I [Langdon] have taken with the lawyers to ensure that you can return to Moscow to visit your father." (Exhibit 7) Langdon then wrote "I am writing to address what I believe is the most pressing matter we discussed—your desire to visit your father in Moscow in light of his ailing health. I understand a bit about the tension between you and your former associates in Moscow such that you are concerned about returning to Russia. In this regard, I instructed the Trust's counsel from Miller & Chevalier to engage in very direct discussions with Nariman Gadzhiev a few weeks ago during one of their routine trips to Europe to underscore the importance of this matter." (Exhibit 8)

Having demonstrated his complete disengagement from SK, Witness was ultimately able to bring his father back to the U.S. in December 2021 after nearly three years of intense psychological anguish. The attendant stress requires an aggressive medication regime involving prescribed drugs that have affected Witness's memory. (Exhibit 1 ¶11)

Witness has already experienced his own near-death escape from Russia when he refused to deal with SK in compliance with U.S. sanctions and the confinement of his aged father for nearly three years. Witness remains intensely fearful that SK would retaliate were Witness to testify in legal case concerning the subject matter of the proposed deposition. Witness justifiably believes that he owes family's survival to separating from involvement with any activity that could be presented as adverse to SK.

### B. The Immateriality of Witness's Testimony

Witness's knowledge of the relationship between SK and NG is dated and ended as a practical matter in early 2018, now more than six years ago. Many other American professionals had a similar if not greater level of contact with SK and NG prior to 2018. Unlike Witness, several of those American professionals continued those relationships with SK and NG into the period after April 2018. (Exhibits 2, 9, 10, 11).

The government therefore has a variety of other, more knowledgeable sources of evidence at its disposal who are not subject to the same level of threat and impairment as Witness. Indeed, the government could seek testimony from a current government employee with deeper and more recent knowledge of the subject than Witness.

Finally, the government has effectively conceded that it has other sources of evidence available to it that obviate the need for Witness's testimony. In the State Department's press statement of November 14, 2022 announcing sanctions against NG, among others, Secretary of State Blinken described NG as "a primary financial facilitator for Kerimov." (Exhibit 12) Presumably, the government has evidence it could introduce that formed the basis for that statement and its designation of NG.

### C. The Court Should Quash the Subpoena to Testify and the Unredacted Version of the Motion Papers Should Remain Sealed

Given the undue burden the proposed testimony would impose on Witness, the Court should quash the subpoena pursuant to Fed.R.Civ.P. 45. Witness is subject to threat of severe harm from a source, SK, who has already harmed his family. This fear has already traumatized Witness and his family. Other U.S. sources of evidence, including within the government's direct control, are far better positioned to provide evidence than Witness and would suffer none of the undue burden that Witness would endure by doing so.

For the same reasons that underlie Witness' concerns over his and his family's safety, the unredacted version of these Motion papers should remain sealed in the public record.

Dated: September 24, 2024

Respectfully submitted,

*Andrew Hruska*

Andrew C. Hruska

KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
(212) 556-2100
ahruska@kslaw.com