# EXHIBIT A

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2

    - - - - - - - - - - - - - - - - -
3                                    )
    UNITED STATES OF AMERICA,        )
4                                    )
                 Plaintiff,          )
5                                    )  Case No.:
    v.                               )  23 Civ. 9304 (DEH)
6                                    )
    THE M/Y AMADEA, A MOTOR YACHT    )
7   BEARING INTERNATIONAL MARITIME   )
    ORGANIZATION NO. 1012531,        )
8   INCLUDING ALL FIXTURES, FITTINGS,)
    MANUALS, STOCKS, STORES,         )
9   INVENTORIES, AND EACH LIFEBOAT,  )
    TENDER, AND OTHER                )
10  APPURTENANCE THERETO,            )
                 Defendant-In-Rem.   )
11  - - - - - - - - - - - - - - - - -
12
13     VIDEO DEPOSITION OF PROFESSOR EWAN McKENDRICK, KC
14
15                Thursday, October 3, 2024
16             Commencing:  10:36 a.m. (GMT)
17
18

                 Regus - London - St James
19                  4 - 12 Regent Street
                   4th Floor - Rex House
20                        London
                     United Kingdom
21
22
23  Court Reporter (Remote):
24  Chanelle M. L. Malliff
    CLR, SSIV(NZ), MBIVR
25

```
 1              A P P E A R A N C E S
 2
    Appearing for the Claimants and taking:
 3
               FORD O'BRIEN LANDY LLP
 4             275 Madison Avenue, Floor 24
               New York, NY 10016
 5             (212) 858-0040
               By:  Robert S. Landy, Esq.
 6                  rlandy@fordobrien.com
 7                  Adam C. Ford, Esq.
                    aford@fordobrien.com
 8
 9  Appearing for the United States of America:
10             U.S. DEPARTMENT OF JUSTICE
               Criminal Division
11             1400 New York Avenue, NW
               Washington, D.C. 20005
12             (202) 355-5705
               By:  David H. Smith, Esq.
13
14
15  Also Present:
16             Ali Al'Karim, Consultant Expert
               Kieron Brennan, Videographer, Veritext
17
18
19
20
21
22
23
24
25
```

1           MR. SMITH:  Objection to the form.

2           THE WITNESS:  There is nothing express in the

3    contract to that effect, no.  Do you mean by "bound",

4    in the sense of having obligations --

5    BY MR. LANDY:

6        Q.  Correct --

7        A.  -- or having rights?

8        Q.  Ah, having obligations.

9        A.  Having obligations.  No, there would be no

10   other party having obligations.

11       Q.  So if you take a look at page -- I have the

12   clause written in.  We've done this.  We've done

13   this.  Professor, you're aware that one of the

14   term -- or this contract speaks to something referred

15   to as a completion of sale?

16       A.  Yep, that's clause (18) of the contract, yes.

17       Q.  Right.  Are you -- do you have an opinion as

18   to whether the completion of sale took place?

19           MR. SMITH:  Objection to form.

20           THE WITNESS:  That obviously is a matter of

21   fact but on the basis of the documentation that

22   I have read it does not appear that the completion of

23   sale took place as intended by clause (18).

24   BY MR. LANDY:

25       Q.  And what is a completion of sale?

1          A.   A completion of sale would be the point at
2     which legal title, i.e. property, passes from seller
3     to buyer.
4          Q.   Okay.
5          A.   That's essentially to me what clause (18)
6     says.
7          Q.   Now I'll ask you, for the purposes of this
8     deposition, to presume -- we can fight about it --
9     you know, the facts will be fought out -- but to
10    presume that the formal completion of sale did not
11    occur?
12         A.   Yeah.
13         Q.   Okay?  Assuming the completion of sale did
14    not occur, is it your opinion that that failure is
15    irrelevant to the question of whether or not Errigal
16    became the owner of the vessel?
17              MR. SMITH:  I'll just make a standing
18    objection to all questions assuming the completion of
19    sale had taken place, so I don't have the same
20    objection each time.
21              THE WITNESS:  Sure, okay.  The trouble is --
22    BY MR. LANDY:
23         Q.   Shall we ask the question again?
24         A.   Well I'll endeavor to answer it.  So as
25    I understand it this is an agreement to sell, and it

1    is a binding contract, and that is the burden of my

2    expert report.  Is it a sale?  Answer: only if

3    property passes from seller to buyer.

4        Under a sale contract the law is interested in the

5    legal title passing from seller to buyer.  If there

6    is no completion, legal title does not pass from

7    seller to buyer under this contract.  That is not to

8    say that the property can't pass in some other way,

9    but that's not a matter that's governed by my report.

10   It seems to me it is clear that property is to pass

11   pursuant to clause (18).  If we assume that did not

12   happen as a matter of this contract, the contract is

13   binding as an agreement to sale, but it is not a

14   sale.

15       Q.  Well, let's presume we have -- actually

16   I'm going to take this into a hypothetical.

17       A.  Okay.

18       Q.  So let's go out of this particular clause.

19   And at some point you may have been warned that in

20   expert depositions we get to do this.

21       A.  Okay.

22       Q.  We're not talking about the ships,

23   Millemarin, Errigal, any of these.

24       Let's presume that I've inherited a house from my

25   father, okay?  I don't need it anymore.  And so

```
                                             Page 25
1      but not the benefit relating to temporary possession?
2          A.   Yeah.
3          Q.   Okay.  You understand that Millemarin
4      Investments Limited contends that the transaction as
5      contemplated by the September 14 Memorandum of
6      Agreement was never completed; correct?
7              MR. SMITH:  Objection to form.
8              THE WITNESS:  I understand that it was not
9      completed as intended, in the sense of clause (18)
10     was not fulfilled.
11   BY MR. LANDY:
12         Q.   Clause (18).  Do you have any understanding
13     as to whether Errigal claims otherwise?
14         A.   I have no understanding in relation to
15     Errigal.
16         Q.   Okay.  Are you aware of anyone other than the
17     United States Government arguing that this contract
18     was completed?
19             MR. SMITH:  Objection to form.
20             THE WITNESS:  No, I'm not aware but I haven't
21     asked anybody on that basis.  But in the documents
22     that I have looked at, I don't recall such.
23   BY MR. LANDY:
24         Q.   The US Government is not a third party
25     beneficiary to the September 14, 2021 MOA, are they?
```

Page 28

1          A.   Yeah.   Yeah.

2          Q.   Okay.

3               (Reporter clarification on word.)

4               THE WITNESS:   Yeah, warrants, as in the sense

5      of promises/undertakes.   It's in clause (15) of the

6      agreement.

7    BY MR. LANDY:

8          Q.   What are your understandings of the

9      requirements of the delivery of the vessel under

10     clause (21)?   What had to happen?

11              MR. SMITH:   Objection to form.

12              THE WITNESS:   Well, in short, that the

13     requirements of the clause be carried out.

14   BY MR. LANDY:

15         Q.   Okay.   Why don't we flip along -- if you take

16     a look again at paragraph 18 --

17         A.   Yeah.

18         Q.   -- you see that it requires documentation --

19         A.   Yeah.

20         Q.   -- documentation set out in appendix 1?

21         A.   Yeah.

22         Q.   Did you look at appendix 1?

23         A.   Yes, I did.

24         Q.   Okay, let's turn to appendix 1.   All right.

25     Right above "SECTION A", it says:

1          Q.   Page 4596.

2          A.   Yeah.

3          Q.   Under SECTION A, the number (1) is a Legal

4     Bill of Sale.  Were you provided with a copy of a

5     Legal Bill of Sale?

6          A.   No, I was not.

7          Q.   Do you know if one was ever created?

8          A.   If it was, it's not in the documentation that

9     I have read.

10          Q.   All right.  Did you, in connection with your

11     review of the documents for this opinion, look to see

12     whether the various documents referred to in

13     ANNEX ONE were given to you?

14          A.   No, because the scope of my opinion was

15     actually when you read it, I am talking about this as

16     being an agreement to sell.  So I'm analyzing this in

17     contractual terms.  What you're now focusing on is

18     essentially whether the conditions for property

19     passing have been satisfied, and that was not the

20     issue that I was examining in my report.

21          Q.   All right.  If you -- back to page -- the

22     third page of this.  And I apologize that

23     I'm dragging you through all of this.  Some of it

24     will be repetitive.  You'd agree that the parties to

25     this agreement -- I'm going to direct you to (13)(d).

1    No, sorry, I'm going to (13)(a).  Would you agree

2    that the parties to this agreement considered the

3    documentary requirements of ANNEX ONE to be integral

4    to the agreement?

5        A.   That is what (13)(a) says, that Annex A is

6    an integral part of this agreement, yes.

7        Q.   Okay.  And if an integral part of the

8    agreement is not satisfied, what does that do to the

9    agreement?

10           MR. SMITH:  Objection to form.

11           THE WITNESS:  It means that that part of the

12    agreement has not been complied with, so that to the

13    extent that it is -- it could give rise to a claim

14    for breach of contract.

15   BY MR. LANDY:

16       Q.   Okay.  Is it your understanding that the

17    September 14, 2021 agreement gave Errigal the right

18    to use any obligation to maintain the vessel in the

19    time leading up to the completion of sale?

20       A.   Yes.

21       Q.   It's probably in (13) also.

22       A.   Well, it's in (7):

23           "The Buyer may start using the yacht

24           and/or start any works on board after

25           this payment.  The Buyer shall become

Page 34

1       Q.   The exchange?

2       A.   Yeah, from 14th of September.

3       Q.   Okay.

4       A.   And it runs so that the buyer bears the risk

5    until such time as the parties either vary the

6    contract or the contract is discharged in some way.

7       Q.   Okay.  Does the assumption of risk clause on

8    the part of the buyer excuse the seller from

9    complying with clause (18), completion of sale?

10           MR. SMITH:  Objection to form.

11           THE WITNESS:  No, the seller still has to

12    comply with the obligation under clause (18).

13   BY MR. LANDY:

14       Q.   Okay.  And if the seller fails to comply

15    under clause (18), would that constitute a default

16    under clause (20)?

17       A.   Yes.

18       Q.   All right.  And if the seller failed to

19    comply with clause (18), by being incapable of

20    delivering ownership title of the vessel, would the

21    buyer then be entitled to claim from the seller,

22    amongst other things, "provable losses and expenses

23    reasonably incurred following from such failure ...

24    together with interest ..." at a rate of LIBOR plus

25    2?

Page 35

1      A.  That's what clause (20) states.

2      Q.  Any reason to believe that clause (20) was

3   invalid?

4      A.  No clause (20) is valid.

5      Q.  And nothing about clause (22) invalidates

6   clause (20)?

7      A.  No.  A court would seek to read the two

8   together unless there was a manifest inconsistency

9   and the two would stand.

10      Q.  Okay.  Let's go back to your opinion.  Let's

11   see where I put your opinion.  I'm going to turn you

12   to the very last clause -- the last clause of the

13   last sentence of the last paragraph of your opinion,

14   which is on page 11.

15      A.  Okay.

16      Q.  It says -- I'm going to read with some

17   internal ellipses:

18          "... Errigal ... having paid the

19          purchase price in full, would be

20          entitled to seek redress in respect of

21          Millemarin's failure to transfer the

22          legal title to the Vessel to Errigal."

23          Do you see that?

24      A.  Yes.

25      Q.  What sort of redress would that be?

1    A.   I think it would be repayment of the purchase

2    price plus any consequential loss that you can prove

3    to have been suffered as a result of the breach.

4         Q.   Okay.  How long have we been going?

5         A.   Almost an hour.

6              MR. LANDY:  Let's take 5.

7              THE WITNESS:  Okay.

8              VIDEOGRAPHER:  We are going off the record.

9    The time is 11:24 a.m.

10                  (A short break)

11             VIDEOGRAPHER:  Back on the record.  The time

12   is 11:32 a.m.

13   BY MR. LANDY:

14        Q.   All right, we should continue.  Okay,

15   professor, so let's continue to presume that the

16   completion of sale in clause (18) did not occur as

17   required under the terms of the September 14,

18   2021 MOA from September 21 -- 14 of 2021 until today.

19        A.   Yeah.

20        Q.   Right.  And let's presume for this question

21   that the contract has not been varied --

22        A.   Yeah.

23        Q.   -- in any way, but it hasn't been completed.

24        A.   Mm-hmm.

25        Q.   What would be the state of affairs now as

1    obligations?

2        A.  By delivering the vessel.

3        Q.  Right.  Or is there any other way they could

4    satisfy the obligations after --

5        A.  They could renegotiate the contract.

6        Q.  Would repaying the money be a way of

7    satisfying the --

8        A.  No.

9        Q.  All right.  So assuming the seller has not

10   delivered title of the vessel, you would agree that

11   the buyer did not obtain it?

12           MR. SMITH:  Objection to form.

13           THE WITNESS:  The buyer did not obtain it

14   under the contract.

15   BY MR. LANDY:

16       Q.  Okay.  Is it your opinion, Professor, that in

17   this case Errigal did in fact obtain title to the

18   vessel?

19           MR. SMITH:  Objection to the form.

20           THE WITNESS:  That is a question I cannot

21   answer because I don't know all the facts and

22   circumstances.  What I would say is that I haven't

23   seen anything that suggests legal title was passed

24   from seller to buyer under this agreement because

25   clause (18) was not implemented.

Page 39

```
 1    BY MR. LANDY:
 2         Q.  Okay, and is legal title valuable?
 3         A.  Yes.
 4         Q.  Is possession valuable?
 5              MR. SMITH:  Objection to form.
 6              THE WITNESS:  Possession under this contract
 7         could be valuable in the sense that the buyer was
 8         given the use and the possession of the vessel.
 9         Under a straight contract of sale there is clear
10         English law to the effect that possession is not of
11         value because in a sale contract what you are -- what
12         the buyer is asking for is the transfer of title not
13         the transfer of possession.  So under a straight sale
14         there's no -- there is no benefit.
15    BY MR. LANDY:
16         Q.  Okay.  You would agree that until and unless
17         Millemarin transfers title to the vessel to Errigal,
18         Millemarin remains the legal owner of the vessel?
19              MR. SMITH:  Objection to form.
20              THE WITNESS:  Under this particular contract,
21         if it has not been carried through title did not pass
22         under the memorandum of agreement.  It could possibly
23         have passed in some other way but that is not the
24         subject of my opinion.
25    BY MR. LANDY:
```

1          Q.  Okay.  So again we haven't got an answer to

2     the question.  Could Errigal under the Memorandum of

3     Agreement of September 14 perform the, you know,

4     intent of the September 3, 2021 co-operation

5     agreement by finding a third party interested in the

6     boat and assigning their rights in the boat for a

7     value, would that have the same effect?

8               MR. SMITH:  Objection to form.

9               THE WITNESS:  There is a potential functional

10     equivalence, but legally they seem to me to be

11     separate and distinct.

12     BY MR. LANDY:

13          Q.  Do you contest that there is a connection

14     between those two documents?

15               MR. SMITH:  Objection to form.

16               THE WITNESS:  I don't think it's my function

17     to contest whether there's a connection between them.

18     BY MR. LANDY:

19          Q.  All right, I'll phrase it this way.  Do you

20     have any reason -- if I were to represent to you that

21     the addendum 2 to the September 13 -- September 14,

22     2021 Memorandum of Agreement was created in order to

23     implement the terms of the November 22 addendum to

24     the agreement between Mr. Khudainatov and

25     Mr. Kochman, would you have any reason looking at the

1    document to say that was not the case?

2        A.   Well, they are between different parties in

3    the sense one's the corporate form, the other is

4    between two individuals.  They're clearly related to

5    the same transaction, and what I would expect would

6    be that what an English court would do would be to

7    admit this into evidence and then what it would do

8    would seek to look at them together, assuming they're

9    part of the factual matrix, and then seek to work out

10   what the relationship between the two is.

11       Q.   Okay, and when you say "admit this", I see

12   you're placing your hand on Exhibit 4, which is the

13   November 22 document?

14       A.   Yeah.

15       Q.   All right.

16       A.   If I could just add a slight caveat.

17       Q.   Sure.

18       A.   Which is that for the September agreement the

19   November 22 amendment would not be admissible in

20   evidence because it's conduct subsequent to the

21   making of the contract, so in principle it would be

22   inadmissible.  But I think the fact that here you

23   have a later amendment to the September agreement

24   would then bring this into play.

25       Q.   Right.  Okay.  Just to put ourselves in time

Page 59

```
 1              THE WITNESS:  In relation to the
 2      documentation I have seen, yes, it is the first time
 3      it has appeared.
 4   BY MR. LANDY:
 5         Q.  Okay.  You've not seen another document that
 6      is a modification of the September -- strike that.
 7      We're fine with what you've got.
 8         A.  Okay.
 9         Q.  All right.  Looking at this document, as of
10      the date of the document, September 7 -- sorry,
11      March 7, 2022, can you determine who the owner of the
12      vessel Amadea is?
13              MR. SMITH:  Objection to form.
14              THE WITNESS:  (Pause).
15   BY MR. LANDY:
16         Q.  And to the extent you need to reference other
17      agreements, that's fine.
18         A.  It doesn't -- unless I've missed something,
19      and that's always the risk when you're looking at
20      a document, aware that everybody is watching you, it
21      doesn't -- it doesn't say who is the owner.
22         Q.  As of September -- as of the date of the
23      September 14, 2021 agreement, you would agree that
24      the owner was Millemarin Investments Limited?
25              MR. SMITH:  Objection.
```

Page 60

1          A.   Yes.   I'm sorry.   Yes.

2     BY MR. LANDY:

3          Q.   And this is an amendment to the September 14,

4     2021 agreement, correct, a second amendment?

5          A.   It is correct it's an amendment to the

6     Memorandum of Agreement, yes.

7          Q.   And have you seen any documentation

8     suggesting that between September 14, 201 and

9     March 7, 2022, Millemarin Investments Limited ceased

10    to be the legal title-holder of the vessel Amadea?

11         A.   I have not seen anything.

12         Q.   Okay.   Now looking at this document, what --

13    how does this change the nature of the September 14,

14    2021 Memorandum of Agreement?

15         A.   As I understand it it essentially seeks to

16    achieve the same goal but by a different route so

17    that instead of delivering the vessel, you deliver or

18    transfer the shares which would then give ownership

19    of the vessel.   But by a share transfer route rather

20    than delivery of the vessel.

21         Q.   Okay.   Shares of what?

22         A.   The shares -- I'm just looking.   The shares

23    of Millemarin.

24         Q.   Okay.   So this agreement, correct me if

25    I'm wrong, suggests that they are no longer going to

Page 61

1    transfer the vessel at all, legally; correct?

2                MR. SMITH:  Objection to form.

3                THE WITNESS:  That that -- sorry, so you're

4    saying they're not going to deliver the vessel.

5    They're not going to deliver the vessel, they're

6    going to deliver the shares instead or transfer the

7    shares instead.

8    BY MR. LANDY:

9         Q.  But who the "they" are becomes very important

10   here.

11        A.  Okay.

12        Q.  Right?  Millemarin is not delivering its own

13   shares --

14        A.  Yep.

15        Q.  -- to Errigal; correct?

16                MR. SMITH:  Objection to form.

17                THE WITNESS:  It is the seller who is

18   undertaking the obligation and the seller is Invest

19   International Finance.

20   BY MR. LANDY:

21        Q.  So it's the new party -- the new party in

22   this agreement, which is the owner of Millemarin,

23   under this agreement requires Millemarin, or is

24   required to transfer its ownership of Millemarin

25   itself to the buyer; is that correct?

Page 62

1       A.   Yes.
2       Q.   Okay.  So do you have any understanding of
3    whether that transfer ever occurred?
4       A.   On the basis of the information that I saw
5    the transfer did not occur because it was signed by
6    one party but not the other.
7       Q.   And is it your understanding that the
8    directors of Errigal resigned prior to signing the
9    transfer?  I can represent to you that that occurred.
10           MR. SMITH:  Objection to form.
11           THE WITNESS:  Okay, the only cause for doubt
12    I have, and it seemed a factual one, is that the two
13    directors or the company "Campbell", or whatever it's
14    called, it's out of the picture.
15 BY MR. LANDY:
16       Q.   Right.
17       A.   The two directors are out but there was a
18    reference to someone that looked like a Russian name
19    that was coming in as a director.
20       Q.   I can explain that all to you off the record,
21    but it's irrelevant.
22       A.   Okay.
23       Q.   For now the question is, did you see any
24    evidence in your view that suggested that the
25    closing, because in this case it's considered a

Page 63

```
 1      closing, occurred?
 2              MR. SMITH:  Objection.
 3              THE WITNESS:  A closing of what?
 4    BY MR. LANDY:
 5         Q.  It's a term in this agreement.  It doesn't
 6      say completion here it says, "Closing":
 7              "5.  The closing of the Agreement will
 8              take place on or before 15 March ..."
 9         A.  Yeah.
10         Q.  Did you see any document suggesting that that
11      closing actually occurred on or before March 15?  And
12      I'll represent that closing and completion are two
13      terms of art in different legal circles.
14         A.  Yeah, fine.  I did not see any document.
15         Q.  Okay.  And based on your review of this
16      amendment, is this also a two-step transaction where
17      you have something similar in exchange followed by a
18      completion?
19              MR. SMITH:  Objection.
20              THE WITNESS:  Well, I mean first of all this
21      is governed by the law of the Cayman Islands.
22    BY MR. LANDY:
23         Q.  Again, we're gonna hope it's the same.
24         A.  So we have to make an assumption.  But it
25      looks -- a two-step transaction in the sense that do
```

Page 64

1    you mean that there's an initial agreement followed

2    by a subsequent transfer of the shares?

3         Q.   Correct.

4         A.   Yes, that is how it would appear to be.

5    There's no immediate transfer of the shares, it is

6    intended that that will happen at a future point.

7         Q.   And like the Memorandum of Agreement from

8    September of 2021, if the share transfer does not

9    occur, then the seller would be in breach; is that

10   correct?

11        A.   Yes.

12        Q.   Okay.  So this is different in that

13   Millemarin itself is being transferred.  And there

14   may be a factual dispute as to whether or not the

15   closing occurred, however two questions.  Let's

16   presume the closing did not occur.

17        A.   Yeah.

18        Q.   If the closing never occurred, based on this

19   agreement and the previous ones, do you have

20   an understanding of what entity is the direct legal

21   owner of the Amadea?

22             MR. SMITH:  Objection to form.

23             THE WITNESS:  So my understanding on the

24   documents that we are looking at, if we assume at the

25   outset that the owner is -- legal title is with

Page 65

1    Millemarin, the completion doesn't take place under

2    the September memorandum, therefore legal title

3    stays, and because there is no completion or closing

4    of this transaction, under this transaction legal

5    title does not move either.

6  BY MR. LANDY:

7        Q.  Okay.  Now let's take the other assumption.

8    Let's presume that the March 7, 2022 amendment does

9    close and the shares of Millemarin pass from IIF to

10   Errigal.  Under that circumstance which entity is the

11   direct legal owner of the Amadea?

12           MR. SMITH:  Objection to form.

13           THE WITNESS:  Millemarin.

14  BY MR. LANDY:

15       Q.  There's no change; correct?

16           MR. SMITH:  Objection.

17           THE WITNESS:  Well, there is -- that again is

18   something I probably would want to think about.  You

19   are quite right, in corporate form there is no

20   change, but the corporation in a sense has changed

21   because the ownership behind it has changed.

22  BY MR. LANDY:

23       Q.  If after the -- under English law -- let's do

24   this under English law.  I understand the

25   BVI problem.

1        A.   Okay.

2        Q.   Under English law, if the March 7 agreement,

3    March 7, 2020 agreement was fully consummated and the

4    shares did transfer so Errigal became the owner of

5    Millemarin --

6        A.   Yeah.

7        Q.   -- and Millemarin was then the owner of the

8    vessel, if subsequent to that time there was a

9    dispute regarding the vessel in an English court,

10   would Millemarin have standing to argue its position?

11            MR. SMITH:   Objection.

12            THE WITNESS:   Well it would have standing

13   under this contract.

14   BY MR. LANDY:

15       Q.   Right, and I'm saying presume this contract

16   was executed, the shares of Millemarin itself

17   transferred, but the vessel stayed in the name of

18   Millemarin.   Would Millemarin have standing to state

19   its position with respect to any dispute relating to

20   the boat?

21            MR. SMITH:   Objection.

22            THE WITNESS:   I think that would depend on

23   the facts and circumstances but assuming the contract

24   is fully executed and has been performed they would

25   be out of the picture.

Page 68

```
 1     owner of the vessel?
 2   BY MR. LANDY:
 3        Q.  Well, that's a question -- do you have any
 4     indication that Millemarin ceased to be the legal
 5     owner of the vessel at in any time?
 6             MR. SMITH:  Objection.
 7             THE WITNESS:  I -- no.
 8   BY MR. LANDY:
 9        Q.  Okay.  And so we've agreed that regardless of
10     whether the September -- I'm sorry, the March 7, 2022
11     amendment is performed or not, Millemarin was to
12     retain legal title, because the subject of the sale
13     was the shares of Millemarin itself.  Millemarin was
14     to retain legal title to the vessel, correct?
15        A.  It is retaining legal title but of course the
16     economic reality is very different because there's
17     been a change of control.
18        Q.  Well, it's only if the shares were
19     transferred?
20        A.  If the shares are transferred there has been
21     a change of control but the legal form remains the
22     same.
23        Q.  But let's say this contract is completed,
24     done.  We're past it.  There's a total new dispute.
25     It relates to the boat.
```

Page 69

 1         A.  Yeah.

 2         Q.  Somebody else says they own the boat.

 3         A.  Yeah.

 4         Q.  Does Millemarin appear in court and say, "We

 5    own the boat", or does Errigal appear in court and

 6    say, "We own the boat"?

 7              MR. SMITH:  Objection to form.

 8              THE WITNESS:  Assuming there's no change in

 9    registration documents or anything of that nature it

10    would be Millemarin.

11              MR. LANDY:  Why don't we take one more break.

12    I'm just gonna check my notes but I'm, if not

13    completely done, very close to done.

14              THE WITNESS:  Okay, fine.  Do you want us to

15    go out this time?

16              VIDEOGRAPHER:  Going off the record.  The

17    time is 12:22 p.m.  Thank you.

18                    (A short break)

19              VIDEOGRAPHER:  We are back on the record.

20    The time is 12:33 p.m.

21   BY MR. LANDY:

22         Q.  Thank you, Professor.  I really only have a

23    few additional questions to ask and we'll be going

24    back, as we have many times before this morning, to

25    the September 14, 2021 Memorandum of Agreement.  Is

Page 71

1      agreement that prevents the individuals who control

2      the parties to the agreement from making an agreement

3      amongst themselves to vary the terms of the

4      Memorandum of Agreement?

5                MR. SMITH:  Objection to form.

6                THE WITNESS:  No.  It would of course have to

7      be proved that there was such an agreement, but there

8      isn't -- if the question is, is there anything that

9      prevents them, the answer is no.

10               MR. LANDY:  Okay.  I have no further

11     questions.  Thank you very much for your time.

12     Mr. Smith may or may not ask you questions, and if he

13     does, I may say "Objection", and you can ignore me,

14     just as you ignored him.

15               MR. SMITH:  I have no questions.  Thank you.

16               MR. LANDY:  Then we're done.  Thank you.

17               VIDEOGRAPHER:  We are off the record at

18     12:36 p.m., and this concludes today's testimony

19     given by Professor Ewan McKendrick.

20               The total number of video clips recorded was

21     three, and they will be retained by Veritext.  Thank

22     you very much.

23               MR. SMITH:  Oh I'm sorry, I'd like to request

24     on the record that Professor McKendrick reads and

25     signs the transcript.

```
                                                    Page 72
 1               (Reporter requests transcript orders.)
 2               MR. LANDY:  We would like not a rough but we
 3     would like expedited delivery of the transcript,
 4     which of course then Professor McKendrick will have
 5     the ability to submit errata on.
 6               COURT REPORTER:  Mr. Smith, you don't want a
 7     rough; you hadn't ordered one?
 8               MR. SMITH:  Correct.  And I don't know how it
 9     works, if we have to place a separate order for it to
10     be, you know, our own order for it to be expedited,
11     but we'd like it the same time as opposing counsel.
12               THE WITNESS:  And if you could tell me the
13     time frame within which I have to correct it, that
14     would be appreciated.
15               MR. SMITH:  I think it's 30 days.
16               THE WITNESS:  Okay fine.  So there's a rule.
17               (Whereupon, the deposition concluded at
18     12:37 p.m.)
19
20
21
22
23
24
25
```