UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-09304 |
| THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, | The Honorable Dale E. Ho |
| Defendant-*In-Rem*, | |
| and | |
| EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD., | |
| Claimants. | |

## MOTION TO EXCLUDE EXPERT OPINION OF ANDERS ASLUND

Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd., by and through counsel, move this Court to exclude the expert opinion of Anders Aslund (the "Aslund Report")[1] pursuant to Rule 702 of the Federal Rules of Evidence.

## PRELIMINARY STATEMENT

---

[1] The Aslund Report is attached as **Exhibit 1**.

The government has engaged Anders Aslund ("Aslund"),[2] a self-described specialist on Eastern European economies, to opine on "the estimated historical and current net worth of Russian businessman Eduard Khudainatov and the business activities that generated his wealth." Aslund Report ¶ 5.[3] To render this "expert" opinion, Aslund read newspaper articles. Specifically, he relied almost exclusively on Russian newspaper articles discussing Mr. Khudainatov's personal and professional history. *Id*. ¶ 11. He did not conduct any independent investigation into Mr. Khudainatov's business dealings, examine the sources underlying the news articles he reviewed, or interview the authors of those articles. Rather, he simply read the articles, summarized them, and made extrapolations about the amount of money that he believes would have been in Mr. Khudainatov's possession following the transactions described in the articles. He then offered the following "expert" opinion: Mr. Khudainatov could not possibly have owned the *Amadea* at the time of its seizure because he never had enough money to build it in the first place. As such, this "expert" offers his "expert" opinion that the U.S.-sanctioned Suleiman Kerimov ("Kerimov") must own the *Amadea*.[4]

That is improper "expert" testimony for a whole host of reasons:

*First*, an opinion that merely summarizes secondary sources is not based on reliable principles or methodology and, consequently, is not an expert opinion at all. It is merely the

---

[2] The government has withdrawn its confidentiality designation of Mr. Aslund's name.

[3] As discussed below, Mr. Aslund also was engaged "to provide financial, business, and limited personal information about Russian citizens Suleiman Kerimov, Alisa Gadzhieva, and Igor Sechin. Aslund Report ¶ 5. The focus of the opinion, however, is Mr. Khudainatov's wealth.

[4] The expert does not bother to address the thornier issue raised by his expert opinion: if Mr. Khudainatov did not have the money to buy the *Amadea* originally, how did he sell it to Mr. Kerimov in the fall of 2021, when the government alleges he sold it to him.

repetition of hearsay evidence that allows the proponent of the opinion, under the guise of expert "analysis," to circumvent the rule prohibiting hearsay.

*Second*, even assuming that the Aslund Report is more than simply a regurgitation of news articles—and it is not—it is tantamount to an opinion as to Mr. Khudainatov's credibility, which is not the proper subject of expert testimony. Specifically, the Aslund Report uses news articles to attempt to undercut the testimony of several witnesses with first-hand knowledge who knew that Mr. Khudainatov owned the *Amadea*, *Crescent*, and *Scheherazade*. Aslund argues that the newspaper articles (largely published by Russian opposition papers) prove Mr. Khudainatov's statements concerning his ownership of the *Amadea* to be "implausible." That is the equivalent of saying that Mr. Khudainatov is lying when he says he commissioned the building of the *Amadea* and still owned it at the time of its seizure. And that is a question for only the finder of fact to answer. Mr. Aslund's repeating to this Court his interpretation of newspapers he read does not assist the trier of fact in any way.

*Third*, the Aslund Report improperly seeks to opine on the ultimate factual issue of the case, which is whether the *Amadea* is owned by Kerimov, as the government contends, or Mr. Khudainatov, who is not the subject of U.S. sanctions. If Mr. Khudainatov is the rightful owner of the *Amadea*, Claimants have standing and there was no criminal conduct to warrant its seizure. Again, that is a question for only this Court to answer.

*Fourth*, the few paragraphs of the Aslund Report that are not based entirely on, and effectively a regurgitation of, news articles should be excluded because they concern subjects on which Mr. Aslund is not qualified to opine, namely (1) the reliability of Deloitte's valuation of Independent Oil Company ("NNK"), a company owned by Mr. Khudainatov; and (2) the commercial reasonableness of a loan extended by Alisa Gadzhievna Gadzhieva ("Gadzhieva") to

Errigal Marine Ltd. ("Errigal"), a company owned by Evgeniy Kochman ("Kochman"), for temporary use rights to the *Amadea*. Mr. Aslund's experience in the macroeconomics of Russia and Ukraine do not qualify him to testify on whether facts that other witnesses testified to are true or false, nor has the government offered him as an expert on those subjects.

*Finally*, the Aslund Report improperly opines on whether Mr. Khudainatov owns several superyachts other than the *Amadea*. The only issue presently before the Court is whether Mr. Khudainatov has a colorable claim of interest in the *Amadea* such that he has standing to challenge its forfeiture. What other superyachts he owns or does not own is irrelevant to that question. In any event, Claimants have produced in discovery all the relevant corporate documents demonstrating Mr. Khudainatov's ownership of all three vessels. These documents are supported by the testimony of several witnesses with first-hand knowledge of that ownership. Mr. Aslund's view that Mr. Khudainatov did not purchase these vessels from Lurssen shipyard because he did not have the funds to do so has no business being introduced as evidence in a case where the CEO of Lurssen shipyard testified that he worked extensively with Mr. Khudainatov during the building of these three vessels and that Mr. Khudainatov commissioned and paid for them.

Accordingly, the Court should exclude the Aslund Report, and Mr. Aslund's testimony regarding his report, entirely.

## SUMMARY OF THE ASLUND REPORT

In various sworn statements submitted in this case,[5] Mr. Khudainatov has outlined the history of the *Amadea*'s building and ownership over the period 2012 through 2022. He has

---

[5] Mr. Khudainatov's sworn statements include the Verified Claim filed on November 28, 2023 (Doc. No. 9), Mr. Khudainatov's declaration submitted in opposition to the government's motion

4

testified—and submitted documents demonstrating—how he generated the financial resources to commission its construction, how he paid for the construction over time, his efforts to sell the ship, and his retention of its ownership once a sale was never consummated. His assistant testified for ten hours as to how she personally oversaw the commissioning of and payments for the *Amadea*, complete with all the supporting wire transfers and corporate documents.

Relying predominantly on Russian news outlets, including several opinion pieces from opposition leaders, the Aslund Report challenges the truth of Mr. Khudainatov's sworn statements concerning his wealth and ownership of the *Amadea* and other superyachts, characterizing them as "implausible" and "highly improbable." For example, the Aslund Report contains the following opinions:

- Citing an article from *Market Insider*: "Mr. Khudainatov's claim [in the Khudainatov Declaration] that his sale of his Rosneft shares in 2013 netted him $100 million is ***implausible though not altogether impossible***. In this period, the Rosneft share price fluctuated in a narrow range around $200 a share, so no significant rise over $42 million appears plausible." Aslund Report ¶ 30 (emphasis added).[6]

- Citing an article from *Forbes*: "Mr. Khudainatov's claims in paragraph 6 in [the Khudainatov] declaration that Deloitte assessed the value of NNK at $8.6 billion on June 30, 2015, and that the value then rose even higher are ***completely implausible***." *Id*. ¶ 40 (emphasis added).

- "Nor is there any apparent public evidence of Mr. Khudainatov having had any dealings with the far more luxurious yacht shipyards Lurssen (which built *Amadea*) or Oceanco (which built *St. Princess Olga*). ***Given that the Russian media expressed surprise at his ability to buy a minor yacht for $19 million in 2018***, ***it is implausible that he would be able to purchase Amadea for €212,824,677 between 2012 and 2017*** as he alleges in [the Khudainatov Declaration], paragraph 15." *Id*. ¶ 52 (emphasis added).

---

to strike the claim (the "Khudainatov Declaration") (Doc. No. 126), and Mr. Khudainatov's interrogatory responses served on June 21, 2024.

[6] "Rosneft" is a lucrative oil company of which Mr. Khudainatov became president in September 2010. Aslund Report. ¶ 21.

5

- Relying on an article from *Market Insider* (*id.* ¶ 30) and a publishing from the Organized Crime and Corruption Reporting Project ("OCCRP") (*id.* ¶ 33): "Claimant's interrogatory responses (signed under penalty of perjury by Mr. Khudainatov) state that Mr. Khudainatov commissioned the Amadea for roughly €223 million in February 2012, even though the full €223 million purchase price was not paid to the ship's builder. I have seen no financial documents that Mr. Khudainatov had the financial means to commission a €223 million superyacht in 2012, and ***the available facts of Mr. Khudainatov's business trajectory show that he did not have the means to commission a €223 million superyacht in 2012***. *Id.* ¶ 67 (emphasis added).

- Summarizing previously discussed news reports: "Mr. Khudainatov's amended interrogatory responses… appear ***highly improbable*** given that Mr. Khudainatov lacked the money to make the purchases he set forth… Claiming to have commissioned *M/Y Amadea* on February 24, 2012 from Lurssen and paid €212,824,677 is ***completely implausible***, as discussed above." *Id.* ¶ 110 (emphasis added).[7]

Apart from news articles, the only other documents on which the Aslund Report relied to assess Mr. Khudainatov's wealth were: (1) his Russian income declarations (the equivalent of tax returns in the U.S.) for the years 2017-2022, which Mr. Aslund characterizes as "brief and easy to read" (*id.* ¶ 59); and (2) valuations of NNK (the oil company created by Mr. Khudainatov in 2013) prepared by Deloitte (Russia) and three other Russian companies (*id.* ¶¶ 40-46). In rejecting Deloitte's valuation of NNK at $8.6 billion as of June 30, 2015 as "completely implausible" (*id.* ¶ 40), the Aslund Report opines that the valuations prepared by the other three companies are similarly inflated because they are based on "highly unrealistic" and "wildly optimistic" price assumptions about the potential value of oil and gas in the ground—not the actual market value of Mr. Khudainatov's company (*id.* ¶¶ 41-46). Mr. Aslund

---

[7] The Aslund Reports similarly attacks the credibility of Mr. Khudainatov's sworn statements concerning his ownership of the *M/Y Crescent*, *M/Y Scheherazade*, and *M/Y Amore Vero*. *Id.* ¶¶ 110-11. As discussed below, the only question relevant to Mr. Khudainatov's standing to challenge the government's forfeiture of the *Amadea* is whether he has a colorable claim of interest in the *Amadea* itself. The Aslund Report's opinions concerning Mr. Khudainatov's ownership of other superyachts is irrelevant at this juncture.

ultimately concludes: "[A]part from the period after December 2020, it appears inconceivable that Mr. Khudainatov would have had sufficient means to buy or commission a superyacht costing more than $200 million." *Id*. ¶ 112.

The last quarter of the Aslund Report provides information about Russian businessmen and politicians Suleiman Kerimov and Igor Sechin, and Kerimov's niece, Alisa Gadzhieva ("Gadzhieva"), who owns several restaurants in Moscow. Like the information he gathered about Mr. Khudainatov, Mr. Aslund obtained information about these other individuals almost entirely from news articles and other public sources. Aslund Report Ex. B ¶¶ 6-7. The only non-public documents on which Mr. Aslund relied were a handful of documents produced in discovery, consisting of a loan agreement between Gadzhieva and Errigal and letters reflecting instructions for payment of the loan proceeds. Aslund Report ¶ 91. Under the loan agreement, Gadzhieva loaned €225 million to Errigal, a holding company controlled by Kochman, who used those proceeds to pay Mr. Khudainatov for temporary rights to use the *Amadea* while Kochman endeavored to sell it. *Id*. Based on his review of three websites concerning Gadzhieva's restaurant businesses (*id*. ¶ 89 at n.69), Mr. Aslund "infers" that the €225 million Gadzhieva loaned to Errigal must have come from Kerimov (*id*. ¶ 90). He then opines that the loan made no economic sense from the perspective of either Gadzhieva or Kochman—neither of whom he knows personally— "creating a strong inference that it was not a genuine loan at all but rather a disguised means for Kerimov to purchase the *Amadea*." *Id*. ¶¶ 91-93.

As set forth below, none of Mr. Aslund's conclusions is based on reliable methodology, most concern matters that are not the proper subject of expert testimony, and others are beyond the scope of his expertise. The Court should exclude the Aslund Report entirely.

7

# ARGUMENT

A qualified expert may testify in the form of an expert opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In considering whether an expert satisfies the requirements of Rule 702, the court should consider: "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data or methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011).

To determine whether the opinion is based upon reliable data, courts consider "whether the theory can be tested, whether it has been subjected to peer review, the error rate associated with the methodology, and whether the theory is generally accepted by the scientific community." *Andersen News, L.L.C. v. American Media, Inc.*, 2015 WL 5003528, at *1 (S.D.N.Y. Aug. 20, 2015) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)). An expert's data and methodology are sufficiently reliable only where there is a "rigorous analytical connection between [the] methodology and the expert's conclusions." *Andersen News*, 2015 WL 5003528, at *1 (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005)).

To determine whether expert testimony will assist the trier of fact, courts examine whether "the jury is capable of understanding and deciding the matter without the expert's help." *Arista Records*, 2011 WL 1674796, at *4. "[A]n expert cannot be presented to the jury solely for

the purpose of constructing a factual narrative based upon record evidence." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (quoting *Highland Capital Mgm't L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)). As this Court has explained: "Experts are entirely appropriate to assist the Court with complex, technical matters. But they are not percipient witnesses… and they are not a vehicle to provide factual narration." *In re M/V MSC Flamina*, 2017 WL 3208598, at *3 (S.D.N.Y. July 28, 2017). Nor can an expert "merely recite what is on the face of a document produced during discovery" and do "no more than that which the finder of fact could him or herself do." *Anderson News*, 2015 WL 5003528, at *2 (internal quotation marks and citation omitted).

Notably, certain subjects are not proper for expert testimony at all, no matter how reliable the methodology used to assess them. For example, "expert opinions that constitute evaluations of witness credibility" are inadmissible. *Nimley*, 414 F.3d at 398. Expert testimony concerning intent, motive, or state of mind is likewise inappropriate. *Anderson News*, 2015 WL 5003528, at *2 (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 29, 531, 551 (S.D.N.Y. 2004). And experts may not coopt the role of the factfinder "by weighing the evidence to reach factual determinations." *MSC Flamina*, 2017 WL 3208598, at *4 (precluding expert testimony where expert was acting as "a conduit for a factual narrative" and "finding facts" that were in contention in case).

Essentially a summary of news articles handpicked by Mr. Aslund, which he then uses as a premise to write whatever he wants (the entire report is plagued by citations to newspaper articles that do not say was Aslund asserts they say) the Aslund Report is not the product of a reliable methodology as required by Rule 702. Nor is Mr. Aslund's testimony, which the government uses solely to advance its factual narrative, necessary to assist the Court as the trier

9

of fact. And perhaps most problematically, the government is improperly using Mr. Aslund to attack Mr. Khudainatov's credibility, as well as the credibility of Gadzhieva and Kochman, and to make a critical factual determination that is both hotly contested and dispositive—namely whether Mr. Khudainatov or Kerimov is the beneficial owner of the *Amadea*. The Court should exclude the report entirely.

### A. The Court should exclude the Aslund Report because it neither employs a reliable methodology nor assists the trier of fact.

Mr. Aslund readily acknowledges that the "main sources" of his report are "Russian business newspapers," which are inadmissible hearsay. Aslund Report. ¶ 11 & Ex. B. While an expert is entitled to rely on hearsay in forming his opinion, the expert must form his opinion by applying his "extensive experience and a reliable methodology to the inadmissible materials." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the Government to circumvent the rules prohibiting hearsay." *Id.* (internal quotation marks omitted); *see also Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27, 33 (D.D.C. 2010) ("Expert opinions may be based on hearsay, but they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge.").

Mr. Aslund articulates no methodology at all in his report, much less a reliable one. Mr. Aslund simply reviews a selection of Russian news articles concerning Mr. Khudainatov and his businesses and summarizes those that fit the government's factual narrative about Mr. Khudainatov's ability to afford the acquisition of the *Amadea*. His "analysis," to the extent it can be called that, "consists entirely of deductions and observations that flow directly from the content of the hearsay statements and would be self-evident to a lay person." *Gilmore v. Palestinian Interim Self Gov't Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014) (excluding expert

10

opinion "based entirely on hearsay evidence"), *aff'd* 843 F.3d 958 (D.C. Cir. 2016). That is not an expert analysis at all.

To the extent Mr. Aslund can be said to have employed any methodology in reviewing the news articles on which his report is based, his deposition testimony confirms that it was not one on which this Court should rely. Mr. Aslund admitted during his deposition that an article he cited as evidencing that Mr. Khudainatov solidified his relationship with Russian oligarch Igor Sechin by testifying against one of his nemeses in June 2007 did not mention Mr. Khudainatov at all. *See* Excerpts from November 8, 2024 deposition of A. Aslund, attached as **Exhibit 2**, at 36:4–41:24. Mr. Aslund further admitted that, despite citing *Reuters* articles in his report, he views *Reuters* as "by [and] large not reliable." Ex. 2 at 38:1–12. He also admitted that, because wealthy individuals in Russia often have the means and motivation to hide assets, public reports purporting to quantify their wealth are often inaccurate. *Id*. at 54:4-64:8. These admissions prove that Mr. Aslund's collection of news articles about Mr. Mr. Khudainatov's wealth is not a reliable assessment of his ability to afford the commissioning of the *Amadea*.[8]

---

[8] Indeed, portions of the Aslund Report are no more than rank speculation. For example, concerning his conclusion that it was Kerimov who funded the €225 million loan from Gadzhieva to Errigal in 2021 (Aslund Report ¶ 90), Mr. Aslund testified as follows:

> Q  Do you have an understanding of how the Kerimov family manages its wealth?
> A  Yes, but it's [Suleiman] Kerimov that handles money to his three kids, and the three kids of his sister, for some reason his brother I have not seen any evidence that he's involved in the family business. He stays in Dagestan.
> Q  Do you have an understanding of how they legally structure the wealth?
> A  I mean, they always do it through a lot of shell companies.
> Q  Okay, so do you believe it is impossible that Ms. Gadzhieva was given, in a legal manner, enough money to have [funded the €225 million loan] notwithstanding the fact that she didn't make it from her restaurants?
> A  A legal manner, it's a loan to transfer money to her, I mean it cannot be that she has earned it. Capital management by Mr. Kerimov.

Apart from lacking any reliable methodology, the Aslund Report is also not necessary to assist the trier of fact because it essentially recites the content of otherwise inadmissible news articles that any reader could understand on his or her own. *Arista Records*, 2011 WL 1674796, at *4. The subjects of the articles are not technical, nor are they difficult to understand. They concern how much money Mr. Khudainatov made on certain business deals and how much money he spent on superyachts. And even the limited number of financial documents Mr. Aslund reviewed do not require interpretation. Mr. Aslund himself characterizes Mr. Khudainatov's income and tax declarations as "brief and easy to read." Aslund Report ¶ 59.[9] Accordingly, even if the Aslund Report were reliable, it is not necessary to assist the trier of fact as required by Rule 702 and should be excluded on that basis. *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (rejecting portions of expert report on ground that testimony consisted of "a narrative of the case which a lay juror is capable of constructing"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (rejecting portion of expert opinion that provided historical commentary of events).

---

| | | |
|---|---|---|
| Q | | Well, that's not -- I'm not asking whether she has earned the money from running restaurants, I won't assume that the restaurants are even profitable. |
| A | | I think they are. |
| Q | | Really? |
| A | | Yes. |
| Q | | They're often vanity projects. The question is whether your statement, you do not believe that the Kerimov family could have structured their assets such that Ms. Gadzhieva would in fact have $225 million to spend, if she wanted? |
| A | | No. |
| Q | | It just simply wouldn't have happened? |
| A | | I don't think so. |

Ex. 2 at 150:11-151:21. This is pure conjecture, not specialized knowledge of any kind.

[9] While an opinion on the valuations of NNK could be construed as helpful to the trier of fact, Mr. Aslund is not qualified as a valuation expert. As set forth below, his opinions concerning the accuracy of the NNK valuation reports should be excluded on that basis.

### B. The Court should exclude the Aslund Report because it improperly opines on Mr. Khudainatov's credibility as a witness.

The Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimley,* 414 F.3d at 398. Such testimony does not assist the trier of fact, but rather "undertakes to tell the jury what result to reach and attempts to substitute the expert's judgment for the jury's." *Id* (internal quotation marks omitted) (excluding expert testimony that "commented directly, under the guise of expert opinion, on the credibility of trial testimony from crucial fact witnesses"); *see also United States v. Dugue*, 763 Fed. App'x 93, 96 (2d Cir. 2019) (granting motion to exclude expert testimony concerning the credibility of cooperating witnesses); *United States Sec. & Exch. Comm'n v. Collector's Coffee Inc*., 552 F. Supp. 3d 427, 432 (S.D.N.Y. 2021) (granting motion to exclude expert testimony concerning cooperating witness's motive to lie).

As set forth above, the Aslund Report ***directly*** challenges Mr. Khudainatov's credibility (as well as the credibility of Gadzhieva, Kochman, and every other witness testifying in a manner inconsistent with the government's theory of the case), rejecting the sworn statements Mr. Khudainatov has made concerning his wealth as "implausible," "improbable," "inconceivable" and not "credible." Aslund Report ¶¶ 30, 40, 52, 64, 66, 67, 70, 110a-c, 111.  as well as that of Gadzhieva, Kochman, and every other witness that has testified in a manner inconsistent with the government's allegations. The Report also questions the legitimacy of the 2021 transaction between Mr. Khudainatov and Evgeniy Kochman, detailed in the Khudainatov Declaration, whereby Kochman (through Errigal) paid Mr. Khudainatov €225 million for use of the *Amadea* while Kochman endeavored to sell it. *Id*. ¶ 53. Mr. Aslund opines that the transaction made "no economic sense"—another attack on Mr. Khudainatov's credibility. *Id*.

13

Even the paragraphs that do not expressly challenge Mr. Khudainatov's credibility implicitly do so, as the primary purpose of the Aslund Report is to demonstrate that Mr. Khudainatov is lying when he says he commissioned the construction of the *Amadea* in 2012 and remains the beneficial owner of the vessel today. These attacks on Mr. Khudainatov's credibility, under the guise of expert testimony, are plainly improper under Rule 702. *Nimley,* 414 F.3d at 398.

      **C. The Court should exclude the Aslund Report because it purports to make a factual determination as to the ownership of the *Amadea*.**

While an expert may assist the trier of fact to understand evidence or determine a fact in issue, "he may not substitute his judgment for the jury's by telling the jury what decision to make." *Dibella v. Hopkins*, 2002 WL 31427362, at *3 (S.D.N.Y. Oct. 30, 2002). When an expert weighs evidence and makes findings about facts in dispute, he improperly invades the province of the jury and his testimony **must** be excluded. *Id*. (excluding expert testimony that sought to "draw conclusions as to the ultimate factual conclusions in the case—what actually happened, what the parties said, and what they thought") (emphasis added); *MSC Flamina*, 2017 WL 3208598, at *8 (excluding testimony of expert who purported "to provide extensive factual narrative—to gather facts from throughout the record, to tell a story favorable to their client and with much advocacy embedded throughout, and to purport to 'opine' on the ultimate fact issues that this Court must find only after trial."); *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (excluding portion of expert testimony that made findings as to contested facts).

The Aslund Report engages in the exact type of fact-finding that the law prohibits. Mr. Aslund not only finds it "inconceivable that Mr. Khudainatov would have had sufficient means to buy or commission a superyacht costing more than $200 million" in 2012 (Aslund Report ¶ 112), but he goes on to opine that it is Kerimov—not Mr. Khudainatov—who was the beneficial owner of the *Amadea* at the time of its seizure and continues to be so today.

14

Specifically, Mr. Aslund opines that, when Ms. Gadzhieva claimed to be "loaning" Kochman/Errigal €225 million to purchase the temporary right to use the *Amadea* in 2021, she was actually "purchasing the *Amadea* for Mr. Kerimov using Mr. Kerimov's money." *Id*. ¶ 90. According to Mr. Aslund, the "loan" made no commercial sense, "thus creating a strong inference that it was not a genuine loan at all but rather a disguised means for Kerimov to purchase the *Amadea*." *Id*. ¶ 91. This "expert opinion," which merely contradicts the testimony of the fact witnesses with first-hand knowledge of the transaction, is not permitted. Whether the Errigal transaction was a sale to Kerimov is a question the Court will be called upon to resolve at a trial on the merits, and one that Mr. Aslund is neither qualified nor permitted to answer. For that reason, his opinion must be excluded.

### D. The court should exclude the Aslund Report because it contains opinions about which Mr. Aslund is not qualified to testify.

As this Court has stated: "[T]he Federal Rules of Evidence—and this Court—require that proffered experts confine their testimony to the subjects on which they are qualified to opine. In short, experts must stay in their lane, and this Court will police inappropriate drifting. *MSC Flamina*, 2017 WL 3208598, at *2. On top of its other faults, the Aslund Report offers opinions on topics outside the scope of Mr. Aslund's expertise, specifically: (1) the reliability of Deloitte's evaluation of NNK; and (2) the commercial reasonableness of Gadzheiva's loan to Errigal and the corresponding transactions between Mr. Kochman (Errigal) and Mr. Khudainatov (Millemarin). Aslund Report ¶¶ 40-46, 53, 90-93. Mr. Aslund is not qualified to opine on either subject.

While a specialist on Eastern European economies, Mr. Aslund is no expert in corporate valuation. Aslund Report Ex. A (curriculum vitae). At his deposition, Mr. Aslund admitted that he has never studied auditing or worked as an accountant. Ex. 2 at 96:21-97:6. While he has

15

reviewed company valuations as a member of various boards, he has never conducted one. *Id*. at 97:13-98:4. He has never taught a class in auditing or accounting. *Id*. at 98:8-12. In fact, Mr. Aslund does not hold large accounting firms in high esteem. When asked at his deposition if he was familiar with Deloitte, Mr. Aslund identified it as "one of the many cheating auditing companies." *Id*. at 99:23-100:2.

As for experience in commercial transactions, Mr. Aslund does not have that either. Aslund Report Ex. A. His curriculum vitae is devoid of any experience that would qualify him to opine on the reasonableness of any business transactions.

Given his lack of expertise in the areas of valuation and commercial transactions, Mr. Aslund should not be permitted to opine on either topic. His opinion on the reliability of Deloitte's valuations of NNK is especially improper, given his apparent bias against the firm and others like it. Accordingly, to the extent the Court does not exclude the Aslund Report in its entirety, it should at a minimum exclude the paragraphs containing opinions outside Mr. Aslund's expertise. Aslund Report ¶¶ 40-46, 53, 90-93.

> **E. The Court should exclude the Aslund Report because it improperly opines on matters irrelevant to the question of whether Mr. Khudainatov has standing to contest forfeiture of the *Amadea*.**

In addition to (improperly) opining on the question of whether Mr. Khudainatov owns the *Amadea*, the Aslund Report also opines on whether Mr. Khudainatov owns several other superyachts, including the *M/Y Crescent*, the *M/Y Scheherazade*, and the *M/Y Amore Vero*. Aslund Report ¶¶ 68, 69, 70, 110-11. Mr. Aslund's opinions concerning Mr. Khudainatov's ownership of these other vessels should be excluded at this juncture because they will not assist the Court in answering the question presently before it, which is whether Mr. Khudainatov has standing to contest forfeiture of the *Amadea*.

To establish standing, Mr. Khudainatov must come forth with "[a]n allegation of ownership and some evidence of ownership. . . ." sufficient to create a case or controversy. *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (quoting *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158 (2d Cir. 1994)). That standard is met when a claimant demonstrates a "facially colorable interest" in the property at issue. *United States v.$557,933.89 More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002). As the Second Circuit explained in *$557,933.89 More or Less, in U.S. Funds*:

> to establish standing 'the claimant need not prove the full merits of [his] underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court (internal citations omitted). The function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture. Thus, the only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required 'facially colorable interest, not whether he ultimately proves the existence of that interest.'

*Id*. (internal citations omitted); *see also United States v. Any and All Funds on Deposit in Account No. 12671905, Held in the Name of Landlocked Shipping Company at Wells Fargo Brokerage Services, LLC*, No. 09 CV 3481 (HB), 2010 WL 3185688, at *5 (S.D.N.Y. Aug. 10, 2010) ("Courts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable possessory interest in it.")

Thus, the question before the court is whether Mr. Khudainatov has a colorable claim of ownership to the *Amadea*, and the *Amadea* alone. Whether Mr. Khudainatov holds any ownership interest in the *M/Y Crescent*, the *M/Y Scheherazade*, and the *M/Y Amore Vero* has no bearing on his standing to contest forfeiture of the *Amadea* and, consequently, Mr. Aslund's opinions relating to the ownership of the other vessels should be excluded.

17

## CONCLUSION

For the foregoing reasons, this Court should exclude the expert report of Anders Aslund, and his testimony regarding the same, its entirety.

Dated: December 20, 2024
New York, New York

                FORD O'BRIEN LANDY LLP

/s *Adam C. Ford*
Adam C. Ford
Robert S. Landy
Renée L. Jarusinsky
Amy C. Brown
Brian W. McCracken
275 Madison Avenue
24th Floor
New York, New York 10016
aford@fordobrien.com
rlandy@fordobrien.com
rjarusinsky@fordobrien.com
abrown@fordobrien.com
bmccracken@fordobrien.com
(212) 858-0040

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, and accompanying exhibit, were served on all counsel of record via the Court's CM/ECF system.

Dated: December 20, 2024

<u>/s/ Adam C. Ford</u><br>
Adam C. Ford