# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br>     Plaintiff, <br><br>       v. <br><br> THE M/Y *AMADEA*, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO, <br><br>     Defendant-*In-Rem*, <br><br>      and <br><br> EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD., <br><br>     Claimants. | Case No. 1:23-cv-09304 <br><br> The Honorable Dale E. Ho |

## CLAIMANTS' PRELIMINARY PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047

*Attorneys for Claimants Eduard Yurievich Khudainatov and Millemarin Investments Ltd.*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

CLAIMANTS' PROPOSED FINDINGS OF FACT ..........................................................6

    I.     Witnesses ................................................................................................................6

          A.  Eduard Yurievich Khudainatov .......................................................................6

          B.  Ekaterina Azarenko Parfireva .........................................................................10

          C.  Radovan Cvijetic, Millemarin 30(b)(6) Witness ...................................................11

          D.  Peter Lürssen ...........................................................................................13

          E.  François Zuretti ..........................................................................................14

          F.  Captain Guy Bennett-Pearce .............................................................................14

          G.  Peter Read ................................................................................................16

          H.  John Walsh ...............................................................................................17

          I.  Martyn Messenger ......................................................................................18

          J.  Dinar Khalikov ...........................................................................................19

          K.  Viktoria Pastukhova ....................................................................................20

          L.  Lesley Reynard ...........................................................................................21

          M.  Evgeniy Kochman ........................................................................................21

          N.  Alisa Gadzhieva ..........................................................................................22

          O.  Gulnara Kerimova ........................................................................................23

          P.  John Wolf .................................................................................................23

          Q.  Damien Magee ...........................................................................................24

          R.  Ewan McKendrick .......................................................................................25

          S.  Ben Turner ................................................................................................26

II.     Mr. Khudainatov Commissioned and Built the Amadea. ............................................26

III.    Upon the Amadea's Completion, Mr. Khudainatov Hired Imperial Yachts to Manage the Amadea. ...........................................................................................................31

IV.     Mr. Khudainatov Took Trips on His Vessel the Amadea Between 2017 and 2021....32

V.      Efforts to Sell the Amadea were Unsuccessful............................................................33

VI.     Mr. Khudainatov Remained the UBO of the Amadea as it Transferred Ownership from Nereo to Millemarin. ........................................................................................35

VII.    The Temporary Use Agreement was Not a Sale to Suleiman Kerimov and the Transaction Never Closed. ........................................................................................39

        A.  The September 3, 2021 Cooperation Agreement between Mr. Khudainatov and Kochman had nothing to do with Suleiman Kerimov. ...........................................39

        B.  Errigal's Beneficial Owner is Evgeniy Kochman, and No Evidence Exists that Links Errigal's Ownership to Anyone Else. .........................................................41

        C.  The September 14, 2021 MOA did Not Effectuate a Sale or Transfer of Ownership. .............................................................................................................43

        D.  The Loan Taken Out by Kochman/Errigal from Alisa Gadzhieva in connection with the Temporary Use Deal was Not a Payment to Purchase the Amadea. .......44

        E.  Further Corroborating that Neither the September MOA, Nor the Payments, Represented a Sale of the Amadea, the Closing Date was Postponed..................49

        F.  Consistent with his Ownership of the Amadea during the Temporary Use Agreement, Mr. Khudainatov was Kept Informed of and Approved Certain Events....................................................................................................................50

        G.  The Events that Resulted from the Russian Military Operation in Ukraine Thwarted the Purposes of the Temporary Use Agreement, the Parties by Necessity Terminated It, and No Sale of the Amadea Ever Took Place................................51

        H.  Upon Commencement of Legal Action in Fiji to Seize the Amadea, Mr. Khudainatov Retained Counsel, and Millemarin Appeared in the Action to Challenge the Seizure. ..........................................................................................55

        I.  Mr. Khudainatov Has a Financial Interest in the Amadea.....................................57

VIII.   The Government's Alleged "Facts" that Kerimov Bought the Amadea are Belied by the Evidence..............................................................................................................59

A. Suleiman Kerimov was not Interested in Purchasing the Amadea and Did Not Purchase It..................................................................................................59

B. Gulnara Kerimova Chartered the Amadea; Neither She Nor Anyone In Her Family Purchased It. ......................................................................................62

C. Most of the Changes were only Suggested, and None of the Changes Signified that Kerimov, or Anyone from his Family Bought the Amadea............................63

D. The Use of Certain Terms by the Crew Do Not Evidence Ownership. ................67

E. Neither Captain Walsh Nor Head of Security Martyn Messenger Told the FBI that Kerimov Owned the Amadea Because they Did not Know or Believe he owned the Amadea. ..........................................................................................................70

F. The Amadea Had All Necessary Certifications and Paperwork to Charter in the Caribbean During January and February 2022. ....................................................71

G. The Government's Experts Were Unqualified to Opine on Any Relevant Issue and Their Testimony Did Not Assist the Trier of Fact. .........................................73

H. Mr. Khudainatov Built, Commissioned, Paid for and Owns the Crescent and the Scheherazade..........................................................................................................76

IX.  Not One Witness Testified or Declared that a Sale of the Amadea to Any Third-Party Closed. .................................................................................................................81

PROPOSED CONCLUSIONS OF LAW ......................................................................................83

I.  The Court Possesses Subject Matter Jurisdiction under the Federal Forfeiture Statutes, Not under Admiralty Principles. ..................................................................................83

II.  Congress Passed the Civil Asset Forfeiture Reform Act of 2000 (CAFRA) in Response to Widespread Criticism of the Scope of the Government's Forfeiture Authority. ....................................................................................................................85

III.  Legal Standard on a Motion to Strike for Lack of Standing under CAFRA ...............88

A. Motion to Strike under Supplemental Rule G.......................................................88

B. Summary Judgment under Rule 56........................................................................89

C. Interplay between Supplemental Rule G and Rule 56. ..........................................89

D. Standing is a Legal Question for the Court............................................................91

IV.    Claimants Have Shown by a Preponderance of the Evidence that They Have Standing to Contest the Forfeiture of the *Amadea*. ....................................................................92

    A.    All Second Circuit Precedent Requires for Claimants to Survive a Motion to Strike is a Facially Colorable Interest in the Proceedings. ....................................92

    B.    Claimants Have Presented Substantial Evidence of Title, Possession, Control, and a Financial Stake in the *Amadea*. ..........................................................................94

CONCLUSION ...................................................................................................................99

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Ins. Co. v. 356 Bales of Cotton,*
26 U.S. 511 (1828) ...................................................................................................... 83

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .................................................................................................... 91

*Argus Inc. v. Eastman Kodak, Co.,*
801 F.2d 38 (2d Cir. 1986) ......................................................................................... 91

*Da Silva v. Kinsho Int'l Corp.,*
229 F.3d 358 (2d Cir. 2000) ....................................................................................... 83

*Ferrostaal, Inc. v. HACI HASSAN YARDIM,*
2006 WL 2819585 (S.D.N.Y. Sept. 29, 2006) ........................................................... 84

*In re Bennett Funding Grp., Inc.,*
336 F.3d 94 (2d Cir. 2003) ......................................................................................... 91

*In re Millenium Seacarriers, Inc.,*
419 F.3d 83 (2d Cir. 2005) ......................................................................................... 84

*Leonard v. Texas,*
580 U.S. 1178 (2017) .................................................................................................. 87

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .................................................................................................... 93

*Mackensworth v. S.S. Am. Merch.,*
28 F.3d 246 (2d Cir. 1994) ......................................................................................... 84

*Panama R. Co. v. Johnson,*
264 U.S. 375 (1924) .................................................................................................... 84

*Romero v. Int'l Terminal Operating Co.,*
358 U.S. 354 (1959) .................................................................................................... 84

*Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet,*
260 F.3d 114 (2d Cir. 2001) ....................................................................................... 83

*Torres v. $36,256.80 U.S. Currency,*
25 F.3d 1154 (2d Cir. 1994) .................................................................................. 92, 93

*United States v. $8,440,190.00 in U.S. Currency,*
719 F.3d 49 (1st Cir. 2013) ................................................................................ 89, 90, 99

*United States v. $148,840.00 in U.S. Currency,*
521 F.3d 1268 (10th Cir. 2008) ....................................................................................... 92

*United States v. $196,969.00 U.S. Currency,*
719 F.3d 644 (7th Cir. 2013) ................................................................................... 90, 93

*United States v. $577,933.80 More or Less in U.S. Funds,*
287 F.3d 66 (2d Cir 2002) ......................................................................................... Passim

*United States v. All Assets of Statewide Auto Parts, Inc.,*
971 F.2d 896 (2d Cir. 1992) ............................................................................................. 86

*United States v. Any And All Funds on Deposit In Acct. No. 12671905, Held In The Name of
Landlocked Shipping Co. At Wells Fargo Brokerage Servs., LLC, All Int. And other Proceeds
Traceable Thereto,* No.,
2010 WL 3185688 (S.D.N.Y. Aug. 10, 2010) ...................................................... 97, 98

*United States v. Cambio Exacto, S.A.,*
166 F.3d 522 (2d Cir. 1999) ..................................................................................... 2, 91, 94

*United States v. Emor,*
785 F.3d 671 (D.C. Cir. 2015) ........................................................................................ 92

*United States v. Funds Held in the Name or for the Benefit of Wetterer,*
210 F.3d 96 (2d Cir. 2000) ............................................................................................... 86

*United States v. Funds in the Amount of $239,400,*
795 F.3d 639 (7th Cir. 2015) ..................................................................................... 90, 91

*United States v. Funds in the Amount of $574,840,*
719 F.3d 648 (7th Cir. 2013) ........................................................................................... 90

*United States v. One Lincoln Navigator 1998,*
328 F.3d 1011 (8th Cir. 2003) ....................................................................... 90, 91, 94, 95

*United States v. One Red 2003 Hummer H2 VIN: 5GRGN23U93H118675,*
234 F. Supp. 3d 415 (W.D.N.Y. 2017) ........................................................................... 98

*United States v. One-Sixth Share of Mass Millions Lottery Ticket,*
326 F.3d 36 (1st Cir. 2003) ............................................................................................. 93

*United States v. Real Prop. Located in Los Angeles, California*,
  2023 WL 3564732,n.3 (C.D. Cal. Apr. 17, 2023) ................................................... 91

*United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*,
  859 F.3d 1085 ................................................................................... 91, 92, 93

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*,
  731 F.3d 189 (2d Cir. 2013) ................................................................... 86, 87

*von Hofe v. United States*,
  492 F.3d 175 (2d Cir. 2007) ................................................................... 87

**Statutes**

18 U.S.C. § 981 ................................................................................... 85, 88

18 U.S.C. § 983 ................................................................................... 86

28 U.S.C. § 1331 ................................................................................ 85

28 U.S.C. § 1355 ................................................................................ 85

50 U.S.C. § 1701 ................................................................................ 75

U.S. Const. art. III ............................................................................. 83, 84

**Rules**

Fed. R. Civ. P. 39(b) ........................................................................... 85

Fed. R. Civ. P. 39(c) ........................................................................... 85

Fed. R. Civ. P. 56(a) ........................................................................... 88

Fed. R. Civ. P. 56(c)(1)(A) .................................................................... 89, 90

Fed. R. Civ. P. 56(c)(4) ....................................................................... 89

**Other Authorities**

146 Cong. Rec. S1753–02, S1760, (daily ed. March 27, 2000) ................................. 87

H.R. Rep. No. 106-192 (1999) ................................................................... 85, 86

## INTRODUCTION

1.    Before this Court is the government's motion to strike the claims of each of the two Claimants in this case, Eduard Yurievich Khudainatov ("Mr. Khudainatov") and Millemarin Investments Ltd. ("Millemarin"). For the reasons set forth below, the government's motion to strike should be denied as to both Claimants, as the Claimants have demonstrated their standing.

2.    The government's motion to strike was originally filed as a motion for summary judgment on May 17, 2024. (ECF 97-101). Claimants opposed the government's motion, and submitted five witness declarations. (ECF 127-130). The government filed its reply memorandum, and included new declarations and documents. (ECF 137-140). On account of the newly introduced evidence, the Court permitted Claimants the opportunity to file a sur-reply, so that Claimants were not prejudiced by having newly-made arguments and facts asserted without the opportunity to respond. Claimants filed their sur-reply (ECF 147). Thereafter, the government sought permission to file another sur-reply, citing to new "bombshell" evidence. (ECF 160). The Court originally denied the government's request, but later reconsidered its Order and granted the government permission to file a second sur-reply. (ECF 181). The government filed its supplemental memorandum of law to strike Claimants' Claims on August 28, 2024. (ECF 197-201). Claimants submitted their opposition memorandum addressing the newly presented evidence on September 6, 2024. (ECF 216).

3.    Meanwhile, the parties have largely, if not entirely, completed discovery. Over the last several months, the parties have exchanged millions of pages of documents and taken over

fifteen depositions—literally around the world—and collected declarations of numerous witnesses.[1]

4.      On November 15, 2024, the Court ruled that the motion for summary judgment could not be decided because of factual disputes, and it was necessary for the Court to hold an evidentiary hearing to resolve them. (ECF 312). The hearing is scheduled to take place over the course of four days from January 21-24, 2025.

5.      The law of standing is well-settled. The burden on a claimant to demonstrate constitutional standing in a civil forfeiture case is low, where all that it needed is "[a]n allegation of ownership and some evidence of ownership." *United States v. Cambio Exacto, S.A*., 166 F.3d 522, 527 (2d Cir. 1999). This standard is met when a claimant demonstrates a "facially colorable interest" in the property at issue. *United States v. $577,933.80 More or Less in U.S. Funds*, 287 F.3d 66, 78 (2d Cir 2002). Indeed, "to establish standing 'the claimant need not prove the full merits of [his] underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court (internal citations omitted). The function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *Id*. Considering this standard, which the Court is compelled to do, it is clear that Claimants have met this "threshold" burden and satisfied the burden of standing.

6.      Claimants appear before this Court with over 1100 exhibits, the depositions of fifteen witnesses spanning close to 90 hours of testimony, and declarations of several more

---

[1] The only depositions that were noticed that did not take place prior to the hearing were that of Claimant Eduard Khudainatov, Gulnara Kerimova, and Alisa Gadzhieva.

witnesses, each attesting under penalty of perjury as to very specific facts, relevant to the issue of standing. Within this trove of documentary and testimonial evidence, it is clear that Claimants have come forward with "some evidence" of a facially colorable claim. Indeed, each and every witness testified consistently that they either believed Mr. Khudainatov and/or Millemarin was and still is the owner of the Amadea, or stated that they were not sure who owned the Amadea. Not a single fact witness testified in support of the government's allegations. While the government presented two FBI agents and two paid expert witnesses, the testimony of these witnesses was insufficient to strip Claimants of standing to contest the forfeiture. Notably, Mr. Khudainatov's economist (or assistant) who worked at his family office ("family office") testified as to the veracity of hundreds of documents demonstrating that Mr. Khudainatov built and commissioned the Amadea, and was and is its ultimate beneficial owner. The record also shows that Millemarin took legal ownership of and title to the Amadea on August 16, 2021, and has owned the Amadea ever since. The record demonstrates that at the time of the Amadea's seizure on or about April 13, 2022, Millemarin held title to the vessel, Millemarin was owned by Invest International Finance Ltd. ("IIF"), and both companies were trust assets in the September Trust, of which Mr. Khudainatov was the direct beneficiary. The record further shows that Mr. Khudainatov exercised dominion and control over the Amadea, in that he was responsible for its payments among other things, which is corroborated by documentary evidence, specifically the April 4, 2022 Management Agreement between Millemarin and Imperial Yachts.

7.      Mr. Khudainatov's and Millemarin's conduct in relation to the Amadea has been consistent. Specifically, once the vessel was seized in Fiji, it was Mr. Khudaintov and Millemarin that appeared in that litigation to claim ownership of the vessel. These Claimants then continued to assert their property interest before the Department of Justice and eventually in this Court. It is

worth noting that this consistency is highly relevant to the question of standing. Indeed, in *$557,933.89, More or Less in U.S. Funds*, the Second Circuit upheld the District Court's finding that a claimant had standing even where the claimant originally disclaimed ownership of money and later retracted that statement to claim ownership, and where the Claimant refused to answer interrogatories by asserting the Fifth Amendment. *$557,933.89, More or Less in U.S. Funds*, 287 F.3d at 73-74, 79. Even in these circumstances, the Second Circuit agreed with the district court the claim must be put to a jury. *Id.* at 79. There is no doubt that the Second Circuit strongly prefers that forfeiture claims are litigated against claimants not against inanimate objects.

8.    Each of the corporate records demonstrates that Millemarin is the legal owner of the Amadea. As such, even if Millemarin were owned by someone other than Mr. Khudainatov, Millemarin would still have standing to contest the forfeiture.

9.    In its Complaint, the government alleged that Mr. Khudainatov functioned solely as a straw owner for the Amadea, and also for two other superyachts—the M/Y Scheherazade and the M/Y Crescent. However, multiple witnesses—including the owner of the shipyard that built the yachts—testified that Mr. Khudainatov commissioned all three yachts, was the owner of the yachts once they were built, and remains the owner of those yachts today. Throughout discovery and at the hearing, the government failed to put forth evidence rebutting this testimony. As such, allegations of Mr. Khudainatov being a straw owner of the Amadea (as well as other superyachts) remain unsubstantiated.

10.    Now, the heart of the government's theory attacking Claimants' standing is that the vessel was sold to Suleiman Kerimov in or around September 2024, and that this sale was effectuated through a September 14, 2021 Memorandum of Agreement to sell the Amadea. The evidence at the hearing was undisputed that the sale never closed and therefore actual title never

transferred. That the sale never closed is supported by the documentary record, as well as the testimony of Ekaterina Parfireva, an Economist who works in Mr. Khudainatov's family office, Prof. Ewan McKendrick, the government's own expert, John Wolf and Damien Magee, Errigal's former directors, as well as the declarations of Evgeniy Kochman and Mr. Khudainatov himself.

11.    The government argues that even if the sale did not close on paper, the Amadea was nevertheless purchased by Kerimov and the documentary evidence showing that it never closed was merely a ruse to hide that fact that Kerimov had purchased it. While the government presented arguments for why it believes the vessel was sold to Kerimov, ultimately there is no independent factual support for these arguments. By way of limited example, the government argues that because Kerimov's daughter was on the vessel, that is evidence that her father owned it. But Kerimova submitted a declaration stating under penalty of perjury that she chartered the vessel, and her father did not purchase it. The Kerimov family AV/IT consultant Dinar Khalikov confirmed this in his testimony. As did the Captain of the Amadea, John Walsh, who testified that he believed the guest trip was a charter. The government also argued that the requested modifications to the Amadea around the time of the fall of 2021 are evidence of a sale and/or ownership by Kerimov. But no witness testified that Kerimov purchased the Amadea. Khalikov again testified that when he was making the various requests for modifications, he was doing so in anticipation of an upcoming charter and to make the vessel more charterable in general. Finally, the government argues that the €225 million in funds sent from Alisa Gadzhieva to IIF represents a payment from Kerimov to buy the Amadea. But the government presented no factual witnesses to support this argument. While the government presented the testimony of paid experts to opine as to what they believe likely happened, such testimony cannot overcome the testimony of each and every one of the fact witnesses who testified that in fact the Amadea was never sold, and that

it is owned by Eduard Khudainatov. As such, Claimants have demonstrated a colorable claim of standing in this matter.

12.    While Claimants are not required to prove ownership to demonstrate their standing, the record shows that Mr. Khudainatov built and commissioned the Amadea, and has owned it ever since.

## CLAIMANTS' PROPOSED FINDINGS OF FACT

### I.    Witnesses

#### A.    Eduard Yurievich Khudainatov

13.    Mr. Khudainatov is a Russian businessman who has built his wealth over the past forty-plus years primarily in the oil and gas industry. (Khudainatov Dec. ¶¶ 2-6).[2] He was born on September 11, 1960, in the former Soviet Union, what is currently Chimkent, Kazakhstan. (*Id.* at ¶ 2; CX-112-A; Connolly Dec. ¶ 65).[3] He spent the early part of his career in a remote Siberian city called Nefteyugansk, where in the early 1980s, he began his career by installing oil rigs there. (Khudainatov Dec. ¶ 3; Connolly Dec. ¶ 65). In 1989, he founded an industrial pig farm in Nefteyugansk, which supplied food for the region. (Khudainatov Dec. ¶ 3; Connolly Dec. ¶ 66). Given Nefteyugansk's abundance in natural resources and underdeveloped infrastructure, he started to build diversified business holdings in the region in the early 1990s, and obtained multiple licenses for oil production. (*Id.*). By the early 2000s, his multi-level branched business interests in the region included gas stations, shopping malls, restaurants, and many other assets. (*Id.*). In 2000,

---

[2] Claimant Eduard Yurievich Khudainatov submitted a declaration under penalty of perjury in support of Claimants' opposition to the Government's Motion to Strike on June 13, 2024 (ECF 126), which will be cited to herein as "Khudainatov Dec.," and which is also marked as CX-26.

[3] The Rebuttal Declaration of Dr. Richard Connolly, PHD, Claimants' expert who is expected to rebut the testimony of the government's expert Prof. Anders Aslund, and which was filed on January 10, 2025 will be cited to herein as "Connolly Dec."

he was invited to St. Petersburg to become a federal inspector in the Northwestern Federal District. (*Id.*; CX-112-A). In order to accept this position, he was required to sell his business holdings in the Nefteyugansk region, which he did for approximately $600,000,000. (*Id.*; Parfireva Tr. 28:22-29:17). He then invested those funds in various projects including real estate and other operating companies within the Russian Federation. (Khudainatov Dec. ¶ 3).

14.     Mr. Khudainatov later returned to the oil and gas sector because he felt there were untapped opportunities in that sector in Western Siberia. (*Id.* at ¶ 4). In 2003, he became the General Director of Tyumen-region subsidiary of state-owned gas company Gazprom, OJSC Severneftegazprom, a joint venture of the German BASF and Gazprom. (*Id.*; CX-112-A; Connolly Dec. ¶ 69; *see also* Parfireva Tr. 123:8-125:24). While there, he developed and commissioned the Yuzho-Russkoye field, which ensured gas supplies via the Nord Stream gas pipeline to Europe. (Khudainatov Dec. ¶ 4; Connolly Dec. ¶ 69).

15.     By at least 2007, Mr. Khudainatov "had all the attributes of a very wealthy person," whose wealth was in the hundreds of millions or billions. (Parfireva Tr. 27:1-17). By that time, he traveled with a security team comprising of several individuals, and he and his security team traveled in "rare and very expensive" vehicles. (*Id.* at 27:20-28:1). Mr. Khudainatov also owned three private business jets, two of which were Russian-made equivalents of the Boeing 737-500 and one of which was an Embraer, which he used for air travel, and he supported the crews of those jets. (*Id.* at 28:2-21). Also by that time, Mr. Khudainatov owned real estate in Russia that was indicative of him being very wealthy, and his family office was located in a "very high class" office building in "the best area of Moscow." (*Id.* at 29:18-30:4).

16.     In 2008, Mr. Khudainatov joined Rosneft as Vice President, one of Russia's and the world's largest oil and gas companies. (CX-112-A; Khudainatov Dec. ¶ 5; Connolly Dec. ¶

72). In 2009, he was promoted to First Vice President. *Id.* In these roles, he led the headquarters for the construction and commissioning of the Vankor Field, an oil field located in Eastern Siberia and one of Russia's largest industrial projects, which was officially launched on August 21, 2009. *Id.* From 2010 until May 2012, he served as Rosneft's President, and from May 2012 until 2013, he served as First Vice President and Deputy Chairman of the Management Board. (CX-112-A; Khudainatov Dec. ¶ 5; Connolly Dec. ¶¶ 73, 75).

17.    Mr. Khudainatov left Rosneft in 2013 to create his own oil company, Independent Oil and Gas Company ("NNK"), where he serves as President and sole shareholder. (CX-112-A; CX-26 at pp. 40–47; Khudainatov Dec. ¶ 6; Connolly Dec. ¶¶ 77, 78). He started NNK with his own funds and loans, and acquired the requisite licenses for oil and gas production. (Khudainatov Dec. ¶ 6). The funds he invested in NNK consisted of proceeds from the sale of businesses in 2000, his salary and bonuses from his positions at Gazprom and Rosneft, and the sale of his Rosneft shares which netted him $100 million. *Id.* Much of Mr. Khudainatov's career history is set forth in a Curriculum Vitae. (CX-112-A).

18.    NNK began with thirty employees and now has more than 30,000 employees. (Khudainatov Dec. ¶ 6). Over the past decade, NNK has been quite successful. Through the years, Mr. Khudainatov had acquired vast oil fields and licenses for oil production, which have provided him with assets to use to access large sources of capital. (Connolly Dec. ¶ 13(d)). In addition, NNK has sold billions of dollars of these assets, including for example the Taymyr oil field that Mr. Khudainatov purchased in 2013 at the time he left Rosneft (*Id.* at ¶¶ 78, 81), which was later sold to Rosneft for approximately $11 billion. (*Id.*). These sales have brought significant revenues to Mr. Khudainatov as NNK's sole shareholder. (Khudainatov Dec. ¶ 6; Connolly Dec. ¶¶ 13(d), 78,

81). Deloitte and its successor Russian entity has issued valuations of NNK over the years, as follows:

- As of June 30, 2015, $8.6 billion USD;

- As of December 31, 2015, $8.2 billion USD;

- As of June 30, 2016, $10.6 billion USD;

- As of December 31, 2016, $11 billion USD;

- As of June 30, 2017, $10.6 billion USD:

- As of December 31, 2017, $14.1 billion USD;

- As of June 30, 2018, $16 billion USD;

- As of December 31, 2018, $17.1 billion USD;

- As of June 30, 2019, $26.9 billion USD;

- As of December 31, 2019, $28.6 billion;

- As of June 30, 2020, $48.4 billion USD;

- As of December 31, 2022, $25 billion USD.

(*See* CX-597–CX-610).

19.     Mr. Khudainatov commissioned, built, and has always been the ultimate beneficial owner ("UBO") not only of the Amadea, but also of the Crescent and the Scheherazade.

20.     Mr. Khudainatov has submitted a declaration in this matter under penalty of perjury attaching 22 exhibits. (CX-26). He has also submitted a Verified Claim in this matter which attaches 26 exhibits, (CX-1), and he has Verified Responses to Special Interrogatories served on the government attesting to the matters asserted herein, particularly with respect to standing. (*See, e.g.,* CX-20).

## B. Ekaterina Azarenko Parfireva

21.    Ekaterina Azarenko Parfireva, with a degree in Economics, began working for Mr. Khudainatov's family office in April 2007 as an Economist, and has worked there ever since. (Parfireva Tr. 14:6-16:12). Her job responsibilities have included building property structures for several assets of Mr. Khudainatov, analysis of and following the conditions of related agreements on the part of Mr. Khudainatov, communicating with related service providers located outside of Russia. (*Id.* at 15:13-25). In her role at the family office, Parfireva oversaw matters relating to the Amadea, the Crescent, and the Scheherazade, the three superyachts owned by Mr. Khudainatov. (*See generally* Parfireva Deposition). Parfireva was also responsible for maintaining the related documents in Mr. Khudainatov's family office, including corporate documents, contracts, communications, and other relevant documents relating to, among other things, the Amadea, the Crescent, and the Scheherazade. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15, 64:15-66:8).[4] Notably, Parfireva was not noticed for a deposition by the government, so Claimants noticed her deposition, and she appeared voluntarily for her deposition in the Bahamas.

22.    Among her responsibilities regarding the Amadea, Parfireva assisted in forming Nereo Management Limited ("Nereo"), the entity that was the first legal owner of the Amadea, and which was controlled by Mr. Khudainatov. (*Id.* at 35:20-37:16, 38:15-18, 41:1-42:11). Regarding the change in the Amadea's ownership from Nereo to Millemarin in 2021, Parfireva testified at length about her role in facilitating that transaction and how Mr. Khudainatov was the ultimate beneficial owner of Millemarin. (*Id.* at 66:10-82:13). Parfireva testified that after the

---

[4] At the request of counsel for Claimants, Parfireva searched the family office records for documents responsive to the government's discovery requests, which were then produced in this litigation. (*Id.* at 17:5-19:3). Parfireva verified that documents attached to Mr. Khudainatov's Verified Claim and his declaration came from the family office records and were kept in the ordinary course of business. (*Id.* at 20:7-24:4, 26:20-25).

Nereo to Millemarin transaction closed, Mr. Khudainatov was the UBO of the Amadea. (*Id.* at 78:20-79:25).

23.    Parfireva also testified extensively about the Temporary Use Agreement (as defined *infra* at ¶ 103) for the Amadea entered into between Mr. Khudainatov and Kochman in the fall of 2021. (*Id.* at 82:14-110:23). She recalled that the agreement was subsequently terminated and that as a result "Millemarin continued, or they remained the owner of *Amadea*." (*Id.* at 110:24-112:2). Parfireva further testified that at the time the Amadea was seized in Fiji, Mr. Khudainatov was the UBO of the vessel and Millemarin was its legal owner. (Parfireva Tr. 110:24-112:5). Parfireva testified that in her role at the family office, she would have "absolutely" known if the Amadea had been sold. (Parfireva Tr. 63:11-14).

### C. Radovan Cvijetic, Millemarin 30(b)(6) Witness

24.    Radovan Cvijetic serves as a director of various companies, (Cvijetic Tr. 22:21-22), and he has been the sole Director of Millemarin since October 11, 2024. (*Id.* at 13:1-2, 26:8-12, 33:25-34:6). When he assumed that position, he "was interested in knowing everything," so he obtained and reviewed documents from various sources, including the former director, Mr. Khudainatov's family office, and Imperial Yachts. (*Id.* at 12:19-13:19). Based on his review, he testified:

25.    "Millemarin is Khudainatov's company. He's the ultimate beneficial owner. It's a BVI company, and its sole asset is Amadea." (*Id.* at 28:4-6). According to Cvijetic, no member of the Kerimov family has ever owned Millemarin. (*Id.* at 42:8-10). Mr. Khudainatov became interested in selling the Amadea, and in 2021, Millemarin entered into an agreement to grant Kochman "temporary use and possession of Amadea" so that Imperial Yachts could charter out the vessel and try to sell it, but that the agreement was later modified. (*Id.* at 49:7-50:12). Cvijetic

reiterated that the agreement was for "temporary use" and that "[t]he buyer would come -- again, if Evgeniy [Kochman] was capable of finding one." (*Id.* at 92:3-14). Cvijetic understood Errigal Marine Limited ("Errigal") to be Kochman's company. (*Id.* at 92:24-93:2). Cvijetic testified that Kochman "was not able to sell" the Amadea initially "and so they made a new agreement addendum, and basically Eduard extended the temporary use agreement until May 1, 2022." (*Id.* at 113:15-19).

26.    Cvijetic further testified that Gulnara Kerimova chartered the Amadea from January to February 2022, consistent with Kochman's temporary-use arrangement and ability to charter out the vessel. (*Id.* at 121:12-122:8).

27.    In March 2022, the yacht "became almost impossible to sell," including because of "the speech given by US President on the 1st of March, that he basically said that they are going after Russian-owned yachts and jets and properties in general." (*Id.* at 133:21-134:2). No transfer of shares of Millemarin was effectuated in March 2022, no sale of the Amadea was made, and "[s]o all other obligations towards Amadea fall back to Millemarin." (*Id.* at 143:10-15; *see also id.* at 141:4-19).

28.    Regarding the former director of Millemarin, Olga Kroon (aka Boltenko), Cvijetic testified that Kroon stopped being the director of Millemarin the same day he took over, October 11, 2024. (*Id.* at 26:8-12, 27:8-11). Cvijetic further explained that Kroon had also been the director of Millemarin's parent company, Invest International Finance Ltd., had provided counsel to Mr. Khudainatov and served (through her Boltenko Trust) as the trustee of the September Trust, of which Mr. Khudainatov was the beneficiary. (*Id.* at 18:2-11, 27:2-11, 38:1-39:4).

### D.  Peter Lürssen

29.    Peter Lürssen has worked for the Lürssen Group since 1987. (Lürssen Tr. 10:8-11). The Lürssen Group includes Lürssen Werft, the company that constructed the Amadea, the Crescent, and the Scheherazade. Lürssen was deposed in Germany pursuant to a Hague Convention request.

30.    Lürssen testified as to how the Amadea came about: "Mr. Khudainatov, many years ago, he inquired about the construction of a yacht. He came to Bremen [in Germany] for that together with his wife and his consultant, his advisor." (*Id.* at 10:22-24). Lürssen was aware of several in-person meetings at his company's offices regarding the construction of the Amadea (previously called "Project Mistral") that Mr. Khudainatov attended in person. (*Id.* at 10:24-11:6). Lürssen also met with Mr. Khudainatov "twice as neighbors" at a home in Austria owned by Mr. Khudainatov's first wife that was near Lürssen's home in Austria. (*Id.* at 34:7-11).

31.    Lürssen was personally involved in the project. (*Id.* at 17:21-25). "At the end of the construction period," and as part of the transfer and delivery of the Amadea to Mr. Khudainatov, Lürssen Werft confirmed that Mr. Khudainatov was the beneficial owner of the yacht through Nereo. (*Id.* at 13:5-22, 21:2-24). Lürssen understood Mr. Khudainatov was also the beneficial owner of Densiarly Enterprises Ltd. ("Densiarly"), the entity that commissioned the building of the Crescent yacht. (*Id.* at 23:10-24:8). And for the building of the Scheherezade, Lürssen likewise "negotiated and discussed with the same people [as the Crescent], Mr. Khudainatov and the representatives, the same representatives." (*Id.* at 24:20-24). Lürssen recalled that, in light of the relationship with Mr. Khudainatov and the fact that multiple projects of his were underway, Lürssen agreed to extend credit to Mr. Khudainatov in connection with completing the construction of the Amadea. (*Id.* at 25:14-21, 26:18-28:1).

13

### E. François Zuretti

32.     Francois Zuretti founded and operates Zuretti Interior Design ("ZID"), "a design office to provide interior design of motor yachts." (Zuretti Tr. 18:5-14). Zuretti's design firm was hired to provide the interior design on all three yachts, the Amadea, the Crescent, and the Scheherazade. (*Id.* at 25:6-18, 27:16-21, 109:5-12). Zuretti was deposed in France pursuant to a Hague Convention request.

33.     Zuretti testified that ZID was involved in the interior design of the Amadea, (*id.* at 25:6-18), and that, among other meetings, he "had a meeting at Lurssen," "a German shipyard." (*Id.* at 22:17-18). Zuretti stated that he "went to see Lurssen, and there was Mr. Khudainatov and his spouse. We would come, not in the offices of Lurssen, but at the private residence of Peter Lurssen and we began to discuss the project." (*Id.* at 22:20-24). They also met at Mr. Khudainatov's home. (*Id.* at 23:24-24:5). In all, Zuretti believed he may have met with Mr. Khudainatov "more than ten" times. (*Id.* at 43:14-22).

34.     At the time the Amadea was built, Zuretti understood Mr. Khudainatov to be the true owner, (*id.* at 44:5-10, 49:14-19), and that Millemarin was responsible for paying ZID for its work. (*Id.* at 147:2-148:24). Zuretti "believe[s] even today" that Mr. Khudainatov is "still the owner" of the Amadea. (*Id.* at 149:13-19). In addition, Zuretti testified that he "did not know, and even today, that the boat had been sold. Sincerely. It was never told me directly, never said to me directly. Never suggested to me. . . . it was still Mr. Khudainatov who was the owner." (*Id.* at 108:25-109:7).

### F. Captain Guy Bennett-Pearce

35.     Guy Bennett-Pearce is the "Captain of the Scheherazade," (Bennett-Pearce Tr. 15:24), which is owned by Mr. Khudainatov. (*Id.* at 29:20-22). He has "extensive maritime based

training, both in terms of operational experience and academic experience to achieve a master mariners unlimited certification." (*Id.* at 16:2-5). Bennett-Pearce voluntarily appeared for his deposition in England.

36.    Bennett-Pearce testified that he joined the Scheherazade in September 2018, then known as "Project Lightning, a new build 140 meter that was under construction in northern Germany at the Lürssen shipyard facility." (*Id.* at 25:2-6). He was initially the "build captain," meaning his "responsibilities were to oversee and execute the full operational setup of the vessel" and to prepare "the vessel for all the legislative compliance with the flag state." (*Id.* at 26:2-17).

37.    Bennett-Pearce testified that "[s]everal months after [his] employment," he "was introduced to the owner, Mr. Khudainatov," (*id.* at 26:21-27:10), whom he met with "a great number of times" during the construction of the Scheherazade. He explained that "Mr. Khudainatov was intimately involved in all aspects from design through to interior outfitting[.]" (*Id.* at 27:11-28:4). Bennett-Pearce testified that, apart from the Scheherazade, Mr. Khudainatov "is the owner of -- I believe him to be the owner of Amadea, MY Amadea and MY Crescent." (*Id.* at 29:20-22). While the Scheherazade was under construction, Bennett-Pearce personally visited both the Crescent and the Amadea at Mr. Khudainatov's request with an eye toward improving the design of the *Scheherazade*. (*Id.* at 29:23-32:4, 143:23-144:17, 157:21-158:23).

38.    Bennett-Pearce formed and owns the company that manages the Scheherazade on Mr. Khudainatov's behalf. (*Id.* at 34:21-35:11). After the vessel was completed, Mr. Khudainatov requested that Bennett-Pearce prepare suggested cruising itineraries, and personally visited the vessel several times while Bennett-Pearce was on board. (*E.g.*, *id.* at 59:4-60:19, 67:3-13, 68:17-24, 69:2-12, 72:12-16).

15

39.     Bennett-Pearce's testimony debunked allegations made in a YouTube video that President Vladimir Putin owns the Scheherazade. (*Id.* at 85:11-102:11, 149:6-22, 158:25-166:23). Bennett-Pearce also testified to the death threats and harassment he and his family faced (and specifically his children) as a result of the video's allegations, which led to having him put his family into protective custody for a matter of weeks, and to having to move to a new home after his address was published on the internet. (*Id.* at 87:11-89:11).

### G.  Peter Read

40.     Peter Read was first employed in connection with the Amadea "towards the end of the build process" and "came into the project as one of the two build captains" in 2016. (Read Tr. 27:16-19). Once the Amadea launched, Read became one of "the two operational captains." (*Id.* at 27:22-23). Read remained a Captain of the Amadea until in or about October 2021. (*Id.* at 115:7-116:16). Read was deposed in Scotland pursuant to a Hague Convention request.

41.     Read was drawn to the Amadea in part because "Lurssen's a very reputable shipyard." (*Id.* at 52:7-9). Read was cruising on the vessel in 2017 when an individual whom he understood to be the owner was on board. (*Id.* at 82:23-84:10). Read identified that owner by name as Eduard Khudainatov, (*id.* at 84:1-2), and by photograph. (*Id.* at 84:4-10, 190:16-20). Read captained the Amadea for three trips in 2017 during which Mr. Khudainatov was on board. (*Id.* at 84:11-86:4, 211:23-212:10). Read reiterated that he believed Mr. Khudainatov was the owner based on how he was referred to and what spaces he occupied, but Read also explained that "[y]ou couldn't presume everybody who stepped on an owner's deck was an owner, of course not, then there would be thousands of owners." (*Id.* at 86:16-87:17). Read also explained that usage of the term "owner's rep" did not necessarily refer to the actual owner of the Amadea, but instead "[i]t depends on the context of the conversation." (*Id.* at 192:8-194:14).

42.     In the fall of 2021, Read was aboard the Amadea when its formal "owning company" was changed from Nereo Management Limited to Claimant Millemarin Investments Limited. (*Id.* at 110:15-112:12). Around that time, Read also recalled "getting [the Amadea] guest ready," but did not recall getting ready for a new owner. (*Id.* at 156:13-20). As far as Read could remember, there was no further change in ownership from Millemarin to another entity during his time. (*Id.* at 232:9-16).

### H.  John Walsh

43.     John Walsh is an experienced seafarer who was hired to captain the Amadea in the fall of 2021. (Walsh Tr. 10:1-14:17, 17:19-19:13). At the time, he understood the Amadea to be owned by Millemarin Investments Limited, as indicated on his employment agreement. (*Id.* at 19:14-20:18). Walsh did not know the individual who owned Millemarin, but he did not think there was anything unusual about an entity owning the vessel "[b]ecause it's common within this industry." (*Id.* at 20:22-21:3). Walsh's first rotation aboard the vessel began "approximately 30th November" of 2021. (*Id.* at 23:8-11). At the time, Walsh understood there was an upcoming guest trip, (*id.* at 24:10-16), and he "had a sense that it was a charter." (*Id.* at 28:2-7). Walsh understood that "G-codes were going to be used" to refer to specific guests, which was "not an issue" for him because he "used codes on [his] other vessel as well." (*Id.* at 25:19-21).

44.     Walsh testified that the usage of the modifier "owner" to describe particular aspects of a yacht is "an informal way of talking about an area on the boat." (*Id.* at 34:18-22). Walsh also recalled hearing, in late 2021, Khalikov referred to as "owner's rep," but did not understand that to mean Khalikov represented the person who owned the vessel. (*Id.* at 35:22-37:12). Walsh rotated off the Amadea on February 22, 2022, (*id.* at 49:19-21), and recalled that shortly thereafter, a military conflict began between Russia and Ukraine. (*Id.* at 49:22-24).

45.    In March 2022, Walsh was transiting through LAX to join the Amadea in Fiji and sail it to the Philippines for maintenance. (*Id.* at 52:6-56:20). Walsh was detained overnight by U.S. law enforcement and told members of the FBI that he "didn't know who owned the vessel," (*id.* at 62:7-12), consistent with a sworn statement he was asked to review and sign by Customs and Border Protection. (*Id.* at 69:25-72:9).

## I.    Martyn Messenger

46.    Martyn Messenger was employed on the Amadea from December 2019 to April 2022. (Messenger Tr. 14:12-24). Initially his position was "security/deckhand," and later he was "promoted to head of security." (*Id.* at 16:1-16). Messenger's "primary focus when there were guests on board was the safety of the guests." (*Id.* at 22:7-8). He also testified that all non-crew visitors aboard the Amadea were referred to as "guests." (*Id.* at 24:1-8). As to how the crew referred to specific guests, Messenger explained that "G codes are used on all yachts for privacy reasons, because radios are, obviously, open air so anyone can intercept the call, so it's usually G0, G1, and they will represent a person of the family." (*Id.* at 32:1-7). How particular codes corresponded to specific guests "was preorganized so an organogram would be put together, and they would all be assigned their own codes." (*Id.* at 32:10-12). The assignment of codes "changed per trip," and the owner of the Amadea did "[n]ot necessarily" have a specific code. (*Id.* at 32:19-33:2).

47.    Messenger testified that when he first joined the vessel and asked his "rotational partner, so the other head of security, Scott Fairey," who the owner was, he was told "Eduard Khudainatov." (*Id.* at 17:2-11). Messenger recalled that Mr. Khudainatov was on the vessel in Greece for "[m]aybe two weeks, two to four weeks." (*Id.* at 34:9-13). Kerimov was on board the Amadea briefly towards the end of 2021 based on handover notes from Fairey, but Messenger did

not see Kerimov. (*Id.* at 35:21-36:16). Messenger understood Kerimov was "just a Russian guest," and Messenger was not told he was a new owner. (*Id.* at 36:23-37:2). Messenger did not recall ever learning that the Amadea had been sold or that it had a new owner. (*Id.* at 44:24-45:4).

48.    In April 2022, while transiting through LAX to join the Amadea, Messenger was detained by U.S. law enforcement, questioned for hours, and "kept in a cell overnight." (*Id.* at 80:6-81:2, 82:17-83:4). He was prevailed upon to state that he knew Kerimov to be the owner of the Amadea but refused, other than to say he had seen the rumor online. (*Id.*)

**J. Dinar Khalikov**

49.    Dinar Khalikov is an AV/IT engineer with his own company going back to approximately 2001, and has had extensive experience installing, fixing, reverse engineering, and otherwise working on AV/IT systems in homes, and on superyachts and other pleasure craft. (Khalikov Tr. 9:10-18, 10:6-11:24). Khalikov voluntarily appeared for his deposition in the Bahamas for "personal reasons," because the government named him in the public complaint—the first document that appears on the internet when his name is searched—stating that he "was employed by Kerimov's family as their assistant to help them purchase Amadea and it's not true." (*Id.* at 142:8-143:11).[5]

50.    Khalikov's company was hired to provide work on the Kerimov family homes and on the family yacht ICE in approximately 2011, and Mr. Khalikov testified that the family has been a respected and very important client of Khalikov's company ever since. (*Id.* at 11:25-13:15, 19:8-23, 22:23-24:24, 27:14-21). In 2020, Khalikov visited the Amadea with Kerimov in Abu

---

[5] Having traveled approximately 30 hours each way to and from Russia at his own expense, upon his arrival in the Bahamas, Khalikov was detained at the airport for an hour after he showed the Bahamian official the safe passage letter from the U.S. Department of Justice. (Khalikov Tr. 140:12-142:7).

Dhabi. (*Id.* at 44). On the way home from the visit, Khalikov strongly advised Kerimov not to buy the Amadea, to which Kerimov responded in substance, "do you think I'm stupid." (*Id.* at 59:21-60:9). Among various issues, Kerimov complained to Khalikov that the interior of the Amadea did not make him "feel at home and relaxed onboard," remarking, "who would want that." (*Id.* at 52:18-53:4).

51.    In early 2022, Kerimov's daughter, Gulnara Kerimova, chartered the Amadea, after another vessel she wanted to charter was unavailable. (*Id.* at 72:11-73:1). Khalikov was involved in modifications to the Amadea to get it ready for Gulnara's charter, which he testified were not "structural" changes. (*Id.* at 113:18-121:22). Khalikov never held himself out as an "owner's rep" for Kerimov on the Amadea, and when Khalikov heard a crew member refer to him as the "owner's representative," he met with the captain to make clear that he "was not representing the owner of Amadea." (*Id.* at 137:16-138:13). Throughout his deposition, Khalikov testified repeatedly that Kerimov did not own the Amadea. (*See, e.g.*, *id.* at 137:14-15).

52.     In the course of his career, Khalikov has become very familiar with the technical aspects of superyachts, including propulsion systems and navigation, among other things. (*Id.* at 25:9-26:17).

**K.  Viktoria Pastukhova**

53.    In 2011, Pastukhova began working for a company associated with Imperial Yachts, and in or about 2017, she became the Client Coordinator assigned to the Amadea until its seizure in Fiji. (Pastukhova Dec. ¶ 4).[6] As the Client Coordinator assigned to the Amadea, Pastukhova declared under penalty of perjury that she had direct contact with Mr. Khudainatov

---

[6] The Declaration of Viktoria Pastukhova was filed in support of Claimants' Opposition to the government's Motion to Strike in this matter on June 13, 2024 (ECF 127), and will be cited to herein as "Pastukhova Dec." It is also marked as CX-102.

during that entire time period. In fall 2021, she learned that Gulnara Kerimova would be chartering the Amadea, and coordinated certain aspects of preparing for that charter, including certain of Gulnara's requests, which were not unusual for a charterer of a vessel like the Amadea. (*Id.* at ¶ 5-7, 9-11). Pastukhova informed Mr. Khudainatov of certain of the requests, and also kept him apprised of the Amadea's status when it was seized in Fiji. (*Id.* at ¶¶ 5-8, 18). Pastukhova never spoke with Kerimov, always understood that Mr. Khudainatov was the owner of the Amadea, and at no time did she learned of a sale of the Amadea to anyone else. (*Id.* at ¶¶ 15-16, 18).

### L. Lesley Reynard

54.    Lesley Reynard served as a stewardess for the Amadea from September 2020 to in or about July 2022, and served as Chief Stewardess during guest trips. (Reynard Dec. ¶ 2).[7] Reynard did not know who the owner of the Amadea was, nor was the owner's identity ever shared with the crew while she worked on the Amadea. (*Id.* at ¶¶ 3, 20).

### M. Evgeniy Kochman

55.    Evgeniy Kochman has known Mr. Khudainatov since in or about 2002. (Parfireva Tr. 206:19-207:3 ("Mr. Kochman was not only a partner of Mr. Khudainatov, but he was also his friend for many years . . . ."); *see also* Kochman Dec. ¶ 3;[8] Khudainatov Dec. ¶ 8). Kochman has spent the last 25 years of his career in the yachting industry, most recently as the leader of Imperial Yachts, which was founded in 2009 to engage in yacht management, charter and sale brokerage, and new build management for yachts of 40 meters in length and above. (Kochman Dec. ¶ 2).

---

[7] The Declaration of Lesley Reynard was filed in support of Claimants' Opposition to the government's Motion to Strike in this matter on June 13, 2024 (ECF 128), and will be cited to herein as "Reynard Dec." It is also marked as CX-103.

[8] Evgeniy Kochman submitted a declaration under penalty of perjury, which was filed in this matter on October 31, 2024 (ECF 295-5), and which will be cited to herein as "Kochman Dec." It is also marked as CX-184.

Kochman and Mr. Khudainatov met in or around 2002, and the two have developed a strong relationship in the ensuing years working on several business transactions together. (Khudainatov Dec. ¶ 8; Kochman Dec. ¶ 3). Among these transactions were the building of the Amadea, the Crescent, and the Scheherazade, three yachts that Mr. Khudainatov commissioned and had built by Lürssen Shipbuilders, with Kochman and a team from Imperial Yachts acting as construction managers for all three builds. (Parfireva Tr. 16:16-26:25, 47:13-51:18, 49:9-51:8, 51:9-18, 53:19-55:15; Kochman Dec. ¶¶ 4-5). As a result of their joint yachting projects over the years, Mr. Khudainatov and Kochman have developed a strong mutual trust in our business endeavors. (Khudainatov Dec. ¶ 35; *see also* Parfireva Tr. 206:19-207:3). Kochman declared, "At no time have I ever considered myself or anyone else other than Eduard Khudainatov to be the owner of the Amadea. . . . Because the Errigal transaction was never executed, my understanding is that title to the yacht never transferred from Mr. Khudainatov. Therefore, I believe he is still the sole owner of Amadea." (Kochman Dec. ¶ 24).

**N. Alisa Gadzhieva**

56.    Alisa Gadzhieva declared under penalty of perjury that she never owned the Amadea. She further declared that her uncle, Suleiman Kerimov, did not provide the funds for, or discuss with her, the loan she provided to Kochman. (Gadzhieva Dec. ¶ 2).[9] She further declared that she would not have had to charter the Amadea if she or any of her relatives owned the Amadea. (*Id.* at ¶ 7).

---

[9] The Declaration of Alisa Gadzhieva was filed in this matter on October 31, 2024 (ECF 295-2) and will be cited to herein as "Gadzhieva Dec." It is also marked as CX-183.

### O. Gulnara Kerimova

57.    Gulnara Kerimova declared under penalty of perjury that neither she, nor any member of her family, ever owned the Amadea. (Kerimova Dec. ¶¶ 12-13).[10] She further states that she chartered the Amadea. (Kerimova Dec. at ¶ 7).

### P. John Wolf

58.    John Wolf was trained as a lawyer, "admitted as a solicitor and barrister in the Cayman Islands," and worked as a partner a Campbells from January 1997 until March 2023. (Wolf Tr. 13:7-25). In his role at Campbells and its affiliated companies, Wolf oversaw "the firm's maritime practice," including corporate work "with the major players in the pleasure yacht or the maritime sphere." (*Id.* at 17:11-20:12). Wolf has extensive experience with the transfer of ownership of vessels, and he detailed the various documents required to effectuate the sale of a yacht. (*Id.* at 183:9-184:24, 185:2-12). Wolf's deposition was noticed by the government.

59.    Wolf testified that Campbells formed Errigal Marine Limited, and that Kochman was the ultimate beneficial owner of Errigal. (*Id.* at 68:16-69:20). Regarding the September 2021 Memorandum of Agreement between Errigal and Millemarin, Wolf testified that "the payment schedule [was] unusual" for a sale of a vessel because "it's unusual to have a buyer using a yacht during the period when they just put down a deposit on it, and the reason for that – one reason for that is they're operating this vessel in the name of the seller." (*Id.* at 83:9-85:4). Wolf continued: "This agreement we were asked to execute which we did, but then it never seemed to close which is in itself unusual." (*Id.* at 87:18-20). Instead, it "fizzled out." (*Id.* at 87:23-24). Wolf elaborated that "this transaction we never got close to being given a delivery date or bill of sale, all the things

---

[10] The Declaration of Gulnara Kerimova was filed in this matter on October 31, 2024 (ECF 295-4), and will be cited to herein as "Kerimova Dec." It is also marked as CX-185.

that are required to close the sale of a yacht." (*Id.* at 92:4-7; *see also id.* at 185:13-187:10). Wolf also testified: "I am aware [Imperial Yachts was] chartering the [*Amadea*]. They had been chartering it ever since it was constructed. As far as I was concerned, it was available for charter." (*Id.* at 250:16-20).

### Q.  Damien Magee

60.    Damien Magee was trained as a maritime lawyer and worked for Campbells, a law firm in the Cayman Islands, from January 2017 to August 2023. (Magee Tr. 10:20-25). During his time at Campbells and in his broader career, Magee has had extensive experience with transferring ownership of vessels. (*Id.* at 61:20-62:11). Magee's deposition was noticed by the government.

61.    Magee explained all the various documentation that would be required to effectuate the transfer of ownership of a vessel. (*Id.* at 62:12-68:9, 74:5-20). He confirmed that as of August 16, 2021, Millemarin was the registered legal owner of the Amadea, (*id.* at 110:11-113:3), and testified that, after that date: "I don't recall any transfer of ownership of the Amadea." (*Id.* at 148:23-149:6).

62.    Magee testified that he "instructed corporate administrators" of Campbells "to form Errigal [Marine Limited]." (*Id.* at 12:11-14). Magee was also a director of Errigal from the date of its formation until March 2022, (*id.* at 13:6-14), when Campbells "resigned all companies that had Russian clients." (*Id.* at 52:13-16). Magee agreed that, based on the documents shown to him, Evgeniy Kochman was the ultimate beneficial owner of Errigal and that the September 2021 Memorandum of Agreement between Errigal and Millemarin was not sufficient to effectuate a sale of the Amadea. (*Id.* at 148:12-16, 142:18-143:9). Magee testified: "[A]s of the date of my resignation from Errigal, to the best of my knowledge, Errigal was not the owner of the Amadea," (*id.* at 149:22-150:3), adding that "pleasure yachts can accept paying guests if they're under the

Cayman flag," (*id.* at 43:14-16), and that it was "fairly common" for yachts to "charter in the Caribbean in the winter." (*Id.* at 44:3-7).

### R.  Ewan McKendrick

63.    Ewan McKendrick is an English barrister, "a professor of Anglo-American private law in the University of Leiden, and an emeritus professor in the University of Oxford." (McKendrick Tr. 5:8-14). The government previously disclosed McKendrick as one of its experts in this case, and McKendrick authored a report regarding the September 14, 2021 Memorandum of Agreement between Errigal and Millemarin. Since McKendrick's deposition, the government has declined to rely on his opinion in filings and has not indicated that intends to call him as a witness at the upcoming hearing.

64.    McKendrick testified that, as of September 14, 2021, he understood Millemarin to be the owner of the Amadea. (*Id.* at 59:22-60:1). When asked about the September 2021 Memorandum of Agreement between Errigal and Millemarin, and whether a completion of sale had taken place, McKendrick testified, "That obviously is a matter of fact but on the basis of the documentation that I have read it does not appear that the completion of sale took place as intended by clause (18)." (*Id.* at 16:11-16:23). He elaborated that "[a] completion of sale would be the point at which legal title, i.e. property, passes from seller to buyer," (*id.* at 17:1-3), confirming that he "ha[d]n't seen anything that suggests legal title was passed from seller to buyer under this agreement because clause (18) was not implemented," (*id.* at 38:22-25), and "if clause (18) was not complied with then legal title did not pass under this Memorandum of Agreement." (*Id.* at 40:5-7). More broadly, McKendrick "did not see any document" indicating that the transaction had closed. (*Id.* at 63:10-14). McKendrick agreed that if the transaction did not close, then Millemarin would remain the legal owner of the yacht. (*Id.* at 65:7-13).

### S.  Ben Turner

65.    Ben Turner is a yacht captain who worked on the Amadea in 2019. (Turner Tr. 47:12-20). The government noticed his deposition.

66.    Turner testified that he was "employed for approximately six months, and [] was onboard the vessel for approximately three months." (*Id.* at 47:14-16). He further testified that, while he was aboard the Amadea, he did not know who the owner was, but that crewmembers said "it was Eduard Khudainatov, that gentleman was the owner." (*Id.* at 59:15-60:1). However, Turner explained, that with respect to whether crewmembers would know that a particular guest onboard was a charter guest or an owner of the vessel, "I would agree that none of us would truly know." (*Id.* at 70:9-15).

## II.    Mr. Khudainatov Commissioned and Built the Amadea.

67.    Mr. Khudainatov entered into, and signed, an investment agreement dated September 23, 2011 to build what later became the Amadea, as declared by Khudainatov and Kochman, and as testified to by Parfireva. (Parfireva Tr. 30:5-35:8; CX-26 at pp. 48–55; Khudainatov Dec. ¶ 8; Kochman Dec. ¶ 3). Under this agreement, Mr. Khudainatov was to provide the funding for the project and Kochman and his company Imperial Yachts was to oversee the construction and provide technical expertise. (*Id.*).

68.    As part of her job duties working on Mr. Khudainatov's behalf, Parfireva "ordered the establishment" of a corporate entity to hold the asset that would become the Amadea. (Parfireva Tr. 35:8-36:7; Khudainatov Dec. ¶  9). Parfireva came up with the name of the company, Nereo Management Ltd., which was created on February 13, 2012 in the Cayman Islands, based on the Greek maritime god Nereus. (Parfireva Tr. 36:7-37:5, 38:13-18, 39:23-40:12; CX-26 at pp. 56–90, CX-316, CX-317, CX-318).

69.     Nereo as the buyer entered into a Shipbuilding Agreement with the German shipbuilder Lürssen on or about February 24, 2012, and entered into subsequent amendments to that agreement thereafter, based in part on Mr. Khudainatov's wish to increase the length of the vessel and to advance the delivery date of the yacht by the shipbuilder. (Parfireva Tr. 37:6-39:22; Lürssen Tr. 11:2-3; CX-26 at pp. 91–147, CX-152, CX-153, CX-155, CX-313, CX-314, CX-315; Khudainatov Dec. ¶¶ 9-12; Kochman Dec. ¶ 4). The name of the project was "Project Mistral," which upon completion became the Amadea. (Parfireva Tr. 38:19-39:1; Khudainatov Dec. ¶ 10; Kochman Dec. ¶ 4).

70.     Mr. Khudainatov controlled Nereo, as his company Elearco Holdings Ltd. ("Elearco"), of which he was the sole shareholder, was the Optionholder of Nereo. (Parfireva Tr. 41:10-43:4; CX-498; Khudainatov Dec. ¶ 13-14). The option agreement was structured so that Mr. Khudainatov could take control of Nereo by having its shares transferred to him on his "first wish," by him simply dating and submitting certain documents. (Parfireva Tr. 41:16-42:11; CX-320, CX-321, CX-499 at p. 15; Khudainatov Dec. ¶¶ 13-14).

71.     Mr. Khudainatov paid for the building of the Amadea with his own funds. (Khudainatov Dec. ¶¶ 15-18; *see also* Parfireva Tr. 43:13-48:15). Part of Parfireva's responsibilities were ensuring that such payments were made. Parfireva regularly received emails from Imperial Yachts sending invoices from Lürrsen and different vendors and requesting that the family office effectuate payments of the attached invoices. With respect to invoices from Lürssen, for example, Parfireva would confirm the amount and the timing of the payment against the relevant Lürssen agreement. Once she determined that the amount and the timing of the invoice was in accordance with the relevant Lürssen agreement, Mr. Khudainatov would approve payment of the invoices, after which she would forward the invoice to the family office employee in charge

of making payments, and she would thereafter receive bank confirmations from that employee showing that the invoice had been paid. (Parfireva Tr. 43:13-45:7; CX-26 at pp. 199–212). Examples of these types of emails Parfireva received from Imperial Yachts with payment instructions for various vendors can be found at CX-339, CX-339-A, CX-340, CX-341, CX-341-A–H, CX-343, CX-343-A–D, CX-348, CX-348-A–E, CX-354, CX-354-A–B, CX-357, CX-357-A.

72.     Parfireva created the chart that appears in Mr. Khudainatov's declaration that comports with the invoices and bank confirmations she received in real time during her employment in the family office. Parfireva Tr. 45:8-46:12; Khudainatov Dec. ¶ 15; CX-26 at pp. 199-212; CX-330–CX-338.

73.     This chart also shows that Nereo paid approximately €212,000,000 to Lürssen for the construction of the Amadea between 2012, including from his own funds, and from a loan Lürssen granted him in 2017 (CX-26 at pp. 213-234, CX-323), that he paid off in September 2020, by way of a tri-partite agreement relating to another vessel that Mr. Khudainatov had commissioned to be built by Lürssen. (Parfireva Tr. 45:8-48:15; CX-326-F; Khudainatov Dec. ¶¶ 15-18). This agreement was between Lürssen, Nereo, and Bielor Asset Ltd. ("Bielor"), the owning company of the third vessel Mr. Khudainatov had commissioned to be built by Lürssen, the Scheherazade. (Parfireva Tr. 47:13-48:15; CX-326-F). Lürssen owed liquidated damages to Mr. Khudainatov in connection with the Scheherazade due to various shortcomings with the vessel, and the agreement permitted those liquidated damages Lürssen owed to Bielor to pay off Nereo's debt to Lürssen. (*Id.*; CX-326-F). This tri-partite agreement evidences that Mr. Khudainatov owned not only the Amadea, but the Scheherazade as well. (*See* Lürssen Tr. 27:12-28:11 ("A. Mr Khudainatov placed an order for three ships with us, and when the loan was signed, . . . the

28

contracts for the ships Thunder [Crescent] and Lightening [Scheherezade] were signed, have been signed, and also an advance payment had been made, and, and they were being built. So we did not have any negative experience which would have prevented us from granting a secured loan.")). For additional evidence of Mr. Khudainatov's ownership of all three vessels, *see infra* at ¶¶ 198-208.

74.     Mr. Khudainatov also paid for the interior and exterior design of the Amadea, as well as for all furnishings and other items needed for the vessel. (Khudainatov Dec. ¶ 17). Parfireva facilitated payments to these vendors as well, including for example the interior designer Zuretti Interior Design, and the exterior designer Espen Øino. (Parfireva Tr. 55:24-56:18; Khudainatov Dec. ¶ 17). Contracts with the designers were maintained in the family office. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15; CX-26 at pp. 253–285, CX-328).

75.     Mr. Khudainatov had the Amadea built to his specifications and was fully involved in the design process. (Parfireva Tr. 56:19-57:10; Zuretti Tr. 43:14-22, 53:7-8, 60:11-14, 62:18-21, 63:6-17; Khudainatov Dec. ¶¶ 19-21). Mr. Khudainatov visited the shipyard on at least 3 occasions, including for undocking day of the AMADEA, which was April 16, 2016, and December 10, 2016. (Lurssen Tr. 18:16-19). Photographs and a video evidence his presence at these events. (CX-26 at pp. 235–252). For example, Imperial Yachts produced an undocking day video and photos where Mr. Khudainatov is depicted engaging and celebrating with Peter Lürssen (the owner of the shipyard), Espen Øino (the exterior/hull designer), François Zuretti, and Evgeniy Kochman. (Khudainatov Dec. ¶ 21; *see also* Lürssen Tr. 30:6-32:7 (recognizing pictures with referenced individuals but not recalling exact date)).

76.     In connection with the build of the Amadea, Mr. Khudainatov met with Peter Lürssen, the head of the Lürssen shipyard, no fewer than 10 times. (Lürssen Tr. 18:16-19 ("more

than ten times"); Khudainatov Dec. ¶ 22). Peter Lürssen of the Lürssen Group corroborated that Mr. Khudainatov commissioned the building of the Amadea and recalled several meetings with him about the Amadea. As to how the *Amadea* came about, Lürssen testified: "Mr. Khudainatov, many years ago, he inquired about the construction of a yacht. He came to Bremen [in Germany] for that together with his wife and his consultant, his advisor." (*Id.* at 10:22-24). Lürssen was aware of several meetings at his company's offices regarding the construction of the *Amadea* (previously called "Project Mistral") that Mr. Khudainatov attended in person. (*Id.* at 10:24-11:6). Lürssen also met with Mr. Khudainatov personally and was personally involved in the project. (*Id.* at 17:21-25). Among other occasions, Lürssen met with Mr. Khudainatov "twice as neighbors" at a home in Austria owned by Mr. Khudainatov's first wife that was near Lürssen's home in Austria. (*Id.* at 34:7-11).

77.    Mr. Khudainatov also met with Zuretti more than a dozen times to select the interior finishes for the vessel. Zuretti testified about the Amadea that he "went to see Luerssen, and there was Mr. Khudainatov and his spouse. We would come, not in the offices of Luerssen, but at the private residence of Peter Luerssen and we began to discuss the project." (Zuretti Tr. 22:20-24). Zuretti testified they also met at Mr. Khudainatov's home. (*Id.* at 23:24-24:5). In all, Zuretti believed he may have met with Mr. Khudainatov "more than ten" times. (*Id.* at 43:14-22). Zuretti confirmed that, at the time the Amadea was built, he understood Mr. Khudainatov to be the true owner, (*id.* at 44:5-10, 49:14-19). He also recalled that he had discussed specific details of the yacht's interior with Mr. Khudainatov, including perhaps "some trimming on the sofas that did not please him," (*id.* at 53:7-8), and that Mr. Khudainatov had said to Zuretti: "I want a galley, a reception room, and myself, I will be cooking. I will be doing the cooking[.]" (*Id.* at 60:11-14).

Zuretti was asked to redesign one particular room on the *Amadea* "[s]everal times," including "by Mr. Khudainatov himself" "in the year following delivery of the boat." (*Id.* at 62:18-21, 63:6-17).

78.    In addition, Mr. Khudainatov asked the exterior designer, Espen Øino, to create a unique design for the bow, which was the albatross that he designed specifically for the Amadea. (Khudainatov Dec. ¶ 24). Mr. Khudainatov met with Mr. Øino no fewer than 10 times to discuss the exterior design for the Amadea. (*Id.*).

### III.    Upon the Amadea's Completion, Mr. Khudainatov Hired Imperial Yachts to Manage the Amadea.

79.    The Amadea was completed and delivered in 2017. (*Id.* at ¶ 25; Kochman Dec. ¶ 4; *see also* Read Tr. 27:16-19, 27:22-23). Lürssen testified: "At the end of the construction period," and as part of delivery of the Amadea to Mr. Khudainatov and facilitation of the transfer, Lürssen Werft confirmed that Mr. Khudainatov was the beneficial owner of the yacht through Nereo. (Lürssen Tr. at 13:5-22; 21:2-24 ("Q. . . [D]id Lürssen Werft determine who the ultimate beneficial owner of Nereo Management Limited was? A. Yes. Q. And who was that? A. Eduard Khudainatov.")).

80.    While Imperial Yachts served as Mr. Khudainatov's representative and liaison to the builder and designers during the build, once the Amadea was delivered, Mr. Khudainatov retained Imperial Yachts to act as the vessel's management company, which included hiring and managing crew, overseeing vessel maintenance, technical support, insurance, safety and compliance, acting as sales marketer and broker, and coordinating guest trips. (Parfireva Tr. 57:15-59:18; Khudainatov Dec. ¶ 26; Kochman Dec. ¶ 4;). The Imperial Yachts Management Agreement for the Management of the Amadea dated March 6, 2017 was maintained in Mr. Khudainatov's family office files. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15, 57:15-59:18; CX-359).

81.    As the UBO of the Amadea, Mr. Khudainatov was financially responsible for paying the costs of operating and maintaining the *Amadea* (including insurance) from January 1, 2017 until approximately September 17, 2021, and did pay such costs. Indeed, the Imperial Yachts Management Agreement, referenced above, required Nereo to pay such costs. (Parfireva Tr. 60:4-19; CX-359). As an example, a copy of an Imperial Yachts invoice covering the time period of July 2020 through August 2021 and a copy of the SWIFT demonstrating that Nereo paid this invoice, were maintained in Mr. Khudainatov's family office files. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15; CX-366). As reflected by this payment, due to Mr. Khudainatov's close relationship with Kochman, maintenance costs were reconciled irregularly. (Khudainatov Dec. ¶ 27; *see, e.g.,* CX-366).

82.    From the time of the Amadea's delivery in 2017 to the time the Amadea was seized in Fiji in 2022, Mr. Khudainatov's contacts at Imperial Yachts were Evgeniy Kochman and the Client Coordinator named Viktoria. (Khudainatov Dec. ¶ 26). This is corroborated by the Client Coordinator, Viktoria Pastukhova, who declared under penalty of perjury that she had direct communications with Mr. Khudainatov regarding the Amadea from approximately 2017 through and including the time the vessel was seized in Fiji. (Pastukhova Dec. ¶¶ 4-7, 18-19).

**IV.    Mr. Khudainatov Took Trips on His Vessel the Amadea Between 2017 and 2021.**

83.    Mr. Khudainatov took approximately four trips on the Amadea. The first one was in May 2017, when he vacationed in the French Riviera with his then-partner and two daughters and his brother and his brother's wife. (Khudainatov Dec. ¶ 28). The second trip was in July 2017, when he vacationed in Greece with his then-partner and their two daughters. (*Id.*). The third trip was in August 2017, when he vacationed in Croatia with his then-partner, their two daughters, his brother and his brother's wife, and their son. (*Id.*). The fourth trip was in June 2021, when he

vacationed in Greece with his then-partner, their two daughters, and his partner's mother. (*Id.*; Messenger Tr. 34:9-13 (recalling that Mr. Khudainatov was on the Amadea in Greece)). For all of these trips, they were accompanied by security and household staff. (Khudainatov Dec. ¶ 28).

84.     Mr. Khudainatov's Declaration on this point is corroborated by the testimony of former Amadea Captain Peter Read. Read testified that in 2017, he was cruising on the vessel when an individual whom he understood to be the owner was on board, and identified that individual by name as Claimant Eduard Khudainatov and by photograph. (Read Tr. 82:23-84:10; *see also id.* at 190:16-20 ("A. In 2017, late 2017, I could have said I think I could have said confidently that the owner must have been Mr. Eduard Khudaynatov.")). Read testified that he captained the *Amadea* for three trips in 2017 during which Mr. Khudainatov was on board. (*Id.* at 84:11-86:4, 211:23-212:10). Read later testified that he thought he recalled having conversations with Captain Michael Zerr, likely in 2021 regarding the ownership of the *Amadea* when Zerr was set to cruise in Greece. (*Id.* at 219:11-220:17). At the time, Read understood Mr. Khudainatov to be the owner of the Amadea and that Mr. Khudainatov was cruising on board the vessel in Greece. (*Id.* at 220:18-221:2).

## V.     Efforts to Sell the Amadea were Unsuccessful.

85.     Mr. Khudainatov built the Amadea not only to use himself, but also because of the prospect of profiting from selling the vessel. (Khudainatov Dec. ¶ 29; Kochman Dec. ¶ 5). The Amadea was on the public and private markets for sale starting in approximately 2018 through and until a sale to a third-party was rendered impossible due to the U.S. government's and its allies' policy to pursue and restrain Russian-owned assets including yachts in the wake of the commencement of the Russian special military operation in Ukraine. (Parfireva Tr. 61:8-17, 63:5-

14, 85:21-86:2, 111:20-112:5, 113:13-15; Khudainatov Dec. ¶¶ 29-30, 33-34, 39-40; Kochman Dec. ¶¶ 6-10, 21-23).

86.     In 2018, Mr. Khudainatov tasked Imperial Yachts, as his sales broker, to put the Amadea on the public market, and Imperial Yachts also marketed the Amadea at the 2019 Monaco Yacht Show and conducted viewings and events in the Middle East in 2020. (Khalikov Tr. 31:14-33:24; Lürssen Tr. 36:4-6, 36:13-37:4 (recalling efforts to sell the Amadea in 2019 or 2020); Messenger Tr. 38:25-45:19; Khudainatov Dec. ¶ 29; Kochman Dec. ¶ 6). COVID travel restrictions and quarantines halted yacht shows and slowed the market, but Imperial Yachts continued to conduct limited viewings in 2020 and 2021. (Messenger Tr. 39:7-23, 41:14-42:12; Khudainatov Dec. ¶ 29; Kochman Dec. ¶ 8).

87.     Mr. Khudainatov's declaration is corroborated by the testimony of Parfireva who testified that she knew that the Amadea was on the market, and had received information regarding individuals who were potentially interested in buying the Amadea, including several individuals from the Middle East, and one from Canada. Notably, she never came to learn that Suleiman Kerimov was interested in purchasing the Amadea. (Parfireva Tr. 61:8-62:24, 85:21-86:2). Parfireva's testimony is corroborated by emails she received from Imperial Yachts that show certain individuals were interested in buying the Amadea, and that certain negotiations ensued that never resulted in a sale. (CX-367, CX-368).

88.     By July 2021, multiple prospective buyers expressed interest in the Amadea, but the vessel never sold. (Parfireva Tr. 85:21-86:2; Khudainatov Dec. ¶ 30; Kochman Dec. ¶¶ 6-8). Parfireva corroborated this fact during her deposition, and noted that she would "absolutely" know if the Amadea had been sold in her role at the family office. (Parfireva Tr. 63:5-63:14).

89.     To broaden the marketing of the Amadea to a larger audience, Mr. Khudainatov permitted Imperial Yachts to enter into a joint central sales agency agreement with another yacht broker named Edmiston, which allowed the Amadea to be marketed to Edmiston's U.S. clientele, to which the Amadea had never been exposed. (CX-369; Khudainatov Dec. ¶ 30; Kochman Dec. ¶ 8).

## VI.     Mr. Khudainatov Remained the UBO of the Amadea as it Transferred Ownership from Nereo to Millemarin.

90.     In or about early 2021, Mr. Khudainatov decided to change the ownership of the Amadea to a structure that led back to him individually, as opposed to the option structure that existed with Nereo, and so that the vessel could be held within a trust structure. (Parfireva Tr. 63:15-64:14, 64:22-65:5; Khudainatov Dec. ¶ 31; Kochman Dec. ¶ 4).

91.     Parfireva worked on this transfer by instructing Mr. Khudainatov's trustee, Swiss-based lawyer Olga Kroon, to create a new entity to be the legal owner of the Amadea. (Parfireva Tr. 66:10-67:1; CX-582). Parfireva chose the name Millemarin for this new entity based on the French words for "sea" and "mile." (Parfireva Tr. 66:18-67:6). Millemarin was subsequently incorporated on June 10, 2021 to be the new holding company for the Amadea. (CX-408, CX-410).

92.     Parfireva also drafted and revised a Memorandum of Agreement in connection with this transfer. (Parfireva Tr. 68:5-69:5; CX-371, CX-374). In addition, Parfireva coordinated with Kroon's office to have documents signed that were needed to effectuate this transfer. (CX-581). Parfireva also provided KYC documents that were required by Campbells, who at the time was going to be Millemarin's registered agent in the Cayman Islands and ensure that the new ownership of the Amadea by Millemarin would be recognized by the Cayman Islands Shipping Registry. (Parfireva Tr. 69:16-71:9). Multiple emails demonstrate this. (CX-380, CX-382, CX-387, CX-388,

CX-390, CX-394, CX-401, CX-405, CX-407, CX-569, CX-570, CX-571, CX-572, CX-575, CX-576).

93.    The transfer from Nereo to Millemarin took place on August 16, 2021, and Mr. Khudainatov remained the UBO of the Amadea, and had nothing to do with a sale to any third-party. (Parfireva Tr. 64:8-14, 67:9-68:4, 79:18-25, 80:15-20, 82: 8-13; Magee Tr. 110:11-113:3 (confirming that as of August 16, 2021, Millemarin was the registered legal owner of the Amadea), 129:8-130:15 (testifying that based on the documents, Millemarin became the owning company of the Amadea upon the August 16, 2021 transfer and Mr. Khudainatov was the UBO of the Amadea); Cvijetic Tr. 59:9:11; CX-395, CX-397; Khudainatov Dec. ¶ 31).

94.    Corroborating the fact that the transfer from Nereo to Millemarin was *not* a sale to a third-party is an email from Julia Stewart of Imperial Yachts, dated August 9, 2021, in which Stewart asked the family office to postpone the transfer because "there were viewings of the Amadea daily, with two "focused clients." (CX-379). The family office, however, denied Stewart's request, stating that there had been several serious buyers in the past that did amount to a sale. (*Id.*).

95.    Further corroborating the fact that Mr. Khudainatov remained the UBO of the Amadea upon its transfer from Nereo to Millemarin is another email dated August 16, 2021, the day of the transfer, informing the family office that the re-registration had been completed, and attaching the new Certificate of British Registry and the Transcript of British Registry. Stewart informed the family office that a new insurance policy would be issued shortly, and also advised that she would send separately an updated Management Agreement and Sale CA. (Parfireva Tr. 80:7-14; CX-400). She further advised the family office that Imperial Yachts' bank would require a change to Millemarin to process payments of on-going operational invoices. (CX-400). In

addition, Stewart later provided the family office with an updated insurance policy for the Amadea in the name of Millemarin. (CX-402). Had a third-party purchased the Amadea on August 16, 2021, Stewart would not have been providing this information to the family office, but rather to the new UBO.

96.    The transfer of the Amadea was evidenced by a bill of sale, a protocol of delivery and acceptance, as well as the Memorandum of Agreement, among other documents that are part and parcel of a vessel sale, and ultimately resulted in the Cayman Islands Shipping Registry issuing a Certificate of British Registry. (Parfireva Tr. 78:20-79:17; Magee Tr. 62:12-68:9, 74:5-20 (explaining all the documentation that would be required to effectuate a vessel transfer); CX-395, CX-397, CX-400).

97.    The ownership structure of the Amadea is set forth in the Verified Claim and the documents attached thereto, demonstrating that Mr. Khudainatov is and was the UBO of the Amadea at the time it was seized. (CX-1). To summarize, Millemarin's sole shareholder is and was Invest International Finance Ltd., and the sole shareholder of IIF was the Boltenko Trust, which served as the trustee of the September Trust, and the beneficiary of the September Trust was Mr. Khudainatov. (Parfireva Tr. 67:13-68:4; Cvijetic Tr 38:19-39:4; CX-756 (marked as pp. 1–4)). Thus, when Millemarin took ownership of the Amadea, it too became an asset held by the September Trust. (*Id.*; Khudainatov Dec. ¶ 32).

98.    The ownership structure of the Amadea, and the fact that Eduard Khudainatov is the UBO of the Amadea, has been attested to by Olga Kroon, then-director of Millemarin, then-trustee of the September Trust, and then-director of Millemarin's parent company, Invest International Finance, Ltd. By letter dated April 24, 2022, which was submitted to the Court in Fiji, Kroon confirmed the Amadea's ownership structure that is described above, which

demonstrates that Mr. Khudainatov is the Amadea's UBO. (Parfireva Tr. 240:13-241:7; CX-756 (marked as pp. 1–4)).

99.     In Spring 2022, because of the events in Ukraine, it became almost impossible for European trustees to provide trust services to Russian citizens. (Khudainatov Dec. ¶ 32). As a result, the shares of IIF were transferred directly to Mr. Khudainatov on May 23, 2022. (CX-1 at pp. 84–89, CX-16). Thus, since that time, Millemarin's shareholder is IIF, and IIF's shareholder is Mr. Khudainatov. (*Id.*; Khudainatov Dec. ¶ 32). This is the current ownership structure of the *Amadea* and it has not changed since May 23, 2022. (Khudainatov Dec. ¶ 32).

100.     Further evidence that Mr. Khudainatov remained the UBO of the Amadea upon the transfer from Nereo to Millemarin is demonstrated by the assumption of debt liability by Millemarin from Nereo, which debt liability ultimately leads back to Mr. Khudainatov. The Memorandum of Agreement that precipitated the sale of the Amadea from Nereo to Millemarin reflected a price of €243,920,883. (Parfireva Tr. 71:15-73:23; Radovan Tr. 52:9-12, 53:3-21; CX-383-D). This figure was arrived at based on the following. All financing received by Nereo for construction of the Amadea consisted in 2021 of two parts: (1) loan due to Kochman (in the amount of €8,836,155) and (2) other loans consolidated beforehand on the sole creditor Lionsbay, which debt ultimately was owed to Mr. Khudainatov. (Parfireva Tr. 73:24-77:78:1; Cvijetic Tr. 54:19-55:4). On July 21, 2021, to pay for the Amadea, Millemarin assumed the liability of Nereo, which owed money to Lionsbay in the amount of €235,084,728. (Parfireva Tr. 76:6-77:4; CX-437). Lionsbay, in turn, owed this amount to Mr. Khudainatov's company, Arico; Arico's shares were held by Ivan Kolarov's company Dorson Business Ltd., and Ivan Kolarov was the nominee shareholder of those shares for Mr. Khudainatov. (CX-11, CX-12, CX-17, CX-18, CX-438). When Nereo received payment from Millemarin for the sale of the Amadea, Nereo repaid in full its debt

due to Kochman. (Parfireva Tr. 74:14-75:2; Cvijetic Tr. 66:13-67:9, 161:8-164:9). The rest of Nereo debts were assumed by Millemarin and then set-off against the balance of the yacht sales price. (Parfireva Tr. 76:6-78:19; CX-437, CX-439). As a result, Millemarin became a new debtor of Lionsbay, which ultimately owed its debts to Mr. Khudainatov, while its liability under the yacht sale agreement was fully met. (Cvijetic Tr. 54:15-55:4, 64:12-19, 65:18-24, 161:22-25).

**VII.    The Temporary Use Agreement was Not a Sale to Suleiman Kerimov and the Transaction Never Closed.**

  **A. The September 3, 2021 Cooperation Agreement between Mr. Khudainatov and Kochman had nothing to do with Suleiman Kerimov.**

101.    After ownership of the Amadea was transferred to Millemarin, Mr. Khudainatov continued to push Imperial Yachts to sell the Amadea. Up to that point, Mr. Khudainatov and Kochman had a long-standing disagreement over the investment and sales strategy for the Amadea. Kochman believed that it would be better to charter the Amadea and that chartering the Amadea would not only cover its running costs, but also could generate profits and improve the prospects of a sale. (Kochman Dec. ¶ 9; Khudainatov Dec. ¶ 33). Mr. Khudainatov, on the other hand, was opposed to the idea of chartering the Amadea, as he was concerned that doing so would reduce the Amadea's value, making the vessel harder to sell. (*Id.*)

102.    Around the summer of 2021, Mr. Khudainatov had grown frustrated with Imperial Yachts' inability to sell the Amadea for what he thought would be a reasonable selling price. (Parfireva Tr. 85:21-86:20; Khudainatov Dec. ¶ 34). Kochman told Mr. Khudainatov that he thought that he could sell the Amadea for more than €225,000,000 by the end of the year. (Khudainatov Dec. ¶ 34). However, Mr. Khudainatov wanted a more immediate solution. (*Id.*).

103.    Mr. Khudainatov and Kochman reached a compromise agreement that was memorialized in a September 3, 2021 "Cooperation Agreement." (Parfireva Tr. 82:14-83:2; CX-

242; Khudainatov Dec. ¶¶ 35-36; Kochman Dec. ¶ 10). The compromise they reached, as reflected in the agreement, was that Mr. Khudainatov would grant temporary use of the Amadea to Kochman, including the ability to charter the vessel and market it for sale in search of a buyer. (Parfireva Tr. 82:14-83:16, 85:15-86:20; Khudainatov Dec. ¶¶ 35-36; Kochman Dec. ¶ 10; CX-242). Kochman would carry the responsibility for paying its maintenance costs, while Mr. Khudainatov would maintain full ownership. (*Id.*). To secure the arrangement, Mr. Khudainatov required that Kochman pay him €225,000,000 while Kochman endeavored to sell the Amadea. (Khudainatov Dec. ¶ 36; Kochman Dec. ¶ 10). It also provided that Kochman would be entitled to charter profits and any sale proceeds in excess of €225,000,000. (CX-242; Khudainatov Dec. ¶ 36; Kochman Dec. ¶ 10). The agreement explicitly stated that Mr. Khudainatov was not transferring ownership of the Amadea to Kochman. (CX-242; Khudainatov Dec. ¶ 36; Kochman Dec. ¶ 10). It also stated that Kochman should organize the sale of the Amadea no later than December 1, 2021. (CX-242). The September 3, 2021 Cooperation Agreement will be referred to herein as the "Cooperation Agreement." However, the arrangement between Mr. Khudainatov and Kochman, which started with the Cooperation Agreement and continued until on or about February 24, 2022 when its goals became frustrated, will be referred to herein as the "Temporary Use Agreement."

104.    Mr. Khudainatov gave this heavy financial obligation to Kochman as well as the ability to profit from the sale and charters to further incentivize him to sell the Amadea as quickly as possible, and it was attractive to Kochman because it would allow him to receive any profits above €225,000,000, which he felt confident he could do. (Khudainatov Dec. ¶ 35; Kochman Dec. ¶ 10; *see also* Parfireva Tr. 84:22-86:23). As Mr. Khudainatov had commissioned and built the Amadea over the course of five years and put much time and effort into its design in order to have it for his use and enjoyment and for the possibility of a fruitful return on his investment, he did not

want to transfer ownership of the Amadea to Kochman at the time of the Cooperation Agreement, and he wanted to maintain some level of control over the vessel. (Khudainatov Dec. ¶ 35). In addition, Mr. Khudainatov agreed that he would return the €225,000,000 to Kochman if Kochman was unable to find a third-party buyer. (Khudainatov Dec. ¶ 35; Kochman Dec. ¶ 10). Therefore, Mr. Khudainatov and Kochman agreed that a transfer of ownership would only take place if and when Kochman was able to find a bona-fide buyer for the Amadea. (CX-242).

105.    In connection with her role overseeing the Amadea and other assets of Mr. Khudainatov in the family office, Parfireva was provided with a copy of this Cooperation Agreement, reviewed it, maintained it in the family office, and testified at her deposition to her understanding of its terms. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15, 82:14-84:15, 84:22-86:23).

## B. Errigal's Beneficial Owner is Evgeniy Kochman, and No Evidence Exists that Links Errigal's Ownership to Anyone Else.

106.    Mr. Khudainatov and Kochman decided to formalize the Cooperation Agreement on MYBA terms and conditions. (Parfireva Tr. 88:24-89:13; Kochman Dec. ¶ 11). MYBA is a standard form contract which is widely used in the yachting industry. (Kochman Dec. ¶ 11). In addition, it is standard practice in the industry to create new entities as special purpose vehicles ("SPVs") for each specific transaction, including to own vessels like the Amadea. (*Id.*; Read Tr. 230:3-6 (confirming that it was "standard across superyachting" for a vessel to be formally owned by an entity rather than an individual); Walsh Tr. 20:22-21:3 (confirming "it's common within this

industry" for an entity, rather than an individual, to be the legal owner of a superyacht); Hitch Dec.
¶ 61).[11]

107.    Errigal Marine Ltd. was incorporated on Kochman's behalf by Campbells
Corporate Services (a Cayman service provider) to serve as the counter-party to Millemarin, the
corporate owner of the Amadea, in the proposed MYBA memorandum of agreement. (Magee Tr.
12:11-14 (Magee "instructed corporate administrators" of Campbells "to form Errigal"); Wolf Tr.
68:16-69:20; Khudainatov Dec. ¶ 37; Kochman Dec. ¶ 12). In fact, Damien Magee chose the name
"Errigal." (Magee Tr. 131:21-133:10; CX-129).

108.    Kochman is the sole beneficial owner of Errigal. (Parfireva Tr. 88:6-23 (the family
office had requested and received Errigal's corporate documents, which showed that Kochman
was the beneficial owner of Errigal); Wolf Tr. 68:16-69:20, 200:4-201:21, 202:12-203:25; Magee
Tr. 132:5-11; CX-450, CX-451, CX-34; Khudainatov Dec. ¶ 37; Kochman Dec. ¶ 12). Magee
testified that, based on the documents shown to him, Evgeniy Kochman was the ultimate beneficial
owner of Errigal. (Magee Tr. 133:23-138:23, 148:12-16; CX-130). Notably, no document exists
tying Errigal to Suleiman Kerimov. John Wolf testified that he did not know who Suleiman
Kerimov was. (Wolf Tr. 244:13-17).

109.    John Wolf and Damien Magee of Campbells were named directors of Errigal, and
served in that capacity from the date of Errigal's formation until March 2022. (Magee Tr. 13:6-14;
Wolf Tr. 69:4-17; CX-452).

---

[11] The Rebuttal Declaration of Michael A. Hitch, Claimants' expert who is expected to rebut the
testimony of the government's expert Sean Meagher, and which was filed on January 10, 2025
will be cited to herein as "Hitch Dec."

### C. The September 14, 2021 MOA did Not Effectuate a Sale or Transfer of Ownership.

110.    A Memorandum of Agreement dated September 14, 2021 ("September MOA") was drafted, reviewed, negotiated, and finalized to effectuate as closely as possible the Cooperation Agreement that had been entered into by Mr. Khudainatov and Kochman between the Khudainatov family office (and by extension Kroon's office as director of Millemarin) on behalf of Millemarin, and Imperial Yachts (and by extension Campbells as the directors of Errigal) on behalf of Errigal. (Parfireva Tr. 88:24-89:13; CX-442, CX-443, CX-447; Kochman Dec. ¶¶ 11, 13).

111.    Parfireva arranged to have the MYBA Memorandum of Agreement signed by Millemarin's Director Olga Kroon (CX-567), and the family office ultimately received back a fully executed document signed also by Damien Magee, a director of Errigal. (Magee Tr.  140:20-142:17; CX-2, CX-3, CX-453).

112.    The September MOA did not effectuate a sale to anyone. As Damien Magee testified, this document simply set forth "an agreement to purchase the vessel at a future date for a set price with conditions," and therefore did not effectuate a sale of the Amadea. (Magee Tr. 63:3-9, 142:18-143:9, 148:12-16). Indeed, it specifically provided for a closing date of November 1, 2021. (Parfireva Tr. 90:18-93:22; CX-2 at p. 3; Kochman Dec. ¶ 13). In addition, the documents and events that correspond with a vessel sale, such as a bill of sale and protocol of delivery and acceptance, among several others, do not exist in connection with the September MOA. (Magee Tr. 63:9-64:17, 65:4-9, 74:5-20; Wolf Tr. 92:4-7). Moreover, regarding the September MOA, Wolf testified that "the payment schedule" with a large non-refundable deposit was "unusual" for a sale of the vessel because "it's unusual to have a buyer using a yacht during the period when they just put down a deposit on it, and the reason for that – one reason for that is they're operating this vessel in the name of the seller." (Wolf Tr. 83:9-85:4). Wolf further testified that based on the

43

unusual provisions of the September MOA, "there must have been a close relationship between the buyer and seller here for this to happen . . . ." (*Id.* at 86:3-6, *see also* 191:13-192:9).

113.    The September MOA contained a payment structure that shows that the payments intended under the September MOA were not intended to actually purchase the Amadea, particularly not at that time. In addition, the payment structure set forth in the September MOA corroborates Mr. Khudainatov's agreement to return the funds to Kochman if the vessel does not sell. The Memorandum of Agreement explicitly required two payments, one in the amount of €45,000,000 paid within 3 banking days of September 14, and the second in the amount of €180,000,000 to be paid by November 1. The first payment was explicitly made non-refundable at the request of the family office. (Parfireva Tr. 90-18-93:16). They did this because Mr. Khudainatov had granted permission to Kochman to charter, and make changes to, the vessel. (CX-2, CX-242). In the event that Kochman was unable to find a third-party buyer, but he had made changes to the Amadea that did not comport with Mr. Khudainatov's taste, or if the boat had been damaged while in Kochman's care, the €45,000,000 non-refundable portion provided Mr. Khudainatov with the protection he needed to repair or change the Amadea back to the way he wanted it to be should the vessel be returned to him. (Parfireva Tr. 90:18-93:16). The second installment of €180,000,000 notably, was not made non-refundable, and therefore was refundable. (*Id.* at 93:11-16).

114.    No document or testimony exists linking the September MOA to Suleiman Kerimov in any way.

### D. The Loan Taken Out by Kochman/Errigal from Alisa Gadzhieva in connection with the Temporary Use Deal was Not a Payment to Purchase the Amadea.

115.    Kochman did not have ready access to €225,000,000, so he approached Alisa Gadzhieva, who he had known through business circles, to provide him with a loan. (Kochman

Dec. ¶ 14; Gadzhieva Dec. ¶ 4). Gadhzieva agreed to make the loan to Errigal, Kochman's entity, and provided for a 3.5% annual interest rate, which projected annual income to her of €7.88 million. (CX-453-B). The loan principal and accrued interested are expected to be fully repaid by September 9, 2031. (Gadzhieva Dec. ¶ 3; Kochman Dec. ¶ 16).

116.    Kochman explained to Gadzhieva his idea to charter the Amadea while simultaneously looking for a buyer, and that he thought he could sell the Amadea relatively quickly as the demand for superyachts was increasing in the post-COVID environment, which would allow him to repay the loan in short order. (Kochman Dec. ¶¶ 14, 17). Kochman also explained to Gadzhieva that the annual income of nearly €8 million that the loan provided for could easily be covered by profits from the Amadea's charter activity. (*Id.* at ¶ 17).

117.    Gadzhieva agreed to make the loan to Kochman based on her "view and knowledge of the EU financial market, the value of the Amadea and Kochman's reputation in the superyacht market, the expected return from the loan relative to other investment opportunities" (particularly as opposed to investments in the volatile Russian ruble market), and the low risk of default based on Kochman's business talents and his need to avoid reputation risk. (Gadzhieva Dec. ¶ 5).

118.    Consistent with the loan agreement, Gadzhieva made two payments on behalf of Errigal, one on October 6, 2021 for €45,000,000, the non-refundable portion as set forth in the September MOA, and then the €180,000,000, the refundable portion, on or about October 27, 2021. (Parfireva Tr. 97:8-99:22; CX-453, 458). Parfireva testified that she provided payment instructions with the bank details of the account of Millemarin's parent company, IIF, on Millemarin's behalf (and organized to have Millemarin's director, Kroon, sign the instructions) to Imperial Yachts (on behalf of Errigal). (CX-247-A, CX-453). Gadzhieva explained that she received instructions from Errigal to send the payments to IIF, which she did. (Gadzhieva Dec. ¶

6; *see also* CX-247-A, CX-453, CX-453-A, CX458-A; Parfireva Tr. 95:3-97:5, 97:6-99:22. Parfireva further testified that after receiving the first payment from Gadzhieva, she requested documentation from Kochman to explain the payment from Gadzhieva, and in response he provided her with the loan agreement, which Parfireva maintained in the family office's files. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15, 97:8-98:14; CX-453). Parfireva further testified that the reason payments were requested to be made to IIF's bank account is because "Millemarin never had its own bank account." (Parfireva Tr. 107:24-108:5). On or about November 30, 2021, Parfireva drafted a reconciliation report listing the two payments made by Gadzhieva on behalf of Errigal to Millemarin, which report was then executed on behalf of Errigal and Millemarin. (Parfireva Tr. 106:12-24; CX-464, CX-466). Parfireva created this reconciliation report in order to receive written confirmation from both parties that the payments were made in accordance with the September MOA. (Parfireva Tr. 106:25-107:23).

119. Documents received and maintained by the family office in connection with Gadzhieva's loan to Errigal, as well as Gadzhieva's declaration, demonstrate that Gadzhieva had sufficient independent funds to make this loan, and that she did not receive any funds from Suleiman Kerimov. Gadzhieva has invested in restaurants and other sectors, and her personal financial resources come from her maternal grandmother, Kuncha Kerimova ("Kuncha"), and other relatives, and makes up her portion of her wealth which she uses for her own purposes. (Gadzhieva Dec. ¶ 4). Family office documents show that Gadzhieva received a gift from her grandmother that more than covered the amount of her loan to Errigal, and that her grandmother had prior to that received a gift from her grandson, Said Kerimov, that more than covered the gift that the grandmother later made to Gadzhieva. Documents further show that Said Kerimov, as the sole beneficial owner of Polyus Gold International Limited ("Polyus"), had received significant

dividends from Polyus that sufficiently covered the gift he had made to his grandmother. Specifically, documents show that Said Kerimov received dividends from Polyus on October 23, 2020, June 9, 2021, and October 13, 2021, in the approximate amounts of, respectively €242,624,588, €387,998,854, and €282,815,423, totaling just under a billion euros over the course of one year. (CX-67, CX-68, CX-69). A gift agreement received by the family office shows that on or about December 28, 2020, Said Kerimov agreed to gift his grandmother the equivalent amount of €242,624,588, which corresponds with the dividends he received on October 23, 2020. (CX-64, CX-67). Another gift agreement shows that subsequently, on or about June 15, 2021, Gadzhieva's grandmother agreed to gift Gadzhieva the equivalent of approximately €239,610,591 at that time, which would have more than sufficiently covered the loan she made to Errigal. (Ex. CX-66).

120.    No evidence exists that Suleiman Kerimov provided Alisa Gadzhieva, his niece, with the funds she used to make the loan to Errigal. The government brought forth two witnesses, former U.S.-based financial advisors of Suleiman Kerimov, seeking to create a link—where none exists—that the loan from Alisa Gadzhieva was really a payment to purchase the Amadea by Suleiman Kerimov. Both witnesses, however, stopped working with Suleiman Kerimov in or about 2018 or 2019 (Vine Tr. 10:2-9, 35:8-11; von Poblitz Tr. 16:16-20), and either had no firsthand knowledge of the Amadea or its ownership or did not provide testimony on the topic. (Vine Tr. 80:13-24; *see generally* von Poblitz Deposition). One of the witnesses did not know whether Suleiman Kerimov ever paid for things for family members or otherwise provided funds to members of his family (Vine Tr. 34:16-22), while the other testified that Suleiman Kerimov had previously gifted his children hundreds of millions of dollars and that his children have significant "outside assets," including independent sources of wealth. (von Poblitz Tr. 55:6-22). That same

witness did not know who Alisa Gadzhieva was. (von Poblitz Tr. 35:4-6, 43:2-5). The other had met Gadzhieva socially, but had never interacted with her in the context of his work for Kerimov (Vine Tr. 79:20-80:12).

121.    In addition, Special Agent Timothy Bergen could not identify a single document or communication that showed that Suleiman Kerimov directed his niece to make these payments, or any connection between Kerimov and the maintenance payments alleged in the Complaint. (Bergen Tr. 120:3-122:12). In fact, Special Agent Bergen admitted that the only evidence the government has linking Suleiman Kerimov to the Amadea is the loan agreement between Gadzhieva and Errigal. (Bergen Tr. 122:5-12 ("Q You don't have any evidence that Suleiman Kerimov directed Alisa Gadzhieva to make that transfer; do you? . . .  A I think the evidence in the Complaint and the evidence of the loan deal is sufficient evidence. But again, it's up to the judge to - - to decide that.")).

122.    Moreover, Gadzhieva declared that she never owned the Amadea, her uncle Suleiman Kerimov did not provide her with the funds she used to make the loan to Errigal, and nor did she discuss the loan with her uncle. (Gadzhieva Dec. ¶ 2). Similarly, Kochman declared that he never spoke to Suleiman Kerimov regarding his request for the loan from Gadzhieva, and that he understood that Gadzhieva had sufficient independent wealth that she could utilize at her discretion. (Kochman Dec. ¶ 15).

123.    Further, Parfireva testified that ownership of the Amadea did not transfer upon receipt of the loan payments. (Parfireva Tr. 99:23-100:24). Indeed, she explained that "there were no documents that transferred the Ownership Right for the boat. For example, a Bill of Sale" and the "protocol of sale and delivery." (*Id.* at 100:12-24).

124.    Further corroborating that Gadzhieva's payments were in fact a loan, and not payments to purchase the Amadea, is that Gadzhieva arranged to charter the Amadea for the period of March 15 to April 14 for €9,062,500. (Gadzhieva Dec. ¶ 7). This is corroborated by the charter agreement that reflects this charter in her name. (CX-45). This is also corroborated by documents confirming that she made the first of three required payments for that charter. (CX-636). The charter ultimately did not happen because of the events that began on February 24, 2022. (Gadzhieva Dec. ¶ 7). As a result, Gadzhieva signed and dated a note on March 10, 2022, asking to seek permission from the Amadea's "owner" "to postpone the charter and change dates." (CX-641). This note makes clear that she was not the owner of the Amadea, and it also makes clear that her uncle was not the owner of the Amadea, as she would not have had to write such a note and she would not have referred to her uncle as an unnamed "owner." In addition, had she or any of her family members owned the Amadea, she "she would not have arranged and paid for a charter of the Amadea." (Gadzhieva Dec. ¶ 7). Gadzhieva makes clear that "[a]t no time did [she] have any ownership or control over the Amadea." (*Id.*).

### E. Further Corroborating that Neither the September MOA, Nor the Payments, Represented a Sale of the Amadea, the Closing Date was Postponed.

125.    The September MOA contemplated that a sale would close by November 1, 2021, but that did not happen because Kochman did not find a buyer by that time. (Parfireva Tr. 100:25-101:7, 102:6-22; Kochman Dec. ¶ 21; Khudainatov Dec. ¶ 39). By email dated November 19, 2021, Julia Stewart of Imperial Yachts sent an email to the family office advising that Kochman and Mr. Khudainatov had met the day before and agreed to postpone the closing date until May 1, 2021. (CX-248; Kochman Dec. ¶ 21). Therefore, on November 22, 2021, this new agreement resulted in the Additional Agreement to the Cooperation Agreement of September 3, 2021, dated November 22, 2021, which both Mr. Khudainatov and Kochman signed, and which extended the

time for Kochman to organize the sale of the Amadea until May 1, 2022. (CX-243; Khudainatov Dec. ¶ 39; Kochman Dec. ¶ 21). Parfireva was aware of this amendment to the Cooperation Agreement at the time it took place, and like all exhibits to her deposition, this document was maintained in the family office. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15, 101:5-102:4). Parfireva testified that the closing date was postponed because the "main obligation of Kochman, according to the [September 3, 2021] Cooperation Agreement, was the sale of the Amadea Yacht," and that Kochman had failed to sell it by the original closing date. (*Id.* at 102:6-22).

126.    Consistent with the November 22, 2021 amendment to the Cooperation Agreement, an Addendum to the September MOA was entered into by Millemarin and Errigal containing additional provisions, but most importantly which extended the closing date until May 1, 2022. (Parfireva Tr. 102:23-106:5; CX-248, CX-461, CX-462, CX-463).

### F. Consistent with his Ownership of the Amadea during the Temporary Use Agreement, Mr. Khudainatov was Kept Informed of and Approved Certain Events.

127.    Around the time that Mr. Khudainatov and Kochman initiated the Temporary Use Agreement in September 2021, Kochman told Mr. Khudainatov that he had a group interested in chartering the Amadea for a potential long-term charter. (Khudainatov Dec. ¶ 43). Mr. Khudainatov asked Kochman to keep him "updated about any significant modifications to the interior he wanted to implement in order to make the vessel more attractive for the sale and the charters." *Id.* Corroborating Mr. Khudainatov's statements, Pastukhova declared that Mr. Khudainatov asked her to keep him informed of certain details during this charter, "including for example significant comments from guests," and that "it was [her] role as Client Coordinator to pass this information to him, which [she] did." (Pastukhova Dec. ¶¶ 5-7).

128.    Mr. Khudainatov also requested to be kept informed of location plans for the Amadea, and he was so informed. In an email dated February 8, 2022 that Pastukhova sent to the Captain of the Amadea, with the subject line "AMA: Planning for 2022," Pastukhova wrote "Please be advised that G1 has requested to consider the amended planning for 2022 . . . ." In this email, she was referring to Mr. Khudainatov. (Pastukhova Dec. ¶ 14(b)(i)).

129.    In or about early 2022, Kochman informed Mr. Khudainatov "that the Amadea would need maintenance to be completed that year." (Khudainatov Dec. ¶ 45). Mr. Khudainatov approved that the Amadea would go to the Philippines to have this maintenance completed, and he also approved the specific route it would take to get there. (*Id.*). As the Amadea's UBO, Mr. Khudainatov "was financially responsible to pay for this journey and the subsequent maintenance, but as detailed below the vessel was seized in Fiji and this maintenance never took place." (*Id.*). Mr. Khudainatov remains "financially responsible for the costs of this journey to Fiji." (*Id.*). These facts are corroborated in an email dated February 15, 2022 regarding surveys and servicing, in which Pastukhova used "G1" to refer to Mr. Khudainatov because, as the owner, he would be the one to be made aware of these matters, not a charterer. (Pastukhova Dec. ¶ 14(b)(iv)).

**G. The Events that Resulted from the Russian Military Operation in Ukraine Thwarted the Purposes of the Temporary Use Agreement, the Parties by Necessity Terminated It, and No Sale of the Amadea Ever Took Place.**

130.    Following the February 24, 2022 Russian military action in Ukraine, the U.S. government and U.S. allies around the world issued public statements targeting Russian-owned yachts.[12] In the wake of these events, the "charter market collapsed, making it difficult to charter

---

[12] *See, e.g., Attorney General Merrick B. Garland Announces Launch of Task Force KleptoCapture*, U.S. DEP'T    JUST. OFF. PUB. AFFS. (Mar. 2, 2022) https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-launch-task-force-kleptocapture

Amadea to cover operational costs and interest" Kochman owed to Gadzhieva. (Kochman Dec. ¶ 22; Khudainatov Dec. ¶ 40). In the midst of the chaos, Mr. Khudainatov and Kochman "initially considered completing the transfer from Millemarin to Errigal in hopes of optimizing Amadea's charter and sales efforts to non-Russian markets." (Kochman Dec. ¶ 23; *see also* Khudainatov Dec. ¶ 40).

131.    In addition, the parties understood that in the current geopolitical climate, a traditional yacht transfer would be difficult to effectuate, as there was a concern that the Cayman Islands Registry of Vessels would deny the transfer. (Parfireva Tr. 108:6-24). To minimize that risk, the parties decided to effectuate a transfer of Millemarin's shares from IIF to Errigal. (Parfireva Tr. 108:25-109:8; CX-467, CX-469, CX-472, CX-472-A, CX-474; Khudainatov Dec. ¶ 40). The parties' agreement was set forth in the March 7, 2022 Amendment to the September 14, 2021 Memorandum of Agreement, which was signed by Olga Kroon on behalf of Millemarin and John Wolf from Campbells on behalf of Errigal. (Parfireva Tr. 109:9-21; Wolf Tr. 188:17-189:4l; CX-475, CX-566, CX-566-A; Khudainatov Dec. ¶ 40).

132.    This agreement, however, did not complete the transaction, as it included a closing date of March 15, 2022, and a share transfer document needed to be effectuated. (Parfireva Tr. 109:10-110:7; Magee Tr. 143:10-144:23, 145:17-146:16, 147:12-148:7; Wolf Tr. 188:17-189:14; CX-134, CX-135, CX-566-A). To that end, Parfireva asked Kroon to sign the Instrument of Transfer of Shares dated March 10, 2022 on behalf of IIF (Kroon was also the director of IIF), which she did and sent back to the family office. (CX-477, CX-477-A). Parfireva then sent it to Julia Stewart to get it counter-signed by one of Errigal's directors. (CX-479).

133.    However, the March 10, 2022 Share Transfer document was never counter-signed by Errigal, which is corroborated by the testimony of Errigal's directors themselves. First, John

Wolf himself stated that he and Damien Magee resigned as Errigal's directors on or about March 7, 2022, leaving Errigal with no ability to have a director act on its behalf. (Wolf Tr. 168:15-23, 198:10-18, 200:4-201:21; *see also* Magee Tr. 52:13-16; Parfireva Tr. 109:22-110:23; CX-286-A). Wolf testified that the future sale referred to in the September MOA "never seemed to close." Wolf Tr. 87:18-20. Instead, it "fizzled out." (Wolf Tr. 87:23-24). Wolf elaborated that "this transaction we never got close to being given a delivery date or bill of sale, all the things that are required to close the sale of a yacht." (*Id.* at 92:4-7; *see also id.* at 185:13-187:10; Hitch Dec. ¶ 73 (declaring that he had not been provided with any evidence of a change in ownership in the fall of 2021 or early 2022 and that if such a change had occurred "there would have been formal records of the exchange in international waters")). No counter-signed Share Transfer document was found during discovery, consistent with the testimony and documents. Thus, the Share Transfer document was never fully executed, Millemarin's shares were never transferred, and Mr. Khudainatov remained the Amadea's UBO.

134.    Indeed, no witness testified that Errigal or Kochman (as the UBO of Errigal) became the owner of the Amadea. In addition, Parfireva testified that Kochman "was not the owner of the Amadea, the owner of Amadea was and remains Eduard Khudainatov." (Parfireva Tr. 113:6-15; *see also* Kochman Dec. ¶ 24).

135.    Further corroborating that shares never transferred and Mr. Khudainatov remained the Amadea's UBO is an email from March 30, 2022, in which a colleague of Kroon's asked Parfireva about the status of the share transfer, and Parfireva responded that the transfer of the company was on "standby." (CX-480). Parfireva testified that she was referring to the transfer of Millemarin's shares from IIF to Errigal. (Parfireva Tr. 114:25-117:19).

136.    Also corroborating the fact that the deal never closed was that Mr. Khudainatov's family office continued to act on behalf of the Amadea in the weeks that ensued, leading up to the seizure of the Amadea on or about April 13, 2022. During March and April, Millemarin's (and the Amadea's) registered agent in the Cayman Islands resigned, the Amadea risked losing its Cayman Flag, and the family office received multiple requests for documents demonstrating Mr. Khudainatov's ownership of the Amadea, which they provided. For example, on March 30, 2022, Imperial Yachts notified the family office that KYC was required for insurance underwriters, UK Admiralty, and a disclosure regarding main engine maintenance. Parfireva provided the required documents that were then brought to the Moscow office of Imperial Yachts. (CX-481).

137.    As another example, on April 6, 2022, Julia Stewart emailed and said that the Amadea "needs 'authorized representative' to retain Cayman Flag and finish the deal.'" (CX-25). She asked the family office to contact Kroon's office (Boltenko) to provide needed documents to a potential new authorized representative, and asked that we do this "tomorrow to finalise the matter (and then the deal can be closed)." (*Id.*). Because Campbells had resigned from serving as the Amadea's (Millemarin's) registered agent in the Cayman Islands, emails demonstrate that the family office worked to try to get another Cayman company (FFP), to take over as registered agent, as referred to in this email. (CX-25, CX-561). The family office then forwarded Stewart's email to Boltenko Law to ask them to send the documents to FFP. (CX-561). Kroon also provided a letter to FFP informing them in her role as Director of IIF that the Boltenko Trust "is acting as trustee of The September Trust . . . which holds 100% of the share capital of [IIF]," and that Mr. Khudainatov is "economic settlor of the Trust." (CX-562, CX-562-A). Ultimately, however, FFP declined to provide any services to the Amadea. (CX-24).

138.    In the midst of these events, Mr. Khudainatov and Kochman acknowledged the unviability of chartering or marketing the Amadea for sale, and by necessity agreed to no longer continue the Temporary Use Agreement. As a result, the rights and responsibilities granted to Kochman in the September 3, 2021 and November 22, 2021 agreements between Mr. Khudainatov and Kochman, and the corresponding MYBA contracts, reverted fully back to Mr. Khudainatov.

139.    Corroborating this is the fact that Millemarin and Imperial Yachts entered into a new yacht management agreement dated April 4, 2022, between Millemarin (as owner of the Amadea) and Imperial Yachts, a copy of which was maintained in the family office's files. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 53:19-55:15; CX-482). As set forth in this yacht management agreement, Millemarin appointed Imperial Yachts to act as the vessel's manager. (*Id.*). That agreement specifically provides that Millemarin "shall at all times remain solely responsible for all costs and expenses related to the Yacht . . . ." (*Id.* at ¶ 6.3). Parfireva testified that she learned of this management agreement at the time, and understood it to signify that the Temporary Use Agreement was no longer in effect. (Parfireva Tr. 110:24-112:5). This was the status of the Amadea at the time the vessel was seized in Fiji.

**H. Upon Commencement of Legal Action in Fiji to Seize the Amadea, Mr. Khudainatov Retained Counsel, and Millemarin Appeared in the Action to Challenge the Seizure.**

140.    Upon the seizure of the Amadea in Fiji by the U.S. Authorities, on or about April 13, 2022, legal counsel was retained to challenge the seizure on Mr. Khudainatov's behalf. (Parfireva Tr. 112:6-113:5; CX-758; Khudainatov Dec. ¶ 47). As a result, Millemarin, as the Amadea's legal owner, appeared in that action to challenge the seizure. (CX-757, CX-758).

141.    In support of Millemarin's claim of ownership of the Amadea, local counsel in Fiji submitted the same ownership documents that Claimants submitted in this litigation in support of their claim here. (CX-756 (marked as pp. 5–72)).

142.    In addition, Kroon submitted a letter dated April 24, 2022, which was filed in support of Millemarin's claim in the Fiji litigation, explaining that her firm "has advised Mr. Eduard Khudaynatov on various legal matters, including the establishment of the September Trust," and that she was the then-director of Millemarin and IIF, and the trustee of the September Trust, of which Mr. Khudainatov was the beneficiary. (*Id.* (marked as pp. 1-4)). She went on to explain the ownership structure of the Amadea in a manner consistent with Claimants' submissions in this matter. (*Id.*). In that letter, dated April 24, 2022, Kroon explained that the registered owner of the Amadea at that time was Millemarin, the sole shareholder of Millemarin was IIF, the sole shareholder of IIF was the Boltenko Trust as trustee of the September Trust, and that the economic settlor of the September Trust was Mr. Khudainatov. (*Id.* marked as p. 2; *see also* Parfireva Tr. 240:13-241:7). Kroon further stated that Suleiman Kerimov had "never held any interest in any of the companies and/or trust identified" in her letter. (*Id.*). Indeed, Suleiman Kerimov never appeared in the Fiji litigation. Thus, according to Millemarin's and IIF's director, and the trustee of the September Trust, no sale of the Amadea to a third-party took place prior to the vessel's seizure in Fiji.

143.    Mr. Khudainatov submitted an affidavit in the Fiji litigation, which he signed on May 2, 2022. In that affidavit, he stated that he is the "sole beneficial owner" of the Amadea. (CX-755).

144.    While the vessel was in Fiji, Mr. Khudainatov "kept in regular close touch with Kochman" and he "asked Mr. Kochman to give [him] regular updates as to what was happening

there," which Kochman did every week or so. (Khudainatov Dec. ¶ 46). Mr. Khudainatov's statements on this point are corroborated by Viktoria Pastukhova, the Client Coordinator who worked for a company associated with Imperial Yachts and was assigned to the Amadea, who declared under penalty of perjury that "[o]nce the American authorities attempted to seize the vessel in Fiji, [she] began giving Mr. Khudainatov updates at first weekly, and later periodically." (Pastukhova Dec. ¶ 18). Pastukhova "also gave updates to Mr. Kochman who [she] understood passed the information along to Mr. Khudainatov." (*Id.*). Pastukhova stated that the last time she "spoke to Mr. Khudainatov about the AMADEA was during the time that the vessel was in Fiji." (*Id.*).

### I.  Mr. Khudainatov Has a Financial Interest in the Amadea.

145.    Once the Temporary Use Agreement was canceled, Millemarin (Mr. Khudainatov) became liable to pay Errigal (Kochman) back for the full amount. This liability is demonstrated in Millemarin's financial statements that originated from the former director of Millemarin, Olga Kroon, and were signed by her. (CX-674, CX-675, CX-676, CX-677). Millemarin's balance sheets list liabilities, which is explained in the notes to the financial statements that these liabilities include the €225,000,000 that is owed to Errigal for the Amadea. (*Id.*).[13]

146.    These documents also make specific reference to the amounts received from Alisa Gadzhieva in connection with the loan she made to Errigal. In Millemarin's balance sheets as of December 31, 2021 and 2022 (as well as 2023), an asset of Millemarin's is called "Debtors" in the amount of 251,326,371 USD. (CX-674, CX-675, CX-676, CX-677). The notes to the financial statements indicate that this amount comprises of a loan from Millemarin to IIF in the amount of

---

[13] The other liability listed is to Lionsbay in the amount of €235,084,728, which as demonstrated above, is a debt that is ultimately owed to Mr. Khudainatov.

251,316,371 USD plus a promissory note with IIF in the amount of 10,000 USD. (*Id.*). The loan schedule accompanying these balance sheets lists the two payments from Alisa Gadzhieva, which total 251,316,371 USD. This loan from Millemarin to IIF and the amount corresponds with another document that originated from Kroon, which is a loan agreement between Millemarin, as lender, and IIF, as borrower, dated 15.09.2021, and which contains two appendices, each of which sets forth the agreement that the funds received from Gadzhieva is a loan installment pursuant to the loan agreement. (CX-716). The total of those two payments, according to these documents, is 251,316,371 USD.

147.    This evidence corroborates the fact that the funds received from Gadzhieva were in fact a loan, because if those funds had actually been used to purchase the Amadea, no liability would exist to return those funds to the "buyer." In addition, both Kochman and Gadzhieva agree that her loan remains outstanding, interest is accruing, and that Kochman is fully expected to pay Gadzhieva back the full amount plus interest once the situation with the Amadea is resolved. (Kochman Dec. ¶ 26; Gadzhieva Dec. ¶ 8).

148.    Mr. Khudainatov has not yet returned those funds, and they remain a liability on Millemarin's balance sheet as demonstrated above. Given the criminal allegations made that the Amadea was owned by Suleiman Kerimov and had been involved in sanctions evasion and money laundering, and the allegations made against Mr. Khudainatov and/or Kochman serving as straw owners or facilitators of these crimes, Mr. Khudainatov and Kochman agreed to delay any repayment until it was clear that such transaction would not be used as evidence of any wrongdoing or until the situation with the Amadea resolved. (Parfireva Tr. 113:16-114:9; Kochman Dec. ¶ 25; Khudainatov Dec. 41).

VIII.    **The Government's Alleged "Facts" that Kerimov Bought the Amadea are Belied by the Evidence.**

A.    **Suleiman Kerimov was not Interested in Purchasing the Amadea and Did Not Purchase It.**

149.    The evidence shows that the Amadea was previously viewed twice by or on behalf of Suleiman Kerimov, in or about 2018 or 2019, and again in June 2020, and both visits resulted in a decision that the Amadea was not a vessel Kerimov had any interest in purchasing.

150.    Suleiman Kerimov and his family have been long-term clients of Dinar Khalikov, an engineer with his own company going back to approximately 2001, who has extensive experience installing, fixing, reverse engineering, and otherwise working on AV/IT systems in homes, and on superyachts and other pleasure craft. (Khalikov Tr. 9:10-18; 10:6-11:24). This work includes retrofitting smarthome systems in homes and on vessels, which control lighting, shades, heating, ventilation, air conditioning, and entertainment systems. (*Id.* at 10:20-11:24). Khalikov's company was hired to provide work in the Kerimov family homes and on the family yacht, ICE, in approximately 2011, and the family has been a respected and very important client of Khalikov's company ever since. (*Id.* at 11:25-13:15, 19:8-23, 22:23-24:24, 27:14-21). Khalikov performed extensive work on ICE over the course of the three years that the family owned the vessel, visiting the vessel five to eight times per year and spending one to three weeks per visit. (*Id.* at 22:23-24:24). During the course of his work on ICE, Khalikov learned about yacht operations, navigation, and how the vessel works and drives, and became very close professionally with Alan Weaver, ICE's captain. (*Id.* at 25:9-26:17).

151.    Khalikov has also served as a consultant to Kerimov, particularly about yachts. (*Id.* at 29:5-23). In fact, Kerimov asked Khalikov for guidance on boats that Kerimov might be interested in buying. (*Id.* at 29:7-30:9). Based on his experience working on ICE, Khalikov was

aware, not only of the habits of Kerimov and his family on yachts, but also their aesthetic preferences. (*Id.* at 30:10-31:13 (testifying that he learned the vessel preferences of the Kerimov family, including their aesthetic preferences, and describing the family's prior yacht as "timeless," "invisible," "light," "neutral," "contemporary," containing no "unnecessary decorations," as "everything is there for a purpose")). Khalikov also became aware of Kerimov's technical preferences, such as the less-common diesel electric hybrid propulsion system, which was the system on ICE, and which provides a dramatically different experience on the yacht in terms of decreased noise and vibration than a conventional propulsion system, and is more fuel efficient. (*Id.* at 13:16-17:25). In fact, Khalikov considered ICE to be a "technical masterpiece" that provides an "absolutely comfortable," "stable," and "quiet" experience. (*Id.* at 18:1-19:7; 25:9-21). Khalikov looked for yachts with Kerimov's assistant who was assigned to yachting related matters, Vladimir Maslov, and the two would filter the boats that they believed were actually worth Kerimov's time to look at, based on his preferences. (*Id.* at 41:17-42:1).

152.    In or about 2018 or 2019, Khalikov went to the Monaco Yacht Show to view yachts that were for sale because Kerimov wanted to buy a boat. (*Id.* at 31:14-33:24). When he viewed the Amadea there, he thought the Amadea was "horrible," due to the "Louis the XIV" style interior, as well "technical issues in terms of noise and vibration," as well as service issues because the galley was too far from the serving areas where people eat. (*Id.* at 35:18-36:17). Khalikov knew Kerimov would not be interested in buying the Amadea for these reasons, as well as the fact that its propulsion system is not diesel electric. (*Id.* at 36:18-25; 42:7-24). Khalikov explained that you buy a yacht "to enjoy it," so if there is any part of it that you do not enjoy, there is no purpose in buying it, particularly given that a boat is something that you have to pay for "constantly." (*Id.* at 36:25-38:1).

153.    Given these issues, Khalikov did not consider the Amadea to be a potential purchase for Kerimov. (*Id.* at 41:12-42). This is corroborated by a text message between Khalikov and Henry Craven Smith, a yacht broker, on April 26, 2020, during which Khalikov stated that Kerimov did not want Khalikov (and presumably Maslov) to look at the Amadea:

```
2020-04-26 17:20:28 UTC <Dinar <792602326667@s.whatsapp.net>>: Hello Henry. I was mistaken. He wants us to see GA. Not Amadea.
2020-04-26 17:20:28 UTC <Dinar <792602326667@s.whatsapp.net>>: Hello Henry. I was mistaken. He wants us to see GA. Not Amadea.
2020-04-26 17:36:33 UTC <Unknown-Party-11eaefa5-3de7-4e5e-b3b1-9bdc5f5717ee@WhatsApp>: Hi Dinar, GOLDEN ODYSSEY?
2020-04-26 17:36:33 UTC <Unknown-Party-11eaefa5-3de7-4e5e-b3b1-9bdc5f5717ee@WhatsApp>: Hi Dinar, GOLDEN ODYSSEY?
2020-04-26 17:36:49 UTC <Dinar <792602326667@s.whatsapp.net>>: Yes.
2020-04-26 17:36:49 UTC <Dinar <792602326667@s.whatsapp.net>>: Yes.
2020-04-26 17:37:10 UTC <Dinar <792602326667@s.whatsapp.net>>: No for Amadea. Golden Odyssey.
2020-04-26 17:37:10 UTC <Dinar <792602326667@s.whatsapp.net>>: No for Amadea. Golden Odyssey.
```

(CX-763 at p. 4). Khalikov also conveyed his negative impressions of the Amadea to Kerimov. (Khalikov Tr. 43:24-44:15). There is no evidence that Kerimov had any interest in buying the Amadea at that time.

154.    Khalikov accompanied Kerimov to Abu Dhabi in June 2020, where they spent the night on the Amadea. This was at the invitation of Kochman, who offered them the opportunity to stay on board the vessel, which gave Kerimov something to do during the COVID-19 pandemic in a COVID-free environment. (Khalikov Tr. 44:16-45:9; 51:6-25). Kerimov, Kochman, and Khalikov stayed on the vessel for approximately two days/one night. (*Id.* at 45:25-46:2).

155.    There is no evidence that after this visit Kerimov was interested in buying the Amadea. In fact, on the way home from the visit, Khalikov strongly advised him not to buy the Amadea, to which Kerimov responded in substance, "do you think I'm stupid." (*Id.* at 59:21-60:9). Khalikov testified that Kerimov complained that the interior did not make him "feel at home and relaxed onboard" and said "who could want that." (*Id.* at 52:18-53:4). Khalikov described the interior of the Amadea as "quite dark," with "wooden surfaces, glossy with gold trimming" that are "hard to service," not relaxing, "[t]oo much unnecessary decorations," which is a "different world" from the aesthetic preferences of the Kerimov family, which are "contemporary, relaxed"

with "bright," "neutral," and "pastel colors," "without unnecessary things laying around," and "timeless." (*Id.* at 30:10-31:13 (describing the family's prior yacht as "timeless," "invisible," "light," "neutral," "contemporary," containing no "unnecessary decorations," as "everything is there for a purpose."); *id.* at 53:5-54:22). In addition, Kerimov complained that "he barely slept because of air-conditioning struggled to . . . cool the room . . . to a reasonable temperature." (*Id.* at 55:11-56:2).

156.    After that, Khalikov continued to look for other vessels to consider for Kerimov, approximately 40 boats, that were filtered down to a few that were diesel electric and/or more in line aesthetically with the family's preferences. (*Id.* at 60:20-66:17).

### B. Gulnara Kerimova Chartered the Amadea; Neither She Nor Anyone In Her Family Purchased It.

157.    More than a year later, Kerimov's eldest adult daughter Gulnara Kerimova ("Gulnara"), who has a family of her own, and her mother Firuza ("Firuza") were interested in chartering a vessel. They had previously chartered another vessel managed by Imperial Yachts called the Flying Fox, which Gulnara liked. (Kerimova Dec. ¶ 5; Khalikov Tr. 71:15-72:9). Gulnara wanted to charter the Flying Fox in late 2021 and early 2022, but the vessel was already booked with other charters and not available. (Kerimova Dec. ¶¶ 5, 8). As a result, Imperial Yachts suggested that she consider chartering the Amadea instead. (Kerimova Dec. ¶ 6; Khalikov Tr. 72:10-73:1). (This was around the same time that Mr. Khudainatov and Kochman initiated the Temporary Use Agreement).

158.    The evidence shows that Gulnara and her mother *only* chartered (but did not buy) the vessel from Millemarin. On or about September 21, 2021, Gulnara entered into a charter agreement for the Amadea. (Kerimova Dec. ¶¶ 12-13). That charter agreement provided for a month-long charter in the Caribbean from January 14 to February 16, 2022, for €5 million as well

as a sea trial of the vessel for three nights in October 2021. (*Id.*; Kerimova Dec. ¶¶ 7-9; Pastukhova

Dec. ¶¶ 5, 16, 17, 19). That charter agreement also contemplated the possibility of 20 additional

weeks of charter during 2022-2023 for approximately €900,000 per week plus expenses. It did not

contemplate a sale. (*Id.*). Around this time, Kochman informed Mr. Khudainatov that he had a

group interested in chartering the Amadea for a potential long-term charter. (Khudainatov Dec. ¶

43). Pastukhova also learned in September 2021 that Gulnara would be chartering the Amadea.

(Pastukhova Dec. ¶ 5). Khalikov was also told around this time that Firuza and Gulnara would be

chartering the Amadea. (Khalikov Tr. 74:14-75:10).

159.    Consistent with the charter agreement, Gulnara was permitted to "test out" the

Amadea. She did so in October 2021 at the conclusion of her then-charter on the Flying Fox, at

which point she transferred from the Flying Fox to the Amadea. During this test period, the guests

in her party included herself, her children, nannies, security, her mother, and her adult siblings, but

not her father Suleiman. (Kerimova Dec. ¶¶ 8-9). Pastukova helped prepare for this "test" by

Gulnara and her mother, in preparation for a long-term charter in early 2022 and possibly more in

later 2022. (Pastukhova Dec. ¶ 6).

160.    As anticipated in the charter agreement, Gulnara chartered the Amadea in

January/February 2022 in the Caribbean. (Kerimova Dec. ¶ 11). She was accompanied by her

children, her adult siblings, nannies, and security. *Id.* Neither her father nor her mother was present

for that trip. (*Id.*). Gulnara declared under penalty of perjury that neither she, her father, nor anyone

else in her family has ever owned the Amadea. (*Id.* at ¶¶ 12-13).

### C.  Most of the Changes were only Suggested, and None of the Changes Signified that Kerimov, or Anyone from his Family Bought the Amadea.

161.    Prior to the test, Gulnara viewed photographs of the Amadea and realized that the

Amadea's interior design "was not to [her] liking," and was much different looking from the Flying

Fox, whose amenities and recreational facilities she preferred. (Kerimova Dec. ¶ 6). She arranged to have Khalikov tour the Amadea "and report back with suggestions for AV/IT and cosmetic changes to make the" Amadea more like the Flying Fox. (Kerimova Dec. ¶ 7). Indeed, Khalikov received a phone call from Firuza who told him that they were planning to charter the Amadea and asking him to go to the Amadea to try to fix certain issues on board such as noise, vibration, odors, and the like. (Khalikov Tr. 74:14-75:10, 77:15-20; Pastukhova Dec. ¶ 6).

162.    In addition, Khalikov had known Kochman professionally for a couple of years by then, and had worked on several yacht projects together. Kochman also asked for Khalikov's advice at this time for making the Amadea more charterable in general, consistent with the Temporary Use Agreement. (Khalikov Tr. at 46:3-51:5; 78:19-88:4; 91:10-94:5).

163.    As a result, Khalikov flew to the boat and walked around with crew, and made suggestions for things that could be done to conform not only to the Kerimov family's preferences for the upcoming charter, but that were also were common sense modifications that could make the Amadea more broadly appealable to a wider audience for charters. (*See, e.g., id.* at 77:23-88:4, 102:23-103:23, 112:1-113:17, 121:23-123:8). Mr. Khalikov  Khalikov recommended  short-term fixes or procedures that could be implemented by the crew, more involved suggestions that could be implemented by subcontractors, and as well as suggestions for modifications that could be done in a shipyard during a maintenance period. (*Id.*).

164.    For example, to address the noise and vibration, Khalikov suggested an unbalancing of the HVAC system, which would cost nothing, changing the winter garden into a gym, as the gym on the Amadea was small and the winter garden was not an optimal indoor dining space given its high level on the vessel (*see also* Reynard Dec. ¶ 14), removing noisy refrigerators in the guest cabins and replacing the spaces with much-needed storage, and removing the bar in the main salon

and the jacuzzi on the aft deck. (Khalikov Tr. 81:10-83:1, 103:24-107:10, 115:5-118:1, 118:3-119:24 (removal of jacuzzi was not requested by Kerimov family), 123:18-125:7, 213:13-217:11).

165.    Requests from Firuza and Gulnara were minor and not expensive (particularly relative to the price of the charter), such as access to Russian TV channels and Russian radio stations, and strengthening the Wi-Fi. (*Id.* at 88:5-89:5, 107:11-109:20). Gulnara also asked for new mattresses, for certain electrical sockets to be moved, to remove certain carpets and curtains, and for certain sports and water equipment. (Pastukhova Dec. ¶¶ 6-7; Kerimova Dec. ¶ 10). Consistent with his knowledge that Gulnara had allergies, Khalikov made similar recommendations about removing items that collect dust such as heavy shades, draperies, and carpets. (Khalikov Tr. 84:13-21, 85:3-16). Gulnara also requested to have a pizza oven installed on the Amadea, because the Flying Fox had one, but the logistics proved complicated, so a pizza stone was purchased instead. (Kerimova Dec. ¶ 10, Pastukhova Dec. ¶ 6). Firuza asked for reading lamps, and thus Khalikov suggested that portable reading lamps be purchased. (Khalikov Tr. 92:17-93:5, 114:1-115:4; *see also* Reynard Dec. ¶ 17). Firuza asked that the silk rosette on the ceiling in the owner's cabin be removed, and thus Khalikov suggested that the rosette could be removed from the ceiling, soundproofing could be inserted into the dead ceiling space above the rosette, and another item covered in fabric could be installed in place of the silk rosette. (Khalikov Tr. 85:3-16, 122:20-25, 217:18-218:4).

166.    None of these requests or suggestions constituted a "structural change." Khalikov explained that a "structural change" is a change to the hull or the superstructure of the vessel (the parts of the boat that hold it together), a change that could potentially impact the integrity of the vessel, and which would require the vessel to be dry-docked in order to make the change. These are the types of changes that are not done unless they are absolutely necessary. (*Id.* at 68:5-70:17).

None of Gulnara's or Firuza's requests or Khalikov's suggestions constituted structural changes. (*Id.* at 113:18-25 (removing and replace the silk rosette is not a structural change), *id.* at 114:19-115:4 (installing reading lamps is not a structural change), *id.* at 115:5-116:23 (removing the bar is not a structural change); Hitch Dec. ¶ 36-37). In addition, when confronted with the government's "expert" Sean Meagher, who said that cutting into a ceiling is a "big deal," Khalikov made clear that his suggestion for removing the silk rosette and inserting soundproofing material did not involve cutting into the ceiling. (Khalikov Tr. 218:12-222:6).

167.    None of these changes is inconsistent with continued ownership by Mr. Khudainatov. Given the high price that came with chartering a vessel like the Amadea, particularly for long-term charters, the requests for certain modifications and equipment were not unusual, so long as the owner approved of the changes, or they can easily be changed back. (*Id.* at 116:24-117:22; Pastukhova Dec. ¶ 9; Reynard Dec. ¶¶ 13, 16; Hitch Dec. ¶¶ 36, 110). In addition, Khalikov, who has played "a significant role" in "20, 30, 40 . . . many, plenty, a lot" of yacht charters for Russian and non-Russian clients (Khalikov Tr. 223:13-224:7), explained that certain changes may be paid for by a charterer or the owner, depending on the change. (*Id.* at 96:8-98:11). In addition, Khalikov believed that the Amadea was "owned by someone" (not Kerimov) represented by Kochman/Imperial Yachts who would need to give approval. (Khalikov Tr. 116:24-117:22).

168.    In fact, Pastukova recalled that during this time period, she prepared presentations regarding certain proposed changes to the Amadea that she understood Kochman used to present to Mr. Khudainatov, further reflective of Mr. Khudainatov's ownership at this time. (Pastukhova Dec. ¶ 8).

169.    Consistent with the Temporary Use Agreement which permitted Kochman to make changes to the Amadea, Imperial Yachts entered into a contract with ZID for a possible refit of the Amadea. (ECF 100-24). There is no evidence, however, that this contract had anything to do with Kerimov.

170.    In any event, only few of the changes that were requested by Gulnara, Firuza, and/or Khalikov were actually implemented before the January/February 2022 Caribbean charter. (Pastukhova Dec. ¶¶ 7, 9; Kerimova Dec. ¶ 10).

171.    Suleiman Kerimov's presence on the Amadea for a day or so on or about October 17, 2021 was not because he had purchased the vessel, but because Firuza had asked him to see it for himself. Khalikov was present for that visit and conveyed to Kerimov what could be done to make it more suitable for the family's use. (Khalikov Tr. 110:4-111:25). In fact, Kerimov is not alleged to have been on the Amadea in connection with any purported sale until that date, October 17, 2021, over a month after the September MOA. (ECF 100-16).

**D.  The Use of Certain Terms by the Crew Do Not Evidence Ownership.**

172.    Crew use of codes for guests on board a superyacht like the Amadea is standard practice, and is not done to either obscure or signify ownership of a vessel. These codes are used for owners and non-owner guests alike. Many former Amadea crew members testified to this effect. (*See* Read Tr. 92:10-93:7 (describing code names as a matter of "radio etiquette" and "for security reasons"); Walsh Tr. 25:16-28:1 (describing use of codes for guests as "standard operating procedure"); Messenger Tr. 92:16-94:8 (describing codes as "loosely used" and "a lot of confusion surrounding the codes and different crew members using different codes and different dates"); Pastukhova Dec. ¶ 12; Reynard Dec. ¶ 9). Special Agent Bergen even testified to this, stating that

"G" codes could refer to owners and guests alike, and are used to protect the passengers' privacy. (Bergen Tr. 209:15-210:7).

173.    During the Kerimov family's use of the Amadea, the Amadea crew, on the one hand, and Imperial Yachts, on the other, used "G" codes, "G" for guest, to refer to various individuals in an inconsistent manner. (Messenger Tr. 92:16-94:8; Pastukhova Dec. ¶¶ 12-14; Reynard Dec. ¶¶ 9, 11, 15–16, 18). Captain Walsh testified that, as set forth in an email, the Amadea crew assigned "G" codes to the Kerimov family in a manner inconsistent with the way Imperial Yachts assigned "G" codes to those same individuals. (Walsh Tr. 38:2-40:9; CX-75). Thus, in emails between the crew and individuals working with Imperial Yachts during this time period, there was a lack of clarity on the part of the recipient as to which individual was being referred based on the "G" codes being used by the sender in such emails, rendering these documents unreliable. (Walsh Tr. 117:2-22; Pastukhova Dec. ¶ 14; Reynard Dec. ¶ 11). Indeed, Firuza was referred to as both "G1" and "G2" at different times, and Gulnara was referred to as both "G2" and "G3" at different times. (Walsh Tr. 117:19-22; Reynard Dec. ¶ 11; Pastukhova Dec. ¶¶ 14(a), 14(b)(iii), 14(b)(iv)).

174.    All references to "G1" during the September 2021 to February 2022 time period were *not* references to Suleiman Kerimov. "G1" generally relates to the main guest on a particular trip, and thus was used to refer to Suleiman Kerimov during his brief stay on the Amadea in October 2021. (Messenger Tr. 32:19-33:2 (confirming that the assignment of codes "changed per trip"); Reynard Dec. ¶ 15; Pastukhova Dec. ¶ 13). Pastukhova, the Amadea's Client Coordinator on behalf of Imperial Yachts, however, also used "G1" to refer to either the owner or the principal user, and at times used "G1" in emails to refer to Mr. Khudainatov. (Pastukhova Dec. ¶¶ 12, 14(b)(i), 14(b)(iv)). Because Pastukhova never spoke to Suleiman Kerimov, any references in

emails she wrote to "G1" were either to Mr. Khudainatov or Firuza. (*Id.* at ¶ 15). "G1" was also used by crew in Work Order Forms to indicate that a guest request had been made for a particular item, as opposed to being a reference to a particular individual. (Reynard Dec. ¶ 18).

175.    Similarly, the use of terms like "owner's representative" do not evidence ownership. These terms, used by the Amadea crew, were not intended to connote the writer's direct knowledge of the vessel's ownership. It was rather a shorthand way of referring to an individual who functioned as a liaison between the crew and guests. (*Id.* at ¶¶ 6-8, 12, 13; Pastukhova Dec. ¶ 17; Hitch Dec. ¶¶ 81-82). As Captain Peter Read explained, usage of the term "owner's rep" did not necessarily refer to the actual owner of the Amadea, but instead "[i]t depends on the context of the conversation." (Read. Tr. 192:8-194:14; *see also* Walsh Tr. 37:2-12, 127:22-128:19). Both Captains Read and Walsh also explained that the term "owner" is used on vessels to refer to different spaces on board, such as the owner's cabin, the owner's comment book, the owner's gym, etc., so the term "owner" is often used in a non-specific or shorthand way by the crew, and not necessarily to connote knowledge of the vessel's ownership. (Read Tr. 86:16-87:17; Walsh Tr. 34:18-22).

176.    Despite that certain crew referred to Khalikov as the "owner's rep.," Khalikov never served as a representative of the owner of the Amadea. (Khalikov Tr. 137:19-139:4). Khalikov testified that when he heard that crew members were referring to him as the owner's representative of the Amadea, he asked Captain Zerr to instruct the crew not to refer to him as that, as he did not represent the owner. (*Id.* at 137:19-139:9). As Khalikov testified, he did not know who the owner of the Amadea was, but he knew that it was not Suleiman Kerimov. (*See generally* Khalikov Direct; *see also* Khalikov Tr. 136:20-137:15). Pastukhova confirmed that she knew that

Khalikov did not represent Mr. Khudainatov, who she knew to be the Amadea's owner. (Pastukhova Dec. ¶ 17).

177.    In any event, crew members on superyachts like the Amadea that are not regularly used by the owner and their family and are managed by a separate management company often do not know who the individual owner actually is. This was the case with the Amadea. Indeed, former Amadea Captain Ben Turner testified on this point stating "I would agree that none of us would truly know." (Turner Tr. 70:9-15, *see also* 59:15-60:1 ("hearsay" amongst the crew was that Mr. Khudainatov owned the Amadea); Walsh Tr. 20:22-21:3; Hitch Dec. ¶¶ 38-43, 61-69; Reynard Dec. ¶¶ 3, 20).

### E. Neither Captain Walsh Nor Head of Security Martyn Messenger Told the FBI that Kerimov Owned the Amadea Because they Did not Know or Believe he owned the Amadea.

178.    Contrary to the assertions made in the Declaration of Special Agent Todd McGee, neither Captain Walsh nor Martyn Messenger told any law enforcement officials that they had direct knowledge of who the owner of the Amadea was, or that they knew definitively that Kerimov owned the vessel. Rather, as Captain Walsh testified, he told agents at LAX that he did not know the owner of the Amadea was, but that he had seen stories on the internet that Suleiman Kerimov was the owner and that he was sanctioned. (Walsh Tr. 62:7-64:19). In fact, Walsh testified that his understanding was that the Kerimov family members had been onboard the Amadea as charterers only. (Walsh Tr. 28:2-7, 30:11-32:13, 102:9-13).

179.    Similarly, according to Special Agent McGee, Messenger had heard from other crew members that the boat had been sold to Suleiman Kerimov. This is hardly a statement of direct knowledge. In addition, Messenger testified that he never learned that the Amadea was sold, and he understood Mr. Khudainatov to be the owner of Amadea. (Messenger Tr. 34:9-35:11;

44:24-45:4). In fact, Messenger testified that he did not tell the FBI that Kerimov owned the Amadea, and that he had no basis to say there had been a change in ownership. (*Id.* at 84:3-25).

180.    Consistent with Messenger's statements, evidence shows that rumors frequently spread amongst the crew on the Amadea regarding it having been sold. This rumor spread on approximately four or five separate times during 2020–2021. (Reynard Dec. ¶¶ 6, 8). These types of rumors amongst crew are not unusual. (Hitch Dec. ¶¶ 44, 84-86). Pastukhova never heard that the Amadea had been sold, and she never heard anyone from Imperial Yachts tell any crew members that the Amadea had been sold. (Pastukhova Dec. ¶ 16). She explained her belief that certain crew members had a misunderstanding about the charters undertaken by Gulnara and her family because the vessel was a private vessel, and not a commercial charter vessel. In addition, the Amadea had also not been used regularly for quite some time until Mr. Khudainatov's trip in June 2021, and then there was a flurry of activity surrounding the long-term charters for Gulnara and her family. Pastukhova believes these factors led to certain members of the Amadea crew assuming that the vessel had been sold. (*Id.*)

### F.  The Amadea Had All Necessary Certifications and Paperwork to Charter in the Caribbean During January and February 2022.

181.    Even as a pleasure yacht, the Amadea was permitted to charter. Magee of Campbells testified that "pleasure yachts can accept paying guests if they're under the Cayman flag," (Magee Tr. 43:14-16), and that it was "fairly common" for yachts to "charter in the Caribbean in the winter[.]" (*Id.* at 44:3-7). In addition, his colleague, John Wolf, testified: "I am aware [Imperial Yachts was] chartering the [*Amadea*]. . . . As far as I was concerned, it was available for charter." (Wolf Tr. 250:16-20). Moreover, Claimants' Expert Michael Hitch declared that "[i]t is common to charter a vessel that meets this criterion while holding a pleasure yacht

designation. The Amadea, therefore, was legally permitted to charter in the Caribbean during the January/February 2022 time frame." (Hitch Dec. ¶ 96, *see also* ¶¶ 51, 97-100).

182.    The government asserts that "[t]he existence of a charter agreement in Gulnara Kerimova's name is not inconsistent with her father Suleiman Kerimov owning the vessel. Indeed, although Mr. Khudainatov claims to have owned the *Amadea* in 2017, he has admitted that his own family signed charter agreements for use of the yacht during that year and that he (Mr. Khudainatov) was the ultimate payor for these charters." (ECF 387 at p. 6). However, this assertion is not supported by the evidence.

183.    In 2017, when Mr. Khudainatov and his family took guest trips on Amadea, the vessel was registered as a commercial vessel. (GX-204, GX-205, GX-206). All guest trips on commercially registered yachts need to be memorialized in a charter agreement to comply with EU Value Added Tax (VAT) regulations whether or not the guests are the vessel's UBO and/or his family. (*See Bacino Charter Company SA v. Belgium*, Case C-116/10, ECLI:EU:C:2010:349, Judgment of the Court of Justice of the European Union (Third Chamber) (Oct. 21, 2010) (finding that any use by private persons of a commercially registered yacht without intent for economic gain is subject to VAT and thus requires a charter agreement even when the guest is the UBO)).[14] The 2017 trips were considered charters even though the only guests were Mr. Khudainatov and his family and charter agreements with his then-partner were prepared accordingly.

184.    By contrast, in 2022, when Gulnara chartered the Amadea, the vessel was registered as a Pleasure Yacht 36G. (CX-618). As a paying third-party guest, Kerimova's trip needed to be memorialized in a charter agreement even though Amadea was a pleasure vessel. (*See* Merchant

---

[14] *See also* Oceanskies, "The Charter of Yachts in the European Union (EU): A Guide," available at https://oceanskies.com/yachts/yacht-guides/yacht-operation/the-charter-of-yachts-in-the-european-union-eu-a-guide

Shipping (Vessels in Commercial Use for Sport or Pleasure) Regulations, 2002 (stating that a non-commercially registered yacht may be in a pleasure or a commercial mode of use when having onboard 12 guests or less, the latter of which requires compliance with relevant regulations for commercial charters); *see also* CX-99). However, the UBO of the vessel and his family would not need a charter agreement to take a trip on the vessel at that time. (*Id.*). Indeed, when Mr. Khudainatov and his family took a guest trip on the Amadea in June 2021 in Greece, no charter agreement was prepared because Amadea was a pleasure vessel hosting only the vessel's UBO and the members of his family. (*See* Greece, Law 4256/2014 (Touristic Yachts and Other Provisions), Official Gazette of the Hellenic Republic A 92/14.04.2014, Art. 9). If, as the government claims, Gulnara or her family maintained an ownership interest in Amadea in January 2022, they would similarly not require any charter agreement. Only because Gulnara was a third-party guest and maintained no ownership interest in Amadea was a charter agreement necessary and prepared accordingly.

### G. The Government's Experts Were Unqualified to Opine on Any Relevant Issue and Their Testimony Did Not Assist the Trier of Fact.

185.    The government has put forth two paid experts, Sean P. Meagher and Anders Aslund. (*See* Declaration Testimony of Sean P. Meagher ("Meagher Dec."), ¶ 16; Declaration Testimony of Anders Aslund ("Aslund Dec."), ¶ 12). However, neither of these purported "experts" can help the government defeat a colorable claim that Claimants have standing to contest the forfeiture of the Amadea.

186.    The government has put forth Sean P. Meagher as a paid "yachting expert." (ECF 415 at 2; Meagher Dec. ¶ 16). However, Meagher's opinions in the Meagher Declaration add no value or assistance on the issue of Claimants' standing to contest the forfeiture of the Amadea as (1) he lacks the critical experience; (2) he merely recites internal correspondence aboard the

Amadea and uses this as a basis to make an unfounded conclusion that Kerimov is the owner of Amadea; and (3) he opines on witness credibility. (*See generally* Meagher Dec.).

187.    Meagher lacks the requisite experience to opine on Amadea and practices aboard the Amadea as Meagher's experience is limited to smaller yachts, mostly nearly half the length of the Amadea, that were not managed by a full-service management company, and that are much lower in value and cost than the Amadea. (Meagher Tr. 94:7-17, 105:19-106:8 (My Seanna, a 60 meter vessel, charters for $180k-$200k per week with a sale price of up to $19.9 million), 97:24-98:1 (Lunasea, a 73 meter vessel, where Capt. Meagher was only a "relief" Captain), 96:5-6 (Latitude, a 47 meter vessel), 87:3-4 (Blue Gold, a 52 meter sailing yacht); 84:4-7 (Ohana, a 51 meter vessel), 81:19-82:12 (Burrasca, a 56 meter vessel), 79:24-80:6 (Tai Pan, a 24 meter vessel)).

188.    While Meagher opines on the ownership of the Amadea, Meagher has admitted that a captain has no legal requirement to know the identity of a UBO and admitted that in 100% of the vessels he has captained, he knew the identity of the UBO, and most times, this was because he spoke to the ultimate beneficial owner, which was not the case with any of the Amadea captains. (*See* Meagher Tr. at 119:22-120:7, 62:5-25, 65:25-66:2 (Bravo Eugenia), 80:24-81:12 (Tai-Pan), 82:24-83:7 (Burrasca), 83:8-21 (Ohana), 85:17-87:1 (Blue Gold), 91:3-16, 92:6-17 (Newvida which later became My Seanna), 95:2-96:12 (Latitude), 100:4-6 (Lunasea), 103:6-18 (Asteria); Meagher Dec. ¶ 42 ("I have captained over a dozen yachts, and for each one I knew the UBO's identity.")).

189.    Meagher has only one experience on a yacht over 100 meters that utilized a full-service management company, which was on the Bravo Eugenia as a relief captain. (Meagher Tr. 61:10-63:23; 66:22-67:1). Notably, the Bravo Eugenia was only chartered for a one-week period with only two guests during Meagher's time as a Captain there. (Meagher Tr. 62:12-15). This is

not analogous to the operations on the Amadea which was fully managed by Imperial Yachts. (CX-26 at pp. 287–316).

190.    It follows that Meagher's conclusions regarding purported changes made and contemplated on the Amadea would only be made by an owner, and not that of a charterer, cannot be relied upon. (Meagher Dec. ¶¶ 19, 48, 51, 53-56, 58-61, 67, 69-72, 75, 81, 83-84, 88, 97). Notably, Peter Lürssen, of the Lürssen Group that built the Amadea itself, has testified that turning a wintergarden into a gym is not a significant change. (Lürssen Tr. 43:8-15 ("It's basically standard, nothing unusual.")).

191.    Meagher relies on and recites internal correspondence on the Amadea where the Amadea staff use "G Code" system to conclude that Kerimov owns the Amadea. (Meagher Dec. ¶¶ 32, 43-47, 63-68, 75-81, 83-84). However, Meagher admitted he had never used a code system himself until he reviewed materials in connection with preparing his report. (Meagher Tr. 120:9-17).

192.    Meagher also inappropriately testified to witness credibility and continues to do so in his declaration. (*Id.* at 155:2-19, 162:11-163:3, 163:5-164:4, 157:15-158:10, 171:4-172:19; Meagher Dec. ¶¶ 19, 97-102 (referring to "'Gulnara charter' story" as "implausible.")).

193.    Meagher is also not permitted to opine on the government's legal theory in this case, that the Defendant In Rem constitutes or is derived from proceeds traceable to violations of International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA") sanctions, and that the post-purchase maintenance payments made in violation of IEEPA sanctions must have allowed the Defendant In Rem to continue to exist as an operational vessel. It is improper expert opinion, and he is certainly not qualified to make legal conclusions. (*See* Hitch Dec. ¶¶ 114-117).

194.     Anders Aslund is also a paid "Russian economic and oligarch expert" put forth by the government. (Aslund Dec. ¶ 12). Like Meagher, Aslund adds no value or assistance on the issue of Claimants' standing to contest the forfeiture of the Amadea as (1) he merely summarizes and recites articles, (2) he opines on witness credibility, and (3) he opines on topics on which he is not qualified to opine. (*See generally* Aslund Dec.).

195.     To render his purported "expert" opinion, Aslund read newspaper articles and relied almost exclusively on Russian newspaper articles discussing Khudainatov's personal and professional history.  (Aslund Dec. ¶¶ 13-20, 21-26, 28-29, 32-37, 41, 45, 53, 56, 59-62, 65, and 101).

196.     Aslund inappropriately opines on witness credibility throughout his declaration by opining on Khudainatov's credibility and characterizing transactions as "implausible." (Aslund Dec. ¶¶ 28, 58, 92, 94, 106-107).

197.     Lastly, Aslund opines on subjects on which he is not qualified to opine, namely (a) the reliability of Deloitte's valuation of Independent Oil and Gas Company, a company owned by Mr. Khudainatov (Aslund Dec. ¶¶ 46-47, 69); and (b) the commercial reasonableness of a loan extended by Alisa Gadzhieva to Errigal, a company owned by Evgeniy Kochman, for temporary use rights to the Amadea (Aslund Dec. ¶¶ 90-94).

**H.  Mr. Khudainatov Built, Commissioned, Paid for and Owns the Crescent and the Scheherazade.**

198.     Mr. Khudainatov commissioned, built, and continues to own, not only the Amadea, but also the Crescent and the Scheherazade. Shipbuilder Peter Lurssen testified to this (Lürssen Tr. 13:5-22, 21:2-24, 23:10-24:8, 24:20-24, 27:12-28:1), as well as interior designer François Zuretti (Zuretti Tr. 25:6-18, 27:16-21, 109:5-12), Scheherazade Captain Guy Bennett-Pearce (Bennett-Pearce Tr. 29:20-22), and Mr. Khudainatov's economist Parfireva (Parfireva Tr. 47:13-

51:18, 53:19-55:15). Lürssen testified that Mr. Khudainatov was not the only client to have multiple projects going on at the same time and that "[s]hips built by top ship building companies," including his, "as a rule they -- people can achieve a higher sales prices than the price that they to pay for the construction." (Lürssen Tr. 25:14-21, 26:23-27:1). Bennett-Pearce testified that while the Scheherazade was being built, Mr. Khudainatov asked him to look at his other yachts, the Amadea and the Crescent, to see how things were done on those yachts. (Bennett-Pearce Tr. 29:23-32:4). He also told Bennett-Pearce that he wanted to correct certain things he felt he had done wrong on the Amadea, such as the position of some of the guest spaces, and to not make those same mistakes on the Scheherazade. (Bennett-Pearce Tr. 143:23-144:17).

199.    The documents regarding all three vessels also demonstrate his ownership, and were maintained in the family office. (Parfireva Tr. 16:16-26:25, 49:9-51:8, 51:7-18, 53:19-55:15). The investment agreements for all three projects are nearly identical (CX-312, CX-489, CX-508), as are the shipbuilding agreements with Lürssen. (CX-313, 490, 509). As he did with Nereo for the Amadea, Mr. Khudainatov controlled the entities that were created to own the Crescent (Densiarly) and the Scheherazade (Diams Overseas Ltd. ("Diams")) through his ownership of Elearco, which was the optionholder of both Densiarly and Diams. (CX-491, CX-492, CX-493, CX-494, CX-495, CX-496, CX-497, CX-498, CX-499, CX-500, CX-501, CX-510, CX-511, CX-512, CX-513, CX-514, CX-515, CX-764, CX-765, CX-766, CX-767).

200.    In addition, before he transferred the Amadea from Nereo to Millemarin on August 16, 2021 in order to own the vessel directly, rather than through an optionholder structure, he made similar transfers to do away with the optionholder structure for both the Crescent and the Scheherazade. (Parfireva Tr. 64:15-66:8). With respect to the Crescent, on September 30, 2020, the beneficial title to Densiarly's shares were transferred to Mr. Khudainatov, and Mr.

Khudaiantov entered into a trust deed with Alemil Holdings Ltd. ("Alemil"), under which the shares in Densiarly are held and continue to be held by Alemil in trust of Mr. Khudainatov. (CX-502, CX-503). For the Scheherazade, a new entity was created called Bielor Asset Ltd., and on April 21, 2020, Diams executed the novation agreement with Lürssen and Bielor for the replacement of Diams by Bielor as the new owner of the yacht. (CX-516, CX-517, CX-520, CX-521, CX-522, CX-523, CX-642, CX-643). Mr. Khudainatov owns the shares of Bielor via a trust deed. (CX-520, CX-524, CX-525, CX-526, CX-527, CX-528).

201.    Mr. Khudainatov paid for all expenses relating to the building, outfitting, and design of the Crescent and the Scheherazade. (Parfireva Tr. 55:8-15). As with the Amadea, Imperial Yachts regularly sent emails to Parfireva requesting payment for various vendors, including the hull designer, the interior designer, the shipyard, and other vendors for both projects. (*See, e.g.,* CX-504, CX-543, CX-543-A–C). As with the Amadea, upon receipt of such emails, Parfireva ensured that these payments were made. (Parfireva Tr. 49:9-18; 50:6-51:6, 53:19-55:7).

202.    Further evidence of Mr. Khudainatov's ownership of these vessels is the tri-partite agreement that was entered into between Lürssen, Nereo, and Bielor, the owning company of the Scheherazade. (Parfireva Tr. 47:13-48:15; CX-326). As discussed at ¶ 73 *supra*, Mr. Khudainatov was able to pay off his loan from Lürssen through this agreement because Lürssen owed liquidated damages to Mr. Khudainatov in connection with the Scheherazade due to various shortcomings with the vessel, and the agreement permitted those liquidated damages Lürssen owed to Bielor to pay off Nereo's debt to Lürssen. (*Id.*; CX-326).

203.    Mr. Khudainatov and Imperial Yachts intended to sell the Amadea prior to the Crescent's delivery in 2019. (Kochman Dec. ¶ 7). However, Mr. Khudainatov understood that two new Lürssen superyachts over 100 meters were a rarity on the market and that both the Amadea

and the Crescent could potentially compete for buyers which would drive down sale prices for both vessels. (*Id.*). Thus, because the Amadea was still on the market at the time the Crescent was delivered, Mr. Khudainatov and Kochman agreed to hold off marketing the Crescent for sale. (*Id.*). Because the Amadea never sold, the Crescent was never placed on the market. (*Id.*; *see also* Zuretti Tr. 53:10-13).

204.    Because Mr. Khudainatov intended to use the Scheherazade personally, he asked the Scheherazade's build captain, Guy Bennett-Pearce, in or about April 2020 to create a company to serve exclusively as the manager of the Scheherazade. (Bennett-Pearce Tr. 34:21-35:11). On December 4, 2020, Bennett-Pearce incorporated Onda Mare Yacht Management Ltd. in the Cayman Islands. (CX-547, CX-548, CX-549).

205.    Also because Mr. Khudainatov intended to use the Scheherazade personally, he asked Bennett-Pearce for a Russian crew. (Bennett-Pearce Tr. 44:15-45:1). This endeavor proved to be a bit challenging as many Russian crew members had more commercial experience, as opposed to knowledge of running a high-level luxury superyacht. (*Id.* at 45:2-46:6). Therefore, a then-employee of the family office (who had prior maritime and hospitality experience) assisted with finding candidates. (*Id.* at 46:7-21; CX-550, CX-551, CX-552).

206.    The Scheherazade was completed and delivered in the midst of the Coronavirus pandemic in June 2020. Mr. Khudainatov wanted to see the vessel, so Bennett-Pearce sailed the vessel to Sochi, where Mr. Khudainatov boarded the vessel for a tour and spent the night in August 2020. Mr. Khudainatov also visited the vessel in September 2020 in Egypt. In June 2021, Mr. Khudainatov visited the vessel in Croatia and stayed on board for a day or two. Mr. Khudainatov also visited the vessel again in Sochi in July 2021. (*E.g.*, *id.* at 59:4-60:19, 67:3-13, 68:17-24, 69:2-12, 72:12-16).

207.    There is no evidence in the record that anyone other than Mr. Khudainatov owns either the Crescent or the Scheherazade, certainly not anything to overcome the quantum of evidence demonstrated herein that Mr. Khudainatov owns these vessels. During his cross-examination at his deposition, Bennett-Pearce was not confronted with any evidence other than allegations made in unsubstantiated social media reports about the Scheherazade's ownership, and he specifically debunked these allegations demonstrating their falsity. (*Id.* at 85:11-102:11, 149:6-22, 158:25-166:23). Indeed, the government has produced no evidence that calls into question Mr. Khudainatov's ownership of the Scheherazade. In addition, Special Agent Bergen testified that none of the agents listed in the government's witness list has knowledge about the Scheherazade's ownership. (Bergen Tr. 108:15-23).

208.    The government's allegation that Mr. Khudainatov is not wealthy enough to own the Amadea, the Crescent, and the Scheherazade, and that he is therefore a straw owner of those vessels is not supported by any evidence in the record. Mr. Khudainatov has more than sufficiently demonstrated his vast wealth, as being the sole shareholder of NNK, which has been valued at in the tens of billions (*see* ¶¶ 13-18, *supra*). Given his ownership of oilfields and licenses for oil production, Mr. Khudainatov has for years had ample access to hundreds of millions, if not billions of dollars in capital. (Connolly Dec. ¶ 13(d)). Lastly, Special Agent Bergen even testified that his conclusion that Mr. Khudainatov was not wealthy enough to own these yachts was based on reading "news articles" on the internet, and noted that "banks in Russia would not be cooperative with a subpoena." (Bergen Tr. 190:4-192:7). Special Agent Bergen added that no additional investigation had been conducted regarding Mr. Khudainatov's wealth since the submission of his affidavit in support of the seizure warrant in April 2022. (*Id.* at 192:9-25).

IX.    **Not One Witness Testified or Declared that a Sale of the Amadea to Any Third-Party Closed.**

209.    Multiple witnesses independently corroborate Mr. Khudainatov that no sale of the Amadea ever closed to a third-party.

210.    Errigal's former director, John Wolf, testified that as of the date of his resignation as a director of Errigal (March 2022), he was not aware of any transfer of ownership of the Amadea. (Wolf Tr. 87:18-20, 87:23-24, 92:4-7, 168:15-23, 185:13-187:10, 198:10-18, 200:4-201:21). John Wolf further testified that he sent a letter dated November 2, 2021 in response to allegations from Burgess that Gulnara Kerimova (and not Suleiman Kerimov) had purchased the Amadea, in which he stated that Gulnara had not purchased the Amadea, its registered owner was Millemarin, and Campbells was in possession of "full details" of its registered owner, "including its beneficial ownership." (*Id.* at 223:3-229:18; CX-147, CX-298, CX-298-A). This letter was written and signed *after* the government alleges Suleiman Kerimov bought the Amadea.

211.    Damien Magee, the other former director of Errigal, testified: "[A]s of the date of my resignation from Errigal, to the best of my knowledge, Errigal was not the owner of the Amadea." (Magee Tr. 149:22-150:3). He further testified that the Certificate of British Registry "would be prima facie evidence of who is registered as the legal owner of the vessel," which is Millemarin. (*Id.* at 111:5-18).

212.    The government's own expert, Prof. Ewan McKendrick, testified that he "did not see any document" indicating that the transaction had closed. (McKendrick Tr. at 63:10-14). If the transaction did not close, McKendrick agreed that Millemarin would remain the legal owner of the yacht. (*Id.* at 65:7-13).

213.    Parfireva testified that in her role at the family office, she would have "absolutely" known if the Amadea had been sold. (Parfireva Tr. 63:11-14). Parfireva further testified that at the

time the Amadea was seized in Fiji, Mr. Khudainatov was the UBO of the vessel and Millemarin was its legal owner. (*Id.* at 110:24-112:5).

214.    Dinar Khalikov testified repeatedly that Kerimov did not own the Amadea. (*See, e.g.*, Khalikov Tr. 137:14-15).

215.    Interior Designer François Zuretti testified that he has "never, never met Mr. Kerimov, neither him nor anyone representing him." (Zuretti Tr. 67:9-10). Zuretti "believe[s] even today" that Mr. Khudainatov is "still the owner" of the Amadea. (*Id.* at 149:13-19).

216.    Pastukhova, the Client Coordinator assigned to the Amadea, declared that "[d]uring [her] time working for the company associated with Imperial Yachts, the only owner of the Amadea with whom [she] communicated was Mr. Khudainatov, and [she] never learned of any sale of the Amadea to anyone else." (Pastukhova Dec. ¶ 19).

217.    Alisa Gadzhieva declared under penalty of perjury that she never owned the Amadea. She further declared that her uncle, Suleiman Kerimov, did not provide the funds for, or discuss with her, the loan she provided to Kochman. (Gadzhieva Dec. ¶ 2). She further declared that she would not have had to charter the Amadea if she or any of her relatives had owned the Amadea. (*Id.* at ¶ 7).

218.    Gulnara Kerimova declared under penalty of perjury that neither she, nor any member of her family, ever owned the Amadea. (Kerimova Dec. ¶¶ 12-13).

219.    Evgeniy Kochman declared under penalty of perjury that "[a]t no time have I ever considered myself or anyone else other than Eduard Khudainatov to be the owner of the Amadea. . . . Because the Errigal transaction was never executed, my understanding is that title to the yacht never transferred from Mr. Khudainatov. Therefore, I believe he is still the sole owner of Amadea." (Kochman Dec. ¶ 24).

220.    Peter Read was on board the *Amadea* in the fall of 2021 when its formal "owning company" was changed from Nereo to Millemarin. (Read Tr. 110:15-112:12). He also confirmed, during that same timeframe, that as far as he could remember, there was no further change in ownership from Millemarin to another entity. (*Id.* at 156:13-20, 232:9-16).

221.    Head of Security Martyn Messenger testified that he had been told that the owner of the Amadea was Eduard Khudainatov (Messenger Tr. 17:2-11), and that he did not recall ever hearing that the Amadea had been sold or that it had a new owner. (*Id.* at 44:24-45:4).

222.    John Walsh testified that he understood Millemarin to be the owner of the Amadea. (Walsh Tr. 19:14-20:18).

223.    Peter Lürssen understood Mr. Khudainatov to be the UBO of the Amadea, the Crescent, and the Scheherazade. (Lürssen Tr. 13:5-22, 21:2-24, 23:10-24:8).

224.    Bennett-Pearce testified that, apart from the *Scheherezade*, Mr. Khudainatov "is the owner of -- I believe him to be the owner of Amadea, MY Amadea and MY Crescent." *Id.* at 29:20.

## PROPOSED CONCLUSIONS OF LAW

**I.    The Court Possesses Subject Matter Jurisdiction under the Federal Forfeiture Statutes, Not under Admiralty Principles.**

1.    The Court has an "obligation to make [its] own independent determination that subject matter jurisdiction exists." *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 365 (2d Cir. 2000). The Court does not possess admiralty jurisdiction over the Amadea, but instead possesses subject matter jurisdiction over this action under the federal forfeiture statutes.

2.    The federal courts possess "limited jurisdiction, their powers circumscribed at their most basic level by the terms of Article III of the Constitution[.]" *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001). As relevant here, Article III provides: "The judicial Power shall extend . . . [1] to all Cases, in Law and Equity,

arising under this Constitution, the Laws of the United States, and Treaties . . . [and] [2] to all Cases of admiralty and maritime Jurisdiction[.]" U.S. Const. art. III, § 2.

3.    Forty years after the Constitution's enactment, the Supreme Court confronted the question "whether cases in admiralty, and cases arising under the laws and Constitution of the United States, are identical." *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 545 (1828). Chief Justice Marshall—writing for the Court—answered in the negative, reasoning that "[t]he discrimination made between them . . . is . . . conclusive against their identity." *Id.* at 512. "A case in admiralty does not, in fact, arise under the Constitution or laws of the United States." *Id.*

4.    In contrast to laws of the United States, "the source of admiralty rights [is] a controlling body of federal admiralty law," derived from the general maritime law existing at the time the Constitution was enacted. *See Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 377 (1959). Indeed, Article III "presupposes the existence in the United States of a law of that character." *Panama R. Co. v. Johnson*, 264 U.S. 375, 385 (1924).

5.    Additionally, the Second Circuit has explained that "[s]ubject matter jurisdiction in an *in rem* action in admiralty lies in the district court where the vessel or other *res* is located." *Mackensworth v. S.S. Am. Merch.*, 28 F.3d 246, 252 (2d Cir. 1994) (citations omitted); *see also In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 94 (2d Cir. 2005) (Sotomayor, J.) ("In particular, subject matter jurisdiction lies in the district court where the vessel or other *res* is located, but that jurisdiction does not attach until the vessel is arrested within the jurisdiction." (citing Fed R. Civ. P. Supp. R. C(2))). In that vein, Supplemental Rule C(2)(c) requires that an *in rem* "complaint must . . . state that the property is within the district or will be within the district while the action is pending." Fed R. Civ. P. Supp. AMC R. C(2).

6.      Here, the Amadea was seized in Fiji and is docked in San Diego, Am. Compl. ¶ 4—within the Southern District of California. The Amadea is not in this District, and the Court is not aware of any plans by the government to bring the Amadea here. The Court thus does not possess *in rem* jurisdiction over the Amadea under admiralty principles. *See Ferrostaal, Inc. v. HACI HASSAN YARDIM*, No. 03 CV 4886 (GBD), 2006 WL 2819585, at *4 (S.D.N.Y. Sept. 29, 2006) ("The record . . . contains no evidence that the vessel has been or will be within the territorial jurisdiction of New York. Accordingly, this Court does not have *in rem* jurisdiction over the vessel.").

7.      Instead, the proper basis for the Court's subject matter jurisdiction is federal arising-under jurisdiction. *See* 28 U.S.C. § 1331. More specifically, the government's claims arise under federal statutory law, *see* 28 U.S.C. § 1355, including the statutory scheme amended by the Civil Asset Forfeiture Reform Act of 2000, *see* 18 U.S.C. § 981. The government's statutory claims do not implicate, or otherwise depend on, any interpretation of maritime law, and the vessel is not located within the District.

8.      Because this action does not fall within the Court's admiralty jurisdiction, the parties have a right to trial by jury on the merits. Both the government and Claimants have expressly reserved the right to seek a trial by jury. *See* Joint Letter re Scheduling at 4 (noting "Claimants intend to demand a jury trial in this matter") (ECF 12); First Am. Compl. at 1 n.1 (". . . Plaintiff reserves the right to move for a jury trial under Fed. R. Civ. P. 39(b) and/or 39(c).") (ECF 37).

## II.      Congress Passed the Civil Asset Forfeiture Reform Act of 2000 (CAFRA) in Response to Widespread Criticism of the Scope of the Government's Forfeiture Authority.

9.      Civil asset forfeiture "descends from a medieval English practice whereby an object responsible for an accidental death was forfeited to the king, who 'would provide the [proceeds,

the "deodand"] for masses to be said for the good of the dead man's soul . . . or [would] insure that the deodand was put to charitable uses.'" H.R. Rep. No. 106-192, at 2 (1999) (citation omitted). The practice was carried over into U.S. law, and by the 1980s proceeds from civil asset forfeiture matters went not to "charitable uses" but instead "primarily . . . to the Department of Justice's Assets Forfeiture Fund and the Department of the Treasury's Forfeiture Fund." *Id.* at 4 (citations omitted).

10.     The arrangement "prove[d] to be a great monetary success" for the government, but by the same token created perverse incentives. *See id.* at 5. Indeed, "as forfeiture revenues were approaching their peaks, some disquieting rumblings were heard." *Id.* at 6. For example, in 1992, the Second Circuit emphasized: "We continue to be enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes." *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir. 1992); *see also, United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 110 (2d Cir. 2000) ("The bare financial facts of this case shine a light on the corrupting incentives of this arrangement: we see aggressive but marginal claims asserted on dubious jurisdiction to seize charitable funds . . . , so that the money can be diverted for expenditure by the Department of Justice.").

11.     Congress took heed. In June 1997, the House Judiciary Committee held a "day of hearings on civil asset forfeiture reform legislation," welcoming testimony from members of law enforcement, including the Department of Justice, and from private individuals adversely affected by oppressive civil-forfeiture policies. *See* H.R. Rep. 106-192, at 19–20. The Committee also received material from the President of the American Civil Liberties Union and the Director of the Center for Constitutional Studies at the CATO Institute. *Id.* In the Committee's report on proposed

reform legislation, it recounted specific episodes of abusive forfeiture practices by the government and noted the negative "impact [on] civil liberties and property rights." *See id.* at 6–10.

12.    Ultimately, "[i]n response to criticism of the broad scope of the government's civil forfeiture authority," Congress passed the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. 106–185, 114 Stat. 202 (codified principally at 18 U.S.C. § 983), which "consolidated and dramatically overhauled the procedures for civil judicial forfeiture proceedings." *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 195–96 (2d Cir. 2013) (citations omitted). Then-Senator Patrick Leahy, who later chaired the Senate Judiciary Committee, observed shortly before CAFRA's passage that the revisions were designed to temper the "prosecutorial zeal" that "skirts the boundaries of due process, leading to the taking of private property regardless of whether the owner is innocent of, or even cognizant of, the property's use in an illegal act, or whether the seizure is entirely out of proportion to the criminal conduct alleged." *See* 146 Cong. Rec. S1753–02, S1760, (daily ed. March 27, 2000) (statement of Sen. Leahy).

13.    CAFRA implemented several changes to the civil-forfeiture regime. "Among the most notable changes was the heightened standard by which the government must prove that the property is subject to forfeiture." *Sum of $185,336.07*, 731 F.3d at 196. After passage of CAFRA, "the burden of proof now rests solely with the government to show by a preponderance of the evidence—rather than mere probable cause—that the property is subject to forfeiture." *Id.* (citing *von Hofe v. United States*, 492 F.3d 175, 179 (2d Cir. 2007)).

14.    In short, CAFRA erected additional procedural guardrails to curb the government's seize-first-ask-questions-later approach to civil forfeiture and to counter the Department of Justice's unfettered desire to fill its coffers. Notwithstanding these changes, however, lower courts

have occasionally struggled to apply the new requirements with vigor. *See Sum of $185,336.07*, 731 F.3d at 196 (reversing where "[t]he District Court stated three outdated standards from pre-CAFRA case law"). And CAFRA's efforts to combat the corrupting influence of money in civil-forfeiture proceedings has not eliminated other potential motivations for abuse. *See Leonard v. Texas*, 580 U.S. 1178 (2017) (Thomas, J.) (statement respecting denial of certiorari) ("This system—where police can seize property with limited judicial oversight and retain it for their own use—has led to egregious and well-chronicled abuses."); *see also id.* ("This petition asks an important question: whether modern civil-forfeiture statutes can be squared with the Due Process Clause and our Nation's history.").

## III.   Legal Standard on a Motion to Strike for Lack of Standing under CAFRA.

### A.   Motion to Strike under Supplemental Rule G.

15.    In 2006, following the passage of CAFRA, Congress enacted the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"). Supplemental Rule G "governs a forfeiture action in rem arising from a federal statute." Supp. R. G(1). The government's claims arise under 18 U.S.C. § 981 ("Civil forfeiture").

16.    In a forfeiture action *in rem*, "[a]t any time before trial, the government may move to strike a claim ... because the claimant lacks standing." Supp. R. G(8)(c)(i)(B).[15] The government's motion to strike "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(8)(c)(ii)(B).

17.    The advisory committee notes to Rule G provide: "If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing." Rule G,

---

[15] This refers to Article III standing. The government has never contested that Claimants have established statutory standing under Supplemental Rule G(8)(c)(i)(A).

2006 adv. comm. n. "The evidentiary hearing is held by the court without a jury." *Id.* "The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden." *Id.*

**B.  Summary Judgment under Rule 56.**

18.  Rule 56 provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

19.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

20.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**C.  Interplay between Supplemental Rule G and Rule 56.**

21.  Where the Court conducts an evidentiary hearing on the government's motion to strike a claim for lack of standing, the government's motion is still ultimately analyzed under the summary judgment standard.

22.  As the First Circuit has explained, "though the burden is on [claimant] Van Bommel to convince us of his standing, it is important to remember that this case comes to us on the government's motion for summary judgment. Thus, facts are viewed in a light most favorable to Van Bommel and all reasonable inferences go in his favor." *United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 61 (1st Cir. 2013) (citation omitted); *see id.* at 58 & n.12 (noting that "[t]his

case comes to us . . . following a hearing that the district court ordered specifically to address the issue of standing" but that does not mean "a distinct test should be applied to civil forfeiture actions at the summary judgment phase").

23.     The Eighth Circuit has likewise observed: "The district court proceeded in this manner, quite properly using the evidentiary hearing . . . to help resolve what the government presented as a threshold issue of standing. But the *disputed* issue was statutory standing—whether claimants' colorable ownership interests are subject to forfeiture. This issue goes to the merits and therefore must be decided in accordance with Rule 56 standards, viewing the evidence in the light most favorable to Bearden and Andrews and leaving credibility issues to the ultimate finder of fact." *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1012, 1014 (8th Cir. 2003) (reversing district court's grant of summary judgment against claimants that was based "in part on its findings as to their credibility at a prior evidentiary hearing" and concluding claimants "have Article III standing to contest the forfeiture").

24.     "[I]nsofar as standing is intertwined with legitimate ownership, at the summary judgment stage that issue 'must be decided in accordance with Rule 56 standards, viewing the evidence in the light most favorable to' the non-movant and 'leaving credibility issues to the ultimate finder of fact.'" *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 642, n.2 (7th Cir. 2015) (quoting *One Lincoln Navigator 1998*, 328 F.3d at 1014).

25.     As to the evidence the Court may consider in ruling on the government's motion, "[a]ffidavits are of course typically relied on to support or defend against motions for summary judgment." *United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 60 (1st Cir. 2013) (citing Fed. R. Civ. P. 56(c)(1)(A)). That includes a verified claim submitted by a claimant. *United States v. $196,969.00 U.S. Currency*, 719 F.3d 644, 646 (7th Cir. 2013) ("Because the claim was verified

it was evidence, like an affidavit."). "Remember that the claim that Rule G(5)(a)(i) requires of a claimant is not just a naked statement 'I want the dough.' It must be signed under penalty of perjury and identify the claimant and the nature of his interest. It is evidence, […] and shifts to the government the burden at least of production of evidence that the claim is invalid[.]" *United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 653 (7th Cir. 2013) (citations omitted).

26.    The foregoing authority is consistent with the accepted Second Circuit practice of conducting a hearing in connection with deciding a motion for summary judgment in other contexts. *See, e.g.*, *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 102 (2d Cir. 2003) (recognizing that it was appropriate in "a standing case" for district court to hold an "evidentiary hearing" at the summary judgment stage "to narrow the controverted issues to triable matters" (citing *Argus Inc. v. Eastman Kodak, Co.*, 801 F.2d 38, 42 n.2 (2d Cir. 1986))); *see also Argus*, 801 F.2d at 42 n.2 ("When the motion for summary judgment was made in the instant case, the record consisted of an enormous mass of documents, and the district court was well within its discretion to conclude that a hearing would allow the court to assess the record expeditiously and accurately.").

**D.    Standing is a Legal Question for the Court.**

27.    "Standing is . . . a legal question to be determined by the court, not a jury." *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 78 (Sotomayor, J.) (citing *Cambio Exacto, S.A.*, 166 F.3d at 526). But the Court's factfinding authority in this regard, prior to a trial on the merits, is narrowly circumscribed. "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*, 859 F.3d 1085, 1087 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

28.    "If deciding standing meant deciding 'legitimate' ownership, then judges would functionally be deciding forfeitability[.]"*Funds in the Amount of $239,400*, 795 F.3d at 646. "To use . . . factual findings [from an evidentiary hearing] to decide legitimate ownership, which goes to the heart of the merits in a forfeiture case, would invade the province of the jury." *Id.* at 642 n.2 (citing *One Lincoln Navigator 1998*, 328 F.3d at 1014); *see also United States v. Real Prop. Located in Los Angeles, California*, No. 220CV06314CASKSX, 2023 WL 3564732, at *3 n.3 (C.D. Cal. Apr. 17, 2023) ("The parties appear to agree that plaintiff's motion may be treated either as a motion for an evidentiary hearing or as a motion for summary judgment and that the applicable legal standard is the summary judgment standard.").

29.    An exception exists only "when a [party's] claim is supported solely by the [party's] own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the [party] has deliberately committed perjury." *Seventeen Thousand Nine Hundred Dollars ($17,900.00)*, 859 F.3d at 1093 (citation omitted). In such instances, the Court may weigh credibility and strike a claim.

**IV.    Claimants Have Shown by a Preponderance of the Evidence that They Have Standing to Contest the Forfeiture of the *Amadea*.**

> **A.    All Second Circuit Precedent Requires for Claimants to Survive a Motion to Strike is a Facially Colorable Interest in the Proceedings.**

30.    As then-Judge Sotomayor explained for the Second Circuit, "to establish standing 'the claimant need not prove the full merits of [his] underlying claim.'" *$557,933.89, More or Less, in U.S. Funds,* 287 F.3d at 78 (quoting *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158 (2d Cir. 1994)). "All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court." *Id.* (quoting *Torres*, 25 F.3d at 1158) (internal quotations

omitted); *accord United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1273 (10th Cir. 2008) ("Although a claimant must make an initial evidentiary showing of such an interest, a claimant need not definitively prove the existence of that interest.") (citations omitted).

31.    The D.C. Circuit has emphasized: "[T]he requirements for a [claimant] to demonstrate constitutional standing to challenge a forfeiture are very forgiving." *Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*, 859 F.3d at 1089 (alterations omitted) (quoting *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015)). "Imagine what it would do to federal litigation to require every plaintiff (or claimant in a forfeiture suit, who is like a plaintiff) not only to allege, but to prove, facts establishing the district court's constitutional authority to decide his case. That is not required." *$196,969.00 U.S. Currency*, 719 F.3d at 646 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)).

32.    "It must be remembered . . . that in a civil forfeiture action the *government* is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated." *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 79 (emphasis in the original). "If the government fails to meet its burden of proof . . . , the claimant need not produce any evidence at all—i.e., the claimant has no 'case' that he must present or 'elements' to which he bears the burden of proof." *Id.*

33.    "The function of standing in a forfeiture action is therefore truly threshold only— to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *Id.* (footnote omitted). "Thus, the only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required 'facially colorable

interest,' not whether he ultimately proves the existence of that interest[.]" *Id.* (quoting *Torres*, 25 F.3d at 1158).

34.    "Courts should not conflate the constitutional standing inquiry with the merits determination that comes later." *Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States Currency*, 859 F.3d at 1091 (quoting *United States v. One-Sixth Share of Mass Millions Lottery Ticket*, 326 F.3d 36, 41 (1st Cir. 2003)). "Where . . . a claimant's account of ownership is irreconcilable with the theory upon which the government seeks forfeiture, requiring the claimant to produce more than 'some evidence' of ownership [prior to trial] runs the danger of impermissibly shifting the merits burden to the claimant—tantamount to, say, making a claimant prove that her property is *unconnected* to unlawful activity." *Id.* (emphasis in the original).

**B.    Claimants Have Presented Substantial Evidence of Title, Possession, Control, and a Financial Stake in the *Amadea*.**

35.    Claimant Eduard Khudainatov maintains that he owns the Amadea through Claimant Millemarin Investments Ltd. and thus has standing to contest the government's forfeiture of the vessel. At this stage, the Court is more than satisfied that Claimants have demonstrated a facially colorable interest in the proceedings.

36.    The Second Circuit has "recognized that an owner of property seized in a forfeiture action will normally have standing to challenge the forfeiture," and "that the possession of property may likewise confer standing to challenge its forfeiture." *Cambio Exacto, S.A.*, 166 F.3d at 527 (citations omitted). "In determining standing to challenge a forfeiture, we look to ownership and possession because they are often reliable indicators of injury that occurs when property is seized." *Id.*

37.    Even absent compelling evidence of ownership or possession, however, a claimant may still establish standing by demonstrating a "financial stake" in the property. *Id.* at 528

(declining to decide whether claimants owned property at issue but reversing and remanding district court's finding that claimants lacked standing because claimants nevertheless "had a financial stake in the funds"); *accord One Lincoln Navigator 1998*, 328 F.3d at 1013 ("[A] colorable ownership interest 'may be evidenced in a number of ways including showings of actual possession, control, title and financial stake.'" (citation omitted)).

38.    As recounted in more detail above in the Findings of Fact, Claimants have presented substantial—oftentimes unrebutted—evidence of possession, control, title, and financial stake regarding the Amadea sufficient to satisfy Article III standing, including the following:

a.    Eduard Khudainatov commissioned the building of the Amadea by the German company Lürssen and paid for its construction. *See* Findings of Fact ("FOF") ¶¶ 67-78, *supra*. Khudainatov initially controlled the vessel through a holding company called Nereo. *See id.* ¶¶ 68-70.

b.    After the Amadea's completion, Mr. Khudainatov personally sailed aboard the vessel several times with family members and personal guests of his, evidencing possession and control. *See id.* ¶¶ 83-84. While Mr. Khudainatov was onboard the yacht for these trips, the captain of the vessel understood Mr. Khudainatov to be the owner. *See id.* ¶ 84. From the time the vessel was completed in 2017 until approximately September 17, 2021, Mr. Khudainatov was ultimately financially responsible for paying all costs of operating and maintaining the Amadea (including insurance), and did pay such costs. *See id.* ¶¶ 79-82.

c.    In September 2021, Mr. Khudainatov transferred formal ownership of the Amadea from Nereo to another entity he controlled: Claimant Millemarin Investments Ltd. *See id.* ¶¶ 90-100. Since that time, including to this day, Mr. Khudainatov has held legal

title to the vessel through Millemarin. *See id.* ¶¶ 90-100, 130-139, 209-224. Legal title indicates ownership. *See One Lincoln Navigator 1998*, 328 F.3d at 1013 ("The certificate of title to the Navigator was issued to Andrews, which means she is the car's registered owner. . . . [A]lthough there is evidence that Andrews has only 'bare legal title,' we conclude that is sufficient to confer Article III standing to contest the forfeiture.").

d.      Claimants do not dispute that Mr. Khudainatov has actively tried to sell the Amadea. *See* FOF ¶¶ 85-89. To that end, also in September 2021, Mr. Khudainatov entered into the Temporary Use Agreement with Evgeniy Kochman of Imperial Yachts, the company that has managed the Amadea on Mr. Khudainatov's behalf since it was constructed. *See id.* ¶¶ 101-105. The arrangement was between Millemarin and Errigal, Kochman's company. *See id.* ¶¶ 106-114. Although Errigal bore some of the costs associated with operating the Amadea under the arrangement, the transaction did not effectuate a sale of the Amadea from Millemarin to Errigal but instead granted Kochman authority to charter the vessel while he attempted to identify a permanent third-party buyer. *See id.* ¶¶ 101-105, 110-114. Full completion of the transaction required Kochman to find such a buyer. *See id.* ¶ 104.

e.      In exchange for temporary use of the Amadea, including the ability to charter the vessel and the right to capture any proceeds from a sale above an agreed-upon price, Kochman agreed to pay Millemarin €225,000,000, which Kochman accomplished through a loan from Alisa Gadzhieva on commercially reasonable terms. *See id.* ¶¶ 101-105, 110-124. The loan did not provide Gadzhieva, who is Suleiman Kerimov's niece, with any property interest in the Amadea. *See id.*

f.      John Wolf and Damien Magee—two lawyers in the Cayman Islands, where the Amadea is flagged—have extensive experience in transferring ownership of vessels. *See id.* ¶¶ 58-62. Wolf and Magee served as directors of Errigal up until March 2022. *See id.* ¶ 133. Both explained the steps required to complete a sale of a vessel, and both testified that those steps were not undertaken with respect to the agreement between Mr. Khudainatov (Millemarin) and Kochman (Errigal) concerning the Amadea. *See id.* ¶¶ 59, 62, 210, 211.

g.      The government's own legal expert, Professor Ewan McKendrick, confirmed: ". . . I haven't seen anything that suggests legal title was passed from seller to buyer under this agreement because clause (18) was not implemented" (McKendrick Tr. 38:22-25), and "if clause (18) was not complied with then legal title did not pass under this Memorandum of Agreement." *Id.* at 40:5-7. More broadly, McKendrick also "did not see any document" indicating that the transaction between Millemarin and Errigal had closed. *Id.* at 63:10-14. If the transaction did not close, McKendrick agreed that Millemarin would remain the legal owner of the yacht. *Id.* at 65:7-13.

h.      Once the Temporary Use Agreement between Mr. Khudainatov and Kochman fell apart following Russia's military action in Ukraine, complete possession and control of the Amadea reverted to Mr. Khudainatov, and Mr. Khudainatov (by way of Millemarin) became liable to Kochman (by way of Errigal) for the funds that Errigal had paid under the agreement. *See* FOF ¶¶ 130-39. In other words, Mr. Khudainatov has a clear financial stake in these proceedings; if he is not able to contest the forfeiture, he will have lost his yacht and will also still be indebted to Kochman. *See id.* ¶¶ 145-48.

i.    At the time the Amadea was seized in Fiji in April 2022, Mr. Khudainatov was responsible for paying the cost of the vessel's journey, further demonstrating his dominion and control of the yacht. *See id.* ¶¶ 139-147. While the vessel was in Fiji, Mr. Khudainatov "kept in regular close touch with Mr. Kochman" and he "asked Mr. Kochman to give [him] regular updates as to what was happening there," which Kochman did every week or so. *See id.* ¶¶ 127-29. Mr. Khudainatov (and no one else) contested the Amadea's seizure in Fiji. *See id.* ¶¶ 140-144. Likewise, Mr. Khudainatov and his company are the sole Claimants here.

39.    The government's theory that Mr. Khudainatov has merely functioned as a straw owner for the Amadea is not borne out by the record evidence. None of the "straw owner" cases relied on by the government confronted the extensive evidence of title, possession, control, and financial stake presented by Claimants here. *See United States v. Any And All Funds on Deposit In Acct. No. 12671905, Held In The Name of Landlocked Shipping Co. At Wells Fargo Brokerage Servs., LLC, All Int. And other Proceeds Traceable Thereto*, No. 09CV3481HB, 2010 WL 3185688, at *7 (S.D.N.Y. Aug. 10, 2010) (collecting cases and observing: "[i]n civil forfeiture cases where standing has been denied, the government typically has shown that the claimant has, at best, only legal title with no further evidence of dominion, possession, or interest in the property"); *see also United States v. One Red 2003 Hummer H2 VIN: 5GRGN23U93H118675*, 234 F. Supp. 3d 415, 419 (W.D.N.Y. 2017) (finding claimant was not a mere straw owner and had standing where discovery showed "he purchased the Vehicle; he held title to the Vehicle; he insured the Vehicle; he maintained the Vehicle; he held the keys to the Vehicle; he drove the Vehicle 75% of the time; he allowed others to drive the Vehicle only with his permission; and his possessions were recovered from the Vehicle").

40.     The government points to no evidence linking Suleiman Kerimov to Errigal and no evidence that Suleiman Kerimov acted or instructed others to effectuate a purchase of the Amadea on his behalf. *See* FOF ¶¶ 106-109. In fact, the record evidence shows Suleiman Kerimov was not interested in purchasing the Amadea. *See id.* ¶¶ 149-156. The evidence shows that members of Suleiman Kerimov's family chartered the Amadea in early 2022, consistent with the Temporary Use Agreement between Mr. Khudainatov and Kochman. *See id.* ¶¶ 157-160. Members of the Kerimov family requested modifications to the Amadea prior to their charter, but these suggested modifications were predominantly cosmetic, were not structural, and were not unusual requests from high-paying long-term charter guests. *See id.* ¶¶ 161-171.

41.     In short, Claimants have presented sufficient evidence of legal title, possession, control, and financial stake in the Amadea to confer Article III standing. That is all that is required for the Court to decide the government's motion to strike at this juncture. The Court does not express any opinion on "[w]hether [Claimants] will ultimately prevail on [their] assertion that the property should not be forfeited[.]" *$8,440,190.00 in U.S. Currency*, 719 F.3d at 62.

## CONCLUSION

42.     For all the foregoing reasons, and based on all the evidence in the record, the Court concludes that Claimants Eduard Khudainatov and Millemarin Investments Ltd. have established a facially colorable interest in these proceedings concerning the government's effort to forfeit the Amadea.

43.     The government's motion to strike is therefore denied.

Dated: January 14, 2025

Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: _____

    Adam C. Ford
    Robert S. Landy
    Renée L. Jarusinsky
    Anjula S. Prasad
    Stephen R. Halpin III
    Christine Isaacs
    Bryan W. McCracken
    275 Madison Avenue, 24th Floor
    New York, NY 10016
    Tel.: (212) 858-0040 (main)
    aford@fordobrien.com
    rlandy@fordobrien.com
    rjarusinsky@fordobrien.com
    aprasad@fordobrien.com
    shalpin@fordobrien.com
    cisaacs@fordobrien.com
    bmccracken@fordobrien.com

    *Attorneys for Claimants Eduard Yurievich*
    *Khudainatov and Millemarin Investments*
    *Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Claimants' Proposed Findings of Fact and Conclusions of Law was served on all counsel of record via the Court's CM/ECF system.


Dated: January 14, 2025

_____
Adam C. Ford