UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       Plaintiff,

       - v. -                    23 Civ. 9304 (DEH)

THE M/Y AMADEA, A MOTOR YACHT
BEARING INTERNATIONAL MARITIME
ORGANIZATION NO. 1012531, INCLUDING
ALL FIXTURES, FITTINGS, MANUALS,
STOCKS, STORES, INVENTORIES, AND
EACH LIFEBOAT, TENDER, AND OTHER
APPURTENANCE THERETO,

       Defendant-*In-Rem*,

       and

EDUARD YURIEVICH KHUDAINATOV,
MILLEMARIN INVESTMENTS LTD.,

       Claimants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF UNITED STATES OF AMERICA'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff the United States of America ("the Government"), by its attorneys, Edward Y. Kim, Acting United States Attorney for the Southern District of New York, and Margaret A. Moeser, Chief of the Money Laundering and Asset Recovery Section, Criminal Division, respectfully submits the following proposed findings of fact and conclusions of law.

## I.    Introduction

1.     The defendant-in-rem, the M/Y *Amadea*, was seized in Fiji based on a seizure warrant issued by U.S. Magistrate Judge G. Michael Harvey on April 13, 2022, ECF No. 39-1, and delivered into the Government's custody on or about June 7, 2022. *See* Bergen Decl. ¶¶ 10, 12. The Government filed the present civil forfeiture case against the *Amadea* on October 23, 2023, ECF No. 1, and filed an amended complaint on February 16, 2024, ECF No. 37.

2.     The only claim filed in the forfeiture case was that of Eduard Khudainatov and Millemarin Investments Ltd. ("Khudainatov" and "Millemarin" and, together, "Claimants"). ECF No. 9. The Government filed a motion to strike the claim on the ground that Claimants lacked standing. ECF No. 97. Claimants filed an opposition on June 13, 2024, ECF No. 123, and the Government filed a reply on June 27, 2024, ECF No. 137. The parties submitted supplemental briefing on several dates thereafter. *See* ECF Nos. 147, 197, 216, 295, 296.

3.     Supplemental Rule G(8)(C)(ii)(B) of the Federal Rules of Civil Procedure provides that a motion to strike in a civil forfeiture action:

> may be presented . . . as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence.

4.     Having reviewed the parties' briefing, the Court scheduled a hearing to resolve factual disputes and to determine whether Claimants "can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(8)(C)(ii)(B). ECF No. 312.

5.     After having held the hearing on January 21, 2025 and [subsequent dates], and considered the evidence, the Court now issues these Findings of Fact and Conclusions of Law. Each of the following Findings of Fact and Conclusions of Law represents the Court's consideration of all of the evidence in light of the pertinent law and the Court's consideration and

evaluation of the witnesses' qualifications and credibility. Any conclusion of law that may be construed to include a finding of fact is hereby adopted as a finding of fact.

## II.    Forfeiture Claimants Bear the Burden of Proving Standing

6.    "In order to contest a governmental forfeiture action, claimants must have . . . standing under Article III of the Constitution as required for any action brought in federal court." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999); *United States v. Any and All Funds on Deposit in Acct. No. 12671905*, No. 09CV3481, 2010 WL 3185688, at *4 (S.D.N.Y. Aug. 10, 2010). "The burden of proof in making a demonstration of standing rests with the claimants." *United States v. All Right, Title & Int. in Prop., Appurtenances, & Improvements Known as 479 Tamarind Drive, Hallendale, Fla.*, No. 98 CIV. 2279 DLC, 2011 WL 1045095, at *2 (S.D.N.Y. Mar. 11, 2011) (citing *Mercado v. United States Customs Service*, 873 F.2d 641, 644 (2d Cir. 1989)); Supp. R. G(8)(C)(ii)(B).

7.    "Without standing, [a claimant] is simply a stranger to the litigation." *United States v. Vazquez-Alvarez*, 760 F.3d 193, 198 (2d Cir. 2014). Thus, standing's threshold function "ensures that the Government is put to its proof only where someone acting with a legitimate interest contests the forfeiture." *United States v. $295,726.42*, 279 F. Supp. 3d 1050, 1053 (C.D. Cal. 2018). Also, just as "in every federal case," standing "determin[es] the power of the court to entertain the suit." *Cambio Exacto, S.A.*, 166 F.3d at 526 (quotation marks omitted). Thus, "if the claimant lacks standing, the court lacks jurisdiction to consider his challenge of the forfeiture." *United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990); *see United States v. Weiss*, 467 F.3d 1300, 1308 (11th Cir. 2006) ("If a claimant lacks Article III standing to challenge a forfeiture, this Court does not have jurisdiction to consider the claim.").

8.      Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). "The requirement applies as much to intervenors or claimants in civil forfeiture actions as to any other party in federal court." *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 224 (D.D.C. 2017); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (holding that "an intervenor must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff").[1]

9.      The "ultimate focus" of the Article III standing question is "injury to the party seeking standing." *Cambio Exacto, S.A.*, 166 F.3d at 527. "To demonstrate standing under Article III, therefore, a litigant must allege a 'distinct and palpable injury to himself,' that is the direct result of the "'putatively illegal conduct of the adverse party,' 'likely to be redressed by the requested relief.'" *Id.*; *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (calling this the "irreducible constitutional minimum of standing").

10.     For that reason, courts "den[y] standing to 'straw' owners," that is, claimants "who do indeed 'own' the property, but hold title to it for somebody else." *Cambio Exacto, S.A.*, 166 F.3d at 527. "Such owners do not themselves suffer an injury when the property is taken." *Id.* Indeed, "courts have uniformly rejected standing claims put forward by nominal or straw owners." *United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 35 (1st Cir. 1999); *see United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 105 (D.D.C. 2013) ("[C]ourts do

---

[1] "In a civil forfeiture case, . . . the claimant is an intervenor." *United States v. $822,694.81*, No. 3:13CV545, 2019 WL 4760185, at *1 n.1 (D. Conn. Sept. 30, 2019); *United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d 1, 5 (D.D.C. 2009); *United States v. One-Sixth Share of James J. Bulger in All Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 40 (1st Cir. 2003); *see United States v. One 2003 M/V Edgewater Vessel*, No. CIV. 12-1783, 2015 WL 998168, at *2 (D.P.R. Feb. 27, 2015) ("As an intervenor, the claimant must establish that he has sufficient interest in the property to invoke the court's jurisdiction").

not regard nominees as 'a true owner of an interest in the property' and on that basis frequently deny them standing to contest forfeitures" (quoting *United States v. Vacant Land Located at 10th St. & Challenger Way*, 15 F.3d 128, 130 (9th Cir.1993)); *see also United States v. $829,422.42*, 561 F. App'x 100, 100 (2d Cir. 2014) ("In order to have standing to challenge the forfeiture of property, one must be more than a mere 'straw owner'"); *United States v. Weiss*, 467 F.3d 1300, 1308–09 & n.1 (11th Cir. 2006); *Vacant Land*, 15 F.3d at 130; *United States v. Twenty Cashier's Checks*, 897 F.2d 1567, 1571 (11th Cir. 1990).

11.     "Such nominal ownership is of concern in the forfeiture context because it can be used as a subterfuge to evade forfeiture." *Bank Julius Baer & Co.*, 959 F. Supp. 2d at 105 (quotation marks omitted). Put differently, "[b]are legal title can be insufficient to demonstrate standing in a civil forfeiture action, because appearances may be manipulated and deceptive and it may be an attempt to disguise interests in property by not placing title in their own names." *Acct. No. 12671905*, 2010 WL 3185688 at *5 (quotations omitted); *United States v. $829,422.42*, No. 3:08-CV-00914, 2013 WL 2446486, at *7 (D. Conn. June 5, 2013); *United States v. One 1982 Porsche*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990); *One 1982 Porsche*, 732 F. Supp. at 451 ("A search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture."); *cf. United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2000) ("Failing to look beyond bare legal title . . . would foster manipulation of ownership by persons engaged in criminal activity."); *see also Mercado*, 873 F.2d at 646 (2d Cir.1989) (noting "substantial danger of false claims in forfeiture proceedings.").

12.     In other words, "possession of mere legal title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a

forfeiture." *Vacant Land*, 15 F.3d at 130; *United States v. One Red 2003 Hummer H2*, 234 F. Supp. 3d 415, 419 (W.D.N.Y. 2017) ("The possession of bare legal title to the res may be insufficient [to establish standing], absent other evidence of control or dominion over the property." (quotation marks omitted)); *Cambio Exacto, S.A.*, 166 F.3d at 527. For that reason, "numerous cases hold that once the government makes a *prima facie* showing that a third-party claimant is a 'straw,' the claimant must present evidence of dominion and control or other indicia of true ownership." *United States v. Ida*, 14 F. Supp. 2d 454, 459-60 (S.D.N.Y. 1998) (quotation marks omitted)*; see, e.g., United States v. Coffman*, 612 F. App'x 278, 286 (6th Cir. 2015); *United States v. Morgan*, 224 F.3d 339, 344 (4th Cir. 2000); *$81,000.00,* 189 F.3d at 37; *United States v. One 1945 Douglas C–54 (DC–4) Aircraft, etc.,* 604 F.2d 27, 28-29 (8th Cir. 1979); *see also United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1113 (5th Cir. 1992) ("[c]ourts generally look to indicia of dominion and control" to determine ownership).

13.     Thus, for example, a putative claimant holding legal title does not have standing to contest a forfeiture when another person continues to maintain, manage, and pay for the defendant property. In *United States v. 500 Delaware St.*, 113 F.3d 310 (2d Cir. 2002), the Second Circuit affirmed the dismissal of a party contesting forfeiture of real property as "a mere straw owner" even though he was named on the deed. *Id.* at 312. In that case, the previous owner transferred the property to his father after being arrested, but continued to "ma[k]e mortgage, property tax, and insurance payments, paid utility bills, and maintained the property and made repairs." *Id. at* 311-312. Here, as will be set forth below, the Claimants at most hold title to the *Amadea*; they have been paid in full for the *Amadea*'s sale and have ceased maintaining, making repairs to or payments in connection with the *Amadea*. Any relationship that Claimants continue to have to it is as a straw owner.

14.    Claimants' argument that they need to show only a "facially colorable interest" in the *Amadea* to establish standing is incorrect. Standing requires an "injury in fact," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), not merely a colorable injury or a possible injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (injury-in-fact requirement not satisfied by merely "conjectural" or "hypothetical" injuries). If a merely colorable interest were enough to challenge forfeiture, then a claimant with no actual interest in a property would be able to consume the Court's and the government's resources opposing the forfeiture of a property in which he or she has no actual interest.

15.    Further, "the showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds." *Carter v. HealthPort Techs.*, 822 F.3d 47, 56 (2d Cir. 2016); *see Lujan*, 504 U.S at 561 (standing must be established "with the manner and degree of evidence required at the successive stages of the litigation"). The cases in which courts have suggested that a "facially colorable interest" standard may apply concerned standing determinations made in different procedural postures, not an evidentiary hearing under Rule G(8)(c)(ii)(B). *See United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)*, No. 1:16-CV-06564 (AMD), 2018 WL 948752, at *3 (E.D.N.Y. Feb. 16, 2018) (motion on pleadings); *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154 (2d Cir. 1994) (summary judgment); *United States v. U.S. Currency in Sum of Six Hundred Sixty Thousand, Two Hundred Dollars*, 242 F. App'x 750, 751 (2d Cir. 2007) (challenge to standing via a Rule 60(b) motion to reopen judgment); *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 75 (2d Cir. 2002) (post-trial reconsideration of pre-trial ruling).[2]   The Court is not aware of any case

---

[2] In *$557,933.89, More or Less*, the Second Circuit held that a district court was not required to revisit a pretrial ruling on standing after trial because doing so would only "result in unnecessary

applying the "facially colorable interest" standard at an evidentiary hearing on standing, where the Court's role is not to determine whether a claimant has a sufficiently colorable theory of standing for the case to proceed, but to determine whether he or she in fact does have standing.[3]

## III.    Relevant Entities and Individuals

16.    **The Motor Yacht *Amadea*** ("*Amadea*") is a 348-foot (106-meter) luxury superyacht bearing International Maritime Organization No. 1012531, commissioned in 2012 and delivered in 2017. GX-702 at 9; GX-200; *see also* GX-100 (photo of *Amadea*). From the time of its launch until the time of its seizure, the *Amadea* was flagged in the Cayman Islands. GX-300; GX-301; GX-302.

17.    **Nereo Management Limited** ("Nereo") is or was a corporate entity formed under the laws of the Cayman Islands in 2012. GX-200; GX-303. The original Certificate of British Registry issued by the Cayman Islands upon the *Amadea*'s delivery from the shipyard, dated

---

and unproductive 'tail-chasing.'" 287 F.3d at 78. In that context—*i.e.*, after a merits trial in which the Government had been put to its proof—the Second Circuit observed that the "function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *Id.* at 79. Though the Court of Appeals also suggested that Article III standing requirements in civil forfeiture cases may differ from those of other cases because the claimant is not the plaintiff, *see id.*, those comments were dicta. Further, those comments are inconsistent with both (a) the Supreme Court's subsequent ruling in *Town of Chester*, 137 S. Ct. 433, that "an intervenor of right [such as a claimant] must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests," *id.* at 439, and (b) the Supreme Court's repeated direction that the requirements of constitutional standing are "irreducible," *Brown*, 600 U.S. at 561, and "essential and unchanging." *DaimlerChrysler Corp.*, 547 U.S. at 342.

[3] Moreover, because this case sounds in admiralty and is triable to the Court on the merits, the concerns expressed in some cases about a standing adjudication taking issues away from the jury do not apply. *See* ECF No. 84 at 30-35 (Government brief collecting authorities that there is no right to jury trial for seizures on navigable waters).

March 6, 2017, reflects that Nereo was the *Amadea*'s registered owner, and that it received correspondence "c/o Campbells Corporate Services Ltd." GX-300.

18.    **Millemarin Investments Ltd**. ("Millemarin") is a corporate entity formed under the laws of the British Virgin Islands on June 10, 2021, with Invest International Finance Ltd. as its only shareholder. GX-305; Wolf Tr. 52:14-21. A Certificate of British Registry dated August 16, 2021, reflects that Millemarin was the *Amadea*'s registered owner as of that date. GX-302. *See* Millemarin 30(b)(6) Tr. 28:3-28:6 ("Q. What is Millemarin?   A. Millemarin is Khudainatov's company. He's the ultimate beneficial owner. It's a BVI company, and its sole asset is Amadea. That's about it."). At all times from Millemarin's formation until October 2024, Millemarin's sole director was Olga Kroon (aka Olga Boltenko). *See* Millemarin 30(b)(6) Tr. 27:2-9; 33:25-34:6.[4]

19.    **Errigal Marine Ltd** ("Errigal") is or was an entity formed under the laws of the Cayman Islands on September 8, 2021. GX-307 at 1; GX-304.

20.    **Campbells Corporate Services Ltd** ("Campbells Corporate") is a corporate services firm in the Cayman Islands affiliated with the Cayman law firm Campbells. Wolf Tr. 14:22-15:14, 33:10-34:24. Campbells Corporate and its affiliates incorporated Cayman entities and then registered yachts owned by them with the Cayman Islands Shipping Registry ("CISR").

---

[4] The Government is entitled to rely on Millemarin's Rule 30(b)(6) deponent's statements under Federal Rules of Evidence 801(d)(2)(A) and (C). *See* Fed. R. Civ. P. 32(a)(3) ("An adverse party may use for any purpose the deposition of … anyone who, when deposed, was the party's … designee under Rule 30(b)(6)."). That is so even though Millemarin's 30(b)(6) designee became a director of Millemarin only two months before the deposition and lacked personal knowledge of the events at issue in this case. *See United States v. Torres*, No. 22-2527-CR, 2024 WL 5172316, at *7 (2d Cir. Dec. 20, 2024) (recognizing that the personal knowledge requirements of Rule 602 does not extend to admissions admitted under Rule 801(d)(2)). By contrast, Claimants may not admit such testimony. *See* MOORE'S FEDERAL PRACTICE—CIVIL § 30.25 (2022) ("An entity may not call its own 30(b)(6) witness to testify at trial to hearsay and other matters outside the witness's personal knowledge."); *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02-cv-9144, 2006 WL 988143, at *2 (S.D.N.Y. Apr. 13, 2006); *VIV Healthcare Co. v. Mylan Inc.*, No. 12-cv-1065, 2014 WL 2195082, at *2 (D. Del. May 23, 2014).

Wolf Tr. 18:21-19:16. Campbells Corporate and its affiliate Campbells Nominees Ltd. and their employees (1) held the stock of Nereo and served as Nereo's registered office in the Caymans, Wolf Tr. 34:9-24, 164:13-165:5; GX-300 at 1, and (2) created Errigal and served as its directors. Wolf Tr. 68:19-69:8. To be flagged in the Caymans, yachts owned by entities that are not formed under Cayman law must have a "representative person" in the Caymans. Wolf Tr. 59:3-10. Campbells Corporate and its affiliate served as the "representative person" for Millemarin, and registered the *Amadea* under Millemarin's name with the CISR. GX-406; GX-406-H at 1-4. Campbells and its affiliates also provided directors and registered office services to Densiarly Enterprises Ltd., the corporate owner of the superyacht M/Y *Crescent*, Wolf. Tr. 116:20-118:1, and registered the superyacht M/Y *Scheherazade* with the CISR. Wolf Tr. 125:18-130:1.

21.     **Imperial Yachts** was a company headquartered in Monaco. Wolf Tr. 21:21-22:24; Walsh Tr. 18:13-19:3; Magee Tr. 57:4-58:4. At all relevant times, Imperial Yachts managed the *Amadea* on behalf of the owner and employed its captain and crew through its wholly-controlled affiliate Ocean Crew Limited. Walsh Tr. 19:16-20:9; Read Tr. 52:20-53:9; ECF No. 126 ("Khudainatov Decl.") at ¶ 26;[5] ECF No. 126-26 at 2, 25, 28 (Nereo management agreement with Imperial Yachts); ECF No. 126-29 at 2, 25, 28 (Millemarin management agreement).

22.     **Fiduchi** is a corporate group in the Bailiwick of Jersey that performed various corporate and trust services for Imperial Yachts with respect to the yachts it managed. Azarenko Tr. 160:4-161:5, 173:19-174:10; GX-475 (performing due diligence on possible ultimate beneficial

---

[5] Though Claimants may not admit the Khudainatov declaration because it is hearsay, the Government may rely on it as it contains admissions of a party opponent, subject to the rule of completeness. *See* Fed. R. Evid. 801(d)(2)(A); *United States v. Germaine Ramsey*, No. 23-7211-CR, 2024 WL 5199288, at *2 (2d Cir. Dec. 23, 2024) ("the rule of completeness is violated only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant." (quotation marks omitted)).

owners of vessels managed by Imperial Yachts); GX-474 (discussing Imperial Yachts accounts at Barclays Bank).

23.    **Eduard Khudainatov** ("Khudainatov") is a Russian national who claims to have spent approximately €224 million to build the *Amadea* and to have been its beneficial owner at all times. GX-702 at 9-10; ECF No. 9; *see also* GX-103 (photo of Khudainatov).

24.    **Evgeniy Kochman** ("Kochman") is a Russian national who was chairman of Imperial Yachts. Wolf Tr. 69:21-70:3; Magee Tr. 58:5-18. As of March 13, 2022, Kochman was purportedly the sole owner and ultimate beneficial owner ("UBO") of Errigal. *See* GX-307 at 60, 76 (identifying Kochman as the and sole shareholder UBO of Errigal); *see also* GX-101 (photo of Kochman and another individual).

25.    **Julia Stewart** is Kochman's sister. She worked as a manager at Imperial Yachts along with Kochman. Magee Tr. 58:5-18.

26.    **Suleiman Kerimov** ("Kerimov") is a Russian national. *See* GX-102 & GX-104 (photos of Kerimov). On or about April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Kerimov as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et. seq. ("IEEPA"). Bergen Decl. ¶ 5

27.    **Firuza Kerimova** ("Firuza") is a Russian national and the wife of Kerimov. Khalikov Tr. 100:4-8; GX-400-A; GX-494-A; *see also* GX-105 (photo of Firuza). On or about November 14, 2022, OFAC designated Firuza as an SDN under the IEEPA. Press Release from US Dept. Of Treasury (Nov. 14, 2022). https://home.treasury.gov/news/press-releases/jy1102.

28.    **Gulnara Kerimova** ("Gulnara") is a Russian national and the daughter of Kerimov. Von Poblitz Tr. 41:25-42:11; *see also* GX-107 (photo of Gulnara). On or about November 14, 2022,

OFAC designated Gulnara as an SDN under the IEEPA. Press Release from US Dept. Of Treasury (Nov. 14, 2022). https://home.treasury.gov/news/press-releases/jy1102.

29.    **Alisa Gadzhieva** ("Gadzhieva") is a Russian national and the niece of Kerimov (his sister's daughter). GX-704 at 2; Vine Tr. 64:2-14; Aslund Decl. at ¶¶ 86, 90.

30.    **John Wolf** ("Wolf") was the head of corporate and a managing partner at Campbells who oversaw the firm's maritime practice. Wolf Tr. 14:18-16:2, 17:7-18:16. He was also a director of Campbells Corporate. Wolf Tr. 14:18-16:2. Wolf served as a director of Errigal from the date of Errigal's formation until approximately March 2022. Wolf Tr. 93:23-25, 168:15-21.

31.    **Damien Magee** ("Magee") was an employee of Campbells Corporate who served as a director of Errigal from the date of Errigal's formation until approximately March 2022. Magee Tr. 10:20-12:14; 13:6-14.

32.    **Francois Zuretti** ("Zuretti") is a French national and former manager of Zuretti Interior Design, which provided design services for yachts, including the *Amadea*, *Crescent*, and *Scheherazade*. Zuretti Tr. 17:23-18:10, 27:9-28, 115:3-22.

33.    **Peter Read** ("Read") is a British national and was a captain of the *Amadea* from approximately June 2016 to October 2021.[6]   Read Tr. 51:11-16, 115:12-116:14.

34.    **John Walsh** ("Walsh") is a British national and was a captain of the *Amadea* from approximately November 30, 2021 to June 7, 2022, when the *Amadea* was delivered into the Government's custody. Walsh Tr. 23:8-11, 92:14-18, 93:19-25.

---

[6] The captains and crew of the *Amadea* worked on a rotational system, with one captain or crew member filling a particular role on board for set periods of time, and then being replaced by a different captain or crew member filing that same role. Messenger Tr. 17:12-19:5; Meagher Decl. ¶¶ 21, 29.

35.    **Ben Turner** ("Turner") was a captain of the *Amore Vero* (formerly known as the *St. Princess Olga*) from approximately 2014 to 2018. Turner Tr. 13:4-15, 37:8-38:6. He also was a chief officer of the *Crescent* for approximately six months in 2018 and 2019, *id.* 37:20-38:6, 43:19-44:8, and a captain of the *Amadea* for approximately six months in 2019, *id.* 11:4-12:5, 47:9-48:18.

36.    **Martyn Messenger** ("Messenger") was a Chief Security Officer for the *Amadea* from approximately December 2019 to April 2022. Messenger Tr. 14:12-20, 16:1-16.

37.    **Guy Bennett-Pearce** ("Bennett-Pearce") has been a captain of the *Scheherazade* from approximately September 2018 to the present. Bennett-Pearce Tr. 15:23-24, 24:24-26:20, 114:23-115:4.

38.    **Ekaterina Azarenko Parfieva** ("Azarenko") has been an employee of Khudainatov's "family office" from 2007 to the present. Azarenko Tr. 16:2-9.

39.    **Dinar Khalikov** ("Khalikov" or "Dinar") is a consultant to Kerimov and a Kerimov family representative. Khalikov Tr. 29:5-6; Walsh Tr. 126:13-23. The *Amadea*'s captain considered Khalikov to be an "owner's rep" with respect to the *Amadea*. Walsh Tr. 127:11-14.

40.    **Adam von Poblitz** ("Von Poblitz") is a Citibank employee who managed assets of the Kerimov family. Von Poblitz Tr. 16:16-18:6.

41.    **Allen Vine** ("Vine") is an investment advisor, previously employed by Merrill Lynch, who performed work for Kerimov's family office. Vine Tr. 10:2-18.

## IV.    Background on Claimant Eduard Khudainatov

42.    Claimant Eduard Khudainatov was born in Kazakhstan, USSR in 1960. Beginning in 1985, he worked as a loader and foreman in the oil fields of Western Siberia. Aslund Decl. at ¶ 14; Khudainatov Decl. ¶¶ 2-3. He later went into business, including as a vice president of a small oil company. Aslund Decl. ¶ 15.

43.    In December 1999, Khudainatov was a candidate for the State Duma, the lower chamber of the Russian Parliament, but was not elected. Aslund Decl. ¶ 17. As a candidate for the Duma, Khudainatov was required to declare his assets and his income for 1998. He declared an annual income of 260,000 rubles. At the end of 1998, the ruble exchange rate was RUB20.65=$1, so this amounted to approximately $12,591. He declared his ownership of two apartments in the Khanty-Mansiisk region, with a total area of 120 square meters, and also an apartment of 149 square meters in Moscow. Aslund Decl. ¶ 25; GX-306; GX-306-T. After the Russian financial collapse of August 1998, half of all Russian banks closed and bank assets dissipated due to inflation, so Khudainatov is unlikely to have held any significant monetary assets at this time. Aslund Decl. ¶ 25.

44.    In 2000, Khudainatov led Putin's electoral campaign in the Tiumen region. In August that year, he was awarded the order "For Services to the Fatherland," Second Degree. A few months later he was appointed as a federal inspector of the presidential administration in the region. Aslund Decl. ¶ 19. In March 2003, Khudainatov left state service and became the head of Severneftegazprom, a subsidiary of the state-owned gas giant Gazprom in the Tiumen region. Aslund Decl. ¶ 20; Khudainatov Decl. ¶ 4.

45.    In approximately 2008, Khudainatov began to work at Rosneft, the Russian state-owned oil and gas company, which remains one of the world's largest oil and gas companies. Khudainatov rose through the ranks at Rosneft over the next five years. Aslund Decl. ¶ 21-22; Khudainatov Decl. ¶ 5.

46.    Igor Sechin was the chairman of the board of directors of Rosneft from at least 2004 to 2010. Aslund Decl. ¶¶ 97-98. From 2010 to 2012, Sechin served as Deputy Prime Minister of Russia. Aslund Decl. ¶ 98. During the time that Sechin was Deputy Prime Minister, Khudainatov

held the position of President of Rosneft. Aslund Decl. ¶ 98; Khudainatov Decl. ¶ 5. When Sechin

ceased serving as Deputy Prime Minister, Sechin took Khudainatov's place as President of Rosneft

and Khudainatov became "First Vice President." Aslund Decl. ¶¶ 98; Khudainatov Decl. ¶ 5.

47.    Khudainatov left Rosneft in 2013 to set up his own private oil company, known as

the Independent Oil and Gas Company or "NNK," which he funded in part with his own assets

and in part with debt. Aslund Decl. ¶ 23; Khudainatov Decl. ¶ 6. By and large, NNK was not a

profitable company from its formation in 2013 through 2020, with the possible exception of a one-

time asset sale in 2017. Aslund Decl. ¶¶ 38-43.

48.    From at least 2010 to the present, Khudainatov has been closely associated with

Sechin, one of the most powerful people in Russia. Aslund Decl. ¶¶ 37, 45, 59-61, 100-102.

49.    Khudainatov claims to have built and owned at least five superyachts[7] from

approximately 2009 to 2021. GX-702 at 9-11. He claims to have ordered the construction of three

of them from the German shipbuilder Lürssen Werft Gmbh ("Lürssen"):

> (1) the 106-meter *Amadea* (ordered in February 2012 and delivered in 2017),
>
> (2) the 136-meter *Crescent* (ordered in March 2013 and delivered in May 2019);
> and
>
> (3) the 140-meter *Scheherazade* (ordered in December 2014 and launched in April
> 2020).

GX-702 at 9-11.

---

[7] The term "superyacht" does not appear to have a formal definition, but is often used to refer to
pleasure vessels that are more than 40 meters in length. Each of the vessels under discussion here
is over 40 meters in length, with the exception of the *Divina Barbara* and *Milagro 2*. *See* GX-
702 at 9-12; Meagher Decl. ¶¶ 107-111.

50.     While under construction, these yachts were known as Project Mistral (*Amadea*),
Project Thunder (*Crescent*), and Project Lightning (*Scheherazade*). GX-200 at 1; GX-202 at 2;
GX-809 at 1. Each yacht is registered through a corporate entity: Millemarin (*Amadea*), Densiarly
Enterprises Ltd. (*Crescent*), and Bielor Asset Ltd. (*Scheherazade*), GX-702 at 10-11, but
Khudainatov claims to be the UBO of each of them at all relevant times, up to the present. GX-
702 at 9-11.

51.     In addition, Khudainatov claims to have purchased the 47-meter *Ariadna* in 2009
and the 86-meter *Amore Vero* (formerly known as the *St. Princess Olga*) in 2012 from different
shipbuilders. GX-702 at 11-12. Khudainatov claims to have sold the *Ariadna* in approximately
2016 and the *Amore Vero* in approximately 2017 or 2018. GX-702 at 11-12.

52.     There is evidence that Khudainatov was involved with at least some of the yachts
during portions of the claimed periods. For example, Peter Lürssen, of the shipbuilder Lürssen,
stated in his deposition that he believed Khudainatov was the owner of the *Amadea*, *Crescent*, and
*Scheherazade* at the time his shipyard built them. Lürssen Tr. 10:19-23, 13:20-22. Likewise,
Francois Zuretti, the yachts' interior designer, testified that he met with Khudainatov regarding the
design of each of those three yachts. *See* Zuretti Tr. 27:20-28:9; GX-810-T at 3-4, 6. Further,
Azarenko, an employee of Khudainatov's family office, testified that the family office maintained
documents and records related to Khudainatov's assets, Azarenko Tr. 16:6-20, which allegedly
included these yachts.

53.     However, there is significant conflicting evidence that suggests Khudainatov's
involvement with these yachts was for someone else's ultimate benefit. Among this evidence is
(1) the staggering sum that Khudainatov claims to have spent on the yachts' construction or
purchase (approximately €1.456 billion on the *Amadea*, *Crescent*, and *Scheherazade* and the

*Amore Vero*) between 2012 and 2014; (2) the involvement of Imperial Yachts and Evgeniy Kochman in the yachts' construction and management and Imperial Yachts' history of obscuring and mispresenting the ultimate beneficial ownership of yachts, including those at issue here; (3) the general implausibility of any one person, no matter how wealthy, needing or wanting to own such a large collection of yachts; and (4) the minimal personal use Khudainatov made of these yachts.

54.    I address this conflicting evidence below. *See* Section VII.A, *infra*. Though these issues bear on the credibility of Khudainatov's current claims to own the *Amadea*, they are not essential to my ultimate finding as to whether Khudainatov and Millemarin have been straw owners of the *Amadea* since September 2021.

## V.    The *Amadea* Prior to August 2021

### A.  Construction and Early Use

55.    The *Amadea* was built by Lürssen in Germany from 2012 to 2017. GX-702 at 9. The contract for the construction of the *Amadea* was between Lürssen and Nereo. *See* GX-200.

56.    Peter Lürssen, who was managing director of Lürssen's yacht division, understood Khudainatov to have been the owner of Nereo (and hence the *Amadea*) at the time of its construction, *see* Lürssen Tr. 13:20-22. So did Francois Zuretti, whose firm was charged with the *Amadea*'s interior design, Zuretti Tr. 43:14-44:3. Lürssen and Zuretti, however, both testified that Kochman (whom Lürssen referred to as the "consultant") was present at all of their meetings with Khudainatov, that they generally communicated with Khudainatov through Kochman, and that Kochman often translated for Khudainatov (who does not speak English). *See* Zuretti Tr. 62:12-21, 65:17-66:14, 68:2-17, 69:17-71:23; Lürssen Tr. 33:10-34:17.

57.    On December 31, 2015, Julia Stewart, Kochman's sister, signed an option agreement in which she represented that she was "the sole beneficial owner of one hundred (100%) fully paid-up share capital of" Nereo. GX-201 at 2; *see id.* at 3 (defining "the Company" as Nereo). The option agreement purported to give another company, Elearco Holdings Ltd., the right to buy Nereo's shares. *Id.* at 4-5.

58.    On March 13, 2017, a few days after the *Amadea* was first registered with the Cayman Islands, *see* GX-300, Stewart signed a letter to an asset management company in which she "confirmed" that "Alexander Smyzikov" was "the primary investor" in the *Amadea* and that Smyzikov was "therefore the ultimate beneficial owner of the yacht." GX-402 at 1; *see id.* at 2 (Stewart's signature "as confirmation of these arrangements"). The letter further stated that Smyzikov had requested that Stewart "hold the shares in Nereo Management on his behalf . . . pursuant to an arrangement between him, Julia, and Evgeniy, which is not recorded in writing." GX-402 at 1. The letter made no mention of Khudainatov.

59.    There is no evidence in the record as to the identity of Alexander Smyzikov (also spelled Smuzikov). Azarenko, an employee of the Khudainatov family office, testified that she had no knowledge of Alexander Smuzikov, Azarenko Tr. 232:8-12, and that Stewart's statement regarding his ownership of the *Amadea* did not "correspond[] to the real situation." Azarenko Tr. 231:16.

60.    Stewart also told others that Smuzikov owned the *Amadea*. For example, John Wolf, an attorney who worked for Campbells Corporate, testified that Julia Stewart told him in approximately 2017 that Nereo was owned by Alexander Smuzikov. *See* Wolf Tr. 35:7-10. Wolf also testified that Stewart told him that Smuzikov "was the source of all funds for the vessel [i.e., the *Amadea*]," Wolf Tr. 41:20-25, and that Stewart told him that it was Smuzikov's decision to put

the *Amadea* up for sale, Wolf Tr. 42:10-25. These misstatements were important: Campbells Corporate's affiliate held the shares of Nereo and it served as Nereo's registered office in the Caymans. *See* Wolf Tr. 34:10-24, 164:13-165:5; GX-201 at 2 (stating Campbells Corporate holds Nereo's shares); *see* GX-300 at 1 (Nereo's address was "c/o Campbells"). In Stewart's own words, Wolf was "really important" in matters concerning the *Amadea*. GX-466 at 1.

61.     Only in August 2021 did Stewart mention Khudainatov to Wolf. *See* Wolf Tr. 55:13-15. At that time, Nereo was in the process of transferring title to the *Amadea* to the company Millemarin, and Stewart emailed Wolf and his colleagues KYC (*i.e.*, know-your-client compliance) documents for who she said was the "new UBO" of the *Amadea*. GX-406. She attached information for Khudainatov. GX-406-A, GX-406-B; *accord* Magee Tr. 152:15-153:5. As a result of Stewarts' representations, Wolf and his colleagues at Campbells understood that Khudainatov, through Millemarin, purchased the *Amadea* from Smuzikov and his company Nereo in August 2021, and thus became the *Amadea*'s "new UBO" at that time. *See* Wolf Tr. 60:22-61:6.[8]

62.     Captain Peter Read, who joined the *Amadea* while it was under construction and remained until October 2021, said "with great certainty" that he never met anyone he would have considered the "principal" or owner of the *Amadea* in the shipyard. Read Tr. 64:25-65:7. From Read's point of view, "we are building this boat for Imperial and that's it." *Id.* at 68:21-25. Indeed, throughout Read's entire employment—with the exception of a short period in 2017—"Imperial

---

[8] Stewart likewise told Wolf that Smuzikov owned Densiarly, the company that owned the *Crescent*. Wolf Tr. 51:5-24. When, in March 2022, Stewart told Wolf for the first time that Khudainatov owned Densiarly (and therefore the *Crescent*), Wolf Tr. 111:7-18, it "surprised [Wolf] sufficiently" that he "more or less immediately" notified Campbells Corporate's compliance department. Wolf Tr. 111:22-25. Shortly thereafter, Campbells off-boarded Imperial Yachts and related entities as clients. *See* Wolf Tr. 151:2-8, 168:8-23.

was very much to be treated as the owner, and that was it; we were there for Imperial, and that was it." Read Tr. 61:9-12.

63.    In the summer of 2017, Khudainatov and his family took three trips on the *Amadea*. *See* Khudainatov Decl. ¶ 28; GX-702 at 13; Read Tr. 85:4-11; *see* Read Tr. 85:6 (characterizing the three trips as "very short trips"). For each of those trips, Nereo—the company that owned the *Amadea*—signed a charter agreement with Maria Ignumova (aka Marina Amaffi),[9] GX-204, GX-205, GX-206, though Khudainatov claims that he was "the ultimate payor" for these trips. GX-702 at 14.

64.    Read testified, that during this limited period, Khudainatov "very much seemed to be a guy that we would think of as an owner. They would never refer to him by name as the owner, but there was definitely a guy we would presume to be the owner at that point." Read Tr. 61:4-61:8; *see also* Read Tr. 219:8-10 ("We wouldn't have called him owner, we might have said G1, or main guest, or whatever Imperial wanted us to call him.").

65.    Aside from that period in 2017, Read testified that Imperial Yachts was treated as the owner. Read Tr. 61:9-12; *cf.* Read Tr. 157:7-11 (Read's testimony that in final weeks of his employment in late September 2021, "he didn't have that clear a recollection" because he was "getting ready to go home").

66.    After 2017, it was not clear whether Khudainatov stored any belongings on board, but if he had, they were "deep stored," meaning placed "in a box on the tank deck." Read Tr. 95:11-15. From 2018 to 2021, the *Amadea* was maintained in "show condition," meaning at all times the crew "are ready to exhibit the boat for a photo shoot, for clients." Read Tr. 95:17-96:8. During this period, the yacht had many visitors, but none of them took overnight cruises on the yacht. Read

---

[9] Amaffi is or was Khudainatov's partner, with whom he has had children. GX-702 at 13.

Tr. 117:15-119:23; 126:4-127:4; *see id.* 116:24-25 ("the function of [the *Amadea*] was we were a showroom, [with] Imperials' clients coming and going"). Captain Read and Captain Turner assumed the *Amadea* was for sale because it began to attend boat shows, including the 2019 Monaco Boat Show. *See* Read Tr. 98:1-10; Turner Tr. 48:8-13.

### B. Kerimov's Visit to the *Amadea* in June 2020

67.     The next guest to spend the night on board the *Amadea* was Suleiman Kerimov. Read Tr. 117:15-119:23; 126:4-127:4.

68.     Specifically, in early June 2020, the *Amadea* was located off the coast of Abu Dhabi, in the United Arab Emirates. Read Tr. 99:8-18; Khalikov Tr. 157:20-159:5. Imperial Yachts instructed the crew that "Evgeniy [Kochman] had clients coming, so of course that's make sure everything is like a palace, not a spectacle of dust anywhere." Read Tr. 99:20-24.

69.     The client in question was Suleiman Kerimov, who toured the yacht with Kochman and then spent the night on board. Read Tr. 98:20-102:22; Khalikov Tr. 158:19-159:24; *see also* GX-102 (photo of Kerimov on board the *Amadea*); Bergen Decl. at ¶¶ 5-6. In addition to Kochman, Kerimov was accompanied on board the yacht by Dinar Khalikov, who had acted as a consultant on yachts for the Kerimov family. *See* Khalikov Tr. 29:5-30:18.[10]

70.     Captain Read considered Kerimov's visit a "triumph" and "was quietly quite proud that against the odds we managed to keep Evgeniy [Kochman] happy." Read Tr. 227:13, 227:18-20.

71.     Khalikov, by contrast, has testified that Kerimov did not like the *Amadea*, would never have purchased the *Amadea*, and was merely using it during the June 2020 visit as a "floating

---

[10] The visit appears to have occurred on the night of June 8, 2020. *See* GX-635 (flight manifest showing Kerimov and Kochman travelled to Abu Dhabi on June 8, 2020, and returned to Moscow the following day).

hotel" to avoid Covid-19. Khalikov Tr. 44:16-46:2, 51:6-54:22. I do not credit this testimony. First, Kerimov has not testified and any statements that he made to Khalikov about his views of the *Amadea* are inadmissible hearsay. Second, even if it were admissible, I do not find Khalikov's testimony credible for the following reasons:

a. Khalikov testified that he became involved in this case at the request of Evgeniy Kochman. Khalikov Tr. 147:9-148:13. As detailed herein, Kochman is one of the individuals that participated in concealing the *Amadea*'s ownership.

b. Additionally, Khalikov has a long-standing business relationship with the Kerimov family.[11]

c. Many of Khalikov's statements about the *Amadea* and Kerimov's distaste for it were implausible and were inconsistent of some of his own statements and with those of witnesses with less of an incentive to support Kerimov's interests. *See* Khalikov Tr. 54:10-12 ("The *Amadea* is horrible . . . she is depressing"); Khalikov Tr. 251:1-2 ("this boat is a disaster.")  For example, Khalikov testified that as a result of the *Amadea*'s "two engines," the "vibrations" on the yacht were so bad "you could actually literally spill your coffee," Khalikov Tr. 58:20-59:11, and "I could barely sleep" on the *Amadea* even though "I can sleep anywhere, like anywhere." Khalikov Tr. 57:5-7. But, with respect to another yacht, the *Ice*, which Kerimov undisputedly purchased, Khalikov testified that the vessel is "perfect in terms of sea keeping."

---

[11] It is also relevant that Khalikov resides in Russia, where he faces no meaningful penalty for perjury. *See United States v. Buck*, 271 F. Supp. 3d 619 (S.D.N.Y. 2017) (noting concerns about the reliability of testimony of witnesses located in countries that will not extradite witnesses to United States for perjury). By contrast, Khalikov may face adverse consequences for providing truthful testimony that supports the United States' enforcement of sanctions on his client, Suleiman Kerimov.

Khalikov Tr. 18:1-10. Peter Lürssen, whose shipyard built both the *Amadea* and the *Ice* testified that "from the guest's perspective, there is no difference" between the propulsion systems on the *Amadea* and the *Ice* and that both "have low noise level[s]." Lürssen Tr. 29:17-30:4; 46:9-12.

d.    As further described below, the Kerimov family used the *Amadea* in 2021 and 2022 and they later considered plans for cruising on board the *Amadea* to destinations around the world in 2022, 2023 and as late as "winter 2023/2024." Moreover, as also described below, the Kerimov family also invested significant time and energy in a large-scale refit of the *Amadea*. This prolonged interest and investment of energy in the *Amadea* is inconsistent with the strong dislike of the *Amadea* that Khalikov attributed to Kerimov. *See* Khalikov Tr. 35:4-36:25 (testifying that, knowing Kerimov's preferences, "He wouldn't use it . . . . I mean he definitely wouldn't – he wouldn't like or he wouldn't prefer to use it and he definitely will not buy it."); *id.* 59:23-60:2 ("I was like Mr. Kerimov, you know, just for the record, I strongly do not advise you to buy this boat and he was replying like, do you think I'm stupid. That was the conversation.").

72.    After Kerimov's visit in June 2020, the *Amadea*'s use did not appear to change and there continued to be "lots and lots of showings." Read Tr. 109:23.

## VI.    The Kerimovs' Purchase of the *Amadea* in or around September 2021

73.    Through a series of transactions that began in August 2021, the *Amadea* was transferred to new ownership. Though the transactions were structured such that formal title to the *Amadea* remained with Claimant Millemarin, Millemarin no longer had the legal right to use the *Amadea* or the obligation to pay its expenses (which it in fact did not pay); it also no longer bore the risk of loss or damage to the yacht. Further, Millemarin, through its parent company, received

payment for the entire €225 million purchase price of the *Amadea*. As I describe below, that €225 million was paid by the Kerimov family via transfers from Kerimov's niece, Alisa Gadzhieva, and the Kerimov family began to exercise full dominion and control over the *Amadea*. The Kerimovs became its exclusive users who made plans for cruises on the *Amadea* years into the future and planned a major renovation covering 61 rooms of its rooms, including the conversion of the *Amadea*'s so-called winter garden to a gymnasium, which would have required months in the shipyard to implement.

74.     As set forth below, these facts show that, as of September 2021, Claimants Millemarin and Khudainatov ceased to exercise dominion and control over the *Amadea* and were thereafter straw owners.

### A.  Errigal Obtained All Legal Rights of Ownership to the *Amadea* Except Title

> i.  *The Amadea Is Sold to Millemarin in August 2021 and Millemarin Agrees To Sell It to Errigal in September 2021*

75.     On June 10, 2021, Millemarin was incorporated under the laws of the British Virgin Islands, GX-406-C; GX-406-D at 2-3. Olga Kroon was Millemarin's sole director. GX-406-E at 3. Invest International Finance Ltd. ("IIF") was Millemarin's sole shareholder. GX-406-F.

76.     On or around July 20, 2021, Nereo and Millemarin signed a "Memorandum of Agreement," which provided that Nereo as "seller" would transfer the *Amadea* to Millemarin as "buyer." *See* GX-209. Azarenko, an employee of the Khudainatov family office, testified that Imperial Yachts had drafted this agreement to effectuate a transfer from Nereo to Millemarin at the family office's request and that, in her understanding, Khudainatov owned both Nereo and Millemarin. *See* Azarenko Tr. 68:10-69:15. The agreement provided that the agreement's "completion date" was August 16, 2021, unless otherwise agreed. GX-209 at 2.

77.    On August 11, 2021, Julia Stewart of Imperial Yachts sent Damian Magee of Campbells an email with the title "Amadea – KYC for re-registration – urgent." GX-406 at 1. Stewart stated that she was "enclos[ing] the documents for the new UBO," and further stated that "this new UBO" was in the Fortune 500. *Id.* at 2. The documents she attached included Khudainatov's passport, CV, and what Stewart called "a bank reference letter as a proof of address." *Id*. *See* GX-406-A, GX-406-B, GX-406-G.[12]  As noted above, Wolf, who was overseeing Campbells' work related to the *Amadea*, had never before heard of Khudainatov, even though Campbells and its affiliates had acted as Nereo's registered office and shareholder for several years. *See* Wolf Tr. 55:13-57:1; GX-466 at 1 (Stewart email stating that Wolf had been "involved with" the *Amadea* since 2016 and was "really important"); *see also* Wolf Tr. 60:7-61:10 (explaining that Wolf understood, based on information provided by Imperial Yachts, that the Nereo-Millemarin sale was an "arm's length transaction" selling the *Amadea* from Smuzikov to Khudainatov).

78.    On or around August 16, 2021, Imperial Yachts instructed Captain Read to take the *Amadea* to international waters and sign documents that effectuated its sale and transfer of title from Nereo to Millemarin. *See* Read Tr. 110:15-114:3; GX-219 (Bill of Sale signed by Captain Read). Read did not know who owned either Nereo or Millemarin, did not understand the purpose of the transaction, and was simply following orders from Imperial Yachts. Read Tr. 112:13-20.

---

[12] The bank reference letter and CV both listed "87 Udaltsova Street 87, building 3, apt 46" as Khudainatov's address. As a photograph of that building shows, it appears to be an apartment building in an outer-lying neighborhood of Moscow for residents of ordinary means. *See* GX-109. It seems unlikely that such an address is the true primary address of the owner of a multimillion dollar yacht. Nonetheless, Khudainatov has claimed it was his "principal residential address" on other documents that he has signed. GX-811 at 1.

79.     On September 8, 2021, Errigal was incorporated under the laws of the Cayman Islands. GX-304. Wolf signed documents in connection with Errigal's incorporation, *see* GX-307 at 2, 9, 43, and he and his colleague Damien Magee served as Errigal's directors from September 8, 2021, until March 13, 2022, *see* GX-307 at 63. According to Claimants, Kochman was Errigal's ultimate beneficial owner. *See* GX-701 at 11.

80.     On or around September 14, 2021, Millemarin and Errigal signed a "Memorandum of Agreement." *See* GX-212 (the "September MOA"). Olga Kroon signed on behalf of Millemarin and Damian Magee signed on behalf of Errigal. GX-212 at 8.

81.     The September MOA provided that Millemarin "agree[s] to sell," and that Errigal "agrees to buy," the *Amadea* to Errigal for a "sales price" of €225 million. GX-212 at 4, 5, 2. The agreement also provided:

   a.   for a "payment schedule" of two tranches: a first payment of €45 million, followed by a second of €180 million, GX-212 at 2;

   b.   that the €45 million payment would be "non-refundable" and that after it was made "the Buyer [Errigal] may start using the yacht and/or start any works on board," GX-212 at 2;

   c.   that, after the initial €45 million payment, Errigal would "become responsible for all operational cost" and that "all running costs including berthing fees and crew's wages shall be for [Errigal's] account," GX-212 at 4;

   d.   that, even before the initial €45 million payment was made, "the risk of loss, damage, or destruction of the Vessel shall be borne by [Errigal] until the completion of sale," GX-212 at 4;

e.   that Errigal "accepts the Vessel" and that Errigal had conducted a "sea tr[i]al on September 11, 2021," GX-212 at 5;

f.   that Millemarin "undertakes not to use the Vessel after the Sea Trial," GX-212 at 4;

g.   that Millemarin agrees "not to enter into any other agreement for the sale of the Vessel," GX-212 at 4;

h.   that the written agreement was "the entire Agreement between [Millemarin] and [Errigal]," and there were "no other duties, obligations, liabilities or warranties implied or otherwise," GX-212 at 6;

i.   that "time being of the essence," the agreement's "completion date" was "1 November 2021 upon receipt of full payment" or "such earlier date as may be agreed" by the parties, GX-212 at 3;

j.   that, under the heading "Completion of Sale," "on delivery of the Vessel and in exchange for payment of the Sales Price," Millemarin would "provide the documentation set out in Annex One," GX-212 at 4; Annex One, in turn, described that there would be a "Completion Meeting" and set out various documents including a Legal Bill of Sale and safety and registration certificates for the *Amadea* that would be provided at or before that meeting, GX-212 at 10-11.

82.   The September MOA thus provided that, upon payment of the initial €45 million payment, Errigal would have exclusive possession and use of the *Amadea*, Errigal would be responsible for all costs of the *Amadea*, Errigal would have the right to perform "works on board," Errigal would bear all risk of loss or damage to the *Amadea*, and Errigal would have the right to rename the *Amadea*. By contrast, Millemarin would not have the right to use the *Amadea* or to sell

it to anyone else. In sum, upon payment of the initial €45 million, the incidents of ownership of the *Amadea* would pass from Millemarin to Errigal.

83.      By its terms, the September MOA would not be fully "completed" upon payment of the initial €45 million. Instead, completion, which was anticipated to occur on November 1, 2021 "or such earlier date as may be agreed," required payment of the additional €180 million. *See* GX-212 at 3 (Clause 12). Further, pursuant to Annex One, Millemarin was required to deliver various documents to Errigal upon completion, at a Completion Meeting, such as a "Legal Bill of Sale" and various safety and regulatory certificates. *See id.* at 10. But even if legal title to the *Amadea* would not transfer to Errigal until such formal completion, all other incidents of ownership would transfer upon payment of the initial €45 million. Thus, at that point—and certainly by the time Millemarin had received payment of the second payment of €180 million— the only right to the *Amadea* that Millemarin arguably retained was that of bare title.

> ii. *Kerimov's Family Pays the €225 Million Purchase Price for the Amadea on Behalf of Errigal Pursuant to a Dubious Loan Agreement*

84.      Pursuant to a letter dated September 15, 2021, Millemarin directed Errigal that payments under the September MOA "should be made to the account of Invest International Finance, Ltd," CX-247-A at 1, which was Millemarin's parent company that Khudainatov claims to own. *See* GX-702 at 10.

85.      "[B]etween on or about September 15, 2021, and October 27, 2021, two transfers of funds totaling €225 million were caused to be made . . . to an account of IIF" on behalf of Errigal. GX-704 at 2 (Claimants' response to Request for Admission). Specifically:

     a.   On October 6, 2021, Khudainatov's family office sent an email to Julia Stewart acknowledging that "the first payment" was received by "our company." GX-412 at 1. The payment was described in part as "FIRST PAYM ACCORDING TO THE

MEMORANDUM OF AGREEMENT 14.09.2021." GX-412 at 1. *See* Millemarin 30(b)(6) Tr. 103:18-104:15 (acknowledging that this email concerned payment under the September MOA).

b.  On or around October 27, 2021, Kochman sent an email to employees of the Khudainatov family office attaching a bank transfer confirming that a second payment of €180 million had been made to IIF. *See* GX-431 (Kochman email); GX-431-A (bank transfer confirmation).

86.     Thus, by approximately September 15, 2021, Errigal's initial €45 million payment under the September MOA had been made and, accordingly, all incidents of ownership to the *Amadea*, except title, had passed under the September MOA to Errigal. By October 27, 2021, the remaining €180 million payment had also been made and all of the conditions for completion, except for the Completion Meeting, had occurred.

87.     That payments were made is all that was required under the September MOA to transfer dominion and control over the *Amadea* to Errigal, and to deprive Claimants of standing. But these payments were made under highly suspicious circumstances that support my additional finding, described below, that Khudainatov, Kochman, Kerimov and others agreed to transfer ownership of the *Amadea* to Kerimov while leaving Claimants as the paper owners.

88.     As an initial matter, both the €45 million and €180 million payments to Millemarin's parent company, IIF, were made from accounts in the name of Suleiman Kerimov's niece, Alisa Gadzhieva. *See* GX-412, GX-431-A, GX-704 at 2. That fact is highly unusual, given that Kochman—and not Gadzhieva or Kerimov—supposedly owned Errigal, and the September MOA was supposedly a transaction between Khudainatov and Kochman that did not involve the

Kerimov family in any way. *See* GX-701 at 13, 19 (Claimants' interrogatory responses that averring that the transactions did not "involv[e] any third party and specifically not Kerimov").

89.     Moreover, Gadzhieva, who was born in 1987, did not have independent assets. Instead "all the [family's] wealth was created by Suleiman." Von Poblitz Tr. 20:5-22:11. Moreover, Gadzhieva's brother—Nariman Gadzhiev—headed the Kerimov family office. *See* Von Poblitz Tr. 20:5-22:11. Therefore, the transfers from accounts in Gadzhieva's name were more likely than not transfers on behalf of Kerimov. *Cf.* GX-701 at 13 (Claimants' assertion that the "Errigal transaction . . . did not involve Suleiman Kerimov"); GX-701 at 19 (likewise asserting that the September MOA was "certainly not a transaction involving any third party, and specifically not Kerimov").

90.     In addition, the bank transfer information associated with both the €45 million and €180 million payments made reference to a "loan agreement" dated September 15, 2021. GX-412 at 1 (stating in part "GRANTING A CREDIT/LOAN TO A NON-RESIDENT LOAN AGREEMENT 15.09.2021"); GX-431-A at 1 (stating in part "GRANTING A CREDIT/LOAN TO A NON-RESIDENT"). Claimants have produced that supposed loan agreement in discovery, as well as two letters from Errigal to Gadzhieva referencing the loan agreement. *See* GX-412-B (loan agreement); GX-412-A (9/15/2021 Errigal letter re: loan); GX-430 (10/21/2021 Errigal letter re: loan). These documents are themselves suspicious for several reasons.

91.     First, the loan agreement is dated September 15, 2021, *see* GX-412-B, one day after the September MOA was signed, and is for €225 million, the exact sales price of the *Amadea*. Because it is highly unlikely that Errigal and Gadzhieva negotiated a €225 million loan agreement within twenty-four hours or less, it appears highly probable that Gadzhieva—and therefore the Kerimov family—were aware of, and involved in, the negotiation of the September MOA.

92.    Second, the "loan" was economically irrational. An unsecured "loan" of €225 million to a shell company such as Errigal—which had only been incorporated the week beforehand—is highly risky. *See* Magee Tr. 22:6-22:11 (testimony of Errigal director: "Q. If Errigal had no assets, could Errigal have paid back two hundred twenty-five million Euros plus interest? . . . A. I do not know how Errigal could have repaid this loan."). Moreover, the €225 million loan amount was not even paid to Errigal (the debtor) but to a third party (IIF), thus making it even more unlikely that Errigal would have the funds to repay the loan. *See* GX-412-A & GX-430 (Errigal letters instructing that Gadzhieva pay funds under the loan to IIF). There is no evidence that the loan was secured by the *Amadea* and, indeed, according to Claimants, Errigal did not even own the *Amadea*, so as to be able to secure it. Yet the "loan" charged a mere 3.5 percent annual interest, which was payable only in ten years' time, at the conclusion of the loan's term, *see* GX-412-B at 2, which is a low interest rate that does nothing to compensate the supposed "lender" for the extreme risk of non-repayment. *See* Aslund Decl. ¶¶ 93-94 (Russian economic expert's explanation of why the loan agreement is economically irrational).

93.    Third, the evidence suggests that the signatures of Errigal's directors on the loan agreement and two associated Errigal letters were forged. The loan agreement and the two letters were each purportedly signed on behalf of Errigal by its director Damian Magee (himself an employee of Campbells Corporate). *See* GX-412-B, GX-412-A, GX-430. However, Magee had no recollection of having signed—or even seen—the loan agreement. *See* Magee Tr. 20:7-12. Likewise, Magee testified that he did not recall signing the two Errigal letters directing Gadzhieva to make the payments under the loan agreement, even though his signature appears on those documents. *See* Magee Tr. 26:15-27:22.

94.     Magee further testified that it was "very rarely, if ever" that he was asked to sign agreements involving such large sums. Magee Tr. 22:22-23:10. Moreover, Magee testified that approving a loan from a member of a sanctioned individual's family could expose him to personal liability under Cayman law. *See* Magee Tr. 55:3-56:21. Thus, if Magee had signed such a €225 million loan agreement, it would have been memorable. Magee noted other discrepancies about the loan agreement as well, such as his signature not appearing the way he would expect, the lack of corporate records of due diligence for the loan, the fact that as a director of Errigal he would have at least known if Errigal had incurred €225 million in debt, and that a four-page loan agreement was unusually short for such a larger financial commitment. *See* Magee Tr. 22:12-26:11, 33:18-25.

95.     Wolf, Magee's supervising partner and the other director of Errigal, likewise testified that he had not seen or heard of any loan to Errigal. *See* Wolf Tr. 89:9-15. Moreover, Wolf would have been "absolutely" surprised if Magee had signed such documents because for Errigal to borrow money, there would need to be resolutions of the board of directors and neither he nor Magee (Errigal's directors) had prepared them. *See* Wolf Tr. 93:12-95:17 (testifying that it is "inconceivable" that Magee would have signed such a loan agreement without bringing it to Wolf's attention).

96.     Finally, Roger Jackson, Campbells' Head of Information Technology, testified that Campbells retained both employee emails and client documents—such as loan agreements and letters—from 2021 on. Jackson searched Campbells' IT systems using a broad range of keywords and did not find either the loan agreement or letters (*i.e.*, GX-412-B, GX-412-A, GX-430); nor did he find documents similar to them (such as earlier drafts), or any "emails or other correspondence

that discuss[]" the letters or loan agreements. *See* Jackson Tr. 17:15-34:22; GX-807 (keywords used by Jackson to search for the Errigal loan agreement and letters).[13]

97.     Given Magee and Wolf's complete lack of recollection of the Errigal-Gadzhieva loan agreement, the discrepancies Magee identified with his signature, and Jackson's inability to find a record of the loan agreement or the letters associated with it on Campbells' IT systems, combined with the remarkable nature of the loan agreement itself, it is more likely than not that Magee's signature on these documents was forged.

98.     Though there is no direct evidence in the record as to the purpose of the forgery, it seems plausible that the loan agreement was created to justify to banks the €225 million in payments from Alisa Gadzhieva, Kerimov's niece, to IIF, the parent company of Millemarin, without revealing their true purpose. *See* Bergen Decl. ¶ 29 ("banks (including banks in Russia), often require supporting documentation . . . before they process large wire transfers"). The bank transactions processing the €45 million payment and the €180 million payment both make reference to the Errigal-Gadzhieva loan agreement. *See* GX-412 (€45 million payment made reference to "GRANTING A CREDIT/LOAN TO A NON-RESIDENT LOAN AGREEMENT 15.09.2021"); GX-431-A (€180 million payment made reference to "Granting a Credit/Loan To A Non-Resident").

---

[13] Further, as discussed below, on another occasion Julia Stewart of Imperial Yachts proposed in emails with Khudainatov's family office doing a "side letter" with details Campbells would not see when she was unsure whether Campbells would sign what was being proposed. *See* GX-469 at 1; GX-468 at 1. This supports an inference that both Imperial Yachts and the Khudainatov family office were willing to bypass Campbells when they believed Campbells' compliance policies or concerns might prevent them from carrying out transactions that they had contemplated.

99.    In any event, though it is impossible to draw definitive conclusions about the purpose of the forgery, its existence casts significant doubt on the account of the Millemarin-Errigal transactions proffered by Claimants.

100.    Further, the forgery—and the other facts I have described and further describe below—shows that the most likely explanation of the financial and legal transactions surrounding the September MOA is that Khudainatov, Kochman, members of the Kerimov family (including Kerimov, Firuza and Gulnara), and others conspired to leave Claimants as the titleholders on paper, while permitting the Kerimovs to be the yacht's de facto owners.

### iii. *Further Contracts Extend the September MOA's Completion Date, But Do Not Return Any Rights to the Amadea to Millemarin*

101.    Though Gadzhieva had made full payment for the *Amadea* on behalf of Errigal by October 27, 2021, and the September MOA provided for completion on or before November 1, the Completion Meeting contemplated in Annex One of the September MOA appears not to have occurred.

102.    Instead, on November 19, 2021, Stewart emailed Mikhail Avsiannikov (an employee of the Khudainatov family office) stating:

> Evgeniy met with the Principal yesterday. It has been decided to leave Milemarin as the registered owner until 1 May 2022. In reality, we will aim to do the re-registration in March – April when the yacht will be a long way from Europe.

GX-436 at 3.[14]  Avsiannikov replied that:

---

[14] "Evgeniy" appears to be a reference to Evgeniy Kochman. While the email does not specify who the referenced "Principal" is, prior correspondence reflects that Imperial Yachts has used the term to refer to the principal guest or user of the yacht to preserve their anonymity. GX-600 at 12-13. Though the term in the past had been used to refer to Khudainatov, it seems unlikely that Stewart would use such an anonymous term while communicating with Khudainatov's own family office. This, combined with the evidence that the Kerimov family had paid for and were using the *Amadea*, further supports an inference that the reference to "Principal" was to a member of the Kerimov family.

> The director of Milemarin Olga Kroon is much concerned about the obligation of Milemarin to transfer the ownership title once the final payment is made under the MOA of 14 September 2021. The final payment has already been made.

GX-436 2-3. In response, Stewart suggested that the parties sign an "Addendum Two" to the September MOA. *Id.* at 2.

103.    On November 30, 2021, Julia Stewart sent Avsiannikov an email attaching a signed "Addendum Two" to the September MOA. *See* GX-437 (cover email); GX-437-A (signed attachment). Pursuant to Addendum Two, "the Completion Date is postponed until May 1, 2022." GX-437-A. Addendum Two also reiterated that Errigal retained the incidents of ownership, other than title, over the *Amadea*. It provided that:

    a.   Errigal "shall pay all insurance costs" for the *Amadea*;

    b.   Errigal "will be responsible for costs of rectifying any loss or damage, including but not limited to total loss of the yacht";

    c.   Errigal "shall pay all and any costs associated with or incurred by the Yacht or by [Millemarin] in connection with the yacht from 14 September 2021 until the Completion Date";

    d.   Errigal "is fully responsible for and shall pay all costs of the Yacht's or [Millemarin's] compliance with all applicable rules and requirements of Flag and Class";

    e.   Errigal "shall pay all operational costs from 14 September 2021 such as crew salaries, insurance, technical, and operational maintenance, fuel and consumables, mooring and any Port fees, food and alcohol, and any other costs incurred by the Yacht";

    f.   Errigal "shall indemnify [Millemarin] for any loss or damage of the Yacht, including but not limited to total loss of the Yacht, until the Completion Date"; and

    g.   "[i]n the event of a dispute, Errigal will cover all the costs of [Millemarin] or any other party related to [Millemarin] associated with the dispute."

GX-437-A.

104.    Thus, Addendum Two extended the Completion Date of the September MOA to May 1, 2022, but left Errigal with all rights and incidents of ownership of the *Amadea* except title.

105.    In March 2022, however, the parties decided to amend the September MOA yet again. A March 7, 2022 email exchange between Stewart and Azarenko reflects that Stewart urgently wanted to change the structure of the agreement, writing: "At the moment every hour counts. We need to complete this matter." GX-469 at 1. The email's subject line was "Share Purchase" and the email attached a draft agreement in which IIF, Millemarin's parent, would transfer all of the shares in Millemarin to Errigal. *See* GX-469-A. Stewart expressed concern that she was "not sure that Campbells [who served as directors of Errigal] would sign this" and suggested that "[w]e can do a separate private letter with more details without [sic] Campbells involvement." GX-469 at 1. She later sent another email on the same day reiterating that "[w]e can always do side letter between us for more details" but that "[f]or the Cayman side better to go simple and neutral." GX-468 at 1.

106.    Millemarin, its parent company IIF, and Errigal signed an amendment to the September MOA dated March 7, 2022. GX-217 (the "March MOA"). Millemarin's director, Olga Kroon, signed for Millemarin and IIF and Errigal's director, John Wolf signed for Errigal. GX-217 at 3-4.

107.    The recitals to the March MOA reflected that Errigal and Millemarin had entered into an agreement to sell the *Amadea*, that the sales price under the agreement had been paid in two tranches of €45 million and €180 million, and that the parties now wished to sell Millemarin's shares to Errigal. GX-217 at 2. Under the terms of the agreement, Errigal agreed to purchase Millemarin's shares for €225 million and the two prior payments totaling €225 million that had already been paid on Errigal's behalf "shall be set off" against the purchase price. GX-217 at 2 (Clauses 1 and 2). Thus, in exchange for the September and October 2021 payments from Gadzhieva for the *Amadea*, IIF would transfer the shares of Millemarin to Errigal without any additional payments being required.

108.    The March MOA was styled as an "amendment" to the September MOA. GX-217 at 1 (its title was "Amendment to the Memorandum of Agreement dated 14 September 2021"). It therefore did not purport to replace or cancel the September MOA. Moreover, nothing in the March MOA's terms altered the terms of the September MOA (or those of Addendum Two to the September MOA) that provided Errigal with all the incidents of ownership over the *Amadea* except title. Indeed, John Wolf—who signed the March MOA on behalf of Errigal—testified that "it was perfectly obvious to me on the face of this that MOA [*i.e.*, the September MOA] still stood." Wolf Tr. 80:22-23.

109.    Wolf, an experienced practitioner of Cayman maritime law, also testified that the March MOA was "irregular." Wolf. Tr. 78:1. He explained, "it wasn't entirely clear to me what the purpose of this agreement was because the September MOA intended to sell the yacht from Millemarin to Errigal so why would you then transfer the shares of Millemarin to Errigal?" Wolf Tr. 77:20-25. He testified that he asked Stewart the purpose of the March MOA, and Stewart's response was:

A. From recollection she said she would get back to me which she did, and then she came back and said that the reason was that there was a maritime communications agreement with Millemarin which Errigal wanted to continue taking advantage of as the new owner of the yacht.

Rather than setting up a new account, they would simply transfer the shares of Millemarin to Errigal and that way, that contract could continue in place and then be operated and renewed by Errigal.

Q. Just to make sure I understand, so she told you that completing this transaction by having Errigal purchase Millemarin was done so that the satellite contract could be continued?

A. Correct.

Q. Did she give a reason why Errigal couldn't assume the contract from Millemarin?

A. She didn't know.

Wolf Tr. 78:10-78:21, 79:9-21.

110.    In any event, the March MOA provided that "the closing of this agreement will take place on or before 15 March 2022." GX-217 at 3 (Clause 5). It is unclear whether the closing took place. On the one hand, IIF signed a share transfer certificate dated March 10 transferring its shares in Millemarin to Errigal. *See* GX-218. On the other hand, the agreement appears not to have been countersigned by Errigal. *See* GX-218.[15]

111.    Ultimately it is irrelevant whether the March MOA closed because, as stated above, the agreement did not purport to alter the essential terms of the September MOA: Millemarin—through its parent company IIF—had received full payment of the €225 million sales price of the

---

[15] Magee and Wolf resigned as Errigal's directors effective March 13, 2022, but Errigal's corporate records show they were replaced by a different director the following day. *See* GX-307 at 63. Thus, Claimants' interrogatory response that the closing of the March MOA "became a legal impossibility as the Directors of Errigal resigned from their positions" is false. GX-701 at 16. Moreover, Claimants have argued that Kochman and Khudainatov agreed to cancel the March MOA; if Kochman himself had the power to cancel the March MOA outright, he must have also had the power to close out a preexisting agreement.

*Amadea* and Errigal acquired all rights, responsibilities, and incidents of ownership to the *Amadea* except title.

### B. The Kerimov Family Became the Exclusive Users of the *Amadea* and Planned Both Cruises and Extensive Renovations to It in the Future

112.    At the same time that the contractual documents transferred dominion over and control of the *Amadea* from Millemarin (and hence Khudainatov) to Errigal, the Kerimov family began to exercise the rights of ownership. After September 2021, the Kerimovs became the exclusive users of the *Amadea*, were greeted and treated as the "new owners" by the crew during a trip in October 2021, and planned trips into 2024 on board. They also were extensively consulted on a large-scale renovation of the *Amadea* to have it match their tastes. Further, during the Caribbean cruise, Millemarin's director signed a letter on Millemarin letterhead stating that the guests on board (*i.e.*, Gulnara Kerimova and others related to her) are "private guests of the Owner and the members of his family." GX-456-A at 1. Thus, just as Claimants ceased to have the rights of an owner on paper, they also ceased to have them in fact.[16]

#### i. *The Kerimovs' Use of the* Amadea *Beginning in August 2021*

113.    Starting in approximately August 2021, the Kerimovs made several trips on board the *Amadea* and were the yacht's exclusive users. Specifically, the evidence reflects that the Kerimovs made the following trips:

    a. September 2021 (Mediterranean): Captain Read testified that he captained a trip from Nice, France with female guests with the last name "Kerimov" in approximately September

---

[16] Consistent with the terms of the September MOA, Claimants admit that they have not received any income in connection with their interest in the Amadea since September 2021, other than the €225 million sale price. *See* GX-701 at 26. Likewise, they admit that they ceased being "financially responsible for paying for the costs of operating and maintaining the Amadea [in] . . . approximately September 17, 2021." GX-702 at 15.

2021. *See* Read Tr. 117:12-119:23. Read's recollection of the precise dates of the trip was uncertain, but he recalls that it was "definitely [an] overnight" trip. *Id.* at 119:17; *cf.* Read Tr. 116:12-14 (Read ceased serving as the *Amadea*'s captain before October 5, 2021).

      b. October 2021 (Mediterranean): In October 2021, the Kerimovs spent time on board the *Amadea* in the Mediterranean. Read testified that he delivered the *Amadea* to Sicily in early October for a cruise that was to take place after Read's time on the *Amadea* had ended. Read Tr. 156:19-157:14. There are a significant number of crew communications reflecting preparations for this trip with the Kerimovs in October. *See*, *e.g.*, GX-410, GX-410-A, GX-410-B, GX-410-C (crew email with subject "AMA -Guest Preferences_October 2021 Guest Trip" attaching spa and housekeeping preferences for Gulnara Kerimova, Firuza Kerimova, Amina Kerimova, Said Kerimov and children and personal staff); GX-414, 414-A (crew email with cabin allocations for Firuza Kerimova, Gulnara Kerimova, children, nannies, security and others for October 2021 trip and assigning them "G" numbers with Firuza as G-2 and Gulnara as G-3); GX-416, GX-416-A (same); GX-425, GX-425-A (daily report from October 13, 2021 reflecting presence of G1, G2 and G3 on *Amadea*). Khalikov also testified that he saw Suleiman Kerimov on board the *Amadea* in October, that Kerimov "just came down because Firuza had asked him to," and that Kerimov was referred to as "G-1." Khalikov Tr. 110:9-10, 174:2-7; *see also* GX-608 at Sheet 2 (listing Suleiman Kerimov as "G1" on October 17, 2021 guest list). At the end of this trip, a crewmember reported that "when I was packing up G1s clothes – Ek and G1 said to keep his Nike trainers on board for his next visit. Ek said to purchase 2 – 3 pairs of these trainers to always have them on board for him." GX-424.[17]

_____

[17] The reference to a male G1 was to Kerimov. *See* Khalikov Tr. 174:22-175:1. The reference to "EK" appears to have been to Evgeniy Kochman. *See also* GX-424 at 1 (noting that crewmember

c. <u>January-February 2022 (Caribbean)</u>:  From at least January 16, 2022, to at least February 10, 2022, Gulnara Kerimova and others cruised on board the *Amadea* in the Caribbean. *See, e.g.* GX-606 (January 16, 2022 guest list reflecting *Amadea*'s presence in St. Kitts with Gulnara on board); GX-607 (February 10, 2022 guest list reflecting *Amadea*'s presence in St. Barts with Gulnara, Amina Kerimova, Said Kerimov and others on board); *see also* GX-444, GX-444-A (crew email with anticipated cabin allocations for Kerimov family on "January 2022 G trip");[18] Walsh Tr. 102:5-8, 140:9-21.

114.    The *Amadea* crew and Imperial Yachts management referred to the Kerimovs using a series of "G-Codes," assigning each member of the family a number (*e.g.*, G1, G2, G3) rather than using their names. Captain Walsh, however, testified that some confusion arose because the *Amadea* crew had assigned different G numbers to Kerimov family members than had Imperial Yachts management. *See* Walsh Tr. 38:7-39:24. On January 21, 2022, Walsh sent the following table to the *Amadea*'s officers clarifying the two sets of codes that had been in use:

---

also "checked with DK" regarding the Nikes, which appears to be a reference to Dinar Khalikov, who has no known relationship with Khudainatov).

[18] Claimants have produced a purported charter agreement between Gulnara Kerimova and Millemarin for a Caribbean trip between January 14 and February 16, 2022. *See* GX-216. However, no one with personal knowledge of such a charter agreement has testified about it. Moreover, Captain Walsh—who was the Captain on board during that time—testified that he had not seen the agreement at the time of the purported charter. *See* Walsh Tr. 159:25-160:2 ("Q. At the time of the Caribbean charter, did you see any charter document for the Kerimov family? A. No."). That fact is remarkable given that the Imperial Yachts standards book provided "For every charter Captain needs to read carefully the signed Agreement." GX-600 at 9; *see also id.* at 2, 8. Regardless of the charter agreement's authenticity, however, the position that Gulnara was a *mere* charterer is implausible for all the reasons detailed in Paragraphs 97-102 of Captain Meagher's testimony. *See* Meagher Decl. ¶¶ 97-102. Moreover, even if Gulnara did charter the yacht, it does not suggest that the Kerimov family did not own the yacht: Khudainatov himself admits that his family signed several charter agreements for their own use of the *Amadea* during the periods that they supposedly owned the *Amadea* in 2017. GX-204, 205, 206; *see* GX-702 (interrogatory responses) at 13-14.

| AMA Guest Call Sign Confirmation Table ☺ | | | |
|---|---|---|---|
| **AMA / Owner Request** | | | **Imperial Management** |
| Sir | G0 | | G1 |
| Mme | G1 | | G2 |
| Daughter 1 | G2 | | G3 |
| Son 1 | G3 | | G4 |
| Daughter 2 | G4 | | G5 |
| A███████ | A███████ | | G6 |
| A███████ | A███████ | | G7 |
| M█████ | M█████ | | G8 |

GX-447. The codes in the middle column reflect the G-Codes generally used by the *Amadea* crew in internal communications; the codes on the right reflect the codes generally used in communications with Imperial Management. *See* Walsh Tr. 38:7-39:24. As Walsh testified, the first row ("Sir") referred to Suleiman Kerimov, the second ("Mme") to Firuza Kerimova, the third ("Daughter 1") to Gulnara Kerimova, the fourth ("Son 1") to Said Kerimov, and the fifth ("Daughter 2") to Amina Kerimova. *See* Walsh Tr. 100:2-19. The three final rows referred to Kerimov and Firuza's grandchildren. *See* Walsh Tr. 100:20-24.

115.    Walsh further testified that the crew had begun to use the codes in the middle column (titled "AMA / Owner Request") at the request of "Dinar [Khalikov,] the owner's rep as he called himself." Walsh Tr. 38:14-22.

116.    In addition, records would often not reflect Suleiman Kerimov's presence on board because the crew had been instructed not to list him in certain records. As Captain Michael Zerr wrote in a note dated October 14, 2021 in his log file:

> Dinar [Khalikov] informed me of the common practice that G1 is not declared on the Guest list. Only Security is listed as guest as cover (false declaration can put us (the Capt. in particular) into serious trouble if inspected) However, reportedly G1 has a diplomatic Passport if this is correct and management agrees to this I am willing to subscribe to the above but would prefer if both embarkation and disembarkation of G1 happen in Portofino as for this no Guest list whatsoever is requested or required.

GX-627 at 28-29. Khalikov confirmed at his deposition that he gave this instruction and that the "G1" he referred to was Suleiman Kerimov. *See* Khalikov Tr. 168:19-21; 169:13-19; *see also* GX-

633, GX-424 (crew documents reflecting the presence of a senior male G1 guest on the *Amadea* in October 2021).

117.     Starting in September 2021, the *Amadea* captain and crew frequently referred to the yachts' guests—the Kerimovs—as "owners" of the *Amadea*, or referenced the fact there were new owners or that the vessel had been sold. Specifically:

a. On September 30, 2021, a crewmember sought approval to purchase a new coffee machine, explaining "we need to be guest ready for the new owner." GX-411-A at 3.

b. On October 8, 2021, a crewmember sent the *Amadea*'s Chief Stewardess, Lead Housekeeper and Lead Service member an email with a link to menus for the upcoming trip. The link read: "O:\Interior\045 - GUEST TRIP - NEW OWNER - OCT 21\Amadea  Menu's.pdf." GX-415.

c. On October 13, 2021, a crewmember sought to order a flower display from a vendor. GX-418. The flower order was saved to the directory "O:\Interior\045 - GUEST TRIP - NEW OWNER - OCT 21\G1\FLower Order\Flower order" GX-418-A; *see* GX-418-A-Z (same with relevant text enlarged).

d. On October 20, 2021, *see* GX-423, a crewmember sent "handover notes" to another crewmember with following notes:

     i. "Trip with a new Owner mid-October." GX-423-A at 4.
    ii. "As per new Owner regulation and upcoming trip, we need to hire more interior crew." *Id.* at 5.
   iii. "The boat has been sold. We are expecting recondition of Winter Garden and OD Gym." *Id.*

e. On October 29, 2021, the *Amadea*'s Lead Housekeeper noted that "One of the comments for the new owner was to source portable reading lamps for the exterior decks" and suggested purchasing the same. GX-434 at 1-2.

f. On January 17, 2022, Walsh wrote an email to Imperial Yachts employees thanking them for approving a change to housekeeping staffing levels and further reporting "HSK are delivering a fantastic, zero owner comments performance and this will give us every opportunity to maintain continuity." GX-446 at 1.

g. On January 25, 2022, Walsh wrote an email to Imperial Yachts employees reporting that "we came very close to our first owner comment today." GX-458 at 4. Walsh was referring to an incident in which "G2 (IY G3)" (*i.e.*, Gulnara) pressed a button calling for service, but the button did not operate properly. *Id.* at 5.

h. On February 11, 2022, following up on the Kerimov's request to plan for future itineraries on the *Amadea* (which is further described below), Walsh wrote an email to other *Amadea* officers stating: "we can't afford mistakes because this is for the owner." GX-461 at 1.

118.    The crew also referred to Dinar Khalikov, Kerimov's consultant, as the "O. Rep" or "owners' representative." *See e.g.* GX-425 (email from captain with "Comments from yesterday evening 13.10 walkaround with O.Rep Mr. Dinar"); Walsh Tr. 38:16 (testifying that Dinar "called himself" the "owner's rep"); GX-432-A (November 2, 2021 form seeking approval to purchase subscription for satellite TV per "[r]equest from Owners representative Dinar"); GX-623 (similar form for approval for purchase of phones for "Owners representative (Dinar)"); *see also* Read Tr. 36:2-36:6 ("Q. Well, would you ever refer to someone who represents not the owner, but instead

a charterer, or a guest, as the owner's rep?  A. I don't think you would. That wouldn't be normal, no, I don't think."); Khalikov Tr. 28:3-5 ("Q. Do you know what that term [owner's representative] means? A. It's basically someone who's representing the owner of the vessel.").

119.    During the January-February 2022 Caribbean cruise, the *Amadea*'s purser requested information regarding the entry requirements for the British Virgin Islands. *See* GX-456 at 7. A representative in the British Virgin Islands responded by stating that the answer depended on whether the *Amadea* was "commercial or private." *Id.* at 6. "If you are private then . . . we only need to have a letter stating that the vessel is here in a purely private capacity from the director of the owning company." *Id.* Imperial Yachts employee Victoria Pastukhova then sent Captain Walsh a letter dated February 3, 2022, stating: "Please find attached requested letter for BVI authorities." GX-456 at 1. Pastukhova's email attached a letter signed on Millemarin's letterhead, which stated:

> Dear Sirs,
>
> This is to confirm that under COBR dated August 2021 the motor yacht AMADEA has pleasure private vessel registration and *all guests aboard are private guests of the Owner and the members of his family*. This is concerned all cruises area including the BVI waters.

GX-456-A at 1 (emphasis added). The letter was signed Olga Kroon, Millemarin's director, "for and on behalf of Millemarin Investments Limited." *Id.*; *see also* Millemarin 30(b)(6) Tr. 125:10-16 (confirming that the signature "looks like" Kroon's signature and the letterhead "looks like" Millemarin's). Captain Walsh responded, stating "we have fwd'd this on to the BVI agent for submission to customs." GX-457 at 1.

120.    As of the date of the above letter, the guests on board the *Amadea* were "Gulnara and her three children and the, the younger brother, and also the younger sister from the family." Walsh Tr. 167:3-5. Thus, Millemarin had represented that Gulnara and her family were "private guests of the Owner and the members of his family." GX-456-A.

ii. *The Kerimovs' Plans To Use the Amadea into 2023 and 2024*

121.    While the *Amadea* was in the Caribbean, Imperial Yachts and the *Amadea* crew began to plan future trips around the world for and in consultation with the Kerimovs. The planning continued for months and was for a long-term trip including destinations through the end of 2023 (then nearly two years out). As Captain Walsh testified, "it was like a global itinerary for, for these guests"—meaning, he clarified, the "Kerimov family. There was a feeling that it was long-term." Walsh Tr. 144:9-12. Specifically:

a.    On January 28, 2022, Walsh sent Pastukhova an email stating that "G3" [*i.e.*, Gulnara] was "pleased with everything on AMA," and that she had requested to visit destinations in the Caribbean, such as Antigua and BVI. GX-452 at 4. Walsh also wrote: "Mme suggested Galapagos is scheduled to start mid-March, not start March," which Walsh said, "holds significant impact to our scheduled [ship]yard period pre Mediterranean season." GX-452 at 4. He further wrote: "She has asked me to look into visiting Mexico, I'm looking at potential itineraries through some high end travel contacts I have, and will revert." GX-452 at 4.

b.    On February 8, 2022, Pastukhova wrote an email to Walsh stating "Please be advised that G1 has requested to consider the amended planning for 2022 stated below and advise him all pros and cons of the stated below destinations:

> 1. After Galapagos-to consider French Polynesia or any other close by destinations.
> 2. Summer 2022—Philippines, Japan.
> 3. October 2022—back to Med. for shipyard period."

GX-460 at 3.

c.    On the same day, Walsh responded stating, among other things, that "G3" [*i.e.,* Gulnara] was "requesting a new itinerary for Mexico for east side Mexico" and that

she "has stated that Galapagos will be moved to 2023," which "clashes with G1 directive below" (*i.e.*, in Pastukhova's email). GX-460 at 2; *see* Walsh Tr. 151:19-24 (Walsh's testimony that his email concerned conflicting directives from Gulnara and Suleman Kerimov).

d.  On the same day, Walsh requested the assistance of the *Amadea*'s other captain (Michael Zerr) in preparing the itineraries. *See* GX-460 at 1. Zerr agreed to help prepare the itineraries, which he said was "a massive task." *Id.*

e.  On February 10, 2021, Walsh asked the *Amadea*'s safety officer to prepare a tabulated list of "current CV19 restrictions for guests / crew" for 18 different destinations, including Mexico, Philippines, French Polynesia and Japan. GX-461 at 3. Walsh stated in a follow-up email the next day: "we can't afford mistakes because this is for the owner." *Id.* at 1; *see* Walsh Tr. 142:21-143:5 (testifying that he was requesting this information for the "guests we had on board, or might have on board" and that at the time "the Kerimov family were on board").

f.  On February 15, 2021, Pastukhova wrote to Walsh to relay requests and directives "discussed with G1 yesterday." GX-463 at 6. Pastukhova wrote: "cruise to Mexico is planned as instructed by the Guests on board"; after that, "French Polynesia, Cook Islands, Fiji, Philippines, etc. was chosen with a note to add Malaysia at some stage. But as discussed yesterday, all options need to be presented to G's while they are on board until 16th February." *Id.* Pastukhova also directed Walsh to propose itineraries for "Winter 2022-2023," and wrote "shipyard period postponed for Autumn 2023, proposals for Autumn-Winter (Seychelles, Australia—please propose)." *Id.*

g.  The same day, Walsh replied to Pastukhova stating that G3 had requested to "relocate AMA to French Polynesia & Pacific." GX-463 at 4.[19] Walsh wrote: "ETA (Guest Arrival) mid-April was suggest and agreed, as it is the best time of the year to visit the region," *id.*, "G3 said she didn't want to return to the Med this year." *Id.*

h.  In notes for a captain handover on February 17, 2022, Walsh wrote to Captain Zerr "current intention is to remain in St. Maarten until 10th March; Transit the Canal on 16th; Sail direct to Tahiti and have 10days stby recci opportunity before guest arrival 15th April." GX-621 at 1. He also wrote: "Mexico options and 4 x 2022 Timeline Option delivered to the G0 on 14th Feb by IY." *Id.* Walsh testified in reference to this document that "G0" referred to Suleiman Kerimov, "IY" referred to Imperial Yachts, and "4 x 2022 Timeline Option" referred to "four options of cruise itineraries." Walsh Tr. 174:10-175:11.

i.  On February 18, 2022, Imperial Yachts Technical Manager Neil Mattimoe sent an email to several contractors and crewmembers stating in part: "Please be advised that Amadea's planned Spring maintenance period in MB92[20] has been cancelled. Amadea will not be returning to the Mediterranean for the Spring / Summer season." GX-464 at 1.

j.  On February 24, 2022, Pastukhova emailed Captain Michael Zerr and others regarding "AMA: meeting with G3 dd 24.02.2022." GX-467 at 2-3. Her email

---

[19] Notably, Gulnara's purported "charter" of the *Amadea* was, by its terms, scheduled to end on February 16, 2022. *See* GX-216. Nonetheless, on February 15, 2022, she was giving directions that would send the *Amadea* on a voyage around the world and significantly affect its maintenance schedule.

[20] MB92 operates shipyards in La Ciotat, France and Barcelona, Spain. *See* https://mb92.com/.

contained "minutes of meeting with G3 today." *Id.* at 3. The first item read as follows:

> I. Guests planning for 2022-2023 – please see below a list of amendments for the Global itinerary
>> 1. To delete the following destinations from the itinerary: Australia, Seychelles, Malaysia, Turkey.
>> 2. To add the following destinations:
>> - New Zealand – winter 2023/2024 when it is a good period
>> - South of Maldives – before April 2023
>> - Very interested to visit Bali Saudi Arabia – when it is good time to visit?
>> - May-June 2023 – Cyprus, Greece
>> - July 2023 – Croatia, Montenegro
>> - August 2023 – Capri, Sardinia, Corsica

GX-467 at 3.

k.  Consistent with G3's directive to "relocate to the French Polynesia & Pacific," GX-463 at 4, the *Amadea* was in Fiji when it was seized in April 2022.

### iv. *The Kerimovs Plans for a Major Renovation of the Amadea*

122.    The Kerimovs, working through Imperial Yachts, also planned a major renovation of the *Amadea* to remodel it according to their tastes. As further described below, the scope of the renovation was considerable and would have required the *Amadea* to spend several months in a shipyard. Throughout the second half of 2021 and early 2022, Imperial Yachts coordinated with designers to make presentations to the Kerimov family and to convey their preferences (including those of Kerimov, Firuza and Gulnara, denoted as "G1," "G2" and "G3") to prepare for the renovation. The Kerimovs' cruising plans delayed actual implementation of the renovation, but the renovation was still intended in April 2022, when the *Amadea* was seized.

123.    On August 17, 2021, Evgeniy Kochman held a meeting with representatives of Zuretti Interior Design ("ZID") on board the *Amadea* to discuss a "winter works proposal to get a less rigid classic, and conventional yacht." GX-408-A (meeting minutes). Zuretti testified the

purpose of the meeting was to discuss with Kochman changes to the *Amadea* for "a client," but he did not know who the client was and never met the client. Zuretti Tr. 65:17-67:13-14. Zuretti testified there would be a later meeting in August with the "clients," "mean[ing] the persons liable to buy the boat," did not attend that meeting and did not know who they were. Zuretti Tr. 72:22-73:16.[21]

124.    The changes under consideration were extensive: Zuretti, ZID's principal, spent "two or three days of work" on board the *Amadea* just to prepare for this initial meeting. Zuretti Tr. 67:16-18. Further, as described below, the design fee alone for the work was €1 million and Zuretti estimated that implementation of the work would require the *Amadea* to spend seven months in a shipyard. *See* GX-215 at 20-21; Zuretti Tr. 90:22-23.

125.    As the meeting minutes reflect, one of the many proposed changes was to convert the space known as the "winter garden" (aka the winter patio) into a gymnasium. GX-408-A at 6 (Item 4.16); Zuretti Tr. 68:2-7. The following is a representation of the winter garden as it existed on the *Amadea*:

---

[21] Throughout his testimony, Zuretti insisted that Imperial Yacht's client for the renovation project was not Kerimov or a member of the Kerimov family. As his testimony reflects, however, Zuretti simply did not know one way or the other who Imperial Yachts' client was. *See, e.g.*, Zuretti Tr. 95:2-5 ("Let me repeat, under oath, still, I do not know G1. I never came across, never met G1. I don't know G2. Never met G2. And I'm not sure whether there is a G3."). Indeed, when ZID's lawyer sent an email asking who the "UBO" was, ZID's general manager said he did not know and that "Imperial has given to us some contradictory information (on purpose!!!), and we work directly with the captain." GX-421 at 1.



GX-106; *see* GX-704 at 3. The winter garden, and the replacement gymnasium, was referred to as

"Sun Deck 507" or "SD 507" on architectural plans. Zuretti Tr. 62:1-8; 77:11-23.

126.    Describing the proposed changes, Zuretti testified:

the client who was interested by this boat, he must have been a true sportsman, not like Mr. Khudainatov or myself. And he wanted some sports gear, Russian sports gear. It's really big machines for musculation, not just small training bicycles.

Zuretti Tr. 69:21-70:5.

127.    As Captain Walsh testified, "Suleiman Kerimov was, was into his fitness. I know

Gulnara used the gym on a daily basis when she was on board with me." Walsh Tr. 113:18-19.

Walsh, who coordinated with Imperial Yachts and ZID on the redesign, testified that Suleiman

Kerimov "was the driver of, of having, having, having a bigger gym. But it was, again excuse me,

it would have been for, would have been not just for him, it would have been open for the rest of

the family." Walsh Tr. 178:23-179:7.

128.    Zuretti and his firm continued to work on the proposed redesign of the *Amadea* throughout the fall of 2021.

a.    Minutes from a September 29-30, 2021, meeting taken by a Lürssen employee reflect that "[t]he Owner plans to relocate the Gym from the Owner's Deck to the Sun Deck" and that "[s]amples of certain design materials need to be made and submitted for approval to the Owner /Interior Designer." GX-483-A at 1.

b.    Minutes from an October 11, 2021, meeting between ZID employees and the Captain of the *Amadea* reflect a wide scope of work "to be completed April 2022," GX-626 at 1, with some items—such as the "Removal of 'MD [Main Deck] bar'" listed as "not possible Apr./May22->October 2022." *Id.* 3. The meetings further reflect "Zuretti to provide visual renderings ready for proposal to G1/G2 before 1 Dec." *Id.* at 1; *see id.* at 2 (renderings "will be printed and presented when G's onboard");

c.    On October 15, 2021, Imperial Yachts Client Coordinator Viktoria Pastukhova sent an email to ZID requesting information and catalogues related to the new gymnasium plan "in order for G1 to see all details." GX-419 at 1.

d.    On or around the same date, ZID sent Kochman "a proposition of service" for project, which Kochman approved. GX-420. The proposition for services reflected there would be "typical changes" in 61 rooms on the *Amadea* and "room design changes" in 15 rooms," including SD. GX-420-C.; *see* Zuretti Tr. 75:11-14 (explaining that "typical changes" involve changes "to finishes such as door handles, carpeting, lights, light fixtures, taps"); *id.* 77:24-78:2 (explaining that the spreadsheet at GX-420-C reflects an "overview of all the changes" that ZID was to

design). As Zuretti testified while reviewing GX-420-C, "So as you can see, grossly we change everything." Zuretti Tr. 75:15-16.

    e.    On or around November 19, 2021, ZID signed a contract with Imperial Yachts for the redesign work. GX-215; *cf.* Zuretti Tr. 89:9-90:7 (explaining ZID had already commenced design work before signing the contract).

    f.    Under the contract, ZID's design fee was €1 million, GX-215 at 21, which reflects the large scope of work contemplated.

    g.    The contract also estimated that the concept design and schematic design phases would take twelve months (six months each), and then the construction phase would require the *Amadea* to be in a shipyard for seven months. GX-215 at 20; *see* Zuretti Tr. 90:22-23 (confirming that the contract had estimated the "time it takes for the contractors to do the job" as "seven months").

129.    Captain Walsh's handover notes reflect that "We have signed an Agreement with ZID Zuretti Interior Design. Consultancy and supervision of Coming refit. Basically a scope of Rendering for Client presentation...." GX-613 at 10. Walsh testified the "client" he was referring to was Kerimov or the Kerimov family. *See* Walsh Tr. 113:10-12 ("Q… Who was the client you were referring to in this sentence? A. I think it might be --- it would be my understanding that the presentation would be for, for Kerimov."); *see id.* 113:23-25 (clarifying that the client may have been "the Kerimov family"); *see id.* 114:7-14 (testifying that Kochman was managing the redesign "for the benefit of the Kerimov family").

130.    After the contract between ZID and Imperial Yachts for the *Amadea* redesign was signed, Imperial Yachts relayed comments from the Kerimovs to ZID and arranged a meeting between ZID and the Kerimovs to discuss the redesign.

a. On December 27, 2021, Imperial Yachts Client Coordinator Victoria Pastukhova emailed Zuretti and Captain John Walsh with what she called "a list of comments given by G2 during the meeting on 23rd December." GX-442 at 1. The list contained 12 comments on the redesign of the *Amadea*, tied to a presentation booklet that had over 100 pages. GX-442 at 1. The comments included:

   i. "Tables – to double check that there are no sharp corners, very important,"
   ii. "Page 77 – Owners living room – to send more photos of chandelier from different angels to understands its dimensions in combination with furniture and tables in the living room," and
   iii. "Page 115 – Guests corridor – new proposal (preference Z) was liked by G2 but with the following comments: to put ornament from the side panels on the central panels."

   Pastukhova further asked Walsh "please could you upload the latest presentation on iPad and once G2 is on board, please could you walk around the vessel with her to review and confirm the made comments again." GX-442 at 2.

b. On January 21, 2022, Pastukhova emailed Captain Walsh that "G2 has requested to add a socket in all guests bathrooms in more accessible for guests location. Currently all sockets are in the cupboards, and it is not convenient to plug any equipment in." GX-448 at 1. Pastukhova asked Walsh to forward G2's requests to ZID, which he did. GX-448 at 1.

c. On January 21, 2022, Sebastien Gey, ZID's general manager, emailed several Imperial Yachts employees, writing "we have received instructions from Mr Kochman to have a meeting with Madame in the next days, in order to cover all the pending questions related to interiors." GX-449 at 2. Gey stated, accordingly, that he was planning a trip to attend a meeting on board the *Amadea*. GX-449 at 2.

d.   The same day, Captain John Walsh emailed Gey: "I have been advised that G2 will not be attending AMA in the Carib as originally planned. Therefore please postpone anticipated meeting in St Barth's until further notice." GX-454 at 1.

e.   On February 1, 2022, Gey asked Walsh whether there was "any update regarding a potential date for a meeting with Madame." GX-454 at 1.

f.   The same day, Captain John Walsh emailed Pastukhova, asking "Please confirm if Sebastian (Zuretti) is to mobilize to the Carib to present rendering to the G2?" GX-453 at 2. Walsh testified that "G2" in this email was Firuza. Walsh Tr. 115:11-116:16; *see also* GX-455 at 1 (Walsh confirming he will follow up regarding meeting, and asking Gey to confirm he has "solutions with rgds to relocation of bathroom power sockets, as requested by G2").

g.   On February 12, 2022, Pastukhova emailed Zuretti and Gey writing "Mr Kochman has requested to organise a meeting re AMA with G2 in Moscow after 16th February. Exact date TBC." GX-462 at 1.

h.   Captain Walsh's handover notes, dated February 17, 2022, state "Francois Zuretti has been invited to the Moscow to a meeting about the Interior with G1, final discussions on the renderings." GX-621 at 7-8. Walsh testified that the reference to G1 in his notes was a reference to Firuza. *See* Walsh Tr. 176:16-177:17.

i.   On February 18, 2022, Zuretti wrote to Imperial Yachts Technical Manager Neil Mattimoe that he anticipated "a meeting with Mr. EK and a G member in the near future." GX-465 at 1; *see* Zuretti Tr. 104:18-105:14 (Zuretti's testimony that "Mr. EK" refers to Evgeniy Kochman, but that Zuretti had "absolutely" no understanding of who the "G member" was).

131.    The anticipated meeting between ZID and the "G members" never occurred because of the Russian invasion of Ukraine, which began on February 24, 2022. *See* Zuretti Tr. 77:8-10 ("Because it was precisely the time when there was the Russian intervention in Ukraine, our project stopped there."). Thus, Zuretti never met G1 or G2 or any other G members and was not aware of their identities. *See* Zuretti Tr. 95:2-5.

132.    However, the implementation of the redesign project, which had already been delayed, was still contemplated and anticipated to take place in "winter 2023/24" or even later.

   a.    Specifically, on January 25, 2022, Imperial Yachts employee Neil Mattimoe sent an email to a gym equipment supplier with the subject "AMA - Spring Shipyard SD[22] Conversion Delay." Mattimoe explained that the *Amadea* was anticipated to be in the shipyard for only three weeks in the spring and "[w]ith this new time frame, we (and other contractors) are not able to complete this project in Spring." GX-477 at 4. Consequently, "This project will now be moved to our Winter refit scheduled for October at [the German shipyard] Lurssen." *Id.*; *see also* GX-465 (February 18, 2022, email chain reflecting that *Amadea* "interior changes as presented by ZID" were under consideration for the "Lurssen visit").

   b.    On April 6, 2022, the *Amadea*'s captain wrote an email concerning storage fees for gym equipment that had already been purchased and noted that, because the *Amadea* was "currently on the other side of the world," "[t]he Gym Conversion appears unlikely before winter 23/24." GX-477 at 1.

---

[22] SD is a reference is to "Sun Deck," where the winter garden and contemplated gymnasium were located. *See* Zuretti Tr. 62:6-7.

133.    The major remodeling of the *Amadea* that had been designed by ZID, in consultation with the Kerimovs, is strong evidence that the Kerimovs were the de facto owners of the *Amadea*. For example, Captain Walsh testified that in his experience as a superyacht captain, he had never seen a "charter family creating a new gym in the boat out of a different room" and that he "had a sense that the family were going to be using the boat for a long time, or a period -- a longer period of time than say a week or a single season in the Mediterranean, that, that was quite clear." Walsh Tr. 179:12-23; *see* Meagher Decl. at ¶ 48 (explaining that the changes went "far beyond what would be expected from a mere charter guest").

134.    In addition, a notable subset of the proposed renovations involved removing the *Amadea*'s alcohol infrastructure. For example, the main salon bar was slated for removal, see GX-427-C, and so was the yacht's wine cellar. GX-441. Khalikov explained that "Kerimov's family have a Muslim background and they do not drink alcohol." Khalikov Tr. 191:14-15. This further supports the inference that these alcohol-related changes were for the benefit of and at the direction of the Kerimov family. Moreover, these changes were significant and difficult to reverse— Khalikov himself testified that the main salon bar was bonded to the floor, that removing it would take a week of work, and that this change was "not easily undoable." Khalikov Tr. 115:5-116:23. The fact that the Kerimov family would direct this significant and difficult-to-reverse change to tailor the boat to their religious preferences supports the inference that they were the new owners of the boat, not just temporary guests.[23]

---

[23] An *Amadea* crew memorandum dated October 18, 2021, with the title "GUEST COMMENTS AND INSTRUCTIONS" contains comments and instructions on many of the renovations, including the bar removal and the "Owners gym & Wintergarden Refit." GX-427-C at 1. Kerimov was on board the *Amadea* on or around October 17, 2021, the day before the memorandum's date, Khalikov Tr. 166:13-167:11; GX-608, Sheet 2, which further suggests his involvement in these renovations.

iv. *The Kerimov Family Acted as Owners in Additional Ways*

135.    In addition to being the yacht's exclusive users, being referred to by the crew as "owners," making plans for use of the yacht around the world almost two years out, and planning a major renovation of the yacht, the Kerimovs also acted as owners of the *Amadea* in additional ways.

136.    For example, the Kerimovs ordered that the uniforms of crewmembers be redesigned. Specifically:

    a.  On October 14, 2021, the *Amadea*'s purser sent Pastukhova and others an email with the subject line: "AMA – New Uniform Look Book," stating "We have been advised by Dinar that the skorts for the girls should be slightly longer than the pictures on the Look book." GX-422 at 3.

    b.  On October 21, 2021, an Imperial Yachts manager emailed the *Amadea*'s chief stewardess and others with an amended "uniform look book" and directed them to "Please delete the old version and print the attached one for G2." GX-428 at 1

    c.  On October 21, 2021, Pastukhova emailed *Amadea* crewmembers and other Imperial Yachts employees stating that she had "added the uniform proposal to the Agenda with G1 for tomorrow." GX-428 at 1.

137.    As the Government's expert Sean Meagher explained, it is "highly unlikely that a charter guest (even a long-term charter guest) would change the crew uniforms." Rather, "[s]uch decisions—particularly involving crew appearance—are typically within the purview of an owner or their representative." Meagher Decl. ¶ 55.

138.    On January 12 and 13, 2022, *Amadea* crew and Imperial Yachts employees discussed a proposal to install a pizza oven on board the *Amadea*. The oven was to be installed "in the Spring yard period," after Gulnara's alleged charter ended. GX-484 at 1. Nonetheless, Imperial Yachts employees stated they needed to "present [it] to EK and G2" for approval. GX-484 at 1.

139.    Further, on or around January 23, 2022, Suleiman Kerimov requested a "full inventor[y]" of the *Amadea*, which Walsh directed his crew to provide. GX-450 at 1; *see* Walsh Tr. 180:14-181:4. Walsh did not know why Kerimov had requested the inventory, *see id.*, but the fact that he requested it—and the Captain directed the crew to provide it—shows that Kerimov acted as the owner of the *Amadea*.

140.    Moreover, in 2022, Imperial Management and the *Amadea* crew referred to Suleiman Kerimov as either "G0" or "G1" and often confirmed his agreement with various decisions related to the yacht. *E.g.*, GX-621 at 1; GX-450 at 1; GX-463 at 6; Messenger Tr. 90:13-17. Indeed, Walsh testified that in case of a conflict between Kerimov's directives and Gulnara's directives, he "would follow Suleiman's." Walsh Tr. 151:25-152:3, 138:15-139:24. But Kerimov did not sign the purported charter agreement for the *Amadea* in January and February 2022 (Gulnara did), and indeed there was no evidence that he joined the yacht at all that year. The fact that Imperial and the *Amadea* crew nonetheless assigned him a G-Code (one connoting the highest rank), consulted him with him on decisions regarding the yacht, and would follow his directions over that of the signatory of the charter agreement suggests that he was in fact the yacht's owner.

## VII.    There Are Additional Reasons To Doubt Claimants' Credibility

141.    Though the above facts are sufficient to support my findings that, as of September 2021, Claimants did not hold dominion and control over the *Amadea* there are some additional considerations that further support my rejection of Claimants' account of these transactions.

**A. It Is Implausible That Khudainatov Owned All of the Yachts He Claims To Have Owned**

142.   As noted above, Khudainatov claims to have built and owned the *Amadea*, the *Crescent*, and the *Scheherazade* and to have owned the *Amore Vero* (formerly known as the *St. Princess Olga*) and the *Ariadne*. *See* GX-702 at 11-12. Imperial Yachts managed each of these yachts and did so (with two exceptions) at all relevant times.[24]  *See* GX-702 at 11-12.

143.   Each of these yachts was expensive. The cost of design and construction for the *Amadea* was approximately €223 million, for the *Crescent* approximately €509 million, and for the *Scheherazade* approximately €608 million. GX-702 at 9-11. In addition, the purchase price of the *Amore Vero* was approximately €134 million, and of the *Ariadna* was approximately €27 million. GX-702 at 11-12. With the exception of the *Ariadna* (the smallest of these four yachts), Khudainatov purchased or commissioned each of these yachts in a short span of time between 2012 and 2014. GX-702 at 9-11. Thus, between 2012 and 2014 alone, Khudainatov claims to have acquired superyachts costing a collective €1.456 billion (including the construction prices of the *Amadea*, *Crescent*, and *Scheherazade*, and purchase price of the *Amore Vero*).

144.   Not only are the yachts expensive to acquire, they are also expensive to maintain. For example, the *monthly* operating costs of the *Amadea* were between approximately €679,582 and €1,372,756. GX-503; GX-504; GX-505; GX0506. The average monthly costs of maintaining a yacht such as the *Crescent* are approximately $1.5 million to $2 million. Meagher Decl. ¶ 107. The *Scheherazade*'s monthly running costs were approximately €2.5 million to €3 million.

---

[24] The *Ariadna* was at first managed by a different company before its management was transferred to Imperial Yachts. GX-702 at 11-12. The *Scheherazade* was managed by Imperial Yachts while it was under construction but its management was transferred to a different company after its launch. GX-702 at 10-11.

Bennett-Pearce Tr. 145:2-8. Together, these three yachts alone would have cost at least $5 million per month to maintain, or $60 million per year.

145.    Moreover, yachts depreciate in value. Of the two yachts that Khudainatov claims to have sold (the *Ariadna* and the *Amore Vero*), he admits that he sold them at a loss: specifically, he admits that he sold the *Ariadna* for "approximately €20 million," despite having purchased it for "approximately €27-28 million," and the *Amore Vero* for "€120 million," despite having purchased it for €134,501,269. GX-702 at 11-12.

146.    Khudainatov claims to have used his own funds to purchase each of these yachts, with the exception of a €52 million loan from the shipbuilder Lürssen to complete the construction of the *Amadea*. Khudainatov. Decl. ¶¶ 15-16; *see also* ECF No. 126-14 (loan agreement). Yet the Government's expert has shown that Khudainatov did not have the means to commission or purchase nearly €1.5 billion of superyachts between 2012 and 2014. *See* Aslund Decl. ¶¶ 24-75. If Khudainatov had to borrow money to launch a $500 million company in 2013, it seems implausible that he had the financial means to commission or purchase nearly €1.5 billion in superyachts in the same time period. *See* Aslund Decl. ¶ 29.

147.    Khudainatov also made little personal use of these yachts. Khudainatov's use of the *Amadea* (three trips in 2017 followed one trip in 2021) is described above. The *Scheherazade*'s captain testified that Khudainatov was on board the *Scheherazade* four times, never for more than one night. *See id.* at 59:12-19 (one night off Sochi), *id.* at 60:7-23 (1.5 days off Egypt), *id.* at 67:19-68:1 (day off Croatia), *id.* at 72:23-73:11 (day off Sochi). And the then-captain of the *Amore Vero* testified that Khudainatov was on board only "once, maybe twice," and always with Sechin. Turner Tr. 71:22-72:7.

148.    There are compelling reasons to question whether the *Amore Vero*, in particular, belonged to Khudainatov (as he claims) and not to Sechin. Ben Turner, who was the captain of *Amore Vero* from 2014 to 2018 testified that the only regular users of the yacht during those years were Igor Sechin and members of his family, who used it for multiple months each year. No guest was ever onboard the *Amore Vero* without a Sechin family member also present (including Khudainatov who was on board only "once, maybe twice"). Turner Tr. 75:12-76:11, 71:22-72:7. Further, from approximately 2012 to 2017, the *Amore Vero* was named the *St. Princess Olga*, which the ship's captain and crew understood to be a reference to Sechin's then-wife Olga Rozhkova. Turner Tr. 30:15-22, 36:10-16. The same year Sechin divorced Rozhkova, in 2017, the yacht was stripped of its "Olga" name and re-named the *Amore Vero*. Aslund Decl. at ¶ 107.

### B. Khudainatov and Imperial Yachts Have Told Ever-Shifting Stories Concerning Yacht Ownership

149.    Khudainatov and Imperial Yachts, who Khudainatov hired to manage his yachts (and with whose principal, Kochman, he had "developed a strong mutual trust in our business endeavors," ECF 126 ¶ at 35), have a long history of shifting, misleading and apparently false stories regarding the yachts' true ownership.

150.    The Court has already described Imperial Yachts' years-long misrepresentation that "Smuzikov" or "Smyzikov" owned both the *Amadea* and the *Crescent*.

151.    In addition, there is significant evidence that *either* the Khudainatov family office misrepresented the *Scheherazade*'s ownership *or* that Khudainatov's own claims to have owned the *Scheherazade* at all relevant times are false. Specifically, the email address info.mainoffice42@gmail.com sent several emails signed "Family Office" to John Wolf at Campbells seeking his assistance with the registration of the *Scheherezade*. Thus, for example, on April 24, 2020, someone using that email address emailed John Wolf writing in part:

> Dear Mr Wolf,
> We refer to ongoing process of registration of M/Y SCHEHEREZADE.
> Please find attached a copy of the UBO's passport, as requested. This document is provided in the strictest confidence. Please do not share further.

GX-405. The email attached a copy of a Swiss passport for a person by the name of Daniel Kolarov, thus representing that Kolarov was the ultimate beneficial owner of the *Scheherazade*. GX-405-A. The email continued:

> Regarding routine matters of registration, please contact Captain Guy Benett. However, please do not share UBO details with him.
>
> Thank you for your assistance.
> Yours sincerely,
> Family Office

GX-405. The same email address sent Wolf other similar emails similarly representing that Kolarov owned the *Scheherazade*. *See* GX-404 & 404-B (attaching "explanatory CV for the UBO" and attaching Kolarov's CV); GX-479 & 479-A. On May 1, 2022, John Wolf responded to info.mainoffice42@gmail.com and attached a Caymans certificate of registration for the *Scheherazade*. GX-478 & 478-C.

    152.    Because there is no credible evidence that Daniel Kolarov was in fact the UBO of the *Scheherazade*—indeed, the *Scheherazade*'s captain had never heard of him (Bennett-Pearce Tr. 104:8-11)—the emails appear to falsely represent the *Scheherazade*'s ownership.

    153.    Though it is unclear who used the info.mainoffice42@gmail.com email address,[25] the most logical explanation is that either Khudainatov or his representatives mispresented the ownership of the *Scheherazade*. In any event, there are only two plausible scenarios: On the one hand, the user of info.mainoffice42@gmail.com who signed emails "Family Office" may have

---

[25] Both Azarenko, the Khudainatov family office employee, and Guy Bennett-Pearce, the *Scheherazade* captain testified that they did not recognize the info.mainoffice42@gmail.com address. *See* Bennett-Pearce Tr. 104:1-7, 121:9-12; Azarenko Tr. 219:12-220:5

been an employee of the Khudainatov family office. That would stand to reason given that he or she was communicating with Wolf to register the *Scheherazade*, a yacht Khudainatov claims to have owned at all relevant times. *See* GX-702 at 10-11. If that is the case, then Khudainatov's family office lied when it represented Kolarov as the *Scheherazade*'s UBO. On the other hand, if the user of info.mainoffice42@gmail.com was not an employee of the Khudainatov family office; then some other "family office" registered the *Scheherazade*, thus undermining Khudainatov's own claim—in this litigation and elsewhere—that he was at all times the owner of the *Scheherazade*.

154.    Khudainatov also recently a made misleading statement regarding yacht ownership to the Council of the European Union. On April 7, 2023, Khudainatov signed a statement to the EU Council in which he stated that his "first venture" in commissioning a yacht was the *Crescent*, while his "next boat" was the *Scheherazade*. *Id.* at 10-11. He did not mention the *Amadea* at all.

155.    Imperial Yachts and Khudainatov also made conflicting and apparently false statements regarding yachts that Khudainatov claims *not to* own. Specifically, Khudainatov now denies ever having owned the yachts *Divina Barbara* or *Milagro 2. See* GX-702 at 12. However, Imperial Yachts represented to the financial services firm Fiduchi that Khudainatov *did* own the *Divina Barbara* and *Milagro 2*. Specifically:

> a.  On August 5, 2021, Imperial Yachts representative Vera Vorobiova told Fiduchi that "Mr. Eduard Kh." owned the *Divina Barbara* and *Milagro 2*. GX-490 at 1. She also forwarded a 2017 email from Kochman "in regards to the name of the final UBO and Owner of the vessels," in which Kochman wrote that "Mr. Eduard Kh. has verbally confirmed to" Kochman that the two companies who remitted funds for the vessels belong to him [*i.e.*, Khudainatov]. GX-492 at 1.

b.  On March 21, 2022, a Fiduchi employee told Kochman that "Barclays have requested details of the UBOs of all the yachts under management" and attached a spreadsheet of yachts and their owners. GX-493 at 1. Kochman replied and said, "I confirm the attached list of the Projects." GX-493 at 1. The list associated both the *Divina Barbara* and the *Milagro 2* with "Eduard Khudaynatov." GX-493-U.[26]

c.  On March 30, 2022, Vorobiova again responded to a question from Fiduchi regarding the UBO of *Divina Barbara*, by stating that the nominal owner was "a nominee of Mr. E. Kh." GX-491 at 1.

156.    These representations by Imperial Yachts are all inconsistent with Claimants' interrogatory response in this case that "Mr. Khudainatov has never had any ownership interest in: . . . (3) the Divina Barbara . . . or (5) the *Milagro 2*." GX-702 at 12.

### C.  Both Khudainatov And Millemarin's Only Knowledgeable Director Have Failed To Testify

157.    A party's "failure to testify is significant." *N. Sims Organ & Co. v. Sec. & Exch. Comm'n*, 293 F.2d 78, 80 (2d Cir. 1961). It "warrants the inference that his testimony would have been adverse." *Id*. at 81; *see Gray v. Great Am. Recreation Ass'n, Inc.*, 970 F.2d 1081, 1082 (2d Cir. 1992) (same).

158.    Here Khudainatov declined to testify—either in person at the hearing or via a deposition. I am permitted to infer from this that Khudainatov's testimony would have been adverse to his and Millemarin's position in this litigation. *Cf. Lauratex Textile Corp. v. Allton*

---

[26] This information was redacted from the image file Claimants produced to the Government in this case, (*see* GX-493), though it was included in the text load file produced along with the document. *See* GX-493-U.

*Knitting Mills Inc.*, 517 F. Supp. 900, 904 (S.D.N.Y. 1981) ("Levine refused to testify at trial, and we find the excuse offered, that he did not feel well enough to take the stand, to have been a pretense, and draw a negative inference from his failure to testify").

159.   Specifically, I may—and do—infer:

   a.   That there was no oral termination of the September MOA;

   b.   Khudainatov agreed with Kochman to conceal the true beneficial ownership of the *Amadea*; and

   c.   The true purpose of the September MOA, and the subsequent extensions to it, was to allow the Kerimovs to become de facto owners of the *Amadea*, while not holding title or being connected to any of the entities holding title.

160.   But even though I can, and do, draw such inferences, I would (as I describe below) also find the same facts based on the evidence before me even if I had not drawn any such inferences based on Khudainatov's failure to testify.

161.   In addition, "when [a] party fails to produce [a] witness whose testimony would elucidate the transaction there is an inference that testimony would be unfavorable." *S.E.C. v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 614 (S.D.N.Y. 1993), *aff'd sub nom. S.E.C. v. Posner*, 16 F.3d 520 (2d Cir. 1994) (citing authorities). That is particularly true where the witness in question was a corporate officer or director. *See, e.g.*, *Lauratex*, 517 F. Supp. at 904.

162.   Here, Olga Kroon was Millemarin's sole director from Millemarin's formation until October, 2024, *see* Millemarin 30(b)(6) Tr. 27:2-9; 33:25-34:6, and she signed each of the September MOA, the November Addendum and the March MOA on Millemarin's behalf. *See* GX-212 at 8, GX-214 at 2, GX-217 at 4. Kroon resigned as a director shortly after the Government issued a Rule 30(b)(6) notice of deposition to Millemarin on August 6, 2024, and Millemarin

instead produced a new director as its Rule 30(b)(6) designee, who had no personal knowledge relevant to this case—nor hardly any knowledge at all beyond a briefing that had been provided to him by Millemarin's litigation counsel. *See* Millemarin 30(b)(6) Tr. 11:24-14:6; 14:20-15:24; 16:9:18. Thus, I may—and do—infer:

     a. That Kroon understood the purpose of the September MOA was to sell the *Amadea* (not to effectuate a temporary use arrangement);

     b. That Kroon would have testified that the September MOA was not orally cancelled before the *Amadea*'s seizure;

     c. That Kroon would have testified that after Millemarin had received payment in full for the *Amadea*, it no longer had any rights to the *Amadea* except for title.

163.    But even though I can, and do, draw such inferences, I would also find the same facts based on the evidence before me even if I had not drawn any such inferences based on Millemarin's failure to elicit testimony from Kroon.

## VIII.   Claimants' Arguments Are Not Supported by the Evidence

164.    Claimants dispute the Government's assertions that the September MOA rendered them mere straw owners. They argue that the September MOA did not call for a sale of the *Amadea*, but was instead part of a temporary arrangement under which Khudainatov (through Millemarin) lent the *Amadea* to Kochman (through Errigal), so that Kochman could find a permanent buyer. Claimants further argue that it does not matter that the September MOA divested them of all rights to the *Amadea* except bare title because, shortly before the *Amadea*'s seizure in April 2022, Khudainatov and Kochman decided to cancel the September MOA. In this context, they argue that the Kerimovs may have used the *Amadea* between September 2021 and April 2022, but that they did so only as charterers.

165.    Claimants' arguments are not supported by the evidence. First, as detailed above, there is significant evidence that the Kerimovs were not mere charterers, but instead paid for, held, and exercised all the rights and responsibilities of ownership of the *Amadea*. For the reasons that follow, I conclude that Claimants' arguments that (1) the September MOA was part of a temporary use arrangement and (2) the September MOA was cancelled shortly before seizure of the vessel are also unsupported by the evidence.[27]   Finally, I note that (3) no witness has provided credible testimony, based on personal knowledge, that supports Claimants' assertions that they remain owners of the *Amadea.*

### A. The Evidence Does Not Support Claimants' Argument that the September MOA Was A Temporary Use Agreement

166.    For the following reasons, the evidence does not support Claimants' argument that the September MOA was a mere temporary use agreement.

167.    **<u>First</u>**, the September MOA states on its face that it is an agreement between Millemarin as "seller" and Errigal as "buyer" in which Millemarin "agrees to sell" the *Amadea* for the "sales price" of €225 million. GX-212 at 1, 4. Moreover, not only does the September MOA's language suggest that it was, in fact, an agreement for sale, but nothing in its language suggests that it was instead an agreement for temporary use. For example, there are no provisions suggesting any limitation on the timeframe of the supposed temporary use, no provisions providing for the return of the *Amadea* after that term has run, no provisions regarding the assessment of the vessel's condition on return, or any provisions describing how and when the €225 million "sales price"

---

[27] In any event, even if the September MOA were intended as a temporary use agreement, the fact remains that it resulted in the transfer of all incidents of ownership except bare title.

should be returned when the term of temporary use has run.[28]  It is hard to believe that the parties entered into an agreement for the temporary use of a €225 million asset without specifying the length of the term of use, how the asset should be returned, or how and when repayment should be made.

168.    **Second**, Khudainatov family office employees (including Azarenko) and Imperial Yachts employees (including Stewart) referred to the contract as a "sales contract" as they exchanged drafts of it, including via emails with the subject line "Amadea sale," and likewise referred to Errigal as a "buyer" and Millemarin as a "seller." *See*, *e.g.,* GX-412 at 3-6; GX-409, 409-A (Stewart email attaching draft September MOA as "Sale Contract A v3 clean.docx); GX-481 & 481-A (Stewart email attaching draft September MOA as "Amadea sale contract v 4.pdf"); GX-495 at 1 (Stewart email attaching draft September MOA with subject line "Amadea sale" and discussing "Purchase of Amadea."). There is no suggestion in their contemporaneous correspondence of a temporary use agreement.

169.    **Third**, as described above, the evidence shows that the Kerimov family paid the full €225 million "sales price" for the *Amadea* on behalf of the "buyer" and then began to act as the yacht's owners, planning trips and extensive renovations that would take place years into the future. There is every reason to believe that the family who paid the purchase price for a yacht under an agreement that says it was for the purchase of the yacht, then acted as the yacht's purchasers, were in fact its purchasers, not just its "temporary users."

170.    **Fourth**, there is no evidence that Kochman or Errigal attempted to sell the *Amadea* after September 2021 as they were supposedly to do under the claimed temporary arrangement.

---

[28] Indeed, the agreement specifies that the first €45 million payment "shall be non-refundable," GX-212 at 2, which is inconsistent with the idea of a temporary use agreement.

Before September 2021, there is significant evidence that the *Amadea* attended boat shows and had regular viewings with clients, but there is no evidence of such showings after that date. Instead, the *Amadea* was used for cruises with the Kerimovs, and travelled to the Caribbean and the Pacific—far away from the boat shows where it was previously marketed.

171.    Claimants' only evidence that the September MOA was not, in fact, an agreement to sell the *Amadea* is the testimony of Azarenko, an employee of the Khudainatov family office. Azarenko testified that:

> Mr. Khudainatov really wanted to sell the Amadea Yacht, and Mr. Kochman is the one who was involved, through his company, Imperial Yachts, with an effort to do the sale. But throughout several years the real sale of the Yacht didn't take place, so the Yacht was not sold. Mr. Khudainatov was very disappointed with the situation because he had to incur large expenses, large running expenses to support the Yacht. And when it comes to Mr. Kochman, I believe that Mr. Khudainatov expressed his displeasure to Mr. Kochman, since he was unhappy that Mr. Kochman has been unable to sell the Yacht, and he could offer this assignment of selling the Yacht to someone else. And so Mr. Kochman didn't want to lose the chance to have an option to sell the Yacht or operate it in whatever way, and so there was a solution suggested that Mr. Kochman is going to use the Yacht. In the meantime Mr. Khudainatov will get rid of paying the substantial amounts necessary for running expenses of the Yacht. I mean Mr. Kochman will use the Yacht to obtain profit, and at the same time look for a buyer for the Yacht.

Azarenko Tr. 85:21-86:23. But Azarenko had no personal knowledge of these facts. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Azarenko had never spoken with either Khudainatov or Kochman about their intentions as to the September MOA. *See* Azarenko Tr. 188:4-9 ("Q. Did you ever talk to Mr. Khudainatov [sic] about what he intended with this transaction? A. No. Q. Did you talk to Mr. Kochman about what he intended with this transaction? A. No.").[29]  And neither Kochman nor Khudainatov testified. Instead, Azarenko's opinion about

---

[29] Even if she had, her testimony about what Khudainatov and Kochman told her would be hearsay.

the purpose of the September MOA was based on inferences she supposedly made from the existence of a "cooperation agreement" (CX-27). She testified:

> Q. Is it fair to say that the MYBA Agreement being drafted was intended to effectuate the Cooperation Agreement that had been entered into between Mr. Kochman and Mr. Khudainatov?
> MS. DOUD: Objection.
> THE WITNESS: That's correct.
> Q. BY MR. FORD: And how do you know that?
> A. Because we received the MYBA Agreement right after the Coop Agreement, or Cooperation Agreement was generated, and the terms and conditions of the MYBA Agreement coincided with what was included in the Cooperation Agreement.

Azarenko Tr. 88:24-89:13. Azarenko was not involved in the drafting of the cooperation agreement. *See* Azarenko Tr. 213:7-15 (testifying she first saw the cooperation agreement after it was already signed). Moreover, Azarenko's contemporaneous correspondence regarding the September MOA with Imperial Yachts, including Kochman and Stewart, did not reference a cooperation agreement and discussed the September MOA as what it appears to be: an agreement for sale. *See, e.g.*, GX-412 (referring to the "buyer" and "seller" and an "SPA," an abbreviation for "sales purchase agreement"); CX-495 at 1 (Stewart email forwarded to Azarenko with subject "Amadea sale").[30]

172.    In fact, beyond its existence, there is no evidence in the record about the cooperation agreement between Khudainatov and Kochman. Unlike with the September MOA, the November Addendum, and the March MOA, there are no contemporaneous emails concerning the

---

[30] The Court notes that Azarenko is an employee of Khudainatov who read Khudainatov's declaration filed in this case, *see* Azarenko Tr. 129:9, met with Claimants' counsel to prepare for her deposition testimony, *see* Tr. 122:10-12, and considered herself to the represented by Khudainatov's counsel at the deposition, Tr. 120:21-121:4. Certain of Azarenko's testimony, on matters of which she admitted not to have direct personal knowledge, appears to parrot assertions in the declaration filed by her employer, Khudainatov.

Cooperation Agreement's drafting or signing. And, again, the two parties who purportedly signed the agreement—Khudainatov and Kochman—have not testified.

173.    Whatever Khudainatov's and Kochman's intentions were when (and if) they signed the Cooperation Agreement, they ultimately matter little. The Cooperation Agreement does not change the fact that the September MOA deprived Millemarin of all rights and incidents of ownership to the *Amadea*, as a matter of law, and that the Kerimovs exercised those rights as a matter of fact. As a result, Millemarin held only bare title to the *Amadea* at the time it was seized and neither Millemarin nor Khudainatov have standing.

**B.    The Evidence Does Not Support Claimants' Theory That the September MOA Was Cancelled in April 2022**

174.    Nor is there credible evidence that the September MOA was cancelled shortly before the *Amadea*'s seizure, thus returning rights to the *Amadea* beyond bare title to Millemarin.

175.    **First**, there is no written evidence of this cancellation. One would expect there at least to be an email, if not more formal communication, directing, memorializing, or at least referring to, a contractual event requiring the return of up to €225 million, as well as the re-delivery of a superyacht from one party's custody and care (Errigal's) to another's (Millemarin's).

176.    **Second**, there is no oral testimony of such a cancellation by anyone involved. The two principals supposedly involved in the cancellation—Khudainatov and Kochman—have not testified.[31] Azarenko, testified that she had *inferred* the September MOA was cancelled. But she had no personal knowledge of that supposed cancellation. She testified:

---

[31] Nor is it clear how the formalities of such a cancellation could have worked. The September MOA was between Errigal and Millemarin. Claimants have argued that because Errigal's directors, Wolf and Magee, resigned in March 2022, Errigal was unable to sign the share transfer instrument, *see* GX-218, and close the March MOA. But if Errigal had no directors able to close the March MOA, how did it have the power to cancel the September MOA?

> Q. Did Mr. Khudainatov tell you that the [September Memorandum of] Agreement with [sic] had been canceled?
> A. No.
> Q. Did anyone else tell you that the Agreement had been canceled?
> A. Verbatim, no, but it was kind of like a consequence of the situation where we found ourselves.
> Q. Did he talk to you about the fact that the Agreement was terminated?
> A. Who (In English)?
> Q. Mr. Khudainatov.
> A. No.
> Q. Did you have any conversation with him whatsoever about the termination of the Agreement?
> A. No.

Azarenko Tr. 199:17-200:8. Instead, Azarenko testified that she concluded that the September MOA had been terminated in April 2022 by reference to other documents she had or had not seen. She explained:

> Q. What is the basis for your understanding that the Memorandum of Agreement stopped existence in April 2022?
> A. After the Management Agreement was signed between Millemarin and Imperial Yachts; that was the period.
> Q. So your understanding that the Agreement, the September 2021 Agreement was terminated, is based on seeing another document.
> A. And also on the fact that there was no other document that confirmed that the deal or the transaction was consummated.

Azarenko Tr. 199:4-16. Azarenko's inferences and speculation based on the existence or non-existence of other documents, however, are not personal knowledge, and so not evidence. *See* Fed. R. Evid. 602. Further, the inferences themselves are not logical and need not be credited by the Court.

   a.  First, Azarenko's inference that the September MOA must have been cancelled because there was no document in April 2022 reflecting that the September MOA transaction had closed (*i.e.*, a document formally transferring title to Errigal) is illogical. After all, from September 2021 until March 2022, there was *also* no document that formally closed or "consummated" the September MOA by

transferring title to Errigal, yet there is plenty of evidence that the September MOA had not, in those months, been cancelled. That is, after all, why on March 7, 2022, the parties signed an "Amendment to The Memorandum of Agreement Dated 14 September 2021." GX-217. The parties would not sign an amendment to an agreement if the underlying agreement had been cancelled. Thus, if the September MOA continued in effect without a formal transfer of title from September 2021 until March 2022, there is no reason to infer that without a transfer in April 2022, it must have been cancelled then.

b. Second, Azarenko's inference that the September MOA must have been cancelled because Millemarin and Imperial Yachts signed a management agreement in April 2022 is no more reliable. As an initial matter, the Millemarin-Imperial Yachts management agreement was not fully signed until May 10, 2022, *see* CX-482 at 20—nearly a month after the *Amadea*'s seizure. Thus, its status as an accurate reflection of the parties' understanding is suspect. In any event, it is plain from the document that it was a mere formality related to the August transfer of title from Nereo to Millemarin. Specifically, the new April 2022 Millemarin-Imperial Yachts management agreement (CX-482) is a near replica of a previous management agreement between Nereo and Imperial Yachts (CX-359). The Nereo-Imperial Yachts agreement, which was signed in March 2017, provided that it "shall be deemed terminated" upon sale of the *Amadea* and further defined a sale as any time Nereo "ceases to be the registered owner." CX-359 at 14-15 (Clause 13.5). Nereo ceased to be the registered owner of the *Amadea* in August 2021 when Millemarin became the titleholder. *See, e.g.*, GX-219, GX-302. The new Millemarin-Imperial

Yachts management agreement, though signed in 2022, provided that its commencement date was August 21, 2021. *See* CX-482 at 2. The most straightforward inference to draw from these facts is that the new Millemarin-Imperial Yachts management agreement corrected an oversight from the August 2021 transfer by updating the management agreement to be with Millemarin, the new titleholder. Such an inference is supported by the fact that on March 25, 2022 (a mere 10 days before the date of the agreement) Fiduchi requested certain information from Imperial Yachts regarding the *Amadea* and other Imperial Yachts managed vessels and asked whether the March 6, 2017 Management Agreement was with Nereo was "still current and valid." GX-491 at 2. There is no reason to infer that the new management agreement somehow reflected a decision to *cancel* the sale from Millemarin to Errigal: indeed, it is consistent with the continued existence of the unconsummated September MOA, which left Millemarin as the registered titleholder, while Errigal paid all expenses for the yacht.[32]

177.    **Third**, there is no evidence that any of the €225 million paid on behalf of Errigal was ever returned. *See* Azarenko Tr. 113:16-21 (admitting that the funds were not returned). The only explanation in the record for this failure is as follows:

Q. Do you know why those funds were not returned?
A. Yes.
 Q. And why is that?  As far as I know the lawyers of Mr. Evgeniy Kochman stated that any action related to the Amadea that has indefinite status after it was seized in Fiji can result in violation of any Sanctions rules or regulations. In other words, any

---

[32] Though the new management agreement stated that Millemarin would pay Imperial Yachts for the expenses of running the *Amadea* starting in August 2021, there is no dispute that Millemarin did not in fact pay those expenses, at least as to the period when the September MOA was in effect. *See* CX-482 at 21 (providing that "start date for payment" is August 21, 2021); GX-702 at 15 (Claimants' interrogatory response that, starting in September 2021, "Imperial Yachts and/or Errigal Marine Ltd. paid the costs of operating and maintaining the *Amadea*").

> actions regarding this event, until the status of the boat is clarified, were not advisable.

Azarenko Tr. 113:22-114:9. This explanation is inadequate, as it is both based on hearsay and lacks foundation. It is unclear how Azarenko would be privy to the legal advice reportedly provided to Kochman, the counterparty to a contract with her boss. There is also no corroborating written evidence reflecting that such legal advice was given, such as emails referring to the advice of lawyers.[33] Further, the advice is inconsistent with Kochman's other actions. The Russian invasion of Ukraine took place on February 24, 2022, and on March 1, 2022, the U.S. President announced the creation of a U.S. Department of Justice task force focusing on sanctions enforcement in his State of the Union address,[34] yet those events did not prevent Errigal and Millemarin from entering the March MOA days later. In fact, Imperial Yachts signed the Millemarin-Imperial Yachts management agreement as to the *Amadea* on May 10, 2022, nearly a month after the *Amadea* had been seized. CX-482 at 20. It would be odd that Kochman allowed his company to sign a management agreement and receive payments for new services it was going to provide to the *Amadea*, yet was unwilling to accept the return of €225 million after having supposedly returned the yacht. It is even more strange, given that both Khudainatov and Kochman reside in Russia, where Khudainatov should easily be able to return funds to Kochman without fear of legal sanction. Moreover, there is no evidence that Kochman was particularly cautious about dealing with sanctioned persons: Suleiman Kerimov had been sanctioned by the United States since 2018, yet Kochman visited the *Amadea* with him in 2020, and allowed Imperial Yachts to coordinate with him and his family regarding the use and renovation of the *Amadea* in 2021 and 2022.

---

[33] After Azarenko's testimony, the government requested the production of such documents, but Claimants produced none.

[34] https://www.whitehouse.gov/state-of-the-union-2022/

178.    **Fourth**, Khudainatov had supposedly been trying to sell the *Amadea* for years. It is therefore implausible that after having signed a contract and received €225 million for the sale of the *Amadea* and given up use and control of it, that Khudainatov would simply change his mind and agree to cancel the sale.

179.    **Fifth,** there is no evidence of a change in use of the *Amadea* to support that control had been passed back to Khudainatov and Millemarin. As described above, many of the practices and plans that began in the fall of 2021 continued until the date of the seizure. For example:

a.    In March and April 2022, the *Amadea* left the Caribbean, crossed the Panama Canal, and arrived in Fiji. *See* Bergen Decl. ¶¶ 8-9. This travel was consistent with Gulnara Kerimova's request in February to "relocate AMA to French Polynesia & Pacific." GX-463 at 4. Thus, up until the date of the seizure, the Kerimovs appeared to be directing the *Amadea*'s movements.

b.    As late as April 6, 2022, the *Amadea*'s captain wrote an email about converting the winter garden to a gym—suggesting that the Kerimovs' planned renovation remained unchanged. *See* GX-477 at 1.

c.    As late as April 13, 2022, *Amadea* crew still referred to Suleiman Kerimov as "G1." Specifically, after Martin Messenger was interviewed by U.S. authorities in Los Angeles International airport, he sent an email to Imperial Yachts recounting that U.S. law enforcement had "said G1's name," which, he testified, was a reference to Kerimov. Messenger Tr. 90:13-17; *see generally id.* 88:25-90:21.[35]

---

[35] That the *Amadea* crew assigned Suleiman Kerimov a "G-Code" at all also suggests that the Kerimovs had purchased the yacht. After all, Kerimov was not a party to the charter agreement, nor apparently a guest on the *Amadea* during its supposed charter in the Caribbean.

### C.   No Witness Has Provided Credible Testimony Based on Personal Knowledge That Supports Claimants' Assertions

180.    No witness has provided credible testimony based on personal knowledge that supports Claimants' assertions that they remain owners of the *Amadea.* Neither Zuretti nor Lürssen knew whether the *Amadea* had been sold in 2021; indeed, Lürssen had never heard of Millemarin or Errigal, Lürssen Tr. 37:8-17, and Zuretti did not know the identities of the "G members" on whose behalf he was working. Zuretti Tr. 95:2-5. Walsh, Read and Messenger similarly testified that they did not know who owned the *Amadea* in 2021 or 2022. Walsh 72:8-9; Read Tr. 112:9-19; Messenger Tr. 83:1-10.

181.    Azarenko purported to know, but her knowledge was based review of the inadmissible Khudainatov declaration and on a review of contracts that are available to the Court. Azarenko Tr. 129:9; 187:24-188:9; 237:9-238:3. Moreover, Azarenko's knowledge of Khudainatov's affairs was limited. First, she herself acknowledged that Khudainatov and Kochman "met together without the presence of people from the Family Office and they could discuss issues related to the Yacht without the Family Office." Azarenko Tr. 206:22-207:3. Second, in connection with the March MOA, Stewart proposed to Azarenko to "do [a] separate private letter with more details without Campbells involvement," GX-468 at 2, yet Azarenko had no knowledge or understanding about what that might refer to, Azarenko Tr. 221:15-222:14, thus suggesting that Stewart knew about some hidden terms concerning the *Amadea*'s sale that Azarenko did not. Third, Azarenko had no knowledge of who "Smuzikov" was, even though Imperial Yachts had represented him as an owner of the *Amadea*. Finally, Azarenko had no knowledge of the info.mainoffice42@gmail.com email address that was used to register the *Scheherazade* (with false information about the UBO), further suggesting that there were operations of the Khudainatov family office of which Azarenko was not aware.

### IX.    Findings Relevant to the Admissibility of Evidence

182.    I have based my findings on a review of the all the evidence in the record, but I rely only on admissible evidence in reaching these findings of fact and conclusions of law.

183.    To the extent that I have quoted or relied on hearsay, I have not considered it for the truth of the matter stated.

184.    In the alternative, I find that the certain statements I have relied on are those of Claimants' co-conspirators in furtherance of a conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). The existence of a conspiracy "can be shown based on circumstantial evidence alone," *United States v. Urena*, 73 F. Supp. 3d 291, 298 (S.D.N.Y. 2014) (citing *United States v. Gordon,* 987 F.2d 902, 906-07 (2d Cir.1993)); *cf. United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) (observing that "prolonged cooperation between the parties, a level of mutual trust, . . . [and] sales on credit" are all factors from which a conspiracy may be inferred); *see* ECF 126 (Khudainatov Decl.) at ¶ 35 (Khudainatov's statement that "Mr. Kochman and I have developed a strong mutual trust in our business endeavors."). For purposes of Rule 801(d)(2)(E), a conspiracy's objective "need not be criminal at all" and a "joint venture" among the parties counts as a "conspiracy" for purposes of the Rule. *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002); *see also* 4 Christopher B. Mueller & Laird C. Kirkpatrick, Fed. Evid. § 8:59 (3d ed.); *United States v. Guo*, No. 23 CR. 118 (AT), 2024 WL 3275265 at *5 (S.D.N.Y. July 1, 2024); *United States v. Postal*, 589 F.2d 862, 886 n. 41 (5th Cir. 1979); *United States v. Layton*, 855 F.2d 1388, 1397-1400 (9th Cir. 1988).

185.    Thus, I find that:

a.    Khudainatov conspired since at least 2017 with Evgeniy Kochman, Julia Stewart, Imperial Yachts and others to operate and manage the *Amadea* while concealing the *Amadea*'s true ownership;

b. That conspiracy included concealing Kerimov's ownership of the *Amadea* since at least September 14, 2021 and, starting at that time, Kerimov, Gulnara, Firuza, and Gadzhieva joined the conspiracy;

186.    I based my finding of this conspiracy on the basis of the all the evidence in the record, including the false or misleading representations by Imperial Yachts about the true ownership of the *Amadea*, the unusual sales agreement that transferred all rights in the *Amadea* to Errigal and was extended several times without consummation, and Kerimov's niece Gadzhieva's payment of €225 million to Millemarin's holding company IIF owned by Khudainatov via a purported unsecured loan to Errigal based on a loan agreement with an apparently forged signature.

187.    Imperial Yachts employees and *Amadea*'s crew were agents of the conspirators and statements they made in operating the *Amadea* on behalf of the Kerimovs' are therefore also admissible under Federal Rule of Evidence 801(d)(2)(E). Evidence of the involvement of the crew as agents of or participants in the conspiracy include the facts that:

a. Imperial Yachts prohibited captains working on the *Amadea* from any mention of an individual as an owner or to inquire about a possible owner. Read Tr. 59:14-60:20.

b. Imperial Yachts used codenames such as "G1," because "they didn't like writing down names of guests[.]" Read Tr. 91:10-21.

c. Kerimov (G1) and his family members regularly required security cameras to be turned off while they were onboard the *Amadea* but outside their cabins. Meagher Decl. at ¶ 40.

d. In September 2021, G1 sought to avoid any association between himself and the *Amadea* in public, including requiring crew onshore to cover up the *Amadea*'s

insignia on their clothes and to refer to the *Amadea* as the "Alba" on radio communications. GX-615 at 24.

e.  In December 2021, a captain of the *Amadea* created and coordinated a plan through which Kerimov (G1) could arrive in Italy and board the *Amadea* without informing local authorities. GX-627 at 29; Khalikov Tr. 166:13-170:3. As the captain noted, "the common practice that G1 is not declared on the Guest list. Only Security is listed as guest as cover…(false declaration can put us (the Capt. In particular) into serious trouble if inspected)." GX-627 at 28-29.

f.  After the *Amadea* was searched by Panamanian authorities in March 2022, the *Amadea*'s captain directed the yacht's head of security to prepare a report for Imperial Yachts, writing "we should also mention what went right and what did not go so well," including that it was "hard to control the ID aspect," and that Panamanian authorities "have taken photos of all clearances back to 18.06.2021… so they have GUEST TRIP (1) 21.-29.06.21 (previous Gs) & GUEST TRIP (II) 09.-26.10.21 new set of Gs .. but NOT G0," GX-488 at 1 (ellipses in original), thus demonstrating the crew's efforts to maintain the secrecy of Kerimov's (i.e., G0's) presence on and association with the *Amadea.*

188.  Further evidence of Imperial Yachts' involvement in the conspiracy includes the facts that:

a.  Despite knowing that final payment had been made under the September MOA to purchase the *Amadea*, in November 2021, Imperial Yachts and the Khudainatov family office discussed a plan "to leave Millemarin as the registered owner" of the *Amadea* until at least spring 2022, and to not re-

register the *Amadea* until "the yacht will be a long way from Europe." GX-436 at 3.

b.  As of February 23, 2022, Imperial Yachts and the Khudainatov Family Office coordinated their response to a KYC request from Campbells to avoid putting "the UBO in the spotlight." GX-466 at 1.

c.  In February 2022, Imperial Yachts was unwilling to provide the *Amadea*'s ownership documents if requested by BVI authorities, and directed the *Amadea* crew to cancel the voyage to the BVI if providing ownership information were required. GX-456 at 1-2.

189.    I also find, in the alternative, that the statements I have relied on are statements of a party's agent or employee on a matter within the scope of that relationship and while it existed. *See* Fed. R. Evid. 801(d)(2)(D). In support of this alternate finding, I find that:

a.  It is undisputed that the titleholder to the *Amadea* at all relevant times was Nereo or Millemarin. Further, at all relevant times, a management agreement between Imperial Yachts and the relevant titleholder gave Imperial Yachts broad powers to operate and manage the *Amadea*.

b.  The captain and crew of the *Amadea* were retained by Imperial Yachts, through a subsidiary, under those management agreements.

c.  Claimant Khudainatov himself claims to have owned the *Amadea* at all relevant times. At a minimum, in the alternative, that position estops him for opposing the admission of the statements of the people who were purportedly his agents.

## X.    Final Findings and Conclusions

190.    "The burden of proof in making a demonstration of standing rests with the claimants." *479 Tamarind Drive, Hallendale, Fla.*, 2011 WL 1045095, at *2 (citing *Mercado*, 873 F.2d at 644); Supp. R. G(8)(C)(ii)(B). "The burden of showing something by a preponderance of the evidence . . . requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997).[36]

191.    "As trier of fact, [I am] entitled, just as a jury would be to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

192.    I may also "draw reasonable inferences from the evidence presented." *Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc.*, 254 F. Supp. 3d 584, 587 (S.D.N.Y. 2017), *aff'd*, 738 F. App'x 722 (2d Cir. 2018).

193.    I am also cognizant that the evidence in the record does not address all factual issues involving the Claimants' relationship to the *Amadea* and the Kerimov family. For example, (1) the Claimants contend that the March 2022 MOA was terminated by oral conduct, yet Claimants have offered no admissible evidence setting forth when, where and how Khudainatov and Kochman did so. In fact, there is no evidence whatsoever of their communications in the record, despite the fact that Khudainatov is a party and presumably could have offered evidence of them. Additionally, the record does not resolve (2) who Alexander Smuzikov is and what relationship, if any, he had to the *Amadea* or to Khudainatov. Nor does the record establish (3) who forged Magee's signature on the Gadzhieva-Errigal loan agreements and associated letters or (4) how Khudainatov

---

[36] I would however reach the same findings and conclusions, even if the burden were reversed.

supposedly financed the construction of the *Amadea*, *Crescent*, and *Scheherezade*, if his own income was insufficient.

194.    Such lacunae are not surprising because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jimenez*, 96 F.4th 317, 325 (2d Cir. 2024).[37]  But I need not resolve these questions to reach these findings of fact and conclusions of law.

195.    In light of the above principles, and the evidence in the record, I find and conclude:

a.  Claimants Khudainatov and Millemarin are at most straw owners of the *Amadea*, and have been since at least the dates of the initial €45 million payment and the concluding €180 million payment under the September MOA, *see* GX-212 at 2 (Clause 7 of September MOA);

b.  Claimants Khudainatov and Millemarin have failed to show that they exercised dominion and control over the *Amadea* or that they would suffer any "distinct and palpable injury" from its forfeiture. *Cambio Exacto, S.A.*, 166 F.3d at 527. To the extent Claimants have presented evidence that they may retain nominal title to the *Amadea*, such evidence of bare title is insufficient to establish standing.

---

[37] I am also cognizant that (1) many witnesses have expressed a fear of testifying, whether for fear of offending their previous employers or those associated with them, or for other reasons. *See, e.g.*, McGee Decl. ¶¶ 8-10, 16; *see also* ECF Nos. 263, 309 (witness expressing fear for physical safety if required to testify against Kerimov in this case) and also that (2) Kerimov has been sanctioned by the U.S. Government since 2018, such that witnesses may be reluctant to admit to having had knowing relations with him for a fear of possible penalty for having done so. *See, e.g.* Zuretti Tr. 67:10-12 (denying that he met Kerimov and stating "I'm pleased not to have met [him] because I would be in trouble here").

196.    For the foregoing reasons, I find that Claimants' only interest in the *Amadea* is that of title alone. I further find that Claimants lack standing to contest the forfeiture of the *Amadea*.

197.    I therefore GRANT the Government's motion to strike. The Verified Claim of Eduard Yurievich Khudainatov and Millemarin Investments Ltd. (ECF No. 9) is hereby STRICKEN.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney
Southern District of New York

By:    */s/ Dominika Tarczynska*
DOMINIKA TARCZYNSKA
RACHAEL DOUD
Assistant United States Attorneys

MARGARET A. MOESER
Chief
Money Laundering and Asset Recovery
Section, Criminal Division
U.S. Department of Justice

By:    */s/ D. Hunter Smith*
JOSHUA L. SOHN
D. HUNTER SMITH
LINDSAY P. GORMAN
Trial Attorneys
Money Laundering and Asset Recovery
Section