UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>                    v.<br><br>The M/Y Amadea, a Motor Yacht Bearing International Maritime Organization No. 1012531,<br><br>                              Defendant. | 23 Civ. 9304 (DEH)<br><br>**FINDINGS OF FACT AND CONCLUSION OF LAW** |

DALE E. HO, United States District Judge:

Before the Court is the Government's Motion to Strike the Claim of Claimants Eduard Khudainatov ("Khudainatov") and Millemarin Investments Ltd. ("Millemarin" and collectively, "Claimants"), for lack of standing.  Mot. to Strike, ECF No. 97.  In substance, the Government asserts that Claimants lack a true ownership interest in the M/Y *Amadea*—a 348-foot luxury superyacht subject to this forfeiture action—and therefore do not have standing to contest its forfeiture.

The Court held an evidentiary in this matter over four days beginning on January 21, 2025, to resolve apparent factual disputes between the parties regarding standing.  Much of the record was submitted directly to the Court through exhibits and deposition designations, which were also submitted via video.  As the Court explains in detail below, while the record in this case is voluminous, it is ultimately not very complicated with respect to the issues that are material to the Government's motion.   Having  carefully  reviewed  that  record,  the  Court  finds  that  the preponderance of the evidence before it indicates that the incidents of ownership in the *Amadea* other than title—possession, dominion and control, and a financial stake—were transferred to Errigal Marine Ltd ("Errigal") in September 2021, pursuant to a payment of €225 million in

1

connection with a Memorandum of Agreement (the "September 2021 MOA"). Moreover, the Court finds that a preponderance of the evidence in the record indicates that after that point, Claimants did not hold or exercise the incidents of ownership in the *Amadea* other than bare title. That is a sufficient basis to conclude that Claimants are mere straw owners of the *Amadea*, who hold title to it for another party and therefore, under Second Circuit precedent, lack standing to contest forfeiture. And while it is unnecessary for the Court's decision, the Court notes that the preponderance of the evidence in the record indicates that after the September 2021 MOA, the incidents of ownership in the *Amadea* other than title were held or exercised by members of the family of Suleiman Kerimov, an individual who is subject to sanctions pursuant to a designation by the Treasury Department under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq*.

In sum, Claimants have failed to establish standing by a preponderance of the evidence, which they acknowledge is their burden on this motion. But the record is tilted even more than that, as Claimants have failed, on the record before the Court, to establish even a genuine issue of material fact as to their standing. That is, leaving aside any genuine factual disputes or factual issues on which the Court weighs the evidence, and considering the undisputed material facts alone, Claimants have not adduced *any* competent evidence indicating that they exercised the incidents of ownership with respect to the *Amadea* other than bare title after the September 2021 MOA. Under any legal standard, they lack standing to contest forfeiture. Accordingly, the Government's Motion to Strike is **GRANTED**.

## PROCEDURAL BACKGROUND

1.    This is an action *in rem* to forfeit the M/Y *Amadea*, which the Government alleges is beneficially owned by Suleiman Kerimov, a Russian national who has been designated by the

U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") as a Specially Designated National ("SDN") under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA").  *See* Am. Compl. ¶¶ 5-6, ECF No. 37.  Pursuant to Kerimov's designation as an SDN, U.S. persons (including U.S. financial institutions) are generally prohibited from engaging in any dealings involving Kerimov's property or in dealings that involve the provision of funds, goods, or services to or for Kerimov's benefit.  *See id.*

2.     The Government alleges that Kerimov entered into an agreement to purchase the *Amadea* in 2021 and that since then, he "or others acting on his behalf have spent more than a million dollars to maintain and provision the *Amadea*, routing the money through U.S. financial institutions"—transactions that the Government alleges "violated the sanctions imposed under IEEPA and therefore constitute 'specified unlawful activity' as that term is defined in the federal money laundering statute, 18 U.S.C. § 1956(c)(7)."  *Id.* ¶ 7.

3.     On April 13, 2022, a seizure warrant issued for the *Amadea*.  It was subsequently seized in Fiji, and it is currently located in San Diego, California.  *See* Am. Compl. ¶ 4.

4.     The Government filed this civil forfeiture case against the *Amadea* on October 23, 2023, ECF No. 1, and filed an Amended Complaint on February 16, 2024, ECF No. 37.

5.     Only one claim was filed: by Khudainatov and Millemarin.  *See* Verified Claim of Eduard Yurievich Khudainatov and Millemarin Investments Ltd. ("Claim"), ECF No. 9.

6.     The Initial Case Management Plan issued on January 17, 2024, setting a fact discovery cutoff of June 24, 2024, and an expert discovery cutoff of August 8, 2024.  *See* ECF No. 17.

7.      On February 9, 2024, the Government filed a Motion for Interlocutory Sale.  *See* ECF No. 32.  After full briefing and oral argument, the Court denied the motion on June 11, 2024.  *See* Opinion and Order, ECF No. 121.

8.      On March 15, 2024, Claimants filed a Motion to Dismiss the Amended Complaint.  *See* ECF No. 71.  That motion has been fully briefed, *see* ECF Nos. 84 (Opposition) and 89 (Reply), and remains pending.

9.      On May 17, 2024, the Government filed a motion to strike the Claim on the ground that Claimants lack standing.  *See* ECF No. 97.[1]  Claimants filed an Opposition on June 13, 2024, ECF No. 123, and the Government filed a Reply on June 27, 2024, ECF No. 137.  The Government's motion was initially styled as a motion for summary judgment, but in its Reply brief, the Government noted that, should the Court deny summary judgment, it would request— pursuant to Supplemental Rule G[2]—an evidentiary hearing at which Claimants must establish their standing by a preponderance of the evidence.  *See* Mem. of L. Supp. P's Mot. to Strike ("Reply") at 19, ECF No. 137 (citing Supplemental Rule G(8)(c)(ii)(B)).  The parties subsequently submitted several supplemental briefs.  *See* ECF Nos. 147, 197, 216, 295, and 296.

10.     On May 24, 2024, the Court extended the fact discovery deadline by approximately two months, to August 30, 2024.  *See* Order, ECF No. 104.

11.     On July 26, 2024, the Court extended the fact discovery deadline a second time, for an additional one-a-half months, to October 18, 2024.  *See* Order, ECF No. 159 (granting in part Claimants' request to extend fact discovery through November 22, 2024).

---

[1] Because Supplemental Rule G(8) of the Federal Rules of Civil Procedure requires that any government motion to strike a claim be decided prior to resolution of that claimant's motion to dismiss, the Court deferred consideration of the Claimants' Motion to Dismiss.  *See* Supp. R. G(8)(c)(ii).

[2] All references to Rules are to the Federal Rules of Civil Procedure.

12.    On August 13, 2024, the Court set a tentative date of December 9, 2024, for an evidentiary hearing on the Government's motion to strike, if necessary.  *See* Order, ECF No. 175.

13.    On September 19, 2024, the Court extended the fact discovery deadline a third time, for an additional month, to November 15, 2024.  *See* Order, ECF No. 255 (granting in part Claimants' request to extend discovery until January 15, 2025).

14.    On November 15, 2024, the Court extended the fact discovery deadline a fourth time, this time solely for the purpose of completing certain depositions—those of Claimants and an affiliated third-party witness—and gave the parties an additional five weeks, until December 20, 2024, to complete these depositions.  *See* Mem. Order ("Nov. Order") at 14, ECF No. 312 (granting in part Claimants' request to extend discovery).

15.    In the same Order, the Court reserved decision on the Government's Motion to Strike.  *See id.* at 4-5.

    a.    First, the Court noted that the gravamen of the Government's motion is that Claimants "are mere straw owners of the *Amadea*," and "have not had dominion or control over the *Amadea* or any financial stake in it" since a transaction in September 2021 with Errigal Marine Limited ("Errigal"), a company nominally owned by a non-party to the suit, Evgeny Kochman ("Kochman").  Mot. to Strike at 1.

    b.    Claimants responded by arguing, *inter alia*, that "[n]o transfer of ownership [of the *Amadea*] ever took place" and the transaction with Errigal was "ultimately cancelled." See Claimants' Mem. of L. in Opp. To Pl.'s Mot. to Strike at 2, 4, ECF No. 123.  In making these assertions, Claimants relied heavily on the declaration of Claimant Khudainatov himself.  *See* Decl. of Claimant Eduard Khudainatov in Supp. of Claimants' Opp. To Pl.'s Mot. to Strike, ECF No. 126.

    c.    The Court concluded that, on the record before it, it could not resolve the Government's motion in a summary judgment posture.  The Court explained that,

        [T]he parties' submissions contain numerous factual disputes—most significantly, whether the Errigal transaction was in fact consummated, which in turn depends in part on the credibility of Khudainatov's declaration denying that it was. In this context, the Court cannot adjudicate the Government's Motion to Strike in a summary judgment posture on the papers.

Nov. Order at 4.  In essence, the Court reasoned that if the September 2021 MOA with Errigal had, in fact, effectuated a transfer of ownership of the *Amadea* to Errigal, Claimants would have no standing for their claim. But given the declaration of Mr. Khudainatov denying this, the Court could not award summary judgment to the Government on the record before it at the time.  *See id.*

16.     In the same Order, the Court formally ordered an evidentiary hearing under Supplemental Rule G(8)(c)(ii)(B), adjourning it from the week of December 9, 2024, to the week of January 21, 2025.  *See id.* at 4-5.

17.     Throughout the discovery period, the Government repeatedly sought but was never able to take Khudainatov's deposition.  The Court does not recount that long and tortured history, which is set forth in some detail in the Court's November 15 Mem. Order, ECF No. 312, and January 8 Mem. Order, ECF No. 407.  It is also recounted at some length in the Court's Opinion and Order on Claimant's Motion for Reconsideration and on the Government's Motion for Sanctions, which is issued concurrently with this Opinion.  For purposes of these Findings of Fact and Conclusions of Law, it is sufficient to note that: (1) the Court extended the fact discovery period in this case four times—three times at the request of Claimants for purposes that included Khudainatov's deposition; and (2) Khudainatov did not appear for three noticed depositions and did not file a motion for a protective order before the dates of those depositions:

    a.  He did not appear for a deposition noticed in July 2024 and did not file a motion for a protective order beforehand;

    b.  After the Court extended the deadline for certain depositions to December 20, 2024 and ordered that Khudainatov's deposition take place in a location where the Government could conduct it, he did not appear again, citing a "medical emergency" at 3:00 AM on the morning that the Government's lawyers were scheduled to travel to the agreed-upon location for the deposition;

    c.  After the Court granted the Government's Motion to Compel, ECF No. 363 (under seal),[3] and ordered that his deposition take place in New York during the week of January 13, 2025, *see* Mem. Order, ECF No. 407, Claimants filed a motion for

---

[3] The Government's Motion to Compel is publicly available at ECF No. 364.

reconsideration the day before his noticed deposition date, and Khudainatov did not appear.

18.    The Court held an evidentiary hearing over four days between January 21 and 27, 2025.  The Court heard live testimony from five witnesses and received into evidence video deposition designations from 15 additional witnesses.  The parties collectively offered more than 500 exhibits, most of which were received into evidence without objection.  Closing argument was held on February 7, 2025.

19.    As explained below, the Court does not directly address objections to every exhibit and every proffered line of deposition testimony.  The Court addresses objections where it relies on, or expressly declines to rely on, particular exhibits or testimony to which there is an objection. With respect to any objections to exhibits or testimony that the Court deems immaterial or wholly irrelevant to its decision, the objections are denied as moot.

## FINDINGS OF FACT

### A.  Relevant Individuals and Entities

#### i.    Claimants and Claimants' Employees

20.    **Eduard Yurievich Khudainatov ("Khudainatov")**

a.  Khudainatov is a Russian businessman who claims to have commissioned the *Amadea* and to be the *Amadea*'s ultimate beneficial owner.

b.  Khudainatov claims to have built and owned numerous superyachts from approximately 2009 to 2021, including: (1) the 106-meter Amadea (ordered in February 2012 and delivered in 2017); (2) the 136-meter Crescent (ordered in March 2013 and delivered in May 2019); (3) the 140-meter Scheherazade (ordered in December 2014 and launched in April 2020), among others.  *See* GX-702-H at 9-11.  He claims to have spent at least approximately €1.456 billion collectively on various yachts between 2012 and 2014.

c.  Despite being afforded ample opportunities to testify as to his ownership of the *Amadea*, Khudainatov failed to attend his duly noticed depositions.  He ultimately submitted a declaration not subject to testing by cross examination during the evidentiary hearing held in this case.

    d.   Claimants submit a hearsay declaration from Khudainatov, and they rely on it throughout their Proposed Findings of Fact and Conclusions of Law. But, unlike with other witnesses whose hearsay statements Claimants offered, Claimants did not file a motion *in limine* seeking admission of Khudainatov's hearsay declaration.

    e.   The Court excludes Khudainatov's declaration from the record in considering the Government's Motion to Strike because it is hearsay. *See* FRE 802. *Cf.* ECF Nos. 312, 429; Hr'g Tr: 6:15-8:11.[4]

    f.   As explained below, there is no competent evidence in the record tending to show that Khudainatov had possession of, exercised dominion and control over, or held a financial interest in the *Amadea* after a September 2021 transaction.

21.    **Millemarin ("Millemarin")**

    a.   Claimant Millemarin is a corporate entity formed under the laws of the British Virgin Islands on June 10, 2021, with Investment International Finance Ltd. ("IIF") as its only shareholder. GX-305; GX-406-F.

    b.   Claimants aver that Millemarin and IIF are both assets in a trust of which Khudainatov is the direct beneficiary, but they do not cite to the record in stating that proposition. *See* Claimants' Amended Proposed Findings of Fact ("Claimants' PFOF) ¶ 11, ECF No. 455-1.

    c.   The *Amadea* was Millemarin's sole asset. *See* Millemarin 30(b)(6) Tr. 23:3-28:6.

    d.   From Millemarin's formation until October 2024—after the *Amadea* was seized and this litigation had begun—Olga Kroon ("Kroon") was Millemarin's sole director. GX-406-E at 3; Millemarin 30(b)(6) Dep. Tr. 27:2-9; 33:25-34:6.

---

[4] Even if the Court were to consider the Motion to Strike in a summary judgment (rather than a fact-finding) posture, it would not consider Khudainatov's declaration (or other hearsay declarations from other witnesses who have not been made available for cross-examination). A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial." *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985)), *aff'd sub nom. Abdel-Karim v. Egyptair Holding Co.*, 649 F. App'x 5 (2d Cir. 2016). Khudainatov (as well as other witnesses described below) was not deposed before the end of the fact discovery period (which was extended four times and is closed). And Claimants have not made a showing that Khudainatov's testimony will ever be offered in an admissible form at trial. Accordingly, his testimony is properly excluded, regardless of whether the Government's motion is considered in a fact-finding or in a summary judgment posture.

e. At the time of its Federal Rule of Civil Procedure 30(b)(6) deposition, Millemarin had a new director, Radovan Cvijetic, who had no personal knowledge relevant to this case. *Id.* at 11:24-14:6; 14:20-15:24; 16:9:18. All knowledge he did have was derived from briefing documents supplied by Claimants' counsel. *Id.*

22. **Ekaterian Azarenko Parfireva ("Parfireva")**

a. Parfireva[5] works for Khudainatov's "family office." She has been employed there as an "economist" since April 2007. Parfireva Tr. 14:6-16:12. Parfireva testified that she oversaw matters relating to the *Amadea* and that she was responsible for maintaining *Amadea*-related documents in Khudainatov's family office, including corporate documents, contracts, communications, and other relevant documents. *Id.* at 16:16-26:25, 49:9-51:8, 53:19-55:15, 64:15-66:8.

b. As explained below, Parfireva's deposition testimony was based on her review of Khudainatov's hearsay declaration and various documents rather than her own firsthand knowledge of the events and transactions to which she testified.

ii. **Claimants' Counter-Parties in the September 2021 MOA, and Related Individuals and Entities**

23. **Evgeniy Kochman ("Kochman")**

a. Kochman is a Russian businessman who was chairman of Imperial Yachts ("Imperial"), the company that managed the *Amadea* on behalf of its owner and employed the *Amadea*'s captain and crew.

b. According to its Certificate of Incorporation, Kochman was the sole owner and ultimate beneficial owner of Errigal Marine Ltd ("Errigal"), a Cayman Island entity formed on September 8, 2021. *See* GX-307.

c. The Court excluded Kochman's declaration, CX-184, for two primary reasons: (1) he was disclosed as a witness too late in the discovery process to make him realistically available for deposition, and (2) he was not made available for cross-examination, rendering his declaration hearsay. *See* Hr'g Transcript, 6:15-7:9.

24. **Errigal Marine Ltd ("Errigal")**

a. Errigal is an entity formed under the laws of the Cayman Islands on September 8, 2021. GX-307. Kochman was Errigal's UBO. *See id.* at 60.

b. As explained below, Errigal obtained all rights of ownership in the *Amadea* other than title pursuant to a contract signed on September 14, 2021 (the "September 2021 MOA"). *See* GX-212.

---

[5] The Government refers to her in its filings as "Azarenko," which is apparently her maiden name.

25. **Imperial Yachts ("Imperial")**

a. Imperial was a company headquartered in Monaco. Wolf Tr. 21:21-22:24; Walsh Tr. 18:13-19:3; Magee Tr. 57:4-58:4. Kochman was chairman of Imperial Yachts. Wolf Tr. 69:21-70:3; Magee Tr. 58:5-18.

b. At all relevant times, Imperial Yachts managed the *Amadea* on behalf of the owner and employed its captain and crew through its wholly controlled affiliate Ocean Crew Limited. Walsh Tr. 19:16-20:9; Read Tr. 52:20-53:9.

26. **Victoria Pastukhova ("Pastukhova")**

a. Pastukhova purportedly worked for a company associated with Imperial Yachts and purportedly became the "Client Coordinator" assigned to the *Amadea* until its seizure in Fiji. Pastukhova claims to have helped coordinate charters of the *Amadea* for Gulnara Kerimova. Claimants never made Pastukhova available for deposition, and the Court excluded her declaration as hearsay. *See* Hr'g Tr. 6:15-25.

27. **Campbells Corporate Services Ltd. ("Campbells")**

Campbells is a corporate services firm in the Cayman Islands affiliated with a Cayman law firm of the same name. Wolf Tr. 14:22-15:14, 33:10-34:24. Campbells and its affiliates incorporated Cayman entities and then registered yachts owned by them with the Cayman Islands Shipping Registry ("CISR"). Wolf Tr. 18:21-19:16. Campbells, its affiliate Campbells Nominees Ltd., and their employees created Errigal, and two Campbells lawyers served as Errigal's directors. Wolf Tr. 68:19-69:8.

28. **John Wolf ("Wolf")**

a. Wolf was the head of corporate and a managing partner at Campbells from January 1997 until March 2023. Wolf Tr. 13:7-25. In his role at Campbells, Wolf oversaw "the firm's maritime practice," including corporate work "with the major players in the pleasure yacht or the maritime sphere." *Id.* at 17:11-20:12. Wolf testified that Campbells formed Errigal and that Kochman was Errigal's UBO. *Id.* at 68:16-69:20. He also served as one of Errigal's two directors from its formation until approximately March 2022. *Id.* at 93:23-25, 168:15-21.

29. **Damian Magee ("Magee")**

a. Damien Magee worked for Campbells from January 2017 to August 2023. Magee Tr. 10:20-25. Magee was Errigal's other director, serving in that capacity from Errigal's formation until approximately March 2022. *Id.* at 10:20-12:14; 13:6-14. He testified that, after August 2021, he "d[idn't] recall any transfer of ownership of the Amadea." *Id.* at 149:4-6.

### iii.    <u>Suleiman Kerimov, Members of the Kerimov Family, and Employees</u>

30.    **Suleiman Kerimov ("Kerimov")**

   a.    Kerimov is a Russian businessman who is subject to sanctions via his placement on the OFAC's list of SDNs.  Pursuant to his designation as an SDN, U.S. persons (including U.S. financial institutions) are generally prohibited from engaging in any dealings involving Kerimov's property, or that involve the provision of funds, goods, or services to or for Kerimov's benefit.

   b.    The Government alleges that Claimants hold title to the *Amadea* on Kerimov's behalf (i.e., to help the Kerimov family freely use the *Amadea* irrespective of the financial and travel implications that come with Kerimov's designation as an SDN), but that the Kerimov family actually own the *Amadea*.  The Kerimov family were the sole users of the *Amadea* after the September 2021 MOA.

31.    **Firuza Kerimova ("Firuza")**

   a.    Firuza is Kerimov's wife.  She is also an SDN, and she cruised the Mediterranean on the *Amadea* in October 2021. *See* GX-410, 410-A, 410-B, and 410-C. (describing guest preferences for the October 2021 trip); Read Tr. 156:19-24 (Captain Read's testifying that he "deliver[ed] the boat to Sicily" in anticipation of "people getting ready to go cruising").

32.    **Gulnara Kerimova ("Gulnara")**

   a.    Gulnara is Kerimov's daughter.  She is also an SDN, and she took three trips on the *Amadea* between September 2021 and February 2022.  Claimants say these trips were charters of the *Amadea* rather than trips taken as an owner of the boat.  Gulnara was also involved in the *Amadea*'s planned renovation.

   b.    Claimants point to a purported "Charter Agreement," CX-6; GX-216, through which Gulnara agreed to charter the *Amadea* for a one-month trip through the Caribbean in early 2021, as evidence that the Kerimov family did not own the *Amadea*.  Claimants' PFOF ¶ 162-66.  As explained below, the Court finds the "Charter Agreement" has no probative value.

   c.    Claimants submit a declaration from Gulnara, which the Court excluded from evidence.  Claimants did not provide the Government Gulnara's declaration until two weeks before discovery was set to close in this case, which was not enough time to arrange her deposition before the discovery cutoff given the logistical challenges of deposing a Russian national.  They did not notice Gulnara's deposition until after the Court extended discovery for the sole purpose of completing *other* depositions, and they only did so in a foreign country where the Government did not have permission to participate in her deposition.  The Court,

therefore, granted the Government's Motion for a Protective Order, ECF 340, with respect to her and another witness (Alisa Gadzhieva), precluding her declaration from being entered as evidence in this case. *See* Mem. Orders, ECF Nos. 361 and 429; Hr'g Tr. 6:15-8:11.

33.    **Alisa Gadzhieva ("Gadzhieva")**

a.    Gadzhieva is Kerimov's niece. Gadzhieva made the two payments to Millemarin's parent company, IFF, as contemplated by the September 2021 MOA. See GX-412, GX-431-A, GX-704-H at 2.

b.    The parties disagree over whether Gadzhieva was sufficiently independently wealthy as to have made these payments on her own, or if she could only have done so on her uncle Kerimov's behalf. *Compare* Claimants' PFOF ¶ 124 (citing Gadzhieva Declaration, CX-64, CX-66-cx-69), *with* Gov't Proposed Findings of Fact and Conclusions of Law ("Gov't PFOF/COL") ¶ 89, ECF No. 452.[6]

c.    Claimants submit a declaration from Gadzhieva, which the Court excluded from evidence for the same reasons that it excluded Gulnara's declaration. *See* Mem. Orders, ECF Nos. 361 and 429; Hr'g Tr. 6:15-8:11.

34.    **Dinar Khalikov**

a.    Dinar Khalikov is an AV and IT consultant for the Kerimov family. The *Amadea's* captain described Khalikov as the "owner's rep[resenative]" with respect to the *Amadea*, Walsh Tr. 127:11-14, though Khalikov himself disclaimed that characterization, Khalikov Tr. 137:16-138:13.

b.    Khalikov did not offer testimony about Millemarin, and he testified that he "[n]ever" met Khudainatov. Khalikov Tr. 149:9-10. He testified "now I know that Mr. Khudainatov had paid for [the *Amadea*] and them someone had just taken it away from him," *id.* at 142:12-14, but he did not state the basis for that purported knowledge.

c.    He also testified that, in 2020, he visited the *Amadea* with Kerimov in Abu Dhabi. *Id.* at 157:20-159:23. He testified as to various problems that he perceived with the *Amadea*, including that it was noisy and that parts of its interior look "horrible." *Id.* at 152:25-253:2. Khalikov also testified that he advised Kerimov not to buy the

---

[6] Because it is unnecessary to the Court's decision—which is based on the absence of any competent evidence in the record that Claimants exercised the incidents of ownership with respect to the *Amadea* other than bare title after the September 2021 MOA—the Court does not wade through the evidence and conclusively resolve the factual question whether Gadzhieva was sufficiently independently wealthy so as to make payments of €225 million. However, the Court notes that the Government's evidence raises grave doubts with regard to Gadzhieva's ability to purchase the *Amadea* herself—that is, without financial assistance from Kerimov.

*Amadea* and that Kerimov responded in substance, "do you think I'm stupid." *Id.* at 59:21-60:1.

d.  To the extent Claimants rely on Khalikov's statements as to what Kerimov said, that testimony is excluded as hearsay. *See* Fed. R. Evid. 802. The Court also declines to credit Khalikov's testimony regarding the *Amadea* generally, which was implausible given the amount of money and effort that the Kerimov family invested in it, as described throughout this decision. His long-standing business relationship with the Kerimov family also created an incentive to obfuscate the Kerimovs' interest in the *Amadea*. *See* 4 Weinstein's Federal Evidence § 607.04[5] (2025) ("Relationships between a party and a witness are always relevant to a showing of bias, whether the relationship is based on ties of . . . business, friendship, enmity, or fear."). Finally, based on the Court's observation of Khalikov's testimony on video, including his demeanor and his narrative and non-responsive answers to questions,[7] the Court finds that Khalikov's testimony lacks credibility. *See Uddin v. Garland*, No. 20-3618, 2022 WL 14701072, at *2 (2d Cir. Oct. 26, 2022)[8] (holding that a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness).

35.  **Adam von Poblitz ("Von Poblitz")**

a.  Von Poblitz, an employee in Citibank's Global Family Office, helped manage Kerimov and his family's financial affairs. Von Poblitz Tr. 16:2-15; 16:16-18:6. He testified that he helped manage the Heritage Trust, a Kerimov family trust that "provide[d] resources to the broader [Kerimov] family and charity," *id.* at 17:5-25 - 18:1-6, and that was funded exclusively by Kerimov, *see id.* at 20:5-15.

b.  The Government points to Von Poblitz's testimony in arguing that (1) Gadzhieva's brother, Nariman Gadzhiev, headed the Kerimov family office, and (2) Gadzhieva was not independently wealthy enough to "loan" Errigal the € 225 Million to buy the *Amadea* as part of the September MOA—she got the money from Kerimov. *See* Government's PFOF/COL ¶¶ 28, 89.

36.  **Allen Vine ("Vine")**

a.  Vine is a Merrill Lynch investment analyst who served as an advisor to the Kerimov family office from 2006 through late 2017 or early 2018. Vine Tr. 10:2-18. Vine helped advise Kerimov's Heritage Trust, and the Government points to his

---

[7] *See, e.g.*, Khalikov Tr. 79:25-86:3 (exemplifying Khalikov's narrative testimony in an over-six-pages-long response to being asked, "what could make the vessel more charterable?").

[8] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

testimony to help establish that Gadzhieva is Kerimov's niece.  *Id.* at 40:9-44:16; 64:2-14.

    **iv.**    **Other Fact Witnesses**

37.    **Timothy Bergen ("Agent Bergen")**

    a.    Agent Bergen is a special agent with the FBI responsible for conducting and assisting in investigations into the activities of individuals and groups responsible for money laundering, sanctions evasion, and other crimes associated with organized crime.  Decl. of Timothy Bergen ¶ 2.

    b.    Agent Bergen swore out the affidavit in support of a warrant to seize the *Amadea*, and he submitted declaration testimony as to documents collected from the boat after it was searched by FBI agents in Fiji and, later, in California.  *Id.* at ¶¶ 11-12.  Agent Bergen also submitted testimony as to documents and other evidence collected pursuant to grand jury subpoenas on individuals, entities, and financial institutions associated with Errigal, Millemarin, and the *Amadea*.  *Id.* at ¶¶ 16-18.

    c.    Claimants object to Agent Bergen's declaration being entered into evidence "with few exceptions."  *See* Claimants' Objections to the Decl. of Timothy Bergen at 1.  Claimants do not object to the portion of Agent Bergen's declaration that the Court relies on in establishing the foundation of certain exhibits, *see supra*.  The portions of Agent Bergen's declaration that are not objected to are therefore admitted into the record without objection.  The Court does not rely on other portions of his declaration, objections to which are denied as moot.

38.    **Todd McGee ("Agent McGee")**

    a.    Agent McGee is a special agent with the FBI who also conducts and assists in investigations into the activities of individuals and groups responsible for money laundering, sanctions evasion, and other crimes associated with organized crime.  McGee Decl. ¶ 2.

    b.    Agent McGee interviewed two of the *Amadea*'s crewmembers—Captain John Walsh and Martin Messenger—at Los Angeles International Airport in April 2022 as the two men were attempting to travel enroute to Fiji to begin shifts on the *Amadea*.  *Id.* at 4.  Agent Magee's declaration identifies inconsistencies between their responses to his questions and their deposition responses.

    c.    Claimants object to Agent McGee's deposition testimony being entered into evidence on the grounds that it is either hearsay or fails to comply with the rule regarding impeachment by extrinsic evidence of a prior inconsistent statement.

However, because the Court does not rely on McGee's testimony to resolve the Government's Motion to Strike, it need not decide whether his declaration should be admitted.  Claimants' objections to it are therefore denied as moot.

39.    **Francois Zuretti ("Zuretti")**

  a.    Zuretti is the founder and former manager of Zuretti Interior Design, "a design office to provide interior design of motor yachts."  Zuretti Tr. 18:5-14.  Zuretti's design firm was hired to provide the interior design on three yachts: the *Amadea*, the *Crescent*, and the *Scheherazade*.  *Id.* at 25:6-18, 27:16-21, 109:5-12.

  b.    Zuretti claims to have met Khudainatov "more than ten" times, *id.* at 43:14-22, and "believe[s] even today" that Khudainatov owns the *Amadea*, *id.* at 149:13-19.  However, Zuretti provided no explanation as to why he holds this belief or why he is qualified to opine on the *Amadea's* ownership.

40.    **Peter Read ("Captain Read")**

  a.    Captain Read was first employed in connection with the *Amadea* "towards the end of the build process" and "came into the project as one of the two build captains" in 2016. Read Tr. 27:16-19.  When the *Amadea* launched, Captain Read became one of "the two operational captains."  *Id.* at 27:22-23.  Read remained a Captain of the *Amadea* until in or about October 2021.  *Id.* at 115:7-116:16.

41.    **John Walsh ("Captain Walsh")**

  a.    Captain Walsh was hired to captain the *Amadea* in November 2021.  Walsh Tr. 23:8-11, 92:14-18, 93:19-25.

  b.    Captain Walsh testified that, when he was hired, he understood the *Amadea* to be owned by Millemarin because that is what was indicated on his employment agreement.  *Id.* at 19:14-20:18.  He also testified that he did not know and did not care who the *Amadea*'s owner was when he was hired, *id.* at 19:7-13, and that, as of the date of his deposition, "To this day, I still don't know who the owner of *Amadea* is," *id.* at 72:8-9.

42.    **Martyn Messenger ("Messenger")**

  a.    Messenger was employed on the *Amadea* from December 2019 to April 2022 as its Chief Security Officer. Messenger Tr. 14:12-24; 6:1-16.

  b.    Messenger testified that he was told by a different *Amadea* crew member that Khudainatov owned the boat, *id.* at 17:2-11, but did not testify that he had his own firsthand knowledge of that fact.  Later, Messenger testified that he told U.S.

Customs and Border Patrol agents that Kerimov owned the *Amadea*. *Id.* at 83:1-10.

43. **Ben Turner ("Turner")**

a.  Turner testified in his capacity as captain of the *Amore Vero* and a former captain of the *Amadea*. Turner Tr. 13:4-15; 37:8-38:6; 11:4-12:5; 47:9-48:18. Turner testified regarding his experiences as a captain of a chartered vessel, stating that charterers typically do not renovate or otherwise change the vessels they charter. *Id.* at 29:17-25. He also testified that, when he was a captain of the *Amadea*, he did not know who owned the vessel, *id.* at 59:15-60:1, and that "none of [the crew] would truly know" whether a particular guest onboard was a charterer or owner, *id.* at 70:9-15.

**v.   Expert Witnesses**

44. **Anders Aslund ("Dr. Aslund")**

a. Dr. Aslund was offered by the Government as an economic expert who specializes in Russian economic matters. He received his doctorate from Oxford University and describes himself as "a leading specialist on Eastern European economies, especially Russia and Ukraine." Decl. Testimony of Anders Aslund ("Anders Decl.") ¶¶ 1, 4. From 1991-94, he worked as one of the chief economic advisors to Russian President Boris Yeltsin's reform government. *See id.* ¶ 1. He has served at numerous institutions, including the Stockholm Institute of Transition Economics at the Stockholm School of Economics, the Kennan Institute for Advanced Russian Studies, the Woodrow Wilson International Center for Scholars, the Brookings Institution, the Peterson Institute for International Economics, the Atlantic Council, the Russian and Eurasian Program at the Carnegie Endowment for International Peace, and the Carnegie Moscow Center's project on Post-Soviet Economies. *See id.* ¶ 2. He has written sixteen books, edited another sixteen books, and has published more than 1,400 articles, including in *Foreign Affairs*, *Foreign Policy*, *The New York Times*, *The Washington Post*, *Financial Times*, and *The Wall Street Journal*. *See id.* ¶¶ 2-3. He has spent his career studying Russia, including the activities and wealth of Russian oligarchs. *See* ¶ 3. He testified live and via declaration.

b. Specifically, Dr. Aslund opined on two disputed matters and reached the following conclusions: (1) that it was unlikely Khudainatov had the financial means to commission the *Amadea* (and, for that matter, the other super yachts Claimants' state that he owns, which collectively are valued at $1.5 billion), because evidence of his purported wealth during the relevant period—including valuations of his holdings in the oil and gas industries—is "inflated and highly misleading," *id.* ¶ 46; and (2) that Gadzhieva's purported loan to of €225 million to Errigal—a recently-formed shell company with no assets—did not make economic sense, *id.* ¶ 93.

16

c. Claimants filed a *Daubert* motion to exclude to Dr. Aslund's testimony. In it, Claimants do not challenge his qualifications as to Russian and Eastern European economies generally, but instead focus on two arguments:

  i. First Claimants object to Dr. Aslund's methodology, arguing that his testimony was simply a "regurgitation of news articles" and thus "is not an expert opinion at all." Claimants' Corrected Mot. to Exclude Expert Opinion of Anders Aslund at 2, ECF No. 385. But there is no authority for the proposition that a qualified expert cannot rely on secondary sources such as news articles, and courts routinely admit expert testimony based on such sources. *Cf. Coca v. City of Dodge City*, No. 22-1274, 2023 WL 8545263, at *7 (D. Kan. Dec. 11, 2023). Claimants' objections to Dr. Aslund's reliance on secondary sources concern the weight, not the admissibility, of his testimony.

  ii. Next, Claimants' dispute Dr. Anders' qualifications to opine on issues of "corporate valuation" with respect to oil and gas fields specifically. ECF No. at 15. Dr. Anders credibly testified as to his education with respect to auditing, and his experience on the board of Ukrainian State Railroads, a company with 250,000 employees, where he was a member of the audit committee. *See* Hr'g Tr. 285:20-25. This is more than enough to satisfy Daubert's requirements for establishing an expert's qualifications. *See Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12 Civ. 3040, 2014 WL 464769, at *2 (S.D.N.Y. Jan. 28, 2014) ("In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the 'liberal thrust' of the Federal Rules and their general relaxation of traditional barriers to opinion testimony."). In light of his education and experience with corporate auditing generally, any objection to Dr. Aslund's experience with respect to oil and gas field valuation specifically goes to the weight of his testimony, not the admissibility of it.

d. The Court therefore **DENIES** Claimants' motion as to Dr. Aslund's two opinions described above. Furthermore, the Court finds Dr. Aslund's testimony to be credible and persuasive. However, as explained below, his testimony concerns issues (Khudainatov's supposed wealth and Gadzhieva's purported loan) that are ultimately unnecessary to resolve in deciding the Government's motion. That is, while Dr. Aslund's testimony supports the Court's conclusions, it is inessential to the Court's decision.

45.    **Richard Connolly ("Dr. Connolly")**

a.    Dr. Connolly was offered by Claimants as an expert on the Russian economy to rebut the Government's economic expert's testimony.  He received his doctorate from the Centre for Russian and East European Studies (CREES) at the University of Birmingham and has served as director of the research institute there.  *See* Connolly Decl. ¶¶ 1, 3.  He describes himself as "an expert on the Russian economy." *Id.* ¶ 1.  He was a Visiting Professor of Public Policy at the Russian Presidential Academy for the National Economy and Public Administration (RANEPA) in Moscow for five years (2013- 2018). *See id.* ¶ 4.  As a consultant, his clients have included the U.K. Ministry of Defence, the U.S. Department of Defense, the U.S. National Intelligence Council.  *See id.* ¶ 6.  He has held roles with the Royal United Services Institute (RUSI) in London, the Centre for a New American Security (CNAS) in Washington, D.C., and at the NATO Defence College in Rome.  *Id.* ¶ 8.  He has written more than 100 academic articles, book chapters, policy reports and briefs, as well as book titled, *Russia's Response to Sanctions*.  *See id.* ¶ 9.  He testified live and via declaration.

b.    Dr. Connolly offered testimony responding to Dr. Aslund's opinion that Khudainatov lacked the wealth to commission the *Amadea* and other superyachts.  His primary point was that, given Khudainatov's status in his "professional network," which includes "Russian politicians and industry leaders as supporters," "it is highly likely that Mr. Khudainatov would have enjoyed the sort of access to income flows afforded to very few people in Russia." *Id.* ¶ 91.  He opined that, because Khudainatov had "the trust of some of Russia's wealthiest and most powerful individuals and organisations," he had an "unusual degree of access to large volumes of capital." *Id.* ¶ 90.  He also criticized Dr. Aslund for ignoring or understating "Khudainatov's other business activities that are likely to have added to his publicly observable income streams." *Id.* ¶ 93.

c.    Dr. Connolly also sought to explain Gadzhieva's €225 million "loan" to Errigal, which she paid directly to Millemarin in connection with the September 2021 MOA.  Dr. Connolly admitted that the "loan at issue may not be rational from a 'home economics' standpoint," but hypothesized that "[t]here are a variety of motivations that Ms. Gadzhieva may have acted upon." *Id.* ¶ 104.  Dr. Connolly offered no concrete explanation as to why Gadzhieva may have made a loan he characterized as "difficult to explain," Hr'g Tr. 235:13-14, and agreed is facially "irrational," *id.* at 229:1-4.

46.    **Sean Meagher ("Captain Meagher")**

a.    Captain Meagher was offered by the Government as an expert on yachting.  He has 38 years as a professional captain, including "over 150 weeks of charter on vessels

ranging from 65 feet to 357 feet in length." Meagher Decl. ¶ 8. He attended the Naval honors school Tabor Academy and the Massachusetts Maritime Academy. *See id.* ¶ 1. Among other things, he is a managing partner of Marinus Vectors, which provides "technical, operational, tactical, and strategic solutions to unique challenges within the maritime sector, particularly in the superyacht industry and maritime critical infrastructure." *Id.* ¶ 2. He testified live and via declaration.

b.  Captain Meagher testified on various topics including changes made to the *Amadea* crew's uniforms and renovations made and planned for the *Amadea* at the direction of members of the Kerimov family, and which he opined went "far beyond what would be expected from a mere charter guest." *Id.* ¶ 48, *see also id.* ¶¶ 54-55, 67-71, 81-83, 87-88.

c.  Claimants move to exclude Captain Meagher's testimony. Their principal argument is that he "lacks the requisite expert experience to opine on the M/Y *Amadea* and practices aboard the *Amadea*" because he has not regularly skippered boats of similar size and value and with a similar management structure. Claimants' Mot. in Lim. to Exclude Expert Test. and Report of Sean P. Meagher ("Mot. to Exclude Meagher Test.") at 1, ECF No. 376. But Captain Meagher testified that, in addition to his other experience, he has served as a relief captain on the *Bravo Eugenia*, a 109-meter vessel that, during his service was chartered once for approximately one week. *See* Hr'g Tr. 164:10-18. Claimants' argument that the bulk of Captain Meagher's experience was on comparatively smaller vessels goes more to the weight that should be afforded his testimony, rather than suggesting that he is altogether unqualified. The Court finds that Captain Meagher's extensive experience generally and on the *Bravo Eugenia* specifically are sufficient to establish his qualifications under *Daubert*. *See Travelers Indem. Co.*, 2014 WL 464769, at *2.

d.  Claimants also raise a number of objections to various aspects of Captain Meagher's testimony. The Court rejects these objections, as follows:

    i.  Claimants argue that Captain Meagher's testimony that certain changes made to the *Amadea* at the direction of Gulnara Kerimova are the type likely to be made by an owner of a vessel (rather than a mere charterer) reflect his personal, not expert, opinion. *See* Mot. to Exclude Meagher Test. at 14-15. This objection is specious; Captain Meagher's opinion in this regard is based on his experience captaining 150 weeks' worth of charters. *See* Meagher Decl. ¶ 8.

    ii.  Claimants also raise objections to any testimony about whether the *Amadea* could legally be chartered (something that Captain Meagher did not opine

about); Captain Meagher's testimony as to witness credibility (which Captain Meagher also did not opine about except in response to deposition questions posed by Claimants); and his testimony about ownership of the *Amadea* (which the Court does not rely on).  These objections are therefore **DENIED** as moot.

47.  **Michael Hitch ("Captain Hitch")**

a.  Captain Hitch is Claimants' rebuttal expert offered to refute Captain Meagher's testimony.  Captain Hitch skippers the M/Y *Nord*, a 142-meter-long vessel, and has over forty years of seafaring experience, including on yachts greater than 80 meters long.  Rebuttal Decl. of Michael A. Hitch, ¶1-2.

b.  The Court entertained Claimants' initial request for Captain Hitch to testify via remote means (provided requisite legal authorizations for the Government to participate, and appropriate safeguards to ensure reliability, were in place), but Claimants ultimately withdrew their request.  *See* Hr'g Tr. 9:14-22.  Captain Hitch's testimony was instead offered by declaration; he did not appear live at the evidentiary hearing.

c.  The Government objected to Captain Hitch's declaration being entered as evidence, arguing that it is hearsay.  The Government also argued that Captain Hitch's report should not be entered into evidence because it contains four paragraphs added after he was deposed.

d.  The Court ultimately allowed Captain Hitch's report and affidavit to be admitted as evidence except for the four new paragraphs.  Hr'g Tr. 69:10-22.  Given that Captain Hitch did not appear, the Court ordered that "his report and affidavit [would serve] as his direct and his deposition designations [would serve] as the cross." *Id.* at 69:18-22.

e.  In his declaration, Captain Hitch opined, based on his review of various documents, that "Gulnara Kerimova was a guest of the Amadea in late 2021 – early 2022 pursuant to a charter agreement, [and] it does not appear that Ms. Kerimova ever purchased the Amadea, and there is no support for the conclusion that her father, Mr. Suleiman Kerimov, ever became the ultimate beneficial owner of the vessel." *Id.* ¶ 34.  Captain Hitch did not explain the basis for his conclusion in this regard other than to say that it is based on "a careful and thorough review" of certain documents listed by Bates number in an appendix to his declaration.  *Id.* ¶ 33.

f.  Captain Hitch also opined that the changes made to the *Amadea* at the direction of Gulnara Kerimova "were minimal," and "were typical accommodations for an ultra-high net worth individual who intended to charter a vessel long-term." *Id.* ¶ 36.  He further opined that these changes were "all consistent" with Claimants'

"theory of the case" that Gulnara Kerimova merely chartered (and did not own) the *Amadea*, and that the *Amadea* was never sold. *Id.* ¶ 35.

g.  Captain Hitch's testimony that the changes made to the *Amadea* were "typical," however, was undermined by his acknowledgement that in his experience, he has never seen charter guests making the sorts of changes to a vessel ordered by members of the Kerimov family to the *Amadea*, including: changing the entire purpose of a room; replacing toilets and bidets; removing built-in bars; removing a jacuzzi; re-doing a deck in a different type of wood; removing refrigerators from guest cabins; changing the yacht's inlaid metal finishes; re-wiring electrical sockets; or (more generally) making changes so large that an interior designer would fly to the yacht to present renderings.  Hitch Tr. 13:13-16:1. The Court therefore declines to credit his testimony that the changes made or contemplated to the *Amadea* were "minimal."

48.  **Ewan McKendrick ("Professor McKendrick")**

a.  Professor McKendrick is a lawyer and professor based in the United Kingdom whom the Government commissioned as an expert and who wrote a report opining on the legal significance of the September 2021 MOA.  The Government ultimately chose not to rely on his opinion or call him as a witness at the evidentiary hearing.

b.  Claimants point to Professor McKendrick's testimony to substantiate their claim that the transaction between Millemarin and Errigal never closed.  McKendrick Tr. 63:10-14.  Professor McKendrick testified that "[a] completion of sale would be the point at which legal title, i.e. property, passes from seller to buyer," and that he "ha[d]n't seen anything that suggests title was passed from seller to buyer under th[e] agreement because clause (18) was not implemented." *Id.* at 17:1-3; 38:22-25.

II.  **The Errigal Transaction**

A.  **Evidence of Claimants' Ownership of the *Amadea* Before September 2021**

49.  Relying largely on declarations that the Court excluded as hearsay, Claimants aver that "Mr. Khudainatov commissioned, built, and continues to own, not only the *Amadea*, but also the *Crescent* and the *Scheherazade*."  "Claimants' PFOF" ¶¶ 72-83 (citing, *inter alia*, Khudainatov Khudainatov's and Kochman's excluded declarations, the deposition testimony of Khudainatov employee Parfireva (which itself was largely based on her review of Khudainatov's declaration),

and various exhibits). As explained below, resolving this issue is ultimately unnecessary to the Court's decision, which turns on: (1) the transfer of ownership rights in the *Amadea* other than title under the September 2021 MOA, and (2) the absence of competent evidence that Claimants exercised any of those rights in ownership afterwards. But the Court finds, in light of the broader record in this case, that it cannot credit Claimants' assertions regarding the commissioning of the *Amadea*:

     a. The Government presented significant evidence tending to show that Claimants' assertion that Khudainatov commissioned the *Amadea* is implausible. *See* "Gov't PFOF/COL"), ¶¶ 145-58 (citing, *inter alia*, expert testimony of Dr. Aslund opining that Khudainatov lacked the necessary wealth to acquire the *Amadea* and other superyachts, inconsistencies in Claimants' account of his ownership of these vessels, and various exhibits); Aslund Decl. ¶ 57 (opining that, in light of evidence regarding Khudainatov's wealth, "it is implausible that he would [have] be[en] able to purchase the *Amadea*" for approximately €213 million between 2012 and 2017). In particular, Dr. Aslund's expert testimony, which the Court credits, painstakingly reviews the public record concerning Khudainatov's wealth during the relevant period, and he persuasively opines that that record does not indicate that Khudainatov in fact had the financial resources to commission the *Amadea* (and, for that matter, the other superyachts Claimants assert he commissioned and/or owned during the same period).

     b. Dr. Connolly's rebuttal testimony on this question did not undermine Dr. Aslund's conclusions. As noted, the primary point of Dr. Connolly's testimony was his assertion that Khudainatov had "the trust of some of Russia's wealthiest and most powerful individuals and organisations," and therefore would have access to "large volumes of capital" and "other business activities that are likely to have added to his publicly observable income streams." Connolly Decl. ¶¶ 90, 93. But Dr. Connolly does not concretely state what those sources of capital or non-publicly observable income streams may have been. The Court therefore cannot credit Dr. Connolly's testimony in this regard, which is purely speculative. *Cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural").

    50.    On June 10, 2021, Claimant Millemarin was incorporated under the laws of the British Virgin Islands. GX-406-C; GX-406-D at 2-3; CX-408, CX-410. A little over one month later, or around July 20, 2021, Millemarin signed a "Memorandum of Agreement," with Nereo— another entity that Claimants aver is owned by Khudainatov, *see* Claimants' PFOF ¶ 27—which

provided that Nereo as "seller" would transfer the *Amadea* to Millemarin as "buyer." *See* GX-209. The agreement stated that its "completion date" was August 16, 2021.  GX-209 at 2.

51.     On or around August 16, 2021, Captain Read sailed the *Amadea* to international waters and signed documents to effectuate its sale from Nereo to Millemarin. *See* Read Tr. 110:15-114:3; GX-219 (Bill of Sale signed by Captain Read); Magee Tr. 110:11-113:3 (stating that, upon receipt of the certificate of registry from the Cayman Island Shipping Registry representative, Millemarin became the registered legal owner of the Amadea as of August 16, 2021).

### B.    The Terms of the September 2021 MOA with Errigal

52.     On September 8, 2021, Errigal was incorporated under the laws of the Cayman Islands. GX-304.  At this time, John Wolf and Damien Magee of the Campbells law firm were the only people acting as Errigal's directors; they continued in that role until March 13, 2022.  *See* GX-307 at 63.  According to Claimants, Kochman was Errigal's ultimate beneficial owner.  *See* GX-701 at 11.[9]

53.     On or around September 14, 2021, Millemarin and Errigal signed a "Memorandum of Agreement."  *See* GX-212 (the "September 2021 MOA").  Olga Kroon signed on behalf of Millemarin, and Damian Magee signed on behalf of Errigal.  *Id.* at 8.

54.     As discussed below, while the parties disagree as to the purpose of the September 2021 MOA, there is no dispute that, on its face, it provided that Millemarin "agree[s] to sell," and that Errigal "agrees to buy," the *Amadea*.  GX-212 at 4, cl.14; *id.* at 5, cl. 24.

---

[9] Claimants object to this exhibit, their own Amended Responses to the Government's Special Interrogatories, subject to admission of highlighted portions of their responses.  *See* Gov't Ex. List, COURT-X-2.  The Court admits the exhibit in its entirety and overrules the objection as moot. The Court also so rules with respect to Claimants' other discovery responses: Claimants' Second Amended Responses to the Government's Interrogatories (GX-702) and Claimants' Responses to the Government's Requests for Admission (GX-704).

55.    Specifically, on its face, the September 2021 MOA provides:

a.    that the "NAME OF SELLER" is "Millemarin," and that the "NAME OF BUYER" is "Errigal," *id.* at 1, cls. 2-3;

   i.    that the "SALES PRICE" is €225 million, *id.* at 2, cl. 6;

   ii.    that the "PAYMENT SCHEDULE" consists of a "non-refundable" payment of €45 million, with the remaining balance of €180 million to be paid by November 1, 2021, *id.* at 2, cl. 7;

   iii.    that "The SELLER agrees not to enter into any other agreement for the sale of the VESSEL," *id.* at 4, cl. 14;

b.    with respect to <u>usage and control</u> of the Amadea, that

   i.    "SELLER undertakes not to use the VESSEL after the Sea Trial and/or the Condition Survey," *id.* at 4, cl. 22; and

   ii.    "The BUYER has conducted sea trial of the VESSEL on 11 September 2021 and has accepted the VESSEL," *id.* at 3, cl. 13(b)

   iii.    "The BUYER may use the VESSEL after first payment and becomes fully responsible for all Running cost (operational, technical and crew costs)," *id.* at 3, cl. 13(b).

   iv.    "The Buyer may start using the yacht and/or start any works on board after [the initial] payment," *id.* at 2, cl. 7

c.    with respect to <u>financial responsibilities</u>, including

   i.    "RUNNING COSTS," the MOA provides that "All running costs for the VESSEL including berthing fees and crew's wages shall be for the BUYER'S account until Completion of the Sale," *id.* at 4, cl. 19;

   ii.    "RISK," the MOA provides that "The risk of loss, damage, or destruction of the VESSEL shall be borne by the BUYER until the Completion of the Sale," *id.* at 4, cl. 22.

d.    that "time being of the essence," the "COMPLETION DATE" is "1 November 2021 upon receipt of payment in full or such earlier date as may be agreed" *id.* at 3, cl. 12, and

   i.    Under the heading "COMPLETION OF SALE," the MOA provides that "on delivery of the VESSEL and in exchange for payment of the Sales Price, the SELLER shall provide the documentation set out in Annex One," *id.* at 4, cl. 18;

ii. Annex One, in turn, describes various documents including a Legal Bill of Sale, *see id*. at 10-11.

e. under the heading "CANCELLATION," that "BUYER shall return the VESSEL" "[i]n the event of this Agreement being terminated under any of the terms and conditions of Clauses (25) or (26)," *id.* at 5, cl. 28, which in turn are titled "SEA TRIAL" (cl. 25), and CONDITION SURVEY (cl. 26);

f. that the written agreement was "the entire Agreement between SELLER and BUYER," and there were "no other duties, obligations, liabilities or warranties implied or otherwise," GX-212 at 6, cl. 35;

## C.    Payments in Connection with the September 2021 MOA

56.    There is no dispute that two transfers, totaling €225 million, were made in connection with the September 2021 MOA. *See, e.g.*, Claimants' Rule 56.1 Statement ¶¶ 11-13, ECF No. 124.

57.    In a letter dated September 15, 2021, Millemarin told Errigal that payments under the September 2021 MOA "should be made to the account of Invest International Finance, Ltd," CX-247-A at 1, which was Millemarin's parent company.

58.    IIF received two transfers, totaling €225 million, in connection with the September 2021 MOA. While the record is somewhat unclear as to the precise date of the first payment, there is no dispute that the second payment was received on or about October 27, 2021. *See* Hr'g Tr. 440:14-24; Claimants' PFOF ¶ 118 (first payment of €45 million on October 6, 2021, second payment of €180 million on or about October 27, 2021) (citing, *inter alia*, CX-453, CX-458); Gov't PFOF/COL ¶¶ 85-86 (first payment of €45 million by September 15, 2021, second payment of €180 million on or about October 27, 2021) (citing GX-704 at 2 (Claimants' response to Request for Admission); GX-431 (Kochman email); GX-431-A (bank transfer confirmation)).

59.    There is no dispute that these two payments were made from accounts in the name of Alisa Gadzhieva, the niece of Suleiman Kerimov, and not from accounts in the name of Errigal or Kochman. *See* Hr'g Tr. 440:25-441:15; GX-412 at 1, GX-431-A at 1, GX-704 at 2. This

undisputed fact directly contradicts Claimants' interrogatory responses stating that the September 2021 MOA "was not a transaction involving any third party and specifically not Kerimov."  GX-701 at 19.

60.    Claimants assert that Gadzhieva's payments to IIF represented a "loan" from Gadzhieva to Kochman (rather than a payment to purchase the *Amadea* directly).  Claimants' PFOF ¶ 120.  But there is no dispute that Gadzhieva did not send the funds to Kochman or to his company, Errigal, but rather to Millemarin (or more precisely, to its parent company, IIF).  *See* Claimants' PFOF ¶¶ 120-29.  Claimants have produced the supposed loan agreement in discovery, as well as two letters from Errigal to Gadzhieva referencing the loan agreement.  *See* GX-412 at 1 (stating in part "GRANTING A CREDIT/LOAN TO A NON-RESIDENT LOAN AGREEMENT 15.09.2021");  GX-412-A (September 15, 2021 Errigal letter re: loan);  GX-412-B (loan agreement);  GX-430 (October 21, 2021 Errigal letter regarding the loan);  GX-431-A at 1 (stating in part "GRANTING A CREDIT/LOAN TO A NON-RESIDENT").

61.    As explained infra, resolving whether or not the Gadzhieva payments constituted a loan to Errigal (rather than a payment to Millemarin to buy the *Amadea*) is ultimately unnecessary to the Court's decision.  But the Court notes that it does not credit these documents or Claimants' representations as to a "loan" for several reasons.

    a.  First, the purported "loan"—an unsecured transaction of €225 million to Errigal, a shell company that lacked any assets and had only been incorporated the week beforehand—makes no sense, and Claimants' proffered explanation is so irrational as to be implausible.  There is nothing in the record to explain why Gadzhieza would make such a loan.  Specifically:

        i.  The loan charged only 3.5 percent annual interest with a 10-year term, *see* GX-412-B at 2, was unsecured, and Errigal had no assets and therefore no means of repaying the loan.  *See* Magee Tr. 22:6-11 (testimony of Errigal director: "Q. If Errigal had no assets, could Errigal have paid back two hundred twenty-five million Euros plus interest? . . . A. I do not know how Errigal could have repaid this loan").  Indeed, the €225 million "loan" amount was not even paid to Errigal itself, but rather to a different entity—

IIF. *See* GX-412-A (Errigal letters instructing that Gadzhieva pay funds under the loan to IIF); GX-430.

ii. Claimant's expert, Dr. Connolly, did not dispute that the loan was, on its face, irrational from a purely economic perspective. He agreed that the loan "does seem difficult to explain." Hr'g Tr. 235:13-14; *see also id.* 231:19-25 (agreeing that the interest rate was "very, very low"); *id.* at 234:7-17 (admitting that Gadzhieva could have gotten a better return with far less risk by investing in the public securities markets); *id.* at 229:1-230:5 (admitting that the loan would "seem irrational" to "mere mortals . . . someone like you and me"); *id.* at 236:2-4 (admitting that he could not say how Errigal could have possibly repaid the loan).

iii. Dr. Connolly testified, however, that it "may be that there are other motivations driving the extension of this loan," *Id.* at 229:11-12, because "the Russian economy especially in the elite is one characterized by high levels of informality" where "doing favors or helping other parts of that elite is something [one must] engage in to get by." *Id. at* 229:14-15; 230:6-10. Based on this testimony, Claimants contend that "Dr. Connolly . . . provided a plausible explanation for the Alisia Gadzhieva loan . . . , namely that within the society of ultra-high net worth individuals in Russia, it may have been to her perceived advantage to assist Kochman in a transaction," and that, according to Dr. Connolly, "the relatively low interest rate set forth in the loan agreement . . . indicated Ms. Gadzhieva considered the loan to have relatively low risk." Claimants' PFOF ¶ 215.

iv. Dr. Connolly was, however, not aware of anything specific that could have caused Gadzhieva to extend the admittedly "irrational" loan to Errigal. Hr'g Tr. 230:14-22. There is nothing in the record suggesting any specific motive for the purported loan. His testimony that any such motive "may" exist is pure speculation, and the Court therefore declines to credit it. *Cf. Boucher*, 73 F.3d at 21 ("[E]xpert testimony should be excluded if it is speculative or conjectural."). To the extent Dr. Connolly offered testimony about Ms. Gadzhieva' perception of risk, such testimony also lacks foundation and is purely speculative, and the Court declines to credit it.

b. Second, the Court finds that it is more likely than not that the signatures of Errigal's director, Damian Magee, on the loan agreement and two associated Errigal letters, were forged and that these documents are fraudulent.

i. The loan agreement and the two letters were each purportedly signed on Errigal's behalf by Magee, *see* GX-412-B, GX-412-A, GX-430, but he had no recollection of them. Magee testified that he had no recollection of having signed—or even seen—the loan agreement. *See* Magee Tr. 20:7-12. Magee also testified that he did not recall signing the two letters directing

Gadzhieva to make the payments under the loan agreement. *See* Magee Tr. 26:15-27:22.

ii.  Magee's lack of recollection of these documents is notable for several reasons. Although Magee testified that he signed many documents over the years, he also testified that he "very rarely, if ever" was asked to sign agreements involving such large sums. Magee Tr. 22:22-23:10.[10] Magee also testified that approving a loan from a member of a sanctioned individual's family could expose him to personal liability under Cayman law. *See* Magee Tr. 55:3-56:21.

iii.  Claimants do not address Magee's testimony in this regard in their Findings of Fact, and the Court finds that Claimant's position—stated with substantial hesitation at closing argument—that Magee signed documents taking out a €225 million loan and then simply forgot that he did so, *see* Hr'g Tr. 455:11-457:4, is implausible.

iv.  Magee noted other discrepancies about the loan agreement as well, such as his signature not appearing the way he would expect, the lack of corporate records of due diligence for the loan, the fact that as a director of Errigal he would have known if Errigal had incurred €225 million in debt, and that a four-page loan agreement was unusually short for such a large financial commitment. *See* Magee Tr. 22:12-26:11, 33:18-25.

v.  Wolf, Magee's supervising partner and co-director of Errigal, likewise testified that he had not seen or heard of any loan to Errigal. *See* Wolf Tr. 89:9-15. Moreover, Wolf would have been "absolutely" surprised if Magee had signed such documents because for Errigal to borrow money, there would need to be resolutions of the board of directors and neither he nor Magee—Errigal's directors—had prepared any such resolutions. *See* Wolf Tr. 93:12-95:17 (testifying that it is "inconceivable" that Magee would have signed such a loan agreement without bringing it to Wolf's attention).

vi.  Finally, Roger Jackson, Campbells' Head of Information Technology, testified that the corporation retained both employee emails and client documents—such as loan agreements and letters—from 2021 on. *See* Jackson Tr. 19:9-16; 31:1-33:18. Jackson searched Campbells' IT systems using a broad range of keywords and did not find either the loan agreement or letters (*see, e.g.*, GX-412-B, GX-412-A, GX-430); nor did he find documents similar to them (such as earlier drafts), or any "emails or other correspondence that discuss[ed]" the letters or loan agreements. *See id.*

---

[10] Claimants' objections to the testimony of Wolf and Magee regarding the loan documents as "speculative" are overruled. Their testimony in this regard is based on personal experience and does not constitute inappropriate speculation. For example, Magee's testimony that he "rarely" signed documents involving similar amounts of money is a statement of fact about his experience, not "speculation."

17:15-34:22; GX-807 (search terms used by Jackson to search for the Errigal loan agreement and letters).

c.  In light of the absence of any explanation for the purported €225 million Gadzhieva-Errigal "loan," Magee and Wolf's complete lack of recollection of the loan documents (which the Court finds implausible given the size of the loan), the discrepancies Magee identified with his signature, and Jackson's inability to find any record of the agreement or the letters associated with it on Campbells' IT systems, the Court finds that it is more likely than not that Magee's signature on these documents was forged and that the purported loan documents are fraudulent.

**D.    Addenda to the September 2021 MOA**

62.    There is no dispute that "the Completion Meeting contemplated in Annex One of the September 2021 MOA appears not to have occurred."  Gov't PFOF/COL ¶ 102.

63.    There are no fully executed versions of the documents described in Annex One in the record.

64.    Wolf—the Campbells lawyer who served as one of Errigal's directors—testified with respect to the September 2021 MOA that "we were asked to execute [this agreement and] we did, but then it never seemed to close which is in itself unusual."  Wolf Tr. 87:18-20; *see also id*. at 92:4-7.

65.    The only communications in the record bearing directly on why the Annex One documents were not signed are a November 19, 2021, email chain from Julia Stewart of Imperial Yachts to Mikhail Avsiannikov, an employee of the Khudainatov family office.  In it, Stewart states:

Evgeniy met with the Principal yesterday. It has been decided to leave Milemarin as the registered owner until 1 May 2022. In reality, we will aim to do the re-registration in March – April when the yacht will be a long way from Europe.

GX-436 at 3.[11]  Avsiannikov replied that:

---

[11] "Evgeniy" appears to be a reference to Evgeniy Kochman.  The email does not specify who the referenced "Principal" is.

29

The director of Milemarin Olga Kroon is much concerned about the obligation of Milemarin to transfer the ownership title once the final payment is made under the MOA of 14 September 2021. The final payment has already been made.

*Id.* at 2-3.

### i.   The November 2021 Addendum

66.    In response, Stewart suggested that the parties sign an "Addendum Two" to the September 2021 MOA.  *Id.* at 2.

67.    On November 30, 2021, Stewart sent Avsiannikov an email attaching a signed "Addendum Two" to the September 2021 MOA (the "November 2021 Addendum").  *See* GX-437 (cover email); GX-437-A (signed attachment).  Pursuant to Addendum Two, "the Completion Date is postponed until May 1, 2022."  GX-437-A.

68.    On its face, the November 2021 Addendum reiterated that Errigal retained all financial responsibilities associated with the *Amadea*:

    a.   Errigal "shall pay all insurance costs" for the *Amadea*;

    b.   Errigal "will be responsible for costs of rectifying any loss or damage, including but not limited to total loss of the yacht";

    c.   Errigal "shall pay all and any costs associated with or incurred by the Yacht or by [Millemarin] in connection with the yacht from 14 September 2021 until the Completion Date";

    d.   Errigal "is fully responsible for and shall pay all costs of the Yacht's or [Millemarin's] compliance with all applicable rules and requirements of Flag and Class";

    e.   Errigal "shall pay all operational costs from 14 September 2021 such as crew salaries, insurance, technical, and operational maintenance, fuel and consumables, mooring and any Port fees, food and alcohol, and any other costs incurred by the Yacht";

    f.   Errigal "shall indemnify [Millemarin] for any loss or damage of the Yacht, including but not limited to total loss of the Yacht, until the Completion Date"; and

    g.   "[i]n the event of a dispute, Errigal will cover all the costs of [Millemarin] or any other party related to [Millemarin] associated with the dispute."

*Id.* at 1.

### ii.  The March 2022 Addendum

69.    On March 7, 2022, Millemarin, its parent company IIF, and Errigal signed a document styled as an "amendment" to the September 2021 MOA. *See* GX-217 (the "March 2022 Addendum").  Millemarin's director, Olga Kroon, signed for Millemarin and IIF; Errigal's director, John Wolf, signed for Errigal.  GX-217 at 3-4.

70.    The recitals to the March 2022 Addendum reiterate that "the Company [Millemarin] and the Purchaser [Errigal] entered into the Memorandum of Agreement upon which the Company agreed to sell the vessel — pleasure yacht named Amadea," and that "[t]he sale price under the Memorandum of Agreement was paid by the Purchaser to the account of the Seller in two tranches: the first tranche amounting to EUR 45 mln was paid on 17 September 2021, and the second tranche amounting to EUR180 mln was paid on 27 October 2021." *Id.* at 2

71.    Under the terms of the agreement, Errigal agreed to purchase Millemarin's shares for €225 million, but the two prior payments totaling €225 million that had already been paid in connection with the September 2021 MOA "shall be set off" against the purchase price. GX-217 at 2 (Clauses 1 and 2). Thus, in exchange for the September and October 2021 payments from Gadzhieva for the *Amadea*, IIF would transfer the shares of Millemarin to Errigal without any additional payments being required.

72.    On its face, the March 2022 Addendum—which was styled as an "Amendment" to the September 2021 MOA, *see* GX-217 at 1—did not purport to replace or cancel the September 2021 MOA. *See also* Wolf Tr. 80:22-23 (Errigal Director who signed the March 2022 Addendum on behalf of Errigal—testifying that "it was perfectly obvious to me on the face of this that [the

September] MOA still stood.").  There is nothing in the March 2022 Addendum that purports to address the September 2021 MOA's conveyance of the incidents of ownership over the *Amadea*.

73.    The March MOA provided that "the closing of this agreement will take place on or before 15 March 2022."  GX-217 at 3 (Clause 5).  IIF signed a share transfer certificate dated March 10 transferring its shares in Millemarin to Errigal, *see* GX-218, but there is no version in the record countersigned by Errigal.

       **E.**    **Claimants' Proffered Evidence that the September 2021 MOA Was Not a Sales Agreement**

74.    Notwithstanding the face of the September 2021 MOA, which states that it is a sales agreement, Claimants contend that it represented a "Temporary Use Agreement" between Khudainatov (Millemarin) and Kochman (Errigal), to "grant temporary use of the *Amadea* to [Errigal and] Kochman, including the ability to charter the vessel and market it for sale in search of a buyer."  Claimants' PFOF ¶ 108.  According to Claimants, the purpose of this "Temporary Use Agreement" was to effectuate a prior "Cooperation Agreement" to enlist Kochman to sell the *Amadea*.  *See id.*

75.    The Court cannot credit Claimants' assertions of a preexisting Cooperation Agreement.  The purported Cooperation Agreement itself, CX-242, which has been offered by Claimants, is excluded as untimely disclosed and for lack of foundation.[12]

---

[12] As an initial matter, the document Claimants provided the Court is in Russian; they did not provide the Court with a translation of it (but the Government did).  Claimants' Exhibit List, COURT-X-1, indicates that the Government objects to CX-242 on the bases that: (1) it was not timely disclosed, and (2) it lacks a proper foundation.  Claimants respond by pointing the Court to their Opposition to the Government's Motion in Limine dated Jan. 27. 2025, ECF No. 447, and Parfireva's deposition testimony.  As to the Opposition brief, it does not directly reference CX-242.  Moreover, as discussed *infra*, the Court grants the Government's Motion in Limine to exclude various documents as untimely disclosed and not properly authenticated as business records.  As for Parfireva's deposition testimony, Claimants do not cite particular pages of Parfireva's deposition transcript that properly authenticate it, for example, by establishing that it was "kept in

76.    But even assuming that such a preexisting Cooperation Agreement existed, the Court cannot credit the contention that the September 2021 MOA represents a "Temporary Use Agreement" rather than a sales agreement for several reasons.  First, there is no competent documentary evidence in the record supporting Claimants' contention that the September 2021 MOA was for mere "temporary use" of the *Amadea* as opposed to a sale:

    a.   Claimants' contentions as to a temporary use agreement contradict the face of the September 2021 MOA itself, which repeatedly and without exception uses the language of a "sale" of the *Amadea*.  *See, e.g.*, GX-212 at 1, cl. 2-3 (referring to Millemarin and Errigal as "Seller" and "Buyer," respectively); *id.* at 2, cl. 6 (referring the "sales price"); *id.* at 4, cl. 14 (Millemarin "agrees to sell" the *Amadea*).  By contrast, there is nothing in its language suggesting that it was intended as an agreement for temporary use, such as any limitation on the timeframe of the supposed temporary use, provisions for the return of the *Amadea* after that term has run, provisions regarding the assessment of the vessel's condition on return, or any provisions describing how and when the €225 million "sales price" should be returned.[13]

    b.   Claimants' contentions regarding a temporary use agreement also contradict every relevant external document properly in the record, which all refer to the September 2021 MOA as a sales agreement.  *See, e.g.*, GX-437-A (November 2021 Addendum); GX-217 (the March 2022 Addendum); GX-412 at 3-6 (email thread between Julia Stewart of Imperial Yachts, Evgeniy Kochman of Imperial Yachts/Errigal, and Parfireva of the Khudaintatov family office referring to the

---

the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record]."  *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) (cleaned up).  It is not the Court's responsibility to sift through her entire deposition transcript to identify where the foundation for the document was purportedly established.  In any event, the Court has searched through Parfireva's transcript, and she testified that she had no involvement in the drafting of the purported Cooperation Agreement and claims to have seen it only after it was signed.  *See* Parfireva Tr. 213:7-15.  Accordingly, the Court sustains the Government's objections and excludes CX-242.

[13] At closing argument, Claimants pointed to the fact that the first payment was refundable as circumstantial evidence that the September 2021 MOA contemplated a temporary use agreement. *See* Hr'g Tr. 460:24-465:4.  But the fact that a deposit is non-refundable says nothing about whether an agreement is for temporary use.  Claimants also relied on Errigal Director Wolf's testimony that a provision permitting use of a yacht immediately after putting down a deposit is "unusual," *see* Wolf Tr. 84-85, but the fact that the transaction was unusual does not imply that the MOA was, contrary to its plain terms, intended merely for "temporary use" of the *Amadea*.  Finally, to the extent that Claimants rely on Parfireva's testimony regarding the deposit, the Court has addressed that point *infra*.

"buyer" and "seller," as well as an "SPA," an abbreviation for "sales purchase agreement"); GX-409, 409-A (Stewart email attaching draft September 2021 MOA as "Sale Contract A v3 clean.docx"); GX-481 & 481-A (Stewart email attaching draft September 2021 MOA as "Amadea sale contract v 4.pdf");[14] GX-495 at 1 (Stewart email to Parfireva attaching draft September 2021 MOA with subject line "Amadea sale" and discussing "Purchase of Amadea"). There is no suggestion in any of these documents of a temporary use agreement. There are no external documents in the record referring to the September 2021 MOA as a cooperation agreement or temporary use agreement.

77.     Second, there is no competent testimony in the record describing the September 2021 MOA as having been intended to effectuate a purported cooperation agreement between Khudainatov and Kochman. The only testimony offered by Claimants in this regard is from Parfireva, an employee of the Khudainatov family office. *See* Parfireva Tr. 63:11-14; 85:21-86:23.[15] The Court cannot accord any weight to her testimony in this regard for several reasons.

     a.     First, Parfireva lacks personal knowledge as to the intentions of the parties with respect to the September 2021 MOA,[16] and is therefore not competent to testify regarding it. See Fed. R. Evid. 602 ("A witness may testify to a matter only if

---

[14] Claimants purport to object to these exhibits on foundation, authenticity, and hearsay grounds. Those objections are overruled, as the exhibits are authenticated in Agent Bergen's declaration. *See* Bergen Decl. ¶16 (authenticating and laying the foundation for various documents). Claimants do not object to this portion of Special Agent Bergen's testimony, other than to "reserve" their right to object to the exhibits referenced therein. Having reviewed the declaration, the Court finds that it lays an adequate foundation for these documents and authenticates them properly.

[15] Claimants have also submitted the declarations of Khudainatov and Kochman to support the notion of a cooperation agreement. As noted, *supra*, the Court has excluded these declarations from its consideration of this motion.

[16] Parfireva never spoke with Khudainatov or Kochman about their intentions in entering the MOA. *See* Parfireva Tr. 188:4-9. She did not testify that she was involved in the drafting or negotiation of the purported cooperation agreement or the September 2021 MOA. *See id.* 213:7-15 (testifying she first saw the cooperation agreement after it was already signed). Rather, she represented that her testimony was based on the fact that she received the two agreements at roughly the same time and that she understood their terms to "coincide." *See id.* 88:24-89:13 (stating, when asked "how" she knew that the September 2021 MOA "was intended to effectuate the Cooperation Agreement," that it was "[b]ecause we received the [September 2021 MOA] right after the Coop Agreement, or Cooperation Agreement was generated, and the terms and conditions of the MYBA Agreement coincided with what was included in the Cooperation Agreement.").

34

evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").[17]

b. Second, her testimony is this regard is belied by her own contemporaneous correspondence regarding the September 2021 MOA with Imperial Yachts, including Kochman and Stewart, which did not reference a cooperation agreement and described the September 2021 MOA as what it indicates it is on its face: an agreement for sale. *See, e.g.*, GX-412; GX-495.

78.     Third, there is no circumstantial evidence in the record supporting the notion that the MOA was intended for temporary use to effectuate a sale of the *Amadea*, such as testimony or documents showing that, consistent with the asserted purpose of a purported temporary use agreement, any effort was made after September 2021 to market or sell the *Amadea*.

### F.     Claimants' Proffered Evidence that the September 2021 MOA Was Canceled

79.     Claimants aver that the September 2021 MOA was canceled. *See* Claimants' PFOF ¶ 150. The Court rejects that contention for several reasons.

80.     First, there are no documents in record reflecting cancellation of the September 2021 MOA.

a. The face of the September 2021 MOA provides for cancellation in relation to dissatisfaction with the Sea Trial and the Condition Survey. *See* GX-212 at 5, cl. 28 (cancellation clause, citing cl. 25 and 26). There is nothing in the record suggesting cancellation in connection with these clauses of the MOA.

b. The September 2021 MOA itself is memorialized and accompanied by supporting documentation such as email correspondence, but there is no documentary evidence in record suggesting that the MOA was canceled.

---

[17] Parfireva's lack of personal knowledge on this subject is fatal not only in a fact-finding posture. That is, even if the Court were to consider this motion in a summary judgment posture, it would decline to consider her testimony on this subject due to her lack of personal knowledge. *See Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co.*, 197 F. App'x 62, 64 (2d Cir. 2006) (affirming district court's decision not to consider affidavit on summary judgment where it was based only on affiant's "belief and conclusion," rather than on personal knowledge); Rule 56(e) (explaining that affidavits opposing summary judgment must be "made on personal knowledge, set[ting] forth such facts as would be admissible in evidence, and ... show[ing] affirmatively that the affiant is competent to testify to the matters stated therein").

81.    Second, there is no direct oral testimony from a witness with personal knowledge in the record indicating that the MOA was canceled.  The only testimony offered by Claimants on this point is from Khudainatov Family Office employee Parfireva, but her testimony was not based on personal knowledge:

a.    Parfireva acknowledged that Khudainatov did not tell her that the MOA "had been canceled," and she never had "any conversation with him whatsoever about the termination of the Agreement."  Parfireva Tr. 199:17-200:8.  Because she lacked personal knowledge as to whether the MOA was canceled, she was not competent to testify on that subject.  *See* Fed. R. Evid. 602.

b.    Parfireva testified that she *inferred* that it had been canceled based on two factors: (1) "that there was no other document that confirmed that the deal or the transaction was consummated," and (2) that, in April 2022, a "Management Agreement was signed between Millemarin and Imperial Yachts."  *Id.* at 199:4-16.  This testimony is not based on personal knowledge.  And the Court also rejects it for the following additional reasons:

i.    As for the absence of closing documents, the terms of the MOA do not state that transfer of the incidents of ownership other than title depend on closing.  Rather, under the terms of the MOA, transfer of possession, dominion and control, and financial interest in the *Amadea* turn on other conditions such as payment.  There is no dispute these conditions were fulfilled.  There can therefore be no dispute that the incidents of ownership other than title passed from Millemarin to Errigal.  There is nothing under the terms of the MOA itself suggesting that the failure to sign the closing documents affects the transfer of ownership rights in the Amadea other than title.

ii.    As for the April Management Agreement, while it is dated April 4, 2022, it was not fully signed until May 10, 2022, *see* CX-482 at 20—nearly a month after the *Amadea*'s seizure.  It therefore cannot constitute evidence of who was financially responsible for the *Amadea* at the time it was seized.  There is no evidence in the record that any payments were ever made under the Agreement.  And the Management Agreement is contrary to all other evidence in the record as to who actually bore the financial responsibilities for the *Amadea* during the relevant period.  The Management Agreement states that Millemarin would be responsible for paying Imperial Yachts for the expenses of running the *Amadea* starting in August 2021, *see id.* at 21— but that is directly contrary to the terms of the September 2021 MOA, which provided that Errigal would be responsible for those costs after that date.  As explained *infra*, all the relevant evidence in record indicates that, after that date, Millemarin bore no financial responsibility for the *Amadea*.

82.    There is no indirect evidence of cancellation, such as a return of control of the *Amadea* to Millemarin, or a return by Millemarin of any of the €225 million.  *See* Parfireva Tr. 113:16-21 (acknowledging that the funds were not returned).[18]

### G.   Claimants' Proffered Witness Testimony on Claimants' Ownership Generally

83.    Claimants state that "each and every witness testified consistently that they either believed Mr. Khudainatov and/or Millemarin was and still is the owner of the Amadea, or stated that they were not sure who owned the Amadea."  Claimants' PFOF ¶ 11.  In making this broad proclamation, Claimants do not cite any testimony in particular.  As explained *supra*, in reviewing the record, the Court finds that the various generalized testimony proffered by Claimants on this point is not admissible and/or does not address whether Claimants held the incidents of ownership of the *Amadea* after the September 2021 MOA, other than title.  Specifically:

> a.  Lürssen.  Lürssen, the shipbuilder, testified as to his interactions with Khudainatov around the time that the *Amadea* was built.  *See* Claimants' PFOF ¶¶ 34-36 (citing deposition designations).  But he also testified that he was unaware of the transaction represented in the September 2021 MOA and that he had never heard of Millemarin or Errigal.  Lürssen Tr. 37:8-17.  Even crediting his testimony regarding his belief about who owned the *Amadea* a decade ago, Lürssen says nothing about who possessed, exercised dominion and control over, or had a

---

[18] Parfireva attempted to explain the failure to return the funds by stating that "[a]s far as I know the lawyers of Mr. Evgeniy Kochman stated that any action related to the *Amadea* that has indefinite status after it was seized in Fiji can result in violation of any Sanctions rules or regulations. In other words, *any actions* regarding this event, until the status of the boat is clarified, were not advisable." Parfireva Tr. 113:22-114:9 (emphasis added). That testimony is excluded because it lacks foundation and constitutes hearsay under FRE 802.  Even if the Court were to permit the testimony, however, the Court would find that it is not credible, because it is contradicted by Claimants' assertion that they entered into a management agreement with Imperial Yachts (of which Kochman was chair) in May 2022, *after* the *Amadea* had been seized. Claimants' contention that Kochman entered into a management agreement regarding a seized vessel belies Parfireva's testimony that he was unwilling to take *any* actions related to the *Amadea* at that time due to fear of sanctions—including accepting the return of €225 million that he purportedly used to pay for it.

financial stake in the *Amadea* during the relevant time period, *i.e.*, after the September 2021 MOA.

b.  Zuretti.  The interior designer Zuretti testified: "I even believe even today [Khudainatov is] still the owner [of the *Amadea*].  I'm sorry to say that.  But I don't know that."  Zuretti Tr. 44:5-10.  The Government objects that this statement lacks foundation.  That objection is sustained, as Zuretti offered no explanation as to the basis for his "belie[f]" as to the current ownership of the *Amadea*, and even admitted, "I don't know that."  *Id.*

c.  Read.  Captain Read testified that, in 2017, he understood Khudainatov to be the owner of the *Amadea*.  Read Tr. 83:6-84:2.  Read also testified that he did not know about the transfer of the *Amadea* from Nereo to Millemarin.  Read Tr. 112:9-19.  Even crediting his testimony about his understanding in 2017—the basis of which is not explained—that testimony ultimately says nothing about who possessed, exercised dominion and control over, or had a financial stake in the *Amadea* during the relevant time period, *i.e.*, after the September 2021 MOA.

d.  Walsh.  Captain Walsh testified that, at the time he served on the *Amadea* in fall 2021, he had an "understanding" that the "shipowner" was Millemarin Investments Limited, as indicated on his employment agreement.  Walsh Tr. 19:14-20:18.  That testimony was based on a review of his "Seafarer's Employment Agreement," which does not appear to have been offered as an exhibit, and which Claimants do not cite in their Proposed Findings of Fact.  Walsh ultimately testified "To this day, I still don't know who the owner of *Amadea* is."  Walsh Tr. 72:8-9.

e.  Messenger.  Security Officer Messenger testified that he was told by the other head of security, Scott Fairey that the owner was "Eduard Khudainatov." (Messenger Tr. 17:2-11).  The Government objects to this testimony as hearsay.  The Court sustains the objection.  Messenger also acknowledged that, in an interview with U.S. Customs and Border Patrol, he stated that Kerimov was the owner of the *Amadea*.  *Id.* at 83:1-10.

f.  Parfireva.  The specifics of Khudainatov family office employee Parfireva's testimony as to ownership of the *Amadea* are largely addressed above.  The Court further notes, though, that her testimony in this regard is largely based on: (1) her review and restatement of facts in Khudanatov's declaration, *see* Parfireva Tr. 129:9—which the Court has deemed inadmissible and which cannot be entered into the record through the backdoor testimony of another witness simply restating its contents—and (2) Parfireva's interpretation of the September 2021 MOA, *see id.* 187:24-188:9—which the Court can and has interpreted itself, concluding that it unambiguously describes a *sale* of the *Amadea*.[19]

---

[19]  *Cf. New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) ("To the extent that the determination of ownership turns on the interpretation of provisions of a

g.  Khalikov.  Kerimov family employee (or contractor) Khalikov offered testimony that no member of Kerimov family wanted to purchase the *Amadea*.  While he stated that he "know[s] that" Khudainatov "paid for" the Amadea, Khalikov Tr. 142:12-14, he did not state the basis for that purported knowledge and also testified that he never met Khudainatov, see *id*. at 149:9-10.  He is not competent to offer testimony on that fact.  Moreover, as noted above, the Court found his testimony not credible.  But even crediting his testimony in this regard, it says nothing about whether Khudainatov possessed, exercised dominion and control over, or had a financial stake in the *Amadea* during the relevant time period, i.e., after the September 2021 MOA.

h.  Cvijetic.  Millemarin Director and 30(b)(6) witness Cvijetic testified that the September 2021 MOA was for temporary use, not a sale of the *Amadea*.  *See* Millemarin 30(b)(6) Tr. 59:9:11.  But he only began serving as director in late 2024, long after the *Amadea* had been seized and this litigation had commenced.  He admitted during his deposition that he had no personal knowledge relevant to this case, acknowledging that what he did know was largely the product reviewing briefing documents that he received from Claimants' litigation counsel.  *See* Millemarin 30(b)(6) Tr. 11:24-14:6; 14:20-15:24; 16:9:18.

## III.  <u>Indicia of Ownership after the September 2021 MOA</u>

### A.  <u>Title after the September 2021 MOA</u>

84.  Claimants have held legal title to the *Amadea* at all relevant periods of this litigation, including after the September 2021 MOA.  The Government does not dispute this.  *See* Hr'g Tr.  at 359:5-8 (Government statement that pursuant to the September 2021 MOA, "all right of ownership, <u>except bare title</u>, passed from Millemain to Errigal upon payment of 22 million euros"); *id.* at 360:8 (Government argument that the September 2021 MOA transferred all "right and responsibilities and ownership" of the *Amadea* from Millemarin to Errigal "[a]side from bare title").

---

contract, the existence and terms of the contract are questions of fact, but the effect of those terms on ownership is strictly a question of law if the provisions are unambiguous . . . .").

B.    **Possession after the September 2021 MOA**

i.    **Physical Presence on and Usage of the Amadea**

85.    There is no dispute that Khudainatov was never physically present on the *Amadea*

after the September 2021 MOA.  *See* Hr'g Tr. 461:5-9 (Claimants responding "no" to the Court

asking if there was "any evidence that Mr. Khudainatov used the *Amadea* himself, set foot on it

after the September 2021 MOA").

86.    There is no dispute that Khudaintov did not personally use the *Amadea* after the

September 2021 MOA was signed.  *Cf. id.* at 460:24-25; 461:1-9. (Claimants stating that

Khudainatov did not use the *Amadea* himself after the September 2021 MOA and instead

"exercised his ownership rights to give other people the permission to use the property").

87.    The only record evidence regarding use of the *Amadea* after the September 2021

MOA shows that the Kerimov family were the boat's sole users.  The Court does not detail this

evidence at length, but notes that it is unequivocal.  The Kerimov family took three international

trips on the *Amadea* between September 2021 and February 2022:

a.    In September 2021, Captain Read skippered an overnight trip on the *Amadea* to
Nice, France.  Read Tr. 117:2; 119:17.  Captain Read testified that, during this
period "some women," all with the last surname "Kerimov," were the passengers
on this trip.  *Id.* at 118:21-25; 119:8-11.

b.    In October 2021, Captain Read delivered the *Amadea* to Sicily in anticipation of
"guests coming on and people getting ready to go cruising."  *Id.* 156:19-24.  All of
the record evidence demonstrates that the people to whom Captain Read referred
were members of the Kerimov family.  *See, e.g.*, GX-410, GX-410-A, GX-410-B,
GX-410-C.

c.    From mid-January to early February 2022, the Kerimov family cruised on board
the *Amadea* in the Caribbean.  All of the evidence in the record—guest lists and
cabin allocations—shows members of the Kerimov family were aboard the *Amadea*
when it was in St. Kitts and St. Barts.  *See* GX-606; GX-607.

88.    Claimants attempt to explain the Kerimov family's exclusive use of the *Amadea* by

characterizing their cruises as charters rather than owners' voyages.  They point to a purported

contract between Gulnara Kerimova and either Millemarin or Imperial Yachts—a so-called "charter agreement"—as proof that Kerimova simply sought to use the *Amadea* temporarily on a month-long excursion in the Caribbean in early 2022. *See* CX-6; GX-216. The Court does not credit this argument. Claimants proffer a purported contract between Gulnara Kerimova and either Millemarin or Imperial Yachts. CX-6; *see also* GX-216.

> a. This contract states that Kerimova agreed to pay € 5,000,000 to cruise the *Amadea* in the Caribbean in early 2022. But no witness with personal knowledge has testified about this purported charter agreement. There is no evidence of any such payment being made.

> b. Notably, the *Amadea*'s captain at the time of the alleged charters, Captain Walsh, testified that he had no knowledge of any charter agreement with the Kerimov family, Walsh Tr. 159:25-160:2, which is significant because Imperial Yachts' standards book states that "[f]or every charter Captain needs to read carefully the signed Agreement." GX-600 at 9.[20]

> c. While there is proof that the Kerimov family cruised the Caribbean as planned, there is no proof that they paid to charter the *Amadea* or were otherwise subject to treatment concomitant with their being charterers rather than owners.

### ii. Personal Property Onboard the Amadea

89.    Claimants concede that the *Amadea* did not contain any Khudainatov family personal effects—such as family photos or clothing items—at the time it was seized. Hr'g Tr. 372:21-25; 373:1-6.

90.    There is no other evidence that Khudainatov's personal possessions were on board the *Amadea* at the time of seizure. During closing argument, counsel for Claimants pointed to evidence—such as vendor invoices, *see* CX-399, 399A, 340, 341—purporting to show that Khudainatov had "paid for all of the furnishings, etc. that were on board the *Amadea*, [such as] the

---

[20] Claimants object to this document on hearsay grounds. But the Imperial Yachts Standards Book was properly authenticated by Captain Walsh. *See* Walsh Dep. Tr. 160. It is, therefore, admitted into evidence.

furnitures, the drapes, [and] the dishes." Hr'g Tr. 470:3-10; *see also id.* at 471:21-24 (Claimants' argument that "Mr. Khudainatov paid for all the furnishing, the carpet, the drapes, everything that was being put into the *Amadea* while it was being built"). But while that evidence may support the notion that Khudainatov paid for the items aboard the *Amadea* when it was built and outfitted in 2015, it does not establish that those items still belonged to Khudanatov after the September 2021 MOA and <u>at the time the *Amadea* was seized</u> in April 2022. Claimants conceded that if the September 2021 MOA was in fact a sales agreement, then Khudainatov no longer owned the furniture, carpet, drapes, and other fixtures aboard the *Amadea*. *See* Hr'g Tr. 472:14-20. In other words, Claimants' assertion that Khudainatov owned these items at the time of seizure was premised entirely on their contention that the September 2021 MOA did not effectuate a sale of the *Amadea* to Errigal. As explained above, the Court finds by a preponderance of the evidence that it did; indeed, there can be no genuine dispute of fact on that point.

### iii.  The Purported "Presence" of Claimants' Counsel Onboard the *Amadea*

91.    The parties do not dispute that Claimants hired local counsel to contest the *Amadea*'s seizure in Fiji.

    a.  Claimants submit various documents from Fijian litigation contesting seizure to support the fact that Khudainatov retained local counsel. *See* CX-755-58. The Government objects to the documents as hearsay. Specifically with respect to a letter from Fijian counsel to the Fijian court contesting seizure, Claimants state they are not offering that letter for the truth of any statement asserted therein but rather to demonstrate that Khudainatov has constantly asserted ownership of the *Amadea*, including at seizure. The Fiji litigation documents are admitted for the limited purpose of establishing that Claimants contemporaneously retained local counsel to contest the *Amadea*'s seizure; they are nonetheless inadmissible for the truth any matter asserted therein (i.e., to substantiate Claimants' assertion that they owned the *Amadea* at the time of seizure).

    b.  Claimants also cite testimony from Parfireva to support the claim that local counsel was quickly retained and immediately contested seizure. *See* Hr'g Tr. 495:13-23. Parfireva's testimony indicates that, when the *Amadea* was seized, a search for legal counsel to assist with the seizure "was conducted on behalf of Eduard Khudainatov." Parfireva Tr. 113:1-15.

92.     The Court rejects Claimants' characterization of this evidence as demonstrating that that, "at the time of seizure, Mr. Khudainatov was effectively on" the *Amadea* through the presence of counsel in Fiji who contested the seizure.  *Id.* 497:22-23.  During closing argument, Claimants argued that "Mr. Khudainatov was in possession of the *Amadea* at the time that it was seized because he had hired Fijian counsel who was there starting April 12, which is the date the boat arrived in Fiji."  *Id.* 497:18-23.  Claimants stated that Khudainatov was "physically there by way of counsel on April 12th when the boat was seized," *id.* 498:3-4, and that Fijian counsel was "onboard" the *Amadea* when it was seized, *id.* 498:18. *See also id.* 492:13-16 (Claimants stating "Mr. Khudainatov immediately hired counsel who was physically present, if I know, at the time that it was attempted to be seized by US authorities in Fiji").  The Court rejects these statements as mischaracterizations of the record: The statements of Claimants' U.S.-based counsel are not evidence, and there is no evidence in the record that Claimants' Fijian counsel was <u>ever</u> aboard the *Amadea*, let alone at the time it was seized.

## C.  Dominion and Control after the September 2021 MOA

### i.  Changes to the *Amadea*

93.     After the September 2021 MOA was consummated, plans were made to substantially renovate the *Amadea*.  Imperial Yachts commissioned Zuretti to make the *Amadea* "less rigid, classical and conventional."  GX-408-A.  The scope of the project was such that Zuretti charged €1,000,000 in design fees and estimated that the *Amadea* would need to be docked for seven months for work to be completed.  GX-420-A.  Some of the changes planned to be made to the *Amadea* were relatively minor, such as removing decorative fixtures (e.g., drapes and ceiling

rosettes) and replacing carpets.  GX-426.[21]  Other changes were more drastic; the *Amadea*'s bar was to be removed, one of its dining rooms was to be turned into a gymnasium, its jacuzzi was to be removed, and its audio video/information technology system was to be overhauled.  GX-427-C.[22]

94.    The parties' respective experts disagreed as to whether the changes made to the *Amadea* could be made only by an owner (as the Government's expert Captain Meagher testified), or could be made by an ultra-high net worth charterer (as Claimants' expert Captain Hitch testified).  Ultimately, the Court credits the testimony of Captain Meagher in this regard.  It does not credit Captain Hitch's characterization of these renovations and changes to the *Amadea* as "typical," because it is contradicted by his own testimony acknowledging that, in his decades of experience he had never seen changes along these lines directing by a charterer of a vessel.  *See, e.g.*, Hitch Tr. 101:21-23 (Hitch answering "no" after being asked "[h]ave you ever had, seen, a charter guest order a refit that would take seven months").  Ultimately, however, the Court notes that this finding is immaterial to its decision because, as explained below, all of the evidence of dominion and control of the *Amadea* after the September 2021 MOA points away from the Claimants.

95.    There is no evidence in the record that Claimants directed, approved, or otherwise were involved in any of the changes made or planned with respect to the *Amadea* after the September 2021 MOA.  *See* Hr'g Tr. 463:6-10 (Claimants confirming that Khudainatov was not

---

[21] The Government's exhibit list indicates a "Potential Objection Pending," COURT-X-2, but Claimants do not appear to have lodged any such objection to this exhibit.

[22] Claimants object to this document on foundation, authentication, and hearsay grounds.  The Government responds to this objection by noting that the exhibit was testified to by Agent Bergen.  The objection is overruled, as Claimants do not object to the portion of Agent Bergen's declaration authenticating CX-427-C.

involved in any of the specific changes to the *Amadea* after the September 2021 MOA).  There is no evidence that Claimants' input was solicited in the design process for the renovations, that Claimants met with the designers, or that Claimants had final approval over the planned renovations.

96.    To the extent there is any evidence in the record indicating at whose direction these changes were made, all of it indicates that the *Amadea* was being renovated for the Kerimov family's benefit and to the Kerimov family's specifications. *Cf.* Claimants' PFOF ¶ 176 (acknowledging evidence that "[a] few of the changes that were requested by Gulnara [Kerimov], Firuza [Kerimov], and/or Khalikov were actually implemented before the [Kerimov family's] January/February 2022 Caribbean charter").

**D.  <u>Financial Interest in the *Amadea* after the September 2021 MOA</u>**

**i.  <u>Responsibility for the *Amadea*'s Costs</u>**

97.    Under the terms of the September 2021 MOA, Claimants were immediately no longer responsible for the *Amadea*'s running costs upon entry into the agreement—even before receiving the final payment pursuant to the agreement.  *See* GX-212 ("All running costs for the vessel including berthing fees and crew's wages shall be for the Buyer's account until Completion of the Sale.").

98.    There is no dispute that Claimants did not actually bear any of the *Amadea*'s costs after the September 2021 MOA.  *See* Hr'g Tr. 491:22-25; 492:1-16 (Claimants responding "no" to the Court asking if Claimants bore any of the *Amadea*'s costs after the September 2021 MOA). There is no evidence indicating that Claimants actually paid for any of the *Amadea*'s running costs after that date.  *See* Millemarin 30(b)(6) Deposition Tr. 86:1-3 (Claimants' 30(b)(6) witness stating

he was "not sure" and did not know in response to being asked if "Millemarin ever pa[id] any expense related to the Amadea").

99.    During closing argument, Claimants' counsel conceded that Errigal bore <u>all</u> of the *Amadea*'s financial costs between the September 2021 MOA and seizure in April 2022, "aside from the insurance coverage."  Hr'g Tr. 494:2-7.  But those insurance costs were paid *before* the September 2021 MOA.   Claimants offer a "Confirmation of Coverage" as evidence that Millemarin paid for the insurance policy that indemnified the *Amadea* at the time of its seizure. *See* CX402-A.  The document shows that Millemarin is listed as the owner of the *Amadea* on a policy in effect between August 16, 2021, and August 15, 2022.  *Id.*  The document is dated before the September 2021 MOA was signed, and Claimants offer no evidence that they made any insurance payments after the September 2021 MOA was consummated.

100.    Claimants also point to a purported 2022 Management Agreement between Millemarin and Imperial Yachts as evidence that Millemarin continued to have financial obligations with respect to the *Amadea*.  *See* CX-482.  As noted above, the Court does not consider the agreement because it was not signed until *after* the *Amadea* was seized.  But even if the Court did consider it, the Court would afford it no weight.  The terms of the supposed management agreement—which purport to place financial obligations on Millemarin for the costs of managing the *Amadea* as of August 21, 2021—are contradicted by the September 2021 MOA, which transferred all financial obligations associated with the *Amadea* from Millemarin to Errigal.  And there is no evidence in the record that any payments were made in connection with the purported management agreement.

### ii.  **Financial Benefit from the *Amadea* after the September 2021 MOA**

101.    Claimants did not receive any continuing financial benefits from the *Amadea* after the September 2021 MOA.  After receiving €225 million for the *Amadea* pursuant to the September 2021 MOA, there is no evidence Claimants received any additional funds or proceeds related to the vessel, such as profits derived from the purported charters of the vessel.

102.    Claimants offer a document purporting to show that Gulnara Kerimova attempted to make a payment to Imperial Yachts, ostensibly as payment for a charter of the *Amadea*.  *See* CX-54 (Russian version); CX-55 (English version).   Even assuming these documents are admissible,[23] Claimants acknowledge that this payment was not ultimately made.  *See* Hr'g Tr. 482:10-14 (Claimants acknowledging that the bank refused to "conduct the transaction [due to] compliance issues").   Moreover, even if any such payment were made, Claimants have not submitted any evidence establishing that *Claimants* would have received the proceeds.

103.    Claimants also submit various documents such as balance sheets from the Khudainatov family office purporting to demonstrate Khudainatov's continued financial interest in the Amadea after the September 2021 MOA. The Government objects to those documents as untimely produced and the Court sustains those objections.

    a.  Claimants' balance sheets purport to show that they considered the *Amadea* a financial liability for Millemarin even after the September 2021 MOA was consummated.  *See* CX-674 through CX-677.  These documents were produced after discovery closed.  The Government moved *in limine* to exclude these and other similar documents as untimely produced.  *See* ECF No. 445.

    b.  Claimants state that they were unable to produce these documents because Millemarin's former director, Olga Kroon, held exclusive possession of the documents and refused to provide them to Millemarin's new director.  *See* Claimants' Jan. 31, 2024 Letter, ECF No. 447.  Claimants' explanation for why

---

[23] The Government objects to these documents based on foundation, authenticity, and relevance. *See* COURT-X-1.  As explained here, the Court finds that these documents are irrelevant but assumes for purposes of this Opinion that they are admissible.

Millemarin's balance sheets were untimely produced does not bear scrutiny.[24]  The Government's motion *in limine* is granted; accordingly, the balance sheets and other documents subject to the Government's motion (*i.e.*, CX-674 through CX-677, and CX-716), are excluded.[25]

---

[24] Claimants state that Millemarin's former director, Olga Kroon, had "exclusive possession" of the documents and that "she was unwilling to voluntarily cooperate with counsel's request for the disclosure of documents on the basis of a concern that doing so could violate E.U. sanctions law—specifically because Mr. Khudainatov had been sanctioned by the European Union." Claimants' Jan. 31, 2025 Letter at 1-2, ECF No. 447.  Claimants state that Ms. Kroon, as a Swiss citizen, was "unable to take any action to benefit Khudainatov," which they say includes the turning over of documents. *Id.* at 2.  But sanctions were imposed against Khudainatov in June 2022, Hr'g Tr. 354:7-9, and Kroon continued to serve as Millemarin's director for more than two more years, until October 2024; she only resigned after Millemarin's 30(b)(6) deposition was noticed. Moreover, one of the documents on which Claimants seek to rely was prepared by Kroon for Millemarin in April 2024, two years after the EU sanctions were imposed, see *id.* at 507:16-22. Claimants offer no plausible explanation why, after EU sanctions were imposed on Khudainatov, Kroon would continue to serve as Millemarin's sole director and to prepare documents on its behalf, but would not turn those documents over to Khudainatov or Millemarin itself.  At closing argument, Claimants' counsel averred that, after EU sanctions were imposed against Khudainatov, Kroon "would engage in the b[are] minimum obligations that she would have to do as Millemarin during that time, but did not want to act on behalf of Mr. Khudainatov who was sanctioned by getting voluntarily involved in this litigation." *Id.* at 511:1-5.  But counsel did not cite anything in the record to support the assertion that Kroon was willing to do some tasks but not others for Millemarin; counsel's assertion in this regard is not itself evidence.  Finally, the Court notes that various other documents proffered as exhibits by Claimants include documents signed and submitted by Kroon in April 2022, before the imposition of EU sanctions on Khudainatov.  *See* CX-755-58 (documents from Fijian litigation in April 2022).  But Claimants do not explain why, if the balance sheets were in her possession and in fact support Khudainatov's claim of ownership of the *Amadea*, Kroon did not offer these documents at that time.

[25] Beyond the issue of late disclosure of the documents in question, the Government also seeks to exclude these documents on another basis, arguing that they are not admissible as business records under FRE 803(6) and 902(11)-12.  *See* Gov't Mot. in Lim., ECF No. 445.  Claimants purport to authenticate these documents as business records with certifications—untimely produced less than one week before the evidentiary hearing was held—that list virtually every document produced by Claimants in this litigation by Bates number, then purports to authenticate all of them in a conclusory manner.  *See id.* (referencing purported certifications offered as CX-769, CX-770, and CX-771).  Even leaving aside that the purported certifications were untimely disclosed, *see* FRE 902(11)-(12), the certifications do not lay a proper foundation for bulk admission of these documents as business records.  There is no adequate explanation, for example, on a category-by-category basis, of "how the record[s] came into existence in the course of a regularly conducted activity of the entity." *In re Lyman Good Dietary Supplements Litig.*, No. 17 Civ. 8047, 2020 WL 3414927, at *5 (S.D.N.Y. June 22, 2020) (citing FRE 803(6)).  Accordingly, for these reasons as well, the Court grants ECF No. 445 and excludes the documents subject to it.

c.  Even if the Court were to consider these balance sheets, they do not constitute evidence that Claimants actually retained a financial stake in the *Amadea*. Even crediting them, they are purely internal documents; they do not constitute evidence of any kind of enforceable legal liability in connection with the *Amadea*.

## CONCLUSIONS OF LAW

### I.  Legal Standards

#### A.  Overview

1.  There are two separate questions as to the applicable legal standards here.

a.  The first question concerns the factors that are relevant to the standing inquiry in a civil forfeiture case.

(i).  The Court agrees with Claimants that, in at least most cases, a claimant need not demonstrate ultimate beneficial ownership of the *res* to establish standing, but rather only an interest in it. Standing is a threshold inquiry distinct from the merits. *See United States v. $557557557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002) ("*$557,933.89, More or Less*") ("[T]to establish standing the claimant need not prove the full merits of [his] underlying claim.") (cleaned up).

(ii).  In an ordinary case, an interest that can establish standing may include "actual possession, dominion, control, title, or [a] financial stake." *United States v. Contents of Acct. Nos. 208-06070 & 208-06068-1-2* ("*Contents of Accts.*"), 847 F. Supp. 329, 333 (S.D.N.Y. 1994) (citing, *inter alia*, *Mercado v. U.S. Customs Serv.*, 873 F.2d 641, 644 (2d Cir. 1989)).

(iii).  Where, however, the government makes a prima facie showing that a claimant is merely a straw owner of the *res* (i.e., one who "hold[s] title to it for somebody else," *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999)), title alone is not enough to establish standing. Instead, a claimant must establish it possesses some of the other indicia of ownership (e.g., possession, dominion/control, or a financial stake). As explained *infra*, this is essentially the same standard that Claimants urge the Court to adopt, although Claimants deny that the Government has made a prima facie showing of straw ownership.

b.  The second question is the evidentiary standard: whether a motion to strike a claim considered at an evidentiary hearing under Supplemental Rule G(8) should be resolved on a summary judgment standard—such that the motion can be defeated upon a showing that there is a genuine dispute of material fact—or in a fact-finding posture—in which a court may weigh evidence, make credibility determinations, and ultimately resolve factual disputes based on a preponderance of the evidence.

(i).   There is no directly controlling authority from the Second Circuit on this question.  But the Court ultimately concludes, based on guidance from the Circuit and district court decisions within it, that when considering a motion to strike at an evidentiary hearing under Supplemental Rule G, a court may engage in fact-finding and resolve factual disputes based on a preponderance of the evidence standard.

(ii).  As explained below, however, the Court concludes that resolution of this question is ultimately immaterial to the Court's decision in this particular case, because on the record before the Court, the undisputed material facts alone compel the conclusion that Claimants lack standing.  That is, even without engaging in any weighing of the evidence properly in record, and considering only the material facts that are not genuinely disputed, the Court concludes that Claimants lack standing.

## B.   **Standing**

### i.    **Standing to Contest Forfeiture**

2.     The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions were promulgated in 1966.  Supplemental Rule G, which addresses forfeiture actions *in rem*, was added in 2006 "to bring together the central procedures that govern civil forfeiture actions."  Advisory Committee Notes to Supplemental Rule G.  Supplemental Rule G(5) provides that any "person who asserts an interest" in the *res* that is the subject of a forfeiture action may "contest the forfeiture by filing a claim in the court where the action is pending."  Supp. R. G(5)(a)(i).

3.     "Standing is a prerequisite to challenging the forfeiture."  *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014).  "Without standing, [a claimant] is simply a stranger to the litigation."  *Id.* at 198.  "[I]f the claimant lacks standing, the court lacks jurisdiction to consider his challenge of the forfeiture."  *United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807* ("*One 1982 Porsche*"), 732 F. Supp. 447, 451 (S.D.N.Y. 1990).

4.      As the Second Circuit has explained, Supplemental Rule G provides that a claimant contesting forfeiture must establish "claim standing."  *United States v. Technodyne LLC*, 753 F.3d 368, 379-80 (2d Cir. 2014) ("The Advisory Committee Note accompanying that Rule indicates that 'standing' in this context refers to 'claim standing.'") (citing Supplemental Rule G(8)(c) Advisory Committee Note).  "While the meaning of 'claim standing' is somewhat obscure on its face, it appears that the drafters intended to denote a claimant's "standing to contest forfeiture." *Id*. at 380 (citing Supplemental Rule G(8)(a) Advisory Committee Note).  "In general, '[i]n order to contest a governmental forfeiture action, claimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court.'"  *Id*. (quoting *Cambio Exacto*, 166 F.3d at 526).[26]

5.      Constitutional or Article III standing exists only where a litigant has "suffered an injury in fact" that is "fairly . . . trace[able] to the challenged action" and "likely . . . [to be] redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).  The "ultimate focus" of the Article III standing question is "injury to the party seeking standing." *Cambio Exacto*, 166 F.3d at 527.  "To demonstrate standing under Article III, therefore, a litigant must allege a 'distinct and palpable injury to himself,' that is the direct result of the 'putatively illegal conduct of the adverse party,' and 'likely to be redressed by the requested relief.'"  *Id*. (internal citations omitted).

---

[26] In the context of forfeiture actions, statutory standing (as distinct from Article III standing) concerns compliance with the procedural requirements for asserting a claim on the *res*.  *See Technodyne LLC*, 753 F.3d at 380 ("Litigants have statutory standing to oppose forfeiture in a civil *in rem* proceeding commenced by the government if they 'claim[] an interest in the seized property[,] . . . asserting [that] interest in the property in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims.'") (quoting 18 U.S.C. § 983(a)(4)(A)).

6.      To establish Article III standing in a forfeiture action—i.e., that forfeiture will cause the claimant a distinct palpable injury—the claimant "must demonstrate a possessory or ownership interest in the [*res*], which may be proven by actual possession, dominion, control, title, or financial stake." *Contents of Accts.*, 847 F. Supp. at 333 (citing, *inter alia*, *Mercado*, 873 F.2d at 644). Claimants adopted this position during closing argument, initially describing the relevant inquiry as involving "five" factors but, after failing to articulate a difference between "dominion" and "control," ultimately conceding that four factors were relevant to standing: possession, dominion and control, title, and a financial stake. *See* Hr'g Tr. 379:1-23, 380:2-16. Based on case law in the Second Circuit, the Court agrees that, generally speaking, the four factors of (1) actual possession, (2) dominion and control, (3) title, and (4) a financial stake are relevant to a claimant's standing in a forfeiture action. *See Contents of Accts.*, 847 F. Supp. at 333; *One 1982 Porsche*, 732 F. Supp. at 451.

7.      A claimant must "establish standing by a preponderance of the evidence." *Vazquez-Alvarez*, 760 F.3d at 197 (citing Supplemental Rule G(8)(c)(ii)(B)). *See also United States v. Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-Eight Cents ($417,143.48)*, No. 13 Civ. 5567, 2015 WL 5178121, at *5 ("The claimant bears the burden of establishing standing by a preponderance of the evidence."), *aff'd* 682 F. App'x 17 (2d Cir. 2017). "The burden of proof in making a demonstration of standing rests with the claimants." *United States v. All Right, Title & Int. in Prop., Appurtenances, & Improvements Known as 479 Tamarind Drive, Hallendale, Fla.*, No. 98 Civ. 2279, 2011 WL 1045095, at *2 (S.D.N.Y. Mar. 11, 2011) (citing *Mercado*, 873 F.2d at 644). Claimants agreed at closing argument that they bear the burden of establishing standing by a preponderance of the evidence. *See* Hr'g Tr. 373:14-16.

8.      The Second Circuit, however, has repeatedly made clear that "[t]he function of standing in a forfeiture action is therefore truly threshold only," and that "to establish standing 'the claimant need not prove the full merits of [his] underlying claim.'" *$557,933.89, More or Less*, 287 F.3d at 78-79 (quoting *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158 (2d Cir. 1994)); *cf. Cambio Exacto*, 166 F.3d at 528 (stating that, in assessing standing, a court "need not decide the extent to which [claimants] 'own' the [*res*]").

## ii.      Standing and Straw Ownership

9.      The Second Circuit has held that those who are mere "'straw' owners"—for example, those "who do indeed 'own' the property, but hold title to it for somebody else"—lack standing. *Cambio Exacto*, 166 F.3d at 527. "Such owners do not themselves suffer an injury when the property is taken." *Id*. *See also United States v. $829,422.42*, 561 F. App'x 100, 100 (2d Cir. 2014) ("In order to have standing to challenge the forfeiture of property, one must be more than a mere 'straw owner.'").

10.     Because assertions of straw ownership go to a claimant's standing—which is a "threshold" rather than a "merits" issue, *see $557,933.89, More or Less*, 287 F.3d at 78—courts may consider assertions of straw ownership on a motion to strike a claim.  Accordingly, the Second Circuit has affirmed a government's motion for summary judgment for lack of standing where the claimant has bare legal title to a property but is merely a straw owner.  *See United States v. Premises & Real Prop. with Bldgs., Appurtenance & Improvements at 500 Delaware St., Tonawanda, N.Y.*, 113 F.3d 310, 312 (2d Cir. 1997) ("*500 Delaware St.*") ("It is abundantly clear that the district court did not err in holding that the father was a mere straw owner and lacked standing to assert a claim as innocent owner.").

11.    Courts must be mindful of the possibility of straw ownership because, as the Circuit

has recognized, there is a "substantial danger of false claims in forfeiture proceedings." *Mercado*,

873 F.2d at 646.  "Bare legal title can be insufficient to demonstrate standing in a civil forfeiture

action, because appearances may be manipulated and deceptive and it may be an attempt to

disguise interests in property by not placing title in their own names."  *United States v. Any And*

*All Funds on Deposit in Acct. No. 12671905, Held in the Name of Landlocked Shipping Co. at*

*Wells Fargo Brokerage Servs., LLC, & All Int. & Other Proceeds Traceable Thereto*, No. 9 Civ.

3481, 2010 WL 3185688, at *5 (S.D.N.Y. Aug. 10, 2010) (cleaned up).

12.    The Government can show that a claimant is a straw owner with evidence that,

despite holding legal title to the *res*, the claimant lacks other indicia of ownership—such as actual

possession, dominion and control, or a financial stake (such as responsibility for mortgage,

property tax, insurance payments, and utility bills).  *See 500 Delaware St.*, 113 F.3d at 312 (noting

that, while the claimant held title, a party other than the claimant "continued in possession and

management of the property. He received all rental payments and was responsible for leasing when

vacancies occurred. He made mortgage, property tax, and insurance payments, paid utility bills,

and maintained the property and made repairs").  *See also In re 650 Fifth Ave. & Related Props.*,

830 F.3d 66, 92 (2d Cir. 2016) (holding that individuals were not *bona fide* owners given the "lack

of evidence that [they] ever exercised any control over [the corporation], participated in any of its

decisions, or received any income therefrom").[27]

---

[27] The Court does not mean to suggest that the definition of a straw owner is limited to a holder
of bare title who lack other indicia of ownership.  For example, the Second Circuit has stated that
one who has only physical possession of the *res* but lacks the other indicia of ownership may
also be a straw owner who lacks standing to contest forfeiture.  *See Mercado*, 873 F.2d at 645
(explaining that mere "possession, as in the instant case, is not enough. There must be some
indication that the claimant is in fact a possessor, not a simple, perhaps unknowing custodian.").

13.    Thus, "[w]hile ownership may be proven by actual possession, dominion, control, title and financial stake," in some circumstances "'[t]he possession of bare legal title to the *res* may be insufficient,' absent other evidence of control or dominion over the property." *One 1982 Porsche 928*, 732 F. Supp. at 451 (quoting *United States v. One 1945 Douglas*, (Appeal 1), 604 F.2d 27, 28-29 (8th Cir. 1979);); *United States v. One 1945 Douglas*, (Appeal 2), 647 F.2d 864, 866 (8th Cir. 1981)). "A search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture." *Id.*; *see also United States v. One Red 2003 Hummer H2 VIN: 5GRGN23U93H118675*, 234 F. Supp. 3d 415, 419 (W.D.N.Y. 2017) ("*One Red 2003 Hummer H2*") ("[T]he possession of bare legal title to the res may be insufficient [to establish standing], absent other evidence of control or dominion over the property") (quotation marks omitted). "There must be some indicia of reliability or substance to claims of ownership in order to reduce the likelihood of a false or frivolous claim." *$829,422.42*, 561 Fed. App'x at 100 (2d Cir. 2014).

14.    "[N]umerous cases hold that once the government makes a *prima facie* showing that a third-party claimant is a 'straw,' the claimant must present evidence of dominion and control or other indicia of true ownership." *United States v. Ida*, 14 F. Supp. 2d 454, 459-60 (S.D.N.Y. 1998) (quotation marks omitted). The government's showing of straw ownership may be defeated with evidence that the claimant has an actual interest in the *res*—such as evidence that the claimant used the property, paid the costs associated with it, allowed others to use it only with her permission, and mingled other possessions with it. *See, e.g.*, *One Red 2003 Hummer H2*, 234 F. Supp. 3d at 419 (cited in Claimants' Amended Proposed Conclusions of Law ("Claimants' PCOL") ¶ 44, ECF No. 455-1) (finding claimant was not a mere straw owner and had standing where

55

discovery showed "he purchased the Vehicle; he held title to the Vehicle; he insured the Vehicle;

he maintained the Vehicle; he held the keys to the Vehicle; he drove the Vehicle 75% of the time;

he allowed others to drive the Vehicle only with his permission; and his possessions were recovered

from the Vehicle").

15.     At closing argument, Claimants urged the Court to adopt the same sort of burden-

shifting framework, where, upon a prima facie showing of straw ownership, a claimant bears the

burden of establishing other indicia of ownership by a preponderance of the evidence.  *See* Hr'g

Tr. 434:12-17 ("[O]nce the government makes a prima facie showing that a third-party claimant is

a straw, the claimant must present evidence of dominion and control or other indicia of true

ownership. So that's the legal support in why I was suggesting that there's a shifting of burden that

happens.").

### C.    Procedure on a Motion to Strike Under Supplemental Rule G(8)

16.     Supplemental Rule G(8) governs motions in forfeiture cases, and Rule G(8)(c)

addresses motions to strike a claim or answer.  It provides that "the government may . . . move to

strike [a] claim on the ground that the 'claimant lacks standing.'"  *Vazquez-Alvarez*, 760 F.3d at

197 (quoting Supplemental Rule G(8)(c)(i)(B)).

17.     Rule G(8)(c)(ii)(B) states that such a motion "may be presented as a motion for

judgment on the pleadings or as a motion to determine after a hearing or by summary judgment

whether the claimant can carry the burden of establishing standing by a preponderance of the

evidence."  *See also Vazquez-Alvarez*, 760 F.3d at 197 (upon a motion to strike, "[t]he claimant

must then establish standing by a preponderance of the evidence") (citing Supplemental Rule

G(8)(c)(ii)(B)); *Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-

Eight Cents ($417,143.48)*, 2015 WL 5178121, at *5 (same).

18.    Rule G(8)(c) plainly states that a motion to strike a claim can be presented and adjudicated in one of three procedures: "on the pleadings," "by summary judgment," or "after a hearing."  The 2006 Advisory Committee Notes to Supplemental Rule G(8) explain as follows:

> Paragraph (c)(ii) further identifies **three procedures for addressing claim standing**.  If a claim fails on its face to show facts that support claim standing, the claim can be dismissed by judgment on the pleadings. If the claim shows facts that would support claim standing, those facts can be tested by a motion for summary judgment. **If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing.  The evidentiary hearing is held by the court without a jury**. **The claimant has the burden to establish claim standing at a hearing**; procedure on a government summary judgment motion reflects this allocation of the burden.

Advisory Committee Notes to Supplemental Rule G(8)(c)(ii) (emphasis added).

19.    The Second Circuit has not expressly articulated what evidentiary standard is appropriate on motion to strike considered via an evidentiary hearing under Supplemental Rule G(8).  But as the Advisory Committee Notes explain, a court "may hold an evidentiary hearing" "[i]f material facts are disputed, precluding a grant of summary judgment."  Advisory Committee Notes to Supplemental Rule G(8)(c)(ii).  This suggests that, where there is a dispute of material fact that renders summary judgment inappropriate, the purpose of an evidentiary hearing is to *resolve* those disputes via fact-finding "by the court without a jury." *Id.*  Indeed, if fact-finding were not appropriate at an evidentiary hearing under Rule G(8), it would make little sense to specify that a jury—which typically serves as fact-finder—is unnecessary in this context.  In making fact-finding determinations, the Court applies a preponderance of the evidence standard. *Cf. Vazquez-Alvarez*, 760 F.3d at 197 (citing Supplemental Rule G(8)(c)(ii)(B)) (stating that claimant must "establish standing by a preponderance of the evidence").

20.    Claimants argue that "[w]here the Court conducts an evidentiary hearing on the government's motion to strike a claim for lack of standing, the government's motion is still ultimately analyzed under the summary judgment standard."  Claimants' PCOL¶ 21.  To the extent

Claimants argue that, when the government requests an evidentiary hearing, a motion to strike must be adjudicated under the Rule 56 summary judgment standard—that is, a standard where the government must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" to prevail—the Court rejects that argument for several reasons.

   a. First, Claimants' argument is contrary to Supplemental Rule G(8). As noted, the Rule provides for three alternative procedures for a motion to strike: on the pleadings, via summary judgment, or via an evidentiary hearing "[i]f material facts are *disputed*, precluding a grant of summary judgment." Advisory Committee Notes to Supplemental Rule G(8)(c)(ii) (emphasis added). If a court has already determined that summary judgment is inappropriate because material facts are genuinely disputed, holding an evidentiary hearing applying the same "genuine dispute of material fact standard" would serve no purpose. It is axiomatic that "[s]ummary judgment should be denied if . . . a rational factfinder could resolve all material factual issues in favor of [the non-moving] party." *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017). Claimants' position appears to be that, to defeat a motion to strike, they need only submit some evidence such that "there are sufficient facts that [they] could put before a jury [whereby] a jury could find in [their] favor." Hr'g Tr. 378:20-22. But that would render an evidentiary hearing under Supplemental Rule G(8) merely duplicative of summary judgment practice.

   b. Second, at closing argument, Claimants acknowledged that their burden at the evidentiary hearing is to establish standing by a preponderance of the evidence. *See* Hr'g Tr. 389:13-14 ("We have the burden to prove our ownership – facially colorable interest by a preponderance of evidence."). *Cf. Vazquez-Alvarez*, 760 F.3d at 197 ("The claimant must . . . establish standing by a preponderance of the evidence.") (citing Supplemental Rule G(8)(c)(ii)(B)). The notion that showing a mere genuine *dispute* of material fact is sufficient to defeat the Government's motion is inconsistent with that concession.

   21.    The cases cited by Claimants are of limited value in answering this question. The Second Circuit cases cited by Claimants predate the adoption of Supplemental Rule G in 2006 and do not purport to set forth the standard for establishing standing at an evidentiary hearing under the Rule. Moreover, the cited cases arose in different procedural postures, and the quotes Claimants cite from them do not purport to describe the appropriate standards for an evidentiary hearing.

a. For example, in *Torres* (cited at Claimants' PCOL ¶ 30), the Second Circuit stated, "[a]t this preliminary juncture . . . the claimant need not prove the full merits of her underlying claim. All that needs to be shown is a 'facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court." 25 F.3d at 1158. *Torres*, however, was decided in 1994—twelve years before the adoption of Supplemental Rule G—and involved a motion for summary judgment. *See id.* at 1155. In accordance with the summary judgment standard, the Court reversed the district court's grant of summary judgment because the claimant had "submit[ted] documentary evidence" that "raised a triable issue of fact whether under New York law, she is the beneficial owner of a constructive trust" holding the disputed *res*. *Id.* at 1157. *Torres* did not purport to state the standard for assessing standing at an evidentiary hearing held by a court *because* genuine disputes of material fact precluded summary judgment.

b. Claimants quote *Cambio Exacto*, 166 F.3d at 527, for the proposition that all that is needed for standing is "[a]n allegation of ownership and some evidence of ownership." Claimants' PFOF ¶ 5. But *Cambio Exacto* was decided on summary judgment, and in accordance with that standard held that "summary judgment was improper" because the claimants submitted evidence that they "had a financial stake in the [forfeited] funds." *Cambio Exacto*, 166 F.3d at 528. The case does not purport to state the standard at an evidentiary hearing under Supplemental Rule G(8), which is unsurprising given that it was decided in 1999.

c. *$557,933.89, More or Less,* 287 F.3d at 78 (quoting *Torres*, 25 F.3d at 1158) (cited at Claimants' PFOF ¶ 5), was decided in 2002 and also predates the adoption of Supplemental Rule G. It too was decided in a different procedural posture which involved a motion for judgment on the pleadings. The Second Circuit confronted the government's argument—raised for the first time during oral argument on appeal—that, because a jury found that the claimant was not the "innocent owner" of the *res* in question, the claimant lacked standing altogether to contest the forfeiture. *See id.* at 77. But as the Circuit noted, "in this case the district court [had already] held that Article III standing was satisfied by the mere fact that 'Mercado had custody of the money orders at the time of their seizure.'" *Id.* at 79 n.10 (quoting *United States v. $557,933.89, More or Less in U.S. Funds*, No. 95-CV-3978, 1998 WL 817651, at *2 (E.D.N.Y. Mar. 2, 1998)).[28] The district court made that determination in the context of the government's motion for judgment on the pleadings (*i.e.*, not on the basis of any

---

[28] Notably, the Circuit observed that "the district court's holding on this point is questionable." 287 F.3d at 79 n.10. But the Circuit ultimately held that the government's request to revisit that determination "post-verdict, based either on the evidence presented at trial or on the facts found by the jury," "would result in unnecessary and unproductive tail-chasing." *Id.* at 78. As the Circuit explained, "the determination of a claimant's standing [i]s the threshold question" that, in turn, determines "whether the claimant may properly invoke the jurisdiction of the federal courts to determine the merits of the underlying dispute, and it therefore logically precedes, not follows, that determination. Consequently, to establish standing the claimant need not prove the full merits of [his] underlying claim." *Id.*

evidentiary submissions), *see* 1998 WL 817651, at *2.  In holding that the claimant had adequately demonstrated standing for purposes of surviving a motion for judgment on the pleadings, *$557,933.89, More or Less* says nothing about what would be necessary for a claimant to carry its burden of establishing standing at an evidentiary hearing.

    d.   The out-of-Circuit cases cited by Claimants, *see* Claimants' PCOL ¶¶ 22-23, are not binding on this Court and are similarly inapposite.[29]

22.    Finally, to the extent that Claimants argue that a jury must decide the issues raised

on the Government's motion to strike, *see* Claimants' PCOL ¶ 27, that contention is belied by the

Advisory Committee Notes, which plainly state that in this context "[t]he evidentiary hearing *is*

---

[29] For example, Claimants cite the First Circuit's decision in *United States v. $ 8,440,190.00 in U.S. Currency*, 719 F.3d 49 (1st Cir. 2013) for the proposition that, even "[w]here the Court conducts an evidentiary hearing on the government's motion to strike a claim for lack of standing, the government's motion is still ultimately analyzed under the summary judgment standard." Claimants' PCOL ¶¶ 21-22.  But, contrary to Claimants' suggestions, that case did *not* involve an actual evidentiary hearing.  In that case, the government styled its motion to strike as a summary judgment motion, and the district court subsequently decided to hold an evidentiary hearing—but the First Circuit noted that, while the district court's proceeding was originally "billed as an evidentiary hearing, neither side ended up offering factual evidence or testimony." *$8,440,190.00 in U.S. Currency*, 719 F.3d at 54.  In reversing, the First Circuit noted that, "[w]hile the district court called the parties in for an evidentiary hearing, no evidence was in fact taken at the hearing." *Id.* at 60.  Given the absence of any actual evidence received at the hearing, the Circuit treated the government's motion to strike as the government originally styled it—*i.e.*, as a motion for summary judgment.  *See id.*  The case does not appear to stand for the broad proposition that, when a court conducts a hearing under Supplemental Rule G(8) at which it actually receives evidence, it must apply a summary judgment standard.

    The Eighth Circuit's decision in *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011 (8th Cir. 2003), which was decided before the 2006 adoption of Supplemental Rule G, is similarly inapposite.  There, the district court held an evidentiary hearing on the claimants' petition for immediate release of the subject property on grounds of substantial hardship under 18 U.S.C. § 983(f)(1) & (3), and it subsequently denied the hardship petition based on adverse credibility rulings against the claimants.  *See id.* at 1012.  The government then moved for summary judgment, which the district court granted based in part on its prior adverse credibility determinations at the hardship hearing.  *See id.*  The Eighth Circuit held that decision was erroneous because there was no dispute that the one of the claimants had a financial interest in the *res* and the other held title to it, the latter of which "establishes a prima facie case of ownership [in Arkansas]" under state law. *Id.* at 1013.  The Eighth Circuit held that "[i]n these circumstances," the claimants had satisfied the requirements of Article III standing, and that the credibility issues on which the district had ruled went to the merits of the case.  *See id.*

*held by the court without a jury*."  Advisory Committee Notes to Supplemental Rule G(8)(c)(ii)

(emphasis added).[30]

## D.  The Requisite Showing to Establish Standing at an Evidentiary Hearing

23.    As noted, there is no binding authority from the Second Circuit as to precisely what

a claimant must show to establish standing at an evidentiary hearing on a motion to strike under

Supplemental Rule G.

24.    In the absence of direct binding authority as to the requisite showing for

establishing standing at an evidentiary hearing on a motion to strike, the Court returns to the

following basic principles:

- A claimant must have standing to contest forfeiture, *see Vazquez-Alvarez*, 760 F.3d
  at 197;

- "The function of standing in a forfeiture action is . . . truly threshold only . . ."
  *$557,933.89 More or Less*, 287 F.3d at 78.  Thus, to establish standing, a claimant
  "need not prove the full merits of [his] underlying claim.'"  *Id.* (quoting *Torres*, 25
  F.3d at 1158);

- Standing requires only that a claimant have an interest in the *res*, such that they
  would suffer a "distinct and palpable injury" from forfeiture, *Cambio Exacto*, 166
  F.3d at 527;

- A court may grant a motion to strike where the claimant is a straw owner—for
  example, where the claimant has bare legal title to the *res*, but lacks the other
  hallmarks of ownership such as possession, dominion, control, or a financial stake,
  because "[s]uch owners do not themselves suffer an injury when the property is
  taken," *id.*; *see also 500 Delaware St.*, 113 F.3d at 312;

- In adjudicating the motion, "[i]f material facts are disputed, precluding a grant of
  summary judgment, the court may hold an evidentiary hearing" to resolve such
  factual disputes, Advisory Committee Notes to Supplemental Rule G(8)(c)(ii); and

---

[30] The Government also argues that this case sounds in admiralty and is triable to the Court on the
merits and cites this as another reason why any concerns about taking standing issues away from
a jury are misplaced.  Claimants dispute this.  The Court does not resolve this question; it is
unnecessary to its resolution of the motion.

- On a motion to strike, a claimant "must . . . establish standing by a preponderance of the evidence," *Vazquez-Alvarez*, 760 F.3d at 197 (citing Supplemental Rule G(8)(c)(ii)(B));

25.     The Court harmonizes these principles as follows: generally speaking, on a motion to strike based on a lack of standing, a claimant need not establish ultimate beneficial ownership, as such a requirement would inappropriately merge the "threshold" question of standing and the ultimate merits determination.  *See $557,933.89, More or Less,* 287 F.3d at 78.  In an ordinary case, to establish standing, a claimant need only show some indicia of ownership such "actual possession, dominion, control, title, or [a] financial stake." *Contents of Accts.*, 847 F. Supp. at 333; *One 1982 Porsche 928*, 732 F. Supp. at 451.

26.     Where the government makes a prima facie showing of straw ownership, however, the claimant must establish an interest in the property that goes beyond mere title—such as possession, dominion and control, or a financial stake.  *See 500 Delaware St.*, 113 F.3d at 312; *Ida*, 14 F. Supp. 2d at 459-60; *One 1982 Porsche 928*, 732 F. Supp. at 451.  This requirement appropriately balances the Circuit's twin guidance that a straw owner lacks standing, but that a claimant need not prove ultimate beneficial ownership to satisfy the merely threshold standing inquiry.

27.     Where disputed factual issues preclude a grant of summary judgment, the motion may be considered in the context of an evidentiary hearing, at which the court may resolve such factual disputes.  *See* Advisory Committee Notes to Supplemental Rule G(8)(c)(ii).

28.     In so holding above, the Court does not attempt to set forth precisely what showing would be necessary to establish standing at an evidentiary hearing in every case.  But in this context—*i.e.*, where the government makes a prima facie showing of straw ownership—a claimant has the burden of establishing an interest in the property beyond mere title—such as possession,

dominion and control, or a financial interest—by a preponderance of the evidence.  *See Vazquez-Alvarez*, 760 F.3d at 197.

29.     While the Court's reasoning differs from that of Claimants, its conclusion as to the requisite showing for standing at this stage of the proceedings in this particular case is ultimately not meaningfully different from the standard that Claimants proposed.  At closing argument, Claimants argued that, to establish standing, a claimant must show, by a preponderance of the evidence, at least one or more indicia of ownership: possession, dominion/control, title, and financial stake.  *See* Hr'g Tr. 383:16-384:1 (Claimants' counsel acknowledging that "if we could not show any of those things we would not have standing," and further acknowledging that Claimants must do so "[b]y a preponderance of the evidence").  Claimants further offered that, if the government makes a prima facie showing of straw ownership by proving a claimant had possession of bare title and nothing else, a claimant can defeat a motion to strike and establish standing by showing one of the *other* indicia of ownership by a preponderance of the evidence.  *See id.* 396:4-6 (Claimants counsel stating, "[e]ven if the government makes a prima facie showing of straw ownership, then the burden shifts to claimants to show that we actually had more than bare legal title.").  Claimants describe this legal standard as grounded in the summary judgment standard, but regardless of how they describe it, the legal standard that they urge—that they must establish an interest in the *res* by a preponderance of the evidence—is essentially the same one adopted by the Court.[31]

---

[31] To the extent that Claimants contend that fact-finding is inappropriate in this context, that is ultimately irrelevant to the Court's decision in this case, because as explained below, the record is devoid of any evidence that could establish even a genuine dispute of fact as to any of indicia of ownership by Claimants other than title—i.e., possession, control/dominion, or a financial stake—after the September 2021 MOA.

## II. **Application**

30.     The Government initially presented its motion primarily as a Motion for Summary

Judgment, but in the alternative requested an evidentiary hearing in the event that factual disputes

preclude summary judgment, *see* Reply Mem. of Law in Supp. of Mot. to Strike at 19, ECF No.

137.  The Court ruled that Khudainatov's declaration denying that the September 2021 MOA

effectuated a transfer of ownership of the *Amadea* created a genuine dispute of fact as to whether

Claimants had standing, *see* Nov. Order at 4, and in accordance with Rule G(8), set this case for

an evidentiary hearing before the Court without a jury, *see* ECF No. 312 at 14.  As explained below,

however, based on the record now before the Court—from which Khudainatov's declaration is

excluded as hearsay, *see supra*—the Court concludes that:

- The Government has made a prima facie showing that Claimants are mere straw owners of the *Amadea*.  Pursuant to the September 2021 MOA, they hold legal title to the *Amadea* but none of the other incidents of ownership in it such as possession, dominion and control, or a financial stake.

- Claimants have failed to establish that, after the September 2021 MOA, they held or exercised any of the incidents of ownership in the *Amadea* beyond bare title.

As explained below, the preponderance of the evidence supports these conclusions.  And as

explained further, the Court reaches the same conclusions based solely on the undisputed material

facts in the record.

### A.     The Government Has Made a Prima Facie Showing of Straw Ownership

31.     The Court concludes that the Government has made a prima facie case of straw

ownership, i.e., that Claimants "hold title to [the res] for somebody else."  *Cambio Exacto*, 166

F.3d at 527.  Claimants, to the extent they had any ownership interests in the *Amadea*, transferred

such interests other than bare legal title to Errigal through the September 2021 MOA.  Indeed,

there is not even a genuine dispute of fact that they did so:

a.  Under the plain terms of the MOA, in exchange for €225 million, all of the incidents of ownership in the *Amadea* other than title passed from Millemarin to Errigal, including possession; the ability to use it and start any works on it; and all financial responsibilities, including the running costs and all risk associated with loss, damage, or destruction of the *Amadea*.

b.  There is no dispute that the €225 million transfer contemplated by the September 2021 MOA took place.

c.  Thus, under the plain terms of the MOA, after payments were rendered on the September 2021 MOA, Claimants had no interest in the *Amadea* other than title.

d.  This is sufficient to make a prima facie showing of straw ownership.  *See 500 Delaware St.*, 113 F.3d at 312; *One 1982 Porsche 928*, 732 F. Supp. at 451.

32.    Although unnecessary to the Court's determination that the Government has made a prima facie showing of straw ownership, the undisputed fact that Kerimov's niece, Gadzhieva, was the source of funds for the September 2021 MOA further supports the Court's conclusion that the Government has made a prima facie showing straw ownership.  That Errigal itself did not "pay" for the transaction is suspicious.  Moreover, the preponderance of the evidence weighs against Claimants' assertion that Gadzhieva "loaned" €225 million to Errigal, a newly incorporated shell company with no assets and no means of repaying a loan, because the notion of such a loan makes no sense on its face and there is no explanation for it in the record, and the documents purporting to substantiate the purported loan appear to have been forged.  Accordingly, the Court's finding that Gadzhieva paid the €225 million purchase price for the *Amadea* supports (although is unnecessary to) the Court's conclusion that Khudainatov retained title so as to serve as a straw owner for Kerimov and/or members of the Kerimov family.

33.    As noted, the Court rejects Claimants contention that the September 2021 MOA was not a sales agreement but a "temporary use" agreement.  There is no admissible documentary evidence in the record supporting that characterization, which is contradicted by the plain terms of the MOA.  Claimants' characterization is also contradicted by every external admissible document

in the record.  The only evidence in record on this point is the testimony of Khudainatov family office employee Parfireva, to which the Court can accord no weight due to her lack of personal knowledge about the issue.  Thus, it is not merely that the preponderance of the evidence indicates that the September 2021 MOA was a sales agreement rather than a "temporary use agreement": There can be no genuine dispute of fact that it was a sales agreement.  *See Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co.*, 197 F. App'x 62, 64 (2d Cir. 2006) (affirming district court's decision not to consider affidavit on summary judgment where it was based only on affiant's "belief and conclusion," rather than on personal knowledge); Rule 56(c)(4) (explaining that affidavits opposing summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

34.    At closing argument, Claimants denied that the September 2021 MOA and the accompanying payments were sufficient to establish a prima facie case for straw ownership.  But when asked at closing argument what the standard for such a showing would be, and how the Government's showing fell short, Claimants could provide no coherent answer.  *See* Hr'g Tr. 392:15-396:14.    The Court rejects Claimants' hodge-podge arguments contesting the Government's prima facie showing of straw ownership, as follows:

   a.   Claimants initially pointed to the fact that the Government offered no witness testimony as to straw ownership.  Hr'g Tr. 393:10-16.  But Claimants cite no authority for the proposition that witness testimony is necessary to support a prima facie showing of straw ownership.  Here, there is documentary evidence (i.e., the September 2021 MOA) and an undisputed €225 million payment, which together provide clear and unequivocal evidence that Claimants transferred the incidents of ownership of the *Amadea* other than bare title.

   b.   Claimants then noted that "everyone here agrees that September [2021] MOA does not transfer title to the *Amadea*." Hr'g Tr. 394:24-25.  But holding bare title without the other incidents of ownership is perhaps the quintessential definition of straw ownership—and the basis for the Government's prima facie showing here.  *See*

*Cambio Exacto*, 166 F.3d at 527 (explaining that a straw owner is one who "'own[s]' the property, but hold[s] title to it for somebody else"). Claimants' position that title alone is enough to establish standing is foreclosed by Second Circuit precedent holding that a straw owner who holds title and nothing else lacks standing to contest forfeiture. *See 500 Delaware St.*, 113 F.3d at 312.

c.   Claimants also pointed to "evidence showing that Mr. Khudainatov commissioned and built the *Amadea*." Hr'g Tr. 396:11-12. Indeed, in their Proposed Findings of Fact, they make much out of the "evidence of [Khudainatov's] original ownership of the *Amadea*, from construction through delivery, repeated use of the property, and the granting of permission to another to use the property in specified ways." Claimants' PFOF ¶ 8.

(i).   As noted, the Court does not credit Claimants' assertions about Khudainatov commissioning the *Amadea*, which are dubious in light of the Government's expert testimony regarding Khudainatov's wealth during the relevant period.

(ii).   In any event, this issue is ultimately unnecessary to the Court's decision. That is, even if the Court were to reject Dr. Aslund's testimony, and instead credited Claimants' evidence that Khudainatov commissioned the *Amadea* and owned it for some period of time prior to 2021, that would not change the Court's decision. The fact that a claimant previously owned the res at some point in the past does not disprove that the claimant is a mere straw owner *now*, at least under the facts of this case. *Cf. 500 Delaware St.*, 113 F.3d at 312 (affirming district court's determination that claimant, who originally owned property and transferred it to his son, but then had bare title transferred back to him, was a straw owner). Indeed, during closing argument, Claimants ultimately agreed that, for purposes of standing in this case, it "does not matter" whether Khudainatov originally commissioned the *Amadea*, because if he in fact sold it in 2021, then he lacks standing. *See* Hr'g Tr. 447:23-448:10 (conceding that a sale of the *Amadea* would deprive Claimants of standing, but still arguing that, as a legal matter, title is enough to maintain standing).

(iii).   The question before the Court then, is not whether Claimants had any indicia of ownership in the *Amadea* at any point in time. Rather, it is whether, in face of evidence that the *Amadea* was sold pursuant to the September 2021 MOA, they can establish that they exercised *any* incidents of ownership other than title after that date. As explained throughout this Opinion, they cannot establish even a genuine dispute of fact that they did.

    d.   At one point, Claimants argued that the Government needs to show "illegal activity" of some sort in order to make a prima facie showing of straw ownership. Hr'g Tr. 524:9-11 ("The only way the government gets to argue straw ownership is if there's, first, a finding that there was illegal conduct."). Claimants offer no support for that proposition, and the Second Circuit has not held that illegal activity is a prerequisite to a finding of straw ownership. Rather, the Circuit has simply defined a straw owner as one who "hold[s] title to [the property] for somebody else." *Cambio Exacto*, 166 F.3d at 527; *see also $829,422.42*, 561 F. App'x at 100. As Claimants acknowledged, whether the *Amadea* was in fact involved in illegal activity is a merits question, *see* Hr'g Tr. 377:23-378:6, which is not a part of the threshold standing inquiry. Finally, even if some evidence of illegality were a threshold requirement, there is some such evidence here: namely, the forgery of the documents purporting to show that Gadzhieva's payment of €225 million for the *Amadea* was a loan.

    e.   Ultimately, Claimants can do no more than to note that this case features facts that are different from past cases where a straw ownership was found—e.g., where the true owner "transfer[s title to] the property after an indictment, clearly to try to avoid forfeiture. That is sort of your standard arrangement with a straw owner." Hr'g Tr. 392:22-23. But that is a distinction without a difference. If someone who *receives* bare title and no other incidents of ownership can be a straw owner, it follows that the reverse can be true as well—i.e., that someone who *transfers* all of the incidents of ownership except title can be a straw owner, as the Court finds is the case here.

35.    Claimants make much of this Court's previous statement, in declining to award summary judgment to the Government, that "the parties' submissions contain numerous factual disputes—most significantly, whether the Errigal transaction was in fact consummated." Claimants' PFOF ¶ 7 (quoting Nov. Order 4). They then point to the fact that the closing documents for the September 2021 MOA were never signed, *see* Claimants' PFOF ¶ 64 (citing Wolf testimony that September 2021 MOA did not close); *id.* ¶ 66 (citing Magee testimony that ownership of the *Amadea* was not transferred); *id.* ¶ 69 (citing McKendrick testimony that legal title to the *Amadea* did not pass), and then argue that this is enough to defeat the Motion to Strike. This argument, however, reads too much significance into the Court's use of the word "consummated," which was a reference to whether the MOA's terms regarding the transfer of the

incidents of ownership of the *Amadea* had in fact been effectuated.  Under Second Circuit precedent, the fundamental issue on this motion is whether the Claimants have sufficient indicia of ownership so as to have standing to contest forfeiture of the *Amadea*.  *See 500 Delaware St.*, 113 F.3d at 312.  And under the terms of the MOA, all of the incidents of ownership of the *Amadea* were transferred from Millemarin to Errigal upon full payment of its €225 million purchase price.  The only effect of signing the closing documents would have been to transfer title as well.  The testimony of various witnesses—Wolf, Magee, McKendrick, and Parfireva—that there was no transfer of ownership of the *Amadea* because the September 2021 MOA closing documents were never signed—is premised on the notion that ownership is established by mere title.  But as explained *supra*, in this context, title alone is insufficient.  Claimants' position in this regard—that they remained owners of the *Amadea* because they retained mere title to it—is foreclosed by the uniformity of case-law holding that a straw owner who holds bare title and no other ownership interest lacks standing to contest forfeiture.

36.    Finally, Claimants' assertion that the September 2021 MOA was canceled finds no support in the record.  There is no evidence of any of the events that, on the face of the agreement, would trigger cancellation.  There is no documentary evidence supporting the notion of cancellation, or indirect evidence of cancellation such as a return of any portion of the €225 million purchase price to Millemarin.  The only testimony regarding cancellation is from Parfireva, whose testimony in this regard was not based on personal knowledge, but from inferences based on documents that, themselves, do not provide evidence that the MOA was cancelled.  Her testimony and these documents are not sufficient to establish even a genuine dispute of material fact as to cancellation of the MOA.  *See Miller Marine Servs.*, 197 F. App'x at 64 (affirming exclusion of affidavit on summary judgment not based on personal knowledge); Rule 56(e).

37.     In sum, the Government has made a prima facie showing of straw ownership, and has done so not just by a preponderance of the evidence.  On the record before the Court, there is no genuine dispute of fact that the September 2021 MOA effectuated a transfer of all ownership interests in the *Amadea*, other than title, to Errigal.  The fact that Millemarin held only bare title to the *Amadea* at that point is not subject to a genuine dispute.  And bare title alone is insufficient to establish standing to challenge forfeiture.

### B.    Claimants Have Failed to Rebut the Government's Prima Facie Showing of Straw Ownership

38.     In light of the Government's prima facie showing of straw ownership, the burden shifts to Claimants to establish some incident of ownership other than bare title.  *See Ida*, 14 F. Supp. 2d at 459-60; Hr'g Tr. 434:12-17 (counsel for Claimants conceding that once the Government makes a prima facie show of straw ownership, "that there's a shifting of burden" in which a "claimant must present evidence of dominion and control or other indicia of true ownership").  As explained below, the Court concludes that Claimants have not established any indicia of ownership after the September 2021 MOA other than title—such as possession, dominion and control, or a financial stake—by a preponderance of the evidence.  Indeed, there is not even a genuine dispute of material fact that Claimants lacked any indicia of ownership in the *Amadea* other than title after the September 2021 MOA.

39.     Before turning to a discussion of the various indicia other than title, the Court notes that their definitions can be both self-referential and overlapping.  *See, e.g.*, *United States v. U.S. Currency Amounting to the Sum of Thirty Thousand Eight Hundred Dollars*, 555 F. Supp. 280, 283 (E.D.N.Y. 1983) (explaining that, to establish standing, "the claimant must demonstrate a possessory interest in the res with its attendant characteristics of dominion and control"); *Possession*, *Black's Law Dictionary* (6th ed. 1990) (defining "possession" as, inter alia, "having

*control* over a thing with the intent to have and to exercise such control" (emphasis added)); *id.* ("A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise *dominion or control* over a thing . . . is then in constructive possession over it." (emphasis added)); *Dominion*, *Black's Law Dictionary* (6th ed. 1990) (defining "dominion" as "perfect *control* in right of ownership" and stating that "[t]he word implies both *title* and *possession* and appears to require a complete retention of *control* over disposition" (emphasis added)).

40.     The Court does not and need not set out its own precise definitions for each indicator of ownership beyond title. As explained below, regardless of how precisely one might define these terms, Claimants have not demonstrated by a preponderance of the evidence—or even the existence of a genuine dispute of fact—that they held anything beyond the *Amadea*'s title at the time of seizure.

<b>i.    <u>Possession</u></b>

41.     The term "possession," though somewhat "ambiguous," generally "means more than mere custody" and includes "a right or interest of proprietorship . . . ." *Mercado*, 873 F.2d at 644-45. "'Possession' requires a knowledge of presence and an intent to control." *Id.* at 645.

42.     In cases where a claimant says that he owned a seized *res*, the court must find some "indication that the claimant is in fact a possessor, not a simple . . . custodian," and there must be "some indicia of reliability or substance to reduce the likelihood of a false or frivolous claim." *Id.*; *cf. 500 Delaware St.*, 113 F.3d at 312 (holding that claimant who held title was a straw owner where a party other than the claimant, *inter alia*, "continued in possession . . . of the property").

43. As noted *supra*, all of the direct evidence in the record about possession of the *Amadea* after the September 2021 MOA indicates that Claimants did not possess it during the relevant period.

    a. It is undisputed that Khudainatov did not step foot on the *Amadea* after the September 2021 MOA or sail the vessel after the September 2021 MOA. *Compare with One Red 2003 Hummer H2*, 234 F. Supp.3d at 419 (claimant had standing where, *inter alia*, he held keys to the seized vehicle and drove it 75% of the time).

    b. All of the evidence in the record indicates that the only people who used the *Amadea* after the September 2021 MOA were members of the Kerimov family. They alone cruised aboard the boat and decided where the *Amadea* would travel, including to Fiji, where it was ultimately seized.

    c. Claimants argue that the Kerimov family's use of the *Amadea* was in their capacity as charterers, not as owners. As noted above, the Court rejects this argument and finds that it is not supported by a preponderance of the evidence.

    d. Ultimately, the Court's finding that members of the Kerimov family were the only people who used the *Amadea* after the September 2021 MOA supports the Court's decision, but is unnecessary for it. Even leaving aside that finding, there can be no genuine dispute of fact that the Claimants did *not* use the *Amadea* after September 2021.

44. Claimants point to various circumstantial forms of evidence that they possessed the yacht. But their reliance on those forms of evidence is unavailing:

    a. Claimants say that Khudainatov's possessions were onboard the *Amadea* at the time of seizure. *Cf. One Red 2003 Hummer H2*, 234 F. Supp. 3d at 420 (claimant had standing where, *inter alia*, he kept his possessions inside seized vehicle). But Claimants' representation in this regard was not based on evidence of the presence of Khudainatov's personal effects onboard the *Amadea*, as there were none. Rather, it was based on evidence that Khudainatov had paid for furnishings onboard. As noted, the preponderance of the evidence indicates that he lacked the means to pay for the *Amadea* at the time it was commissioned. In any event, the notion that these items belonged to Khudainatov at the time of seizure is based on the premise that the September 2021 MOA did not effectuate a sale of the *Amadea*. The preponderance of the evidence indicates that it did; indeed, there can be no genuine dispute of fact that point.

    b.   Claimants stated at closing argument that their Fijian counsel was "on" the *Amadea* at the time it was seized.  The Court rejects that contention for two reasons.

    (i).   First, as noted, this assertion is based on misrepresentation of facts in the record.  There is no record evidence whatsoever that local Fijian counsel was ever physically present on the *Amadea*, let alone present on the boat when it was seized.   Rather, the evidence suggests that Claimants retained counsel in Fiji around the time the *Amadea* was seized and that local counsel contemporaneously opposed seizure.  These facts do not prove that Claimants "possessed" the *Amadea* when it was seized.

    (ii).   Second, the Court rejects Claimants' argument that, when counsel contests seizure soon after seizure is initiated, the mere fact of contestation is evidence of standing.  *See* Hr'g Tr. 501:18-23.  Claimants cite no legal authority to support this proposition.  The implication of Claimants' argument is that standing to contest forfeiture can be based on a claimant's expeditious hiring of a lawyer—which is obviously not the law.  *See, e.g.*, *U.S. v. All Funds on Deposit on or Before November 8, 1994 in Citibank Acct. No. 42773634*, 955 F. Supp. 23, 27 (E.D.N.Y. 1997) ("[A] bare assertion of ownership of the res, without more, is inadequate to prove an ownership interest sufficient to establish standing.").

45.    In sum, Claimants have not established under any standard that they "possessed" the *Amadea* at any point in time after the September 2021 MOA up until when it was seized in Fiji in April 2022.  The preponderance of the evidence indicates that they did not possess the *Amadea* at any point after the September 2021 MOA; instead, it shows that only members of the Kerimov family did.   Ultimately, there is not even a genuine dispute of fact that Claimants did not possess the *Amadea* during the relevant period, as there is no competent evidence in the record suggesting that they did.

### ii.   <u>Dominion & Control</u>

46.    Commonly accepted definitions of "control" suggest that it means, essentially, the "[p]ower . . . to manage, direct, superintend, restrict, regulate, govern, administer, or oversee" the *rem*.  *Control*, Black's Law Dictionary (6th ed. 1990).  Claimants acknowledged that "control" and

"dominion" are often used in concert and that they are "not certain if there's a difference with the meaning between those two [words] for this case." Hr'g Tr. 379:5-379:25, 380:1. Accordingly, the Court considers these terms together.

47. There is no evidence Claimants exercised dominion and/or control over the *Amadea* after the September 2021 MOA. At the time of its seizure, the *Amadea* was set to undergo substantial renovations, changes that would require the boat to be docked for 7 months while its interior was overhauled. There is no evidence suggesting that Claimants directed the renovations, would oversee the design plans' implementation, or had even been consulted about the changes set to be made.

48. The only evidence in the record about who directed these changes to the *Amadea* is that it was members of the Kerimov family. *See 500 Delaware St.*, 113 F.3d at 312 (claimant who held title was a straw owner where another party, *inter alia*, "maintained the property and made repairs"); *One Red 2003 Hummer H2*, 234 F. Supp. 3d 415, 419 (W.D.N.Y. 2017) (claimant was not a straw owner of seized vehicle where he, *inter alia*, "maintained" it).

49. Claimants respond by asserting Khudainatov was "kept informed of and approved certain events," which they suggest demonstrates that Claimants had dominion and control over the vessel. Claimants' PFOF ¶ 132. Claimants' argument fails for two reasons.

    a. First, there is no evidence in the record that Claimants were actually "kept informed of and approved" the changes that were made and planned to be made to the *Amadea*. The only evidence offered in this regard consists of declarations from witnesses whose testimony the Court excluded. *See* Hr'g Tr. 6-9.

    b. Second, even if Claimants were "kept informed of" such changes, their knowledge of the planned renovations is not the same as "approving of" those changes or otherwise exercising power over the renovation process. Claimants cite no authority for the proposition that receiving information about a *res* is evidence of dominion and/or control over it.

74

50. The preponderance of the evidence, including Captain Meagher's testimony, suggests that these changes to the *Amadea* were substantial, and that they were made by the Kerimovs as owners rather than as charterers, which further supports the Court's conclusions as to standing. But this particular issue is ultimately immaterial. That is, even excluding Captain Meagher's testimony that these renovations could only have been made by an owner, and crediting Captain Hitch's testimony that they *could* have been made by a charterer, there is still no competent evidence in the record that Claimants exercised dominion and control over the *Amadea* with respect to these changes to the *Amadea*. The *only* evidence in the record about who directed these changes is that they were directed by members of the Kerimov family.

51. Accordingly, Claimants have not established under any standard that they exercised dominion and/or control over the *Amadea* at any point in time after the September 2021 MOA up until when it was seized in Fiji in April 2022. The preponderance of the evidence indicates that they did not exercise dominion and/or control over the *Amadea* at any point after the September 2021 MOA, and that only members of the Kerimov family did. Indeed, there is not even a genuine dispute of fact on this point because there is no competent evidence in the record indicating that Claimants exercised dominion and/or control over the *Amadea* during the relevant period.

### iii.    Financial Stake

52. There is no definition of the term "financial interest" in case-law or in dictionaries that is particularly helpful here. *See, e.g.*, *Financial interest*, *Black's Law Dictionary* (6th ed. 1990) (defining "financial interest" as "interest equated with money or its equivalent"). Accordingly, the Court uses a common-sense definition of the term and considers any evidence in the record about legal responsibility for the *Amadea*'s costs, actual payment of such costs, or financial benefits derived from the *Amadea*.

53.    There is no dispute that Kerimov's niece Gadzhieva paid €225 million in connection with the September 2021 MOA.  As noted, the plain terms of the agreement transferred all costs and risk of loss associated with the *Amadea* to Errigal.

54.    There is no evidence that, after September 2021, Claimants paid for the *Amadea*'s upkeep, crew, docking and undocking, fueling, or other costs associated with maintaining a superyacht.  Claimants have presented no admissible evidence—not a single receipt, invoice, or other evidence of expenditure—showing any payments made by Millemarin or Khudainatov in connection with the *Amadea* after the September 2021 MOA.

55.    Claimants point to three pieces of evidence to support the notion that they had a continued financial stake in the *Amadea* after September 2021.  None are availing:

   a.    The one expense that Claimants point to involves the *Amadea*'s insurance coverage, which extended beyond the September 2021 MOA.  *See* CX-402-A.  But those costs were all paid *before* Millemarin and Errigal contracted with each other, thus the payment does not prove anything about whether Claimants actually continued to bear any financial responsibility for the *Amadea* after September 2021.  *Cf. 500 Delaware St.*, 113 F.3d at 312 (finding title-holding claimant a straw owner when another person, inter alia, "made mortgage, property tax, and insurance payments, paid utility bills").

   b.    Claimants point to a purported 2022 management agreement with Imperial Yachts as evidence that they continued to bear financial responsibility for the *Amadea*, but the Court does not consider the agreement because it was not signed until *after* the *Amadea* was seized.  It therefore cannot be evidence of Claimants' contention that the September 2021 MOA—and its transfer of financial obligations from Millemarin to Errigal—was no longer in effect.

   c.    Claimants point to the fact that the *Amadea* is listed as a liability on Millemarin's internal balance sheets as purported evidence of their continued financial stake in the boat, but as noted *supra*, those documents were untimely disclosed and thus are not admitted as evidence.  In any event, it is unclear how numbers purporting to show a liability on an internal spreadsheet held by Millemarin's former director—which Claimants say that they themselves lacked access to until only recently, and do not represent any kind of legally enforceable obligation—constitute evidence of a financial interest.

76

56.     Similarly, Claimants present no evidence showing that they obtained any financial benefit from the *Amadea* after receiving the €225 million sales proceeds pursuant to the September 2021 MOA.  Claimants aver that Gulnara Kerimova attempted to pay for at least one trip taken aboard the *Amadea*, which ostensibly proves that the boat was being chartered and had not been sold.  That payment was never made; nor is there evidence that Claimants (as opposed to Imperial Yachts) would have received payment for the purported charter.  In fact, there is no competent evidence in the record that Claimants ever received a single euro from any of the so-called charters of the *Amadea*.  *Cf. 500 Delaware St.*, 113 F.3d at 312 (claimant who held title was straw owner where a party other than the claimant, inter alia, "received all rental payments" from property).

57.     Finally, it is uncontested that Claimants never returned the €225 million Millemarin received pursuant to the September 2021 MOA.  Claimants say Millemarin is now liable to Errigal to return funds paid as part of the September 2021 MOA since their deal "fell apart following Russia's military action in Ukraine."  Claimants' PCOL ¶ 38(h).  But, beyond a line in Millemarin's excluded balance sheets listing the *Amadea*'s value as a liability, there is no evidence Millemarin is actually indebted to Errigal.

58.     Claimants have not established under any standard that they had a financial interest in the *Amadea* at any point in time after the September 2021 MOA.  Indeed, there is not even a genuine dispute of fact on this point because there is no competent evidence in the record that Claimants were liable for any costs of, actually made any payments in connection with, or derived any financial benefit from the *Amadea* during the relevant period.

## C.     Claimants' Other Arguments Regarding Ownership of the *Amadea* Fail

59.     Claimants raise several additional arguments regarding ownership of the *Amadea*. For example, Claimants repeat a mantra that numerous witnesses testified that Khudainatov owned

the *Amadea*.  *See* Claimants' PFOF ¶ 11.  The Court concludes that these witnesses' testimony does not create a genuine dispute of fact as to the relevant indicia of ownership of the *Amadea* after September 2021.

     a.  To the extent that these witnesses testified as to who *legally* owned the vessel, the Court cannot rely on such testimony; not even an expert witness can testify to a legal conclusion.  *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[T]his Court requires the exclusion of testimony which states a legal conclusion.").

     b.  As explained above, to the extent that these witnesses sought to testify to *facts* that are relevant to the indicia of ownership, such testimony: (1) did not address the relevant time period (i.e., after the September 2021 MOA); (2) was not based on personal knowledge of the witness and/or was based purely on hearsay; and/or (3) addressed the issue of legal title rather than other incidents of ownership—such as possession, dominion/control, or a financial stake— which, in the context of this case, is not sufficient to establish standing.

60.    In their post-hearing Proposed Findings of Fact, Claimants raise a new argument: that the Government's allegation of straw ownership is itself a basis for establishing Claimants' standing.  They state that "the threshold for standing is so low that other Circuits have noted that the government's allegations [of straw ownership] combined with an assertion of ownership, even without any additional evidence, can themselves be sufficient for standing."  Claimants' PFOF ¶ 6. Claimants elaborated at closing argument that "the government's assertion that Mr. Khudainatov is a straw owner, combined with []our verified claim, are sufficient for standing."  Hr'g Tr. 397:19-22.  In essence, Claimants contend that, where the government alleges that a claimant posed as a straw owner, such an allegation shows that the claimant has some sort of interest in the property sufficient to confer standing.  The Court declines to credit this argument, which was not raised in Claimants' pre-hearing Proposed Findings of Fact and Conclusions of Law, *see* ECF No. 426, and has no support in Second Circuit case-law.  More to the point, Claimants' argument turns the law on straw ownership on its head, by trying to make what courts have consistently found to be a basis to *deny* standing into a reason for finding it.  *See, e.g.*, *Cambio Exacto*, 166 F.3d at 527

(stating straw owners "do not themselves suffer an injury when the property is taken"); *$829,422.42*, 561 F. App'x at 100 ("In order to have standing to challenge the forfeiture of property, one must be more than a mere 'straw owner.'").

### D. Summary

61.    In sum, Claimants have not established under any standard that they had an interest in the *Amadea* other than bare title at any point in time after the September 2021 MOA.  The preponderance of the evidence indicates that they did not.  But, even leaving aside disputed factual issues, there is no dispute of material fact as to standing because:

a.  There can be no genuine dispute that, to the extent Claimants had any ownership interest in the *Amadea*, the September 2021 MOA transferred away the incidents of ownership in the *Amadea* other than title, because:

(i).    All of the documents in the record about the September 2021 MOA— including the MOA itself, the addenda to it, and contemporaneous documents referencing it—confirm that it was for a sale of the *Amadea*;

(ii).    There is no dispute that €225 million was paid in connection with the September 2021 MOA;

(iii).    The terms of the MOA are unambiguous that all of the incidents of ownership in the *Amadea* other than title were then transferred away; and

(iv).    There is no competent evidence in the record indicating that the September 2021 MOA was canceled or was meant to provide for the mere temporary use, rather than the sale, of the *Amadea*;

b.  There can be no genuine dispute that, after the September 2021 MOA, Claimants did not hold or exercise the incidents of ownership in the *Amadea* other than title;

(i).    there is no competent evidence in the record that Claimants held or exercised any of the incidents of ownership in the *Amadea* other than title after September 2021; and

(ii).    all of the competent evidence regarding the incidents of ownership other than title after September 2021 points to parties other than Claimants.

There is therefore not even a genuine dispute of material fact that Claimants are mere straw owners who lack standing to contest forfeiture of the *Amadea*.

**CONCLUSION**

For the foregoing reasons, the Government's Motion in Limine (ECF No. 445) and its Motion to Strike (ECF No. 97) are **GRANTED.**  Claimants' Motion to Dismiss (ECF No. 71) is **DENIED AS MOOT**.

The Clerk of Court is respectfully requested to terminate ECF Nos. 71, 97, and 455.

**SO ORDERED.**

Dated: March 10, 2025
       New York, New York

_____
DALE E. HO
United States District Judge