UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 23 Civ. 9304 (DEH) |
| v. | **OPINION AND ORDER** |
| The M/Y Amadea, a Motor Yacht Bearing International Maritime Organization No. 1012531, | |
| Defendant. | |

DALE E. HO, United States District Judge:

Before the Court are: (1) Eduard Khudainatov and Millemarin Investments Ltd.'s (collectively, "Claimants") Motion for Reconsideration of the Court's January 8, 2025 Order, ECF No. 407, granting the Government's Motion to Compel Khudainatov's deposition in New York (filed under seal via email); and (2) the Government's Motion for Sanctions against Khudainatov and Millemarin (filed under seal via email), which seeks to strike their Claim to the *Amadea*, *see* ECF No. 9. For the reasons stated below, Claimants' motion is **DENIED**, and the Government's motion is **GRANTED**.

## BACKGROUND

The general facts of this case are set forth in the Court's Findings of Fact and Conclusions of Law, familiarity with which is presumed. The facts underlying these motions are largely set forth in the Court's Orders regarding the Government's efforts to take the deposition of Claimant Khudainatov, dated November 15, 2024, ECF No. 312, and January 8, 2025, ECF No. 407. For the sake of completeness, the relevant background facts are set forth in additional detail below.

Both motions center around Khudainatov's deposition, which was noticed three times but never taken. First, on June 6, 2024, the Government noticed Khudainatov's deposition to take

place in New York on July 15, 2024. Claimants did not file a motion for relief, such as a motion for a protective order, before the deposition was set to occur. Instead, Khudainatov simply did not appear. It was not until one week after the date on which his deposition was noticed that Claimants sought a protective order. In a letter brief dated July 22, 2024, Claimants explained that Khudainatov was unwilling to travel to New York out of fear for his "personal safety" because "two of [his] companies . . . [had been] added to [the Office of Foreign Assets Control's] Russia-Related sanctions" list and because "numerous documents in the Government's [discovery] production contain[ed] language indicating possible ongoing criminal investigations into [his] assets." Claimants' July 22, 2024 Letter at 2, ECF No. 149. Claimants also raised concerns that requiring Khudainatov to travel to the United States would impose a "personal burden" on him, arguing that because he "did not choose New York as a forum [or] choose to have the M/Y *Amadea* seized," "Mr. Khudainatov [could not] be reasonably expected to travel to New York." *Id.* Claimants moved for the Court to issue a protective order allowing Khudainatov (and other Russian witnesses) "to appear for depositions remotely or, at the government's option, in person at a mutually-agreeable location in the United Arab Emirates." *Id.* at 1. In addition to the UAE, Claimants offered Azerbaijan, Uzbekistan, and Kyrgyzstan as countries to which Khudainatov was willing to travel for his deposition. *Id.* at 2.

The Government, in an opposition letter-brief dated July 25, 2024, asserted its right to depose Khudainatov in New York and, concomitantly, its opposition to Khudainatov being deposed remotely. *See* Gov't July 25, 2024 Letter, ECF No. 156. With respect to the former, the Government presented cases standing for the proposition that "by filing a claim and voluntarily entering the forfeiture case, a claimant consents to the jurisdiction of the forum court and thus cannot resist deposition in the forum." *See id.* at 1. To assuage Khudainatov's fears for his personal

safety were he to travel to New York, the Government stated that it was "willing to give him a safe-passage letter promising that he w[ould] not be arrested or detained when he travel[ed] to the United States for deposition." *Id.* at 2.

To substantiate its opposition to Khudainatov being deposed remotely, the Government first stated "Khudainatov's credibility is front and center in this case. He claims to own the *Amadea*; the Government believes he is lying. For depositions where credibility is at stake, in-person deposition is important and remote deposition is no adequate substitute." *Id.* Then, it explained that Claimants' proposals for a deposition in the various Middle Eastern and Asian countries they offered "pose[d] significant challenges." *Id.* For the Government to take and attend a deposition in many foreign countries, it first needed to seek formal permission—in the form of a Mutual Legal Assistance (MLA) request—from that country's government.[1]  *Id.* After making such a request, the Government would be subject to the foreign country's "law[s] and procedure," which would "dictate the progress and outcomes of th[e] request[]." *Id.* The Government went on to describe MLA requests to the UAE specifically as being "time-consuming and uncertain," and argued that if the Court permitted Khudainatov's deposition to take place there, "the prospect, timing, and conditions of the deposition [would be] at the mercy of whatever the UAE authorities allow[ed]." *Id.* at 2-3.

The Court held a conference on July 26, 2022 to discuss, *inter alia*, the issue of when and where Khudainatov would be deposed. The parties reiterated the respective concerns as raised in their letters, and the Court asked if a safe passage letter would alleviate Claimants' concerns

---

[1] The Government did not represent that it is required to submit MLA request to *every* foreign country where it seeks to participate in a deposition. Indeed, the United States has pre-existing relationships with some countries that obviate the need for MLA requests. No such relationship exists in any of the countries presented by Claimants as places where Khudainatov was willing to sit for his deposition.

regarding Khudainatov sitting for his deposition in New York.  *See* July 26, 2024 Conf. Tr. at 15:2-11, ECF No. 165.  Claimants responded by stating that "an adequately worded safe passage letter would address th[e] concern[s]" outlined in their July 25 letter brief but then raised an additional, brand-new concern: that traveling to the United States would subject Khudainatov "to rather unwanted attention in the Russian Federation from the FSB or the GRU."[2]  *Id.* at 15:15-18; 9:3-7.  During the conference, the Court reserved judgment on the issue of whether Khudainatov could be deposed remotely.  *Id.* at 16:6-18.

After the Conference, the Court issued an order denying without prejudice Claimants' Motion for a Protective Order.  *See* July 26, 2024 Order at 1, ECF No. 159.  That Order directed the Government to produce a draft safe passage letter to Claimants by July 31, 2024.  *Id.*  It also directed the parties to "meet and confer regarding the location of Khudainatov's deposition and . . . file a joint status letter by August 7, 2024, stating either that they were able to reach an agreement or, if necessary, presenting their positions on how Khudainatov's deposition should be taken."  *Id.*

The Government sent a draft safe passage letter to Claimants on July 31, 2024 in compliance with the Court's July 26 Order.  *See* Aug. 7, 2024 Joint Letter, ECF No. 170 (under seal).[3]  But Claimants again stated that Khudainatov would be in danger upon his return to Russia

---

[2] These references appear to be to the Federal Security Service of the Russian Federation (FSB) and to the Main Directorate of the General Staff of the Armed Forces of the Russian Federation (GRU). *See generally* Andrew S. Bowen, Congressional Research Service, Russian Military Intelligence: Background and Issues for Congress (2020), https://crsreports.congress.gov/product/pdf/R/R46616/6.

[3] A redacted, publicly filed version of this letter is located at ECF No. 179.  The Court allowed the parties to file this letter (and subsequent letters regarding Khudainatov's international deposition) under seal because public filing would likely have undermined efforts to obtain approval for the deposition from the countries referenced in the letter and because the letter contained sensitive information regarding U.S. foreign relations.  For similar reasons, in this Opinion, the Court does not name the specific countries referenced in the letters and motions filed under seal.

if he were to sit for a deposition in the United States (or in any U.S. government building overseas) and provided an expert declaration attempting to substantiate that concern. *See* Expert Decl., ECF No. 170-1 (under seal).[4]  Claimants reiterated that Khudainatov was willing to be deposed in the UAE, Azerbaijan, Uzbekistan, and Kyrgyzstan, and they added Vietnam and Tunisia as additional options.  Aug. 7, 2024 Joint Letter at 3.  The Government disputed Claimants' contention that Khudainatov would be in danger simply by virtue of traveling to the United States and requested the Court "order Khudainatov's deposition take place in SDNY under the cover of a safe-passage letter."  *Id.* at 2.

The August 7 letter also reflected the parties' disagreement with respect to which foreign locations were suitable to host Khudainatov's deposition.  The Government stated that it would be unable to participate in depositions in the countries proposed by Claimants without first lodging an MLA request and waiting to see if the relevant authorities subsequently granted permission.  *Id.* ("The Government has confirmed this point with the DOJ's Office of International Affairs—even if a deposition is voluntary, it *cannot* be taken in those jurisdictions without an MLA request to the host government.").  The Government also stated that going through this process was impracticable because it would "put[] the timing and logistics for the deposition at the mercy of whatever the . . . authorities decide to allow."  *Id.*  For their part, Claimants asserted that an MLA request was not necessary and that they "d[id] not understand why Khudainatov's deposition in this civil proceeding would necessitate any request to a foreign government for assistance."  *Id.* at 5.

---

[4] The Court ultimately found Claimants' submissions—including this declaration—regarding potential threats to Khudainatov's safety if he were to travel to New York to be "too general and too conclusory to form a basis for finding good cause for Claimants' requested protective order." *See* Mem. Order at 11-12, ECF No. 312.

On August 12, 2024, the Court held a conference in an attempt to better understand—and resolve—the parties' impasse regarding Khudainatov's deposition location. During the conference, Claimants stated that Khudainatov was unwilling to travel "anywhere within the United States [and] also in countries that are closely aligned with the United States." Aug. 12, 2024 Conf. Tr. at 8:1-6, ECF No. 183. The Government reiterated that it would need to submit an MLA request for all of the countries proposed by Claimants "regardless of the fact that the witness was sitting voluntarily," *id.* at 10:25-11:1-2, and that its "position remain[ed] that Khudainatov should be deposed in New York," *id.* at 15:25-16:1. During the conference, Claimants rejected the Government's suggestion that Khudainatov's deposition take place in the United Kingdom or the Bahamas, *id.* at 8:3-6, and they disputed that the uncertainty regarding how long it might take for the Government's MLA request to be approved constituted good reason not to make the MLA requests in the first place, *see id.* at 12:4-18. Claimants offered no additional countries for the deposition besides those identified in their July 22 letter.

On August 13, 2024, the Court issued an order directing the parties to "meet and confer in good faith to identify a location (1) where the Government can take a voluntary deposition of Claimant Khudainatov in person without an MLAT request and (2) that is acceptable to Claimants." Order at 1, ECF No. 177. The Court directed the parties to submit a status letter within one week—by August 20, 2024—indicating whether the parties had identified a location for the deposition. *Id.* at 2.

On August 20, 2024, the parties filed a joint letter stating that they had "identified two host countries that may be acceptable to both sides." Aug. 20, 2024 Letter, ECF No. 186. Before either location could be confirmed, the Government needed to consult or notify the countries in question. But the Government was "optimistic that such process could take place within a few weeks as to

permit a deposition before the discovery cut-off in th[e] case," which was set for October 18, 2024, at that time.  *Id.*  The parties asked the Court's permission to file a follow-up letter on August 23, 2024, to provide further details.  *Id.*  The Court granted the parties' request to file a status update on August 23.  *See* Mem. Order, ECF No. 187.

Whatever hope the parties' August 20 letter inspired regarding mutual agreement on Khudainatov's deposition location vanished three days later.   In an August 23 letter, the Government listed eight countries where (1) it believed Khudainatov might be willing to travel and (2) it *might* be able to secure the requisite permission from that country's government.  *See* Aug. 23, 2024 Letter, ECF No. 192 (under seal).[5]  It proposed that the deposition take place in either of two of those countries—places where "the deposition could proceed without any need for further approvals from those countries' governments" thus providing a "relatively high degree of confidence that the deposition could take place . . . on a schedule consistent with the Court's discovery schedule."  *Id.* at 2.

Claimants objected to the Government's proposal without explanation, stating that Khudainatov did not need "to provide specific reasons for his rejection" of the two countries the Government proposed.  *Id.* at 2-3.  Instead, they proposed that the deposition take place in a different country on the Government's list of eight, a place where the Government stated that it would need to request permission from the host country's government (and, further, where the Government did not know the timeframe by which it could expect a response from that country's government).  *Id.* at 3.

Over the next four months, across more than a dozen letters and in multiple conferences, the parties continued to argue over where Khudainatov would be deposed.  *See* Mem. Order ("Nov.

---

[5] A redacted, publicly filed version of this letter is located at ECF No. 193.

Order"), ECF No. 312 at 5-7 (describing filings).  All told, the Court extended discovery on four occasions in this case—three times at Claimants' request for purposes that included efforts to resolve the issue of Khudainatov's deposition.  Throughout that process, Claimants continually proposed locations where the Government would be unable to participate in a deposition without first receiving permission from that country's government, while simultaneously rejecting all of the Government's proposed locations.  To attempt to accommodate Claimants, the Government ultimately made several MLA or other diplomatic requests to various countries in which Claimants indicated Khudainatov was willing to be deposed.

On November 15, 2024, the Court issued an Order extending discovery again, for the limited purpose of completing Khudainatov's and two other related depositions.  Nov. 15, 2024 Order, ECF No. 312.  The Court required that the deposition be conducted in person, finding that an in-person deposition was appropriate given Khudainatov's role in this case and explaining its reasoning in detail.  *See id* at 9-14.  The Court also noted that a remote deposition, as proposed by Claimants, would not solve the main logistical difficulty cited by the Government—namely, that to participate in a deposition in *any* country in which Khudainatov was willing to be deposed, be that participation in-person or remote, the Government would need the host country's permission.  *See id.* at 9-11.  The Court observed that the MLA process was impracticable because it was time-consuming, uncertain to succeed, and even if granted could subject the Government to impossibly cumbersome procedural restrictions—such as a requirement that all questions be posed through a legal official of the host country's government in that country's national language (as was the case with at least one country under discussion).  *See id.* at 6.  The Court therefore ordered that the deposition be conducted in a country where the Government could participate without making an MLA request.  *See id.* at 13.  It also advised the parties, *inter alia*, that it would not consider

declarations from witnesses who had not been deposed at the upcoming evidentiary hearing on the Government's pending Motion to Strike.  *See id.* at 14.

It was only at that point that the parties finally appeared to settle on a deposition location. After the Court's November 15 Order, Claimants noticed Khudainatov's deposition to take place on December 13, 2024, or one week before the new discovery cutoff.  Notably, Claimants noticed the deposition in a country previously offered by the Government that they had summarily, unequivocally rejected twice before.  *See, e.g.*, Sept. 6, 2024 Letter at 2, ECF No. 220 (under seal) ("Claimants' indicated that [country] was not acceptable."); Sept. 13, 2024 Letter at 1 n.1, ECF No. 237 (under seal) ("Claimants do not know why the government has sought permission from [country] to hold Khudainatov's deposition there. Claimants have never agreed to hold the deposition of Khudainatov in [country], and thus Claimants do not consent to holding Khudainatov's deposition there regardless of the response from the authorities from [country].").  Nevertheless, because the Government had already received permission from that country to take Khudainatov's deposition, the Government agreed to Claimants' proposal.

Then, at 3:00 A.M. on the morning the Government's litigation team was set to travel to the deposition location, Claimants' counsel emailed the Government to say that Khudainatov had suffered an unspecified "medical emergency" and would not sit for his deposition as scheduled. *See* Gov't Dec. 10, 2024 Emergency Letter, ECF No. 355.  No further details were provided that day to the Government or to the Court.  The following day, Claimants reported that, "after not feeling well, Mr. Khudainatov **went to a hospital near his home, where he was examined** and tested positive for Covid," and that he had been "instructed to remain in 'self isolation' from December 10 until December 16."  Claimants' Dec. 11, 2024 Letter at 1, ECF No. 360 (emphasis added).  Claimants explained that, functionally, this meant that Khudainatov would not know

whether he was healthy enough to travel for his deposition until December 17 at the earliest. *Id.* They proposed that the Government nonetheless travel across the globe to the location in question to take the depositions of two *other* witnesses, *see id.* at 2 (referencing two late-disclosed witnesses for whose depositions the Court had *not* extended discovery), and dangled the possibility—without any assurance—that Khudainatov's could take place on December 20, if he recovered before then. *See id.* at 1-2.

In a letter dated December 11, 2024, the Government agreed to accommodate Claimants' request with respect to rescheduling Khudainatov's deposition to December 20, but with a caveat: Given its need to source a court reporter, videographer, and interpreter available with nine days' notice to travel internationally for a deposition set to take place five days before Christmas, the Government stated that it could only agree to participate in a December 20 deposition if Claimants confirmed his availability by December 12. *See* Gov't Dec. 11, 2024 Letter at 1-2, ECF No. 359. Absent such confirmation, the Government offered to "facilitate [Khudainatov's] entry to the United States (with a safe passage letter) to allow for his deposition to take place before the end of discovery on or before December 20 in New York." *Id.* at 2.

December 12 came and went without Khudainatov confirming if he would be able to sit for his deposition on December 20. So, on December 13, 2024, the Government moved to compel Khudainatov's deposition in New York on December 20, the final day of the discovery period. Mot. to Compel at 1, ECF No. 363 (under seal). The Motion and its accompanying exhibits undermined the veracity of the documents submitted by Khudainatov to substantiate his claim of being ill with COVID-19. Specifically, an attached declaration from FBI Special Agent Todd

McGee, noted several points.[6]  The declaration described Agent McGee's training, experience, and

responsibilities.  Decl. of Todd McGee ("McGee Decl.") ¶ 1, ECF No. 363-1 (under seal).  He

---

[6] The Government moved to temporarily seal McGee's Declaration based on, *inter alia*, the fact that it contained Khudainatov's medical information, anticipating that Claimants would file a subsequent request for permanent sealing.  *See* Gov't Letter Mot. to Seal, ECF No. 362.  Claimants do not appear to have filed any such request.  The Court nonetheless left the McGee Declaration under temporary seal and permitted the parties to redact medical information from or altogether seal other judicial documents submitted in connection with their ongoing discovery dispute, in which the presumption of public access to judicial documents "is generally somewhat lower than the presumption applied to material . . . in connection with dispositive motions."  *Brown v. Maxwell*, 929 F.3d 41, 50 (2d Cir. 2019).

Now, however, the Government's Motion for Sanctions seeks dispositive relief, and the presumption of public access is accordingly higher.  The Court therefore re-analyzes the question whether redaction or sealing of these documents is appropriate in this new context.

As an initial matter, there can be no question that the filings and documents regarding Khudainatov's medical situation are "relevant to the performance of the judicial function and useful in the judicial process," and are therefore "judicial documents" subject to a "presumption of immediate public access."  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 113 (2d Cir. 2006).  "[S]ubmissions relating to [a] sanctions proceeding . . . are 'judicial documents.'"  *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 197, 204 (S.D.N.Y. 2007); *see also CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13 Civ. 2581, 2021 WL 4135007, at *2 (S.D.N.Y. Sept. 10, 2021) ("Because the information defendants wish to redact was submitted for the Court's consideration in response to plaintiffs' motion for sanctions and was related to the Court's decision, the information is plainly included as part of judicial documents.").  Moreover, "the presumptive right to public observation is at its apogee when asserted with respect to documents relating to matters that directly affect an adjudication," as is the case here in light of the case-dispositive relief sought by the Government.  *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004) (internal quotation marks and citation omitted).

Therefore, in accordance with the higher presumption of public access applicable on this dispositive motion, the Court now reconsiders the issue of redacting and sealing the referenced medical records and related filings.  "[T]here is a recognized privacy interest in medical records, although that privacy right is neither fundamental nor absolute."  *United States v. Sattar*, 471 F. Supp. 2d 380, 387 (S.D.N.Y. 2006).  Accordingly, courts sometimes decline to permit the redaction of medical information when submitted in connection with a dispositive motion.  *See, e.g.*, *Robinson v. De Niro*, No. 19 Civ. 09156, 2023 WL 3728350, at *3 (S.D.N.Y. May 26, 2023) (stating that information concerning a "Viagara prescription" would not be redacted because it was "submitted in support of [a] motion for summary judgment").  The presumption of public access is particularly strong here with respect to the Court's Opinion and Order, "in view of the public's legitimate interest in monitoring Article III courts and the longstanding values of openness and self-governance upon which that interest is grounded."  *United States v. Yeghoyan*, No. 20 Crim. 652, 2024 WL 2945976, at *1 (S.D.N.Y. June 11, 2024).  "The Court is mindful that [Khudainatov]

stated that, "based on [his] interviews with persons who are familiar with Russia and Russian healthcare, it is easy to obtain fake medical records of this nature for less than $100, and it is not at all unusual for Russian medical providers to provide such records in exchange for payment." *Id.* ¶ 4. McGee noted that Khudainatov's "medical records are suspicious," noting in particular that his purported "Disability Certificate" stated on its face that it "has not been finalized or has been finalized with error. It is necessary to refer to the person in charge." *Id.* ¶ 3. Most notably, McGee stated that the hospital that issued Khudainatov's COVID-19 results is operated by the City of Moscow and "provides free or low-cost care." *Id.* ¶ 5. It was, therefore, "unlikely" that Khudainatov, who claims in this litigation to own three superyachts collectively worth more than $1 billion, "would seek medical care from such a clinic." *Id.* McGee also observed that other facts cast doubt on Claimants' representations, including information about Khudainatov's purported residence that appeared improbable for someone as wealthy as he claims to be. *See id.* ¶¶ 7-11.

Claimants' subsequent status letter on December 17, 2024 purported to provide an update regarding Khudainatov's health, but it did not directly address (much less refute) the assertions in

---

has a privacy interest in sealing his medical records, but that interest does not outweigh the public's interest under the law in access to court decisions. Absent extraordinary circumstances, federal courts should not exercise power behind closed doors or in secret." *Id.*

Accordingly, the Court does not redact its discussion of Khudainatov's medical condition and medical records, or of any materials submitted by the parties discussing his medical condition or records, from this Opinion and Order. The Court additionally finds that redaction or sealing of its discussion of these materials is inappropriate because of the credibility concerns identified in this Opinion and Order.

Moreover, in light of the discussion above and the fact that the referenced medical records and the parties' submissions regarding them are directly relevant to a motion seeking dispositive relief and are necessarily described in this Opinion, the Court will *sua sponte* direct the relevant documents to be unsealed and made available on the public docket. *See Gambale*, 377 F.3d at 140-42 (explaining that a district court may act sua sponte to unseal judicial documents); *Eagle Star Ins. Co. v. Arrowood Indem. Co.*, No. 13 Civ. 3410, 2013 WL 5322573, at *1 (S.D.N.Y. Sept. 23, 2013) (district court "may sua sponte unseal [judicial] records").

the Government's Motion to Compel casting doubt on the truthfulness of Khudainatov's COVID-19 diagnosis and the veracity of the medical records purporting to substantiate that diagnosis. Instead, Claimants simply submitted *new* medical records from a private hospital purporting prove that he was, in fact, ill. *See* Claimants' Dec. 17, 2024 Letter, ECF No. 369 - 369-3 (under seal). They informed the Court that, because of his purported illness, Khudainatov was unable to sit for a deposition prior to the conclusion of discovery on December 20, and further stated that it was not possible to provide the Court with a confirmed date for a deposition. *See id*. Claimants took pains to note that this was not Khudainatov's fault because he was ill and in fact hospitalized. *See id.* Claimants proposed that the Court allow Khudainatov to sit for his deposition in late January or early February, either during or after the evidentiary hearing. *See id.*

The Court held a conference on December 20, 2024 during which the Government orally modified its motion, seeking to take Khudainatov's deposition the week of January 13, 2025 in New York, assuming he was healthy enough to travel. *See* Dec. 20, 2024 Conf. Tr. 18:15-23, ECF No. 405 (under seal). During the conference, Claimants again did not address the McGee Declaration or its allegations.

Claimants followed up with a status letter on January 3, 2025, stating, *inter alia*, that Khudainatov was "not yet strong enough to travel to sit for a deposition within the next two weeks, prior to the start of the hearing on standing." Claimants' Jan. 3, 2025 Letter, ECF No. 389 (under seal). Again, Claimants did not address the Government's evidence tending to show that the initial records of Khudainatov's purported COVID-19 diagnosis were false.

On January 6, 2025, the Government filed a request to submit materials relevant to Claimants' status letter with an "Attorneys' Eyes Only" ("AEO") designation. *See* Gov't AEO Letter Mot., ECF No. 397. That day, the Court ordered those materials be submitted for *in camera*

review; on review, the Court permitted and directed the Government to file the materials under seal subject to an AEO designation. *See* Order, ECF No. 403. On January 8, 2025, the Government sent the materials to Claimants.

Later on January 8, the Court issued an Order granting the Government's Motion to Compel. *See* Mem. Order, ECF No. 407. The Court explained that, "[w]eighing the evidence before it, the Court ultimately credits the Government's submissions, including the McGee Declaration, undermining the veracity of the records that Claimant submitted concerning his initial Covid-19 diagnosis." *Id.* at 5. In particular, the Court observed that, "[w]hile Claimants have made various submissions including exhibits since then, *see, e.g.*, ECF Nos. 369 (under seal) and 389 (under seal), it is telling that they do not address the assertions in the McGee Affidavit." *Id.* at 5-6. The Court also noted that "the Government's additional submissions cast further doubt on the notion that Khudainatov's deposition cannot take place before the evidentiary hearing set to begin on January 21, 2025." *Id.* at 6. Ultimately, the Court concluded that "Claimants have not submitted credible evidence establishing good cause to postpone Khudainatov's deposition to sometime beyond the week of January 13," and found that, in light of the procedural posture of the case, the relevant factors supported conducting the deposition in the United States. *See id.* The Order directed that Khudainatov's deposition take place in New York during the week of January 13, 2025.

On January 16, Claimants filed a Motion for Reconsideration of the Court's Order granting the Government's Motion to Compel. Claimants' Motion, filed under seal via email, was accompanied by a declaration from Claimants' counsel Adam Ford and five additional exhibits, including various medical records. On January 31, in accordance with a schedule ordered by the Court, the Government filed a Motion for Sanctions for Claimants' violation of the Court's Order

compelling Khudainatov's deposition.  The Government's Motion, also filed under seal via email, was accompanied by a consolidated memorandum of law in support of its Motion for Sanctions and in Opposition to Claimants' Motion for Reconsideration.  On February 14, Claimants filed a consolidated memorandum in opposition to sanctions and reply[7] in support of their Motion for Reconsideration ("Claimants' Opp. and Reply"), accompanied by another declaration from counsel (this time, from Robert Landy) and new supporting exhibits that purported to show the feasibility of the Government's participation in a deposition in a country where Khudainatov maintains that he is willing to sit for one.  The Government filed its Reply in support of its Motion for Sanctions on February 21.  Both motions are now fully briefed.[8]

---

[7] Although Claimants do not style this filing as a "reply," it is their second filing in support of their Motion for Reconsideration, and is therefore undoubtedly a "reply" brief, at least with respect to that motion.  The Court therefore refers to this filing as a "reply" in the context of its discussion of Claimants' motion for reconsideration, and as an "opposition" in the context of its discussion of the Government's motion for sanctions.

[8] On February 28, 2025, Claimants sought "leave to file a sur-reply in response to the governments' [sic] reply to the sanctions motion," Letter Mot. for Leave to File Sur-reply (filed via email under seal), and attached their proposed sur-reply.  Claimants purport to identify two new arguments in the Government's Reply Brief—one regarding their lack of internal legal authorization to travel to the country now proposed by Claimants for Khudainatov's deposition, and one regarding the propriety of future summary judgment practice if the Court were to deny the Government's Motion to Strike.  Having reviewed the parties' submissions, the Court denies leave.  The parties have had ample opportunity over the past seven months to brief these issues; in particular, the issue of the proper location for Khudainatov's deposition was the subject of motions practice for more than six months, during which the parties presented the Court with more than a dozen submissions on the issue.  Under the procedural posture of this case, there is no basis for a sur-reply.  *See Preston Hollow Cap. LLC v. Nuveen Asset Mgmt. LLC*, 343 F.R.D. 460, 466 (S.D.N.Y. 2023) (noting that, where a "party had ample opportunity to address the argument, courts have denied leave to file a sur-reply") (internal quotation marks and citation omitted).  Even assuming that these two arguments are in fact new, the Court does not rely on them in its decision granting the Government's Motion for Sanctions.  Finally, the Court has reviewed the Proposed Sur-Reply and nothing in it would alter the Court's analysis.  Claimants' request is therefore moot.

## THE PARTIES' MOTIONS

**I.    Claimants' Motion for Reconsideration**

**A.   Legal Standard**

A motion for reconsideration is "an extraordinary request." *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 54 (2d Cir. 2019).[9]   The standard for "such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked," which "might reasonably be expected to alter the conclusion reached by the court." *Smith v. CVS Albany, LLC*, No. 20-4000, 2022 WL 3022526, at *1 (2d Cir. Aug. 1, 2022) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).   "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257.   Ultimately, the decision to grant or deny a motion for reconsideration rests within "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)).

**B.   Discussion**

In their motion, Claimants do not "point to controlling decisions or data that the court overlooked." *Shrader*, 70 F.3d at 257.   Instead, they: (1) express their disagreement with the Court's reliance on the McGee Declaration and its credibility determinations, submitting a new declaration from counsel Adam Ford and other "new evidence," in the form of additional documents regarding Khudainatov's purported illness, Claimants' Mot. for Recons. ("Claimants' Recons. Mot.") 3-4; (2) claim (erroneously) that the Court's decision granting the Government's Motion to Compel was based on certain evidence designated as Attorneys' Eyes Only (AEO),

---

[9] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

which Claimants were not given an opportunity to refute, *see id.* at 7, 16; and (3) submit, on Reply, a new declaration from Mr. Ford's co-counsel, Robert Landy, with even more new exhibits, this time about the supposed feasibility of a deposition in their preferred location, "Claimants' Opp. and Reply" 33.  The Court addresses these points in turn.

### 1.   The McGee Declaration and Khudainatov's Purported Illness

First, Claimants argue that the McGee Declaration, which the Court found undermined the credibility of Khudainatov's purported medical emergency, "is unreliable," and they submit new evidence that purports to confirm Khudainatov' COVID-19 diagnosis.  *Id.* at 8.  But Claimants have waived any arguments with respect to the McGee Declaration by failing to raise them earlier. As noted, the McGee Declaration set forth a specific point that undermined the credibility of Claimants' story: namely, that Claimants' representation that Khudainatov "went to a hospital near his home, where he was examined and tested positive for Covid," Claimants' Dec. 11, 2024 Letter at 1, was implausible, because the institution that produced his COVID-19 test results provides free and low-cost health services and Khudainatov claims to be a billionaire.  Neither in their two subsequent submissions nor during a conference with the Court after the McGee Declaration was filed did Claimants respond directly to that (or any other) assertion in the Declaration.[10]  They may not do so now, as "a motion for reconsideration is not a vehicle for litigating issues a party chose not to contest previously."  *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20 Civ. 2102, 2021 WL 3371621, at *5 (S.D.N.Y. Aug. 2, 2021).  While Claimants state that "Claimants' counsel believed they had adequately responded to the McGee Declaration by way of two [other]

---

[10]  It was not until a month after the McGee Declaration, and after the Court granted the Government's Motion to Compel, that Claimants, in their Motion for Reconsideration, sought to refute the assertion in the McGee Declaration that it was implausible Khudainatov would seek treatment for COVID-19 in a clinic that provides free or low-cost case.

medical updates," Claimants' Recons. Mot.    9, that mistaken belief is not a basis for reconsideration.

Claimants also say that the Court's ruling in this regard was based on a misstatement in their initial submission to the Court. *Id.* at 1-2, 2 n.1. While they represented to the Court that Khudainatov "**went to a hospital near his home, where he was examined and tested**," Claimants' Dec. 11, 2024 Letter at 1 (emphasis added), Claimants now say that this statement was a mistake, that Khudainatov was actually treated at home, Decl. of Adam C. Ford in Supp. of Claimants' Mot. for Recons. 2-3, and that his COVID-19 test results were merely processed at the hospital in question. But a motion for reconsideration is not forum "for correcting a *party's* errors." *MSP Recovery Claims, Series LLC*, 2021 WL 3371621, at \*6 (emphasis added). And even if it were, Claimants' counsel offers no credible explanation for his purported misstatement (which he did not correct through two status letters and ultimately addressed only after the Court granted the Motion to Compel). A court is "not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). Based on the totality of the record before it, the Court finds that the changing details of this narrative render it—and Mr. Ford's subsequent representations about it—not credible.[11]

Furthermore, to the extent that Claimants rely on the Ford Declaration's assertion of facts about the Russian medical institution in question and its purported authentication of additional medical records regarding Khudainatov's condition, the Court declines to credit his statements and those materials for several reasons. First, the declaration is prohibited by Local Rule 6.3, which prohibits such statements in support of a motion for reconsideration "unless directed by the court."

---

[11] The Court does not consider the possibility of sanctions against Mr. Ford at this time. However, the Court directs Mr. Ford to review ABA Model Rule of Professional Conduct 3.3 regarding candor to the court.

S.D.N.Y. & E.D.N.Y. Local Civ. R. 6.3.  While Claimants sought leave to file their papers via email, they did not seek leave (or attempt to justify their desire) to submit a declaration, nor did they receive leave from the Court to do so.  For that reason alone, the Court declines to consider Mr. Ford's declaration and the exhibits attached to it in resolving Claimants' Motion for Reconsideration.  *See Ferring B.V. v. Allergan, Inc.*, No. 12 Civ. 2650, 2013 WL 4082930, at *2 (S.D.N.Y. Aug. 7, 2013) ("While [plaintiff] may entitle its submission as a 'Certification of Counsel,' it is essentially a declaration with attached exhibits that 'must be stricken from the record on the ground that Local Rule 6.3 prohibits the submission of affidavits or declarations in connection with a motion for reconsideration absent permission by the court.' . . . The Court did not direct any filings, nor did [plaintiff] seek leave to file such materials.  Accordingly, the [counsel certification] and the accompanying exhibits are stricken.").

But even if the Court were to excuse Claimants' unexplained disregard of Local Rule 6.3, it would still decline to credit Mr. Ford's declaration and the exhibits attached to them because they lack any indicia of reliability.  Throughout the declaration, Mr. Ford repeatedly makes assertions about conditions in Russia—such as whether it is easy to forge medical documents— and various facts about the hospital that provided the medical documents to substantiate Khudainatov's initial COVID-19 diagnosis.  *See, e.g.*, Ford Decl. ¶ 12 ("Based on my investigation, I have learned that this clinic is equipped with the most modern equipment and highly qualified specialists work there.").  In contrast to Agent McGee, *see* McGee Decl. ¶ 1, Mr. Ford does not explain any training, experience, or qualifications that make him qualified to conduct such an "investigation," let alone render his "investigation" and its derivative conclusions reliable. There is no basis to conclude that Mr. Ford has personal knowledge of the facts to which he attests such that he can properly authenticate the documents in question.  *See* Fed. R. Evid. 602 ("A

witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Evid. 802 (stating rule against hearsay).

Moreover, even if the Court were to accept Claimants' exhibits and consider them, the purportedly "new evidence" is merely cumulative, constituting more of the same type of evidence regarding Khudainatov's illness that Claimants previously submitted to the Court in December 2024 and January 2025. These cumulative medical records are not a basis to reconsider the Court's previous decision because they do not directly address the Court's concerns about the veracity of the *first* set of records that Claimants relied on to try to substantiate Khudainatov's COVID-19 diagnosis.

## 2. AEO Materials

Claimants also assert that, in granting the Motion to Compel, the Court improperly relied on certain Attorneys' Eyes Only (AEO) materials without giving Claimants an opportunity to respond. *See* Claimants' Recons. Mot. 16. That is incorrect. Claimants' assertion is belied by the face of the Order itself, which refers to the AEO materials only to note that the Court permitted the Government to file them and that they "cast further doubt on the notion that Khudainatov's deposition cannot take place" before the anticipated evidentiary hearing set to begin on January 21, 2025. *See* Mem. Order 4, 6. But the Order makes clear that, in finding that Claimants' assertions regarding Khudainatov's purported illness were not credible, the Court relied on the *McGee Declaration*—to which Claimants had two opportunities to respond on paper and at least one opportunity to object to in a conference, but did not. *See id.* at 5. Nonetheless, for the avoidance of doubt, the Court makes clear: The Court found that the McGee Declaration was, by itself, a sufficient basis for granting the Motion to Compel because it undermined Claimants'

assertion that Khudainatov was diagnosed with COVID-19 hours before the Government was to board a flight to the location of his deposition—a deposition Claimants delayed for months.  The Court did not rely on the Government's additional AEO materials in ruling to grant the Motion to Compel, and it does not rely on them now in denying Claimants' Motion for Reconsideration.

## II.    New Arguments on Reply

In their Reply, Claimants make a hodge-podge of additional new arguments and requests for relief, and they submit yet another improper declaration.  These are discussed in turn below.

First, Claimants request that discovery be extended so that Khudainatov's deposition can take place in one of several other countries. For the first time, they offer new declarations purporting to show that the Government may participate in a deposition in two of those countries— Uzbekistan and the United Arab Emirates—without obtaining any special legal authorization from those countries' governments.  *See* Claimants' Opp. and Reply 6, 33.  The Court declines to consider the declarations for several reasons.  First, they are barred by Local Rule 6.3, *see supra*. Second, Claimants do not establish that this evidence was unavailable previously, and so they are an improper basis for a motion for reconsideration.  "It is well established that the submission of new evidence is precluded on a motion for reconsideration."  *Davidson v. Scully*, 172 F. Supp. 2d 458, 463 (S.D.N.Y. 2001).  "A motion for reconsideration should not be used to put forward additional arguments which the movant could have made, but neglected to make before judgment." *Id.* at 464 (internal quotation marks and citation omitted).  Claimants offer no explanation why, during the six months that the Court was supervising this dispute over the location of Khudainatov's deposition, they did not submit evidence that purports to undermine the Government's position that it cannot take the deposition in the countries offered by Claimants. The Court declines to consider this extremely belated proffer now.  Third, even if these materials

were the proper subject of a motion for reconsideration, Claimants' arguments about the feasibility of a foreign deposition were not raised in their Opening Brief, but only for the first time on Reply; the Court declines to consider them on that basis alone. *See, e.g.*, *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, No. 23 Civ. 7331, 2024 WL 2963719, at *5 n.3 (S.D.N.Y. June 12, 2024) ("Arguments made for the first time in reply are not properly cognizable"); *United States v. Letscher*, 83 F. Supp. 2d 367, 377 (S.D.N.Y. 1999) ("[A]rguments raised in reply papers are not properly a basis for granting relief"); *Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 843 (2d Cir. 1999) ("New arguments first raised in reply papers in *support* of a motion will not be considered.").

In any event, even if the Court were to credit all of Claimants' submissions suggesting that such a deposition is possible, the Court would still decline to extend discovery in light of the procedural posture of this case—including four previous discovery extensions (three of which were intended at least in part to facilitate this particular deposition) and a week-long evidentiary hearing that has already taken place to determine Claimants' standing to contest forfeiture.

Finally, Claimants also request that the Court permit depositions of four other witnesses. *See* Claimants' Opp. and Reply 33 n.11. These depositions were not the subject of Claimants' Opening Brief; any request with respect to those witnesses is newly raised on Reply and is denied on that basis alone. Additionally, as noted above, the Court has determined that, in light of the procedural posture of this case, re-opening discovery would be inappropriate. And, in any event, nothing offered by Claimants in their cursory footnote satisfies the "strict" standard for the extraordinary relief of reconsideration of the Court's orders regarding the depositions of these witnesses, which were based on factors including that they were not timely disclosed. *See* ECF Nos. 361 and 429.

* * *

In sum, Claimants offer no arguments on their Motion for Reconsideration that meet the applicable standard for their requested extraordinary relief. Instead, they offer shifting explanations, new arguments that could have been raised earlier, new declarations submitted in violation of the Local Rules (and which concern matters to which the declarant, Claimants' counsel Mr. Ford, is not competent to attest), and purportedly new and previously unavailable evidence that is merely cumulative and does not address the basis for this Court's original determination that the medical records on which Claimant initially relied lack credibility. Accordingly, Claimants' Motion for Reconsideration is **DENIED**.

## II.    Motion for Sanctions

### A.  Legal Standard

Rule 37 of the Federal Rules of Civil Procedure[12] "governs the district court's procedures for enforcing discovery orders and imposing sanctions for misconduct." *Icon Int'l, Inc. v. Elevation Health LLC*, 347 F.R.D. 274, 285 (S.D.N.Y. 2024) (quoting *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 158 (2d Cir. 2012)). "A district court has wide discretion in sanctioning a party" under Rule 37. *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). Two provisions of Rule 37 are implicated here.

First, Rule 37(d) addresses sanctions for a party's failure to attend its own deposition and provides that a court may order sanctions if "a party or a party's officer, director, or managing agent . . . fails, after being served with proper notice, to appear for that person's deposition." Rule 37(d)(1)(A)(i). "No court order is required to bring Rule 37(d) into play." 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2291 (3d ed.).

---

[12] All subsequent references to Rules are to the Federal Rules of Civil Procedure.

Second, Rule 37(b) addresses sanctions for failure to comply with a court order, and provides, in relevant part:

(2) Sanctions Sought in the District Where the Action Is Pending.

(A) For Not Obeying a Discovery Order.  If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders.  They may include the following:
…

(iii) striking pleadings in whole or in part;
…

(vi) rendering a default judgment against the disobedient party.

Fed. R. Civ. P. 37(b)(2).

While case dispositive sanctions are "a drastic remedy that should be imposed only in extreme circumstances," the Second Circuit has "recognized the propriety of a dismissal sanction where a party fails to comply with court orders willfully, in bad faith, or through fault."  *Carter v. Jablonsky*, 121 F. App'x 888, 889 (2d Cir. 2005).  The Circuit has stated that,

In considering whether case-dispositive sanctions are within a district court's discretion under Rule 37, [the Court of Appeals] ha[s] relied on the following non-exclusive factors: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance.

*Mirlis v. Greer*, 80 F.4th 377, 381-82 (2d Cir. 2023).  In addition to these four factors, a court may also consider whether there has been prejudice to the party seeking sanctions.  *See City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345, 2019 WL 3281326, at *4 (S.D.N.Y. July 3, 2019) (Nathan, J.), *opinion supplemented on denial of reconsideration*, 2019 WL 3281110 (S.D.N.Y. July 15, 2019).

Ultimately, the imposition of a case-dispositive sanction does not require that all of the relevant factors "be resolved against the party [facing sanctions]," and a district court may

24

"consider the full record in the case in order to select the appropriate sanction." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d. Cir. 2010) (quotation marks omitted).

### B. Discussion

#### 1. The Relevant Factors

The Second Circuit has repeatedly upheld case-dispositive sanctions where a party fails to appear for its own deposition. *See, e.g.*, *S.E.C. v. Razmilovic*, 738 F.3d 14, 27 (2d Cir. 2013); *S.E.C. v. Setteducate*, 419 F. App'x 23, 25 (2d Cir. 2011); *Republic of the Philippines v. Marcos*, 888 F.2d 954, 956-57 (2d Cir. 1989); *Sieck v. Russo*, 869 F.2d 131, 134 (2d Cir. 1989). And there is precedent for case-dispositive sanctions specifically in a forfeiture action where a foreign claimant fails to appear for a deposition. *See, e.g.*, *United States v. All Assets Held at Bank Julius Baer & Co.*, No. 04 Civ. 798, 2019 WL 6970727, at *6 (D.D.C. Sept. 5, 2019), *report and recommendation adopted*, 2019 WL 6910067 (D.D.C. Dec. 19, 2019) (striking foreign forfeiture claimant's claim for failure to attend deposition). Applying the relevant factors to the facts and circumstances of this case, the Court concludes that the Government's requested relief of striking the Claim is appropriate.

#### a. *Willfulness.*

"Failure to appear for a deposition satisfies [any] element of willfulness required for dismissal under Rule 37." *Sease v. Doe*, No. 04 Civ. 5569, 2006 WL 3210032, at *3 (S.D.N.Y. Nov. 6, 2006) (citing *Republic of the Philippines*, 888 F.2d at 956-57). Here, Khudainatov failed to appear for his own deposition three times. First, in June 2024, the Government noticed his deposition to take place on July 15 in the United States. Khudainatov did not appear and did not move for a protective order until a week afterward. In their Opposition, Claimants recount Khudainatov's objections to traveling to the United States. Claimants' Opp. and Reply 8-13. But

whether those objections have merit (and this Court concluded that they do not, *see* Nov. Order) is irrelevant, as failing to appear for a deposition "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order," which Khudainatov did not as of the July 15 date of his deposition. Fed. R. Civ. P. 37(d)(2).

Second, after granting multiple discovery extensions over several months in an attempt to allow the parties to amicably resolve this issue, the Court issued an Order requiring that the deposition take place by December 20, 2024, in a country where the Government would be permitted to take it. *See* Nov. Order. In so ruling, the Court rejected Claimants' concerns about the difficult logistics of travel (which were unsubstantiated[13]), fear of arrest by the United States government (which was addressed through the provision of a safe passage letter), and fear of reprisals by the Russian government if Khudainatov were to travel to the United States or to a country perceived as aligned with the U.S. (a concern that Claimants did not raise in their initial motion for a protective order and which the Court found was supported only by a "conclusory" declaration, *see id.* at 12).

The parties arranged to take Khudainatov's deposition in a remote location, but at the eleventh hour, his counsel notified the Government that he would not appear based on a purported "medical emergency." Khudainatov's failure to appear for his December 2024 deposition before the Court-ordered deadline of December 20 constitutes a violation under Rules 37(b) and (d).

---

[13] That is, Claimants did not argue that Khudainatov *could not* easily travel to New York for his deposition, safety concerns notwithstanding. Instead, Claimants argued that Khudainatov *should not* have to travel to New York City to contest the seizure of the *Amadea* because making him do so would be fundamentally unfair. *But see United States v. Kokko*, No. 06 Crim. 20065, 2007 WL 2209260, at *7 (S.D. Fla. July 30, 2007) ("Absent a showing of good cause . . . a foreign claimant in a federal forfeiture proceeding . . . can be required to be deposed in the district where the action is pending. Furthermore, the time and expense of having to travel to the United States from another country . . . does not constitute an undue burden.").

Khudainatov did not file a motion for any sort of relief, and the Court ultimately deemed his reasons for failing to appear "not credible." Nov. Order at 7. As noted, the Court made that determination by crediting a declaration from FBI Agent McGee that cast doubt on the veracity of medical records purporting to substantiate Khudainatov's initial COVID-19 diagnosis. *See id.* (citing McGee Decl.). Claimants, in two subsequent contemporaneous submissions to the Court, did not respond to the assertions in the McGee Declaration, but simply submitted *new* medical records purporting to substantiate Khudainatov's diagnosis. *See* ECF Nos. 369 and 389.

Now, Claimants again attempt to substantiate the diagnosis with a declaration from counsel disputing the assertions in the McGee Declaration and with yet more medical records attached. As noted, the Court declines to credit the declaration from Mr. Ford because his statements are not based on personal knowledge and/or constitute hearsay. *See* Fed. Rs. Evid. 602, 802. Because the Court does not credit Mr. Ford's declaration, it also declines to credit the medical documents attached to it, which it purports to authenticate. In any event, those documents do not address the problem here: namely, that the documents Claimants initially submitted to substantiate Khudainatov's COVID-19 diagnosis are not credible. Providing *additional* documents does not address the original credibility problem.

Third, the Court granted the Government's Motion to Compel and ordered that Khudainatov's deposition take place during the week of January 13, 2025, *see* Mem. Order, ECF No. 407, and the Government noticed it for January 17. Claimants never made any effort to comply with that Order. Instead, they filed a motion for reconsideration on January 16, the day before the deposition was to take place. But "the filing of a motion to reconsider did not act as a stay of an order." *Fairbaugh v. Life Ins. Co. of N. Am.*, 872 F. Supp. 2d 174, 181 (D. Conn. 2012), *opinion supplemented at id.* (citing cases). A party cannot simply ignore a discovery order by filing a

motion for reconsideration the day before discovery is due, and then grant itself a stay to excuse its non-compliance by pointing to the pending motion. That is, even if Khudainatov were actually ill, that would not excuse his non-compliance because Claimants failed to seek appropriate relief before his scheduled deposition. Khudainatov's failure to appear in January constitutes yet another violation under Rules 37(b) and (d).

And even if the Court were to credit all of Claimants' assertions about Khudainatov's health, that still would not explain his refusal to appear for a deposition in January. As an initial matter, Claimants' own records are inconsistent as to when Khudainatov recovered—one document, dated January 10, 2025, states that the "end date" of Khudainatov's "disability" was December 16, 2024, and that he was cleared to return to work on December 17, 2024. *See* Claimants' Recons. Mot., Ex. C at 2. Another document states that he was discharged on January 13, 2025, and that "[t]he patient is able to work (office work is permitted)." Claimants' Recons. Mot., Ex. A at 2, 7.[14] In any event, none of the records submitted by Claimants states that Khudainatov was unable to travel for a deposition the week of January 13. Any other basis for refusing to travel to the United States for a deposition (e.g., the difficulty of logistics, fear of arrest by the U.S. government, and fear of reprisals by the Russian government) has already been rejected by the Court, and Claimants offer no reason whatsoever in their Motion for the Court to reconsider *those determinations*, let alone anything that meets the "strict" standard for relief. *See Smith*, 2022 WL 3022526, at *1. In sum, Claimants offer no valid excuse for Khudainatov's failure to appear for his January 17 deposition.

---

[14] Claimants attempt to explain away these inconsistencies by describing one document as a "certificate of disability" and the other as a "certificate of discharge," *see* Claimants' Opp. and Reply 29, but do not adequately explain how that distinction explains the discrepancy. These issues are yet another reason to find Claimants' professed "medical emergency" to be not credible.

In short, Khudainatov first willfully refused to appear at the original July 2024 deposition in this case.  He had no pending motion for a protective order to excuse his non-appearance under Rule 37(d)(2).  Then, after being ordered to sit for a deposition before December 20, 2024, he failed to appear again, violating Rules 37(b) and (d).  The Court deemed his claimed medical emergency not credible; but even if it had not, Khudainatov once again had no pending motion for relief when he failed to appear that would excuse his non-appearance.  Finally, after the Court granted the Government's Motion to Compel, he failed to appear for his January 2025 deposition, constituting yet another violation under Rules 37(b) and (d).  Even crediting Khudainatov's supporting medical documents, none of them state that he was still unable to travel during the week of January 13.  And, even if they had, his motion for reconsideration—filed the day before the deposition was scheduled to take place—did not excuse his non-appearance.  In each instance, Khudainatov failed to appear and essentially granted himself relief, sometimes retroactively.  It is difficult to imagine a clearer example of willfulness than this this "continuing saga of dilatory conduct."  *U.S. Freight Co. v. Penn Cent. Transp. Co.*, 716 F.2d 954, 955 (2d Cir. 1983).

### b.  *Availability of Lesser Sanctions*.

Here, the only notion of lesser sanctions is Claimants' suggestion of "fee shifting for a rescheduled deposition," Claimants' Opp. and Reply 27, which Claimants offer at an unspecified point in the future in a country where the Government has, for more than six months, indicated that it lacks legal authority to conduct a deposition.  As explained above, the Court does not consider Claimants' belatedly offered evidence purporting to show that the Government can take a deposition in that country.  And even if it did, the Court would not re-open discovery in light of the procedural posture of this case (which included four discovery extensions). *Cf. S. New England*

*Tel.*, 624 F.3d at 149 (noting that a party's "hopelessly belated compliance should not be accorded great weight").

More importantly, Claimants have offered no real assurance that Khudainatov will ever actually appear for a deposition in a location where the Government is authorized to conduct one. The Court therefore concludes that Claimants have not demonstrated that their proposed lesser sanction is actually available. Even if it were, the availability of lesser sanctions does not prevent a court from ordering case-dispositive sanctions. *See Sieck*, 869 F.2d at 134. Sanctions may still be imposed "[e]ven when a party finally (albeit belatedly) complies with discovery orders." *S. New England Tel.*, 624 F.3d at 149. As noted, given the procedural posture of this case, the Court finds that additional discovery would not be appropriate at this point; any sanction entailing additional discovery, therefore, would not be appropriate either.

### c.  *Duration of non-compliance.*

"[D]urations of time as brief as a few months have been held to weigh in favor of dispositive sanctions. *Loc. Union No. 40 of the Int'l Ass'n of Bridge v. Car-Wi Const.*, 88 F. Supp. 3d 250, 265-66 (S.D.N.Y. 2015) (citing, *inter alia*, *Embuscado v. DC Comics*, 347 Fed.Appx. 700, 701 (2d Cir. 2009) (three months); *Georgiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y. 1996) (four months)).

Khudainatov failed to appear for a deposition noticed on July 15, 2024. The long and tortured saga that ensued is set forth in detail above. The Court extended discovery multiple times over the next six months to try to resolve this issue. In that time, Khudainatov failed to appear for two more noticed depositions. This factor weighs in favor of case dispositive sanctions.

### d. *Explicit Warning.*

"Parties and counsel have no absolute entitlement to be 'warned' that they disobey court orders at their peril." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991). Here, the Court concludes that, in light of the full record and the facts of this case, including the duration of willful non-compliance by Khudainatov, the absence of an explicit warning does not weigh heavily against case dispositive sanctions.

In any event, Claimants have been aware of the possibility of default from the beginning of this dispute, identifying it as a possible consequence of Khudainatov failing to appear for a deposition in their very first letter to the Court regarding this issue on July 22, 2024. *See* ECF No. 149 at 2 (noting that, "should [Khudainatov] refuse to sit for a deposition, the government would swiftly turn to Rule 37 and seek default"). Approximately six months have now passed, as the Government made "Herculean efforts" to secure Claimants' cooperation in Khudainatov's deposition, ECF No. 312 at 143, and the Court expended considerable resources to try to resolve this dispute. "Given the totality of the circumstances, there can be no doubt that the [Claimants] were fully aware that a default judgment could, and in all likelihood, would be imposed." *Loc. Union No. 40*, 88 F. Supp. 3d at 267.

### e. *Prejudice.*

"Purposefully limiting one's adversary's access to discoverable information is undoubtedly prejudicial." *Id.* at 270. Claimants contend that only they were prejudiced by the failure to take Khudainatov's deposition, because his testimony would have been helpful to their case. But their contention—that a party suffers no prejudice from being unable to take their adversary's deposition—finds no support in case law. Claimants deny that Khudainatov is their key witness and point instead to others, including Ekaterina Azarenko Parfireva, an employee in Khudainatov's

31

family office.  *See* Claimants' Opp. and Reply 25.  But as set forth in the Court's Findings of Fact, Parfireva lacked personal knowledge about many of the events she testified about, and in fact relied on documents—*including Khudainatov's declaration*—as the basis for her purported knowledge. Claimants cannot seek to backdoor Khudainatov's statements through another witness' testimony, then claim that the Government was not prejudiced by being deprived of the opportunity to depose him.  Claimants aver that, "[w]ere Mr. Khudainatov to testify, his testimony would be consistent with that [of other witnesses]."  Claimants' Opp. and Reply  2.  But that self-serving characterization is precisely what the Government sought to test.  Denying the Government that opportunity was undeniably prejudicial.

The Government was prejudiced in multiple additional ways.  Discovery was extended several times to try to resolve the issue of Khudainatov's deposition.  During that time, the Government incurred more than $700,000 per month in expenses related to the maintenance of the *Amadea*.  *See* Op. and Order at 3, ECF No. 121.  And the Government spent approximately $20,000 on flights and non-refundable expenditures in preparation for Khudainatov's December 13 deposition, which Claimants unjustifiably canceled last minute.  *See* Gov't Letter Mot. to Compel at 1 n.1 (under seal).

Perhaps more importantly, this Court denied summary judgment because it determined that Khudainatov's declaration—which, contrary to the plain terms of a September 2021 sales agreement (the "September 2021 MOA"), denied that he transferred his ownership interest in the *Amadea*—created a genuine dispute of material fact on the Government's Motion to Strike.  *See* Nov. Order at 4.  Indeed, in reserving judgment on the motion, the Court described Khudainatov as "perhaps the key witness in this case."  *Id.* at 10.  The Court was unable to resolve this case earlier largely *because* of Claimants' reliance on Khudainatov's declaration.  His subsequent

failure to appear prolonged this litigation and resulted in additional time-consuming procedural steps (including a hearing held over several days) that most likely would have been unnecessary otherwise.

But even if the Government had not suffered prejudice, the Court would still find that case dispositive sanctions are appropriate here. "[T]he Second Circuit has recently emphasized that a lack of prejudice should not be given significant weight in the overall analysis." *Loc. Union No. 40*, 88 F. Supp. 3d at 263. The Circuit has explained that it, "along with the Supreme Court, ha[s] consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions." *S. New England Tel. Co.*, 624 F.3d at 148. "Rule 37 sanctions serve other functions unrelated to the prejudice suffered by individual litigants, including "to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault." *Id.* at 149 (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)). As the Second Circuit has explained,

> [I]f parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules. Moreover, . . . compulsion of performance in the particular case at hand is not the sole function of Rule 37 sanctions. Under the deterrence principle of *National Hockey* [*League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) (per curiam)], [a party's] hopelessly belated compliance should not be accorded great weight. Any other conclusion would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall.

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) (internal quotation marks omitted). *See also S. New England Tel. Co.*, 624 F.3d at 149 (holding that district court did not abuse its discretion in concluding that a default sanction here was appropriate to serve these purposes). Here, given the facts of this case—Claimants' willfulness, repeated violations, lack of a credible explanation for their violations, and waste of

judicial resources in managing this dispute—the Court finds that case dispositive sanctions are warranted even without its finding of prejudice.

*    *    *

In sum, after carefully weighing the relevant factors in view of the full record in this case, the Court concludes that this case presents extreme facts warranting dispositive relief against Claimants in the form of striking Khudainatov's Claim. The Court acknowledges that its decision in this regard has weighty consequences but finds them justified in light of the extensive record and duration of Khudainatov's willful non-compliance, the lack of credibility of his proffered reasons, Claimants' failure even now to make a meaningful and realistic offer of compliance, and Khudainatov's repeated practice of failing to comply with deposition notices and court orders without even moving for appropriate relief such as a protective order beforehand.

## 2. Sanctions Against Millemarin

The Government argues that case dispositive sanctions should also be awarded against Claimant Millemarin. As explained below, the Court agrees.

Millemarin is a shell company. It has no employees, and it has a single director. According to Claimants, it is wholly owned and controlled by Khudainatov. At Millemarin's Rule 30(b)(6) deposition, its designee testified that "Millemarin is Khudainatov's company. He's the ultimate beneficial owner. It's a BVI company, and its sole asset is Amadea. That's about it." Millemarin 30(b)(6) Tr. 28:3-28:6. The Government further notes that Khudainatov signed the Verified Claim on Millemarin's behalf. *See* Claim for Prop. at 8, ECF No. 9 (showing claim signed by Khudainatov "as owner of Millemarin Investments Ltd."). Khudainatov also signed each of Millemarin's various discovery responses. *See, e.g.*, GX-701 (Amended Responses to Interrogatories); GX-702 (Second Amended Responses to Interrogatories); GX-704 (Responses to

Requests for Admission).  The Government argues that, under these facts, Millemarin is nothing more than an alter ego of Khudainatov and that he is at least a "managing agent" of Millemarin, such that sanctions against him for his failure to appear at his deposition should also be chargeable to Millemarin.  Gov't Opening Br. at 13-15.

As an initial matter, the Court agrees that the two entities are alter egos of one another: Claimants position in this litigation is that Khudainatov owns the *Amadea* because Millemarin holds title to it.  They argue, in essence, that Millemarin is Khudainatov.  *Cf. Flaks v. Koegel*, 504 F.2d 702, 706 n.6 (2d Cir. 1974) (finding that defendant and his namesake corporation were alter egos—and the corporation's failure to appear at its deposition was imputable to the defendant— "[i]n light of the[ir] virtual identity of interests" and defendant's "complete control over the corporation").  Sanctions against Millemarin are therefore appropriate for that reason, as "courts have not hesitated to impose sanctions on a party when a person who is the 'alter ego' of a party . . . fails to appear for deposition."  *In re Bear Stearns Companies, Inc. Sec., Derivative, & Erisa Litig.*, 308 F.R.D. 113, 120 (S.D.N.Y. 2015); *see also Marcos*, 888 F.2d at 957 (affirming default judgment against plaintiff corporations after their "beneficial owner" failed to attend a deposition in New York where the owner's "interests were so closely intertwined with the plaintiff corporations in commencing this action that he could be considered their alter ego"); *Flaks*, 504 F.2d at 710 n.6 (holding that corporation and its owner were "alter egos" for purposes of sanctions for failure to attend a deposition).

Second, it is appropriate to treat Khudainatov as a managing agent of Millemarin. "Whether an individual is a 'managing agent' [under the Federal Rules of Civil Procedure] . . . is 'answered pragmatically on an *ad hoc* basis.'"  *Iron Mountain (Nederland) Data Ctr. Ger. B.V. v. WSP USA Bldgs., Inc.*, No. 23 Civ. 2858, 2024 WL 2846607, at *1 (S.D.N.Y. May 30, 2024).  Here,

Khudainatov exercised ownership and a degree of control over Millemarin such that it is appropriate to treat him as its managing agent. *See Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 15 F.R.D. 37, 39 (S.D.N.Y. 1953) (explaining that the "principal shareholder," the person who "has influence upon and actual direction of [a corporation's] affairs," is its "managing agent"). Rule 37 provides for sanctions against a corporate party when its "officer, director, or managing agent" fails to attend a deposition. Rule 37(b)(2), (d)(A)(i). Under the facts of this case, the Court finds it appropriate to sanction Millemarin for Khudainatov's conduct.

Claimants do not respond directly to these points—that is, to either the Government's factual showing that Millemarin and Khudainatov share an identity or its legal argument that a company can be subject to sanctions for the conduct of its human alter ego or managing agent. They instead complain that the Government has changed its position—from arguing that Millemarin was owned by Kerimov (the subject of U.S. sanctions, which is the reason for seizure of the *Amadea*) to now claiming that Millemarin is the alter ego of Khudainatov. *See* Claimants' Opp. and Reply 24-25. But Claimants cite no filings by the Government that demonstrate any meaningful change in position. In fact, the Government has maintained all along that both Khudainatov and Millemarin are straw owners of the *Amadea*. There is nothing in its position on this motion that the two are essentially interchangeable—which is based on Claimants' own representations—that contradicts that.

Accordingly, for the reasons stated above, the Court finds that sanctions against Millemarin are also appropriate.

### 3.  Other Issues

In their Opposition, Claimants contend that the Government's Motion for Sanctions is "not [r]ipe" because it "comes at a procedurally improper time."  Claimants' Opp. and Reply  23. According to Claimants, the Court should resolve the Government's Motion to Strike based on standing first—and if the Court finds Claimants lack standing, then the sanctions motion is moot; but if the Court finds that Claimants do have standing, then the sanctions motion should be denied because the Government's requested relief "would have no remedial impact whatsoever."  *Id.*

Claimants' arguments are not entirely coherent.  At any rate, the motion for sanctions is ripe.  After failing to appear for depositions scheduled in July and December 2024, Khudainatov also failed to appear for his January 2025 deposition, which was noticed subject to the Court's Order granting the Government's Motion to Compel.  The Government seeks sanctions based on that non-compliance.  There are no additional facts or circumstances necessary for this sanctions motion to become ripe for judicial review.  *Cf. Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506, 511 (2d Cir. 2014) (observing that a dispute "is not ripe if it depends upon contingent future events that may or may not occur as anticipated, or indeed may not occur at all").  There is nothing contingent about the issues presented on this motion; the fact that the Government has had a separate Motion to Strike pending is irrelevant to whether the issues raised on this Motion for Sanctions are ripe.

It is true that the Court's Findings of Fact and Conclusions of Law on the Government's Motion to Strike provide an independent basis for the relief the Government seeks on this motion. This motion simply presents an alternative basis for the relief sought by the Government, which this Court exercises its discretion to grant.

## CONCLUSION

For the reasons stated above, Claimants' Motion for Reconsideration is **DENIED**. The Government's Motion for Sanctions is **GRANTED**.

Furthermore, the parties' motions to file unredacted versions of these motions and accompanying papers via email with the Court is **GRANTED**. The parties are further directed to file the briefs and all supporting materials in connection with these motions on the public docket, including (1) Claimants' opening papers on their Motion for Reconsideration; (2) the Government's papers in Opposition to the Motion for Reconsideration and in Support of its Motion for Sanctions; (3) Claimants' papers in Reply in Support of their Motion for Reconsideration and in Opposition to the Government's Motion for Sanctions; (4) the Government's papers in Reply in Support of its Motion for Sanctions; and (5) Claimant's Proposed Sur-Reply papers, subject to the following instructions:

- The parties may redact: (1) materials appropriately designated as "Attorneys' Eyes Only" or that describe such material, and (2) sensitive information implicating the United States' relations with foreign governments; provided that such redactions are narrowly tailored (e.g., the names of particular countries), *cf. United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (approving district court's finding that sealing was appropriate because "disclosure of the information sought would impair identified national interests in substantial ways").

- In light of: (1) the Court's determination that any privacy interests asserted by Claimants in medical documents do not overcome the presumption of public access in the context of the Court's resolution the Government's Motion of Sanctions, *see supra*; (2) the Court's discussion of such records in this Opinion; and (3) the Court's credibility findings, the parties shall not file under seal purported medical records and information, or redact discussions of such records and information, from the materials filed on the public docket.

- The parties shall meet and confer on proposed redactions that are narrowly tailored to comply with this Opinion and Order.

  - If the parties agree as to redactions to all filings, they may file all of the relevant documents with their mutually agreed-upon redactions on the public docket; or

    o   If the parties do not agree as to any particular filings, they may submit to the Court via email a single cover letter identifying any disagreements, attaching as exhibits competing versions of each document at issue, highlighting each party's proposed redactions.  After the Court rules on the parties' competing proposed redactions, the parties shall place all of the relevant filings in court-approved redacted form on the public docket.

    o   The parties shall file all of the relevant materials or provide their competing proposed redactions to the Court via email **no later than March 17, 2025**.

For the same reasons, the Court respectfully directs the Clerk of Court to unseal the following documents that discuss or include medical records: ECF Nos. 363-1, 363-2, 363-3, 369. 369-1, 369-2, 369-3, 389, 389-1, 389-2, and 389-3.

    **SO ORDERED.**

Dated:  March 10, 2025
    New York, New York

                              DALE E. HO
                      United States District Judge