UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>     -v-<br><br>THE M/Y AMADEA, A MOTOR YACHT BEARING INTERNATIONAL MARITIME ORGANIZATION NO. 1012531, INCLUDING ALL FIXTURES, FITTINGS, MANUALS, STOCKS, STORES, INVENTORIES, AND EACH LIFEBOAT, TENDER, AND OTHER APPURTENANCE THERETO,<br><br>     Defendant-*In-Rem*,<br><br>     and<br><br>EDUARD YURIEVICH KHUDAINATOV, MILLEMARIN INVESTMENTS LTD.,<br><br>     Claimants. | 23 Civ. 9304 (DEH)<br><br>**MEMORANDUM OF LAW WITH RESPECT TO TAXATION OF STORAGE AND RELATED COSTS** |

**PLAINTIFF UNITED STATES OF AMERICA'S
MEMORANDUM OF LAW WITH RESPECT TO TAXATION OF STORAGE AND
RELATED COSTS**

  As set forth in the Government's notice of taxation of costs, the Government seeks to tax approximately $25,500,000 in actual expenses incurred by the United States Marshals Service (USMS) to maintain and store the *Amadea*. The Government respectfully submits this memorandum of law in support of the taxation of such costs.

  By statute, "[a] court may tax as costs" the "actual expenses incurred" by the USMS for "[t]he keeping of attached property (including boats, vessels, or other property attached or libeled)," including costs for "storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, [and] insurance . . . ." 28 U.S.C. § 1921(a)(1)(E).

1

Here, the USMS has incurred approximately $32,000,000 in "actual expenses" since it took the *Amadea* into custody in Fiji pursuant to a seizure warrant on June 7, 2022. Though all such costs are taxable, the Government seeks to tax only a subset of those costs, specifically, (i) the $9,639,006.79 in expenses that the USMS incurred between Claimants' first assertion of ownership to the Government and the filing of the complaint (September 8, 2022, to October 22, 2023) and (ii) the approximately $16,000,000 in expenses incurred between the filing of the complaint and the judgment of forfeiture (October 23, 2023, to March 18, 2023).[1]

## BACKGROUND

On April 13, 2022, a U.S. magistrate judge issued a warrant for seizure of the *Amadea*, which was then located in Fiji. ECF No. 38-1. The Government transmitted the seizure warrant to the Fijian government, which enforced it, and, after litigation in Fijian courts, delivered the *Amadea* into U.S. Government custody on June 7, 2022. ECF No. 453-2 ¶ 12. The USMS transported the *Amadea* to the United States, where it arrived on June 27, 2022, and has remained in USMS custody ever since.

On September 8, 2022, Khudainatov, through his U.S. counsel, contacted the Government to assert ownership of the *Amadea*. *See* ECF No. 12 at 2; ECF No. 35 ¶ 3; *see* Claimants' 9/8/22 Ltr to Gov't at 2 (asserting that based on their investigation it is "beyond dispute" that Khudainatov is "the true and actual owner of the AMADEA"). Claimants' and Government counsel met for three attorney proffers in December 2022, February 2023, and May 2023. ECF No. 12 at 2.[2]

---

[1] As described in the Declaration of USMS Assistant Chief Jennifer Crane, the invoice for March 2025 is not yet available, but the Government will supplement the notice of taxation with that invoice and a precise total when the invoice becomes available.

[2] Notably, Claimants did not disclose that they had received €225 million from Kerimov's niece for the *Amadea*, a fact which the Government learned only long after the case had been filed. *See* ECF No. 197.

2

Starting in or about mid-June 2023, the parties held more than ten meetings or phone calls concerning settlement. *Id.* Throughout these discussions, Claimants' counsel "consistent[ly]" represented that Claimants owned the *Amadea*. ECF No. 455-1 at ¶ 12; ECF No. 35 ¶ 3. On October 20, 2023, Claimants' counsel informed the Government that they would end settlement discussions. *See* ECF No. 35 ¶ 3

The next business day, October 23, 2023, the United States filed this civil forfeiture action against the *Amadea*. ECF No. 1. On October 31, 2023, the clerk of court issued a warrant of arrest in rem further commanding the USMS to attach and detain the *Amadea*, which was already in USMS custody pursuant to the seizure warrant. ECF No. 39-1; *see* Fed. R. Civ. P., Supp R. G(3)(b)(i). On November 28, 2023, Khudainatov and Millemarin filed a claim, in which Khudainatov declared under penalty of perjury that he "has always been and continues to be the ultimate beneficial owner" of the *Amadea*. ECF 9 at ¶ 7.

On February 9, 2024, the Government moved for interlocutory sale of the *Amadea*, citing the significant expenditures required for the *Amadea*'s upkeep. ECF No. 33. The Government's motion attached the declaration of USMS Assistant Chief Jennifer Crane describing (1) the approximately $600,000 in monthly maintenance costs that the USMS was incurring, (2) the anticipated $5,600,000 that the USMS would incur as part of an upcoming drydock maintenance cycle, and (3) a $1,725,000 annual insurance premium for the *Amadea*. *See* ECF No. 34 (declaration of USMS Assistant Chief Jennifer Crane). Claimants opposed interlocutory sale (even though they had themselves allegedly been attempting to sell the *Amadea* before its seizure). ECF No. 53. Claimants argued that the maintenance costs that the USMS had incurred were "not unexpected or excessive," *id.* at 15, and they submitted the declaration of a marine consultant, who

3

opined that the USMS's expenses were "reasonable, normal and necessary."  ECF No. 53-9.  The Court sustained Claimants' objection to interlocutory sale.  ECF No. 121.

Under the Court's initial discovery scheduling order, fact discovery was due to close on June 24, 2024, and expert discovery on August 8, 2024.  ECF No. 17 at 2-3.  As the case progressed, Claimants repeatedly moved to extend the discovery deadline over the Government's objections.  In October 2024, the Government stated that it would consent to Claimants' fourth such request for a discovery extension if Claimants either withdrew their objection to interlocutory sale or assumed the costs of the *Amadea*'s upkeep.  *See* ECF No. 290 at 1 n.1.  Claimants rejected that proposal (without explanation).  *See id*.  Claimants instead applied to the Court for the proposed several-month extension, which the Court granted, in part.  *See* ECF No. 312.

On March 10, 2025, after an evidentiary hearing, the Court rejected Claimants' contention that they were the *Amadea*'s ultimate beneficial owners, found that Claimants lacked standing, and struck their claim.  *See* ECF No. 467.  On the same day, the Court also issued a ruling that found Khudainatov in "willful non-compliance" with his discovery obligations and ruled that Claimants' "repeated violations [and] lack of a credible explanation for their violations" warranted case-dispositive sanctions.  ECF No. 468 at 33-34.  The Court observed that Khudainatov's failure to sit for his deposition had delayed resolution of the case and, among other things, forced the Government to incur substantial additional expenses in maintaining the *Amadea*.  *See* ECF No. 468 at 32.

The Court entered a judgment of forfeiture on March 18, 2025.  ECF No. 473.

## ARGUMENT

Federal Rule of Civil Procedure 54 provides that costs "should be allowed to the prevailing party," unless a statute, rule or court order provides otherwise.  Fed. R. Civ. P. 54(d)(1).  "Rule

4

54(d)(1) codifies a venerable presumption that prevailing parties are entitled to costs." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). Indeed, "[t]axing costs . . . in favor of the prevailing party is the rule, not the exception, in civil litigation." *Balance Point Divorce Funding, LLC v. Scrantom*, 305 F.R.D. 67, 70–71 (S.D.N.Y. 2015). "Thus, the burden is on the losing party to show that costs should not be imposed." *Hamptons Locations, Inc. v. Rubens*, No. 01-CV-5477 DRH WDW, 2010 WL 3522808, at *2 (E.D.N.Y. Sept. 2, 2010). "It is well established that the United States may recover costs in civil actions as if it were a private individual." *United States v. Thompson*, 596 F. Supp. 2d 538, 545 (E.D.N.Y. 2009).

"28 U.S.C. § 1921 expressly lists what USMS expenses may be taxed as costs." *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 250 (2d Cir. 2004). Section 1921 provides in relevant part:

> The United States marshals or deputy marshals shall routinely collect, and <u>a court may tax as costs</u>, fees for the following: . . . (E) [t]he keeping of attached property (including boats, vessels, or other property attached or libeled), actual expenses incurred, such as storage, moving, boat hire, or other special transportation, [and] insurance . . . .

28 U.S.C. § 1921(a)(1) (emphasis added).

Consistent with the plain language of the statute, courts have taxed USMS's storage costs against unsuccessful forfeiture claimants. Thus, for example, the Ninth Circuit affirmed an award of costs to the Government for "the amount paid by the Marshal for storage of [slot] machines" that were defendants in rem in a forfeiture case. *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 701 (9th Cir. 1981); *see id.* (explaining that such an award "was provided for" by Section 1921). Likewise, in *United States v. Various Gambling Devices*, 368 F. Supp. 661 (N.D. Miss. 1973), the Court taxed forfeiture claimants under § 1921(a)(1)(E) with the "substantial marshals' fees for actual storage costs" that the Government had incurred. *Id.* at 668. Similarly,

5

in *United States v. One 1949 G.M.C. Truck*, 104 F. Supp. 34 (E.D. Va. 1950), the Court taxed "storage charges" against an unsuccessful forfeiture claimant. *Id.* at 39.

Other cases also recognize that such storage costs may be taxed pursuant to Section 1921. *See, e.g.*, *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 644 fn. 14 (7th Cir. 1991) ("Section 1921 . . . specifically provides for the recovery of storage costs in seizure cases"); *United States v. One 48 Ft. White Colored Sailboat Named LIBERTINE*, 59 F. Supp. 2d 362 (D.P.R. 1999) (relying on § 1921 to tax marshals' storage fees for a vessel against the government); *Storage or similar caretaking charges as taxable costs in proceeding to forfeit personal property*, 60 A.L.R.2d 813 (Orig. 1958) ("In a number of Federal cases involving forfeiture proceedings it is obvious that the propriety of allowing storage or similar charges as taxable costs was assumed.").

Taxation of storage costs is also consistent with the practice in cases that predate or have otherwise not relied on the express grant of statutory authority in the current version of 28 U.S.C. § 1921. *See United States v. 480 Empty Half Barrels*, 36 F.2d 772, 772-73 (2d Cir. 1929) (affirming taxation of marshal's storage costs against forfeiture claimants as consistent with "justice and equity"); *Avignone v. United States*, 12 F.2d 509, 511 (2d Cir. 1926) ("hold[ing] . . . that the charge is on the claimants" as to "who shall bear the expenses of caring for the liquors" in forfeiture case); *Williams v. United States*, 254 F. 48, 50 (5th Cir. 1918) (same); *Barwil ASCA v. M/V SAVA*, 44 F. Supp. 2d 484, 489 (E.D.N.Y. 1999) (relying on admiralty principles to tax costs "incurred by plaintiffs to preserve and maintain the Vessel while it remained in custody"); *United States v. D.K.G. Appaloosas, Inc.*, 829 F.2d 532, 539 (5th Cir. 1987) (affirming partial taxation of maintenance costs as consistent with the "equities implicated by the facts of [the] particular case").

For these reasons, the Court should tax the "actual expenses incurred" by the USMS for "the keeping of attached property." 28 U.S.C. § 1921(a)(1)(E). Property is "attached" when it is "take[n] or seized under legal authority." BLACK'S LAW DICTIONARY (12th ed 2024); *see* WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d. ed. 1942) (defining "attachment" as "a seizure or taking into legal custody by virtue of a legal process"). Thus, the *Amadea* became "attached property" pursuant to 28 U.S.C. § 1921(a)(1)(E) by the time it was seized and delivered to USMS custody on June 7, 2022. Thus, all the USMS's expenses for "keeping" the *Amadea* since that time are taxable under the statute, including even the costs of transporting it from Fiji to the United States. *See* 28 U.S.C. § 1921(a)(1)(E) (making costs for "moving" or "special transportation" of attached property taxable).

Nonetheless, the Government seeks to tax only that portion of the approximately $32 million in actual expenses that the USMS incurred during the period in which Khudainatov, through his repeated, unsubstantiated assertion that he was the true owner of the *Amadea* and his litigation decisions delayed and protracted these proceedings. Specifically, the Government seeks to tax only (i) the $9,639,006.79 in actual expenses that the USMS incurred from the date of Claimants' first direct contact with the Government, in which they made an unfounded assertion of ownership until the filing of the complaint (September 8, 2022 to October 22, 2023) and (ii) the approximately $15,758,433.20 (plus a to-be-determined amount from March 2025) in actual expenses that the USMS incurred from the filing of the complaint to the date of judgment of forfeiture (October 23, 2023 to March 18, 2025). These approximately $25,500,000 in costs, which are further described in the declaration of Jennifer Crane, were all incurred for "the keeping

7

of" the *Amadea*, and include expenses for the *Amadea*'s "storage, moving, . . . [and] insurance." 28 U.S.C. § 1921(a)(1)(E).[3]

There is no reason to depart from the general "rule" that these costs should be taxed. *Point Divorce Funding, LLC*, 305 F.R.D. at 70–71. To the contrary, there are compelling reasons to adhere to that rule. First, Claimants have already conceded that the costs that the USMS incurred or anticipated by February 2024 were "reasonable, normal and necessary," ECF No. 53-9, and as described in the Crane declaration, the costs incurred after that date are consistent with (and in some cases less than) the charges Ms. Crane previously described.

Second, Khudainatov has the means to pay, and, in any event, "costs may be imposed even upon litigants who proceed *in forma pauperis*." *Vails v. Police Dep't of City of New York*, No. 96 CIV. 5283 (DC), 1999 WL 970490, at *1 (S.D.N.Y. Oct. 22, 1999).

Third, Claimants—who were mere straw owners—unnecessarily caused the USMS to incur vastly increased costs, which it could have otherwise avoided. Since Claimants' first contact with the Government, they "consistent[ly]" (ECF No. 455-1 at ¶ 12), and unfoundedly, asserted that Khudainatov was the true owner of the *Amadea*. ECF Nos. 12 at 2; 455-1 at ¶ 12). Indeed, Claimants failed to disclose that Kerimov's niece had paid them €225 million for the *Amadea*, even as they asserted to the Government that Millemarin and Khudainatov (not Kerimov) owned the *Amadea*—furthering the very sort of concealment scheme that the straw ownership doctrine was designed to pierce. *See* n. 2, *supra*.

Once the Government filed the forfeiture case, Claimants intervened to oppose forfeiture and "through their intervention the proceedings were delayed," *Williams*, 254 F.33d at 50, even

---

[3] The Government is not seeking to tax expenses the USMS incurred before Khudainatov made direct assertions of ownership to the Government, including the costs for transportation of the yacht to the United States.

8

though they did not hold a cognizable legal interest in the *Amadea*. Were it not for Claimants' conduct, the USMS would have sold or otherwise disposed of the *Amadea* without incurring massively increased costs. *See Williams*, 254 F.33d at 50 (taxing storage costs incurred during a forfeiture case for this reason); *Avignone*, 12 F.2d at 511 (holding claimants should pay storage costs to the extent "increased by intervention of the claimants").

Claimants' conduct during the case also caused the costs to increase. This Court has already found that Khudainatov's willful refusal to sit for a deposition delayed the case's resolution and caused the USMS to incur substantial additional costs. *See* ECF No. 468 at 32; *cf. Whitfield v. Scully*, 241 F.3d 264, 272 (2d Cir. 2001) (even a party's good faith does not prevent taxation of costs). Moreover, Claimants opposed interlocutory sale both when the Government first moved for it in February 2024, ECF No. 33, and when the Government proposed it again in October 2024. ECF No. 290 at 1 n.1. In short, Claimants have done nothing to mitigate the storage costs incurred by the USMS. To the contrary, Claimants did much to increase those costs.[4]

## CONCLUSION

For the foregoing reasons, the Court should tax Claimants with (i) the $9,639,006.79 in actual expenses incurred by the USMS for the "keeping" of the *Amadea* from September 8, 2023, to October 22, 2023, and (ii) the $15,758,433.20 (plus a to-be-determined amount for March 2025) in costs incurred from October 23, 2023, to March 18, 2025.

---

[4] Indeed, Claimants' efforts to block a sale continue even after this Court's ruling: Claimants have, through counsel, reportedly threatened "to challenge any illegitimate sale or transfer through international legal channels," and warned that the Court's judgment of forfeiture—which they characterized as a "miscarriage of justice"—may not be respected "[i]f the vessel is taken beyond US jurisdiction." Conor Feasey, What's Next for the Amadea, SuperYacht News (March 25, 2025), *available at* https://www.superyachtnews.com/opinion/what-is-next-for-amadea.

          Respectfully submitted,

          MATTHEW PODOLSKY
          Acting United States Attorney
          Southern District of New York

By:   */s/ Dominika Tarczynska*
          DOMINIKA TARCZYNSKA
          RACHAEL DOUD
          Assistant United States Attorneys

          MARGARET A. MOESER
          Chief
          Money Laundering and Asset Recovery
          Section, Criminal Division
          U.S. Department of Justice

By:   */s/ Joshua L. Sohn*
          JOSHUA L. SOHN
          D. HUNTER SMITH
          LINDSAY P. GORMAN
          Trial Attorneys
          Money Laundering and Asset Recovery
          Section